FILED
CLERK, U.S. DISTRICT COURT

June 22, 2023

CENTRAL DISTRICT OF CALIFORNIA
BY: _____JD_____ DEPUTY

AO 241 (Rev. 09/17)

### PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

| United States District Court | District: Central District of California |
|---|---|

| Name (under which you were convicted):<br><br>Superior Court of California for the County of Orange | Docket or Case No.:<br><br>8:22-cv-01640 |
|---|---|

| Place of Confinement : | Prisoner No.: |
|---|---|

| Petitioner (include the name under which you were convicted)<br><br>Xingfei Luo | Respondent (authorized person having custody of petitioner)<br><br>The People of California |
|---|---|
| | v. |

| The Attorney General of the State of: California |
|---|

## [PROPOSED] FIRST AMENDED PETITION

1. (a) Name and location of court that entered the judgment of conviction you are challenging:

   Superior Court of California for the County of Orange

   700 Civic Center Drive West, Santa Ana, CA 92701

   (b) Criminal docket or case number (if you know):   19CM06724

2. (a) Date of the judgment of conviction (if you know):   07/29/2021

   (b) Date of sentencing:   08/13/2021

3. Length of sentence:   3 years probation

4. In this case, were you convicted on more than one count or of more than one crime?   ☑ Yes   ☐ No

5. Identify all crimes of which you were convicted and sentenced in this case:

   Count 1: Vandalism-less than $400 in damages

   Restitution

   Count 2: Disobeying domestic relations court order

   30 days jail, 8 hours Community Service, batterer intervention program, 3 years Probation,  Restitution

   Count 3: Disorderly conduct unlawful dissemination of private photographs and recordings

   Sentenced Suspended

6. (a) What was your plea? (Check one)

   ☑ (1)   Not guilty        ☐ (3)   Nolo contendere (no contest)

   ☐ (2)   Guilty            ☐ (4)   Insanity plea

AO 241 (Rev. 09/17)

(b) If you entered a guilty plea to one count or charge and a not guilty plea to another count or charge, what did you plead guilty to and what did you plead not guilty to?

_____

_____

_____

_____

_____

_____

(c) If you went to trial, what kind of trial did you have? (Check one)

☑ Jury    ☐ Judge only

7.    Did you testify at a pretrial hearing, trial, or a post-trial hearing?

☐ Yes    ☑ No

8.    Did you appeal from the judgment of conviction?

☑ Yes    ☐ No

9.    If you did appeal, answer the following:

(a) Name of court:    Appellate Panel, Superior Court of California for the County of Orange

(b) Docket or case number (if you know):    30-2021-01216615-CL-MC-CJC

(c) Result:    Affirm

(d) Date of result (if you know):    04/27/2022

(e) Citation to the case (if you know):    _____

(f) Grounds raised:    First, Fifth, Sixth, and Fourteenth Amendments violation

_____

_____

_____

_____

_____

_____

(g) Did you seek further review by a higher state court?    ☑ Yes    ☐ No

If yes, answer the following:

(1) Name of court:    Court of Appeal

(2) Docket or case number (if you know):    G061132

(3) Result:    Denied transfer of appeal

_____

AO 241 (Rev. 09/17)

(4) Date of result (if you know):     03/03/2022

(5) Citation to the case (if you know):

(6) Grounds raised:     First, Fifth, Sixth, and Fourteenth Amendments violation

(h) Did you file a petition for certiorari in the United States Supreme Court?     ☑ Yes     ☐ No

If yes, answer the following:

(1) Docket or case number (if you know):     21-8023

(2) Result:     DISTRIBUTED for Conference of 9/28/2022

(3) Date of result (if you know):

(4) Citation to the case (if you know):

10.    Other than the direct appeals listed above, have you previously filed any other petitions, applications, or motions concerning this judgment of conviction in any state court?     ☑ Yes     ☐ No

11.    If your answer to Question 10 was "Yes," give the following information:

(a)    (1) Name of court:     Orange County Superior Court

(2) Docket or case number (if you know):     M-19285

(3) Date of filing (if you know):     10/13/2021

(4) Nature of the proceeding:     Habeas corpus petition

(5) Grounds raised:     First, Fifth, Sixth, and Fourteenth Amendments violation

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

☐ Yes     ☑ No

(7) Result:     Denied

AO 241 (Rev. 09/17)

(8) Date of result (if you know): 10/19/2021

(b) If you filed any second petition, application, or motion, give the same information:

(1) Name of court: California Court of Appeal

(2) Docket or case number (if you know): G060841

(3) Date of filing (if you know): 11/08/2021

(4) Nature of the proceeding: Habeas corpus petition

(5) Grounds raised: First, Fifth, Sixth, and Fourteenth Amendments violation

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

☐ Yes   ☑ No

(7) Result: denied

(8) Date of result (if you know): 11/10/2021

(c) If you filed any third petition, application, or motion, give the same information:

(1) Name of court: California Court of Appeal

(2) Docket or case number (if you know): G061132

(3) Date of filing (if you know): 02/18/2022

(4) Nature of the proceeding: Habeas corpus petition

(5) Grounds raised: First, Fifth, Sixth, and Fourteenth Amendments violation

AO 241 (Rev. 09/17)

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

☐ Yes   ☑ No

(7) Result:   denied

(8) Date of result (if you know):   03/03/2022

(d) Did you appeal to the highest state court having jurisdiction over the action taken on your petition, application, or motion?

(1) First petition:   ☐ Yes   ☑ No

(2) Second petition:   ☐ Yes   ☑ No

(3) Third petition:   ☐ Yes   ☑ No

(e) If you did not appeal to the highest state court having jurisdiction, explain why you did not:

I filed a habeas corpus petition in state supreme court and exhausted all state remedies.

12.   For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States.  Attach additional pages if you have more than four grounds.  State the facts supporting each ground.  Any legal arguments must be submitted in a separate memorandum.

**CAUTION: To proceed in the federal court, you must ordinarily first exhaust (use up) your available state-court remedies on each ground on which you request action by the federal court.  Also, if you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.**

**GROUND ONE:**   See appendix

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

See appendix

(b) If you did not exhaust your state remedies on Ground One, explain why:

AO 241 (Rev. 09/17)

(c)     **Direct Appeal of Ground One:**

(1) If you appealed from the judgment of conviction, did you raise this issue?     ☑ Yes     ☐ No

(2) If you did not raise this issue in your direct appeal, explain why:     I received ineffective assistance of

counsel

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☑ Yes     ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition:     habeas corpus

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):     Denied

(3) Did you receive a hearing on your motion or petition?     ☐ Yes     ☑ No

(4) Did you appeal from the denial of your motion or petition?     ☐ Yes     ☑ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?     ☐ Yes     ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

I filed a habeas corpus petition in a higher court instead of appeal the petition

AO 241 (Rev. 09/17)

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have

used to exhaust your state remedies on Ground One: _____

_____

_____

**GROUND TWO:**                    See appendix

_____

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

See appendix

_____

_____

_____

_____

_____

_____

_____

(b) If you did not exhaust your state remedies on Ground Two, explain why: _____

_____

_____

(c)      **Direct Appeal of Ground Two:**

(1) If you appealed from the judgment of conviction, did you raise this issue?      ☑ Yes      ☐ No

(2) If you did <u>not</u> raise this issue in your direct appeal, explain why:   I received ineffective assistance of couns

_____

(d)      **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☑ Yes      ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition:      Petition for a writ of habeas corpus

Name and location of the court where the motion or petition was filed: _____

_____

Docket or case number (if you know): _____

AO 241 (Rev. 09/17)

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):    Denied

_____

_____

(3) Did you receive a hearing on your motion or petition?                      ❑   Yes    ☑   No

(4) Did you appeal from the denial of your motion or petition?               ❑   Yes    ☑   No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?   ❑   Yes    ❑   No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

I filed a habeas corpus petition in a higher court instead of appeal the petition

_____

_____

_____

(e)    **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you

have used to exhaust your state remedies on Ground Two : _____

_____

_____

**GROUND THREE:**        See appendix _____

_____

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

See appendix

_____

_____

_____

_____

AO 241 (Rev. 09/17)

(b) If you did not exhaust your state remedies on Ground Three, explain why:

(c)  **Direct Appeal of Ground Three:**

(1) If you appealed from the judgment of conviction, did you raise this issue?    ☑ Yes    ☐ No

(2) If you did not raise this issue in your direct appeal, explain why:    I received ineffective assistance of counsel

(d)  **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☑ Yes    ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition:    habeas corpus

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion or petition?    ☐ Yes    ☑ No

(4) Did you appeal from the denial of your motion or petition?    ☐ Yes    ☑ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?    ☐ Yes    ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

AO 241 (Rev. 09/17)

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

_____

_____

_____

(e)      **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you

have used to exhaust your state remedies on Ground Three: _____

_____

_____

**GROUND FOUR:**   See appendix

_____

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

See appendix

_____

_____

_____

_____

_____

_____

(b) If you did not exhaust your state remedies on Ground Four, explain why: _____

_____

_____

_____

(c)      **Direct Appeal of Ground Four:**

(1) If you appealed from the judgment of conviction, did you raise this issue?     ☑ Yes      ☐ No

(2) If you did not raise this issue in your direct appeal, explain why:   I received ineffective assistance of

counsel

_____

(d)      **Post-Conviction Proceedings**:

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☑ Yes      ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition:    Petition for a writ of habeas corpus

AO 241 (Rev. 09/17)

Name and location of the court where the motion or petition was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):   Denied _____

_____

_____

(3) Did you receive a hearing on your motion or petition?                    ❏  Yes      ☑ No

(4) Did you appeal from the denial of your motion or petition?               ❏  Yes      ☑ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?   ❏  Yes   ❏  No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

I filed a habeas corpus petition in a higher court instead of appeal the petition _____

_____

_____

_____

_____

_____

(e)      **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you

have used to exhaust your state remedies on Ground Four: _____

_____

_____

_____

_____

_____

_____

AO 241 (Rev. 09/17)

13.     Please answer these additional questions about the petition you are filing:

(a)     Have all grounds for relief that you have raised in this petition been presented to the highest state court

having jurisdiction?     ☑ Yes     ☐   No

If your answer is "No," state which grounds have not been so presented and give your reason(s) for not

presenting them:   I received ineffective assistance of counsel

_____

_____

_____

(b)     Is there any ground in this petition that has not been presented in some state or federal court?  If so, which

ground or grounds have not been presented, and state your reasons for not presenting them:

_____

_____

_____

14.     Have you previously filed any type of petition, application, or motion in a federal court regarding the conviction

that you challenge in this petition?          ☐    Yes     ☑ No

If "Yes," state the name and  location of the court, the docket or case number, the type of proceeding, the issues

raised, the date of the court's decision, and the result for each petition, application, or motion filed.  Attach a copy

of any court opinion or order, if available.   _____

_____

_____

_____

_____

_____

_____

15.     Do you have any petition or appeal now pending (filed and not decided yet) in any court, either state or federal, for

the judgment you are challenging?          ☐    Yes     ☑ No

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues

raised.   _____

_____

_____

_____

_____

AO 241 (Rev. 09/17)

16.     Give the name and address, if you know, of each attorney who represented you in the following stages of the

        judgment you are challenging:

        (a) At preliminary hearing:   Kevin Stephens, Alison Chabot, Gagandeep Waraich, Daniel Maher

        801 W Civic Center Dr, Ste 300, Santa Ana, CA 92701

        (b) At arraignment and plea:   Michael Morrison

        801 W Civic Center Dr, Ste 300, Santa Ana, CA 92701

        (c) At trial:   Jorge Dominguez

        801 W Civic Center Dr, Ste 300, Santa Ana, CA 92701

        (d) At sentencing:   Jorge Dominguez

        801 W Civic Center Dr, Ste 300, Santa Ana, CA 92701

        (e) On appeal:   Robert L Bullock

        5130 E La Palma Ave Ste 210, Anaheim, CA 92807

        (f) In any post-conviction proceeding:   None


        (g) On appeal from any ruling against you in a post-conviction proceeding:   None



17.     Do you have any future sentence to serve after you complete the sentence for the judgment that you are

        challenging?          ☐  Yes      ☑  No

        (a) If so, give name and location of court that imposed the other sentence you will serve in the future:



        (b) Give the date the other sentence was imposed:

        (c) Give the length of the other sentence:

        (d) Have you filed, or do you plan to file, any petition that challenges the judgment or sentence to be served in the

        future?          ☐  Yes      ☐  No

18.     TIMELINESS OF PETITION: If your judgment of conviction became final over one year ago, you must explain

        why the one-year statute of limitations as contained in 28 U.S.C. § 2244(d) does not bar your petition.*

AO 241 (Rev. 09/17)

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2244(d) provides in part that:

(1)     A one-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody  pursuant to the judgment of a State court.  The limitation period shall run from the latest of -

(A)     the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B)     the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such state action;

(C)     the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D)     the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

AO 241 (Rev. 09/17)

(2)    The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

Therefore, petitioner asks that the Court grant the following relief:    Reverse Petitioner's convictions and find her

innocent.

_____

or any other relief to which petitioner may be entitled.


_____

Signature of Attorney (if any)


I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Petition for

Writ of Habeas Corpus was placed in the prison mailing system on _____06/04/2023_____ (month, date, year).


Executed (signed) on _____06/04/2023_____ (date).


                                                     /s/ Xingfei Luo
_____

Signature of Petitioner

If the person signing is not petitioner, state relationship to petitioner and explain why petitioner is not signing this petition.

_____

_____

_____

_____

1   XINGFEI LUO

2   PO BOX 4886,

3   El Monte, CA 91734

4

5   Petitioner in Pro Se

6

7

8                    **UNITED STATES DISTRICT COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10

11   XINGFEI LUO,                              No. 8:22-cv-01640-MEMF-KES

12                    Petitioner,

13            v.                               **APPENDIX TO FIRST AMENDED**
                                               **PETITION FOR WRIT OF HABEAS**
14   THE PEOPLE OF THE STATE OF               **CORPUS**
     CALIFORNIA
15
                     Respondent.
16

17

18

19

20                               **INTRODUCTION**

21          After Hanh Le's cheating husband, a shameless nudist, Tomas Czodor (Czodor),

22   faked his damages and injuries, Xingfei Luo (Petitioner) was charged by Orange County

23   District Attorney (OCDA)'s misdemeanor complaint, on Aug 6, 2019, with vandalism

24   (Pen. Code, §594{a)/(b)(2)(A)), violation of a protective order (Pen. Code, §273.6(a)) (by

25   coming within 100 yards of the protected person), and disorderly conduct (unlawful

26   dissemination of private photographs and recordings) (Pen. Code, §647(j)(4))(A). CT 1-

27   2.[1] 720 days after the original complaint was filed, despite no finding of good cause to

28   _____
     [1] For purposes of citation, the Reporter's Transcript on Appeal is referred to as RT. The Clerk's Transcript on Appeal
     is referred to as CT. Appeal opinion, the RT and the CT are attached as Exhibit 1. ECF 3.

                                               1

1  justify any belated amendment, the complaint was illegally permitted to amend from

2  allegation of coming within 100 yards of the protected person to failure to deactivate

3  website and created new websites. CT 66-67.

4       After being astonished by public defender's poor performance at trial, Petitioner

5  had to conduct her own investigation which has revealed that the prosecution withheld

6  several material pieces of evidence which would destroy the veracity and credibility of the

7  prosecution's star witness who was the sole witness testified at trial. Petitioner also

8  discovered shocking information of Czodor's background which should have been

9  investigated by public defender and such failure constitutes ineffective assistance of

10  counsel that prejudiced Petitioner.

11       At trial, the state's theory was that (1) Czodor and Petitioner had a dating

12  relationship; (2) After a fallout in the relationship Petitioner threatened to publish

13  Czodor's nude photos and did so after making those threats between Sep 5 and Sep 7,

14  2018 and the following week Czodor reported the said incidents to police; (3) Petitioner

15  scratched Czodor's front door on Sep 18, 2018 for 20 minutes but Czodor discovered the

16  damages on Sep 19, 2018 because it was dark at night. Czodor took photos of the

17  damaged door on Sep 25, 2018 in order to make a police report the next day; (4) Petitioner

18  did not remove websites as the family court ordered and created new websites.

19       But in fact, (1) When Czodor connected with Petitioner, he posed himself as a

20  single man never married but actually he has been married for over ten years. Czodor was

21  seeking casual hook-ups to cheat on his wife. During the entire contact between Petitioner

22  and Czodor, Petitioner never told Czodor her full name. They never had a relationship; (2)

23  Hanh Le's cheating husband, Czodor, is a nudist who believes becoming nude increases

24  confidence. He sent his nude photos to Petitioner when he did not even know Petitioner's

25  full name. Decl. Luo, ¶6. Czodor never asked Petitioner to keep his photos private nor did

26  he receive Petitioner's promise to keep his photos private. The screenshots of the

27  threatening messages have no metadata and no one can tell whether they were falsified or

28  edited. On Sep 10, 2018, the following week after Petitioner allegedly threatened to post

2

his nude photos and did so, Czodor made a police report alleging unfounded terrorism, completely contrary to his testimony; The customer Czodor alleged she told him about his nude photos online never existed; (3) The front door area was brightly lit on Sep 18, 2018, Czodor was able to constantly take photos and shoot videos, it is impossible that he could not discover the damage on Sep 18, 2018 after hearing 20 minutes scratching. The 911 call made on Sep 18, 2018 did not indicate a word regarding scratching a door despite Czodor heard 20 minutes of scratch. The day before Czodor took a photo of his damaged door, on Sep 24, 2018, Czodor learned that the removal of a post related to his credibility would cost money. In order to frame Petitioner, Czodor damaged his own door and took photos on Sep 25, 2018 or the photos of the damaged door were falsified or manufactured using editing software; (4) both orders issued by the family court were unlawful and invalid.

Petitioner, a victim of false accusations, shoddy police work, bad lawyering, prosecutorial misconduct and extreme malfunctions in the state criminal justice systems, seeks relief to vacate her conviction due to actual innocence and violations of First, Fifth, Sixth, and Fourteenth Amendments of the United States Constitution.

## FACTS THE JURY HEARD AND FACTS THE JURY DID NOT HEARD

### I.   THE ISSUANCE OF TWO UNLAWFUL FAMILY COURT ORDERS (TRO AND DVRO)

What the jury heard

Public defender signed off a stipulation with the prosecution stating that "on September 28, 2018 a temporary restraining order, which was lawful and valid, went into effect naming Xingfei Luo as the restrained person and Tomas Czodor as the protected person. This temporary restraining order became a permanent restraining order on October 19th 2018." RT 217-219.

What the jury did not heard

In 2018 Czodor connected with Petitioner while presenting himself as a single man never married but in fact he was a longtime married man seeking casual hook-ups and

3

1  cheating on his wife. Czodor's concealment of marital status and the only two meetings

2  between the parties prove that there was no dating relationship between Czodor and

3  Petitioner. During the entire interaction between the parties Petitioner never told Czodor

4  her full name. Decl. Luo, ¶2. While Czodor was married to Hanh Le, he openly sought

5  DVRO against Petitioner which indicates he carries no shame of cheating on his wife.

6       "Dating relationship" means frequent, intimate associations primarily characterized

7  by the expectation of affection or sexual involvement independent of financial

8  considerations. Cal. Fam. Code §6210. "Dating relationship" does not apply to 'a casual

9  relationship or an ordinary fraternization between [two] individuals in a business or social

10  context.' *People v. Upsher* (2007) 155 Cal.App.4th 1311, 1323, citing *People v. Rucker*

11  (2005) 126 Cal.App.4th 1107, 1117. Had the Legislature intended to apply Domestic

12  Violence Prevention Act (DVPA) to casual dates, it could have simply referred to the

13  dating relationship as "a date" or any dates instead of phrasing it to emphasize the element

14  of frequent and intimate associations.

15       Despite Czodor, a longtime married man seeking casual hook-ups, failed to

16  establish facts justifying the issuance and continuance of a DVRO, despite the

17  associations between the parties did not meet the statutory standard of a "dating

18  relationship", the family court improperly found that Czodor and Petitioner were former

19  partners and issued the TRO and DVROs in violation of Petitioner's due process right.

20       The stipulation with prosecution incorrectly states that the two restraining orders

21  state that Petitioner is to stop online bullying and harassing Mr. Czodor, to stop contacting

22  friends and clients of Mr. Czodor, and to stop stalking Mr. Czodor in cyberspace or in

23  person etc. RT 218-219. Decl. Luo, ¶15, TRO & DVRO.

24       Not only the TRO and DVRO have no legal foundation due to the lack of dating

25  relationship, they do not pass constitutional muster, as they are not sufficiently narrowly

26  tailored. "'The right to free speech is . . . one of the cornerstones of our society,' and is

27  protected under the First Amendment of the United States Constitution and under an 'even

28  broader' provision of the California Constitution." *Evans v. Evans* (2008) 162 Cal.App.4th

1157, 1166 (Evans), quoting *Hurvitz v. Hoefflin* (2000). "Temporary restraining orders and permanent injunctions—i.e., court orders that actually forbid speech activities—are classic examples of prior restraints." *Alexander v. United States* (1993) 509 U.S. 544, 550. A prior restraint is "'the most serious and the least tolerable infringement on First Amendment rights.'" *Near v. Minnesota* (1931) 283 U.S. 697, 713. "Prior restraints are highly disfavored and presumptively violate the First Amendment. [Citations.] This is true even when the speech is expected to be of the type that is not constitutionally protected." (*Evans*, supra, 162 Cal.App.4th at p. 1167; citing *Near v. Minnesota*, supra, 283 U.S. at pp. 704-705 [rejecting restraint on publication of any periodical containing "malicious, scandalous and defamatory" matter]) "[P]rior restraints on speech ... are the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart* (1976) 427 U.S. 539, 559, 96 S.Ct. 2791, 49 L.Ed.2d 683. Orders enjoining the right to speak on a particular topic are disfavored and presumptively invalid. (Id . at p. 558, 96 S.Ct. 2791.)

## II. CZODOR'S NUDIST BACKGROUND AND THE EVENTS LEADING UP TO SENDING HIS NUDE PHOTOS TO PETITIONER

### What the jury heard

Czodor works as a general contractor and painting contractor that owns a company named Gorgeous Painting. RT 129. Czodor met Petitioner through dating app Plenty of Fish in early August 2018. RT 130-131. Two or three weeks after their first message they went out on a date. After their first date Czodor send his nude photos to Petitioner before they met the second time. RT 134. Czodor denied that he had daily communication with Petitioner. RT 132. Czodor had only two dates in total with Petitioner. The second date Petitioner went to Czodor's house but Petitioner did not spend the night with Czodor. RT 133. Czodor does not even know if any dating relationship started with Petitioner. Czodor encouraged Petitioner to meet other people. RT 134. Czodor liked younger women. RT: 197. Other than Petitioner Czodor met only one other person through dating app. RT 199. Czodor portraits himself as a single innocent young man just starting online dating.

5

<u>What the jury did not heard</u>

Czodor signed up on dating app Plenty of Fish as a single man but in fact he was a longtime married man who concealed his marital status to seek casual hook-ups. Decl. Luo, ¶2. Czodor and Hanh Le jointly own a property that was purchased in 2009. Between 2014 and 2019 Czodor and Hanh Le filed taxes as a married couple. Despite Czodor testified he liked younger women, his wife is ten years older than him. Decl. Luo, ¶2. Czodor's words are completely contradicted to facts. It suggests that Czodor either lied on the stand about liking younger women or committed marriage fraud for immigration benefits because he was previously subject to deportation. Decl. Luo, ¶17.

Hanh Le's infamous cheating husband, Czodor, was arrested for impersonation. He was previously convicted of, by OCDA, same prosecuting agency who prosecuted Petitioner, advertising as a general contractor while he was not which is no different than fraud. He was also convicted of probation violation. His convictions rested upon facts establishing dishonesty or false statement. Decl. Luo, ¶17. When he was trying to solicit business he advertised himself as a general contractor but in fact he was not. When he was seeking free sexual favor, he concealed his marital status and presented himself as a single innocent young man. When he was trying to impress a stranger, he openly talked about his upbringing as a nudist. When he did not even know Petitioner's full name he sent his nude photos to Petitioner. When he was trying to frame Appellant for revenge porn, he suddenly became a non-nudist as if he spent all his days fully clothed like the rest of us did. He cheats on his customers. He cheats on his wife. He cheats on the police. He cheats on the jury in July 2021. There must have been more since he cheats whenever it serves his own interest throughout his life. A classic sociopath.

While many prefer to spend their days fully clothed, some prefer to live their lives au naturel. In their birthday suits. Nude. Unclothed. They are naturists. Naturism is a lifestyle of social nudity, and the cultural movement which advocates for and defends that lifestyle. Both may also be referred to as nudism. Nudists believe that becoming nude increases confidence and going naked brings them out of their shell. Without the barrier of

6

clothing, nudists become more open, comfortable, and secure. Czodor grew up in central Europe and was raised as a naturist. He sent Petitioner, a woman he barely knew, his nude photos when he did not even know her full name. Decl. Luo, ¶3. Czodor invited Petitioner to a nudist ranch in Riverside named Olive Dell Ranch. http://www.olivedellranch.com/ Czodor never asked Petitioner to keep his photos private nor did he receive Petitioner's promise to keep his photos private. Decl. Luo, ¶3. All communication between Czodor and Petitioner was through texting. It is particularly odd that the State did not provide any text messages showing that Czodor asked Petitioner to keep his photos private or Petitioner's promise to keep Czodor's photos private despite the State was able to provide Petitioner's threatening messages. Czodor may have sent his nude photos to dozen women while cheating on his wife.

### III.    ALLEGATION OF UNLAWFUL DISSEMINATION OF PRIVATE PHOTOGRAPHS

<u>What the jury heard</u>

Czodor denied that he told Petitioner he didn't mind if she shared his nude photos. Czodor alleged that Petitioner did not reach out to him and ask if it would be okay if she showed other people those nude photos of him. RT 148-149. Czodor first testified that on Friday (Sep 7, 2018) Petitioner started publishing his nude photos. RT 138-139. However, he later testified he had notes indicating that Petitioner started publishing things on Sep 5, 2018. Czodor contacted the police the following week for unlawful dissemination of his nude photographs. RT 150-151. Lilly, Czodor's customer on Yelp, received his nude photos and informed him of the incident. RT: 159-160.

Czodor feels embarrassed to have strangers see his nude photos. RT 288.

<u>What the jury did not hear</u>

On Sep 10, 2018, the following week as he claimed, Czodor called Santa Ana Police Department and alleged unfounded terrorism. Decl. Luo, ¶20. While Czodor alleged that Petitioner started publishing his nude photos on Sep 5, 2018 he waited until the police could not see anything online to make an official report. Decl. Luo, ¶14.

7

It turned out no one named Lilly was on Czodor's Yelp page. Decl. Luo, ¶18.

Czodor is a nudist and his nude photos were taken on a nude beach when he was comfortable with public nudity. RT: 144 – 145.

https://en.wikipedia.org/wiki/Nude_beach.

**IV.ALLEGATION OF VANDALISM**

What the jury heard

Czodor did not invite Petitioner over but she showed up at his house on Sep 18, 2018. RT 152-153. Petitioner scratched Czodor's door upon arrival but Czodor could not discover the door damages the same night because it was dark. The prosecution stated "in the dark of the night, no, he might not have seen when she was doing that." RT: 292. The next day, on Sep 19, 2018, Czodor discovered the damages to his door. RT: 168.

What the jury did not hear

Hanh Le's graceless unfaithful husband, Czodor, lied about being dark. The evidence refutes Czodor's false statement. Decl. Luo, ¶8-10. There was a light bulb installed right above Czodor's front door. The light showered Petitioner from head to toe. It is impossible Czodor could not see the door damages if there was any.

Czodor testified in the family court that he heard weird noises from scratching for 20 minutes, ECF 6 at 171, despite Czodor allegedly told Petitioner to stop scratching his door on the spot, ECF 6 at 155, the 911 call made on Sep 18, 2018 did not indicate any scratching. ECF 6 at 201. In fact, the 911 call made almost 10 minutes after Petitioner's arrival at Czodor's house, the 911 call clearly indicated only knocking on the door instead of scratching. Despite Czodor alleged Petitioner scratched his door for 20 minutes and despite Czodor was capable of taking photos and shooting videos that night, there is no picture or video whatsoever of Petitioner actually scratching his door, not even a single clip. There is no picture or video of Petition with the damaged door either, e.g. standing next to the damaged door.

On Sep 24, 2018 Czodor learned that it would cost him money to remove an online post related to his credibility. He carried out his frame job, damaged his own door, and

8

took photos of his damaged door on Sep 25, 2018.

The damage to the door is inconsistent with 20 minutes scratching. Decl. Luo, ¶11-12. 20 minutes scratching should have done much more damages than what is shown on the photo. ECF 6 at 175. On Sep 18, 2018 Hanh Le may have been inside the house. Czodor may have told Hanh Le regarding the night of Sep 18, 2018. Hanh Le may have found out her husband's cheating many times and she has direct personal knowledge about Czodor's credibility. Public defender's failure to call Hanh Le to testify significantly prejudiced Petitioner.

## STATEMENT OF THE CASE

The state's only evidence of guilt, not properly collected by the police, comes from only one person. This is a textbook case of fabricated evidence, committed perjury, shoddy police work, prosecutorial misconduct, and bad lawyering.

After Hanh Le's cheating husband, a shameless nudist, Czodor, faked his damages and injuries, on August 6, 2019, Petitioner was charged by misdemeanor complaint with vandalism (Pen. Code, § 594{a)/(b)(2)(A)), violation of a protective order (Pen. Code, § 273.6(a)) (by coming within 100 yards of the protected person), and disorderly conduct (unlawful dissemination of private photographs and recordings) (Pen. Code, § 647(j)(4))(A). During the two years prior to jury selection, despite Petitioner did not request reassignment of counsel, six public defenders cycled through her case with no investigation was conducted. One trial date was set on Mar 24, 2020, but later vacated due to building closure. Despite the building closure lasted for only about two months, despite the Trial Court resumed jury trial since late May 2020, Decl. Luo, ¶32, more than ten continuances were granted without a single objection raised by the prosecution, and the trial court repeatedly allowed the matter to be continued without finding good cause on the record despite Petitioner did not request any continuance due to her own inability to appear at trial. Decl. Luo, ¶33-37.

During Petitioner's arraignment while in custody on August 12, 2019, Petitioner's appointed counsel failed to properly and fully advise her about her right to a speedy trial,

9

a general time waiver was entered without Petitioner's willful and intelligent consent and knowledge. Decl. Luo, ¶26 – 42. Had Petitioner known of the consequences flowing from agreeing to have trial at a later date, she would never have agreed on that but would have insisted on going to trial as soon as possible.

At the pretrial on September 6, 2019, the pretrial was continued to October 18, 2019 at the request of public defender instead of Petitioner, despite no good cause stated on the record, the general time waiver was maintained without Petitioner's willful and intelligent consent. Decl. Luo, ¶31. On October 18, 2019, the pretrial was continued to January 10, 2020 at the request of public defender instead of Petitioner, despite no good cause stated on the record, the general time waiver was again maintained without Petitioner's willful and intelligent consent. Despite "the state's need to investigate is presumably satisfied once it has filed charges" *Serna v. Superior Court*, 40 Cal.3d 239, 270 (Cal. 1985), five months after Petitioner's charges were filed, on January 10, 2020, the pretrial was continued at the People's request to February 14, 2020, and a jury trial was set on March 24, 2020. Decl. Luo, ¶31. On February 14, 2020, the pretrial was continued to March 20, 2020 at the request of public defender instead of Petitioner, and the jury trial was to remain. On March 20, 2020, counsel made an appearance pursuant to Penal Code section 977 and entered a general time waiver without Petitioner's willful and intelligent consent. The jury trial was vacated and the pretrial was continued to June 26, 2020 without Petitioner's willful and intelligent consent.

Despite in late May 2020 the Orange County Superior Court already initiated the process of reopening and a large number of prospective jurors heeded the call of duty and came to the Court to serve our community, on July 14, 2020, both prosecution and public defender jointly requested a pretrial date on December 4, 2020 without Petitioner's willful and intelligent consent. Petitioner was not informed of the July 14, 2020 hearing and was not present at the hearing. Outrageous enough, public defender failed to inform Petitioner of her court date, Petitioner did not appear at the pretrial on December 4, 2020 and a bench warrant was issued for her arrest. Decl. Luo, ¶34-35. After the warrant was

10

recalled, on December 22, 2020, counsel appeared for Petitioner pursuant to Penal Code section 977 and a pretrial was set on March 5, 2021 with the general time waiver remaining without Petitioner's willful and intelligent consent, with no good cause stated on the record. On March 5, 2021, the pretrial was continued to May 7, 2021, with the general time waiver remaining without Petitioner's willful and intelligent consent. On June 8, 2021, a jury trial was set on July 19, 2021, as day 0 of 10. Decl. Luo, ¶26-42.

Petitioner did not discover the general time waivers until July 13, 2021. Decl. Luo, ¶31. Waiver requires "an intentional relinquishment or abandonment of a known right or privilege". *Barker v. Wingo* (1972) 407 U.S. 514, 525 92 S.Ct. 2182, 33 L.Ed.2d 101. There is no doubt that none of the general time waivers was entered or maintained with Petitioner's intentional relinquishment or abandonment of her right to a speedy trial. Petitioner was unable to withdraw any of the general time waivers because she did not even know they existed. Had Petitioner known of the general time waiver, she would never have failed to withdraw it. Decl. Luo, ¶28-31.

On July 19, 2021, Petitioner filed a *Marsden* motion and a motion to dismiss. Despite a pretrial hearing on a motion to dismiss for denial of a speedy trial may exclude prosecution, *Shleffar v. Superior Court* (1986) 178 Cal.App.3d 937, the court informed Petitioner that the motion to dismiss was not being accepted or considered because it was untimely and the People were not present. RT 1- 32. On July 26, 2021, the People requested a continuance of the jury trial, but it was denied. 720 days after the complaint was filed, despite no finding of good cause to justify any belated amendment, the People amended the complaint from allegation of coming within 100 yards of the protected person to failure to deactivate website and created new websites.

721 days after the complaint was filed, jury trial commenced on July 27, 2021. Public defender had nothing to offer, made no effort to suppress the introduction of Petitioner's prior involuntary testimony in a family court, called no witness to the stand, presented no evidence from his own investigation, engaged in a lackadaisical and ineffective cross-examination of the prosecution's sole/star witness, stipulated with

11

prosecution over an unlawful family court order, and allowed prosecution to introduce and
misrepresent Petitioner's prior testimony in a family court in violation of her Fifth, Sixth,
and Fourteenth Amendment rights etc. RT: 33 – 313. On July 28, 2021, after Czodor put
on a one man show, the People rested and Petitioner's counsel made a motion pursuant to
Penal Code section 1118.1, which was denied. On July 29, 2021, the jury found Petitioner
guilty of the three counts based on false evidence and perjured testimony. Society was the
loser in this trial. The greatest crime of all in a civilized society is a wrongful conviction.
It is truly a scandal, which reflects unfavorably on all the participants in the criminal
justice system.

Petitioner's convictions were affirmed by the Appellate division of Superior Court
of California for the County of Orange in the number 30-2021-01216615-CL-MC-CJC
after her appointed counsel has found no issues on appeal. After Appellate Division
denied to transfer Petitioner's case to court of appeal, Petitioner filed a petition for a writ
of certiorari with the U.S. Supreme Court under case No. 21-8023.

## POST-CONVICTION PROCEEDINGS

While Petitioner's appeal was pending in Orange County Superior Court Appellate
Division, Petitioner filed a *pro se* Petition on Oct 13, 2021 for Writ of Habeas Corpus in
that court as well. *In re Luo*, M19285, Petition for Writ of Habeas Corpus, ECF 5 at 9.
The superior court downplayed or ignored the contradicted evidence and denied relief on
Oct 19, 2021, ECF 5 at 3. On Nov 8, 2021, Petitioner filed a *pro se* Petition for Writ of
Habeas Corpus in the state appellate court. *In re Luo*, G060841, Petition for Writ of
Habeas Corpus. On Nov 10, 2021 the appellate court denied the petition without prejudice
as premature, ECF 5 at 62. On Feb 18, 2022, Petitioner filed a *pro se* Petition for Writ of
Habeas Corpus in the state appellate court. *In re Luo*, G061132, Petition for Writ of
Habeas Corpus, ECF 6 at 65. On Mar 3, 2022 the appellate court summarily denied the
petition, ECF 5 at 64. On May 2, 2022 Petitioner filed a *pro se* Petition for Writ of Habeas
Corpus in the California Supreme Court. *In re Luo*, S274343, Petition for Writ of Habeas
Corpus, ECF 6 at 4. On August 31, 2022 the Supreme Court of California summarily

1  denied the petition, ECF 6 at 3. After filing a habeas petition in this court, Petitioner

2  returned to state court and filed a *pro se* Habeas Petition on Oct 10, 2022. *In re Luo*, M-

3  20069. ECF 19-1 at 11. The superior court denied relief on Dec 28, 2022 primarily due to

4  Petitioner's failure to object in the trial court, failure to file an application for writ of

5  prohibition, and failure to raise the issues on appeal and in initial habeas petition. In

6  essence, the superior court admitted that Petitioner received ineffective assistance of

7  counsel both at trial and on appeal. ECF 19-1 at 2. On January 5, 2023, Petitioner filed a

8  *pro se* Petition for Writ of Habeas Corpus in the state appellate court. *In re Luo*, G062169,

9  Petition for Writ of Habeas Corpus. ECF 19-2 at 3. On January 26, 2023 the appellate

10  court summarily denied the petition. ECF 19-2 at 2. Petitioner filed a *pro se* Petition for

11  Writ of Habeas Corpus in the California Supreme Court. *In re Luo*, S274343, Petition for

12  Writ of Habeas Corpus, ECF 19-3 at 2 and ECF 21 at 4. On May 17, 2023 the Supreme

13  Court of California summarily denied the petition, ECF 26 at 4.

14      Petitioner could not raise all possible claims in her first habeas corpus petition

15  without assistance of competent counsel. In the rare instance in which the petitioner is

16  able to adequately justify not having raised the claim earlier, the successiveness bar does

17  not apply. *In re Clark* (1993) 5 Cal.4th 750, 21 Cal.Rptr.2d 509, 855 P.2d 729.

18      Moreover, Petitioner's claims are not procedurally barred due to actual innocence

19  and fundamental miscarriage of justice. A fundamental miscarriage of justice is

20  established by showing: (1) that error of constitutional magnitude led to a trial that was so

21  fundamentally unfair that absent the error no reasonable judge or jury would have

22  convicted the petitioner; (2) that the petitioner is actually innocent of the crime or crimes

23  of which he was convicted; (3) that the death penalty was imposed by a sentencing

24  authority which had such a grossly misleading profile of the petitioner before it that absent

25  the error or omission no reasonable judge or jury would have imposed a sentence of death;

26  or (4) that the petitioner was convicted under an invalid statute. *In re Clark*, 5 Cal.4th 750,

27  758 (Cal. 1993).

28      An accused "has a constitutional right to have the jury determine every material

issue presented by the evidence. Regardless of how overwhelming the evidence of guilt may be, the denial of such a fundamental right . . . is a miscarriage of justice. . . ." *People v. Modesto* (1963) 59 Cal.2d 722, 730 [31 Cal.Rptr. 225, 382 P.2d 33]; see also *People v. Sedeno* (1974) 10 Cal.3d 703, 720 [112 Cal.Rptr. 1, 518 P.2d 913].

## PUBLIC DEFENDER'S FAILURE TO PROVIDE ANY EXPLANATION OF TACTIC REASON

In *People v. Pope*, 23 Cal.3d 412 (Cal. 1979), the court suggests that if counsel was asked for an explanation and failed to provide one, this could prove he or she had no tactical reason for the action taken. Despite Petitioner repeatedly asked public defender with respect to the approach they took (or didn't take) in the handling of Petitioner's case #19CM06724, no explanation was ever given. Decl. Luo, ¶22.

"[P]retrial investigation and preparation are the keys to effective representation of counsel." *United States v. Tucker*, 716 F.2d 576, 581 (9th Cir. 1983) (internal citations omitted). Counsel was found "ineffective where he neither conducted a reasonable investigation nor made a showing of strategic reasons for failing to do so." See *Hendricks v. Vasquez*, 974 F.2d 1099, 1109 (9th Cir. 1992) (vacating judgment of district court where it was not possible to "determine if counsel's decision was a strategic one, and if so, whether the decision was a sufficiently informed one.")

Petitioner's trial counsel had nothing to offer to test or attack the prosecution's case. He failed to conduct any basic investigation. He failed to prepare any defense whatsoever. He failed to suppress Petitioner's prior compelled/involuntary testimony, call any fact witnesses, including Hanh Le and the police officer who accepted a stack of paper printout as evidence and did nothing to properly collect evidence using forensic technology. Was Hanh Le inside Czodor's house on Sep 18, 2018? What if any did Czodor tell Hanh Le regarding the night of Sep 18, 2018? How many times did Hanh Le find out her husband's cheating and her personal knowledge about Czodor's credibility?

A competent, committed defense lawyer is often the last, best, and only hope an innocent defendant has. "Left without the aid of counsel he may be put on trial without a

14

proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible. He lacks both the skill and knowledge adequately to prepare his defense, even though he have a perfect one. He requires the guiding hand of counsel at every step in the proceedings against him. Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence." *Powell v. Alabama*, 287 U.S. 45, 69 (1932).

The integrity of our criminal justice system and the fairness of the adversary criminal process is assured only if an accused is represented by an effective attorney. See *United States v.Morrison*, 449 U.S. 361, 364, 101 S.Ct. 665, 667, 66 L.Ed.2d 564 (1981). Absent the effective assistance of counsel "a serious risk of injustice infects the trial itself." *Cuyler v. Sullivan*, 446 U.S.335, 343, 100 S.Ct. 1708, 1715, 64 L.Ed.2d 333 (1980). Thus, a defendant is constitutionally entitled to have effective counsel acting in the role of an advocate. See *Anders v. California*, 386U.S. 738, 743, 87 S.Ct. 1396, 1399, 18 L.Ed.2d 493 (1967). These are some errors that "are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified" thus making it unnecessary to establish the prejudice prong of *Strickland*. Prejudice is presumed in situations where the likelihood of counsel having provided effective assistance is extremely small such as where counsel failed completely to subject the prosecution's case to "meaningful adversarial testing." *United States v. Cronic*, 466 U.S. 648, 658, 104 S.Ct. 2039, 2046 – 2017, 80 L.Ed.2d657 (1984).

A defendant has a Sixth Amendment right to conflict-free representation. *United States v. Moore*, 159 F.3d 1154, 1157 (9th Cir. 1998). Where a court "compel[s] one charged with [a] grievous crime to undergo a trial with the assistance of an attorney with whom he has become embroiled in [an] irreconcilable conflict[it] deprive[s] him of the effective assistance of any counsel whatsoever." *Brown v. Craven*, 424 F.2d 1166, 1170 (9th Cir. 1970). A reviewing court must assess the nature and extent of the conflict and whether that conflict deprived the defendant of representation guaranteed by the Sixth Amendment. *Schell v. Witek*, 218 F.3d 1017, 1027 (9th Cir. 2000).

**CLAIMS FOR RELIEF**

**CLAIM 1: Violation of First and Fourteenth Amendment – Prosecution of
Dissemination of A Nudist's Nude Photos**

Where an individual does not have a reasonable expectation of privacy in an image,
the State's interest in protecting the individual's privacy interest in that image is minimal.
Where the State has only a minimal interest at stake—such as where the individual
depicted did not have a reasonable expectation of privacy—a prosecution of dissemination
of private photographs would not be a justifiable incursion upon First Amendment-
protected speech. *State v. Vanburen*, 214 A.3d 791, 813, 820-21 (Vt. 2019).

Hanh Le's infamous cheating husband, Czodor, had no reasonable expectation of
privacy in the images he sent to Petitioner for at least three reasons: (1) Czodor, a
longtime married man who concealed his marital status, and Petitioner were not engaged
in a relationship engendering a reasonable expectation of privacy; (2) He did not request
Petitioner to keep his photos confidential before sending out his photos to Petitioner; and
(3) He is a nudist. A person with a lifestyle of social nudity does not have a reasonable
expectation of privacy in his nude images. Nudists believe that becoming nude increases
confidence and going naked brings them out of their shell. Without the barrier of clothing,
nudists become more open, comfortable, and secure. Decl. Luo, ¶3. While nudism is a
lifestyle centered around body positivity and self-expression, it is possible for individuals
within nudist communities to exploit the societal discomfort around nudity by falsely
claiming an expectation of privacy in their naked photos. Nudists who assert an
expectation of privacy in their naked photos often do so selectively, choosing when and
where they want their privacy rights to apply. This cherry-picking of privacy expectations
suggests that the motive behind the claim may not be rooted in genuine concerns for
personal privacy, but rather in manipulating the legal system for personal gain.

Where provided evidence establishes that two people exchanging photos did not
engage in a relationship of a sufficiently intimate or confidential nature, where a nudist is
not supposed to expect privacy in his nude photos due to his belief that becoming nude

16

increases confidence, California's prosecution of dissemination of a nudist's nude

photographs violated Petitioner's First and Fourteenth Amendments rights.

### CLAIM 2: Violation of Fourteenth Amendment – Enforcement of Two Unlawful Family Court Orders – Lack of Dating Relationship

The family court had no jurisdiction to issue TRO or DVRO against Petitioner due to the lack of dating relationship between Czodor and Petitioner. When a court lacks jurisdiction in a fundamental sense, an ensuing judgment is void, and "thus vulnerable to direct or collateral attack at any time." *People v. Medina*, 171 Cal. App. 4th 805, 815, 89 Cal. Rptr. 3d 830, 839 (2009), as modified (Mar. 10, 2009). A court cannot validly enter a judgment or order which is void even if the parties agree to it. *Plaza Hollister Ltd. Partnership v. County of San Benito* (1999) 72 Cal.App.4th 1, 12-13.

A void judgment [or order] is, in legal effect, no judgment. By it no rights are divested. From it no rights can be obtained. Being worthless in itself, all proceedings founded upon it are equally worthless. It neither binds nor bars any one. [Citation.] *Rochin v. Pat Johnson Manufacturing Co*. (1998) 67 Cal.App.4th 1228, 1240 [79 Cal.Rptr.2d 719], quoting *Bennett v. Wilson* (1898) 122 Cal. 509, 513-514 [55 P. 390]; see also *Levine v. Smith* (2006) 145 Cal.App.4th 1131, 1136 [52 Cal.Rptr.3d 197].

Czodor, Hanh Le's graceless cheating husband, testified that he did not have daily communication with Petitioner. RT 132. Czodor had only two dates in total with Petitioner. The second date Petitioner went to Czodor's house but Petitioner did not spend the night with Czodor. RT 133. Czodor does not even know if any dating relationship started with Petitioner. Czodor encouraged Petitioner to meet other people. RT 134.

During a secretly recorded conversation, Czodor stated "Who are you to me? Nobody. You are to me nobody. What you think, what we was? It was my wife, girlfriend, boyfriend, what have you been to me. Jesus Christ. I met you one or two times." CT 101.

A party is not necessarily entitled to a restraining order simply because the opposing party has engaged in an act that upsets the petitioning party. It is the party seeking a restraining order that bears the burden of establishing the circumstances

17

1  justifying the order. *Curcio v. Pels* (2020) 47 Cal.App.5th 1, 13 – 14. The moving party

2  for a DVRO must be in a specified domestic relationship with the person to be restrained.

3  Cal. Fam. Code §§6211, 6301, subd. (a). The fact the parties are sexually intimate does

4  not, alone, create a dating relationship. *People v. Shorts* (2017) 9 Cal.App.5th 350, 360-

5  361 [defendant and victim had sexual relations one to two times.]

6      The purpose of DVPA is to prevent acts of domestic violence, abuse, and sexual

7  abuse and to provide for a separation of the persons involved in the domestic violence for

8  a period sufficient to enable these persons to seek a resolution of the causes of the

9  violence. Cal. Fam. Code §6220.

10      The Legislature did not intend the statute to apply to acquaintance or stranger

11  violence, nor did it intend to cover the myriad of relationships that exist or even to all

12  those which might be considered "dating" relationships. A dating relationship under

13  DVPA undoubtedly requires more than a few casual dates. Had the Legislature intended

14  to apply DVPA to casual dates, it could have simply referred to the dating relationship as

15  "a date" or any dates instead of phrasing it to emphasize the element of frequent and

16  intimate associations.

17      While judicial discretion and flexibility are appropriate in applying the statutory

18  definition of "dating relationship," they do not relieve a court of its obligation to apply the

19  legislative criteria while it must keep in mind the protective purpose of DVPA. Here,

20  introduced evidence sufficient to support a contrary finding that Appellant and Czodor

21  had engaged in dating relationship. RT: 132 – 134.

22      "Dating relationship" means frequent, intimate associations primarily characterized

23  by the expectation of affection or sexual involvement independent of financial

24  considerations. Cal. Fam. Code §6210. "Dating relationship" does not apply to 'a casual

25  relationship or an ordinary fraternization between [two] individuals in a business or social

26  context.' *People v. Upsher* (2007) 155 Cal.App.4th 1311, 1323, citing *People v. Rucker*

27  (2005) 126 Cal.App.4th 1107, 1117.

28      Neither the statute nor California courts ever enumerated the factors to be

considered in determining the existence of a "dating relationship." It is not difficult to turn to other jurisdictions, the well-populated states, for guidance in identifying those factors.

In the state of Washington, a dating relationship is "a social relationship of a romantic nature" and courts consider the same factors as federal law[2]: length of relationship, type of relationship, and frequency of interactions between the partners. RCW 26.50.010(2).

Four factors should be considered in the State of Massachusetts: (1) the length of time of the relationship; (2) the type of relationship; (3) the frequency of interaction between the parties; and (4) if the relationship has been terminated by either person, the length of time elapsed since the termination of the relationship." Mass. Gen. Laws ch. 209A §1. See *Brossard v. West Roxbury Div. of the Dist. Court Dep't*, 417 Mass. 183, 185, 629 N.E.2d 295 (1994) ("substantive dating relationship" existed where facts revealed "substantially more than a few casual dates").

In the state of Texas, "dating relationship" means "a relationship between individuals who have or have had a continuing relationship of a romantic or intimate nature," the existence of which is determined by considering the length and nature of the relationship and the frequency and type of interaction between the persons involved in it. TEX. FAM. CODE §71.0021(b).

Section 784.046, Florida Statutes, provides in relevant parts:

(1)(a) "Violence" means any assault, aggravated assault, battery, aggravated battery, sexual assault, sexual battery, stalking, aggravated stalking, kidnapping, or false imprisonment, or any criminal offense resulting in physical injury or death, by a person against any other person.

(d) "Dating violence" means violence between individuals who have or have had a

---

[2] Under The Violence Against Women Reauthorization Act of 2013 (VAWA), Dating Violence means violence committed by a person who is or has been in a social relationship of a romantic or intimate nature with the victim; and where the existence of such a relationship shall be determined based on a consideration of the following factors:
° The length of the relationship
° The type of relationship
° The frequency of interaction between the persons involved in the relationship

continuing and significant relationship of a romantic or intimate nature. The existence of such a relationship shall be determined based on the consideration of the following factors:

1. A dating relationship must have existed within the past six months;

2. The nature of the relationship must have been characterized by the expectation of affection or sexual involvement between the parties; and

3. The frequency and type of interaction between the persons involved in the relationship must have included that the persons have been involved over time and on a continuous basis during the course of the relationship.

In determining whether a dating relationship actually exists under New Jersey's Prevention of Domestic Violence Act, six factors that should, at a minimum, be considered:

1. Was there a minimal social interpersonal bonding of the parties over and above a mere casual fraternization?

2. How long did the alleged dating activities continue prior to the acts of domestic violence alleged?

3. What were the nature and frequency of the parties' interactions?

4. What were the parties' ongoing expectations with respect to the relationship, either individually or jointly?

5. Did the parties demonstrate an affirmation of their relationship before others by statement or conduct?

6. Are there any other reasons unique to the case that support or detract from a finding that a "dating relationship" exists?

Not every person injured by another is entitled to the protections of the Prevention of Domestic Violence Act (the Act), N.J.S.A. 2C:25–17 to –35. *S.K. v. J.H.*, 426 N.J. Super. 230, 233 (App. Div. 2012).

An interpretation of N.J.S.A. 2C:25–19(d) that would apply the Act to two persons who had a single date would give far too much weight to the word "dating" and too little

20

weight to the word "relationship." If the Legislature intended to permit the Act's

protections to apply to persons who had a single date, it would have defined "victim of

domestic violence" as any person who has been subjected to violence by a person whom

the victim has dated. *S.K. v. J.H.*, 426 N.J. Super. 230, 239 (App. Div. 2012). By requiring

evidence of a "dating relationship," the Legislature undoubtedly intended something of

**greater frequency** or **longer duration** than a single date. *Id.*

See also *Alison C. v. Westcott*, 343 Ill.App.3d 648, 798 N.E.2d 813, 278 Ill.Dec.

429 (2003) (holding that the fact that the parties attended the same high school, had

spoken on the telephone, and had a single lunch date was not sufficient to establish a

dating relationship.) There is no significant difference between a single date and two dates.

None of the above states recognizes two casual dates as a dating relationship. Not

to mention it is two meetings of Petitioner with Czodor, a longtime married man who

concealed his marital status to seek casual hook-ups. Extending the reach of dating

relationship to include one or two casual dates would lead to "absurd" or "unreasonable"

applications and abuse of process like this case.

The adjudication of cases by a neutral court is a fundamental element of due

process. In domestic violence cases, as in all other court proceedings, the court is

responsible for protecting the rights of the accused. *People v. Dorman*, 28 Cal.2d 846, 861

(Cal. 1946). The legitimate concern about domestic violence must not be permitted to

affect or diminish the court's responsibility to remain neutral, to protect the rights of the

accused in each case, and to address each case individually on its own merits. A culture of

summarily issuing and extending DVROs would ignore the legislative intent behind

DVPA and undermine a basic pillar of our judicial tradition—that all parties be given a

fair, meaningful, and equal opportunity to be heard. *C.O. v. M.M*, 442 Mass. 648, 659

(Mass. 2004). DVRO proceedings may not violate the due process rights of defendants in

an attempt to accommodate plaintiffs. U.S.C.A. Const.Amend. 14.

**CLAIM 3: Violation of First and Fourteenth Amendment – Enforcement of Two**

**Unlawful Family Court Orders – Blanket Prohibition of speech on all contents,**

**Subjects, Viewpoints, and Images Related to Hanh Le's betraying husband, Czodor**

To establish a valid prior restraint under the federal Constitution, a proponent has the heavy burden to show the countervailing interest is compelling, the prior restraint is necessary and would be effective in promoting this interest, and less extreme measures are unavailable. See *Hobbs v. County of Westchester* (2d Cir. 2005) 397 F.3d 133, 149 (*Hobbs*); see also *Nebraska Press*, supra, 427 U.S. at pp. 562-568, 96 S.Ct. 2791. A permissible order restraining future speech "must be couched in the narrowest terms that will accomplish the pin-pointed objective permitted by constitutional mandate and the essential needs of the public order." *Carroll v. President & Com'rs of PrincessAnne* (1968) 393 U.S. 175, 183-184, 89 S.Ct. 347, 21 L.Ed.2d 325.

The California Constitution is more protective of free speech rights than the federal Constitution, and California courts require "extraordinary circumstances" before a prior restraint may be imposed. *Wilson v. Superior Court of Los Angeles County* (1975) 13 Cal.3d 652, 658-661, 119 Cal.Rptr. 468, 532 P.2d 116; *In re Marriage of Candiotti* (1995) 34 Cal.App.4th 718, 724, 40 Cal.Rptr.2d 299 (*Candiotti*). Nonetheless, in determining the validity of a prior restraint, California courts engage in an analysis of various factors similar to the federal constitutional analysis *Aguilar*, supra, 21 Cal.4th at pp. 145-146, 87 Cal.Rptr.2d 132, 980 P.2d 846, and injunctive relief restraining speech under the California Constitution may be permissible where the relief is necessary to "protect private rights" and further a "sufficiently strong public policy" (id . at p. 167, 87 Cal.Rptr.2d 132, 980 P.2d 846 (conc. opn. of Werdegar, J.) ).

Applying these principles, the court in *Candiotti* held a custody order limiting a parent's right to communicate with third parties about matters related to the custody proceeding was an unconstitutional prior restraint. *Candiotti*, supra, 34 Cal.App.4th at pp. 724-726, 40 Cal.Rptr.2d 299. There, the order prohibited a mother from disclosing negative information about her former husband's new wife to anyone except certain specified professionals. *Id*. at p. 720, fn. 3, 40 Cal.Rptr.2d 299. The *Candiotti* court recognized that courts "are given broad authority to supervise and promote the welfare of

22

children" and may constitutionally order parents to refrain from disparaging their former spouse in front of their children. *Id*. at p. 725, 40 Cal.Rptr.2d 299. However, the court observed the challenged order "went further, actually impinging on a parent's right to speak about another adult, outside the presence of the children." (Ibid.) The court held the order was overbroad in this respect and constituted an undue prior restraint of speech under the California Constitution, reasoning the order "would prevent [the mother] from talking privately to her family, friends, coworkers, or perfect strangers about her dissatisfaction with her children's living situation." (Ibid.) Although the trial court "certainly ha[d] the power to prevent [the mother] from undermining [the father's] parental relationship by alienating the children from [the stepmother]," the *Candiotti* court found the challenged order to be "much more far-reaching, aimed at conduct that might cause others, outside the immediate family, to think ill of [the stepmother]." *Id*. at p. 726, 40 Cal.Rptr.2d 299. The court explained: "Such remarks by [the mother] may be rude or unkind. They may be motivated by hostility. To the extent they are libelous, they may be actionable. But they are too attenuated from conduct directly affecting the children to support a prior restraint on [the mother's] constitutional right to utter them." (Ibid.)

In *Molinaro v. Molinaro*, 33 Cal.App.5th 824 (Cal. Ct. App. 2019) the Court held that the part of the restraining order prohibiting Michael Molinaro from posting "anything about the case on Facebook" is reversed, and the trial court is directed to strike the provision from the order.

"When enjoining activities in the sensitive area of First Amendment freedoms, courts must draft temporary restraining orders 'couched in the narrowest terms that will accomplish the pinpointed objective permitted by constitutional mandate and the essential needs of the public order.'" *United Farm Workers of America v. Superior Court* (1975) 14 Cal.3d 902, 909.

Any orders require Petitioner to remove ALL posts about Czodor from social media and blogs, and bar Petitioner from future posting of ANY material are clearly overbroad and unlawful, as they encompass speech the court itself recognized as

constitutionally protected. An injunction, if upon its face it abridges rights guaranteed by the First Amendment, should be struck down. *United Transportation Union v. Michigan Bar*, 401 U.S. 576, 581 (1971).

The TRO issued on Sep 28, 2018, while Petitioner was not present at the ex parte hearing, Decl. Luo, ¶15, orders Petitioner to remove content from pages on internet what she or her accomplices created to destroy Czodor's online reputation and to stop posting about Czodor online. Decl. Luo, ¶5. These terms are unconstitutionally vague in their overly broad scope, since they apply to speeches on any subjects and viewpoints provided that they are related to Czodor or his online reputation. Reputation means the beliefs or opinions that are generally held about someone or something. Using DVRO to remedy defamation violates a host of well-established limitations on the defamation tort. A defamation injunction, if allowed at all, can only forbid republication of the precise statements proven defamatory at trial.

Item 23 of the DVRO issued on Oct 19, 2018 provides that Petitioner is ordered to cease posting the picture or likeness of Czodor or refer to him by name on *any* social media website or blog. Petitioner is further ordered to remove *any* pictures or references of Czodor from *any* social media website or blog she may have posted. Decl. Luo, ¶5. These terms are undoubtedly and unconstitutionally vague in their overly broad scope, since they apply to speeches on any subjects, viewpoints, and images provided that they are related to Czodor.

Content-based prohibitions have the constant potential to be a repressive force in the lives and thoughts of a free people. To guard against that threat the Constitution demands that content-based restrictions on speech be presumed invalid, *R.A.V. v. St. Paul*, 505 U.S. 377, 382 (1992) , and that the Government bear the burden of showing their constitutionality, *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 817 (2000). Content-based restrictions are valid only in narrow and limited situations. See, e.g., *Chaplinsky v. New Hampshire* (1942) 315 U.S. 568 [86 L.Ed. 1031, 62 S.Ct. 766] [fighting words]; *Miller v. California* (1973) 413 U.S. 15 [37 L.Ed.2d 419, 93 S.Ct. 2607]

24

1   [obscenity]; *Gertz v. Robert Welch, Inc*. (1974) 418 U.S. 323 [41 L.Ed.2d 789, 94 S.Ct.

2   2297] [libel].

3       "A statute is facially invalid if it prohibits a substantial amount of protected

4   speech." *U.S. v. Williams*, 553 U.S. 285 (2008). The assertion of a valid governmental

5   interest "cannot, in every context, be insulated from all constitutional protections." *Stanley*

6   *v. Georgia*, 394 U.S. 557, 563 (1969).

7       Injunctions carry greater risks of censorship and discriminatory application than do

8   general ordinances. Courts should apply a "somewhat more stringent application of

9   general First Amendment principles" to speech-restrictive injunctions than to speech-

10  restrictive statutes. *Madsen v. Women's Health Center, Inc*., 512 U.S. 753, 764 (1994).

11      The State must specifically identify an "actual problem" in need of solving, *United*

12  *States v. Playboy Entertainment Group, Inc*., 529 U.S. 803, 822–823 (2000), and the

13  curtailment of free speech must be actually necessary to the solution, see *R.A.V*., supra, at

14  395, 112 S.Ct. 2538. That is a demanding standard. "It is rare that a regulation restricting

15  speech because of its content will ever be permissible." *United States v. Playboy*

16  *Entertainment Group, Inc.*, 529 U.S. 803, 818 (2000).

17      "Regulations which permit the Government to discriminate on the basis of the

18  content of the message cannot be tolerated under the First Amendment." *Regan v. Time,*

19  *Inc*., 468 U.S. 641, 648-649 (1984). See also *Police Dept. of Chicago v. Mosley*, 408 U.S.

20  92, 95 (1972). "Speech cannot be restricted simply because it is upsetting or arouses

21  contempt." *Snyder v. Phelps*, 562 U.S. 443, 458 (2011). "If there is a bedrock principle

22  underlying the First Amendment, it is that the government may not prohibit the expression

23  of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v.*

24  *Johnson*, 491 U.S. 397, 414 (1989). Indeed, "the point of all speech protection ... is to

25  shield just those choices of content that in someone's eyes are misguided, or even hurtful."

26  *Hurley v. Irish–American Gay, Lesbian and Bisexual Group of Boston, Inc*., 515 U.S. 557,

27  574 (1995).

28      "The tailoring requirement does not simply guard against an impermissible desire

to censor. The government may attempt to suppress speech not only because it disagrees with the message being expressed, but also for mere convenience." *McCullen v. Coakley*, 573 U.S. 464, 486 (2014). By demanding a close fit between ends and means, the tailoring requirement prevents the government from too readily "sacrific[ing] speech for efficiency." *Riley v. National Federation of Blind of N. C., Inc*., 487 U.S. 781, 795 (1988).

Subject matter discrimination is presumptively unconstitutional because it interferes with the free exchange of ideas. It allows governments to manipulate the "marketplace" of ideas by foreclosing certain areas of discussion. For these reasons, subject matter discrimination is properly subject to conventional strict scrutiny. Viewpoint discrimination, however, is properly subject to the "strict scrutiny plus necessity" standard. While subject matter discrimination may foreclose certain areas of speech, viewpoint discrimination forecloses only certain opinions within a given area. It thus skews the free exchange of ideas in a way that subject matter discrimination alone cannot. By prohibiting only certain points of view, the government tacitly endorses other opinions. Viewpoint discrimination is like an artist's chisel, allowing the government to exercise fine control over what opinions may properly be expressed. Since the government is in possession of the instrument, it may then decide the ultimate shape expression may take. Before the government should be allowed to use this instrument, it should have to demonstrate that such viewpoint discrimination is the last resort for eschewing a truly compelling interest.

In view of *R.A.V.*'s extension of such exacting scrutiny to proscribed categories, it is logical that this heightened scrutiny also should be applied to viewpoint discrimination in intermediate categories of speech.

Viewpoint discrimination is properly more threatening to free speech values than subject matter discrimination. *Cox v. Louisiana*, 379 U.S. 536 (1965), a paradigmatic case of viewpoint discrimination, demonstrates why this is so.

*R.A.V.* sharply illustrates the Court's heightening of judicial scrutiny applicable to viewpoint discrimination. The *R.A.V.* Court chose to subject the viewpoint discriminatory

26

ordinance to a "more exacting" standard, which required that the weapon of content

discrimination "be employed only where it is necessary to serve the asserted [compelling]

interest.

The right's "protection" is "afforded" not only to one who speaks but also to those

who listen. *Va. Pharmacy Bd. v. Va. Consumer Council* (1976) 425 U.S. 748, 756; see

*Pacific Gas Elec. Co. v. Public Util. Comm'n* (1986) 475 U.S. 1, 8 (plur. opn. of Powell,

J). When the interests served by the speech at issue extend beyond those of the speaker to

those of the listeners, the speaker, whoever or whatever it may be, may be deemed to

possess the right in question. See *Pacific Gas Elec. Co. v. Public Util. Comm'n*, supra, 475

U.S. at p. 8 (plur. opn. of Powell, J.; *Va. Pharmacy Bd. v. Va. Consumer Council*, supra,

425 U.S. at p. 756; *Consolidated Edison Co. v. Public Serv. Comm'n* (1980) 447 U.S. 530,

533; *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 777 (1978). For instance, the

public deserves all sorts of information to make their informed decisions when dealing

with Respondent.

"No prior decisions support the claim that the interest of an individual in being free

from public criticism of his business practices in pamphlets or leaflets warrants use of the

injunctive power of a court. Designating the conduct as an invasion of privacy, the

apparent basis for the injunction here, is not sufficient to support an injunction against

peaceful distribution of informational literature of the nature revealed by this record."

*Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419-20 (1971).

Since the trial judge's charge permitted the jury to convict for acts clearly entitled

to First Amendment protection, *Stromberg v. California*, 283 U.S. 359 (1931),

independently requires reversal of the conviction. *Gregory v. Chicago*, 394 U.S. 111, 113

(1969).

### CLAIM 4: *Brady* Violation – Withholding of Sep 10, 2018 Police Field Activity Report

Evidence undermining the credibility of a government witness must be disclosed

when the reliability of the witness may be determinative of the defendant's guilt or

1   innocence. *United States v. Brumel–Alvarez*, 991 F.2d 1452, 1458 (9th Cir.1993).

2        At trial, the prosecution presented the text messages provided by Czodor in paper

3   form, not extracted from Czodor's phone by the police, to establish that Petitioner was

4   telling Czodor beforehand what she was going to do. Petitioner threatened Czodor to post

5   his nudes, allegedly on Sep 7, 2018. RT: 120 – 124, 150 – 153, 264 – 265. Czodor also

6   testified at trial he called the police the following week after Sep 7, 2018.

7        The police field activity report on Sep 10, 2018 clearly constituted evidence

8   relating to Czodor's credibility as the prosecution's ONLY witness with respect to whether

9   Petition threatened and posted Czodor's nude photos. Decl. Luo, ¶20. Had Petitioner

10  threatened him and posted his nudes, the option to tell the truth was available to Czodor at

11  that time. Yet, he called the police and alleged unfounded terrorism on Sep 10, 2018.

12  While considering evidence, the Court should keep in mind that the police never properly

13  collected evidence. The "evidence" admitted at trial was a stack of paper printout

14  provided by Czodor. No metadata or time stamp was ever examined. The Sep 10, 2018

15  report alone constituted exculpatory evidence the District Attorney was obligated to turn

16  over to Petitioner. *Giglio v. United States*, 405 U.S. 150 (1972); *People v. Ruthford* (1975)

17  14 Cal.3d 399, 406 [121 Cal.Rptr. 261, 534 P.2d 1341, A.L.R.4th 3132]. What reasonable

18  person, when they're being threatened by dissemination of nudes, would just sit there and

19  not call the police or call the police but said something else? What reasonable person,

20  after they were threatened by dissemination of nudes, would just sit there and wait until

21  the police cannot see the nudes to call the police?

22        It is uncontroverted that the government possessed the Sep 10, 2018 report and

23  Petitioner's counsel had no knowledge of it prior to, during, or after trial. This evidence

24  alone "leaves no room for doubt" that the government wrongfully deprived Petitioner of

25  exculpatory evidence bearing on the credibility of Czodor. *People v. Morris* (1988) 46

26  Cal.3d 1, 30, 31 [249 Cal.Rptr. 119, 756 P.2d 843].

27        **CLAIM 5: *Brady* Violation – Withholding of Sep 18, 2018 Police Field Activity**

28  **Report**

1       The sequence of events is everything in trying to figure out the plausibility of every

2   crime. Below is the chronology of events that took place on the night of Sep 18, 2018 and

3   afterwards:

4       Sep 18, 2018 7:54 pm Czodor took a video showing Defendant tapping (not

5   scratching) on his door with a key. Decl. Luo, ¶7. It is reasonably believed that Petitioner

6   arrived at Czodor's residence at 7:54 pm. Despite Czodor's ability to constantly take

7   photos and shoot videos, no photos or videos of Petitioner actually scratching the door. No

8   videos show the weird sound as Czodor testified in the family court.

9       Sep 18, 2018 7:55 pm – 8:06 pm Czodor already came outside from his house.

10  Decl. Luo, ¶6-7. If there was any damages to Czodor's door it would have been observed.

11      Sep 18, 2018 8:07 pm The 911 call was made, no mention of scratching or weird

12  noises. And the photos show that Czodor's front door area was brightly lit. Decl. Luo, ¶8-

13  9, 20. If there was any damages to Czodor's door it is impossible that he could not see it.

14      Sep 18, 2018 8:13 pm Czodor secretly took a video obviously both parties were

15  outside his residence on the street while Petitioner was unable to reach his front door.

16  Decl. Luo, ¶7.

17      Sep 19, 2018 Czodor alleged he discovered the damages to his door. RT: 168.

18      Sep 24, 2018 Czodor learned that it would cost him money to remove a post related

19  to his credibility. Decl. Luo, ¶11.

20      Sep 25, 2018 Czodor took a photo of his allegedly damaged door. Decl. Luo, ¶12.

21      Sep 26, 2018 police report was made. Decl. Luo, ¶14.

22      The evidence here does not support Czodor's testimony that he found scratches on

23  his door the day after Petitioner repeatedly knocked on it. His testimony was further

24  weakened by evidence that he took the photo of the damaged door after he received an

25  email stating that it would cost money to remove a post related to his credibility.

26      On Oct 19, 2018 Czodor testified that he heard weird noises while Petitioner

27  scratched his door for 20 minutes on Sep 18, 2018. Decl. Luo, ¶12. Family court transcript

28  at p. 34. The police field activity report on Sep 18, 2018 shows that at <u>8:07 pm</u>, the 911

29

1  call was made alleging Petitioner was knocking, instead of scratching Czodor's front door.

2  Decl. Luo, ¶20. Had Petitioner scratched Czodor's door creating weird noises for 20

3  minutes, the option to tell the truth was available to him when he called 911. Yet, he told

4  911 operator that Petitioner simply knocked on his door. Throughout the night on Sep 18,

5  2018 Czodor had no trouble in constantly taking photos and shooting videos but he

6  provided no videos showing the weird noises he testified he heard for 20 minutes, not a

7  single clip or second. Again, what reasonable person, when they're hearing their door

8  being scratched for 20 minutes, would just called 911 emergency and said an uninvited

9  person knocked on his door? What reasonable person, after they heard their door being

10  scratched for 20 minutes, would not suspect damage and check the door right away? What

11  reasonable person, after they heard their door being scratched for 20 minutes, would lie

12  about being dark to explain away his failure to discover the damage right away? What

13  reasonable person, after they discovered their door's damage on Sep 19, 2018, would sit

14  there and call the police six days later? RT: 168. What reasonable person, after they

15  discovered their door's damage on Sep 19, 2018, would just sit there and wait, until he

16  learned on Sep 24, 2018 that it would cost money to remove a post related to his

17  credibility, then right after he learned such fact he took a photo of the allegedly damaged

18  door and went to the police on Sep 26, 2018? Decl. Luo, ¶11. It turns out what prompted

19  Czodor to immediately approach the police was neither the "damaged door" nor his "nude

20  photos" but the fact that it would cost him money to do certain thing, namely revenge. See

21  *Carter v. Burch*, 34 F.3d 257, 260 (4th Cir. 1994) [Prior to the shooting, the alleged victim

22  said "I hate him so much . . . I would shoot myself even if I died if I could make it look

23  like he did it so he would spend the rest of his life in jail, ruin the rest of his life".]

24      There is no court in the United States can enjoin Petitioner from forming or

25  expressing her opinion about someone's credibility. Although Czodor alleged the cheater

26  post caused him damage and harm, he never spent a dime on the removal of the post.

27  Decl. Luo, ¶25.

28      Had Petitioner posted Czodor's nude photos the option to call the police right away

was available to him yet he waited until the police could not observe any nude photos to

approach the police or he was buying time to fabricate evidence? Both the reports on Sep

10, 2018 and Sep 18, 2018 show that Czodor kept changing his story and was untruthful,

from unfounded terrorism to posting nude photos and extortion, from knocking his door to

scratching his door. "[S]uppression of substantial material evidence bearing on the

credibility of a key prosecution witness is a denial of due process. . . ." *Ruthford*, supra, 14

Cal.3d at p. 408.

### CLAIM 6: *Brady* Violation – Withholding Czodor's Prior Conviction

Czodor was prosecution's sole witness. He was previously convicted of, by OCDA,

same prosecuting agency who prosecuted Petitioner. He was also convicted of probation

violation. His convictions rested upon facts establishing dishonesty or false statement no

different than fraud. Decl. Luo,  ¶17. Czodor's criminal record could have been obtained

with a simple click of a computer mouse. Instead, the prosecution engaged in strategic and

willful ignorance, even though it knew that Czodor's credibility was central to proving the

case. To make matters worse, the prosecution went on to bolster Czodor's testimony with

the argument that in the dark of the night Czodor might not have seen when she was

scratching his door, when in fact Czodor's front door was ablaze with light, and then

compounded this error by urging the jury to credit his testimony because of his lies. RT

292.

*United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) set

out a three part test for obtaining relief based on suppression of exculpatory evidence. (1)

The prosecution withheld or suppressed evidence; (2) The evidence was favorable to the

defense; (3) The evidence was material to either guilt or punishment. The evidence

revealed in Czodor's file need not have been independently admissible to have been

material. *Carriger v. Stewart*, 132 F.3d 463, 481 (9th Cir. 1997). As discussed above,

there is no doubt that Petitioner did not receive a fair trial. It is more than obvious that

prosecution's intentional failure to disclose exculpatory evidence under *Brady* was made

with the specific intent to avoid the possibility of an acquittal. Petitioner is entitled to a

1    reversal.

2    **CLAIM 7: Perjured Testimony/False evidence – report to police the following week**

3    **after Sep 7, 2018**

4        The Due Process Clause of the Fourteenth Amendment prevents the state from

5    obtaining a conviction using false evidence and obligates it to correct false evidence or

6    testimony during trial. *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d

7    1217 (1959) (granting relief where the false evidence related to the credibility of a key

8    witness for the state); *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d

9    342 (1976) ("[A] conviction obtained by the knowing use of perjured testimony is

10   fundamentally unfair, and must be set aside if there is any reasonable likelihood that the

11   false testimony could have affected the judgment of the jury.") Habeas relief is merited

12   where a witness's "testimony and credibility [is] crucial to the State's case" in light of each

13   side underscoring it in closing arguments. See *Hayes v. Brown*, 399 F.3d 972, 985–86 (9th

14   Cir. 2005).

15       Here, the police field activity report on Sep 10, 2018, indicating Czodor alleged

16   unfounded terrorism, clearly refutes Czodor's testimony that Petitioner threatened to

17   publish Czodor's nude photos and did so after making those threats between Sep 5 and

18   Sep 7, 2018 and the following week Czodor reported the said incidents to police. RT 150-

19   151.

20   **CLAIM 8: Perjured Testimony/False evidence – It was dark on Sep 18, 2018**

21       At the family court hearing on Oct 19, 2018 Czodor testified that he did not

22   discover the door's damage on Sep 18, 2018 because it was dark but the photos and

23   videos he took show otherwise. Decl. Luo, ¶2.

24       At trial, the prosecution tried to explain away why Czodor did not discover door's

25   damage on Sep 18, 2018. "[I]n the dark of the night, no, he might not have seen when she

26   was doing that. At some point, he's inside; at some point, she's outside. He admits that no,

27   he didn't see it while it was happening." RT 292. The evidence refutes such false

28   statement. Decl. Luo, ¶8-10. There was a light bulb installed right above Czodor's front

                                          32

door. The light showered Petitioner from head to toe in front of the door.

Trial counsel obtained Czodor's testimony at the family court and the photo of the damaged door prior to trial. Trial counsel did not bother to compare Czodor's prior testimony and actual evidence to expose his perjured testimony. The Supreme Court has recognized that where a criminal defense lawyer pursues a certain theory of defense, the lawyer's failure to present readily available evidence supporting that precise defense is unreasonable. See, e.g., *Wiggins v. Smith*, 539 U.S. at 526. It was unreasonable for counsel to fail to review records and expose the falsity of the state's evidence.

### CLAIM 9: Violation of Fifth Amendment - Unlawfully Introducing Petitioner's Compelled Testimony, While At the Same Time Misrepresenting Petitioner's Prior Testimony

"Every criminal defendant is privileged to testify in his own defense, or to refuse to do so." *Harris v. New York* (1971) 401 U.S. 222, 225 [28 L.Ed.2d 1, 91 S.Ct. 643, 645].) The defendant's 'absolute right not to be called as a witness and not to testify' arises from the Fifth Amendment to the United States Constitution and article I, section 15 of the California Constitution. *Cramer v. Tyars* (1979) 23 Cal.3d 131, 137 [151 Cal.Rptr. 653, 588 P.2d 793]. The Fifth Amendment provides that no person 'shall be compelled in any criminal case to be a witness against himself.' The Amendment not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings. *McCarthy v. Arndstein*, 266 U.S. 34, 40, 45 S.Ct. 16, 17, 69 L.Ed. 158 (1924), squarely held that '(t)he privilege is not ordinarily dependent upon the nature of the proceeding in which the testimony is sought or is to be used. It applies alike to civil and criminal proceedings, wherever the answer might tend to subject to criminal responsibility him who gives it. The privilege protects a mere witness as fully as it does one who is also a party defendant.'

In order to be admitted in our courts, inculpatory statements obtained must have

been made voluntarily. See *In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 177, 200 (2d Cir. 2008); see id. at 208 (noting that "statements obtained under . . . circumstances" where suspects were "forced to speak" to the agents of a foreign state "could not be admitted in a U.S. trial if the situation indicated that the statements were made involuntarily"); *Brulay v. United States*, 383 F.2d 345, 349 n.5 (9th Cir. 1967) ("[I]f the statement is not voluntarily given, whether given to a United States or foreign officer[ ]—the defendant has been compelled to be a witness against himself when the statement is admitted."); *United States v. Allen*, 864 F.3d 63, 101 (2d Cir. 2017) (holding that "the Self–Incrimination Clause prohibits the use and derivative use of compelled testimony in an American criminal case against the defendant who provided that testimony"); As a general matter, courts' descriptions of statements as "compelled" (invoking the text of the Self-Incrimination Clause) and/or "involuntary" (invoking, arguably, the Due Process Clause) are often used interchangeably and the words often treated synonymously.

Although tactical decisions at trial are generally counsel's responsibility, the decision whether to testify, a question of fundamental importance, is made by the defendant after consultation with counsel. *People v. McKenzie* (1983) 34 Cal.3d 616, 631, fn. 9 [194 Cal.Rptr. 462, 668 P.2d 769]; *U.S. v. Martinez* (9th Cir. 1989) 883 F.2d 750, 755, vacated on other grounds (1991) 928 F.2d 1470; see also *People v. Robles* (1970) 2 Cal.3d 205, 215 [85 Cal.Rptr. 166, 466 P.2d 710].)" *People v. Hines* (1997) 15 Cal.4th 997, 1032 [64 Cal.Rptr.2d 594, 938 P.2d 388].

It is indisputable that, in a family court proceeding, Petitioner was entitled to invoke the Fifth Amendment right. No court could have forced Petitioner to testify in a deposition or at a trial so long as the potential for criminal charges remained. Here, however, when called to respond in a family court proceeding, Petitioner could not afford counsel and was compelled to testify. With no legal mechanism available to avoid testifying in a family court proceeding Petitioner could not invoke her right to remain silent without counsel. Petitioner's testimony was involuntarily given in a family court and therefore was compelled.

*McCarthy v. Arndstein* reflected the settled view that the object of the Fifth Amendment 'was to insure that a person should not be compelled, when acting as a witness in any investigation, to give testimony which might tend to show that he himself had committed a crime.' *Counselman v. Hitchcock*, 142 U.S. 547, 562, 12 S.Ct. 195, 198, 35 L.Ed. 1110 (1892). See also *Bram v. United States*, 168 U.S. 532, 542—543, 18 S.Ct. 183, 186—187, 42 L.Ed. 568 (1897); *Brown v. Walker*, 161 U.S. 591, 16 S.Ct. 644, 40 L.Ed. 819 (1896); *Boyd v. United States*, 116 U.S. 616, 634, 637—638, 6 S.Ct. 524, 534, 536—537, 29 L.Ed. 746 (1886); *United States v. Saline Bank*, 1 Pet. 100, 7 L.Ed. 69 (1828). A witness protected by the privilege may rightfully refuse to answer unless and until he is protected at least against the use of his compelled answers and evidence derived therefrom in any subsequent criminal case in which he is a defendant. *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). Absent such protection, if he is nevertheless compelled to answer, his answers are inadmissible against him in a later criminal prosecution. *Bram v. United States*, supra; *Boyd v. United States*, supra.

In its holding, the *Kastigar* Court emphasized the breadth of use and derivative use protection. Such protection "prohibits the prosecutorial authorities from using the compelled testimony in any respect, . . . therefore insur[ing] that the testimony cannot lead to the infliction of criminal penalties on the witness." *Kastigar*, 406 U.S. at 445. As the *Kastigar* Court observed, "[t]his total prohibition on use provides a comprehensive safeguard, barring the use of compelled testimony as an investigatory lead, and also barring the use of any evidence obtained by focusing investigation on a witness as a result of his compelled disclosures." Because this "very substantial protection[] [is] commensurate with that resulting from invoking the privilege itself," it "leaves the witness and the prosecutorial authorities in substantially the same position as if the witness had claimed the Fifth Amendment privilege." *Kastigar*, 406 U.S. at 460 – 462.

*Kastigar* also established a doctrine to enforce this protection. When a witness has been compelled to testify relating to matters for which he is later prosecuted, the government bears "the heavy burden of proving that all of the evidence it proposes to use

35

1    was derived from legitimate independent sources." This burden is "not limited to a

2    negation of taint; rather, it imposes on the prosecution the affirmative duty to prove that

3    the evidence it proposes to use is derived from a legitimate source wholly independent of

4    the compelled testimony." *Kastigar*, 406 U.S. at 460. The Government must prove it has

5    met this heavy, albeit not insurmountable, burden by a preponderance of the evidence.

6    *United States v. Nanni*, 59 F.3d 1425, 1431–32 (2d Cir. 1995).

7         In this prosecution, Petitioner's compelled testimony in the family court was

8    unlawfully "used" against her through the testimony provided by prosecution's sole

9    witness at trial. Decl. Luo, ¶2. Family court transcript at p. 9 – 10. RT: 173 – 179. The

10   introduction of Petitioner's prior testimony in a civil proceeding when she was not

11   represented by counsel violated her Fifth, Sixth, and Fourteenth Amendments rights.

12        Further, the prosecution falsely alleged that "She said she didn't need his

13   permission. It was her story. Did you post the videos? "Well, maybe some of them."

14   Under oath, spoke to the judge in that hearing and admitted that. The evidence is

15   abundantly and absolutely clear she's guilty of Count III," RT: 274 – 275, when in fact the

16   original testimony in family court is:

17        THE COURT: YOU CREATED ONE?

18        MS. LUO: YEAH.

19        THE COURT: WITH HIS PERMISSION?

20        MS. LUO: BECAUSE --

21        THE COURT: YES OR NO WITH HIS PERMISSION?

22        MS. LUO: BUT IT DEPENDS ON WHAT CONTENT OF THAT VIDEO.

23        THE COURT: WELL, MA'AM, YOU SAID YOU

24        POSTED ONE. I JUST WANT TO KNOW IF YOU HAD HIS

25        PERMISSION TO PUT HIM ON YOUTUBE.

26        MS. LUO: BECAUSE THAT'S ABOUT ME, ABOUT

27        MY STORY. I DON'T NEED HIS PERMISSION.

28        THE COURT: IS THERE A PICTURE OF HIM ON IT?

1      MS. LUO: NO.

2      Decl. Luo, ¶12.

3          The prosecution falsely alleged that "Her response was, "It's been taken down."

4   Ask yourself -- I invite you to ask you – amongst yourselves when you deliberate, how

5   would she know it's been taken down if she's not the one that put it up, and she has no idea?

6   Why at that point would she not say the court, I never posted that. What are you talking

7   about?" RT: 267, while in fact the original testimony in the family court is:

8          THE COURT: MY QUESTION IS, DID YOU CREATE THIS?

9          MS. LUO: I DON'T RECALL.

10         THE COURT: BUT YOU DO KNOW IT WAS TAKEN DOWN?

11         MS. LUO: BECAUSE I SEARCHED WHEN I GOT

12         THE REQUEST FOR RESTRAINING ORDER, I SEARCHED.

13         IT'S BEEN TAKEN DOWN.

14         Decl. Luo, ¶12.

15         Prosecution's false representation is outrageous. This is a senseless frame job. This

16   prosecutor should be disbarred.

17         **CLAIM 10: Ineffective Assistance of Counsel (IAC) – failure to investigate and**

18                                      **cross-examine**

19         Where there is no forensic evidence, where there is no independent evidence,

20   where the only witness is Czodor, and where the credibility of the witness is a crucial

21   issue in a criminal case, defense attorney failed to discover the facts that (1) Czodor was

22   previously subject to deportation; (2) Czodor was arrested for impersonation; (3) Czodor

23   had prior criminal convictions rested upon facts establishing dishonesty and/or false

24   statements; (4) Czodor was a longtime married man in 2018 when he connected with

25   Petitioner as a single man never married and his wife is ten years older than him; (5) No

26   customer named Lilly on Czodor's Yelp page; (6) No company named "Gorgeous

27   Painting" ever existed. Decl. Luo, ¶2, 18, 19.

28         Criminal defense attorneys have a duty to investigate carefully all defenses of fact

and of law that may be available to the defendant. *People v. Pope* (1979) 23 Cal.3d 412, 425-426.

As *Wiggins* makes clear, without a reasonable investigation, a fully-informed decision with respect to trial strategy is "impossible." *Wiggins v. Smith*, 539 U.S. 510, 527-28 (2003). Where a single juror could reasonably have reached a different result absent counsel's error prejudice has been shown. *Id.* at 537. Because the failure to conduct a reasonable investigation lacked a strategic rationale, Petitioner's representation was ineffective. See *Hendricks v. Vasquez*, 974 F.2d 1099, 1109 (9th Cir. 1992); *Williams v. Taylor*, 529 U.S. 362, 396, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (finding that counsel had an obligation to conduct a thorough investigation of the defendant's background); see also *Strickland v. Washington*, 466 U.S. 668, 691 (1984) (finding that counsel has "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary").

After trial counsel failed to investigate, trial counsel naturally failed to adequately cross-examine and impeach the prosecution's ONLY witness on the following key issues: (1) from what time to what time on Sept 18, 2018 Petitioner was scratching Czodor's door; (2) why Czodor was unable to provide any videos or photos showing Petitioner's scratching motion or sound and the door's fresh damage even after he heard 20 minutes' scratching, when he was able to constantly film and take photos throughout the night on Sep 18, 2018; (3) why the damage of the door was discovered the next day even when the front door area had more than enough lighting on Sep 18, 2018; (4) why Czodor lied about being dark on Sep 18, 2018 when the photos and videos show otherwise; (5) why police was told on Sep 18, 2018 that Petitioner was knocking instead of scratching Czodor's door even after Czodor heard scratching; (6) why the photo of the damaged door was taken right after Czodor discovered that it would cost money to remove Petitioner's online post; (7) it would take only a second to create a scratch, 20 minutes have 1,200 seconds, why the damage on the photo is not consistent with 20 minutes scratching; (8) how did Czodor not know his door was damaged after hearing 20 minutes of scratching;

38

(9) how was it believable that a reasonable person noticed the damage of his own front door the next day even after he heard 20 minutes' scratching; (10) what prevented Czodor to report the door's damage on Sep 19, 20, 21, 22, 23, 24, 2018; (11) from what date to what date Petitioner posted Czodor's nude photos; (12) why Czodor did not call police immediately after Petitioner threatened Czodor; (13) what happened after Petitioner threatened Czodor and what backed up Czodor's version of event; (14) Czodor's upbringing, lifestyle, and public nudity as a nudist; (15) what Czodor knew about Petitioner prior to sending her nude photos while he deemed Petitioner "nobody" and he was Hanh Le's cheating husband; (16) the terrorism report filed on Sep 10, 2021 suggests that Czodor had no difficulty in calling police, why did he waited to report to the police that Petitioner posted his nudes while there was no nude photo of him online; (17) why Czodor didn't report to the police right after his nude photo was posted online; (18) why Czodor waited until the police officer could not observe his nude photos online to make that report; (19) why Czodor could not provide digital evidence with metadata; (20) in this 21st century why there was only paper evidence; (21) why Czodor was able to provide Petitioner's threatening text messages but unable to provide Czodor's request to keep his nude photos private or Petitioner's promise to keep Czodor's nude photos private despite the nude photos were sent through text messages and all communication between the parties were done via texts; (22) why no one named Lilly was on Czodor's yelp page. RT: 196 – 214.

Such a cross-exam could have undermined Czodor's story, and raised the issue that he may have manufactured evidence to frame Petitioner. Under these circumstances, it is reasonable to expect that defense counsel would question the sequence of events. These questions, along with questions of inconsistency and concerning why Czodor lied about having a business and being dark while the light showered Petitioner from head to toe in front of his door on Sep 18, 2018, would have undermined Czodor's credibility. They would also have cast doubt on the jury's mind as to Czodor's door was damaged on Sep 18, 2018 and the purpose he sent nudes to Petitioner while he deemed Petitioner

"nobody". Even if Czodor provided "satisfactory" explanations to such questions, the mere asking of the questions would have led the jury to consider that Czodor was involved in the planting and manufacturing of the evidence. In a case as close as this one, such doubt was essential. Counsel's failure to question along these lines thus constituted a failure to test the adversarial process, and undermines confidence that the trial produced a just result.

Even if Czodor provided a "believable" answer, his credibility and the issues of the photo of the damaged door taken right after Czodor discovered the cost to remove a post related to his credibility and the delay in reporting until the police could not observe any nude photos online would have been clearly raised. Such evidence would have raised at least some doubt in the jury's mind, as to Petitioner's guilt. A failure to bring these issues to the jury's attention was a performance error of constitutional significance.

The inconsistencies would have alerted any reasonably competent attorney and would have produced effective questioning of Czodor on these issues. Such questioning could have tied Czodo to his motive to frame Petitioner after learning it would cost money to remove a post related to his credibility, and further connected Czodor to the fabrication of evidence. Again, whether any credible answers were given or not, the issue would have been placed in the jury's mind for adequate consideration. Instead, Czodor walked away not having been tested by defense counsel.

When the newly discovered evidence contradicts the strongest evidence introduced against Petitioner, it reopens the critical gap in the prosecution's chain of proof. If the jurors even found a reasonable possibility that Czodor's testimony was untrue, it is unlikely that they would find Petitioner's guilt proved beyond a reasonable doubt. See *People v. Martinez*, 36 Cal.3d 816, 823 (Cal. 1984) [holding that to acquit defendant, the jury need not find Torrez' recollection accurate and Gerhis' inaccurate. It need only decide that Torrez' testimony raised a reasonable doubt as to the time when the drill press was repainted, and thus a reasonable doubt as to defendant's guilt.] Any reasonable attorney would have raised these issues in examining the prosecution's only witness. Counsel's

40

1   failure to adequately cross-examine Czodor on the issues presented above constituted

2   ineffective assistance of counsel and prejudiced Petitioner. Trial counsel's woefully

3   inadequate and grossly insufficient legal representation allowed witness perjury to occur

4   unchallenged. See also Claim 16, 23.

5   **CLAIM 11: IAC – Failure to present Czodor's Sep 24, 2018 email and the fact that**

6   **Czodor is a nudist**

7       On Sep 24, 2018, the day before Czodor took photos of his damaged door, Czodor

8   learned that the removal of a post related to his credibility would cost money. Counsel

9   could have used this evidence -- showing that Hanh Le's shameless cheating husband,

10  Czodor, was fabricating evidence of domestic violence -- to undercut the balance of the

11  state's domestic violence evidence solely based on self-reporting by Czodor.

12      Petitioner, prior to trial, informed defense counsel that Czodor was a nudist. Decl.

13  Luo, ¶16. Defense counsel inexcusably elected not to present this fact to the jury. This

14  was so even though Czodor testified he exposed himself in public, on a nude beach. RT

15  144-145. Further, there was never a company "Gorgeous Painting" ever existed. Decl.

16  Luo, ¶19.

17      Naturism is a lifestyle of social nudity, and the cultural movement which advocates

18  for and defends that lifestyle. Both may also be referred to as nudism. Nudists believe that

19  becoming nude increases confidence and going naked brings them out of their shell.

20  Without the barrier of clothing, nudists become more open, comfortable, and secure.

21  However, these facts were not presented to the jury at trial, not even investigated by trial

22  counsel which resulted in the withdrawal of a potentially meritorious defense. Trial

23  counsel did not even bother to cross examine Czodor after he, who is a nudist, testified

24  that his nude photo was taken on a nude beach. RT: 144 – 145.

25      It is reasonably probable that the presentation of the fact that Czodor is a nudist

26  who is comfortable to be naked in public, along with the truth that Czodor did not have a

27  dating relationship with Petitioner, would have led one or more jurors to harbor

28  reasonable doubt about Czodor's expectation of privacy and emotional distress, and

41

Petitioner's knowledge that the distribution of the images would cause a nudist serious emotional distress. Coupled with other exculpatory evidence, it turns out to be clearer that the entire thing was fabrication, namely a hoax. Even if counsel has legitimate tactical reasons for introducing no evidence, his performance is still inadequate if evidence supporting a potentially meritorious defense remains unexplored. *In re Cordero* (1988) 46 Cal.3d 161, 181.

**CLAIM 12: IAC – Failure to request jury instruction related to Dating Relationship**

A trial court should instruct the jury upon every material question upon which there is any evidence deserving of consideration whatever. *People v. Flannel* (1980) 25 Cal. 3d 668, 684.

The trial court's failure to instruct the jury on dating relationship violated Petitioner's right to have the jury determine all the issues presented by the evidence. Substantial evidence is evidence from which a jury composed of reasonable persons could conclude that the particular facts underlying the instruction exist. *Flannel*, 25 Cal. 3d at 684; *People v. Lemus* (1988) 203 Cal. App. 3d 470, 477.

In deciding whether or not there is substantial evidence, courts should not evaluate the weight of the evidence, because that is a task for the jury. *Flannel*, 25 Cal. 3d at 684; *Breverman*, 19 Cal. 4th at 162; *Lemus*, 203 Cal. App. 3d at 477. Importantly, "doubts as to the sufficiency of the evidence to warrant instructions should be resolved in favor of the accused." *Flannel*, Id. at 685; *People v. Wilson* (1967) 66 Cal. 2d 749, 763. As will be set out more fully below, there was sufficient evidence to warrant dating relationship instructions, and all doubts should have been resolved in Petitioner's favor.

Such failure is particularly critical because the sua sponte duty to instruct on the general principles of law includes an obligation to instruct on relevant defenses. *Breverman*, 19 Cal. 4th at 157; *Middleton*, 52 Cal. App. 4th at 30; *Gonzales*; 88 Cal. Rprtr. 2d at 116 - 117. No dating relationship between Czodor and Petitioner was a relied upon theory that the TRO and DVRO were unlawful due to lack of dating relationship and Czodor did not have a reasonable expectation of privacy in his nude photos as a nudist.

1  See *State v. Vanburen*, 214 A.3d 791, 820 (Vt. 2019) [concluding that dismissal is

2  appropriate after finding no evidence in the record showing the complainant and the

3  recipient of naked pictures had any kind of relationship engendering a reasonable

4  expectation of privacy.]

5       Trial counsel's failure to request the trial court to give instructions deprived the

6  jury of "considering the full range of possible verdicts." *Breverman*, 19 Cal. 4th at 155.

7  Such failure resulted in a deprivation of Petitioner's constitutional right to have the jury

8  decide all issues presented by the evidence. *Lopez*, 19 Cal. 4th at 288; *Qskins*, 69 Cal.

9  App. 4th at 139.

10       Whether Czodor and Petitioner had a dating relationship is a question for the jury,

11  not the judge, to decide. See *People v. Cleaves* (1991) 229 Cal. App. 3d 367 (stating that a

12  defendant's right to instructions does not turn on the court's assessment of the credibility

13  or the strength of evidence); see also *Lemus*, 203 Cal. App. 3d at 477; *Lopez*, 19 Cal. 4th

14  at 288; *Oskins*, 69 Cal. App. 4th at 139. It is reasonably likely the result would have been

15  different had counsel done the right thing to request the trial court to instruct the jury on

16  dating relationship because substantial evidence suggests that there was no dating

17  relationship between Czodor and Petitioner. Had the jury been instructed to decide

18  whether Czodor and Petitioner had a dating relationship it is highly probable that no jurors

19  would found any dating relationship between Czodor and Petitioner.

20  **CLAIM 13: IAC – Stipulation with The Prosecution, Without Petitioner's Consent,**

21  **Over Two Unlawful Family Court Orders**

22       Public defender not only presented no defense but also did prosecution a favor so

23  that the prosecution did not need to prove the lawfulness of the TRO and DVRO. Trial

24  counsel signed off a stipulation on Jul 28, 2021 with the prosecution without prior

25  discussion with Petitioner, nor did he ask for Petitioner's consent despite he was well

26  aware that there was no dating relationship between Czodor and Petitioner. Petitioner was

27  uninvolved in that stipulation. RT: 217 – 219.

28       Petitioner did not grant consent or authority to public defender to sign off a

1  stipulation with prosecution. See *Riggins v. Nevada*, 504 U.S. 127, 144, 112 S.Ct. 1810,

2  118 L.Ed.2d 479 (1992) ("We have held that a defendant's right to the effective assistance

3  of counsel is impaired when he cannot cooperate in an active manner with his lawyer. The

4  defendant must be able to provide needed information to his lawyer and to participate in

5  the making of decisions on his own behalf.") (citations omitted). Prior to signing off the

6  stipulation public defender never discussed with Petitioner about the stipulation which

7  indicates a serious breakdown in communications. Public defender's action deprived

8  Petitioner of her right to participate in the making of decisions on her own behalf. Their

9  action was consistent with their failure to fully advise Petitioner of her right to a speedy

10  trial and general time waiver. Although no investigation was done they lied to Petitioner

11  that they would need time to investigate to make Petitioner agree to have trial on a later

12  date.

13          See also Claim 2 & 3. Decl. Luo, ¶22.

14  **CLAIM 14: IAC – Failure to exclude Petitioner's prior compelled testimony in a**

15  **family court**

16          Trial counsel's failure to exclude or object to the introduction of Petitioner's prior

17  compelled testimony in a family court was prejudicially ineffective. When the prosecution

18  cherry picked and misrepresented Petitioner's prior testimony in a civil proceeding when

19  she was not represented by counsel, trial counsel failed to object and did nothing. Trial

20  counsel presented zero legal argument to suppress Petitioner's prior compelled testimony

21  in a family court. RT: 78 – 102. Trial counsel's conduct was so outrageous that no

22  competent attorney would have engaged in it.

23          **CLAIM 15: IAC – Failure to expose the witness's lie about being dark**

24          At the family court hearing on Oct 19, 2018 Czodor testified that he did not

25  discover the door's damage on Sep 18, 2018 because it was dark but the photos and

26  videos he took show otherwise. Decl. Luo, ¶8-10. In fact, there was a light bulb installed

27  right above Czodor's front door. The light showered Petitioner from head to toe. However,

28  Czodor's lie about being dark was never exposed to the jury.

Whether the front door area was dark is a material fact as to whether it is possible that Czodor did not discover his door damages on Sep 18, 2018. A witness who is found not to be credible on one claim may be treated as not credible on others. See *Hattem v. United States*, 283 F.2d 339, 343 (9th Cir. 1960) (stating witness' false testimony on one material fact authorizes trier of fact to disregard all of witness' testimony); cf. *Allen v. Chicago Transit Auth*., 317 F.3d 696, 703 (7th Cir. 2003) (holding trier of fact is to weigh a witness' perjury).

No matter how hard, tapping on wood furniture with a key is not going to damage the furniture. Trial counsel didn't even bother to make a court room reenactment and tap on wood furniture with a key in front of the jury.

### CLAIM 16: IAC – Failure to discover and present the witness's inconsistent statements made to the police and call any defense witnesses

Defense counsel, rendered constitutionally ineffective assistance in failing to discover and present exculpatory evidence, the police field activity reports dated on Sep 10, 2018 and Sep 18, 2018. During the two years of the case's pendency prior to jury selection, six public defenders cycled through Petitioner's case but no meaningful investigation was conducted, none of them ever made any effort to investigate the inconsistent statements the witness made to police. See *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994) (holding that trial counsel was deficient during guilt phase for "fail[ing] to conduct even the minimal investigation that would have enabled him to come to an informed decision about what defense to offer," and that "[d]escribing [counsel]'s conduct as 'strategic' strips that term of all substance").

The most critical point in any trial is the timeline of the crime. The core of the prosecution's theory regarding Petitioner's possibility to commit the vandalism rested on Czodor's testimony that he heard Petitioner scratching his door for 20 minutes on Sep 18, 2018 and took a photo of the damaged door 7 days after Petitioner left his residence due to being unable to see Petitioner's scratching action and late discovery of the damage due to the darkness on Sep 18, 2018. A reasonably competent defense attorney would have

45

1   recognized the importance of investigating the sequence of the events on Sep 18, 2018,

2   whether the police was called during the course of Petitioner's scratching, what was said

3   to the 911 call operator, whether the testimony of Chris Kovacs, the 911 call operator, and

4   the police officers arrived are consistent, and whether Czodor withheld evidence from the

5   police while Czodor provided two videos shot on Sep 18, 2018 but none of those videos

6   show Petitioner was scratching Czodor's door. In any event, there is no reason why

7   competent counsel would not have at least inquired. Such failure is objectively

8   unreasonable and prejudicial to Petitioner.

9          To make out Petitioner's defense at trial, trial counsel relied solely on the

10   prosecution's witness, who was Czodor and provided no help to the theory of the defense.

11   Trial counsel took this tack not for lack of better options, but simply because he failed to

12   conduct an adequate investigation into potential witnesses who might have provided

13   helpful testimony. As a consequence, trial counsel failed to introduce significant

14   testimony that would have raised doubts about Petitioner's guilt.  Trial counsel failed to

15   call to testify Chris Kovacs, the 911 call operator, the police officers arrived on Sep 18,

16   2018 at Czodor's residence and the police officers who "collected" evidence. The 911 call

17   was made at 8:07 pm on Sep 18, 2018. When the 911 call was made Chris Kovacs already

18   arrived at Czodor's residence and met Czodor, and saw both Czodor and Petitioner. These

19   facts pick apart Czodor's statement that Petitioner scratched his door for 20 minutes and

20   he didn't report to the police on Sep 18, 2018 because he didn't see Petitioner's scratching.

21   Had Petitioner scratched his door, Czodor had ample opportunity to see it right away.

22   Those people's testimony, even if imperfect, would have provided a potentially

23   meritorious defense and inconsistency with Czodor's theory ruling out Petitioner's guilt.

24          Police officers were not called to testify how the evidence was collected and the

25   evidence was not examined. Why digital evidence was not collected in 21st century?

26   What evidence protocol should the police follow? Why didn't the police collect evidence

27   following protocol to avoid any foul play? Why paper evidence was accepted in 21st

28   century? Why didn't the police collect any and all photos and videos taken on Sep 18,

2018? Why did the police allow Czodor to cherry pick "evidence"? By not collecting

digital evidence following protocol it is no different from not collecting DNA evidence in

a homicide case. By not collecting digital evidence following protocol how did the police

know the evidence was not manufactured, tampered, or fabricated? We now know Amber

Heard's photos were edited according to metadata expert.

https://www.marca.com/en/lifestyle/celebrities/2022/05/26/628ed0f7e2704e899e8b45f5.h

tml  We also know Fake Texting Apps are everywhere.

https://www.applavia.com/blog/best-fake-texting-apps-for-iphone-ipad/

     Trial counsel failed to call the police officers to the stand and engaged in a

lackadaisical and ineffective cross-examination of the prosecution's sole/star witness.

There was no opportunity to attack the improperly gathered, mischaracterized, or

fabricated evidence.

**CLAIM 17: IAC – Failure to Object**

**1.  Trial Court's Denial of Hardship Request by Juror #4 Prejudiced
     Petitioner**

     After the jury was sworn in, Juror #4, who was a delivery driver, alleged that he

must go to work and requested to be excused due to financial hardship. RT: 103 – 105.

Trial counsel failed to object the trial court's denial of his hardship request. Juror #4 was a

delivery driver struggling to put food on his family's table. It's difficult to see he would

devote himself to the trial due to his frustration. He may want to finish as soon as possible

and gave up his insight and position during deliberation.

**2.  Prosecutorial Misconduct**

     As a public official charged with representing the general interest and attaining

justice, a prosecutor may have special stature in the eyes of the jury, and so his or her

misstatements may carry significant weight. See *People v. Donaldson* (2001) 93

Cal.App.4th 916, 932. Trial counsel's failure to object to prosecutorial misconduct was

prejudicially ineffective.

**3.  Evidence Code §352**

47

1    Pursuant to Evidence Code §352, the court in its discretion may exclude evidence

2    if its probative value is substantially outweighed by the probability that its admission will

3    (a) necessitate undue consumption of time or (b) create substantial danger of undue

4    prejudice, of confusing the issues, or of misleading the jury. *People v. Roscoe* (1985) 168

5    Cal.App.3d 1093, 1100.

6    While the prosecution presented screenshots and secretly recorded videos trial

7    counsel failed to exclude or object on Evidence Code §352 grounds. The prosecution

8    failed to demonstrate that the recordings were complete and that something said or done

9    was not being taken out of context. The prosecution failed to establish that the recordings

10   were of good audio / visual quality and were demonstrably records of the entire meeting

11   or interview rather than an edited selection. The prosecution has not shown that there is no

12   possibility that where Petitioner did not know a conversation was being recorded, the

13   content was not manipulated with a view to drawing Petitioner, the party who was

14   unaware, into some statement that can be taken out of context. Same to screenshots of the

15   text messages presented by prosecution. The prosecution failed to establish that the text

16   messages were complete, not being manipulated or manufactured.

17   "At no point does she say anything to say that she didn't to that, right? She never

18   said, what are you talking about? I would never do that. This is a misunderstanding. No

19   way. What reasonable person, when they're being directly accused of that, would just sit

20   there and not in some way deny it? And she doesn't deny it in any way. "I was emotional."

21   And she admits it again in court, and you should find that she's fully admitting to that

22   crime. And it's clear that she did it, and she is absolutely guilty of Count III." RT: 268.

23   The prosecution attempted to establish Petitioner's guilt from adoptive admission.

24   Considering Petitioner's silence in the context of her one and only statement to Czodor,

25   her failure to deny is of little probative value to a claim of acquiescence since the nude

26   photos at the heart of the questioning—and of this prosecution—were sent to Petitioner by

27   a nudist without any expectation of privacy. Thus, in the setting of an altercation that was

28   about to be upgraded in the middle of the street—such as it was—it is likely that

48

Petitioner denied it while her denial was not recorded, or Petitioner disdained to deny

while it was so obvious a hoax, or her failure to deny may be an attempt to avoid further

altercation, or Czodor, who was the aggressor, withheld the recording of the next part of

the altercation showing Petitioner denied it, or she thought it was unnecessary to deny

because she was in fact innocent. Thus, an adverse inference would be too speculative to

pass §352 muster. Innocent people falsely accused often believe in "a just world and in the

transparency of their own blameless status.... [T]hose who stand falsely accused also have

faith that their innocence will become self-evident to others. As a result, they are not

calculated to choose their words or action, often not realizing that they are being framed

or set up and later trapped by false evidence and perjured testimony. The "lesson of

history," our Supreme Court has observed, is "that a system of criminal law enforcement

which comes to depend on the 'confession' will, in the long run, be less reliable and more

subject to abuses than a system which depends on extrinsic evidence independently

secured through skillful investigation." *Escobedo v. Illinois* (1964) 378 U.S. 478, 489–

490, 84 S.Ct. 1758, 12 L.Ed.2d 977, fns. omitted.

Though jurors were told to follow instructions and accept with no adverse

inference defendant's right not to testify at trial, it was nevertheless concerning that

allowing the Government to introduce evidence and comment on defendant's silence

without anything to measure that silence against invites a degree of confusion in the minds

of the jurors that an instruction is unlikely to remedy. See *Bruton v. United States*, 391

U.S. 123, 135–36, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) ("[T]here are some contexts in

which the risk that the jury will not, or cannot, follow instructions is so great, and the

consequences of failure so vital to the defendant, that the practical and human limitations

of the jury system cannot be ignored."). Here, the implications of defendant's minimally

probative silence would have been powerfully incriminating because of its alluring logical

appeal to ordinary, innocent people—i.e., jurors—who naturally would be unaware of the

reality of each circumstance. In the end, given jurors' lack of healthy skepticism the

danger of unfair prejudice to Petitioner substantially outweighed the de minimis probative

1    value of her silence to establish acquiescence.

2         Trial counsel's failure to suppress or object on evidence code §352 grounds and the

3    introduction of screenshots and secretly recorded videos prejudiced Petitioner.

4                    **CLAIM 18: IAC – Failure to bring the case to a speedy trial**

5         Public defender's failure to prepare for trial in a timely manner violated

6    Petitioner's right to a speedy trial. It also violated Petitioner's right to a competent counsel

7    that would not violate her right to a speedy trial. Decl. Luo, ¶26-42.

8         A Penal Code section 1382 violation entitles the defendant to pretrial dismissal

9    regardless of prejudice. *People v. Anderson* (2001) 25 Cal.4th 543, 604-605; *People v.*

10   *Martinez* (2000) 22 Cal.4th 750, 769. "Waiver" refers to an explicit and intentional

11   relinquishment of a right. *In re S.B.* (2004) 32 Cal.4th 1287, 1293, fn. 2. Petitioner never

12   knowingly, voluntarily, and intelligently waived her right to a speedy trial. Decl. Luo, ¶26

13   – 34. Petitioner did not request any continuance due to her inability to appear for trial.

14   Petitioner did not benefit at all from any continuance. Nor did Petitioner request any

15   reassignment of counsel. Decl. Luo, ¶33-34. Petitioner was taken advantage of and put on

16   a spot to choose to go to trial with an unprepared counsel or go to trial at a later date. Trial

17   counsel failed to file a *Serna* motion upon Petitioner's request. Defense counsel took this

18   tack not for lack of merit, but simply because he did not want to admit his office was

19   substantially responsible for the violation of Petitioner's right to a speedy trial.

20   Eventually, trial counsel called no witness to the stand, engaged in a lackadaisical and

21   ineffective cross-examination of the prosecution's sole/star witness, and presented no

22   evidence from his investigation. RT: 196 – 214. Trial counsel's performance supports the

23   fact that the delay of the trial was substantially caused by the office of public defender and

24   no good cause was ever found for the continuance. Petitioner was unable to have both her

25   constitutional rights to a speedy trial and a prepared and competent counsel. Public

26   defender's lack of loyalty was a stunning betrayal. Decl. Luo, ¶39.

27        When address whether the circumstances were so prejudicial as to require reversal

28   the *Chapman* reversible error standard applies. *Chapman v. California* (1967) 386 U.S.

50

18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065]; *People v. Ruthford* (1975) 14 Cal.3d 399, 408 [121 Cal.Rptr. 261, 534 P.2d 1341, A.L.R.4th 3132]. Under this test, "[a]n accused . . . is entitled to relief in such circumstances unless we can declare a belief that the denial 'was harmless beyond a reasonable doubt.' [Citation.]" (Ibid.) Thus, "[t]he defendant must make a showing of substantial materiality and even after this showing is made reversal is not required if the prosecution established the failure to was harmless beyond a reasonable doubt." *Id*. at p. 409.

Trial counsel's performance clearly showed that there was no investigation or preparation done. There was no excuse to the failure to bring the case to a speedy trial. See also Claim 26. Public defender's failures and actions were constitutionally ineffective.

## CLAIM 19: Unreasonable Determination of The Facts In Light of The Evidence Presented in The State Court Proceeding under 28 U.S.C. § 2254(d)(2)

Sending nude photos after meeting a person just one time cannot establish any expectation of privacy. This is especially true because the person sending nude photos is a nudist and a married man who concealed his marital status to seek casual hook-ups.

## CLAIM 20: Insufficient Evidence – dating relationship that engendered expectation of privacy

Hanh Le's infamously unfaithful husband, Czodor, did not have a dating relationship with Petitioner that engendered any expectation of privacy. RT: 132 – 134. See also Claim 2.

## CLAIM 21: Insufficient Evidence – Expectation of Privacy

The requirement that the images at issue be subject to a reasonable expectation of privacy is central to the statute's constitutional validity under a strict-scrutiny standard. A content-based restriction on First Amendment-protected speech can withstand strict scrutiny only if it is narrowly tailored to serve a compelling state interest. *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 444 (2015). The compelling state interest underlying Penal Code section 647(j)(4)(A) is to protect peoples' reasonable expectations of privacy in intimate images of them and prevent the serious harms that can result when those

51

1   expectations are broken. Where an individual does not have a reasonable expectation of

2   privacy in an image, the State's interest in protecting the individual's privacy interest in

3   that image is minimal.

4   　　　Penal Code section 647(j)(4)(A) "penalizes only the disclosure of images in which

5   the depicted person had a reasonable expectation of privacy rested in part on our

6   construction that the statute would apply only where the person depicted had

7   not <u>distributed</u> the images in a way that would undermine their reasonable expectation of

8   privacy." *State v. Vanburen*, 214 A.3d 791, 821 (Vt. 2019).

9   　　　The State bears the burden of establishing that it has evidence as to each element of

10  the offense. In order to convict under Pen. Code, § 647(i)(4)(A), the State must prove,

11  beyond a reasonable doubt, that Petitioner received or acquired Czodor's images under

12  circumstances in which they agreed or understood that the images shall remain private.

13  　　　Married individuals have an existing commitment to their spouse, which involves

14  maintaining trust and fidelity in their relationship. Infidelity inherently involves a breach

15  of trust and a violation of the commitment made within a marriage. In the context of

16  infidelity, the absence of an established intimate relationship with the person to whom the

17  naked photos are sent further diminishes the expectation of privacy. The lack of emotional

18  and physical intimacy suggests that the sender did not expect the same level of

19  responsibility in maintaining privacy as one would expect within a committed

20  relationship.

21  　　　By engaging in extramarital activities, including sending naked photos to someone

22  other than his spouse, a married nudist demonstrates a lack of regard for the expectations

23  of privacy within the confines of his marriage. By sending his naked photos to someone

24  other than his spouse, a married nudist is voluntarily disclosing his images to a third party

25  in the absence of established intimacy. This act itself suggests no expectation of privacy,

26  as he has chosen to share these images with someone outside the boundaries of his

27  marriage. The breach of trust in marriage, the absence of established intimacy with a third

28  party, and the voluntary disclosure, contribute to the significantly diminished expectation

1  of privacy when it comes to the naked photos shared during infidelity.

2  Hanh Le's graceless betraying husband, a nudist seeking casual hook-ups, sent his

3  nude photos to Petitioner after he just met Petitioner one time and did not even know

4  Petitioner's full name, did not expect privacy in his nude photos. Decl. Luo, ¶3. It is

5  difficult to believe a nudist, who believes becoming nude increases confidence and going

6  naked brings him out of his shell, would expect privacy in his nude photos when he was

7  seeking casual hook-ups to cheat on his wife.

8  It is also difficult to see how a complainant would have a reasonable expectation of

9  privacy in pictures sent to a stranger. The State has not presented evidence to demonstrate

10  that, in contrast to a stranger, Hanh Le's cheating husband, Czodor, had a relationship

11  with Petitioner of a sufficiently intimate or confidential nature that he could reasonably

12  assume that she would not share the photos he sent with others. Nor has it offered

13  evidence of any promise by Petitioner, or even express request by Czodor, to keep the

14  photos confidential. *State v. Vanburen*, 214 A.3d 791, 823 (Vt. 2019). It is particularly

15  odd that the State was able to provide Petitioner's threatening text messages but unable to

16  provide Czodor's request to keep his nude photos private or Petitioner's promise to keep

17  Czodor's nude photos private despite the nude photos were sent through text messages

18  and all communication between the parties were done via texts. Decl. Luo, ¶2-3. The State

19  has the same pattern throughout the entire case. Despite it provided photos and videos

20  taken on Sep 18, 2018 but none of them show the weird scratching sound or any

21  scratching action while Czodor was able to constantly take photos and videos.

22  **CLAIM 22: Insufficient Evidence – Serious Emotional Distress**

23  Hanh Le's shameless betraying husband who is a nudist, Czodor, testified that he

24  was thinking about going to therapy a lot. RT 195. Czodor did not actually seek therapy

25  and never took medication. There is no evidence to establish that Czodor suffered serious

26  emotional distress because he believes becoming nude increases confidence and going

27  naked brings him out of his shell.

28  **CLAIM 23: Insufficient Evidence – Loss of Income**

There is a distinction between earnings received through self-employment in one's own business and wages received from an employer because there is a difference between working for another person and being self-employed. An employee ordinarily agrees to work for, and receives, a set wage or salary. His wages are not directly affected by the net income of the employer. In contrast, the self-employed person operating a "business" has no more income available than the net income of the "business" after paying necessary expenses of the "business." *Hupp v. Workers' Comp. Appeals Bd.*, 39 Cal.App.4th 84, 88 (Cal. Ct. App. 1995). As such, loss of net income of a self-employed person is equivalent to lost wages of an employee.

Between 2014 and 2019 Czodor's made the following net income:

| 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|------|------|------|------|------|------|
| 5,031.00 | 7,075.00 | 5,345.00 | 5,416.00 | 9,836.00 | 10,098.00 |

Czodor alleged Petitioner's 2018 online posting caused him loss of income. First, Czodor provided only tax returns but no evidence establishing his allegation. He cannot even establish he had a steady trend of income. For instance, his income dropped in 2016 compared to 2015. Second, in fact Czodor made more money in 2018 and 2019 than 2017 which is contradicted to his allegation.

**CLAIM 24: Violation of due process – Improper form of evidence**

Law enforcement officers have the obligation to convict the guilty and to make sure they do not convict the innocent. They must be dedicated to making the criminal trial a procedure for the ascertainment of the true facts surrounding the commission of the crime.  ----- Justice Byron White

Not every police department honors Justice White's words like Chicago Police Department that caught Jussie Smollett's hate crime hoax, and Santa Ana Police Department certainly did not. When accusations go undetected as false, they gain traction and viability among actors in the criminal justice system.

Law enforcement personnel are on the front lines of lie detection in the criminal justice system. When a civilian witness alleges that a crime was committed, the police

54

1    bear the responsibility of determining whether that witness is telling the truth. Police was

2    supposed to routinely and consistently to pursue all evidence, rather than those facts that

3    confirm their initial theory. If the complainant's story is contradictory or inconsistent, the

4    police should carefully consider all explanations, including whether the complainant had

5    lied. When police accept the complaining witness's version of events at face value and fail

6    the conduct even basic investigations, the entire adversarial system crumbles.

7            Here in this case, every word coming out from Czodor went unchecked and

8    unchallenged. Every piece of self-made evidence provided by Czodor went unchecked

9    and unchallenged. For instance, the police could have retrieved Czodor's phone and

10   download all messages, screenshots, go to Czodor's residence to take photos of the

11   damaged door and his entire front door area which will show the lighting installation, and

12   retrieve all photos and videos taken on Sep 18, 2018. Had the police done their job

13   Czodor's complaint would have immediately collapsed.

14           Whatever crime is reported the person who goes out to collect evidence should be a

15   police officer instead of Czodor. This is not the case here. Not a single piece of evidence

16   presented at trial was collected and processed following protocol. Not a single screenshot

17   or photo has metadata or timestamp. The lack of metadata makes an accurate examination

18   of evidence impossible. The police didn't even bother to collect all text messages, photos

19   and videos to see whether something was intentionally left out, such as Czodor had sent

20   his nude photos to multiple people, the photos and the videos that Czodor had withheld

21   show Petitioner's innocence. It is common sense that incomplete and edited screenshots,

22   photos, or videos could be manipulated and misrepresented. Yet, other than taking an oral

23   statement and accepting a stack of paper printout the police did nothing. There was

24   absolutely no meaningful investigation. Decl. Luo, ¶12.

25           If a citizen discovers his property was maliciously damaged he would call the

26   police to investigate the crime scene. He would let the police take the crime scene photos

27   and observe the damaged property. Similar to a home burglary, a real victim would call

28   the police to his residence. Here in this case, Czodor did not call the police to his

1    residence although he alleged his front door was maliciously damaged. He did not let the

2    police investigate the crime scene or take any photos of the damaged property. Not a

3    single police officer ever observed the allegedly damaged door or any nude photos online.

4    Czodor took photos of the "crime scene" on his own, made screenshots, printed out on a

5    piece of paper as evidence and went to the police station to report the alleged crimes. He

6    did not even provide a digital copy of the screenshots and photos with metadata for

7    forensic examination to ascertain whether the screenshots and photos were tampered or

8    forged. Czodor took the "crime investigation" and "evidence collection" into his own

9    hands. Same as the screenshots Czodor provided. All screenshots were printed out on

10   paper by Czodor without providing digital copies of the screenshots with metadata. None

11   of those can be submitted for forensic examination. Trial counsel should have explained to

12   the jury how easily the print-outs may be tampered or forged without forensic

13   examination. The police report also documented that "upon checking these websites there

14   were no photographs or video's depicting Czodor's genitalia". Decl. Luo, ¶12. The jurors

15   did not have special knowledge regarding how to evaluate the genuineness of evidence

16   and trial counsel failed to educate the jurors. Trial counsel failed to demonstrate to the

17   jury that the police did not conduct any investigation. Neither did the police collect any

18   evidence following their protocol. All paper evidence in this case is Czodor's self-made

19   and self-manufactured evidence with no way to forensically examine and Czodor has

20   serious credibility issue. Such shoddy police work amounts to violation of Petitioner's

21   federal and state rights to due process.

22       Expert testimony is critical today to prevent the admission of manipulated images.

23   *People v. Beckley*, 185 Cal.App.4th 509, 515 (Cal. Ct. App. 2010). Recent experience

24   shows that digital photographs can be changed to produce false images. See, e.g., *U.S. v.*

25   *Newsome* (3d Cir. 2006) 439 F.3d 181, 183 [digital photographs used to make fake

26   identification cards]. Indeed, with the advent of computer software programs such as

27   Adobe Photoshop "it does not always take skill, experience, or even cognizance to alter a

28   digital photo." (Parry, Digital Manipulation and Photographic Evidence: Defrauding The

1  Courts One Thousand Words At A Time (2009) 2009 J. Tech. L. Pol'y 175, 183.)

2       No evidence here supports that the photographs and screenshots could not have

3  been digitally altered given the witness's strong motive to retaliate and credibility issues.

4  It is particularly odd to provide law enforcement with only paper evidence in this day and

5  age.

6       Hanh Le's shameless cheating husband, Czodor, provided to the police a photo,

7  with no time stamp or metadata, depicting Petitioner holding a key and standing in front

8  of his door which was taken from his kitchen window. Decl. Luo, ¶8. The second photo

9  provided to the police by Czodor depicting Petitioner standing in front of his door view

10  window. Decl. Luo, ¶9. Both photos show strong lighting. The third photo provided to the

11  police shows Petitioner was standing in front of Czodor's garage door which was nowhere

12  close to his front door. Decl. Luo, ¶10. Because all these photos were not provided in

13  digital form with metadata, no one knows at what time they were taken which is the main

14  goal that Czodor provided paper evidence to the police. If any of these photos were taken

15  between 7:55 pm and 8:10 pm it picks apart Czodor's statement that Petitioner scratched

16  his door for 20 minutes, he did not report the scratching on Sep 18, 2018 because he did

17  not see Petitioner scratching his door and did not discover the damage the same night.

18  **CLAIM 25: Violation of Confrontation Clause of the Sixth Amendment and Due**

19  **Process - Admission of inadmissible hearsay**

20       Over defense's objections, the trial court erred in admitting hearsay as evidence.

21  RT 143. The text messages from Czodor's so called friend and statements made by

22  Czodor's clients were erroneously admitted into evidence because none of Czodor's so

23  called friends and clients ever testified or were cross-examined by defense. Petitioner's

24  right to cross examine Czodor's friends and customers were improperly deprived by

25  admitting hearsay evidence. See *Crawford v. Washington* (2004) 541 U.S. 36, 59

26  (Holding that the Sixth Amendment's confrontation clause prohibits the admission of

27  "testimonial statements" made by a nontestifying witness unless the witness is

28  unavailable, and the defendant had a prior opportunity for cross-examination.) Other

1    improper admission of hearsay include: RT 191, RT 223 etc.

2    **CLAIM 26: Violation of 6th & 14th Amendments – Improper permitting amendment**

3            720 days after the original complaint was filed, despite no finding of good cause to

4    justify any belated amendment, the complaint was illegally permitted to amend from

5    allegation of coming within 100 yards of the protected person to failure to deactivate

6    website and created new websites. CT 66-67. Such amendment substantially prejudiced

7    Petitioner's defense as it took place only one day before trial and Petitioner could not

8    possibly have been prepared for trial. See *Powell v. Alabama*, 287 U.S. 45, 53 (1932)

9    (holding that appointment of counsel one day before trial deprived defendants of Sixth

10   Amendment rights to counsel because counsel could not possibly have been prepared for

11   trial.)

12            **CLAIM 27: Violation of Sixth and Fourteenth Amendments – Speedy Trial**

13           A California defendant generally has three sources of the right to a speedy trial: (1)

14   the Sixth Amendment to the federal Constitution, as applied to the states through the due

15   process clause of the Fourteenth Amendment; (2) article I, section 15 of the California

16   Constitution ; and (3) statutory enactments, such as Penal Code section 1382. *People v.*

17   *Harrison* (2005) 35 Cal.4th 208, 225, 25 Cal.Rptr.3d 224, 106 P.3d 895. The tests of due

18   process have been articulated in *Barker v. Wingo* (1972) 407 U.S. 514, 92 S.Ct. 2182, 33

19   L.Ed.2d 101 (*Barker*) and *Mathews v. Eldridge* (1976) 424 U.S. 319, 96 S.Ct. 893, 47

20   L.Ed.2d 18 (*Mathews*). E.g. *People v. Bradley* (2020) 51 Cal.App.5th 32, 38–39, 264

21   Cal.Rptr.3d 819 (Bradley); *In re Butler* (2020) 55 Cal.App.5th 614, 638, 269 Cal.Rptr.3d

22   649 (*Butler*); *People v. DeCasas* (2020) 54 Cal.App.5th 785, 806–813, 268 Cal.Rptr.3d

23   663 (*DeCasas*); *People v. Superior Court* (*Vasquez*) (2018) 27 Cal.App.5th 36, 238

24   Cal.Rptr.3d 14 (*Vasquez*).

25            i. Barker test

26           *Barker*, supra, 407 U.S. at 514, 92 S.Ct. 2182, set forth a nonexhaustive list of four

27   factors for courts to consider when determining whether the right to a speedy trial has

28   been violated: (1) the length of the delay; (2) who is to blame for the delay; (3) the

defendant's assertion of the right; and (4) prejudice. (Id. at p. 530, 92 S.Ct. 2182 ; *People v. Williams* (2013) 58 Cal.4th 197, 233, 165 Cal.Rptr.3d 717, 315 P.3d 1 (*Williams*). None of these factors is "a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant.... [T]hese factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process." *Barke*, supra, at p. 533, 92 S.Ct. 2182.

ii. Mathews test

*Mathews*, supra, 424 U.S. 319, 96 S.Ct. 893, articulated a more general balancing test of three factors "for resolving what process is constitutionally due" *Butler*, supra, 55 Cal.App.5th at p. 639, 269 Cal.Rptr.3d 649: (1) the private interest affected by the government action; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) the government's interest. *Mathews*, supra, at p. 335, 96 S.Ct. 893. Like the Barker test, the Mathews test "involve[s] careful balancing of the competing interests ...." *People v. Litmon* (2008) 162 Cal.App.4th 383, 399, 76 Cal.Rptr.3d 122 (*Litmon*).

<u>Analysis of the Barker factors</u>

Courts address the *Barker* factors in the following order: the length of the delay, who is to blame for the delay, defendant's assertion of the right, and prejudice to balance these factors to determine whether defendant was deprived of due process.

1. Length of the delay

721 days elapsed between the filing of complaint and jury selection. 721 days have 17,304 hours. A delay of more than one year between the arrest and prosecution in a misdemeanor case is unreasonable and prejudice is presumed, with "dismissal being constitutionally compelled in the absence of a demonstration of good cause for the delay." *Serna v. Superior Court* (1985) 40 Cal.3d 239, 253-254 [219 Cal.Rptr. 420, 707 P.2d 793]; see *People v. Booker* (2011) 51 Cal.4th 141, 157 [119 Cal.Rptr.3d 722, 245 P.3d

59

366]. On Jan 10, 2020 jury trial was set on Mar 24, 2020 which was suspended due to COVID. Orange County Superior Court resumed jury trial in late May 2020. Decl. Luo, ¶32. However, more than ten continuances in this case were granted without a statement of facts proved and entered in the minutes. No facts proved were stated on the record justifying the court's finding that there was good cause to continue. Decl. Luo, ¶31.

2. Blame for the delay

The protracted delay between the filing of the complaint and the jury trial was mostly attributable to the constant change of public defender, prosecution's inability to provide evidence and failure to prosecute, the trial court's failure to manage its docket, and covid-19. To determine where the blame lies for these delays, the role of the defense, the prosecution, and the trial court should be considered in turn.

i. The defense

As a general rule, "delays caused by defense counsel are properly attributed to the defendant, even where counsel is assigned." *Vermont v. Brillon* (2009) 556 U.S. 81, 94, 129 S.Ct. 1283, 173 L.Ed.2d 231 (*Brillon*). This rule, however, "is not absolute. Delay resulting from a systemic 'breakdown in the public defender system,' [citation], could be charged to the State." (Ibid.) If counsel's motivation for the continuance is not in the best interests of his client, counsel may not waive his client's right to a speedy trial under section 1382. *People v. Johnson* (1980) 26 Cal.3d 557, 566-569 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255]; accord *Owens v. Superior Court* (1980) 28 Cal.3d 238, 250, fn. 12 [168 Cal.Rptr. 466, 617 P.2d 1098]; *Eshaghian v. Municipal Court* (1985) 168 Cal.App.3d 1070, 1080 [214 Cal.Rptr. 712].

In *Williams*, our state Supreme Court held that although "several of defendant's [eight] attorneys appeared to make little or no progress in preparing his case for trial," there was no evidence of institutional problems that would indicate a systemic breakdown. *Williams*, supra, 58 Cal.4th at p. 248, 165 Cal.Rptr.3d 717, 315 P.3d 1. The court, however, suggested the kind of evidence that might indicate such problems, including "a flaw in the public defender's mechanism for identifying and avoiding conflicts,"

60

1    "problems in the criminal defense panel's assignment system," "unreasonable resource

2    constraints, misallocated resources, [or] inadequate monitoring or supervision." (Id. at p.

3    249, 165 Cal.Rptr.3d 717, 315 P.3d 1, italics added.) In *Litmon*, the Court of Appeal

4    identified the following as examples of a systemic breakdown: "understaffed public

5    prosecutor or public defender offices facing heavy caseloads, underdeveloped expert

6    witness pools, or insufficient judges or facilities to handle overcrowded trial dockets."

7    *Litmon*, supra, 162 Cal.App.4th at p. 403, 76 Cal.Rptr.3d 122, italics added. As the

8    italicized language illustrates, a systemic breakdown is not limited to situations where the

9    state has failed to provide adequate funding for defense counsel.

10        A defendant's right to a speedy trial may be denied simply by the failure of the state

11   to provide enough courtrooms or judges to enable defendant to come to trial within the

12   statutory period. The right may also be denied by failure to provide enough public

13   defenders or appointed counsel, so that an indigent must choose between the right to a

14   speedy trial and the right to representation by competent counsel. "[U]nreasonable delay

15   in run-of-the-mill criminal cases cannot be justified by simply asserting that the public

16   resources provided by the State's criminal-justice system are limited and that each case

17   must await its turn." *Barker v. Wingo*, supra, 407 U.S. 514, 538 [33 L.Ed.2d 101, 121],

18   White, J., conc.

19        The American Bar Association's Standards for Speedy Trial (ABA Project on

20   Standards for Crim. Justice, Stds. Relating to Speedy Trial (Approved Draft 1968))

21   discusses the problem of delay caused by court congestion. It states that "delay arising out

22   of the chronic congestion of the trial docket should not be excused. . . . [¶ But, while

23   delay because of a failure to provide sufficient resources to dispose of the usual number of

24   cases within the speedy trial time limits is not excused, the standard does recognize

25   congestion as justifying added delay when 'attributable to exceptional circumstances.'

26   Although it is fair to expect the state to provide the machinery needed to dispose of the

27   usual business of the courts promptly, it does not appear feasible to impose the same

28   requirements when certain unique, nonrecurring events have produced an inordinate

1  number of cases for court disposition." (Pp. 27-28.)

2  "The same reasoning, distinguishing between chronic conditions and exceptional

3  circumstances, applies to the delay caused by the crowded calendars of public defenders.

4  The state cannot reasonably provide against all contingencies which may create a calendar

5  conflict for public defenders and compel postponement of some of their cases. On the

6  other hand, routine assignment of heavy caseloads to understaffed offices, when such

7  practice foreseeably will result in the delay of trials beyond the 60-day period without

8  defendant's consent, can and must be avoided. A defendant deserves not only capable

9  counsel, but counsel who, barring exceptional circumstances, can defend him without

10  infringing upon his right to a speedy trial. Thus the state cannot rely upon the obligations

11  which an appointed counsel owes to other clients to excuse its denial of a speedy trial to

12  the instant defendant." *People v. Johnson*, 26 Cal.3d 557, 572 (Cal. 1980)

13  A facile assumption that conflicts in the calendar of the public defender constitute good

14  cause for delay may result in denying indigent defendants the equal protection of the laws.

15  As a dissenting opinion in *Townsend v. Superior Court* (1975) 15 Cal.3d 774, 779-784

16  [126 Cal.Rptr. 251, 543 P.2d 619], points out: "If an affluent defendant chooses to employ

17  counsel who is involved in many other cases, then the courts, quite appropriately can

18  require the defendant to wait until his selected counsel is ready for trial; if the delay is

19  unacceptable to the defendant, he can always engage another, less burdened attorney. The

20  indigent defendant, however, can exercise no such option. If the public defender who is

21  appointed to represent him is already handling so many cases that the defendant's case

22  must 'trail' beyond the 60-day period, the indigent necessarily loses his statutory right to a

23  speedy trial." (15 Cal.3d 774, 788, dis. opn. of Tobriner, J.)

24  The *Vasquez* court acknowledged that, generally, "the public defender's office must

25  have the flexibility to decide when it is necessary internally to change the assignment of

26  an attorney" *Vasquez*, supra, 27 Cal.App.5th at p. 73, 238 Cal.Rptr.3d 14, that "flexibility

27  must yield to the individual's right to a timely trial." (Id. at p. 74, 238 Cal.Rptr.3d 14.)

28  At least six public defenders appeared in Petitioner's case during the two years in

62

1   which the Orange County Public Defender represented Petitioner. "[W]hen inadequate

2   representation is alleged, the critical factual inquiry ordinarily relates to matters outside

3   the trial record: whether the defendant had a defense which was not presented; whether

4   trial counsel consulted sufficiently with the accused, and adequately investigated the facts

5   and the law; whether the omissions charged to trial counsel resulted from inadequate

6   preparation rather than from unwise choice of trial tactics and strategy." *Brubaker v.*

7   *Dickson* (9th Cir. 1962) 310 F.2d 30, 32. Over the last two years prior to jury selection,

8   Petitioner never got a chance to discuss the defense with her counsel at length. Prior to the

9   jury trial, Petitioner had no clue whether her counsel adequately investigated the facts and

10  the law. Decl. Luo, ¶41-42.

11          Here, the following specific acts violated Petitioner's due process rights and

12  together, if not separately, manifest a systemic breakdown. These include: failing to take

13  steps to ensure an earlier trial; reassigning the case to multiple attorneys again and again;

14  requesting continuances due to reassignment of defense counsel; DA's failure in

15  providing evidence and subpoena witness, the trial court's failure to manage its docket.

16  On one occasion no one informed Petitioner of the date set for hearing prior to trial which

17  caused Petitioner fail to appear on that date. Decl. Luo, ¶34 – 35.

18          In *Butler*, supra, 55 Cal.App.5th at p. 658, 269 Cal.Rptr.3d 649, the Court of

19  Appeal concluded that "substantial evidence support[ed] the [superior] court's

20  determination that the bulk of the delay may be attributed to the actions (and inactions) by

21  the state." (Ibid.)

22          In *Williams*, supra, 58 Cal.4th 197, 165 Cal.Rptr.3d 717, 315 P.3d 1, where the

23  California Supreme Court considered whether a seven-year delay between a criminal

24  defendant's arrest and the start of his trial violated his right to a speedy trial, (Id. at pp.

25  215–252, 165 Cal.Rptr.3d 717, 315 P.3d 1), "[t]he record indicate[d] that several of [the]

26  defendant's attorneys appeared to make little or no progress in preparing his case for trial."

27  (Id. at p. 248, 165 Cal.Rptr.3d 717, 315 P.3d 1.)

28          "Upon a subsequent motion to dismiss, however, the court must inquire into

1  whether the delay is attributable to the fault or neglect of the state; if the court so finds,

2  the court must dismiss." *People v. Johnson*, 26 Cal.3d 557, 572-73 (Cal. 1980). Although

3  *Johnson*'s requirement of "stricter speedy trial rights" is expressly limited to in-custody

4  defendants, *Rhinehart v. Municipal Court* (1984) 35 Cal.3d 772 [200 Cal.Rptr. 916, 677

5  P.2d 1206], subsequently extended the principals of *Johnson* to noncustody defendants

6  accused of committing misdemeanors.

7  　　　　ii. The prosecution

8  　　　　During the two years this case was pending, at least ten different prosecutors

9  appeared on the matter. The People never objected, on the record, to a single continuance

10  made by public defender, in a total of eleven continuances. "Since the People are

11  responsible for prosecuting the case, the People cannot avoid their duties to move the case

12  forward by passively deferring to the defense and the court." *In re Butler*, 55 Cal.App.5th

13  614, 653-54 (Cal. Ct. App. 2020). Each criminal case is about the State's constitutional

14  obligations. As the United States Supreme Court declared in *Barker*, the state has the duty

15  to bring an accused individual to trial "as well as the duty of insuring that the trial is

16  consistent with due process." *Barker*, supra, 407 U.S. at p. 527, 92 S.Ct. 2182; see *Dickey*

17  *v. Florida* (1970) 398 U.S. 30, 37–38, 90 S.Ct. 1564, 26 L.Ed.2d 26 ["[a]lthough a great

18  many accused persons seek to put off the confrontation as long as possible, the right to a

19  prompt inquiry into criminal charges is fundamental and the duty of the charging authority

20  is to provide a prompt trial," italics added]. See *Litmon*, supra, 162 Cal.App.4th at p. 406,

21  76 Cal.Rptr.3d 122 ["The ultimate responsibility for bringing a person to trial on an SVP

22  petition at a 'meaningful time' rests with the government."].

23  Certain examples illuminate when the government's conduct may fall on the wrong side of

24  the divide between "diligent prosecution" and "official negligence" in bringing the

25  accused to trial. *Doggett*, supra, 505 U.S. at p. 656–657, 112 S.Ct. 2686. For example, the

26  prosecutors in both *Williams* and *Vasquez* were excused from any culpability for the

27  extraordinary delays in those cases only because they took proactive measures to push the

28  matters towards trial. *Williams*, supra, 58 Cal.4th at pp. 218, 239–240, 165 Cal.Rptr.3d

1  717, 315 P.3d 1; *Vasquez*, supra, 27 Cal.App.5th at p. 64, 238 Cal.Rptr.3d 14. In *Williams*,

2  the prosecution objected throughout the proceedings to continuances of the trial date,

3  stated on the record it was ready for trial, and urged the trial court to revoke the

4  defendant's Faretta status when his self-representation led to unnecessary delays.

5  *Williams*, at pp. 218, 228–230, 239–240, 165 Cal.Rptr.3d 717, 315 P.3d 1. In *Vasquez*, the

6  prosecution repeatedly objected to further continuances of the trial date and urged the trial

7  court to remove the public defender's office and appoint new counsel so that the case

8  could proceed to trial. *Vasquez*, at p. 64, 238 Cal.Rptr.3d 14.

9       These authorities make clear that the People's due process obligation in a criminal

10  proceeding requires that it diligently prosecute the case. This may entail stating on the

11  record that it is prepared to go to trial, taking affirmative steps to set a trial date, promptly

12  requesting clinical evaluations and records, and securing the attendance of witnesses in a

13  timely manner. Continuance requests, whether by defense counsel or the prosecution,

14  should be supported by an affirmative showing of good cause, and where such a showing

15  is lacking, an objection to the request may be warranted. Where the prosecution

16  encounters repeated continuances of a setting hearing or trial date, or other dilatory

17  tactics, diligent prosecution may necessitate objecting to the delays, insisting upon trial

18  deadlines, and making the trial court aware of the length of time since the filing of the

19  case or other pertinent details from the record. The prosecution may even find it necessary

20  to seek the removal of appointed counsel, the appointment of new or additional counsel,

21  or other measures to ensure that a defendant is brought to trial at a meaningful time and in

22  a meaningful manner.

23       Turning to the present case, district attorneys never objected to a single

24  continuance requested by public defender. The district attorneys never stated on record

25  that they were ready for trial. After several continuances, no formal motions were ever

26  filed to relieve the public defender or to compel the trial court to set a timely trial date.

27  Nor did the district attorneys state on the record that they were so ready for trial. The

28  People did not actively pursue prosecution in this case. The People was informed on Jun

65

1  8, 2021 that the trial was set on Jul 19, 2021. Then the prosecutor did not subpoena the

2  witness they wished to call to testify. The prosecutor failed to diligently prosecute this

3  matter. Even if Petitioner's counsel was ready for trial the district attorneys did not seem

4  to be able to bring the case to trial.

5      Given the extensive delay in this case and the district attorney's abdication of its

6  duty to ensure that Petitioner received a timely trial, the prosecution should bear

7  significant responsibility for the delay. At the very least, its actions (or lack thereof)

8  supply the official negligence necessary to presume prejudice.

9      iii. The trial court

10     "The trial court has an affirmative constitutional obligation to bring the defendant

11 to trial in a timely manner." *Vasquez*, supra, 27 Cal.App.5th at p. 74, 238 Cal.Rptr.3d 14.

12 *Vasquez* criticized the trial court for failing to take "meaningful action to set deadlines or

13 otherwise control the proceedings and protect Vasquez's right to a timely trial". In

14 *DeCasas*, the trial court "enabled and compounded the delays resulting from the [public

15 defender's office] staffing cuts" by failing to set deadlines and hold the parties accountable

16 to them. Defense counsel failed to obtain a time waiver as suggested by the court, and

17 instead waived time without DeCasas's permission. *DeCasas*, supra, 54 Cal.App.5th at pp.

18 792, 806, 810-811. When a defense attorney requests more time to prepare for trial, the

19 trial court must balance a defendant's right to a speedy trial with his right to competent

20 counsel. *People v. Lomax* (2010) 49 Cal.4th 530, 556, 112 Cal.Rptr.3d 96, 234 P.3d

21 377(*Lomax*) "If counsel seeks reasonable time to prepare a defendant's case, and the delay

22 is for defendant's benefit, a continuance over the defendant's objection is justified." (Ibid.)

23 At the same time, the high court has said that "the primary burden [falls] on the courts and

24 the prosecutors to assure that cases are brought to trial." *Barker*, supra, 407 U.S. at p. 529,

25 92 S.Ct. 2182.

26     Section 1382 does not define "good cause" as that term is used in the provision, but

27 numerous California appellate decisions that have reviewed good-cause determinations

28 under this statute demonstrate that, in general, a number of factors are relevant to a

1   determination of good cause: (1) the nature and strength of the justification for the delay,

2   (2) the duration of the delay, and (3) the prejudice to either the defendant or the

3   prosecution that is likely to result from the delay. See, e.g., *Stroud v. Superior Court*

4   (2000) 23 Cal.4th 952, 969-970; *People v. Szeto* (1981) 29 Cal.3d 20, 29-30; *Jensen v.*

5   *Superior Court* (2008) 160 Cal.App.4th 266, 271-275. Past decisions further establish that

6   in making its good-cause determination, a trial court must consider all of the relevant

7   circumstances of the particular case, "applying principles of common sense to the totality

8   of circumstances . . . ." *Stroud*, supra, 23 Cal.4th 952, 969; see, e.g., *Jensen v. Superior*

9   *Court*, supra, 160 Cal.App.4th 266, 270-275.

10        During the two years pendency of the case, at least nine judicial officers cycled

11   through the case. The trial court repeatedly indulged defense counsel's requests for

12   continuances due to lack of preparation, neither actively set trial dates nor sought to move

13   the case along. During the two years of the pretrial delay, the matter was continued eleven

14   (11) times, at defense counsel's request, and it did not appear from the record that the trial

15   court took meaningful action to set deadlines or otherwise control the proceedings and

16   protect Petitioner's right to a timely trial. The trial court repeatedly allowed the matter to

17   be continued without ever requiring an on-the-record showing of good cause and without

18   ever finding good cause on the record. When the trial date was first set on Mar 24, 2020

19   by Petitioner's fourth attorney it should mean Petitioner was personally ready for trial

20   even before Mar 24, 2020. Despite the knowledge that the trial date was initially set on

21   Mar 24, 2020 the trial Court still allowed multiple continuances by her counsel without

22   showing good cause on the record pursuant to Penal Code section 1050.

23        "[E]ven where the attorneys stipulate to continue a trial date, the trial court has an

24   obligation to determine whether there is a good cause for the continuance." *Vasquez*,

25   supra, 27 Cal.App.5th at p. 75, 238 Cal.Rptr.3d 14. The *Vasquez* court concluded that the

26   trial court "could have acted sooner" to address the later delay caused by the systemic

27   issues in the public defender's office. It discussed at length the options the court should

28   have considered, including the possible removal of the public defender's office so that an

1   attorney with adequate time could have been appointed to prepare defendant's trial. (Id. at

2   pp. 75–81, 238 Cal.Rptr.3d 14.) The appellate court cautioned: "As the 'captain of the

3   ship,' the trial court cannot passively preside over a case as it moves forward at a snail's

4   pace without a trial date in sight." (Id. at p. 81, 238 Cal.Rptr.3d 14.) "Upon learning of

5   counsel's inability to represent the petitioner due to other trial commitments, the trial

6   court, pursuant to the decisions in *Johnson* and *Rhinehart*, should have inquired whether

7   counsel could be replaced by another counsel. The court failed to do this. In fact, it did

8   nothing to ensure the petitioner's speedy trial. The trial court incorrectly justified its

9   position by holding *Rhinehart* inapplicable to the case before it. When the petitioner

10  subsequently made his motion to dismiss, the court perpetuated its error by denying the

11  motion for the same reasons." *Gomez v. Municipal Court*, 169 Cal.App.3d 425, 435 (Cal.

12  Ct. App. 1985).

13          Compliance with the speedy trial rule could not be excused if it were impossible to

14  safely hold a trial as the deadline approached due to an emergency court closure. (See

15  generally Civ. Code, § 3531 ["The law never requires impossibilities"]; *National Shooting*

16  *Sports Foundation, Inc. v. State* (2018) 5 Cal.5th 428, 434, 235 Cal.Rptr.3d 54, 420 P.3d

17  870 ["a statute may contain an implied exception for noncompliance based on

18  impossibility where such an exception reflects a proper understanding of the legislative

19  intent behind the statute"]. COVID-19 pandemic did not create an impossibility. See

20  *Favor v. Superior Court*, 59 Cal.App.5th 984, 993 (Cal. Ct. App. 2021). There was no

21  situation where it was impossible to timely hold a jury trial with the covid emergency

22  protocols in place. On Jan 10, 2020 jury trial of this case was set on Mar 24, 2020 and

23  later was suspended due to COVID but the Court resumed jury trial since June 2020.

24  Since June 2020 this Court did nothing to move the case forward knowing the fact that the

25  jury trial was previously set on Mar 24, 2020.

26          "To the extent the trial court is responsible for a portion of the delay, it is

27  attributable to the state." *Vasquez*, supra, 27 Cal.App.5th at p. 74, 238 Cal.Rptr.3d 14.

28  In sum, the lengthy delay in bringing a misdemeanor case to trial warrants dismissal.

68

"Because Baca was in custody at the time of arraignment, trial had to commence within 30 days of the March 10 date of entry of plea. Thus, the trial court properly granted Baca's motion to dismiss the misdemeanor complaint 33 days later on April 12, 1988." *People v. Baca*, 211 Cal.App.3d 675, 681 (Cal. Ct. App. 1989)

3. Petitioner's assertion of her right

In *Barker*, the United States Supreme Court rejected the "demand" rule, "explaining that a defendant's mere silence in the face of a continuance does not waive the constitutional right to speedy trial because a waiver occurs only when there is a conscious relinquishment of a known right." *People v. Seaton* (2001) 26 Cal.4th 598, 633, 110 Cal.Rptr.2d 441, 28 P.3d 175. Under *Barker*, a defendant's failure to assert a speedy trial violation is not dispositive. "A defendant has no duty to bring himself to trial; the State has that duty as well as the duty of insuring that the trial is consistent with due process." *Barker*, supra, 407 U.S. at p. 527, 92 S.Ct. 2182. "The Constitution guarantees a criminal defendant both a speedy trial right and effective representation, and it puts the burden of securing both guarantees on the state." *Williams*, supra, 58 Cal.4th at p. 238, 165 Cal.Rptr.3d 717, 315 P.3d 1.

"Although the court found that DeCasas had not asserted his right to a speedy trial, he had been 'forced to acquiesce to his counsel's demand for more time and forced to choose between proceeding to trial without prepared counsel or giving up his right to a speedy trial.' The court therefore did not 'give significant weight to [DeCasas's] failure to assert his right to a speedy trial." *People v. DeCasas*, 54 Cal.App.5th 785, 800-01 (Cal. Ct. App. 2020).

Vasquez "was forced to choose between proceeding to trial with an unprepared attorney, or giving up his right to a speedy trial—truly a Hobson's choice. Under these circumstances, it is unfair to give significant weight to Mr. Vasquez's failure to assert his right to a speedy trial. "'The serial representation was very disruptive to the clients because each time somebody has to start anew.' The dysfunctional manner in which the Public Defender's Office handled Mr. Vasquez's case was precisely the type of systemic

1  or institutional breakdown contemplated by *Brillon* and [*People v. Williams* (2013) 58

2  Cal.4th 197, 232, 165 Cal.Rptr.3d 717, 315 P.3d 1]. Accordingly, the reason for the delay

3  in bringing the case to trial should be attributed to the state, and not to Mr. Vasquez."

4  *People v. Superior Court*, 27 Cal.App.5th 36, 54 (Cal. Ct. App. 2018).

5         Here, Petitioner was in the same position as Mr. Vasquez's and DeCasas's. On Aug

6  12, 2019 Petitioner did not knowingly and voluntarily waive her constitutional right to a

7  speedy trial. No one ever explained to Petitioner what was general time waiver and what

8  was the consequence to enter a general time waiver. Given Petitioner's lack of experience

9  in criminal proceedings and traumatic events during incarceration she was most likely not

10 competent to comprehend issues of speedy trial through counsel, or to assist or

11 meaningfully authorize counsel to handle legal proceedings on her behalf. Simply put, had

12 public defender told Petitioner, on Aug 12, 2019, that he was ready for trial next week

13 Petitioner would have been more than happy to appear at trial.

14        Petitioner was not aware of any general time waiver in this case until Jul 13, 2021.

15 Decl. Luo, ¶31. At the time Petitioner was under the impression that she either went to

16 trial now with an unprepared counsel or went to trial on a later date with a prepared

17 counsel. Petitioner did not make a voluntary, knowing and intelligent waiver of her right

18 to a speedy trial.

19        "[T]he consent of appointed counsel to a postponement of trial beyond the statutory

20 period, if given solely to resolve a calendar conflict and not to promote the best interests

21 of his client, cannot stand unless supported by the express or implied consent of the client

22 himself. [Fn. omitted.]" *People v. Johnson*, supra, 26 Cal.430 3 3d at p. 567.

23 On Mar 5, 2021 Petitioner asked Mr Daniel Maher if there was any possibility to dismiss

24 the case. Mr Maher spent less than two seconds in considering the totality of the

25 circumstances and told Petitioner NO.

26        Section 1382 "confers a right upon the defendant, but that right becomes

27 meaningless if counsel can disregard defendant's views and interests and waive the right.

28 Routine waivers to accommodate crowded calendars of defense counsel, moreover, defeat

70

the public interest in speedy criminal trials." *People v. Johnson*, 26 Cal.3d 557, 567 (Cal.
1980). In the present case, no one ever explained to Petitioner what was general time
waiver and what was the consequence to enter a general time waiver. Waiver requires "an
intentional relinquishment or abandonment of a known right or privilege". *Barke*, supra,
407 U.S. at p. 525, 92 S.Ct. 2182. Petitioner was not aware of any general time waiver in
this case until Jul 13, 2021. Decl. Luo, ¶21. Not to mention no one ever told Petitioner
that she could withdraw the time waiver. How could Petitioner withdraw the time waiver
if she was not even aware of its existence? Petitioner did not voluntarily waive her right to
a speedy trial. Petitioner did not voluntarily enter a general waiver of the 30-day trial
requirement. Neither did she, due to her personal reason, request the setting of a trial date
beyond the 30-day period. See *Barker* supra, 407 U.S. at pp. 531–532, 92 S.Ct. 2182
["The defendant's assertion of his speedy trial right ... is entitled to strong evidentiary
weight in determining whether the defendant is being deprived of the right"]. The power
of appointed counsel to control judicial strategy and to waive nonfundamental rights
despite his client's objection (see *Townsend v. Superior Court* (1975) 15 Cal.3d 774, 781
[126 Cal.Rptr. 251, 543 P.2d 619] and cases there cited) presumes effective counsel acting
for the best interest of the client. As the court pointed out in *People v. Corona* (1978) 80
Cal.App.3d 684, 720 [145 Cal.Rptr. 894], "[e]ffectiveness . . . is not a matter of
professional competence alone. It also includes the requirement that the services of the
attorney be devoted solely to the interest of his client undiminished by conflicting
considerations." Thus when the public defender, burdened by the conflicting rights of
clients entitled to a speedy trial, seeks to waive one client's right, that conduct cannot be
justified on the basis of counsel's right to control judicial proceedings. The public
defender's decision under these circumstances is not a matter of defense strategy at all; it
is an attempt to resolve a conflict of interest by preferring one client over another.
"Counsel lacked authority to waive defendant's right to a speedy trial under section 1382."
*People v. Johnson*, 26 Cal.3d 557, 566 (Cal. 1980). "Counsel alone could not waive his
client's rights under section 1382: if counsel were "ineffective" (See 15 Cal.3d at p. 781),

APPENDIX TO FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS

1    "inadequate" (p. 784), "lazy or indifferent" (ibid.)." *People v. Johnson*, 26 Cal.3d 557, 567
2    (Cal. 1980).

3         This Court should consider: (1) whether the general time waiver was valid while
4    Petitioner did not knowingly, voluntarily, and intelligently enter the waiver; (2) what was
5    the real reason behind the entrance of the general time waiver? Was it beneficial solely for
6    the State or Petitioner? (3) even though the general time waiver was valid the State still
7    had a constitutional obligation to bring a case to trial at a meaningful time and in a
8    meaningful manner. Is it ok for the State to drag an innocent person to court and let her
9    hang on the criminal docket for two years? Then caused Petitioner subject to over $20,000
10   interests from restitution. (4) what investigation and preparation was done between each
11   continuance? (5) whether the trail counsel's performance required two years of
12   preparation? The fundamental requirement of due process is the opportunity to be heard
13   "at a meaningful time and in a meaningful manner." *People v. Litmon* (2008) 162
14   Cal.App.4th 383, 395, 76 Cal.Rptr.3d 122 (*Litmon*), quoting *Armstrong v. Manzo* (1965)
15   380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62. An accused is entitled under the due
16   process clause to a timely trial even despite the absence of a specific statutory
17   requirement. *People v. DeCasas* (2020) 54 Cal.App.5th 785, 799–802, 268 Cal.Rptr.3d
18   663 (DeCasas); *Vasquez*, supra , 27 Cal.App.5th at p. 56, 238 Cal.Rptr.3d 14 ; *People v.*
19   *Landau* (2013) 214 Cal.App.4th 1, 27, 154 Cal.Rptr.3d 1; *Litmon*, supra, 162 Cal.App.4th
20   at pp. 399–402, 76 Cal.Rptr.3d 122.

21        Here, the state of California provided no reason to believe that the continuous
22   reassignment of district attorneys and public defender would benefit the resolve of the
23   case. The constant reassignment of counsels denied both Petitioner's right to have a trial
24   in a timely manner and her right to have a prepared counsel. Petitioner's counsel was
25   deliberately subordinating Petitioner's statutory right to a speedy trial to their crowded or
26   mismanaged calendar rather than promoting the best interest of Petitioner. Petitioner did
27   not request the setting of a trial date beyond the 30-day period due to her own inability to
28   appear at trial. "The postponements granted by the trial court in the present case at the

instance of the public defender were not granted "at the request of the Petitioner or with his consent" within the meaning of section 1382, subdivision 2." *People v. Johnson*, 26 Cal.3d 557, 568-69 (Cal. 1980).

### 4. Prejudice to Petitioner

A Petitioner is subject to "the actual restraints imposed by arrest and holding to answer a criminal charge," for purposes of triggering the Sixth Amendment speedy trial guarantee even when he has been released on bond. (Id. at pp. 761-762 [discussing *Dillingham v. United States* (1975) 423 U.S. 64, 65]; *People v. Martinez* (2000) 22 Cal.4th 750, 761 [same].) Under a federal constitutional speedy trial analysis, "[p]rejudice is presumed when it is reasonable to assume sufficient time elapsed to affect adversely one or more of the interests protected by the speedy trial clause." *Ogle v. Superior Court* (1992) 4 Cal.App.4th 1007, 1020 [ 6 Cal.Rptr.2d 205] . Because delay that is "uncommonly long" triggers a presumption of prejudice *Doggett v. United States* (1992) 505 U.S. 647, 651, 652, 656, 657, a defendant can establish a speedy trial claim under the Sixth Amendment without making an affirmative demonstration that the government's want of diligence prejudiced the defendant's ability to defend against the charge. Under the federal Constitution, the defendant need not identify any specific prejudice from an unreasonable delay in bringing the defendant to trial after the speedy trial right has attached. *Moore v. Arizona* (1973) 414 U.S. 25, 26.

Prejudice is assessed in view of three "interests of defendants which the speedy trial right was designed to protect"—namely, "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Barker*, supra, 407 U.S. at p. 532, 92 S.Ct. 2182.

"A man's constitutional liberty means more than his personal freedom." *People v. Holder*, 53 Cal.App. 45, 52 (Cal. Ct. App. 1921). Petitioner was required to appear in court on a date certain subjected Petitioner to restraints on her liberty sufficient to trigger the Sixth Amendment speedy trial guarantee. See *People v. Martinez*, supra, 22 Cal.4th at

73

pp. 761-762. Nearly two years of pretrial delay with a criminal restraining order restricting Petitioner's liberty was undoubtedly oppressive and would do little to minimize the anxiety and concern of the accused. For the last two years, public record shows that Petitioner was being accused of three crimes. The damage and harm to Petitioner's character cannot be compensated or redone. "[T]ime once past can never be recovered." *Vasquez*, supra, 27 Cal.App.5th at p. 64, 238 Cal.Rptr.3d 14.

"Excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify." *Doggett v. United States* (1992) 505 U.S. 647, 655, 112 S.Ct. 2686, 120 L.Ed.2d 520. "While such presumptive prejudice cannot alone carry a Sixth Amendment claim without regard to the other *Barker* criteria, [citation], it is part of the mix of relevant facts, and its importance increases with the length of delay." (Id. at pp. 655–656, 112 S.Ct. 2686, italics added.)

The high court in *Doggett* went on to discuss how the importance of presumptive prejudice varies with the reason for the delay, explaining: "Between diligent prosecution and bad-faith delay, official negligence in bringing an accused to trial occupies the middle ground. While not compelling relief in every case where bad-faith delay would make relief virtually automatic, neither is negligence automatically tolerable simply because the accused cannot demonstrate exactly how it has prejudiced him.... [¶] ... Although negligence is obviously to be weighed more lightly than a deliberate intent to harm the accused's defense, it still falls on the wrong side of the divide between acceptable and unacceptable reasons for delaying a criminal prosecution once it has begun. And such is the nature of the prejudice presumed that the weight we assign to official negligence compounds over time as the presumption of evidentiary prejudice grows. Thus, our toleration of such negligence varies inversely with its protractedness, [citation], and its consequent threat to the fairness of the accused's trial." *Williams*, supra, 58 Cal.4th at p. 237, 165 Cal.Rptr.3d 717, 315 P.3d 1, quoting *Doggett*. Here, "a presumption of prejudice" can be drawn because the record does show that the state was responsible for the delay. *Williams*, supra, 58 Cal.4th at p. 252, 165 Cal.Rptr.3d 717, 315 P.3d 1. "Even if

74

1  the delay did not impair the defense, the prejudice factor weighs in favor of finding a

2  violation of a speedy trial right." *People v. DeCasas*, 54 Cal.App.5th 785, 812 (Cal. Ct.

3  App. 2020).

4      5. Balancing of factors

5      The length of the delay, Petitioner's assertion of her right, and prejudice weigh in

6  her favor. The various continuances were almost entirely due to public defender's

7  crowded or mismanaged calendar and they were not intended for Petitioner's direct

8  benefit. Petitioner should not bear responsibility for the delays. Petitioner's ability to

9  prepare her defense was adversely affected by the continuing change of counsel because

10  each new counsel needed time to prepare for new evaluations, as such Petitioner has

11  shown that she suffered the 'most serious' type of prejudice"—that is, "the inability to

12  adequately prepare his defense [citation.]" *Williams*, supra, 58 Cal.4th at p. 236, 165

13  Cal.Rptr.3d 717, 315 P.3d 1. Balancing these factors, Petitioner's due process right to a

14  timely trial was brutally violated.

15      <u>Analysis of the *Mathews* factors</u>

16      *Mathews* factors should be addressed in the following order: the private interest

17  affected, the risk of erroneous deprivation of that private interest, and the government's

18  interest.

19      1. Private interest affected

20      Petitioner had been subjected to a significant curtailment of her liberty during her

21  extended pretrial and criminal restraining order.

22      2. Risk of erroneous deprivation of private interest through the procedures used

23      No additional or substitute procedural safeguards can be employed other than a

24  dismissal.

25      3. Government's interest

26      There is no question that the state has a compelling protective interest in speedy

27  trial. Cal. Const. art. 1, § 29 ["In a criminal case, the people of the State of California have

28  the right to due process of law and to a speedy and public trial "]; see *Today's Fresh Start,*

1  *Inc. v. Los Angeles County Office of Education* (2013) 57 Cal.4th 197, 212, 213 (*Today's*

2  *Fresh Start*); cf. *Trueblood v. Washington State Dept. of Social & Health Services* (W.D.

3  Wash. 2015) 101 F.Supp.3d 1010, 1023 (*Trueblood*) ["An efficient system that moves

4  people through the competency process quickly will . . . increase the speed at which

5  competent people are brought to trial, will increase the percentage of incompetent people

6  who can be restored and thus brought to trial, and will reduce the amount of money that

7  the public spends incarcerating people"].)

8      4. Balancing of factors

9      The same conclusion weighing the *Mathews* factors can be drawn as with the

10  *Barker* factors: Petitioner's right to due process was brutally violated. Any risk of an

11  erroneous deprivation of Petitioner's Constitutional rights cannot be reasonably mitigated

12  at this time in point. The state's compelling interest in protecting society from the risk

13  Petitioner posed to it is entitled to significant weight and tips the scales in favor of a

14  reversal and dismissal.

15      Trial counsel's failure to (1) prepare for trial in a timely manner and (2) file a

16  *Serna* Motion forced Petitioner to sit for a trial that should not have been held in the first

17  place. Such failure was prejudicially ineffective. As the *Barker* court stated, "[t]he

18  amorphous quality of the [speedy trial] right also leads to the unsatisfactorily severe

19  remedy of dismissal of the indictment when the right has been deprived. This is indeed a

20  serious consequence because it means that a defendant who may be guilty of a serious

21  crime will go free, without having been tried. Such a remedy is more serious than an

22  exclusionary rule or a reversal for a new trial, but it is the only possible remedy." (*Barker*,

23  supra, 407 U.S. at p. 522, 92 S.Ct. 2182, fn. omitted; accord, *Williams*, supra, 58 Cal.4th

24  at p. 233, 165 Cal.Rptr.3d 717, 315 P.3d 1; *Vasquez*, supra, 27 Cal.App.5th at p. 83, 238

25  Cal.Rptr.3d 14.)

26      "We find that the trial court erred in failing to grant defendant a hearing on his

27  motion to dismiss charges under section 1382, and so denied defendant his right to a

28  speedy trial. As we have explained, the state is in no position to deny a defendant his right

76

1   to a speedy trial because the state is unable to provide counsel who can bring the case to

2   trial within the statutory limits. If the state wants to incarcerate a citizen it cannot do so in

3   violation of the state's own obligations and in violation of its own self-imposed conditions

4   of confinement. The state must be a model of compliance with its own precepts." *People*

5   *v. Johnson*, 26 Cal.3d 557, 580 (Cal. 1980).

6       Permitting the prosecution to amend the complaint after 720 days after it was filed,

7   without finding any good cause, was outrageous. There is no remedy other than a reversal

8   of judgment for the violation of Petitioner's due process right and her right to a conflict-

9   free counsel.

10      **CLAIM 28: Violation of Sixth and Fourteenth Amendments – the trial court**

11      **erred in denying the Petitioner's motion to dismiss**

12      Despite a pretrial hearing on a motion to dismiss for denial of a speedy trial may

13  exclude prosecution, *Shleffar v. Superior Court* (1986) 178 Cal.App.3d 937, the court

14  improperly informed Petitioner that the motion to dismiss was not being accepted or

15  considered because it was untimely and the People were not present.

16      **CLAIM 29: Violation of Sixth and Fourteenth Amendments – the trial court**

17      **erred in denying Petitioner's *Marsden* motion**

18      "Even if [trial] counsel is competent, a serious breakdown in communications can

19  result in an inadequate defense." *United States v. Nguyen*, 262 F.3d 998, 1003-04 (9th Cir.

20  2001) (citing *United States v. Musa*, 220 F.3d 1096, 1102 (9th Cir. 2000)); see also *United*

21  *States v. D'Amore*, 56 F.3d 1202, 1206 (9th Cir. 1995) ("[A] court may not deny a

22  substitution motion simply because [it] thinks current counsel's representation is

23  adequate."), overruled on other grounds by *United States v. Garrett*, 179 F.3d 1143(9th

24  Cir. 1999).

25      In *Brown v. Craven*, 424 F.2d 1166 (9th Cir. 1970), Brown's attorney offered only

26  a perfunctory defense, the court found that the defendant was constructively denied his

27  right to counsel where he "was forced into a trial with the assistance of a particular lawyer

28  with whom he was dissatisfied, with whom he would not cooperate, and with whom he

1   would not, in any manner whatsoever, communicate." *Id*. 1169-1170.

2       Here, Petitioner's realization led her particularly to distrust public defender who

3   had failed to inform her of her court date, infringed upon her right to a speedy trial, and

4   had not fully advised her of her right to a speedy trial. Public defender even caused an

5   arrest warrant issued against Petitioner. Decl. Luo, ¶34-35.

6       Similar to *Daniels v. Woodford*, 428 F.3d 1181, 1200 (9th Cir. 2005), the state trial

7   court simply instructed Petitioner that she should discuss the matter with these same

8   attorneys whom she complained and dissatisfied about. RT 1-32.

9       This "serious conflict" between Petitioner and public defender gives rise to a

10  presumption of prejudice. *Perry v. Leeke*, 488 U.S. 272, 278-79, 109 S.Ct. 594, 102

11  L.Ed.2d 624 (1989); *Schell*, 218 F.3d at 1027 ("In the event that the trial court determines

12  that a serious conflict did exist that resulted in the constructive denial of assistance of

13  counsel, no further showing of prejudice is required; and Schell's trial shall be presumed

14  to have been unfair.")

15      Finally, in Nov 2021 Orange County public defender declared conflict and sought

16  to be relieved as Petitioner's counsel. Unfortunately it happened after Petitioner's

17  wrongful conviction.

18  ### CLAIM 30: Prosecutorial Misconduct At Trial

19      That the prosecuting attorney overstepped the bounds of that propriety and fairness

20  which should characterize the conduct of such an officer in the prosecution of a criminal

21  offense is clearly shown by the record. RT: 117 – 125, 214 – 216, 262 – 298. He was

22  guilty of misstating the facts in his presentation of case; of putting into the mouth of

23  Petitioner things which she had not said; of suggesting by his questions that he had proved

24  his case beyond reasonable doubt; of assuming prejudicial facts not in evidence; and in

25  general, of conducting himself in a thoroughly indecorous and improper manner.

26      As a public official charged with representing the general interest and attaining

27  justice, a prosecutor may have special stature in the eyes of the jury, and so his or her

28  misstatements may carry significant weight. See *People v. Donaldson* (2001) 93

78

1  Cal.App.4th 916, 932. "While he may strike hard blows, he is not at liberty to strike foul

2  ones. It is as much his duty to refrain from improper methods calculated to produce a

3  wrongful conviction as it is to use every legitimate means to bring about a just one. …

4  [i]mproper suggestions, insinuations and, especially, assertions of personal knowledge are

5  apt to carry much weight against the accused when they should properly carry none."

6  *Berger v. United States*, 295 U.S. 78, 88 (1935).

7    **1. Unlawfully Introducing Petitioner's Compelled Testimony, While At the**

8       **Same Time Misrepresenting Petitioner's Prior Testimony**

9  See Claim 9.

10   **2. Making Inappropriate or Inflammatory Suggestions**

11     Although prosecutors have wide latitude to draw inferences from the evidence

12  presented at trial, mischaracterizing the evidence is misconduct. *People v. Avena* (1996)

13  13 Cal.4th 394, 420 [53 Cal.Rptr.2d 301, 916 P.2d 1000].

14     Throughout the trial the prosecution repeatedly called Petitioner's failure to deny to

15  the jury's attention and proceeded to argue that it was indicative of guilt. The prosecution

16  stated "At no point does she say anything to say that she didn't to that, right? She never

17  said, what are you talking about? I would never do that. This is a

18  misunderstanding. No way. What reasonable person, when they're being directly accused

19  of that, would just sit there and not in some way deny it? And she doesn't deny it in any

20  way. "I was emotional." And she admits it again in court, and you should find that she's

21  fully admitting to that crime. And it's clear that she did it, and she is absolutely

22  guilty of Count III." RT: 268. Based on an edited and incomplete video obviously, in the

23  setting of an altercation that was about to be upgraded in the middle of the street—such as

24  it was—it is likely that Petitioner denied it while her denial was not recorded, or Petitioner

25  disdained to deny while it was so obvious a hoax, or her failure to deny may be an attempt

26  to avoid further altercation, or Czodor, who was the aggressor, withheld the recording of

27  the next part of the altercation showing Petitioner denied it, or she thought it was

28  unnecessary to deny because she was in fact innocent. Innocent people falsely accused

often believe in "a just world and in the transparency of their own blameless status....
[T]hose who stand falsely accused also have faith that their innocence will become self-evident to others. As a result, they are not calculated to choose their words or action, often not realizing that they are being framed or set up and later trapped by false evidence and perjured testimony. The "lesson of history," our Supreme Court has observed, is "that a system of criminal law enforcement which comes to depend on the 'confession' will, in the long run, be less reliable and more subject to abuses than a system which depends on extrinsic evidence independently secured through skillful investigation." *Escobedo v. Illinois* (1964) 378 U.S. 478, 489–490, 84 S.Ct. 1758, 12 L.Ed.2d 977, fns. omitted.

The prosecution stated "But ask yourself, reasonably, why in the word is she knocking on the door with keys -- with metal keys? Why in the world would you be knocking on the door with metal keys?" RT: 292. Such line of questions implies that the only purpose to use a metal object to knock on a door is to damage the door. However, there are five materials that are most commonly used to make door knockers - cast iron, pewter, copper, stainless-steel and brass. Each comes with different benefits such as copper does not rust, stainless-steel has anti-freezing properties, brass and cast iron are most durable. https://foter.com/best-door-knockers Such suggestion tends to make the prosecutor his own witness-offering unsworn testimony not subject to crossexamination. It has been recognized that such testimony, 'although worthless as a matter of law, can be "dynamite" to the jury because of the special regard the jury has for the prosecutor, thereby effectively circumventing the rules of evidence.' [Citations.]" *People v. Bolton* (1979) 23 Cal.3d 208, 213-214 [152 Cal.Rptr. 141, 589 P.2d 396; *People v. Benson* (1990) 52 Cal.3d 754, 794 [276 Cal.Rptr. 827, 802 P.2d 330] ["a prosecutor may not go beyond the evidence in his argument to the jury"]; *People v. Miranda* (1987) 44 Cal.3d 57, 108 [241 Cal.Rptr. 594, 744 P.2d 1127]; *People v. Kirkes* (1952) 39 Cal.2d 719, 724 [249 P.2d 1]; *Berger v. United States*, 295 U.S. 78, 85 (1935) [The prosecuting attorney's argument to the jury was undignified and intemperate, containing improper insinuations and assertions calculated to mislead the jury]; "Statements of supposed facts not in

1    evidence ... are a highly prejudicial form of misconduct, and a frequent basis for reversal."

2    (5 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Trial, §2901, p. 3550.)

3        **3.  Referring to Facts Not in Evidence**

4        In his opening statement, the prosecutor stated "…when this order is still

5    in effect, … he's seeing postings on YouTube with his nude photos October 4th after the

6    order had been served." RT: 123 – 124. No evidence supports such statement.

7        There was no evidence supports that Czodor and Petitioner engaged in any dating

8    relationship.

9        RT: 132 reads as follow:

10    10  Q Okay. So you went on a date around some time

11    11   near September of 2018.

12    12  A First time it was -- it was like second or

13    13  third week of August.

14    14  Q Okay. And leading up to that you had been

15    15  messaging each other, would you say it was frequently

16    16  through the dating app?

17    17 A Not sure, what is frequently.

18    18  Q Do you mean that it was a like a daily thing

19    19 or?

20    20 A No.

21    21 Q Okay. Like semi-weekly.

22    22 A Something like that.

23    23 Q Okay.

24    24 A Every second day, every third day you know.

25        RT: 133 reads as follow:

26    6 Q Okay. And the first date that you two -well,

27    7 let me ask, how many total dates did you go on

28    8 with Ms. Luo?

9 A Total dates was two dates.

RT: 134 reads as follow:

16 Q Okay. Now, at what point -- at some point did

17 your dating relationship in your view Ms. Luo end?

18 A When she left, actually I don't even know if

19 it started. I just would like to know her as a person

20 first, you know, and when she was leaving my house on

21 the second time and she was texting me. I told her

22 clearly that we should take it easy and if she's on the

23 app she would like meet other people, that's totally

24 fine with me you know.

CT: 101 reads as follow:

18 TC: I did. It's none of your business. Who are you to me? Nobody. You are to me

nobody.

19 What you think, what we was? It was my wife, girlfriend, boyfriend, what have you

been

20 to me. Jesus Christ. I met you one or two times. And that's it. This is freedom this is

not I

21 really wanted be with you forever. If l don't feel like you or don't feel like me it's no

22 problem. Evidently for you it is.

Yet in opening statement the prosecutor stated that "through the witnesses you'll

hear is about a dating relationship that went awfully bad." RT: 117. In closing argument

the prosecutor mislead the jury by stating that this case starts out with a fallout in the

relationship. RT: 264. In fact, Hanh Le's infamous cheating husband never had a

relationship with Petitioner.

The prosecution stated "in the dark of the night, no, he might not have seen when

she was doing that." RT: 292. The evidence refutes such false statement. Decl. Luo, ¶8-

10. There was a light bulb installed right above Czodor's front door. The light showered

82

Petitioner from head to toe.

### 4. Vouching for the Sole Witness, While At the Same Time Withholding Exculpatory Evidence

The prosecution stated "I anticipate Defense may tell you, well, he didn't, you know, tell the police that day that it was damaged. Well, remember, he said he called the police because he's telling her to leave his property, that's his main concern at this point." RT: 269. Looking at the withheld police activity report on Sep 18, 2018 the prosecution's theory was an outright lie. The report clearly stated nude photos and extortion. What reasonable person, while making a 911 call, would say something else but forget to mention the scratching noises he heard for 20 minutes?

The prosecution stated "Really, he's not credible? A guy who walked into a room, took an oath in front of multiple strangers. More than -- I was going to say 14 or more, including court staff. And he went up there, and guess what? He had to tell this room full of strangers he had to get up there on that stand in front of all of you and admit that, I was dating this girl. And yeah, I sent her nude photos after a week. And think about what it takes (indiscernible) actually admit that you're doing that, knowing that you're not just admitting doing that, but guess what? Every single one of these strangers is going to get to see those nude photos of you now, as well. And he went up there and told you that yes, in fact, he did do that. My point is he is credible. He admitted to things that he didn't see when he was asked, did you actually see her scratching up the door? He said, no, I didn't see that happening when it was happening." RT: 288 – 291. The prosecution vouched for the witness's truthfulness because the witness said he did not see Petitioner scratching his door. The truth is the witness could not make his story straight if he said he saw Petitioner scratching his door but he did not report to the police on Sep 18, 2018. The prosecution also vouched for the witness's emotional distress by alleging the witness had to testify in a room full of strangers despite the witness testified he took a nude photo on a nudist beach which was a public place. It is difficult to believe a nudist who was comfortable with public nudity, took nude photos on a nude beach which was on a public land, exposed

1  himself in public, would feel uneasy to testify in a room full of strangers. Especially when

2  Czodor allowed a stranger to take his nude photos on a nude beach. RT: 144 – 145.

3  **5.  Improper Expression of Opinions to The Jury**

4  During his summation, the prosecutor made numerous prejudicial expressions of

5  opinion. There is no court in the United States can order Petitioner not to post online

6  indicating that Mr. Czodor is a nice guy without infringement of Petitioner's First

7  Amendment right. Despite the restraining order did not pass constitutional muster, the

8  prosecution stated that "So the -- by the rules of the restraining order, if she posted a post

9  that said, like, hey, Tomas Czodor, he's a nice guy, that's a violation of the restraining

10  order." RT: 293 – 294.

11  These statements were improper expressions of the prosecutor's personal opinion

12  about Petitioner's guilt and about the evidence introduced at trial. See *Berry*, 627 F.2d at

13  198; *Beach*, 147 Cal. App. at 628 - 629. Even if defense counsel had objected to the

14  improper statements, such an objection would not have cured the resulting harm, not to

15  mention defense counsel failed to object. Under the circumstances of this close case, it

16  was reasonably likely that the jury misconstrued or misapplied the prosecutor's remarks.

17  *Sanders*, 11 Cal. 4th at 526.

18  **CLAIM 31: Violation of Due Process - Cumulative Error**

19  Cumulative error may be grounds for federal habeas corpus relief, even when any

20  single error would not. *Parle v. Runnels* (9th Cir. 2007) 505 F.3d 922, 927-929, citing

21  *Chambers v. Mississippi* (1973) 410 U.S. 284.

22  The Supreme Court has clearly established that the combined effect of multiple

23  trial court errors violates due process where it renders the resulting criminal trial

24  fundamentally unfair. *Chambers*, 410 U.S. at 298, 302-03 (combined effect of individual

25  errors "denied [Chambers] a trial in accord with traditional and fundamental standards of

26  due process" and "deprived Chambers of a fair trial"). See also *Taylor v. Kentucky*, 436

27  U.S. 478, 487 n.15 (1978) ("[T]he cumulative effect of the potentially damaging

28  circumstances of this case violated the due process guarantee of fundamental fairness . . .

84

.") The cumulative effect of multiple errors can violate due process even where no single error rises to the level of a constitutional violation or would independently warrant reversal. *Chambers*, 410 U.S. at 290 n.3.

In determining whether the combined effect of multiple errors rendered a criminal defense "far less persuasive" and had a "substantial and injurious effect or influence" on the jury's verdict, the overall strength of the prosecution's case must be considered because "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland v. Washington*, 466 U.S. 668, 696 (1984). Here, the prosecution's case is particularly weak. The only witness, Hanh Le's infamous cheating husband, provided inconsistent and perjured testimony. The police did not collect any evidence. All "evidence" was provided by Czodor in paper form without metadata.

The prejudicial impact of erroneous inclusion of hearsay and Petitioner's prior compelled testimony was exacerbated by the trial court's additional errors in failure to instruct the jury about dating relationship, denial of juror #4's hardship request, and admission of photos and screenshots without metadata. Viewed collectively, these errors undeniably rendered Petitioner's defense "far less persuasive than it might have been" and thereby violated her due process rights. See *Parle v. Runnels*, 505 F.3d 922, 934 (9th Cir. 2007) (concluding that all of the improperly admitted evidence bolstered the State's case, while all of the erroneously excluded evidence rendered defense far less persuasive than it might have been, it was objectively unreasonable for the California Court of Appeal to conclude that the combined effect of these errors did not violate defendant's due process rights.)

### **Errors Inherently Carrying A High Probability of Prejudice**

Some kinds of error are inherently likely to cause prejudice – for example, comments by persons in authority such as judges or prosecutors, instructions, confessions etc. Examples include:

• Statements by prosecutors: As a public official charged with representing the

general interest and attaining justice, a prosecutor may have special stature in the eyes of the jury, and so his or her misstatements may carry significant weight. See *People v. Guerrero* (1976) 16 Cal.3d 719, 730; *People v. Thomas* (1992) 2 Cal.4th 489, 529; *People v. Donaldson* (2001) 93 Cal.App.4th 916, 932.

• Instructions: Instructions are inevitably crucial in leading jurors (who are for the most part unschooled in the law) to a conclusion. See *People v. Clair* (1992) 2 Cal.4th 629, 663 ["jurors treat the court's instructions as a statement of the law by a judge"].

• Confessions: The defendant's own words inevitably carry heavy weight before a jury; it is difficult to ignore a confession or substantial admission of guilt.

**Prominence of Error**

An error may be prejudicial because it played a prominent role in the case. In contrast, prejudice will be more difficult to establish when the error was relatively trivial, involved tangential or uncontested matters, or happened only once and without particular emphasis. Factors include:

• Centrality to issues: The error may have directly affected the key issue in the case. Here, such as whether Petitioner and Czodor were engaged in a dating relationship that warrants a DVRO and suggests a sufficiently intimate or confidential nature which may have filled a substantial gap in the prosecution's case or damaged the heart of the defense.

• Emphasis given error: An error may have been repeated or exploited or given special emphasis by the prosecutor during argument. As the Supreme Court has put it: "There is no reason why we should treat this evidence as any less 'crucial' than the prosecutor – and so presumably the jury – treated it." *People v. Powell* (1967) 67 Cal.2d 32, 56-57, quoting *People v. Cruz* (1964) 61 Cal.2d 861, 868.

**Closeness of the Case**

A case in which the state or county case is weak or the defense is strong may well be affected by an error. See *People v. Moore* (1954) 43 Cal.2d 517, 530-531 (closely balanced evidence, erroneous jury instructions on matters vital to defense); *People v.*

1    *Weatherford* (1945) 27 Cal.2d 401, 403; *People v. Pearch* (1991) 229 Cal. App. 3d 1282,

2    1294-1295; *People v. Allen* (1978) 77 Cal.App.3d 924, 935 (close contest of credibility);

3    see also *People v. Maestas* (1993) 20 Cal.App.4th 1482, 1498 (key prosecution evidence

4    of questionable credibility, whereas defense was strong); *People v. Roberts* (1967) 256

5    Cal.App.2d 488.

6                               **CLAIM 32: IAC – Direct Appeal**

7            If the attorney appointed by the State to pursue the direct appeal is ineffective, the

8    defendant has been denied fair process. See *Martinez v. Ryan*, 566 U.S. 1, 11, 132 S.Ct.

9    1309, 182 L.Ed.2d 272 (2012) (citing Coleman v. Thompson, 501 U.S. 722, 754, 111

10   S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Evitts v. Lucey*, 469 U.S. 387, 396, 105 S.Ct. 830, 83

11   L.Ed.2d 821 (1985); *Douglas v. California*, 372 U.S. 353, 357-358, 83 S.Ct. 814, 9

12   L.Ed.2d 811 (1963).

13           After Petitioner appealed her conviction public defender declared conflict and

14   sought to be relieved as Petitioner's counsel. Robert Bullock was appointed to represent

15   Petitioner on appeal. Record on appeal was mailed to Bullock in December 2021. Despite

16   Petitioner repeated asked him for the issues he was going to argue he waited until Feb 17,

17   2022 to inform Petitioner that he had found no issue on appeal. Petitioner received zero

18   assistance of counsel on direct appeal.

19                              **CLAIM 33: Actual Innocence**

20           The prosecution has failed to prove each and every element beyond a reasonable

21   doubt. Both the TRO and DVRO issued in Sep and Oct 2018 by family court were

22   unlawful. False and inadmissible evidence was admitted into evidence. Perjured testimony

23   was introduced to the jury. Petitioner's innocence is a matter of reality.

24                         **CLAIM 34: Section 2254(d) Does Not Bar Relief**

25           In its Oct 19, 2021 ruling the state superior court denied relief on Petitioner's

26   *Strickland* claim, concluding that Petitioner has not demonstrated that counsel's

27   performance was substandard or that she was prejudiced by counsel's alleged failures.

28   ECF 5 at 8. Knowing that Petitioner was not represented by counsel in habeas corpus, the

state superior court faulted Petitioner for her failure to provide transcript and rushed to deny Petitioner's relief without giving her any opportunity to supplement the transcript. The state court's finding without reading the transcript is the very definition of an unreasonable determination of fact. The state habeas court's rejection of this claim is not entitled to deference under §2254(d) because the state court ignored the key facts relevant to this claim.

Where a state court resolving a federal constitutional claim refuses to consider facts it should consider in deciding a constitutional claim, that decision is unreasonable and § 2254(d) will not bar relief. *Williams v. Taylor*, 529 U.S. 362, 397-398 (2000). Accord Id. at 416 (O'Connor, J. concurring).

## CLAIM 35: Violation of Sixth and Fourteenth Amendments – Incorrect Jury Instruction

On July 26, 2021, Count 2 was amended from allegation of coming within 100 yards of the protected person to failure to deactivate website and created new websites. CT 66.

The trial court erred in giving a jury instruction unrelated to what Petitioner was charged for. CT 146. The instruction was fundamentally incorrect because it referred to a written order that the defendant not contact, send any messages to, follow, or disturb the peace of the protected person, Tomas Czodor, not the websites that Petitioner was charged for. At trial, there was no evidence showing that Petitioner ever contacted, sent any messages to, followed, or disturbed the peace of the protected person, Tomas Czodor in violation of any court order.

Petitioner received ineffective assistance of counsel both at trial and on appeal. Petitioner's trial counsel failed to object to the incorrect jury instruction and Petitioner's appellate counsel failed to raise the issue on appeal.

## CONCLUSION

Petitioner has now thoroughly controverted and discredited the evidence originally presented to prove her guilt. Petitioner's guilt has not only been called into question, she

1  has proven that no reasonable juror would have found her guilty beyond a reasonable

2  doubt. Her innocence is a matter of reality. This Court must act to find Petitioner actually

3  innocent. This Court must grant this petition and issue a finding of factual innocence. In

4  the alternative, this Court should order an evidentiary hearing at which Petitioner will be

5  permitted to offer further proof in support of her claims for habeas relief.

6  **VERIFICATION**

7  I, Xingfei Luo, declare that I am the petitioner of this petition for writ of habeas

8  corpus. I have prepared the attached Petition for Writ of Habeas Corpus and

9  Memorandum of Points and Authorities in Support Thereof and believe the matters stated

10  therein to be true. On that basis, I allege they are true.

11  I declare under penalty of perjury that the foregoing is true and correct.

12  Executed on June 4, 2023, at Rosemead, California.

13  */s/ Xingfei Luo*

14  Xingfei Luo

15

16

17

18

19

20

21

22

23

24

25

26

27

28

89

APPENDIX TO FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS

## DECLARATION OF PETITIONER XINGFEI LUO

I, XINGFEI LUO declare and state:

1.    I am the Petitioner in this case. I sat through the jury trial commenced on Jul 27, 2021. I requested and received the entire discovery file from public defender in Sep 2021. I have personal knowledge of the facts stated herein. If called upon as a witness I could and would competently testify thereto.

2.    In Aug 2018 Czodor connected with me through POF. All of our communication was through texting. We never talked on the phone. Throughout our interaction I never told Czodor my full name. He told me via texting he was single never married. But in fact, Czodor was a longtime married man. Czodor and his wife, Hanh Le, jointly own a property that was purchased in 2009. Between 2014 and 2019 Czodor and Hanh Le filed taxes as a married couple. Czodor's wife is ten years older than him. Czodor's marital status was unavailable to me until June 2022. A true and correct copy of Czodor's property ownership and tax returns is attached hereto as Exhibit 6. ECF 6 at 138.

3.    Czodor told me via texting he was a nudist right after we started texting in early August 2018. I never asked for his nudes but he sent me anyway. He never asked me to keep his photos private. I never promised I would keep his photos private. When he sent me his nude photos he did not even know my full name. He invited me to a nudist ranch in Riverside named Olive Dell Ranch. He told me via texting he was going back to Europe before our second and last face to face meeting. A true and correct copy of his texts is attached hereto as Exhibit 7. ECF 6 at 153.

4.    For centuries, door knocker has been made with metal. Czodor had neither doorbell nor door knocker on his door in Sep 2018. There is nothing wrong to use any metal object as a door knocker.

5.    On Sep 18, 2018 Czodor took more videos and photos than he provided to the police. He withheld those videos and photos because they would show I did not scratch his door and I denied posting his nudes.

6.    Under the penalty of perjury, Czodor declared that I never told him my name.

90

He further declared that on Sep 18, 2018 I did not stop scratching his door after he told me to, and he called his friend Chris Kovacs and went outside to confront me. His friend suggested to call 911 because I did not want to leave, but not because I was scratching his door. A true and correct copy of Czodor's declaration submitted to family court is attached hereto as Exhibit 8. ECF 6 at 155.

7.    Czodor confirmed that two videos he provided to the police were taken at 7:54 pm and 8:13 pm respectively on Sep 18, 2018. A true and correct copy of his declaration under oath is attached hereto as Exhibit 9. ECF 6 at 157.

8.    Czodor provided to the police a photo, printed out on paper with no trace of time stamp or metadata, depicting me standing and holding a key in front of his door which was taken from his kitchen window. A true and correct copy of the photo is attached hereto as Exhibit 10. ECF 6 at 159. It clearly shows the lighting came from the top of my head showering me from head to toe. The entire front door area was nice and bright enough to see anything, including damages if any. However, Czodor, a professional liar, lied about being dark and unable to see the damage on Sep 18, 2018. A true and correct copy of Czodor's testimony is attached hereto as Exhibit 14. ECF 6 at 167.

9.    The second photo provided to the police by Czodor, also printed out on paper with no trace of time stamp, depicting me standing in front of his door viewer. The photo clearly shows there was bright light coming from the top which backs up the first photo showing strong light coming from the ceiling. A true and correct copy of the photo is attached hereto as Exhibit 11. ECF 6 at 161.

10.   The third photo provided to the police, printed out on paper with no trace of time stamp, shows I was standing in front of Czodor's garage door which was nowhere close to his front door. A true and correct copy of the photo is attached hereto as Exhibit 12. ECF 6 at 163. Because all these photos were not provided in digital form with metadata, I cannot obtain the time stamp of each photo.

11.   On Sep 24, 2018 Czodor expressed his plan to manufacture criminal charges and file a restraining order after he learned that it would cost money to remove a post

related to his credibility. A true and correct copy of Czodor's email is attached hereto as Exhibit 13. ECF 6 at 165.

12.   Czodor testified in the family court that he heard weird noises from scratching for 20 minutes, it was dark so he did not see the damages to his door on Sep 18, 2018, and the photo of the damaged door was taken on Sep 25, 2018. A true and correct copy of the family court transcript is attached hereto as Exhibit 14. ECF 6 at 167. It makes total sense why the photo of the damaged door was taken on Sep 25, 2018 because Czodor damaged his own door that day and falsely filed the police report on Sep 26, 2018 for retaliation with all other manufactured "paper evidence". A true and correct copy of the photo of Czodor's so-called damaged door is attached hereto as Exhibit 15. ECF 6 at 175.

13.   The prosecution falsely alleged that I admitted to post Czodor's nudes while I did not need his permission in the family court but such allegation was completely false. A true and correct copy of the family court transcript is attached hereto as Exhibit 14. ECF 6 at 167.

14.   Czodor's interaction with the police officer was recorded. The police officer's body camera footage shows that the officer did not read any text messages from Czodor's phone and took all paper "evidence" as true and correct without collecting or even asking for digital copy with metadata and timestamp. A true and correct copy of the officer's statement on Sep 26, 2018 indicating no nude photos or videos observed is attached hereto as Exhibit 16. ECF 6 at 177.

15.   On Sep 28, 2018 I received no prior notice and was not present at the ex parte hearing regarding Czodor's request for TRO. There was no court reporter at that hearing and therefore there is no transcript available. A true and correct copy of the TRO and DVRO issued by the family court is attached hereto as Exhibit 17. ECF 6 at 180. Not a word in the DVRO orders me to stay away from Czodor's facebook page. Not a word in the DVRO orders anything related to Czodor's company and he did not have any company ever. Not a word in the DVRO orders me to stop contacting Czodor's friends and clients. Not a word in the DVRO orders me to stop stalking Czodor in cyberspace.

16.   Prior to trial, I informed public defender that Czodor was a nudist but I was told he would not present this fact at trial and the less information the better.

17.   The information of Czodor's prior criminal convictions was not available to me until December 2021. A true and correct copy of Tomas Czodor's criminal conviction records is attached hereto as Exhibit 18. Tomas Czodor's rap sheet was never disclosed by prosecution, including the information that Czodor was previously subject to deportation and arrested for impersonation. The facts that Czodor was subject to deportation and arrested for impersonation by California Highway Patrol were unavailable to me until February 2022.

18.   Czodor's yelp page is https://www.yelp.com/biz/gorgeous-painting-newport-beach. None of his customers on Yelp was named Lilly.

19.   I ran a research both with county and state authorities, which shows there was never a company or business named "Gorgeous Painting". A true and correct of the research is attached hereto as Exhibit 19. ECF 6 at 198. It can be easily searched on https://businesssearch.sos.ca.gov/ and https://cr.ocgov.com/FBNOnlineNet/.

20.   In August 2021 I made a public record request for all complaints and requests for assistance made by Tomas Czodor and Santa Ana Police Department produced two police field activity reports dated on Sep 10, 2018 and Sep 18, 2018. A true and correct copy of the reports is attached hereto as Exhibit 20. ECF 6 at 200.

21.   On Sep 13, 2021 I confirmed with my trial counsel that neither he nor any of his coworkers ever called Chris Kovacs for information. Not to mention Czodor's so-called friends and customers who may never exist. Due to public defender's failure to subpoena all texts between Czodor and me Czodor was free to lie about anything, including but not limited to the fabrication that I asked for his nudes and threatened him.

22.   From the very beginning I have maintained that the restraining orders are unlawful. I did not grant consent or authority to public defender to sign off a stipulation with the prosecution. Prior to signing off the stipulation public defender never discussed with me about the stipulation. Upon my repeated inquiry, public defender failed to

provide any explanation for their action or omission. A true and correct copy of the correspondence with public defender is attached hereto as Exhibit 21. ECF 6 at 206.

23.   Initially public defender was appointed as my counsel on direct appeal. In Nov 2021 public defender declared conflict and sought to be relieved. Mr Bullock was appointed to replace public defender as my counsel on direct appeal.

24.   I repeatedly asked my appeal counsel, Mr Bullock, for the issues he was going to raise on appeal and I was not informed until Feb 17, 2022 that he was not able to identify any issues on appeal. A true and correct copy of the opinion by appellate division is attached hereto as Exhibit 1. ECF 3 at 3.

25.   Although Czodor alleged the cheater post caused him damage and harm, he never spent a dime on the removal of the post.

26.   I was never properly and fully advised by my counsel about my right to a speedy trial. I was not advised, for example, that my case could be dismissed if it was not brought to trial within 30 days after I entered my plea, how a general time waiver was entered, and I could withdraw the time waiver any time I wanted.

27.   On Aug 12, 2019 I did not voluntarily and intelligently waive my constitutional right to a speedy trial. No one ever explained to me what was general time waiver and what was the consequence to enter a general time waiver. I was not aware of any general time waiver in my case until Jul 13, 2021. I did not make a voluntary, knowing and intelligent waiver of my right to a speedy trial. I was forced to choose between my right to a speedy trial and my right to be represented by competent counsel as a result of being represented by public defender and not knowing that I could file a *Marsden* motion until Jul 12, 2021.

28.   Throughout my case, no one ever asked me whether I was asserting or willing to waive my due process right to a speedy trial. No one ever asked for my authority to waive my constitutional right to a speedy trial. No one ever told me that I could withdraw the time waiver. More importantly, I could not withdraw the time waiver because I was not even aware that there was a general time waiver.

29.   Before and during the pretrial hearings on 08/12/2019, 09/06/2019, 10/18/2019, 01/10/2020, 02/14/2020, 03/20/2020, 07/14/2020, 12/22/2020, 03/05/2021, 05/07/2021, 06/08/2021, no one ever explained to me what was general time waiver and what was the consequence to enter a general time waiver. Each time I was simply informed by my counsel that there would be a continuance and as far as I was concerned continuances were required to enable my attorney to be prepared for trial. To me, there is a big difference between a general time waiver and continuance. General time waiver means that I voluntarily and knowingly waive my right to a speedy trial. Continuance means that my counsel is not prepared for trial even though I do not want to waive my right to a speedy trial. Given my lack of experience in criminal proceedings and traumatic events during incarceration I was most likely not competent to comprehend issues of speedy trial through counsel, or to assist or meaningfully authorize counsel to handle legal proceedings on my behalf.

30.   I never waived my right to be present at any hearings pending trial. Each time I was simply informed by my counsel whether or not I would need to be present at the hearing.

31.   On Jan 10, 2020 jury trial was set on Mar 24, 2020. I was not aware of any general time waiver in my case until Jul 13, 2021. A true and correct copy of the correspondence with public defender and minute order is attached hereto as Exhibit 22. ECF 6 at 211.

32.   The jury trial was suspended due to COVID but the Court resumed jury trial since late May 2020. A true and correct copy of the jury release is attached hereto as Exhibit 23. ECF 6 at 218.

33.   I never requested any continuances due to my own inability to appear at trial or any hearing. All the continuances were caused by the prosecution, public defender, and the trial court.

34.   I was not informed that there was a pretrial hearing on Jul 14, 2020. I did not appear in court on Jul 14, 2020 and nobody ever asked me for my authority to enter a

general time waiver or waive my appearance. I was not even informed that the next pretrial was set on Dec 4, 2020.

35.   I failed to appear at the hearing on Dec 4, 2020 because I did not know there was a hearing due to public defender's failure to notify. I was so frustrated about my failure to appear in Court because I was at no fault. I felt like I was a piece of meat on the chopping board. I cannot afford private counsel and at the time I did not know I could file a *Marsden* motion. An arrest warrant was issued for my failure to appear in court on Dec 4, 2020, although I was at no fault.

36.   Had I been represented by competent counsel, there would not have been a general time waiver. Had I been represented by competent counsel, the general time waiver would have been withdrawn by the end of August 2019. Had I been represented by competent counsel I would not have failed to appear in court on Dec 4, 2020. Had I been represented by competent counsel my charges should have been dismissed long time ago. My constitutional rights to competent counsel and a speedy trial had been substantially impaired.

37.   I did not request any continuances due to my inability to appear for trial. I did not request any reassignment of counsel prior to I filed the *Marsden* Motion.

38.   I could not do anything about the case because I was still under the impression that I either had public defender or no counsel at all. More importantly, I had no access to the records. I have no idea what really happened at each pretrial hearing and what's on the records. For example, whether the district attorney objected to each continuance. Until Jul 18, 2021, I did not learn the fact that the district attorney never made objection to each continuance and never stated on record that they were ready for trial.

39.   On Jul 12, 2021 I called public defender Supervising Attorney Ray Jones and expressed my frustration. Instead of advising me to file Marsden request he simply told me to represent myself, which manifests that public defender did not have my best interest in mind.

40.   On Jul 12, 2021 I asked Mr Jorge Dominguez to file a motion to dismiss and on

96

1  Jul 13, 2021 I was informed by Mr Dominguez that he would not do so.

2      41.   Since I was arraigned I was left in the dark throughout the entire process. At

3  each hearing I was told to wait outside the courtroom in the hallway. I had no idea what

4  happened in the courtroom. When I was called inside the courtroom I was simply told

5  when my next court day was.

6      42.   Over the last two years prior to trial, I never got a chance to discuss the defense

7  with my counsel at length. My constitutional rights seem like a joke to the State of

8  California.

9      Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

10  is true and correct.

11      Date: June 4, 2023                          */s/ XINGFEI LUO*
                                                     XINGFEI LUO, In Pro Per
12

APPENDIX TO FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS