HC-001

Name: Xingfei Luo

Address: PO BOX 4886,

El Monte, CA 91734

CDC or ID Number: _____

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE

**OCT 10 2022**

DAVID H. YAMASAKI, Clerk of the Court

BY: __D. HOWARD__ , DEPUTY

Superior Court of California

for the County of Orange

_____

*(Court)*

Xingfei Luo

Petitioner

vs.

The People of the State of California

Respondent

**PETITION FOR WRIT OF HABEAS CORPUS**

No. __M − 2 0 0 6 9__

*(To be supplied by the Clerk of the Court)*

## INSTRUCTIONS—READ CAREFULLY

> • **If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.**
>
> • **If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.**

• Read the entire form *before* answering any questions.

• This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

• Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

• If you are filing this petition in the superior court, you only need to file the original unless local rules require additional copies. Many courts require more copies.

• If you are filing this petition in the Court of Appeal, file the original of the petition and one set of any supporting documents.

• If you are filing this petition in the California Supreme Court, file the original and 10 copies of the petition and, if separately bound, an original and 2 copies of any supporting documents.

• Notify the Clerk of the Court in writing if you change your address after filing your petition.

> Approved by the Judicial Council of California for use under rule 8.380 of the California Rules of Court (as amended effective January 1, 2018). Subsequent amendments to rule 8.380 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Page 1 of 6

Form Approved for Optional Use
Judicial Council of California
HC-001 [Rev. January 1, 2019]

**PETITION FOR WRIT OF HABEAS CORPUS**

Penal Code, § 1473 et seq.;
Cal. Rules of Court, rule 8.380
*www.courts.ca.gov*

HC-001

**This petition concerns:**

| | | | |
|---|---|---|---|
| [x] | A conviction | [ ] | Parole |
| [x] | A sentence | [ ] | Credits |
| [ ] | Jail or prison conditions | [ ] | Prison discipline |
| [x] | Other (specify): Restitution | | |

1. Your name: Xingfei Luo

2. Where are you incarcerated? Currently on probation

3. Why are you in custody? [x] Criminal conviction    [ ] Civil commitment

   *Answer items a through i to the best of your ability.*

   a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").
   Vandalism-less than $400 in damages, Disobeying domestic relations court order, Disorderly conduct unlawful dissemination of private photographs and recordings

   b. Penal or other code sections: 594(a)/(b)(2)(A) PC, 273.6(a) PC, 647(j)(4)(A) PC

   c. Name and location of sentencing or committing court:
   Superior Court of California for the County of Orange
   700 Civic Center Drive West, Santa Ana, CA 92701

   d. Case number: 19CM06724

   e. Date convicted or committed: Jul 29, 2021

   f. Date sentenced: Aug 13, 2021

   g. Length of sentence: 3 years probation

   h. When do you expect to be released?

   i. Were you represented by counsel in the trial court? [x] Yes    [ ] No    *If yes, state the attorney's name and address:*
   Jorge Dominguez
   801 Civic Center Dr, Suite 400, Santa Ana, CA 92701

4. What was the LAST plea you entered? *(Check one):*

   [x] Not guilty    [ ] Guilty    [ ] Nolo contendere    [ ] Other:

5. If you pleaded not guilty, what kind of trial did you have?

   [x] Jury    [ ] Judge without a jury    [ ] Submitted on transcript    [ ] Awaiting trial

HC-001

6. **GROUNDS FOR RELIEF**

**Ground 1:** State briefly the ground on which you base your claim for relief. For example, "The trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page 4. For additional grounds, make copies of page 4 and number the additional grounds in order.)*
See Appendix for details.

_____
_____
_____
_____
_____
_____

a. **Supporting facts:**

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts on which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel, you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is, *who* did exactly *what* to violate your rights at what time *(when)* or place *(where)*.
See Appendix for details.

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

b. **Supporting documents:**

Attach declarations, relevant records, transcripts, or other documents supporting your claim. (See *People v. Duvall* (1995) 9 Cal. 4th 464, 474.)
See Appendix for details.

_____
_____
_____
_____
_____

c. **Supporting cases, rules, or other authority** *(optional)*:

(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)
See Appendix for details.

_____
_____
_____
_____
_____

HC-001

7. **Ground 2 or Ground** _____ *(if applicable):*
   See Appendix for details.

_____

_____
_____
_____
_____
_____

   a. Supporting facts:
      See Appendix for details.

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

   b. Supporting documents:
      See Appendix for details.

_____
_____
_____
_____
_____
_____

   c. Supporting cases, rules, or other authority:
      See Appendix for details.

_____
_____
_____
_____
_____
_____

HC-001

8. Did you appeal from the conviction, sentence, or commitment? ☒ Yes ☐ No    If yes, give the following information:

   a. Name of court ("Court of Appeal" or "Appellate Division of Superior Court"):
     Appellate Panel, Superior Court of California for the County of Orange

   b. Result: Affirmed                   c. Date of decision: April 27, 2022

   d. Case number or citation of opinion, if known: 30-2021-01216615-CL-MC-CJC

   e. Issues raised: (1) First, Fifth, Sixth, Fourteenth Amendments violations

               (2) _____

               (3) _____

   f. Were you represented by counsel on appeal? ☒ Yes ☐ No    If yes, state the attorney's name and address, if known:
     Robert L. Bullock

     5130 East La Palma Avenue, Suite 210, Anaheim, California, 92807-2078

9. Did you seek review in the California Supreme Court? ☐ Yes ☒ No    If yes, give the following information:

   a. Result: _____ b. Date of decision: _____

   c. Case number or citation of opinion, if known: _____

   d. Issues raised: (1) _____

               (2) _____

               (3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal (see *In re Dixon* (1953) 41 Cal.2d 756, 759):
I received ineffective assistance of counsel both at trial and on appeal.

11. Administrative review:

   a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Dexter* (1979) 25 Cal.3d 921, 925.) Explain what administrative review you sought or explain why you did not seek such review:
N/A

   b. Did you seek the highest level of administrative review available? ☐ Yes ☐ No
     *Attach documents that show you have exhausted your administrative remedies. (See People v. Duvall (1995) 9 Cal.4th 464, 474.)*

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or issue in any court, including this court? (See *In re Clark* (1993) 5 Cal.4th 750, 767–769 and *In re Miller* (1941) 17 Cal.2d 734, 735.)
☒ Yes    If yes, continue with number 13.     ☐ No    If no, skip to number 15.

HC-001

13  a.  (1)  Name of court: Orange County Superior Court

      (2)  Nature of proceeding (for example, "habeas corpus petition"): Habeas corpus petition

      (3)  Issues raised:  (a)  Violation of Defendant's First, Fifth, Sixth, and Fourteenth Amendments rights

                          (b)  Ineffective assistance of counsel

      (4)  Result (attach order or explain why unavailable): Denied

      (5)  Date of decision: Oct 19, 2021

   b.  (1)  Name of court: Court of Appeal

      (2)  Nature of proceeding: Habeas corpus petition

      (3)  Issues raised:  (a)  Violation of Defendant's First, Fifth, Sixth, and Fourteenth Amendments rights

                          (b)

      (4)  Result (attach order or explain why unavailable): Denied without prejudice as premature

      (5)  Date of decision: Nov 10, 2021

   c.  For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:
    No hearing was held.

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See *In re Robbins* (1998) 18 Cal.4th 770, 780.)
    I received ineffective assistance of counsel both at trial and on appeal.

16. Are you presently represented by counsel?  ☐ Yes  ☒ No    If yes, state the attorney's name and address, if known:

17. Do you have any petition, appeal, or other matter pending in any court?  ☒ Yes  ☐ No    If yes, explain:
    Habeas petition pending in federal court Case 8:22-cv-01640-MEMF-KES.

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: October 10, 2022    ▶

(SIGNATURE OF PETITIONER)

HC-001 [Rev. January 1, 2019]                **PETITION FOR WRIT OF HABEAS CORPUS**                Page 6 of 6

For your protection and privacy, please press the Clear
This Form button after you have printed the form.    [Print this form]  [Save this form]        [Clear this form]

XINGFEI LUO

PO BOX 4886,

El Monte, CA 91734

Petitioner in Pro Se

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF ORANGE

XINGFEI LUO,

               Petitioner,

   v.

THE PEOPLE OF THE STATE OF CALIFORNIA

               Respondent.

No.

**APPENDIX TO PETITION FOR WRIT OF HABEAS CORPUS**

## INTRODUCTION

After Hanh Le's cheating husband, a shameless nudist, Tomas Czodor (Czodor), faked his damages and injuries, Xingfei Luo (Petitioner) was charged by Orange County District Attorney (OCDA)'s misdemeanor complaint, on Aug 6, 2019, with vandalism (Pen. Code,§ 594{a}/(b)(2)(A)), violation of a protective order (Pen. Code,§ 273.6(a)) (by coming within 100 yards of the protected person), and disorderly conduct (unlawful dissemination of private photographs and recordings) (Pen. Code, § 647(j)(4))(A). CT 1-2.[1] 720 days after the original complaint was filed, despite no finding of good cause to justify any belated amendment, the complaint was illegally permitted to amend from

[1] For purposes of citation, the Reporter's Transcript on Appeal is referred to as RT. The Clerk's Transcript on Appeal is referred to as CT. A true and correct copy of the RT and the CT are attached as Exhibit 1-3.

1 | allegation of coming within 100 yards of the protected person to failure to deactivate

2 | website and created new websites. CT 66-67.

3 |     After being astonished by public defender's poor performance at trial, Petitioner

4 | had to conduct her own investigation which has revealed that the prosecution withheld

5 | several material pieces of evidence which would destroy the veracity and credibility of the

6 | prosecution's star witness who was the sole witness testified at trial. Petitioner also

7 | discovered shocking information of Czodor's background which should have been

8 | investigated by public defender and such failure constitutes ineffective assistance of

9 | counsel that prejudiced Petitioner.

10 |     At trial, the state's theory was that (1) Czodor and Petitioner had a dating

11 | relationship; (2) After a fallout in the relationship Petitioner threatened to publish

12 | Czodor's nude photos and did so after making those threats between Sep 5 and Sep 7,

13 | 2018 and the following week Czodor reported the said incidents to police; (3) Petitioner

14 | scratched Czodor's front door on Sep 18, 2018 for 20 minutes but Czodor discovered the

15 | damages on Sep 19, 2018 because it was dark at night. Czodor took photos of the

16 | damaged door on Sep 25, 2018 in order to make a police report the next day; (4) Petitioner

17 | did not remove websites as the family court ordered and created new websites.

18 |     But in fact, (1) When Czodor connected with Petitioner, he posed himself as a

19 | single man never married but actually he has been married for over ten years. Czodor was

20 | seeking casual hook-ups to cheat on his wife. During the entire contact between Petitioner

21 | and Czodor, Petitioner never told Czodor her full name. They never had a relationship; (2)

22 | Hanh Le's cheating husband, Czodor, is a nudist who believes becoming nude increases

23 | confidence. He sent his nude photos to Petitioner when he did not even know Petitioner's

24 | full name. Decl. Luo, ¶6. Czodor never asked Petitioner to keep his photos private nor did

25 | he receive Petitioner's promise to keep his photos private. The screenshots of the

26 | threatening messages have no metadata and no one can tell whether they were falsified or

27 | edited. On Sep 10, 2018, the following week after Petitioner allegedly threatened to post

28 | his nude photos and did so, Czodor made a police report alleging unfounded terrorism,

APPENDIX TO PETITION FOR WRIT OF HABEAS CORPUS

1   completely contrary to his testimony; The customer Czodor alleged she told him about his

2   nude photos online never existed; (3) The front door area was brightly lit on Sep 18, 2018,

3   Czodor was able to constantly take photos and shoot videos, it is impossible that he could

4   not discover the damage on Sep 18, 2018 after hearing 20 minutes scratching. The 911

5   call made on Sep 18, 2018 did not indicate a word regarding scratching a door despite

6   Czodor heard 20 minutes of scratch. The day before Czodor took a photo of his damaged

7   door, on Sep 24, 2018, Czodor learned that the removal of a post related to his credibility

8   would cost money. In order to frame Petitioner, Czodor damaged his own door and took

9   photos on Sep 25, 2018 or the photos of the damaged door were falsified or manufactured

10  using editing software; (4) both orders issued by the family court were unlawful and

11  invalid.

12       Petitioner, a victim of false accusations, shoddy police work, bad lawyering,

13  prosecutorial misconduct and extreme malfunctions in the state criminal justice systems,

14  seeks relief to vacate her conviction due to actual innocence and violations of First, Fifth,

15  Sixth, and Fourteenth Amendments of the United States Constitution.

16       **FACTS THE JURY HEARD AND FACTS THE JURY DID NOT HEARD**

17       **I.  THE ISSUANCE OF TWO UNLAWFUL FAMILY COURT ORDERS**

18            **(TRO AND DVRO)**

19       <u>What the jury heard</u>

20       Public defender signed off a stipulation with the prosecution stating that "on

21  September 28, 2018 a temporary restraining order, which was lawful and valid, went into

22  effect naming Xingfei Luo as the restrained person and Tomas Czodor as the protected

23  person. This temporary restraining order became a permanent restraining order on October

24  19th 2018." RT 217-219.

25       <u>What the jury did not heard</u>

26       In 2018 Czodor connected with Petitioner while presenting himself as a single man

27  never married but in fact he was a longtime married man seeking casual hook-ups and

28  cheating on his wife. Czodor's concealment of marital status and the only two meetings

3

1    between the parties prove that there was no dating relationship between Czodor and

2    Petitioner. During the entire interaction between the parties Petitioner never told Czodor

3    her full name. Decl. Luo, ¶2. While Czodor was married to Hanh Le, he openly sought

4    DVRO against Petitioner which indicates he carries no shame of cheating on his wife.

5         "Dating relationship" means frequent, intimate associations primarily characterized

6    by the expectation of affection or sexual involvement independent of financial

7    considerations. Cal. Fam. Code §6210. "Dating relationship" does not apply to 'a casual

8    relationship or an ordinary fraternization between [two] individuals in a business or social

9    context.' *People v. Upsher* (2007) 155 Cal.App.4th 1311, 1323, citing *People v. Rucker*

10   (2005) 126 Cal.App.4th 1107, 1117. Had the Legislature intended to apply Domestic

11   Violence Prevention Act (DVPA) to casual dates, it could have simply referred to the

12   dating relationship as "a date" or any dates instead of phrasing it to emphasize the element

13   of frequent and intimate associations.

14        Despite Czodor, a longtime married man seeking casual hook-ups, failed to

15   establish facts justifying the issuance and continuance of a DVRO, despite the

16   associations between the parties did not meet the statutory standard of a "dating

17   relationship", the family court improperly found that Czodor and Petitioner were former

18   partners and issued the TRO and DVROs in violation of Petitioner's due process right.

19        The stipulation with prosecution incorrectly states that the two restraining orders

20   state that Petitioner is to stop online bullying and harassing Mr. Czodor, to stop contacting

21   friends and clients of Mr. Czodor, and to stop stalking Mr. Czodor in cyberspace or in

22   person etc. RT 218-219. Decl. Luo, ¶15, TRO & DVRO.

23        Not only the TRO and DVRO have no legal foundation due to the lack of dating

24   relationship, they do not pass constitutional muster, as they are not sufficiently narrowly

25   tailored. "'The right to free speech is . . . one of the cornerstones of our society,' and is

26   protected under the First Amendment of the United States Constitution and under an 'even

27   broader' provision of the California Constitution." *Evans v. Evans* (2008) 162 Cal.App.4th

28   1157, 1166 (Evans), quoting *Hurvitz v. Hoefflin* (2000). "Temporary restraining orders

4

1    and permanent injunctions—i.e., court orders that actually forbid speech activities—are

2    classic examples of prior restraints." *Alexander v. United States* (1993) 509 U.S. 544, 550.

3    A prior restraint is "'the most serious and the least tolerable infringement on First

4    Amendment rights.'" *Near v. Minnesota* (1931) 283 U.S. 697, 713. "Prior restraints are

5    highly disfavored and presumptively violate the First Amendment. [Citations.] This is true

6    even when the speech is expected to be of the type that is not constitutionally protected."

7    (*Evans*, supra, 162 Cal.App.4th at p. 1167; citing *Near v. Minnesota*, supra, 283 U.S. at

8    pp. 704-705 [rejecting restraint on publication of any periodical containing "malicious,

9    scandalous and defamatory" matter]) "[P]rior restraints on speech ... are the most serious

10   and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v.*

11   *Stuart* (1976) 427 U.S. 539, 559, 96 S.Ct. 2791, 49 L.Ed.2d 683. Orders enjoining the

12   right to speak on a particular topic are disfavored and presumptively invalid. (Id . at p.

13   558, 96 S.Ct. 2791.)

14   ## II. CZODOR'S NUDIST BACKGROUND AND THE EVENTS LEADING

15   ## UP TO SENDING HIS NUDE PHOTOS TO PETITIONER

16   <u>What the jury heard</u>

17   Czodor works as a general contractor and painting contractor that owns a company

18   named Gorgeous Painting. RT 129. Czodor met Petitioner through dating app Plenty of

19   Fish in early August 2018. RT 130-131. Two or three weeks after their first message they

20   went out on a date. After their first date Czodor send his nude photos to Petitioner before

21   they met the second time. RT 134. Czodor denied that he had daily communication with

22   Petitioner. RT 132. Czodor had only two dates in total with Petitioner. The second date

23   Petitioner went to Czodor's house but Petitioner did not spend the night with Czodor. RT

24   133. Czodor does not even know if any dating relationship started with Petitioner. Czodor

25   encouraged Petitioner to meet other people. RT 134. Czodor liked younger women. RT:

26   197. Other than Petitioner Czodor met only one other person through dating app. RT 199.

27   Czodor portraits himself as a single innocent young man just starting online dating.

28   <u>What the jury did not heard</u>

5

1    Czodor signed up on dating app Plenty of Fish as a single man but in fact he was a

2    longtime married man who concealed his marital status to seek casual hook-ups. Decl.

3    Luo, ¶2. Czodor and Hanh Le jointly own a property that was purchased in 2009. Between

4    2014 and 2019 Czodor and Hanh Le filed taxes as a married couple. Despite Czodor

5    testified he liked younger women, his wife is ten years older than him. Decl. Luo, ¶2.

6    Czodor's words are completely contradicted to facts. It suggests that Czodor either lied on

7    the stand about liking younger women or committed marriage fraud for immigration

8    benefits because he was previously subject to deportation. Decl. Luo, ¶17.

9    Hanh Le's infamous cheating husband, Czodor, was arrested for impersonation. He

10   was previously convicted of, by OCDA, same prosecuting agency who prosecuted

11   Petitioner, advertising as a general contractor while he was not which is no different than

12   fraud. He was also convicted of probation violation. His convictions rested upon facts

13   establishing dishonesty or false statement. Decl. Luo, ¶17. When he was trying to solicit

14   business he advertised himself as a general contractor but in fact he was not. When he was

15   seeking free sexual favor, he concealed his marital status and presented himself as a single

16   innocent young man. When he was trying to impress a stranger, he openly talked about his

17   upbringing as a nudist. When he did not even know Petitioner's full name he sent his nude

18   photos to Petitioner. When he was trying to frame Appellant for revenge porn, he

19   suddenly became a non-nudist as if he spent all his days fully clothed like the rest of us

20   did. He cheats on his customers. He cheats on his wife. He cheats on the police. He cheats

21   on the jury in July 2021. There must have been more since he cheats whenever it serves

22   his own interest throughout his life (marriage fraud, tax fraud, and prior criminal

23   conviction etc.) A classic sociopath.

24   While many prefer to spend their days fully clothed, some prefer to live their lives

25   au naturel. In their birthday suits. Nude. Unclothed. They are naturists. Naturism is a

26   lifestyle of social nudity, and the cultural movement which advocates for and defends that

27   lifestyle. Both may also be referred to as nudism. Nudists believe that becoming nude

28   increases confidence and going naked brings them out of their shell. Without the barrier of

6

1  clothing, nudists become more open, comfortable, and secure. Czodor grew up in central

2  Europe and was raised as a naturist. He sent Petitioner, a woman he barely knew, his nude

3  photos when he did not even know her full name. Decl. Luo, ¶3. Czodor invited Petitioner

4  to a nudist ranch in Riverside named Olive Dell Ranch. http://www.olivedellranch.com/

5  Czodor never asked Petitioner to keep his photos private nor did he receive Petitioner's

6  promise to keep his photos private. Decl. Luo, ¶3. All communication between Czodor

7  and Petitioner was through texting. It is particularly odd that the State did not provide any

8  text messages showing that Czodor asked Petitioner to keep his photos private or

9  Petitioner's promise to keep Czodor's photos private despite the State was able to provide

10  Petitioner's threatening messages. Czodor may have sent his nude photos to dozen women

11  while cheating on his wife.

## III.    ALLEGATION OF UNLAWFUL DISSEMINATION OF PRIVATE PHOTOGRAPHS

14  <u>What the jury heard</u>

15      Czodor denied that he told Petitioner he didn't mind if she shared his nude photos.

16  Czodor alleged that Petitioner did not reach out to him and ask if it would be okay if she

17  showed other people those nude photos of him. RT 148-149. Czodor first testified that on

18  Friday (Sep 7, 2018) Petitioner started publishing his nude photos. RT 138-139. However,

19  he later testified he had notes indicating that Petitioner started publishing things on Sep 5,

20  2018. Czodor contacted the police the following week for unlawful dissemination of his

21  nude photographs. RT 150-151. Lilly, Czodor's customer on Yelp, received his nude

22  photos and informed him of the incident. RT: 159-160.

23      Czodor feels embarrassed to have strangers see his nude photos. RT 288.

24  <u>What the jury did not heard</u>

25      On Sep 10, 2018, the following week as he claimed, Czodor called Santa Ana

26  Police Department and alleged unfounded terrorism. Decl. Luo, ¶20. While Czodor

27  alleged that Petitioner started publishing his nude photos on Sep 5, 2018 he waited until

28  the police could not see anything online to make an official report. Decl. Luo, ¶14.

7

1    It turned out no one named Lilly was on Czodor's Yelp page. Decl. Luo, ¶18.

2    Czodor is a nudist and his nude photos were taken on a nude beach when he was

3    comfortable with public nudity. RT: 144 – 145.

4    https://en.wikipedia.org/wiki/Nude_beach.

5    **IV. ALLEGATION OF VANDALISM**

6    Underline What the jury heard

7    Czodor did not invite Petitioner over but she showed up at his house on Sep 18,

8    2018. RT 152-153. Petitioner scratched Czodor's door upon arrival but Czodor could not

9    discover the door damages the same night because it was dark. The prosecution stated "in

10    the dark of the night, no, he might not have seen when she was doing that." RT: 292. The

11    next day, on Sep 19, 2018, Czodor discovered the damages to his door. RT: 168.

12    What the jury did not heard

13    Hanh Le's graceless unfaithful husband, Czodor, lied about being dark. The

14    evidence refutes Czodor's false statement. Decl. Luo, ¶8-10. There was a light bulb

15    installed right above Czodor's front door. The light showered Petitioner from head to toe.

16    It is impossible Czodor could not see the door damages if there was any.

17    Czodor testified in the family court that he heard weird noises from scratching for

18    20 minutes. Decl. Luo, ¶12. The 911 call made on Sep 18, 2018 did not indicate any

19    scratching. Decl. Luo, ¶20. In fact, the 911 call made almost 10 minutes after Petitioner's

20    arrival at Czodor's house, the 911 call clearly indicated only knocking on the door instead

21    of scratching. Despite Czodor alleged Petitioner alleged Petitioner scratched his door for

22    20 minutes and despite Czodor was capable of taking photos and shooting videos that

23    night, there is no picture or video whatsoever of Petitioner actually scratching his door,

24    not even a single clip. There is no picture or video of Petition with the damaged door

25    either, e.g. standing next to the damaged door.

26    On Sep 24, 2018 Czodor learned that it would cost him money to remove an online

27    post related to his credibility. He carried out his frame job, damaged his own door, and

28    took photos of his damaged door on Sep 25, 2018.

8

1    The damage to the door is inconsistent with 20 minutes scratching. Decl. Luo, ¶11-

2    12. 20 minutes scratching should have done much more damages than what is shown on

3    the photo. See Exhibit 15. On Sep 18, 2018 Hanh Le may have been inside the house.

4    Czodor may have told Hanh Le regarding the night of Sep 18, 2018. Hanh Le may have

5    found out her husband's cheating many times and she has direct personal knowledge

6    about Czodor's credibility. Public defender's failure to call Hanh Le to testify

7    significantly prejudiced Petitioner.

## STATEMENT OF THE CASE

9    The state's only evidence of guilt, not properly collected by the police, comes from

10   only one person. This is a textbook case of fabricated evidence, committed perjury,

11   shoddy police work, prosecutorial misconduct, and bad lawyering.

12   After Hanh Le's cheating husband, a shameless nudist, Czodor, faked his damages

13   and injuries, on August 6, 2019, Petitioner was charged by misdemeanor complaint with

14   vandalism (Pen. Code,§ 594{a)/(b)(2)(A)), violation of a protective order (Pen. Code,§

15   273.6(a)) (by coming within 100 yards of the protected person), and disorderly conduct

16   (unlawful dissemination of private photographs and recordings) (Pen. Code, §

17   647(j)(4))(A). During the two years prior to jury selection, despite Petitioner did not

18   request reassignment of counsel, six public defenders cycled through her case with no

19   investigation was conducted. One trial date was set on Mar 24, 2020, but later vacated due

20   to building closure. Despite the building closure lasted for only about two months, despite

21   the Trial Court resumed jury trial since late May 2020, Decl. Luo, ¶32, more than ten

22   continuances were granted without a single objection raised by the prosecution, and the

23   trial court repeatedly allowed the matter to be continued without finding good cause on

24   the record despite Petitioner did not request any continuance due to her own inability to

25   appear at trial. Decl. Luo, ¶33-37.

26   During Petitioner's arraignment while in custody on August 12, 2019, Petitioner's

27   appointed counsel failed to properly and fully advise her about her right to a speedy trial,

28   a general time waiver was entered without Petitioner's willful and intelligent consent and

9

1  knowledge. Decl. Luo, ¶26 – 42. Had Petitioner known of the consequences flowing from
2  agreeing to have trial at a later date, she would never have agreed on that but would have
3  insisted on going to trial as soon as possible.

4         At the pretrial on September 6, 2019, the pretrial was continued to October 18,
5  2019 at the request of public defender instead of Petitioner, despite no good cause stated
6  on the record, the general time waiver was maintained without Petitioner's willful and
7  intelligent consent. Decl. Luo, ¶31. On October 18, 2019, the pretrial was continued to
8  January 10, 2020 at the request of public defender instead of Petitioner, despite no good
9  cause stated on the record, the general time waiver was again maintained without
10  Petitioner's willful and intelligent consent. Despite "the state's need to investigate is
11  presumably satisfied once it has filed charges" *Serna v. Superior Court*, 40 Cal.3d 239,
12  270 (Cal. 1985), five months after Petitioner's charges were filed, on January 10, 2020,
13  the pretrial was continued at the People's request to February 14, 2020, and a jury trial
14  was set on March 24, 2020. Decl. Luo, ¶31. On February 14, 2020, the pretrial was
15  continued to March 20, 2020 at the request of public defender instead of Petitioner, and
16  the jury trial was to remain. On March 20, 2020, counsel made an appearance pursuant to
17  Penal Code section 977 and entered a general time waiver without Petitioner's willful and
18  intelligent consent. The jury trial was vacated and the pretrial was continued to June 26,
19  2020 without Petitioner's willful and intelligent consent.

20         Despite in late May 2020 the Orange County Superior Court already initiated the
21  process of reopening and a large number of prospective jurors heeded the call of duty and
22  came to the Court to serve our community, on July 14, 2020, both prosecution and public
23  defender jointly requested a pretrial date on December 4, 2020 without Petitioner's willful
24  and intelligent consent. Petitioner was not informed of the July 14, 2020 hearing and was
25  not present at the hearing. Outrageous enough, public defender failed to inform Petitioner
26  of her court date, Petitioner did not appear at the pretrial on December 4, 2020 and a
27  bench warrant was issued for her arrest. Decl. Luo, ¶34-35. After the warrant was
28  recalled, on December 22, 2020, counsel appeared for Petitioner pursuant to Penal Code

1  section 977 and a pretrial was set on March 5, 2021 with the general time waiver

2  remaining without Petitioner's willful and intelligent consent, with no good cause stated

3  on the record. On March 5, 2021, the pretrial was continued to May 7, 2021, with the

4  general time waiver remaining without Petitioner's willful and intelligent consent. On

5  June 8, 2021, a jury trial was set on July 19, 2021, as day 0 of 10. Decl. Luo, ¶26-42.

6       Petitioner did not discover the general time waivers until July 13, 2021. Decl. Luo,

7  ¶31. Waiver requires "an intentional relinquishment or abandonment of a known right or

8  privilege". *Barker v. Wingo* (1972) 407 U.S. 514, 525 92 S.Ct. 2182, 33 L.Ed.2d 101.

9  There is no doubt that none of the general time waivers was entered or maintained with

10  Petitioner's intentional relinquishment or abandonment of her right to a speedy trial.

11  Petitioner was unable to withdraw any of the general time waivers because she did not

12  even know they existed. Had Petitioner known of the general time waiver, she would

13  never have failed to withdraw it. Decl. Luo, ¶28-31.

14       On July 19, 2021, Petitioner filed a *Marsden* motion and a motion to dismiss.

15  Despite a pretrial hearing on a motion to dismiss for denial of a speedy trial may exclude

16  prosecution, *Shleffar v. Superior Court* (1986) 178 Cal.App.3d 937, the court informed

17  Petitioner that the motion to dismiss was not being accepted or considered because it was

18  untimely and the People were not present. RT 1- 32. On July 26, 2021, the People

19  requested a continuance of the jury trial, but it was denied. 720 days after the complaint

20  was filed, despite no finding of good cause to justify any belated amendment, the People

21  amended the complaint from allegation of coming within 100 yards of the protected

22  person to failure to deactivate website and created new websites.

23       721 days after the complaint was filed, jury trial commenced on July 27, 2021.

24  Public defender had nothing to offer, made no effort to suppress the introduction of

25  Petitioner's prior involuntary testimony in a family court, called no witness to the stand,

26  presented no evidence from his own investigation, engaged in a lackadaisical and

27  ineffective cross-examination of the prosecution's sole/star witness, stipulated with

28  prosecution over an unlawful family court order, and allowed prosecution to introduce and

1  misrepresent Petitioner's prior testimony in a family court in violation of her Fifth, Sixth,

2  and Fourteenth Amendment rights etc. RT: 33 – 313. On July 28, 2021, after Czodor put

3  on a one man show, the People rested and Petitioner's counsel made a motion pursuant to

4  Penal Code section 1118.1, which was denied. On July 29, 2021, the jury found Petitioner

5  guilty of the three counts based on false evidence and perjured testimony. Society was the

6  loser in this trial. The greatest crime of all in a civilized society is a wrongful conviction.

7  It is truly a scandal, which reflects unfavorably on all the participants in the criminal

8  justice system.

9        Petitioner's convictions were affirmed by the Appellate division of Superior Court

10  of California for the County of Orange in the number 30-2021-01216615-CL-MC-CJC

11  after her appointed counsel has found no issues on appeal. After Appellate Division

12  denied to transfer Petitioner's case to court of appeal, Petitioner filed a petition for a writ

13  of certiorari with the U.S. Supreme Court under case No. 21-8023.

14                    **POST-CONVICTION PROCEEDINGS**

15        While Petitioner's appeal was pending in Orange County Superior Court Appellate

16  Division, Petitioner filed a *pro se* Petition on Oct 13, 2021 for Writ of Habeas Corpus in

17  that court as well. *In re Luo*, M19285, Petition for Writ of Habeas Corpus. The superior

18  court downplayed or ignored the contradicted evidence and denied relief on Oct 19, 2021.

19  On Nov 8, 2021, Petitioner filed a *pro se* Petition for Writ of Habeas Corpus in the state

20  appellate court. *In re Luo*, G060841, Petition for Writ of Habeas Corpus. On Nov 10,

21  2021 the appellate court denied the petition without prejudice as premature. On Feb 18,

22  2022, Petitioner filed a *pro se* Petition for Writ of Habeas Corpus in the state appellate

23  court. *In re Luo*, G061132, Petition for Writ of Habeas Corpus. On Mar 3, 2022 the

24  appellate court summarily denied the petition. On May 2, 2022 Petitioner filed a *pro se*

25  Petition for Writ of Habeas Corpus in the California Supreme Court. *In re Luo*, S274343,

26  Petition for Writ of Habeas Corpus. On August 31, 2022 the Supreme Court of California

27  summarily denied the petition. On September 6, 2022 Petitioner filed a *pro se* Petition for

28  Writ of Habeas Corpus in federal court and this petition aims to exhaust the following

1    claims while her federal habeas petition is stayed.

2    ## PUBLIC DEFENDER'S FAILURE TO PROVIDE ANY EXPLANATION OF

3    ## TACTIC REASON

4    In *People v. Pope*, 23 Cal.3d 412 (Cal. 1979), the court suggests that if counsel was

5    asked for an explanation and failed to provide one, this could prove he or she had no

6    tactical reason for the action taken. Despite Petitioner repeatedly asked public defender

7    with respect to the approach they took (or didn't take) in the handling of Petitioner's case

8    #19CM06724, no explanation was ever given. Decl. Luo, ¶22.

9    "[P]retrial investigation and preparation are the keys to effective representation of

10   counsel." *United States v. Tucker*, 716 F.2d 576, 581 (9th Cir. 1983) (internal citations

11   omitted). Counsel was found "ineffective where he neither conducted a reasonable

12   investigation nor made a showing of strategic reasons for failing to do so." See *Hendricks*

13   *v. Vasquez*, 974 F.2d 1099, 1109 (9th Cir. 1992) (vacating judgment of district court

14   where it was not possible to "determine if counsel's decision was a strategic one, and if so,

15   whether the decision was a sufficiently informed one.")

16   Petitioner's trial counsel had nothing to offer to test or attack the prosecution's

17   case. He failed to conduct any basic investigation. He failed to prepare any defense

18   whatsoever. He failed to suppress Petitioner's prior compelled/involuntary testimony, call

19   any fact witnesses, including Hanh Le and the police officer who accepted a stack of

20   paper printout as evidence and did nothing to properly collect evidence using forensic

21   technology. Was Hanh Le inside Czodor's house on Sep 18, 2018? What if any did

22   Czodor tell Hanh Le regarding the night of Sep 18, 2018? How many times did Hanh Le

23   find out her husband's cheating and her personal knowledge about Czodor's credibility?

24   A competent, committed defense lawyer is often the last, best, and only hope an

25   innocent defendant has. "Left without the aid of counsel he may be put on trial without a

26   proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the

27   issue or otherwise inadmissible. He lacks both the skill and knowledge adequately to

28   prepare his defense, even though he have a perfect one. He requires the guiding hand of

13

1  counsel at every step in the proceedings against him. Without it, though he be not guilty,

2  he faces the danger of conviction because he does not know how to establish his

3  innocence." *Powell v. Alabama*, 287 U.S. 45, 69 (1932).

4        The integrity of our criminal justice system and the fairness of the adversary

5  criminal process is assured only if an accused is represented by an effective attorney. See

6  *United States v.Morrison*, 449 U.S. 361, 364, 101 S.Ct. 665, 667, 66 L.Ed.2d 564 (1981).

7  Absent the effective assistance of counsel "a serious risk of injustice infects the trial

8  itself." *Cuyler v. Sullivan*, 446 U.S.335, 343, 100 S.Ct. 1708, 1715, 64 L.Ed.2d 333

9  (1980). Thus, a defendant is constitutionally entitled to have effective counsel acting in

10  the role of an advocate. See *Anders v. California*, 386U.S. 738, 743, 87 S.Ct. 1396, 1399,

11  18 L.Ed.2d 493 (1967). These are some errors that "are so likely to prejudice the accused

12  that the cost of litigating their effect in a particular case is unjustified" thus making it

13  unnecessary to establish the prejudice prong of *Strickland*. Prejudice is presumed in

14  situations where the likelihood of counsel having provided effective assistance is

15  extremely small such as where counsel failed completely to subject the prosecution's case

16  to "meaningful adversarial testing." *United States v. Cronic*, 466 U.S. 648, 658, 104 S.Ct.

17  2039, 2046 – 2017, 80 L.Ed.2d657 (1984).

18        A defendant has a Sixth Amendment right to conflict-free representation. *United*

19  *States v. Moore*, 159 F.3d 1154, 1157 (9th Cir. 1998). Where a court "compel[s] one

20  charged with [a] grievous crime to undergo a trial with the assistance of an attorney with

21  whom he has become embroiled in [an] irreconcilable conflict[it] deprive[s] him of the

22  effective assistance of any counsel whatsoever." *Brown v. Craven*, 424 F.2d 1166, 1170

23  (9th Cir. 1970). A reviewing court must assess the nature and extent of the conflict and

24  whether that conflict deprived the defendant of representation guaranteed by the Sixth

25  Amendment. *Schell v. Witek*, 218 F.3d 1017, 1027 (9th Cir. 2000).

26                              **CLAIMS FOR RELIEF**

27     **CLAIM 1: Violation of First and Fourteenth Amendment – Prosecution of**

28              **Dissemination of A Nudist's Nude Photos**

1    Where an individual does not have a reasonable expectation of privacy in an image,

2    the State's interest in protecting the individual's privacy interest in that image is minimal.

3    Where the State has only a minimal interest at stake—such as where the individual

4    depicted did not have a reasonable expectation of privacy—a prosecution of dissemination

5    of private photographs would not be a justifiable incursion upon First Amendment-

6    protected speech. *State v. Vanburen*, 214 A.3d 791, 813, 820-21 (Vt. 2019).

7    Hanh Le's infamous cheating husband, Czodor, had no reasonable expectation of

8    privacy in the images he sent to Petitioner for at least the following reasons: (1) Czodor, a

9    longtime married man who concealed his marital status, and Petitioner were not engaged

10    in a relationship engendering a reasonable expectation of privacy; (2) When Czodor sent

11    his images to Petitioner he did not even know Petitioner's full name while Petitioner was

12    no more than a stranger he just met; (3) He did not request Petitioner to keep his photos

13    confidential before sending out his photos to Petitioner; (4) Petitioner never made promise

14    to keep Czodor's photos confidential; and (5) He is a nudist who believes being nude

15    improves confidence. A person with a lifestyle of social nudity does not have a reasonable

16    expectation of privacy in his nude images. Nudists believe that becoming nude increases

17    confidence and going naked brings them out of their shell. Without the barrier of clothing,

18    nudists become more open, comfortable, and secure. Decl. Luo, ¶3.

19    Where provided evidence establishes that two people exchanging photos did not

20    engage in a relationship of a sufficiently intimate or confidential nature, where a nudist is

21    not supposed to expect privacy in his nude photos due to his belief that becoming nude

22    increases confidence, California's prosecution of dissemination of a nudist's nude

23    photographs violated Petitioner's First and Fourteenth Amendments rights.

24    **CLAIM 2: Violation of Fourteenth Amendment – Enforcement of Two Unlawful**

25    **Family Court Orders – Lack of Dating Relationship**

26    The family court had no jurisdiction to issue TRO or DVRO against Petitioner due

27    to the lack of dating relationship between Czodor and Petitioner.

28    Czodor, Hanh Le's graceless cheating husband, testified that he did not have daily

15

1   communication with Petitioner. RT 132. Czodor had only two dates in total with

2   Petitioner. The second date Petitioner went to Czodor's house but Petitioner did not spend

3   the night with Czodor. RT 133. Czodor does not even know if any dating relationship

4   started with Petitioner. Czodor encouraged Petitioner to meet other people. RT 134.

5       During a secretly recorded conversation, Czodor stated "Who are you to me?

6   Nobody. You are to me nobody. What you think, what we was? It was my wife, girlfriend,

7   boyfriend, what have you been to me. Jesus Christ. I met you one or two times." CT 101.

8       A party is not necessarily entitled to a restraining order simply because the

9   opposing party has engaged in an act that upsets the petitioning party. It is the party

10   seeking a restraining order that bears the burden of establishing the circumstances

11   justifying the order. *Curcio v. Pels* (2020) 47 Cal.App.5th 1, 13 – 14. The moving party

12   for a DVRO must be in a specified domestic relationship with the person to be restrained.

13   Cal. Fam. Code §§ 6211, 6301, subd. (a). The fact the parties are sexually intimate does

14   not, alone, create a dating relationship. *People v. Shorts* (2017) 9 Cal.App.5th 350, 360-

15   361 [defendant and victim had sexual relations one to two times.]

16       The purpose of DVPA is to prevent acts of domestic violence, abuse, and sexual

17   abuse and to provide for a separation of the persons involved in the domestic violence for

18   a period sufficient to enable these persons to seek a resolution of the causes of the

19   violence. Cal. Fam. Code §6220.

20       The Legislature did not intend the statute to apply to acquaintance or stranger

21   violence, nor did it intend to cover the myriad of relationships that exist or even to all

22   those which might be considered "dating" relationships. A dating relationship under

23   DVPA undoubtedly requires more than a few casual dates. Had the Legislature intended

24   to apply DVPA to casual dates, it could have simply referred to the dating relationship as

25   "a date" or any dates instead of phrasing it to emphasize the element of frequent and

26   intimate associations.

27       While judicial discretion and flexibility are appropriate in applying the statutory

28   definition of "dating relationship," they do not relieve a court of its obligation to apply the

1    legislative criteria while it must keep in mind the protective purpose of DVPA. Here,

2    introduced evidence sufficient to support a contrary finding that Appellant and Czodor

3    had engaged in dating relationship. RT: 132 – 134.

4         "Dating relationship" means frequent, intimate associations primarily characterized

5    by the expectation of affection or sexual involvement independent of financial

6    considerations. Cal. Fam. Code §6210. "Dating relationship" does not apply to 'a casual

7    relationship or an ordinary fraternization between [two] individuals in a business or social

8    context.' *People v. Upsher* (2007) 155 Cal.App.4th 1311, 1323, citing *People v. Rucker*

9    (2005) 126 Cal.App.4th 1107, 1117.

10        Neither the statute nor California courts ever enumerated the factors to be

11   considered in determining the existence of a "dating relationship." It is not difficult to turn

12   to other jurisdictions, the well-populated states, for guidance in identifying those factors.

13        In the state of Washington, a dating relationship is "a social relationship of a

14   romantic nature" and courts consider the same factors as federal law[2]: length of

15   relationship, type of relationship, and frequency of interactions between the partners.

16   RCW 26.50.010(2).

17        Four factors should be considered in the State of Massachusetts: (1) the length of

18   time of the relationship; (2) the type of relationship; (3) the frequency of interaction

19   between the parties; and (4) if the relationship has been terminated by either person, the

20   length of time elapsed since the termination of the relationship." Mass. Gen. Laws ch.

21   209A § 1. See *Brossard v. West Roxbury Div. of the Dist. Court Dep't*, 417 Mass. 183,

22   185, 629 N.E.2d 295 (1994) ("substantive dating relationship" existed where facts

23   revealed "substantially more than a few casual dates").

24        In the state of Texas, "dating relationship" means "a relationship between

25

26   [2] Under The Violence Against Women Reauthorization Act of 2013 (VAWA), Dating Violence means violence
     committed by a person who is or has been in a social relationship of a romantic or intimate nature with the victim;

27   and where the existence of such a relationship shall be determined based on a consideration of the following factors:
     ° The length of the relationship

28   ° The type of relationship
     ° The frequency of interaction between the persons involved in the relationship

17

1    individuals who have or have had a continuing relationship of a romantic or intimate

2    nature," the existence of which is determined by considering the length and nature of the

3    relationship and the frequency and type of interaction between the persons involved in it.

4    TEX. FAM. CODE § 71.0021(b).

5         Section 784.046, Florida Statutes, provides in relevant parts:

6         (1)(a) "Violence" means any assault, aggravated assault, battery, aggravated

7    battery, sexual assault, sexual battery, stalking, aggravated stalking, kidnapping, or false

8    imprisonment, or any criminal offense resulting in physical injury or death, by a person

9    against any other person.

10        (d) "Dating violence" means violence between individuals who have or have had a

11   continuing and significant relationship of a romantic or intimate nature. The existence of

12   such a relationship shall be determined based on the consideration of the following

13   factors:

14        1. A dating relationship must have existed within the past six months;

15        2. The nature of the relationship must have been characterized by the expectation

16   of affection or sexual involvement between the parties; and

17        3. The frequency and type of interaction between the persons involved in the

18   relationship must have included that the persons have been involved over time and on a

19   continuous basis during the course of the relationship.

20        In determining whether a dating relationship actually exists under New Jersey's

21   Prevention of Domestic Violence Act, six factors that should, at a minimum, be

22   considered:

23        1. Was there a minimal social interpersonal bonding of the parties over and above a

24   mere casual fraternization?

25        2. How long did the alleged dating activities continue prior to the acts of domestic

26   violence alleged?

27        3. What were the nature and frequency of the parties' interactions?

28        4. What were the parties' ongoing expectations with respect to the relationship,

18

1  either individually or jointly?

2       5. Did the parties demonstrate an affirmation of their relationship before others by

3  statement or conduct?

4       6. Are there any other reasons unique to the case that support or detract from a

5  finding that a "dating relationship" exists?

6       Not every person injured by another is entitled to the protections of the Prevention

7  of Domestic Violence Act (the Act), N.J.S.A. 2C:25–17 to –35. *S.K. v. J.H.*, 426 N.J.

8  Super. 230, 233 (App. Div. 2012).

9       An interpretation of N.J.S.A. 2C:25–19(d) that would apply the Act to two persons

10  who had a single date would give far too much weight to the word "dating" and too little

11  weight to the word "relationship." If the Legislature intended to permit the Act's

12  protections to apply to persons who had a single date, it would have defined "victim of

13  domestic violence" as any person who has been subjected to violence by a person whom

14  the victim has dated. *S.K. v. J.H.*, 426 N.J. Super. 230, 239 (App. Div. 2012). By requiring

15  evidence of a "dating relationship," the Legislature undoubtedly intended something of

16  **greater frequency** or **longer duration** than a single date. *Id.*

17       See also *Alison C. v. Westcott*, 343 Ill.App.3d 648, 798 N.E.2d 813, 278 Ill.Dec.

18  429 (2003) (holding that the fact that the parties attended the same high school, had

19  spoken on the telephone, and had a single lunch date was not sufficient to establish a

20  dating relationship.) There is no significant difference between a single date and two dates.

21       None of the above states recognizes two casual dates as a dating relationship. Not

22  to mention it is two meetings of Petitioner with Czodor, a longtime married man who

23  concealed his marital status to seek casual hook-ups. Extending the reach of dating

24  relationship to include one or two casual dates would lead to "absurd" or "unreasonable"

25  applications and abuse of process like this case.

26       The adjudication of cases by a neutral court is a fundamental element of due

27  process. In domestic violence cases, as in all other court proceedings, the court is

28  responsible for protecting the rights of the accused. *People v. Dorman*, 28 Cal.2d 846, 861

1  (Cal. 1946). The legitimate concern about domestic violence must not be permitted to

2  affect or diminish the court's responsibility to remain neutral, to protect the rights of the

3  accused in each case, and to address each case individually on its own merits. A culture of

4  summarily issuing and extending DVROs would ignore the legislative intent behind

5  DVPA and undermine a basic pillar of our judicial tradition—that all parties be given a

6  fair, meaningful, and equal opportunity to be heard. *C.O. v. M.M*, 442 Mass. 648, 659

7  (Mass. 2004). DVRO proceedings may not violate the due process rights of defendants in

8  an attempt to accommodate plaintiffs. U.S.C.A. Const.Amend. 14.

9  **CLAIM 3: Violation of First and Fourteenth Amendment – Enforcement of Two**

10  **Unlawful Family Court Orders – Blanket Prohibition of Speech on All Contents,**

11  **Subjects, Viewpoints, and Images Related to Hanh Le's betraying husband, Czodor**

12  To establish a valid prior restraint under the federal Constitution, a proponent has

13  the heavy burden to show the countervailing interest is compelling, the prior restraint is

14  necessary and would be effective in promoting this interest, and less extreme measures are

15  unavailable. See *Hobbs v. County of Westchester* (2d Cir. 2005) 397 F.3d 133, 149

16  (*Hobbs*); see also *Nebraska Press*, supra, 427 U.S. at pp. 562-568, 96 S.Ct. 2791. A

17  permissible order restraining future speech "must be couched in the narrowest terms that

18  will accomplish the pin-pointed objective permitted by constitutional mandate and the

19  essential needs of the public order." *Carroll v. President & Com'rs of PrincessAnne*

20  (1968) 393 U.S. 175, 183-184, 89 S.Ct. 347, 21 L.Ed.2d 325.

21  The California Constitution is more protective of free speech rights than the federal

22  Constitution, and California courts require "extraordinary circumstances" before a prior

23  restraint may be imposed. *Wilson v. Superior Court of Los Angeles County* (1975) 13

24  Cal.3d 652, 658-661, 119 Cal.Rptr. 468, 532 P.2d 116; *In re Marriage of Candiotti* (1995)

25  34 Cal.App.4th 718, 724, 40 Cal.Rptr.2d 299 (*Candiotti*). Nonetheless, in determining the

26  validity of a prior restraint, California courts engage in an analysis of various factors

27  similar to the federal constitutional analysis *Aguilar*, supra, 21 Cal.4th at pp. 145-146, 87

28  Cal.Rptr.2d 132, 980 P.2d 846, and injunctive relief restraining speech under the

20

1  California Constitution may be permissible where the relief is necessary to "protect

2  private rights" and further a "sufficiently strong public policy" (id . at p. 167, 87

3  Cal.Rptr.2d 132, 980 P.2d 846 (conc. opn. of Werdegar, J.) ).

4          Applying these principles, the court in *Candiotti* held a custody order limiting a

5  parent's right to communicate with third parties about matters related to the custody

6  proceeding was an unconstitutional prior restraint. *Candiotti*, supra, 34 Cal.App.4th at pp.

7  724-726, 40 Cal.Rptr.2d 299. There, the order prohibited a mother from disclosing

8  negative information about her former husband's new wife to anyone except certain

9  specified professionals. *Id.* at p. 720, fn. 3, 40 Cal.Rptr.2d 299. The *Candiotti* court

10  recognized that courts "are given broad authority to supervise and promote the welfare of

11  children" and may constitutionally order parents to refrain from disparaging their former

12  spouse in front of their children. *Id.* at p. 725, 40 Cal.Rptr.2d 299. However, the court

13  observed the challenged order "went further, actually impinging on a parent's right to

14  speak about another adult, outside the presence of the children." (Ibid.) The court held the

15  order was overbroad in this respect and constituted an undue prior restraint of speech

16  under the California Constitution, reasoning the order "would prevent [the mother] from

17  talking privately to her family, friends, coworkers, or perfect strangers about her

18  dissatisfaction with her children's living situation." (Ibid.) Although the trial court

19  "certainly ha[d] the power to prevent [the mother] from undermining [the father's]

20  parental relationship by alienating the children from [the stepmother]," the *Candiotti* court

21  found the challenged order to be "much more far-reaching, aimed at conduct that might

22  cause others, outside the immediate family, to think ill of [the stepmother]." *Id.* at p. 726,

23  40 Cal.Rptr.2d 299. The court explained: "Such remarks by [the mother] may be rude or

24  unkind. They may be motivated by hostility. To the extent they are libelous, they may be

25  actionable. But they are too attenuated from conduct directly affecting the children to

26  support a prior restraint on [the mother's] constitutional right to utter them." (Ibid.)

27          In *Molinaro v. Molinaro*, 33 Cal.App.5th 824 (Cal. Ct. App. 2019) the Court held

28  that the part of the restraining order prohibiting Michael Molinaro from posting "anything

APPENDIX TO PETITION FOR WRIT OF HABEAS CORPUS

1  about the case on Facebook" is reversed, and the trial court is directed to strike the

2  provision from the order.

3    "When enjoining activities in the sensitive area of First Amendment freedoms,

4  courts must draft temporary restraining orders 'couched in the narrowest terms that will

5  accomplish the pinpointed objective permitted by constitutional mandate and the essential

6  needs of the public order.'" *United Farm Workers of America v. Superior Court* (1975) 14

7  Cal.3d 902, 909.

8    Any orders require Petitioner to remove ALL posts about Czodor from social

9  media and blogs, and bar Petitioner from future posting of ANY material are clearly

10  overbroad and unlawful, as they encompass speech the court itself recognized as

11  constitutionally protected.

12    The TRO issued on Sep 28, 2018, while Petitioner was not present at the ex parte

13  hearing, Decl. Luo, ¶15, orders Petitioner to remove content from pages on internet what

14  she or her accomplices created to destroy Czodor's online reputation and to stop posting

15  about Czodor online. Decl. Luo, ¶15. These terms are unconstitutionally vague in their

16  overly broad scope, since they apply to speeches on any subjects, images, and viewpoints

17  provided that they are related to Czodor or his online reputation. Reputation means the

18  beliefs or opinions that are generally held about someone or something. Using DVRO to

19  remedy defamation violates a host of well-established limitations on the defamation tort.

20  A defamation injunction, if allowed at all, can only forbid republication of the precise

21  statements proven defamatory at trial.

22    Item 23 of the DVRO issued on Oct 19, 2018 provides that Petitioner is ordered to

23  cease posting the picture or likeness of Czodor or refer to him by name on *any* social

24  media website or blog. Petitioner is further ordered to remove *any* pictures or references

25  of Czodor from *any* social media website or blog she may have posted. Decl. Luo, ¶15.

26  These terms are undoubtedly and unconstitutionally vague in their overly broad scope,

27  since they apply to speeches on any subjects, viewpoints, and images provided that they

28  are related to Czodor.

APPENDIX TO PETITION FOR WRIT OF HABEAS CORPUS

1    Content-based prohibitions have the constant potential to be a repressive force in

2  the lives and thoughts of a free people. To guard against that threat the Constitution

3  demands that content-based restrictions on speech be presumed invalid, *R.A.V. v. St. Paul*,

4  505 U.S. 377, 382 (1992) , and that the Government bear the burden of showing their

5  constitutionality, *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 817

6  (2000). Content-based restrictions are valid only in narrow and limited situations. See,

7  e.g., *Chaplinsky v. New Hampshire* (1942) 315 U.S. 568 [86 L.Ed. 1031, 62 S.Ct. 766]

8  [fighting words]; *Miller v. California* (1973) 413 U.S. 15 [37 L.Ed.2d 419, 93 S.Ct. 2607]

9  [obscenity]; *Gertz v. Robert Welch, Inc*. (1974) 418 U.S. 323 [41 L.Ed.2d 789, 94 S.Ct.

10  2297] [libel].

11    "A statute is facially invalid if it prohibits a substantial amount of protected

12  speech." *U.S. v. Williams*, 553 U.S. 285 (2008). The assertion of a valid governmental

13  interest "cannot, in every context, be insulated from all constitutional protections." *Stanley*

14  *v. Georgia*, 394 U.S. 557, 563 (1969).

15    Injunctions carry greater risks of censorship and discriminatory application than do

16  general ordinances. Courts should apply a "somewhat more stringent application of

17  general First Amendment principles" to speech-restrictive injunctions than to speech-

18  restrictive statutes. *Madsen v. Women's Health Center, Inc*., 512 U.S. 753, 764 (1994).

19    The State must specifically identify an "actual problem" in need of solving, *United*

20  *States v. Playboy Entertainment Group, Inc*., 529 U.S. 803, 822–823 (2000), and the

21  curtailment of free speech must be actually necessary to the solution, see *R.A.V*., supra, at

22  395, 112 S.Ct. 2538. That is a demanding standard. "It is rare that a regulation restricting

23  speech because of its content will ever be permissible." *United States v. Playboy*

24  *Entertainment Group, Inc.*, 529 U.S. 803, 818 (2000).

25    "Regulations which permit the Government to discriminate on the basis of the

26  content of the message cannot be tolerated under the First Amendment." *Regan v. Time,*

27  *Inc*., 468 U.S. 641, 648-649 (1984). See also *Police Dept. of Chicago v. Mosley*, 408 U.S.

28  92, 95 (1972). "Speech cannot be restricted simply because it is upsetting or arouses

1  contempt." *Snyder v. Phelps*, 562 U.S. 443, 458 (2011). "If there is a bedrock principle

2  underlying the First Amendment, it is that the government may not prohibit the expression

3  of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v.*

4  *Johnson*, 491 U.S. 397, 414 (1989). Indeed, "the point of all speech protection ... is to

5  shield just those choices of content that in someone's eyes are misguided, or even hurtful."

6  *Hurley v. Irish–American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557,

7  574 (1995).

8      "The tailoring requirement does not simply guard against an impermissible desire

9  to censor. The government may attempt to suppress speech not only because it disagrees

10  with the message being expressed, but also for mere convenience." *McCullen v. Coakley*,

11  573 U.S. 464, 486 (2014). By demanding a close fit between ends and means, the tailoring

12  requirement prevents the government from too readily "sacrific[ing] speech for

13  efficiency." *Riley v. National Federation of Blind of N. C., Inc.*, 487 U.S. 781, 795 (1988).

14      Subject matter discrimination is presumptively unconstitutional because it

15  interferes with the free exchange of ideas. It allows governments to manipulate the

16  "marketplace" of ideas by foreclosing certain areas of discussion. For these reasons,

17  subject matter discrimination is properly subject to conventional strict scrutiny. Viewpoint

18  discrimination, however, is properly subject to the "strict scrutiny plus necessity"

19  standard. While subject matter discrimination may foreclose certain areas of speech,

20  viewpoint discrimination forecloses only certain opinions within a given area. It thus

21  skews the free exchange of ideas in a way that subject matter discrimination alone cannot.

22  By prohibiting only certain points of view, the government tacitly endorses other

23  opinions. Viewpoint discrimination is like an artist's chisel, allowing the government to

24  exercise fine control over what opinions may properly be expressed. Since the

25  government is in possession of the instrument, it may then decide the ultimate shape

26  expression may take. Before the government should be allowed to use this instrument, it

27  should have to demonstrate that such viewpoint discrimination is the last resort for

28  eschewing a truly compelling interest.

1    In view of *R.A.V.*'s extension of such exacting scrutiny to proscribed categories, it

2    is logical that this heightened scrutiny also should be applied to viewpoint discrimination

3    in intermediate categories of speech.

4    Viewpoint discrimination is properly more threatening to free speech values than

5    subject matter discrimination. *Cox v. Louisiana*, 379 U.S. 536 (1965), a paradigmatic case

6    of viewpoint discrimination, demonstrates why this is so.

7    *R.A.V.* sharply illustrates the Court's heightening of judicial scrutiny applicable to

8    viewpoint discrimination. The *R.A.V.* Court chose to subject the viewpoint discriminatory

9    ordinance to a "more exacting" standard, which required that the weapon of content

10   discrimination "be employed only where it is necessary to serve the asserted [compelling]

11   interest.

12   The right's "protection" is "afforded" not only to one who speaks but also to those'

13   who listen. *Va. Pharmacy Bd. v. Va. Consumer Council* (1976) 425 U.S. 748, 756; see

14   *Pacific Gas Elec. Co. v. Public Util. Comm'n* (1986) 475 U.S. 1, 8 (plur. opn. of Powell,

15   J). When the interests served by the speech at issue extend beyond those of the speaker to

16   those of the listeners, the speaker, whoever or whatever it may be, may be deemed to

17   possess the right in question. See *Pacific Gas Elec. Co. v. Public Util. Comm'n*, supra, 475

18   U.S. at p. 8 (plur. opn. of Powell, J.; *Va. Pharmacy Bd. v. Va. Consumer Council*, supra,

19   425 U.S. at p. 756; *Consolidated Edison Co. v. Public Serv. Comm'n* (1980) 447 U.S. 530,

20   533; *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 777 (1978). For instance, the

21   public deserves all sorts of information to make their informed decisions when dealing

22   with Respondent.

23   "No prior decisions support the claim that the interest of an individual in being free

24   from public criticism of his business practices in pamphlets or leaflets warrants use of the

25   injunctive power of a court. Designating the conduct as an invasion of privacy, the

26   apparent basis for the injunction here, is not sufficient to support an injunction against

27   peaceful distribution of informational literature of the nature revealed by this record."

28   *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419-20 (1971).

1  Since the trial judge's charge permitted the jury to convict for acts clearly entitled

2  to First Amendment protection, *Stromberg v. California*, 283 U.S. 359 (1931),

3  independently requires reversal of the conviction. *Gregory v. Chicago*, 394 U.S. 111, 113

4  (1969).

5  **CLAIM 4: *Brady* Violation – Withholding Czodor's Prior Conviction**

6  Czodor was prosecution's sole witness. He was previously convicted of, by OCDA,

7  same prosecuting agency who prosecuted Petitioner. He was also convicted of probation

8  violation. His convictions rested upon facts establishing dishonesty or false statement no

9  different than fraud. Decl. Luo, ¶17. Czodor's criminal record could have been obtained

10  with a simple click of a computer mouse. Instead, the prosecution engaged in strategic and

11  willful ignorance, even though it knew that Czodor's credibility was central to proving the

12  case. To make matters worse, the prosecution went on to bolster Czodor's testimony with

13  the argument that in the dark of the night Czodor might not have seen when she was

14  scratching his door, when in fact Czodor's front door was ablaze with light, and then

15  compounded this error by urging the jury to credit his testimony because of his lies. RT

16  292.

17  *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) set

18  out a three part test for obtaining relief based on suppression of exculpatory evidence. (1)

19  The prosecution withheld or suppressed evidence; (2) The evidence was favorable to the

20  defense; (3) The evidence was material to either guilt or punishment. As discussed above,

21  there is no doubt that Petitioner did not receive a fair trial. It is more than obvious that

22  prosecution's intentional failure to disclose exculpatory evidence under *Brady* was made

23  with the specific intent to avoid the possibility of an acquittal. Petitioner is entitled to a

24  reversal. Further, Czodor's taxes were inconsistent with his assets and lifestyle which

25  suggests tax fraud. [3]

26  **CLAIM 5: Perjured Testimony/False evidence – report to police the following week**

27  **after Sep 7, 2018**

28

---

[3] Other than a house Czodor owns at least two vehicles, one is Toyota SUV and the other is BMW. Decl. Luo, ¶2.

1    The Due Process Clause of the Fourteenth Amendment prevents the state from

2    obtaining a conviction using false evidence and obligates it to correct false evidence or

3    testimony during trial. *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d

4    1217 (1959) (granting relief where the false evidence related to the credibility of a key

5    witness for the state); *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d

6    342 (1976) ("[A] conviction obtained by the knowing use of perjured testimony is

7    fundamentally unfair, and must be set aside if there is any reasonable likelihood that the

8    false testimony could have affected the judgment of the jury.") Habeas relief is merited

9    where a witness's "testimony and credibility [is] crucial to the State's case" in light of each

10   side underscoring it in closing arguments. See *Hayes v. Brown*, 399 F.3d 972, 985–86 (9th

11   Cir. 2005).

12       Here, the police field activity report on Sep 10, 2018, indicating Czodor alleged

13   unfounded terrorism, clearly refutes Czodor's testimony that Petitioner threatened to

14   publish Czodor's nude photos and did so after making those threats between Sep 5 and

15   Sep 7, 2018 and the following week Czodor reported the said incidents to police. RT 150-

16   151. The prosecution knowingly offered false testimony by withholding the police field

17   activity report on Sep 10, 2018. See *In re Luo*, No. M19285.

18   **CLAIM 6: Perjured Testimony/False evidence – It was dark on Sep 18, 2018**

19       At the family court hearing on Oct 19, 2018 Czodor testified that he did not

20   discover the door's damage on Sep 18, 2018 because it was dark but the photos and

21   videos he took show otherwise. Decl. Luo, ¶12.

22       At trial, the prosecution tried to explain away why Czodor did not discover door's

23   damage on Sep 18, 2018. "[I]n the dark of the night, no, he might not have seen when she

24   was doing that. At some point, he's inside; at some point, she's outside. He admits that no,

25   he didn't see it while it was happening." RT 292. The evidence refutes such false

26   statement. Decl. Luo, ¶8-10. There was a light bulb installed right above Czodor's front

27   door. The light showered Petitioner from head to toe in front of the door. The prosecution

28   knowingly offered false testimony as the prosecution clearly possessed the evidence

1  contradicted to Czodor's testimony. Even worse is the prosecution tried extremely hard to

2  explain away why Czodor did not discover the door's damage on the same night.

3      Trial counsel obtained Czodor's testimony at the family court and the photo of the

4  damaged door prior to trial. Trial counsel did not bother to compare Czodor's prior

5  testimony and actual evidence to expose his perjured testimony. The Supreme Court has

6  recognized that where a criminal defense lawyer pursues a certain theory of defense, the

7  lawyer's failure to present readily available evidence supporting that precise defense is

8  unreasonable. See, e.g., *Wiggins v. Smith*, 539 U.S. at 526. It was unreasonable for

9  counsel to fail to review records and expose the falsity of the state's evidence.

10  **CLAIM 7: Violation of Fifth Amendment - Unlawfully Introducing Petitioner's**

11  **Compelled Testimony, While At the Same Time Misrepresenting Petitioner's Prior**

12  **Testimony**

13      "Every criminal defendant is privileged to testify in his own defense, or to refuse to

14  do so." *Harris v. New York* (1971) 401 U.S. 222, 225 [28 L.Ed.2d 1, 91 S.Ct. 643, 645].)

15  The defendant's 'absolute right not to be called as a witness and not to testify' arises from

16  the Fifth Amendment to the United States Constitution and article I, section 15 of the

17  California Constitution. *Cramer v. Tyars* (1979) 23 Cal.3d 131, 137 [151 Cal.Rptr. 653,

18  588 P.2d 793]. The Fifth Amendment provides that no person 'shall be compelled in any

19  criminal case to be a witness against himself.' The Amendment not only protects the

20  individual against being involuntarily called as a witness against himself in a criminal

21  prosecution but also privileges him not to answer official questions put to him in any other

22  proceeding, civil or criminal, formal or informal, where the answers might incriminate

23  him in future criminal proceedings. *McCarthy v. Arndstein*, 266 U.S. 34, 40, 45 S.Ct. 16,

24  17, 69 L.Ed. 158 (1924), squarely held that '(t)he privilege is not ordinarily dependent

25  upon the nature of the proceeding in which the testimony is sought or is to be used. It

26  applies alike to civil and criminal proceedings, wherever the answer might tend to subject

27  to criminal responsibility him who gives it. The privilege protects a mere witness as fully

28  as it does one who is also a party defendant.'

APPENDIX TO PETITION FOR WRIT OF HABEAS CORPUS

1    In order to be admitted in our courts, inculpatory statements obtained must have

2  been made voluntarily. See *In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552

3  F.3d 177, 200 (2d Cir. 2008); see id. at 208 (noting that "statements obtained under . . .

4  circumstances" where suspects were "forced to speak" to the agents of a foreign state

5  "could not be admitted in a U.S. trial if the situation indicated that the statements were

6  made involuntarily"); *Brulay v. United States*, 383 F.2d 345, 349 n.5 (9th Cir. 1967) ("[I]f

7  the statement is not voluntarily given, whether given to a United States or foreign officer[

8  ]—the defendant has been compelled to be a witness against himself when the statement is

9  admitted."); *United States v. Allen*, 864 F.3d 63, 101 (2d Cir. 2017) (holding that "the

10  Self–Incrimination Clause prohibits the use and derivative use of compelled testimony in

11  an American criminal case against the defendant who provided that testimony"); As a

12  general matter, courts' descriptions of statements as "compelled" (invoking the text of the

13  Self-Incrimination Clause) and/or "involuntary" (invoking, arguably, the Due Process

14  Clause) are often used interchangeably and the words often treated synonymously.

15    Although tactical decisions at trial are generally counsel's responsibility, the

16  decision whether to testify, a question of fundamental importance, is made by the

17  defendant after consultation with counsel. *People v. McKenzie* (1983) 34 Cal.3d 616, 631,

18  fn. 9 [194 Cal.Rptr. 462, 668 P.2d 769]; *U.S. v. Martinez* (9th Cir. 1989) 883 F.2d 750,

19  755, vacated on other grounds (1991) 928 F.2d 1470; see also *People v. Robles* (1970) 2

20  Cal.3d 205, 215 [85 Cal.Rptr. 166, 466 P.2d 710].)" *People v. Hines* (1997) 15 Cal.4th

21  997, 1032 [64 Cal.Rptr.2d 594, 938 P.2d 388].

22    It is indisputable that, in a family court proceeding, Petitioner was entitled to

23  invoke the Fifth Amendment right. No court could have forced Petitioner to testify in a

24  deposition or at a trial so long as the potential for criminal charges remained. Here,

25  however, when called to respond in a family court proceeding, Petitioner could not afford

26  counsel and was compelled to testify. With no legal mechanism available to avoid

27  testifying in a family court proceeding Petitioner could not invoke her right to remain

28  silent without counsel. Petitioner's testimony was involuntarily given in a family court

1    and therefore was compelled.

2        *McCarthy v. Arndstein* reflected the settled view that the object of the Fifth

3    Amendment 'was to insure that a person should not be compelled, when acting as a

4    witness in any investigation, to give testimony which might tend to show that he himself

5    had committed a crime.' *Counselman v. Hitchcock*, 142 U.S. 547, 562, 12 S.Ct. 195, 198,

6    35 L.Ed. 1110 (1892). See also *Bram v. United States*, 168 U.S. 532, 542—543, 18 S.Ct.

7    183, 186—187, 42 L.Ed. 568 (1897); *Brown v. Walker*, 161 U.S. 591, 16 S.Ct. 644, 40

8    L.Ed. 819 (1896); *Boyd v. United States*, 116 U.S. 616, 634, 637—638, 6 S.Ct. 524, 534,

9    536—537, 29 L.Ed. 746 (1886); *United States v. Saline Bank*, 1 Pet. 100, 7 L.Ed. 69

10    (1828). A witness protected by the privilege may rightfully refuse to answer unless and

11    until he is protected at least against the use of his compelled answers and evidence derived

12    therefrom in any subsequent criminal case in which he is a defendant. *Kastigar v. United*

13    *States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). Absent such protection, if he

14    is nevertheless compelled to answer, his answers are inadmissible against him in a later

15    criminal prosecution. *Bram v. United States*, supra; *Boyd v. United States*, supra.

16        In its holding, the *Kastigar* Court emphasized the breadth of use and derivative use

17    protection. Such protection "prohibits the prosecutorial authorities from using the

18    compelled testimony in any respect, . . . therefore insur[ing] that the testimony cannot lead

19    to the infliction of criminal penalties on the witness." *Kastigar*, 406 U.S. at 445. As the

20    *Kastigar* Court observed, "[t]his total prohibition on use provides a comprehensive

21    safeguard, barring the use of compelled testimony as an investigatory lead, and also

22    barring the use of any evidence obtained by focusing investigation on a witness as a result

23    of his compelled disclosures." Because this "very substantial protection[] [is]

24    commensurate with that resulting from invoking the privilege itself," it "leaves the

25    witness and the prosecutorial authorities in substantially the same position as if the

26    witness had claimed the Fifth Amendment privilege." *Kastigar*, 406 U.S. at 460 – 462.

27        *Kastigar* also established a doctrine to enforce this protection. When a witness has

28    been compelled to testify relating to matters for which he is later prosecuted, the

APPENDIX TO PETITION FOR WRIT OF HABEAS CORPUS

1  government bears "the heavy burden of proving that all of the evidence it proposes to use

2  was derived from legitimate independent sources." This burden is "not limited to a

3  negation of taint; rather, it imposes on the prosecution the affirmative duty to prove that

4  the evidence it proposes to use is derived from a legitimate source wholly independent of

5  the compelled testimony." *Kastigar*, 406 U.S. at 460. The Government must prove it has

6  met this heavy, albeit not insurmountable, burden by a preponderance of the evidence.

7  *United States v. Nanni*, 59 F.3d 1425, 1431–32 (2d Cir. 1995).

8        In this prosecution, Petitioner's compelled testimony in the family court was

9  unlawfully "used" against her through the testimony provided by prosecution's sole

10  witness at trial. Decl. Luo, ¶12. Family court transcript at p. 9 – 10. RT: 173 – 179. The

11  introduction of Petitioner's prior testimony in a civil proceeding when she was not

12  represented by counsel violated her Fifth, Sixth, and Fourteenth Amendments rights.

13        Further, the prosecution falsely alleged that "She said she didn't need his

14  permission. It was her story. Did you post the videos? "Well, maybe some of them."

15  Under oath, spoke to the judge in that hearing and admitted that. The evidence is

16  abundantly and absolutely clear she's guilty of Count III," RT: 274 – 275, when in fact the

17  original testimony in family court is:

18        THE COURT: YOU CREATED ONE?

19        MS. LUO: YEAH.

20        THE COURT: WITH HIS PERMISSION?

21        MS. LUO: BECAUSE --

22        THE COURT: YES OR NO WITH HIS PERMISSION?

23        MS. LUO: BUT IT DEPENDS ON WHAT CONTENT OF THAT VIDEO.

24        THE COURT: WELL, MA'AM, YOU SAID YOU

25        POSTED ONE. I JUST WANT TO KNOW IF YOU HAD HIS

26        PERMISSION TO PUT HIM ON YOUTUBE.

27        MS. LUO: BECAUSE THAT'S ABOUT ME, ABOUT

28        MY STORY. I DON'T NEED HIS PERMISSION.

1    THE COURT: IS THERE A PICTURE OF HIM ON IT?

2    MS. LUO: NO.

3    Decl. Luo, ¶12.

4    The prosecution falsely alleged that "Her response was, "It's been taken down."

5    Ask yourself -- I invite you to ask you – amongst yourselves when you deliberate, how

6    would she know it's been taken down if she's not the one that put it up, and she has no idea?

7    Why at that point would she not say the court, I never posted that. What are you talking

8    about?" RT: 267, while in fact the original testimony in the family court is:

9    THE COURT: MY QUESTION IS, DID YOU CREATE THIS?

10    MS. LUO: I DON'T RECALL.

11    THE COURT: BUT YOU DO KNOW IT WAS TAKEN DOWN?

12    MS. LUO: BECAUSE I SEARCHED WHEN I GOT

13    THE REQUEST FOR RESTRAINING ORDER, I SEARCHED.

14    IT'S BEEN TAKEN DOWN.

15    Decl. Luo, ¶12.

16    Prosecution's false representation is outrageous. This is a senseless frame job. This

17    prosecutor should be disbarred.

18    **CLAIM 8: Ineffective Assistance of Counsel (IAC) – failure to investigate and cross-**

19    **examine**

20    Where there is no forensic evidence, where there is no independent evidence,

21    where the only witness is Czodor, and where the credibility of the witness is a crucial

22    issue in a criminal case, defense attorney failed to discover the facts that (1) Czodor was

23    previously subject to deportation; (2) Czodor was arrested for impersonation; (3) Czodor

24    had prior criminal convictions rested upon facts establishing dishonesty and/or false

25    statements; (4) Czodor was a longtime married man in 2018 when he connected with

26    Petitioner as a single man never married and his wife is ten years older than him; (5) No

27    customer named Lilly on Czodor's Yelp page; (6) No company named "Gorgeous

28    Painting" ever existed; (7) Czodor's taxes were inconsistent with his assets and lifestyle

32

1    which suggests tax fraud. Decl. Luo, ¶2, 18, 19.

2        Criminal defense attorneys have a duty to investigate carefully all defenses of fact

3    and of law that may be available to the defendant. *People v. Pope* (1979) 23 Cal.3d 412,

4    425-426.

5        As *Wiggins* makes clear, without a reasonable investigation, a fully-informed

6    decision with respect to trial strategy is "impossible." *Wiggins v. Smith*, 539 U.S. 510,

7    527-28 (2003). Where a single juror could reasonably have reached a different result

8    absent counsel's error prejudice has been shown. *Id*. at 537. Because the failure to conduct

9    a reasonable investigation lacked a strategic rationale, Petitioner's representation was

10   ineffective. See *Hendricks v. Vasquez*, 974 F.2d 1099, 1109 (9th Cir. 1992); *Williams v.*

11   *Taylor*, 529 U.S. 362, 396, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (finding that counsel

12   had an obligation to conduct a thorough investigation of the defendant's background); see

13   also *Strickland v. Washington*, 466 U.S. 668, 691 (1984) (finding that counsel has "a duty

14   to make reasonable investigations or to make a reasonable decision that makes particular

15   investigations unnecessary").

16       After trial counsel failed to investigate, trial counsel naturally failed to adequately

17   cross-examine and impeach the prosecution's ONLY witness on the following key issues:

18   (1) from what time to what time on Sept 18, 2018 Petitioner was scratching Czodor's

19   door; (2) why Czodor was unable to provide any videos or photos showing Petitioner's

20   scratching motion or sound and the door's fresh damage even after he heard 20 minutes'

21   scratching, when he was able to constantly film and take photos throughout the night on

22   Sep 18, 2018; (3) why the damage of the door was discovered the next day even when the

23   front door area had more than enough lighting on Sep 18, 2018; (4) why Czodor lied

24   about being dark on Sep 18, 2018 when the photos and videos show otherwise; (5) why

25   police was told on Sep 18, 2018 that Petitioner was knocking instead of scratching

26   Czodor's door even after Czodor heard scratching; (6) why the photo of the damaged door

27   was taken right after Czodor discovered that it would cost money to remove Petitioner's

28   online post; (7) it would take only a second to create a scratch, 20 minutes have 1,200

1   seconds, why the damage on the photo is not consistent with 20 minutes scratching; (8)

2   how did Czodor not know his door was damaged after hearing 20 minutes of scratching;

3   (9) how was it believable that a reasonable person noticed the damage of his own front

4   door the next day even after he heard 20 minutes' scratching; (10) what prevented Czodor

5   to report the door's damage on Sep 19, 20, 21, 22, 23, 24, 2018; (11) from what date to

6   what date Petitioner posted Czodor's nude photos; (12) why Czodor did not call police

7   immediately after Petitioner threatened Czodor; (13) what happened after Petitioner

8   threatened Czodor and what backed up Czodor's version of event; (14) Czodor's

9   upbringing, lifestyle, and public nudity as a nudist; (15) what Czodor knew about

10  Petitioner prior to sending her nude photos while he deemed Petitioner "nobody" and he

11  was Hanh Le's cheating husband; (16) the terrorism report filed on Sep 10, 2021 suggests

12  that Czodor had no difficulty in calling police, why did he waited to report to the police

13  that Petitioner posted his nudes while there was no nude photo of him online; (17) why

14  Czodor didn't report to the police right after his nude photo was posted online; (18) why

15  Czodor waited until the police officer could not observe his nude photos online to make

16  that report; (19) why Czodor could not provide digital evidence with metadata; (20) in this

17  21st century why there was only paper evidence; (21) why Czodor was able to provide

18  Petitioner's threatening text messages but unable to provide Czodor's request to keep his

19  nude photos private or Petitioner's promise to keep Czodor's nude photos private despite

20  the nude photos were sent through text messages and all communication between the

21  parties were done via texts; (22) why no one named Lilly was on Czodor's yelp page. RT:

22  196 – 214. Further, based on Czodor's tax returns it is obvious he committed tax fraud

23  considering his assets and lifestyle.

24      Such a cross-exam could have undermined Czodor's story, and raised the issue that

25  he may have manufactured evidence to frame Petitioner. Under these circumstances, it is

26  reasonable to expect that defense counsel would question the sequence of events. These

27  questions, along with questions of inconsistency and concerning why Czodor lied about

28  having a business and being dark while the light showered Petitioner from head to toe in

APPENDIX TO PETITION FOR WRIT OF HABEAS CORPUS

1   front of his door on Sep 18, 2018, would have undermined Czodor's credibility. They

2   would also have cast doubt on the jury's mind as to Czodor's door was damaged on Sep

3   18, 2018 and the purpose he sent nudes to Petitioner while he deemed Petitioner

4   "nobody". Even if Czodor provided "satisfactory" explanations to such questions, the

5   mere asking of the questions would have led the jury to consider that Czodor was

6   involved in the planting and manufacturing of the evidence. In a case as close as this one,

7   such doubt was essential. Counsel's failure to question along these lines thus constituted a

8   failure to test the adversarial process, and undermines confidence that the trial produced a

9   just result.

10   Even if Czodor provided a "believable" answer, his credibility and the issues of the

11   photo of the damaged door taken right after Czodor discovered the cost to remove a post

12   related to his credibility and the delay in reporting until the police could not observe any

13   nude photos online would have been clearly raised. Such evidence would have raised at

14   least some doubt in the jury's mind, as to Petitioner's guilt. A failure to bring these issues

15   to the jury's attention was a performance error of constitutional significance.

16   The inconsistencies would have alerted any reasonably competent attorney and

17   would have produced effective questioning of Czodor on these issues. Such questioning

18   could have tied Czodo to his motive to frame Petitioner after learning it would cost money

19   to remove a post related to his credibility, and further connected Czodor to the fabrication

20   of evidence. Again, whether any credible answers were given or not, the issue would have

21   been placed in the jury's mind for adequate consideration. Instead, Czodor walked away

22   not having been tested by defense counsel.

23   When the newly discovered evidence contradicts the strongest evidence introduced

24   against Petitioner, it reopens the critical gap in the prosecution's chain of proof. If the

25   jurors even found a reasonable possibility that Czodor's testimony was untrue, it is

26   unlikely that they would find Petitioner's guilt proved beyond a reasonable doubt. See

27   *People v. Martinez*, 36 Cal.3d 816, 823 (Cal. 1984) [holding that to acquit defendant, the

28   jury need not find Torrez' recollection accurate and Gerhis' inaccurate. It need only decide

1   that Torrez' testimony raised a reasonable doubt as to the time when the drill press was

2   repainted, and thus a reasonable doubt as to defendant's guilt.] Any reasonable attorney

3   would have raised these issues in examining the prosecution's only witness. Counsel's

4   failure to adequately cross-examine Czodor on the issues presented above constituted

5   ineffective assistance of counsel and prejudiced Petitioner. Trial counsel's woefully

6   inadequate and grossly insufficient legal representation allowed witness perjury to occur

7   unchallenged.

8   **CLAIM 9: IAC – Failure to present Czodor's Sep 24, 2018 email and the fact that**

9   **Czodor is a nudist**

10  On Sep 24, 2018, the day before Czodor took photos of his damaged door, Czodor

11  learned that the removal of a post related to his credibility would cost money. Counsel

12  could have used this evidence -- showing that Hanh Le's shameless cheating husband,

13  Czodor, was fabricating evidence of domestic violence -- to undercut the balance of the

14  state's domestic violence evidence solely based on self-reporting by Czodor.

15  Petitioner, prior to trial, informed defense counsel that Czodor was a nudist. Decl.

16  Luo, ¶16. Defense counsel inexcusably elected not to present this fact to the jury. This

17  was so even though Czodor testified he exposed himself in public, on a nude beach. RT

18  144-145. Further, there was never a company "Gorgeous Painting" ever existed. Decl.

19  Luo, ¶19.

20  Naturism is a lifestyle of social nudity, and the cultural movement which advocates

21  for and defends that lifestyle. Both may also be referred to as nudism. Nudists believe that

22  becoming nude increases confidence and going naked brings them out of their shell.

23  Without the barrier of clothing, nudists become more open, comfortable, and secure.

24  However, these facts were not presented to the jury at trial, not even investigated by trial

25  counsel which resulted in the withdrawal of a potentially meritorious defense. Trial

26  counsel did not even bother to cross examine Czodor after he, who is a nudist, testified

27  that his nude photo was taken on a nude beach. RT: 144 – 145.

28  It is reasonably probable that the presentation of the fact that Czodor is a nudist

36

1   who is comfortable to be naked in public, along with the truth that Czodor did not have a

2   dating relationship with Petitioner, would have led one or more jurors to harbor

3   reasonable doubt about Czodor's expectation of privacy and emotional distress, and

4   Petitioner's knowledge that the distribution of the images would cause a nudist serious

5   emotional distress. Coupled with other exculpatory evidence, it turns out to be clearer that

6   the entire thing was fabrication, namely a hoax. Even if counsel has legitimate tactical

7   reasons for introducing no evidence, his performance is still inadequate if evidence

8   supporting a potentially meritorious defense remains unexplored. *In re Cordero* (1988) 46

9   Cal.3d 161, 181.

10  **CLAIM 10: IAC – Failure to request jury instruction related to Dating Relationship**

11          A trial court should instruct the jury upon every material question upon which there

12  is any evidence deserving of consideration whatever. *People v. Flannel* (1980) 25 Cal. 3d

13  668, 684.

14          The trial court's failure to instruct the jury on dating relationship violated

15  Petitioner's right to have the jury determine all the issues presented by the evidence.

16  Substantial evidence is evidence from which a jury composed of reasonable persons could

17  conclude that the particular facts underlying the instruction exist. *Flannel*, 25 Cal. 3d at

18  684; *People v. Lemus* (1988) 203 Cal. App. 3d 470, 477.

19          In deciding whether or not there is substantial evidence, courts should not evaluate

20  the weight of the evidence, because that is a task for the jury. *Flannel*, 25 Cal. 3d at 684;

21  *Breverman*, 19 Cal. 4th at 162; *Lemus*, 203 Cal. App. 3d at 477. Importantly, "doubts as to

22  the sufficiency of the evidence to warrant instructions should be resolved in favor of the

23  accused." *Flannel*, Id. at 685; *People v. Wilson* (1967) 66 Cal. 2d 749, 763. As will be set

24  out more fully below, there was sufficient evidence to warrant dating relationship

25  instructions, and all doubts should have been resolved in Petitioner's favor.

26          Such failure is particularly critical because the sua sponte duty to instruct on the

27  general principles of law includes an obligation to instruct on relevant defenses.

28  *Breverman*, 19 Cal. 4th at 157; *Middleton*, 52 Cal. App. 4th at 30; *Gonzales*; 88 Cal.

1   Rprtr. 2d at 116 - 117. No dating relationship between Czodor and Petitioner was a relied

2   upon theory that the TRO and DVRO were unlawful due to lack of dating relationship and

3   Czodor did not have a reasonable expectation of privacy in his nude photos as a nudist.

4   See *State v. Vanburen*, 214 A.3d 791, 820 (Vt. 2019) [concluding that dismissal is

5   appropriate after finding no evidence in the record showing the complainant and the

6   recipient of naked pictures had any kind of relationship engendering a reasonable

7   expectation of privacy.]

8         Trial counsel's failure to request the trial court to give instructions deprived the

9   jury of "considering the full range of possible verdicts." *Breverman*, 19 Cal. 4th at 155.

10  Such failure resulted in a deprivation of Petitioner's constitutional right to have the jury

11  decide all issues presented by the evidence. *Lopez*, 19 Cal. 4th at 288; *Qskins*, 69 Cal.

12  App. 4th at 139.

13        Whether Czodor and Petitioner had a dating relationship is a question for the jury,

14  not the judge, to decide. See *People v. Cleaves* (1991) 229 Cal. App. 3d 367 (stating that a

15  defendant's right to instructions does not turn on the court's assessment of the credibility

16  or the strength of evidence); see also *Lemus*, 203 Cal. App. 3d at 477; *Lopez*, 19 Cal. 4th

17  at 288; *Oskins*, 69 Cal. App. 4th at 139. It is reasonably likely the result would have been

18  different had counsel done the right thing to request the trial court to instruct the jury on

19  dating relationship because substantial evidence suggests that there was no dating

20  relationship between Czodor and Petitioner. Had the jury been instructed to decide

21  whether Czodor and Petitioner had a dating relationship it is highly probable that no jurors

22  would found any dating relationship between Czodor and Petitioner.

23  **CLAIM 11: IAC – Stipulation with The Prosecution, Without Petitioner's Consent,**

24  **Over Two Unlawful Family Court Orders**

25        Public defender not only presented no defense but also did prosecution a favor so

26  that the prosecution did not need to prove the lawfulness of the TRO and DVRO. Trial

27  counsel signed off a stipulation on Jul 28, 2021 with the prosecution without prior

28  discussion with Petitioner, nor did he ask for Petitioner's consent despite he was well

1    aware that there was no dating relationship between Czodor and Petitioner. Petitioner was

2    uninvolved in that stipulation. RT: 217 – 219.

3        Petitioner did not grant consent or authority to public defender to sign off a

4    stipulation with prosecution. See *Riggins v. Nevada*, 504 U.S. 127, 144, 112 S.Ct. 1810,

5    118 L.Ed.2d 479 (1992) ("We have held that a defendant's right to the effective assistance

6    of counsel is impaired when he cannot cooperate in an active manner with his lawyer. The

7    defendant must be able to provide needed information to his lawyer and to participate in

8    the making of decisions on his own behalf.") (citations omitted). Prior to signing off the

9    stipulation public defender never discussed with Petitioner about the stipulation which

10   indicates a serious breakdown in communications. Public defender's action deprived

11   Petitioner of her right to participate in the making of decisions on her own behalf. Their

12   action was consistent with their failure to fully advise Petitioner of her right to a speedy

13   trial and general time waiver. Although no investigation was done they lied to Petitioner

14   that they would need time to investigate to make Petitioner agree to have trial on a later

15   date.

16       See also Claim 2 & 3. Decl. Luo, ¶22.

17   **CLAIM 12: IAC – Failure to exclude Petitioner's prior compelled testimony in a**

18   **family court**

19       Trial counsel's failure to exclude or object to the introduction of Petitioner's prior

20   compelled testimony in a family court was prejudicially ineffective. When the prosecution

21   cherry picked and misrepresented Petitioner's prior testimony in a civil proceeding when

22   she was not represented by counsel, trial counsel failed to object and did nothing. Trial

23   counsel presented zero legal argument to suppress Petitioner's prior compelled testimony

24   in a family court. RT: 78 – 102. Trial counsel's conduct was so outrageous that no

25   competent attorney would have engaged in it.

26   **CLAIM 13: IAC – Failure to expose the witness's lie about being dark**

27       At the family court hearing on Oct 19, 2018 Czodor testified that he did not

28   discover the door's damage on Sep 18, 2018 because it was dark but the photos and

1  videos he took show otherwise. Decl. Luo, ¶8-10. In fact, there was a light bulb installed

2  right above Czodor's front door. The light showered Petitioner from head to toe. However,

3  Czodor's lie about being dark was never exposed to the jury.

4       Whether the front door area was dark is a material fact as to whether it is possible

5  that Czodor did not discover his door damages on Sep 18, 2018. A witness who is found

6  not to be credible on one claim may be treated as not credible on others. See *Hattem v.*

7  *United States*, 283 F.2d 339, 343 (9th Cir. 1960) (stating witness' false testimony on one

8  material fact authorizes trier of fact to disregard all of witness' testimony); cf. *Allen v.*

9  *Chicago Transit Auth.*, 317 F.3d 696, 703 (7th Cir. 2003) (holding trier of fact is to weigh

10  a witness' perjury).

11       No matter how hard, tapping on wood furniture with a key is not going to damage

12  the furniture. Trial counsel didn't even bother to make a court room reenactment and tap

13  on wood furniture with a key in front of the jury.

14       **CLAIM 14: IAC – Failure to discover and present the witness's inconsistent**

15             **statements made to the police and call any defense witnesses**

16       Defense counsel, rendered constitutionally ineffective assistance in failing to

17  discover and present exculpatory evidence, the police field activity reports dated on Sep

18  10, 2018 and Sep 18, 2018. During the two years of the case's pendency prior to jury

19  selection, six public defenders cycled through Petitioner's case but no meaningful

20  investigation was conducted, none of them ever made any effort to investigate the

21  inconsistent statements the witness made to police. See *Sanders v. Ratelle*, 21 F.3d 1446,

22  1456 (9th Cir. 1994) (holding that trial counsel was deficient during guilt phase for

23  "fail[ing] to conduct even the minimal investigation that would have enabled him to come

24  to an informed decision about what defense to offer," and that "[d]escribing [counsel]'s

25  conduct as 'strategic' strips that term of all substance").

26       The most critical point in any trial is the timeline of the crime. The core of the

27  prosecution's theory regarding Petitioner's possibility to commit the vandalism rested on

28  Czodor's testimony that he heard Petitioner scratching his door for 20 minutes on Sep 18,

1   2018 and took a photo of the damaged door 7 days after Petitioner left his residence due to

2   being unable to see Petitioner's scratching action and late discovery of the damage due to

3   the darkness on Sep 18, 2018. A reasonably competent defense attorney would have

4   recognized the importance of investigating the sequence of the events on Sep 18, 2018,

5   whether the police was called during the course of Petitioner's scratching, what was said

6   to the 911 call operator, whether the testimony of Chris Kovacs, the 911 call operator, and

7   the police officers arrived are consistent, and whether Czodor withheld evidence from the

8   police while Czodor provided two videos shot on Sep 18, 2018 but none of those videos

9   show Petitioner was scratching Czodor's door. In any event, there is no reason why

10  competent counsel would not have at least inquired. Such failure is objectively

11  unreasonable and prejudicial to Petitioner.

12          To make out Petitioner's defense at trial, trial counsel relied solely on the

13  prosecution's witness, who was Czodor and provided no help to the theory of the defense.

14  Trial counsel took this tack not for lack of better options, but simply because he failed to

15  conduct an adequate investigation into potential witnesses who might have provided

16  helpful testimony. As a consequence, trial counsel failed to introduce significant

17  testimony that would have raised doubts about Petitioner's guilt.  Trial counsel failed to

18  call to testify Chris Kovacs, the 911 call operator, the police officers arrived on Sep 18,

19  2018 at Czodor's residence and the police officers who "collected" evidence. The 911 call

20  was made at 8:07 pm on Sep 18, 2018. When the 911 call was made Chris Kovacs already

21  arrived at Czodor's residence and met Czodor, and saw both Czodor and Petitioner. These

22  facts pick apart Czodor's statement that Petitioner scratched his door for 20 minutes and

23  he didn't report to the police on Sep 18, 2018 because he didn't see Petitioner's scratching.

24  Had Petitioner scratched his door, Czodor had ample opportunity to see it right away.

25  Those people's testimony, even if imperfect, would have provided a potentially

26  meritorious defense and inconsistency with Czodor's theory ruling out Petitioner's guilt.

27          Police officers were not called to testify how the evidence was collected and that

28  the evidence was not examined. Why digital evidence was not collected in 21st century?

41

What evidence protocol should the police follow? Why didn't the police collect evidence following protocol to avoid any foul play? Why paper evidence was accepted in 21st century? Why didn't the police collect any and all photos and videos taken on Sep 18, 2018 in native format with metadata? Why did the police allow Czodor to cherry pick "evidence"? By not collecting digital evidence following protocol it is no different from not collecting DNA evidence in a homicide case. By not collecting digital evidence following protocol how did the police know the evidence was not manufactured, tampered, or fabricated? We now know Amber Heard's photos were edited according to metadata expert.

https://www.marca.com/en/lifestyle/celebrities/2022/05/26/628ed0f7e2704e899e8b45f5.html We also know Fake Texting Apps are everywhere.

https://www.applavia.com/blog/best-fake-texting-apps-for-iphone-ipad/

 Trial counsel failed to call the police officers to the stand and engaged in a lackadaisical and ineffective cross-examination of the prosecution's sole/star witness. There was no opportunity to attack the improperly gathered, mischaracterized, or fabricated evidence.

### CLAIM 15: IAC – Failure to Object

**1.  Trial Court's Denial of Hardship Request by Juror #4 Prejudiced Petitioner**

 After the jury was sworn in, Juror #4, who was a delivery driver, alleged that he must go to work and requested to be excused due to financial hardship. RT: 103 – 105. Trial counsel failed to object the trial court's denial of his hardship request. Juror #4 was a delivery driver struggling to put food on his family's table. It's difficult to see he would devote himself to the trial due to his frustration. He may want to finish as soon as possible and gave up his insight and position during deliberation.

**2.  Prosecutorial Misconduct**

 As a public official charged with representing the general interest and attaining justice, a prosecutor may have special stature in the eyes of the jury, and so his or her

1  misstatements may carry significant weight. See *People v. Donaldson* (2001) 93

2  Cal.App.4th 916, 932. Trial counsel's failure to object to prosecutorial misconduct was

3  prejudicially ineffective.

### 3. Evidence Code §352

5  Pursuant to Evidence Code §352, the court in its discretion may exclude evidence

6  if its probative value is substantially outweighed by the probability that its admission will

7  (a) necessitate undue consumption of time or (b) create substantial danger of undue

8  prejudice, of confusing the issues, or of misleading the jury. *People v. Roscoe* (1985) 168

9  Cal.App.3d 1093, 1100.

10  While the prosecution presented screenshots and secretly recorded videos trial

11  counsel failed to exclude or object on Evidence Code §352 grounds. The prosecution

12  failed to demonstrate that the recordings were complete and that something said or done

13  was not being taken out of context. The prosecution failed to establish that the recordings

14  were of good audio / visual quality and were demonstrably records of the entire meeting

15  or interview rather than an edited selection. The prosecution has not shown that there is no

16  possibility that where Petitioner did not know a conversation was being recorded, the

17  content was not manipulated with a view to drawing Petitioner, the party who was

18  unaware, into some statement that can be taken out of context. Same to screenshots of the

19  text messages presented by prosecution. The prosecution failed to establish that the text

20  messages were complete, not being manipulated or manufactured.

21  "At no point does she say anything to say that she didn't to that, right? She never

22  said, what are you talking about? I would never do that. This is a misunderstanding. No

23  way. What reasonable person, when they're being directly accused of that, would just sit

24  there and not in some way deny it? And she doesn't deny it in any way. "I was emotional."

25  And she admits it again in court, and you should find that she's fully admitting to that

26  crime. And it's clear that she did it, and she is absolutely guilty of Count III." RT: 268.

27  The prosecution attempted to establish Petitioner's guilt from adoptive admission.

28  Considering Petitioner's silence in the context of her one and only statement to Czodor,

her failure to deny is of little probative value to a claim of acquiescence since the nude photos at the heart of the questioning—and of this prosecution—were sent to Petitioner by a nudist without any expectation of privacy. Thus, in the setting of an altercation that was about to be upgraded in the middle of the street—such as it was—it is likely that Petitioner denied it while her denial was not recorded, or Petitioner disdained to deny while it was so obvious a hoax, or her failure to deny may be an attempt to avoid further altercation, or Czodor, who was the aggressor, withheld the recording of the next part of the altercation showing Petitioner denied it, or she thought it was unnecessary to deny because she was in fact innocent. Thus, an adverse inference would be too speculative to pass §352 muster. Innocent people falsely accused often believe in "a just world and in the transparency of their own blameless status.... [T]hose who stand falsely accused also have faith that their innocence will become self-evident to others. As a result, they are not calculated to choose their words or action, often not realizing that they are being framed or set up and later trapped by false evidence and perjured testimony. The "lesson of history," our Supreme Court has observed, is "that a system of criminal law enforcement which comes to depend on the 'confession' will, in the long run, be less reliable and more subject to abuses than a system which depends on extrinsic evidence independently secured through skillful investigation." *Escobedo v. Illinois* (1964) 378 U.S. 478, 489–490, 84 S.Ct. 1758, 12 L.Ed.2d 977, fns. omitted.

       Though jurors were told to follow instructions and accept with no adverse inference defendant's right not to testify at trial, it was nevertheless concerning that allowing the Government to introduce evidence and comment on defendant's silence without anything to measure that silence against invites a degree of confusion in the minds of the jurors that an instruction is unlikely to remedy. See *Bruton v. United States*, 391 U.S. 123, 135–36, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) ("[T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored."). Here, the implications of defendant's minimally

1  probative silence would have been powerfully incriminating because of its alluring logical

2  appeal to ordinary, innocent people—i.e., jurors—who naturally would be unaware of the

3  reality of each circumstance. In the end, given jurors' lack of healthy skepticism the

4  danger of unfair prejudice to Petitioner substantially outweighed the de minimis probative

5  value of her silence to establish acquiescence.

6      Trial counsel's failure to suppress or object on evidence code §352 grounds and the

7  introduction of screenshots and secretly recorded videos prejudiced Petitioner.

8  **CLAIM 16: IAC – Failure to bring the case to a speedy trial**

9      Public defender's failure to prepare for trial in a timely manner violated

10  Petitioner's right to a speedy trial. It also violated Petitioner's right to a competent counsel

11  that would not violate her right to a speedy trial. Decl. Luo, ¶26-42.

1  XINGFEI LUO

2  PO BOX 4886,

3  El Monte, CA 91734

4

5  Petitioner in Pro Se

6

7

8  **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

   **COUNTY OF ORANGE**

9

10

11  XINGFEI LUO,                              No.

               Petitioner,

12

       v.

13                                           **APPENDIX TO PETITION FOR WRIT**

    THE PEOPLE OF THE STATE OF               **OF HABEAS CORPUS**

14  CALIFORNIA

15               Respondent.

16

17

18

19                            **INTRODUCTION**

20        After Hanh Le's cheating husband, a shameless nudist, Tomas Czodor (Czodor),

21  faked his damages and injuries, Xingfei Luo (Petitioner) was charged by Orange County

    District Attorney (OCDA)'s misdemeanor complaint, on Aug 6, 2019, with vandalism

22
    (Pen. Code,§ 594(a)/(b)(2)(A)), violation of a protective order (Pen. Code,§ 273.6(a)) (by
23
    coming within 100 yards of the protected person), and disorderly conduct (unlawful
24
    dissemination of private photographs and recordings) (Pen. Code, § 647(j)(4))(A). CT 1-
25
    2.[1] 720 days after the original complaint was filed, despite no finding of good cause to
26
    justify any belated amendment, the complaint was illegally permitted to amend from
27

28  ───────────────────────────────
    [1] For purposes of citation, the Reporter's Transcript on Appeal is referred to as RT. The Clerk's Transcript on Appeal
    is referred to as CT. A true and correct copy of the RT and the CT are attached as Exhibit 1-3.
                                            I
                        APPENDIX TO PETITION FOR WRIT OF HABEAS CORPUS

1  What evidence protocol should the police follow? Why didn't the police collect evidence

2  following protocol to avoid any foul play? Why paper evidence was accepted in 21st

3  century? Why didn't the police collect any and all photos and videos taken on Sep 18,

4  2018 in native format with metadata? Why did the police allow Czodor to cherry pick

5  "evidence"? By not collecting digital evidence following protocol it is no different from

6  not collecting DNA evidence in a homicide case. By not collecting digital evidence

7  following protocol how did the police know the evidence was not manufactured,

8  tampered, or fabricated? We now know Amber Heard's photos were edited according to

9  metadata expert.

10  https://www.marca.com/en/lifestyle/celebrities/2022/05/26/628ed0f7e2704e899e8b45f5.h

11  tml  We also know Fake Texting Apps are everywhere.

12  https://www.applavia.com/blog/best-fake-texting-apps-for-iphone-ipad/

13       Trial counsel failed to call the police officers to the stand and engaged in a

14  lackadaisical and ineffective cross-examination of the prosecution's sole/star witness.

15  There was no opportunity to attack the improperly gathered, mischaracterized, or

16  fabricated evidence.

17              **CLAIM 15: IAC – Failure to Object**

18     **1. Trial Court's Denial of Hardship Request by Juror #4 Prejudiced**

19       **Petitioner**

20       After the jury was sworn in, Juror #4, who was a delivery driver, alleged that he

21  must go to work and requested to be excused due to financial hardship. RT: 103 – 105.

22  Trial counsel failed to object the trial court's denial of his hardship request. Juror #4 was a

23  delivery driver struggling to put food on his family's table. It's difficult to see he would

24  devote himself to the trial due to his frustration. He may want to finish as soon as possible

25  and gave up his insight and position during deliberation.

26     **2. Prosecutorial Misconduct**

27       As a public official charged with representing the general interest and attaining

28  justice, a prosecutor may have special stature in the eyes of the jury, and so his or her

1  misstatements may carry significant weight. See *People v. Donaldson* (2001) 93

2  Cal.App.4th 916, 932. Trial counsel's failure to object to prosecutorial misconduct was

3  prejudicially ineffective.

### 3.  Evidence Code §352

5  Pursuant to Evidence Code §352, the court in its discretion may exclude evidence

6  if its probative value is substantially outweighed by the probability that its admission will

7  (a) necessitate undue consumption of time or (b) create substantial danger of undue

8  prejudice, of confusing the issues, or of misleading the jury. *People v. Roscoe* (1985) 168

9  Cal.App.3d 1093, 1100.

10  While the prosecution presented screenshots and secretly recorded videos trial

11  counsel failed to exclude or object on Evidence Code §352 grounds. The prosecution

12  failed to demonstrate that the recordings were complete and that something said or done

13  was not being taken out of context. The prosecution failed to establish that the recordings

14  were of good audio / visual quality and were demonstrably records of the entire meeting

15  or interview rather than an edited selection. The prosecution has not shown that there is no

16  possibility that where Petitioner did not know a conversation was being recorded, the

17  content was not manipulated with a view to drawing Petitioner, the party who was

18  unaware, into some statement that can be taken out of context. Same to screenshots of the

19  text messages presented by prosecution. The prosecution failed to establish that the text

20  messages were complete, not being manipulated or manufactured.

21  "At no point does she say anything to say that she didn't to that, right? She never

22  said, what are you talking about? I would never do that. This is a misunderstanding. No

23  way. What reasonable person, when they're being directly accused of that, would just sit

24  there and not in some way deny it? And she doesn't deny it in any way. "I was emotional."

25  And she admits it again in court, and you should find that she's fully admitting to that

26  crime. And it's clear that she did it, and she is absolutely guilty of Count III." RT: 268.

27  The prosecution attempted to establish Petitioner's guilt from adoptive admission.

28  Considering Petitioner's silence in the context of her one and only statement to Czodor,

her failure to deny is of little probative value to a claim of acquiescence since the nude

photos at the heart of the questioning—and of this prosecution—were sent to Petitioner by

a nudist without any expectation of privacy. Thus, in the setting of an altercation that was

about to be upgraded in the middle of the street—such as it was—it is likely that

Petitioner denied it while her denial was not recorded, or Petitioner disdained to deny

while it was so obvious a hoax, or her failure to deny may be an attempt to avoid further

altercation, or Czodor, who was the aggressor, withheld the recording of the next part of

the altercation showing Petitioner denied it, or she thought it was unnecessary to deny

because she was in fact innocent. Thus, an adverse inference would be too speculative to

pass §352 muster. Innocent people falsely accused often believe in "a just world and in the

transparency of their own blameless status.... [T]hose who stand falsely accused also have

faith that their innocence will become self-evident to others. As a result, they are not

calculated to choose their words or action, often not realizing that they are being framed

or set up and later trapped by false evidence and perjured testimony. The "lesson of

history," our Supreme Court has observed, is "that a system of criminal law enforcement

which comes to depend on the 'confession' will, in the long run, be less reliable and more

subject to abuses than a system which depends on extrinsic evidence independently

secured through skillful investigation." *Escobedo v. Illinois* (1964) 378 U.S. 478, 489–

490, 84 S.Ct. 1758, 12 L.Ed.2d 977, fns. omitted.

Though jurors were told to follow instructions and accept with no adverse

inference defendant's right not to testify at trial, it was nevertheless concerning that

allowing the Government to introduce evidence and comment on defendant's silence

without anything to measure that silence against invites a degree of confusion in the minds

of the jurors that an instruction is unlikely to remedy. See *Bruton v. United States*, 391

U.S. 123, 135–36, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) ("[T]here are some contexts in

which the risk that the jury will not, or cannot, follow instructions is so great, and the

consequences of failure so vital to the defendant, that the practical and human limitations

of the jury system cannot be ignored."). Here, the implications of defendant's minimally

1   probative silence would have been powerfully incriminating because of its alluring logical

2   appeal to ordinary, innocent people—i.e., jurors—who naturally would be unaware of the

3   reality of each circumstance. In the end, given jurors' lack of healthy skepticism the

4   danger of unfair prejudice to Petitioner substantially outweighed the de minimis probative

5   value of her silence to establish acquiescence.

6        Trial counsel's failure to suppress or object on evidence code §352 grounds and the

7   introduction of screenshots and secretly recorded videos prejudiced Petitioner.

8        **CLAIM 16: IAC – Failure to bring the case to a speedy trial**

9        Public defender's failure to prepare for trial in a timely manner violated

10  Petitioner's right to a speedy trial. It also violated Petitioner's right to a competent counsel

11  that would not violate her right to a speedy trial. Decl. Luo, ¶26-42.

12       A Penal Code section 1382 violation entitles the defendant to pretrial dismissal

13  regardless of prejudice. *People v. Anderson* (2001) 25 Cal.4th 543, 604-605; *People v.*

14  *Martinez* (2000) 22 Cal.4th 750, 769. "Waiver" refers to an explicit and intentional

15  relinquishment of a right. *In re S.B.* (2004) 32 Cal.4th 1287, 1293, fn. 2. Petitioner never

16  knowingly, voluntarily, and intelligently waived her right to a speedy trial. Decl. Luo, ¶26

17  – 34. Petitioner did not request any continuance due to her inability to appear for trial.

18  Petitioner did not benefit at all from any continuance. Nor did Petitioner request any

19  reassignment of counsel. Decl. Luo, ¶33-34. Petitioner was taken advantage of and put on

20  a spot to choose to go to trial with an unprepared counsel or go to trial at a later date. Trial

21  counsel failed to file a *Serna* motion upon Petitioner's request. Defense counsel took this

22  tack not for lack of merit, but simply because he did not want to admit his office was

23  substantially responsible for the violation of Petitioner's right to a speedy trial.

24  Eventually, trial counsel called no witness to the stand, engaged in a lackadaisical and

25  ineffective cross-examination of the prosecution's sole/star witness, and presented no

26  evidence from his investigation. RT: 196 – 214. Trial counsel's performance supports the

27  fact that the delay of the trial was substantially caused by the office of public defender and

28  no good cause was ever found for the continuance. Petitioner was unable to have both her

1  constitutional rights to a speedy trial and a prepared and competent counsel. Public

2  defender's lack of loyalty was a stunning betrayal. Decl. Luo, ¶39.

3       When address whether the circumstances were so prejudicial as to require reversal

4  the *Chapman* reversible error standard applies. *Chapman v. California* (1967) 386 U.S.

5  18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065]; *People v. Ruthford*

6  (1975) 14 Cal.3d 399, 408 [121 Cal.Rptr. 261, 534 P.2d 1341, A.L.R.4th 3132]. Under

7  this test, "[a]n accused . . . is entitled to relief in such circumstances unless we can declare

8  a belief that the denial 'was harmless beyond a reasonable doubt.' [Citation.]" (Ibid.)

9  Thus, "[t]he defendant must make a showing of substantial materiality and even after this

10  showing is made reversal is not required if the prosecution established the failure to was

11  harmless beyond a reasonable doubt." *Id.* at p. 409.

12       Trial counsel's performance clearly showed that there was no investigation or

13  preparation done. There was no excuse to the failure to bring the case to a speedy trial.

14  Public defender's failures and actions were constitutionally ineffective.

15  **CLAIM 17: Insufficient Evidence – dating relationship that engendered expectation**

16  **of privacy**

17       Hanh Le's infamously unfaithful husband, Czodor, did not have a dating

18  relationship with Petitioner that engendered any expectation of privacy. RT: 132 – 134.

19  See also Claim 2.

20       **CLAIM 18: Insufficient Evidence – Expectation of Privacy**

21       The requirement that the images at issue be subject to a reasonable expectation of

22  privacy is central to the statute's constitutional validity under a strict-scrutiny standard. A

23  content-based restriction on First Amendment-protected speech can withstand strict

24  scrutiny only if it is narrowly tailored to serve a compelling state interest. *Williams-Yulee*

25  *v. Fla. Bar*, 575 U.S. 433, 444 (2015). The compelling state interest underlying Penal

26  Code section 647(j)(4)(A) is to protect peoples' reasonable expectations of privacy in

27  intimate images of them and prevent the serious harms that can result when those

28  expectations are broken. Where an individual does not have a reasonable expectation of

privacy in an image, the State's interest in protecting the individual's privacy interest in that image is minimal.

Penal Code section 647(j)(4)(A) "penalizes only the disclosure of images in which the depicted person had a reasonable expectation of privacy rested in part on our construction that the statute would apply only where the person depicted had not <u>distributed</u> the images in a way that would undermine their reasonable expectation of privacy." *State v. Vanburen*, 214 A.3d 791, 821 (Vt. 2019).

The State bears the burden of establishing that it has evidence as to each element of the offense. In order to convict under Pen. Code,§ 647(i)(4)(A), the State must prove, beyond a reasonable doubt, that Petitioner received or acquired Czodor's images under circumstances in which they agreed or understood that the images shall remain private.

Hanh Le's graceless betraying husband, a nudist seeking casual hook-ups, sent his nude photos to Petitioner after he just met Petitioner one time and did not even know Petitioner's full name, did not expect privacy in his nude photos. Decl. Luo, ¶3. It is difficult to believe a nudist, who believes becoming nude increases confidence and going naked brings him out of his shell, would expect privacy in his nude photos when he was seeking casual hook-ups to cheat on his wife.

It is also difficult to see how a complainant would have a reasonable expectation of privacy in pictures sent to a stranger. The State has not presented evidence to demonstrate that, in contrast to a stranger, Hanh Le's cheating husband, Czodor, had a relationship with Petitioner of a sufficiently intimate or confidential nature that he could reasonably assume that she would not share the photos he sent with others. Nor has it offered evidence of any promise by Petitioner, or even express request by Czodor, to keep the photos confidential. *State v. Vanburen*, 214 A.3d 791, 823 (Vt. 2019). It is particularly odd that the State was able to provide Petitioner's threatening text messages but unable to provide Czodor's request to keep his nude photos private or Petitioner's promise to keep Czodor's nude photos private despite the nude photos were sent through text messages and all communication between the parties were done via texts. Decl. Luo, ¶2-3. The State

47

1  has the same pattern throughout the entire case. Despite it provided photos and videos

2  taken on Sep 18, 2018 but none of them show the weird scratching sound or any

3  scratching action while Czodor was able to constantly take photos and videos.

4  **CLAIM 19: Insufficient Evidence – Serious Emotional Distress**

5  Hanh Le's shameless betraying husband who is a nudist, Czodor, testified that he

6  was thinking about going to therapy a lot. RT 195. Czodor did not actually seek therapy

7  and never took medication. There is no evidence to establish that Czodor suffered serious

8  emotional distress because he believes becoming nude increases confidence and going

9  naked brings him out of his shell.

10  **CLAIM 20: Insufficient Evidence – Loss of Income**

11  There is a distinction between earnings received through self-employment in one's

12  own business and wages received from an employer because there is a difference between

13  working for another person and being self-employed. An employee ordinarily agrees to

14  work for, and receives, a set wage or salary. His wages are not directly affected by the net

15  income of the employer. In contrast, the self-employed person operating a "business" has

16  no more income available than the net income of the "business" after paying necessary

17  expenses of the "business." *Hupp v. Workers' Comp. Appeals Bd.*, 39 Cal.App.4th 84, 88

18  (Cal. Ct. App. 1995). As such, loss of net income of a self-employed person is equivalent

19  to lost wages of an employee.

20  Between 2014 and 2019 Czodor's made the following net income:

21
22

| 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|------|------|------|------|------|------|
| 5,031.00 | 7,075.00 | 5,345.00 | 5,416.00 | 9,836.00 | 10,098.00 |

23  Czodor alleged Petitioner's 2018 online posting caused him loss of income. First,

24  Czodor provided only tax returns but no evidence establishing his allegation. He cannot

25  even establish he had a steady trend of income. For instance, his income dropped in 2016

26  compared to 2015. Second, in fact Czodor made more money in 2018 and 2019 than 2017

27  which is contradicted to his allegation. Czodor's income suggests he has committed tax

28  fraud given his assets and lifestyle.

**CLAIM 21: Violation of due process – Improper form of evidence**

Law enforcement officers have the obligation to convict the guilty and to make sure they do not convict the innocent. They must be dedicated to making the criminal trial a procedure for the ascertainment of the true facts surrounding the commission of the crime. ----- Justice Byron White

Not every police department honors Justice White's words like Chicago Police Department that caught Jussie Smollett's hate crime hoax, and Santa Ana Police Department certainly did not. When accusations go undetected as false, they gain traction and viability among actors in the criminal justice system.

Law enforcement personnel are on the front lines of lie detection in the criminal justice system. When a civilian witness alleges that a crime was committed, the police bear the responsibility of determining whether that witness is telling the truth. Police was supposed to routinely and consistently to pursue all evidence, rather than those facts that confirm their initial theory. If the complainant's story is contradictory or inconsistent, the police should carefully consider all explanations, including whether the complainant had lied. When police accept the complaining witness's version of events at face value and fail the conduct even basic investigations, the entire adversarial system crumbles.

Here in this case, every word coming out from Czodor went unchecked and unchallenged. Every piece of self-made evidence provided by Czodor went unchecked and unchallenged. For instance, the police could have retrieved Czodor's phone and download all messages, screenshots, go to Czodor's residence to take photos of the damaged door and his entire front door area which will show the lighting installation, and retrieve all photos and videos taken on Sep 18, 2018. Had the police done their job Czodor's complaint would have immediately collapsed.

Whatever crime is reported the person who goes out to collect evidence should be a police officer instead of Czodor. This is not the case here. Not a single piece of evidence presented at trial was collected and processed following protocol. Not a single screenshot or photo has metadata or timestamp. The lack of metadata makes an accurate examination

49

1  of evidence impossible. The police didn't even bother to collect all text messages, photos

2  and videos to see whether something was intentionally left out, such as Czodor had sent

3  his nude photos to multiple people, the photos and the videos that Czodor had withheld

4  show Petitioner's innocence. It is common sense that incomplete and edited screenshots,

5  photos, or videos could be manipulated and misrepresented. Yet, other than taking an oral

6  statement and accepting a stack of paper printout the police did nothing. There was

7  absolutely no meaningful investigation. Decl. Luo, ¶12.

8          If a citizen discovers his property was maliciously damaged he would call the

9  police to investigate the crime scene. He would let the police take the crime scene photos

10  and observe the damaged property. Similar to a home burglary, a real victim would call

11  the police to his residence. Here in this case, Czodor did not call the police to his

12  residence although he alleged his front door was maliciously damaged. He did not let the

13  police investigate the crime scene or take any photos of the damaged property. Not a

14  single police officer ever observed the allegedly damaged door or any nude photos online.

15  Czodor took photos of the "crime scene" on his own, made screenshots, printed out on a

16  piece of paper as evidence and went to the police station to report the alleged crimes. He

17  did not even provide a digital copy of the screenshots and photos with metadata for

18  forensic examination to ascertain whether the screenshots and photos were tampered or

19  forged. Czodor took the "crime investigation" and "evidence collection" into his own

20  hands. Same as the screenshots Czodor provided. All screenshots were printed out on

21  paper by Czodor without providing digital copies of the screenshots with metadata. None

22  of those can be submitted for forensic examination. Trial counsel should have explained to

23  the jury how easily the print-outs may be tampered or forged without forensic

24  examination. The police report also documented that "upon checking these websites there

25  were no photographs or video's depicting Czodor's genitalia". Decl. Luo, ¶12. The jurors

26  did not have special knowledge regarding how to evaluate the genuineness of evidence

27  and trial counsel failed to educate the jurors. Trial counsel failed to demonstrate to the

28  jury that the police did not conduct any investigation. Neither did the police collect any

evidence following their protocol. All paper evidence in this case is Czodor's self-made and self-manufactured evidence with no way to forensically examine and Czodor has serious credibility issue. Such shoddy police work amounts to violation of Petitioner's federal and state rights to due process.

Expert testimony is critical today to prevent the admission of manipulated images. *People v. Beckley*, 185 Cal.App.4th 509, 515 (Cal. Ct. App. 2010). Recent experience shows that digital photographs can be changed to produce false images. See, e.g., *U.S. v. Newsome* (3d Cir. 2006) 439 F.3d 181, 183 [digital photographs used to make fake identification cards]. Indeed, with the advent of computer software programs such as Adobe Photoshop "it does not always take skill, experience, or even cognizance to alter a digital photo." (Parry, Digital Manipulation and Photographic Evidence: Defrauding The Courts One Thousand Words At A Time (2009) 2009 J. Tech. L. Pol'y 175, 183.)

No evidence here supports that the photographs and screenshots could not have been digitally altered given the witness's strong motive to retaliate and credibility issues. It is particularly odd to provide law enforcement with only paper evidence in this day and age.

Hanh Le's shameless cheating husband, Czodor, provided to the police a photo, with no time stamp or metadata, depicting Petitioner holding a key and standing in front of his door which was taken from his kitchen window. Decl. Luo, ¶8. The second photo provided to the police by Czodor depicting Petitioner standing in front of his door view window. Decl. Luo, ¶9. Both photos show strong lighting. The third photo provided to the police shows Petitioner was standing in front of Czodor's garage door which was nowhere close to his front door. Decl. Luo, ¶10. Because all these photos were not provided in digital form with metadata, no one knows at what time they were taken which is the main goal that Czodor provided paper evidence to the police. If any of these photos were taken between 7:55 pm and 8:10 pm it picks apart Czodor's statement that Petitioner scratched his door for 20 minutes, he did not report the scratching on Sep 18, 2018 because he did not see Petitioner scratching his door and did not discover the damage the same night.

**CLAIM 22: Violation of Confrontation Clause of the Sixth Amendment and Due Process - Admission of inadmissible hearsay**

Over defense's objections, the trial court erred in admitting hearsay as evidence. RT 143. The text messages from Czodor's so called friend and statements made by Czodor's clients were erroneously admitted into evidence because none of Czodor's so called friends and clients ever testified or were cross-examined by defense. Petitioner's right to cross examine Czodor's friends and customers were improperly deprived by admitting hearsay evidence. See *Crawford v. Washington* (2004) 541 U.S. 36, 59 (Holding that the Sixth Amendment's confrontation clause prohibits the admission of "testimonial statements" made by a nontestifying witness unless the witness is unavailable, and the defendant had a prior opportunity for cross-examination.) Other improper admission of hearsay include: RT 191, RT 223 etc.

**CLAIM 23: Violation of 6th & 14th Amendments – Improper permitting amendment**

720 days after the original complaint was filed, despite no finding of good cause to justify any belated amendment, the complaint was illegally permitted to amend from allegation of coming within 100 yards of the protected person to failure to deactivate website and created new websites. CT 66-67. Such amendment substantially prejudiced Petitioner's defense.

**CLAIM 24: Violation of Sixth and Fourteenth Amendments – the trial court erred in denying the Petitioner's motion to dismiss**

Despite a pretrial hearing on a motion to dismiss for denial of a speedy trial may exclude prosecution, *Shleffar v. Superior Court* (1986) 178 Cal.App.3d 937, the court improperly informed Petitioner that the motion to dismiss was not being accepted or considered because it was untimely and the People were not present.

**CLAIM 25: Violation of Sixth and Fourteenth Amendments – the trial court erred in denying Petitioner's *Marsden* motion**

"Even if [trial] counsel is competent, a serious breakdown in communications can result in an inadequate defense." *United States v. Nguyen*, 262 F.3d 998, 1003-04 (9th Cir.

52

1  2001) (citing *United States v. Musa*, 220 F.3d 1096, 1102 (9th Cir. 2000)); see also *United*

2  *States v. D'Amore*, 56 F.3d 1202, 1206 (9th Cir. 1995) ("[A] court may not deny a

3  substitution motion simply because [it] thinks current counsel's representation is

4  adequate."), overruled on other grounds by *United States v. Garrett*, 179 F.3d 1143(9th

5  Cir. 1999).

6      In *Brown v. Craven*, 424 F.2d 1166 (9th Cir. 1970), Brown's attorney offered only

7  a perfunctory defense, the court found that the defendant was constructively denied his

8  right to counsel where he "was forced into a trial with the assistance of a particular lawyer

9  with whom he was dissatisfied, with whom he would not cooperate, and with whom he

10  would not, in any manner whatsoever, communicate." *Id.* 1169-1170.

11      Here, Petitioner's realization led her particularly to distrust public defender who

12  had failed to inform her of her court date, infringed upon her right to a speedy trial, and

13  had not fully advised her of her right to a speedy trial. Public defender even caused an

14  arrest warrant issued against Petitioner. Decl. Luo, ¶34-35.

15      Similar to *Daniels v. Woodford*, 428 F.3d 1181, 1200 (9th Cir. 2005), the state trial

16  court simply instructed Petitioner that she should discuss the matter with these same

17  attorneys whom she complained and dissatisfied about. RT 1-32.

18      This "serious conflict" between Petitioner and public defender gives rise to a

19  presumption of prejudice. *Perry v. Leeke*, 488 U.S. 272, 278-79, 109 S.Ct. 594, 102

20  L.Ed.2d 624 (1989); *Schell*, 218 F.3d at 1027 ("In the event that the trial court determines

21  that a serious conflict did exist that resulted in the constructive denial of assistance of

22  counsel, no further showing of prejudice is required; and Schell's trial shall be presumed

23  to have been unfair.")

24      Finally, in Nov 2021 Orange County public defender declared conflict and sought

25  to be relieved as Petitioner's counsel. Unfortunately it happened after Petitioner's

26  wrongful conviction.

27  **CLAIM 26: Prosecutorial Misconduct At Trial**

28  .That the prosecuting attorney overstepped the bounds of that propriety and fairness

1  which should characterize the conduct of such an officer in the prosecution of a criminal

2  offense is clearly shown by the record. RT: 117 – 125, 214 – 216, 262 – 298. He was

3  guilty of misstating the facts in his presentation of case; of putting into the mouth of

4  Petitioner things which she had not said; of suggesting by his questions that he had proved

5  his case beyond reasonable doubt; of assuming prejudicial facts not in evidence; and in

6  general, of conducting himself in a thoroughly indecorous and improper manner.

7       As a public official charged with representing the general interest and attaining

8  justice, a prosecutor may have special stature in the eyes of the jury, and so his or her

9  misstatements may carry significant weight. See *People v. Donaldson* (2001) 93

10  Cal.App.4th 916, 932. "While he may strike hard blows, he is not at liberty to strike foul

11  ones. It is as much his duty to refrain from improper methods calculated to produce a

12  wrongful conviction as it is to use every legitimate means to bring about a just one. …

13  [i]mproper suggestions, insinuations and, especially, assertions of personal knowledge are

14  apt to carry much weight against the accused when they should properly carry none."

15  *Berger v. United States*, 295 U.S. 78, 88 (1935).

16       **1.  Unlawfully Introducing Petitioner's Compelled Testimony, While At the**

17           **Same Time Misrepresenting Petitioner's Prior Testimony**

18       See Claim 7.

19       **2.  Making Inappropriate or Inflammatory Suggestions**

20       Although prosecutors have wide latitude to draw inferences from the evidence

21  presented at trial, mischaracterizing the evidence is misconduct. *People v. Avena* (1996)

22  13 Cal.4th 394, 420 [53 Cal.Rptr.2d 301, 916 P.2d 1000].

23       Throughout the trial the prosecution repeatedly called Petitioner's failure to deny to

24  the jury's attention and proceeded to argue that it was indicative of guilt. The prosecution

25  stated "At no point does she say anything to say that she didn't to that, right? She never

26  said, what are you talking about? I would never do that. This is a

27  misunderstanding. No way. What reasonable person, when they're being directly accused

28  of that, would just sit there and not in some way deny it? And she doesn't deny it in any

1   way. "I was emotional." And she admits it again in court, and you should find that she's

2   fully admitting to that crime. And it's clear that she did it, and she is absolutely

3   guilty of Count III." RT: 268. Based on an edited and incomplete video obviously, in the

4   setting of an altercation that was about to be upgraded in the middle of the street—such as

5   it was—it is likely that Petitioner denied it while her denial was not recorded, or Petitioner

6   disdained to deny while it was so obvious a hoax, or her failure to deny may be an attempt

7   to avoid further altercation, or Czodor, who was the aggressor, withheld the recording of

8   the next part of the altercation showing Petitioner denied it, or she thought it was

9   unnecessary to deny because she was in fact innocent. Innocent people falsely accused

10  often believe in "a just world and in the transparency of their own blameless status....

11  [T]hose who stand falsely accused also have faith that their innocence will become self-

12  evident to others. As a result, they are not calculated to choose their words or action, often

13  not realizing that they are being framed or set up and later trapped by false evidence and

14  perjured testimony. The "lesson of history," our Supreme Court has observed, is "that a

15  system of criminal law enforcement which comes to depend on the 'confession' will, in

16  the long run, be less reliable and more subject to abuses than a system which depends on

17  extrinsic evidence independently secured through skillful investigation." *Escobedo v.*

18  *Illinois* (1964) 378 U.S. 478, 489–490, 84 S.Ct. 1758, 12 L.Ed.2d 977, fns. omitted.

19      The prosecution stated "But ask yourself, reasonably, why in the word is she

20  knocking on the door with keys -- with metal keys? Why in the world would you be

21  knocking on the door with metal keys?" RT: 292. Such line of questions implies that the

22  only purpose to use a metal object to knock on a door is to damage the door. However,

23  there are five materials that are most commonly used to make door knockers - cast iron,

24  pewter, copper, stainless-steel and brass. Each comes with different benefits such as

25  copper does not rust, stainless-steel has anti-freezing properties, brass and cast iron are

26  most durable. https://foter.com/best-door-knockers Such suggestion tends to make the

27  prosecutor his own witness-offering unsworn testimony not subject to crossexamination.

28  It has been recognized that such testimony, 'although worthless as a matter of law, can be

1  "dynamite" to the jury because of the special regard the jury has for the prosecutor,

2  thereby effectively circumventing the rules of evidence.' [Citations.]" *People v. Bolton*

3  (1979) 23 Cal.3d 208, 213-214 [152 Cal.Rptr. 141, 589 P.2d 396; *People v. Benson*

4  (1990) 52 Cal.3d 754, 794 [276 Cal.Rptr. 827, 802 P.2d 330] ["a prosecutor may not go

5  beyond the evidence in his argument to the jury"]; *People v. Miranda* (1987) 44 Cal.3d

6  57, 108 [241 Cal.Rptr. 594, 744 P.2d 1127]; *People v. Kirkes* (1952) 39 Cal.2d 719, 724

7  [249 P.2d 1]; *Berger v. United States*, 295 U.S. 78, 85 (1935) [The prosecuting attorney's

8  argument to the jury was undignified and intemperate, containing improper insinuations

9  and assertions calculated to mislead the jury]; "Statements of supposed facts not in

10  evidence ... are a highly prejudicial form of misconduct, and a frequent basis for reversal."

11  (5 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Trial, § 2901, p. 3550.)

12      **3.  Referring to Facts Not in Evidence**

13         In his opening statement, the prosecutor stated "...when this order is still

14  in effect, ... he's seeing postings on YouTube with his nude photos October 4th after the

15  order had been served." RT: 123 – 124. No evidence supports such statement.

16         There was no evidence supports that Czodor and Petitioner engaged in any dating

17  relationship.

18         RT: 132 reads as follow:

19  10 Q Okay. So you went on a date around some time

20  11   near September of 2018.

21  12 A First time it was -- it was like second or

22  13  third week of August.

23  14 Q Okay. And leading up to that you had been

24  15  messaging each other, would you say it was frequently

25  16  through the dating app?

26  17 A Not sure, what is frequently.

27  18 Q Do you mean that it was a like a daily thing

28  19 or?

1    20 A No.

2    21 Q Okay. Like semi-weekly.

3    22 A Something like that.

4    23 Q Okay.

5    24 A Every second day, every third day you know.

6        RT: 133 reads as follow:

7    6 Q Okay. And the first date that you two -well,

8    7 let me ask, how many total dates did you go on

9    8 with Ms. Luo?

10   9 A Total dates was two dates.

11       RT: 134 reads as follow:

12   16 Q Okay. Now, at what point -- at some point did

13   17 your dating relationship in your view Ms. Luo end?

14   18 A When she left, actually I don't even know if

15   19 it started. I just would like to know her as a person

16   20 first, you know, and when she was leaving my house on

17   21 the second time and she was texting me. I told her

18   22 clearly that we should take it easy and if she's on the

19   23 app she would like meet other people, that's totally

20   24 fine with me you know.

21       CT: 101 reads as follow:

22   18 TC: I did. It's none of your business. Who are you to me? Nobody. You are to me

23   nobody.

24   19 What you think, what we was? It was my wife, girlfriend, boyfriend, what have you

25   been

26   20 to me. Jesus Christ. I met you one or two times. And that's it. This is freedom this is

27   not I

28   21 really wanted be with you forever. If I don't feel like you or don't feel like me it's no

57

1  22 problem. Evidently for you it is.

2      Yet in opening statement the prosecutor stated that "through the witnesses you'll

3  hear is about a dating relationship that went awfully bad." RT: 117. In closing argument

4  the prosecutor mislead the jury by stating that this case starts out with a fallout in the

5  relationship. RT: 264. In fact, Hanh Le's infamous cheating husband never had a

6  relationship with Petitioner.

7      The prosecution stated "in the dark of the night, no, he might not have seen when

8  she was doing that." RT: 292. The evidence refutes such false statement. Decl. Luo, ¶8-

9  10. There was a light bulb installed right above Czodor's front door. The light showered

10  Petitioner from head to toe.

11      **4. Vouching for the Sole Witness, While At the Same Time Withholding**

12          **Exculpatory Evidence**

13      The prosecution stated "I anticipate Defense may tell you, well, he didn't, you

14  know, tell the police that day that it was damaged. Well, remember, he said he called the

15  police because he's telling her to leave his property, that's his main concern at this point."

16  RT: 269. Looking at the withheld police activity report on Sep 18, 2018 the prosecution's

17  theory was an outright lie. The report clearly stated nude photos and extortion. What

18  reasonable person, while making a 911 call, would say something else but forget to

19  mention the scratching noises he heard for 20 minutes?

20      The prosecution stated "Really, he's not credible? A guy who walked into a room,

21  took an oath in front of multiple strangers. More than -- I was going to say 14 or more,

22  including court staff. And he went up there, and guess what? He had to tell this room full

23  of strangers he had to get up there on that stand in front of all of you and admit that, I was

24  dating this girl. And yeah, I sent her nude photos after a week. And think about what it

25  takes (indiscernible) actually admit that you're doing that, knowing that you're not just

26  admitting doing that, but guess what? Every single one of these strangers is going to get to

27  see those nude photos of you now, as well. And he went up there and told you that yes, in

28  fact, he did do that. My point is he is credible. He admitted to things that he didn't see

when he was asked, did you actually see her scratching up the door? He said, no, I didn't see that happening when it was happening." RT: 288 – 291. The prosecution vouched for the witness's truthfulness because the witness said he did not see Petitioner scratching his door. The truth is the witness could not make his story straight if he said he saw Petitioner scratching his door but he did not report to the police on Sep 18, 2018. The prosecution also vouched for the witness's emotional distress by alleging the witness had to testify in a room full of strangers despite the witness testified he took a nude photo on a nudist beach which was a public place. It is difficult to believe a nudist who was comfortable with public nudity, took nude photos on a nude beach which was on a public land, exposed himself in public, would feel uneasy to testify in a room full of strangers. Especially when Czodor allowed a stranger to take his nude photos on a nude beach. RT: 144 – 145.

### 5. Improper Expression of Opinions to The Jury

During his summation, the prosecutor made numerous prejudicial expressions of opinion. There is no court in the United States can order Petitioner not to post online indicating that Mr. Czodor is a nice guy without infringement of Petitioner's First Amendment right. Despite the restraining order did not pass constitutional muster, the prosecution stated that "So the -- by the rules of the restraining order, if she posted a post that said, like, hey, Tomas Czodor, he's a nice guy, that's a violation of the restraining order." RT: 293 – 294.

These statements were improper expressions of the prosecutor's personal opinion about Petitioner's guilt and about the evidence introduced at trial. See *Berry*, 627 F.2d at 198; *Beach*, 147 Cal. App. at 628 - 629. Even if defense counsel had objected to the improper statements, such an objection would not have cured the resulting harm, not to mention defense counsel failed to object. Under the circumstances of this close case, it was reasonably likely that the jury misconstrued or misapplied the prosecutor's remarks. *Sanders*, 11 Cal. 4th at 526.

### CLAIM 27: Violation of Due Process - Cumulative Error

Cumulative error may be grounds for federal habeas corpus relief, even when any

1  single error would not. *Parle v. Runnels* (9th Cir. 2007) 505 F.3d 922, 927-929, citing

2  *Chambers v. Mississippi* (1973) 410 U.S. 284.

3       The Supreme Court has clearly established that the combined effect of multiple

4  trial court errors violates due process where it renders the resulting criminal trial

5  fundamentally unfair. *Chambers*, 410 U.S. at 298, 302-03 (combined effect of individual

6  errors "denied [Chambers] a trial in accord with traditional and fundamental standards of

7  due process" and "deprived Chambers of a fair trial"). See also *Taylor v. Kentucky*, 436

8  U.S. 478, 487 n.15 (1978) ("[T]he cumulative effect of the potentially damaging

9  circumstances of this case violated the due process guarantee of fundamental fairness . . .

10  .") The cumulative effect of multiple errors can violate due process even where no single

11  error rises to the level of a constitutional violation or would independently warrant

12  reversal. *Chambers*, 410 U.S. at 290 n.3.

13       In determining whether the combined effect of multiple errors rendered a criminal

14  defense "far less persuasive" and had a "substantial and injurious effect or influence" on

15  the jury's verdict, the overall strength of the prosecution's case must be considered

16  because "a verdict or conclusion only weakly supported by the record is more likely to

17  have been affected by errors than one with overwhelming record support." *Strickland v.*

18  *Washington*, 466 U.S. 668, 696 (1984). Here, the prosecution's case is particularly weak.

19  The only witness, Hanh Le's infamous cheating husband, provided inconsistent and

20  perjured testimony. The police did not collect any evidence. All "evidence" was provided

21  by Czodor in paper form without metadata.

22       The prejudicial impact of erroneous inclusion of hearsay and Petitioner's prior

23  compelled testimony was exacerbated by the trial court's additional errors in failure to

24  instruct the jury about dating relationship, denial of juror #4's hardship request, and

25  admission of photos and screenshots without metadata. Viewed collectively, these errors

26  undeniably rendered Petitioner's defense "far less persuasive than it might have been" and

27  thereby violated her due process rights. See *Parle v. Runnels*, 505 F.3d 922, 934 (9th Cir.

28  2007) (concluding that all of the improperly admitted evidence bolstered the State's case,

1  while all of the erroneously excluded evidence rendered defense far less persuasive than it

2  might have been, it was objectively unreasonable for the California Court of Appeal to

3  conclude that the combined effect of these errors did not violate defendant's due process

4  rights.)

5  **Errors Inherently Carrying A High Probability of Prejudice**

6      Some kinds of error are inherently likely to cause prejudice – for example,

7  comments by persons in authority such as judges or prosecutors, instructions, confessions

8  etc. Examples include:

9      • Statements by prosecutors: As a public official charged with representing the

10  general interest and attaining justice, a prosecutor may have special stature in the eyes of

11  the jury, and so his or her misstatements may carry significant weight. See *People v.*

12  *Guerrero* (1976) 16 Cal.3d 719, 730; *People v. Thomas* (1992) 2 Cal.4th 489, 529; *People*

13  *v. Donaldson* (2001) 93 Cal.App.4th 916, 932.

14      • Instructions: Instructions are inevitably crucial in leading jurors (who are for the

15  most part unschooled in the law) to a conclusion. See *People v. Clair* (1992) 2 Cal.4th

16  629, 663 ["jurors treat the court's instructions as a statement of the law by a judge"].

17      • Confessions: The defendant's own words inevitably carry heavy weight before a

18  jury; it is difficult to ignore a confession or substantial admission of guilt.

19  **Prominence of Error**

20      An error may be prejudicial because it played a prominent role in the case. In

21  contrast, prejudice will be more difficult to establish when the error was relatively trivial,

22  involved tangential or uncontested matters, or happened only once and without particular

23  emphasis. Factors include:

24      • Centrality to issues: The error may have directly affected the key issue in the

25  case. Here, such as whether Petitioner and Czodor were engaged in a dating relationship

26  that warrants a DVRO and suggests a sufficiently intimate or confidential nature which

27  may have filled a substantial gap in the prosecution's case or damaged the heart of the

28  defense.

1    • Emphasis given error: An error may have been repeated or exploited or given

2    special emphasis by the prosecutor during argument. As the Supreme Court has put it:

3    "There is no reason why we should treat this evidence as any less 'crucial' than the

4    prosecutor – and so presumably the jury – treated it." *People v. Powell* (1967) 67 Cal.2d

5    32, 56-57, quoting *People v. Cruz* (1964) 61 Cal.2d 861, 868.

6          **Closeness of the Case**

7          A case in which the state or county case is weak or the defense is strong may well

8    be affected by an error. See *People v. Moore* (1954) 43 Cal.2d 517, 530-531 (closely

9    balanced evidence, erroneous jury instructions on matters vital to defense); *People v.*

10   *Weatherford* (1945) 27 Cal.2d 401, 403; *People v. Pearch* (1991) 229 Cal. App. 3d 1282,

11   1294-1295; *People v. Allen* (1978) 77 Cal.App.3d 924, 935 (close contest of credibility);

12   see also *People v. Maestas* (1993) 20 Cal.App.4th 1482, 1498 (key prosecution evidence

13   of questionable credibility, whereas defense was strong); *People v. Roberts* (1967) 256

14   Cal.App.2d 488.

15          **CLAIM 28: IAC – Direct Appeal**

16          If the attorney appointed by the State to pursue the direct appeal is ineffective, the

17   defendant has been denied fair process. See *Martinez v. Ryan*, 566 U.S. 1, 11, 132 S.Ct.

18   1309, 182 L.Ed.2d 272 (2012) (citing Coleman v. Thompson, 501 U.S. 722, 754, 111

19   S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Evitts v. Lucey*, 469 U.S. 387, 396, 105 S.Ct. 830, 83

20   L.Ed.2d 821 (1985); *Douglas v. California*, 372 U.S. 353, 357-358, 83 S.Ct. 814, 9

21   L.Ed.2d 811 (1963).

22          After Petitioner appealed her conviction public defender declared conflict and

23   sought to be relieved as Petitioner's counsel. Robert Bullock was appointed to represent

24   Petitioner on appeal. Record on appeal was mailed to Bullock in December 2021. Despite

25   Petitioner repeated asked him for the issues he was going to argue he waited until Feb 17,

26   2022 to inform Petitioner that he had found no issue on appeal. Petitioner received zero

27   assistance of counsel on direct appeal.

28          **CLAIM 29: Actual Innocence**

The prosecution has failed to prove each and every element beyond a reasonable doubt. Both the TRO and DVRO issued in Sep and Oct 2018 by family court were unlawful. False and inadmissible evidence was admitted into evidence. Perjured testimony was introduced to the jury. Petitioner's innocence is a matter of reality.

## CONCLUSION

Petitioner has now thoroughly controverted and discredited the evidence originally presented to prove her guilt. Petitioner's guilt has not only been called into question, she has proven that no reasonable juror would have found her guilty beyond a reasonable doubt. Her innocence is a matter of reality. This Court must act to find Petitioner actually innocent. This Court must grant this petition and issue a finding of factual innocence. In the alternative, this Court should order an evidentiary hearing at which Petitioner will be permitted to offer further proof in support of her claims for habeas relief.

## VERIFICATION

I, Xingfei Luo, declare that I am the petitioner of this petition for writ of habeas corpus. I have prepared the attached Petition for Writ of Habeas Corpus and Memorandum of Points and Authorities in Support Thereof and believe the matters stated therein to be true. On that basis, I allege they are true.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 10, 2022, at Rosemead, California.

*/s/ Xingfei Luo*

Xingfei Luo

# DECLARATION OF PETITIONER XINGFEI LUO

I, XINGFEI LUO declare and state:

1.    I am the Petitioner in this case. I sat through the jury trial commenced on Jul 27, 2021. I requested and received the entire discovery file from public defender in Sep 2021. I have personal knowledge of the facts stated herein. If called upon as a witness I could and would competently testify thereto.

2.    In Aug 2018 Czodor connected with me through POF. **All of our communication was through texting. We never talked on the phone.** Throughout our interaction I never told Czodor my full name. He told me via texting he was single never married. But in fact, Czodor was a longtime married man. Czodor and his wife, Hanh Le, jointly own a property that was purchased in 2009. Between 2014 and 2019 Czodor and Hanh Le filed taxes as a married couple. Czodor's wife is ten years older than him. Czodor's marital status and taxes were unavailable to me until June 2022. Other than a house Czodor owns at least two vehicles, one is Toyota SUV and the other is BMW. A true and correct copy of Czodor's property ownership and tax returns of the couple is attached hereto as Exhibit 4.

3.    Czodor told me via texting he was a nudist right after we started texting in early August 2018. I never asked for his nudes but he sent me anyway. He never asked me to keep his photos private. I never promised I would keep his photos private. When he sent me his nude photos he did not even know my full name. He invited me to a nudist ranch in Riverside named Olive Dell Ranch. He told me via texting he was going back to Europe before our second and last face to face meeting. A true and correct copy of his texts is attached hereto as Exhibit 5.

4.    For centuries, door knocker has been made with metal. Czodor had neither doorbell nor door knocker on his door in Sep 2018. There is nothing wrong to use any metal object as a door knocker.

5.    On Sep 18, 2018 Czodor took more videos and photos than he provided to the police. He withheld those videos and photos because they would show I did not scratch

APPENDIX TO PETITION FOR WRIT OF HABEAS CORPUS

his door and I denied posting his nudes.

6.    Czodor declared that I never told him my full name. He further declared that on Sep 18, 2018 he called his friend Chris Kovacs and went outside to confront me. His friend suggested to call 911 because I did not want to leave, but not because I was scratching his door. A true and correct copy of Czodor's declaration submitted to family court is attached hereto as Exhibit 6.

7.    Czodor confirmed that two videos he provided to the police were taken at 7:54 pm and 8:13 pm respectively on Sep 18, 2018. A true and correct copy of his declaration under oath is attached hereto as Exhibit 7.

8.    Czodor provided to the police a photo, printed out on paper with no trace of time stamp or metadata, depicting me standing and holding a key in front of his door which was taken from his kitchen window. A true and correct copy of the photo is attached hereto as Exhibit 8. It clearly shows the lighting came from the top of my head showering me from head to toe. The entire front door area was nice and bright enough to see anything, including damages if any. However, Czodor, a professional liar, lied about being dark and unable to see the damage on Sep 18, 2018. A true and correct copy of Czodor's testimony is attached hereto as Exhibit 12.

9.    The second photo provided to the police by Czodor, also printed out on paper with no trace of time stamp, depicting me standing in front of his door viewer. The photo clearly shows there was bright light coming from the top which backs up the first photo showing strong light coming from the ceiling. A true and correct copy of the photo is attached hereto as Exhibit 9.

10.    The third photo provided to the police, printed out on paper with no trace of time stamp, shows I was standing in front of Czodor's garage door which was nowhere close to his front door. A true and correct copy of the photo is attached hereto as Exhibit 10. Because all these photos were not provided in digital form with metadata, I cannot obtain the time stamp of each photo.

11.    On Sep 24, 2018 Czodor expressed his plan to manufacture criminal charges

65

1  and file a restraining order after he learned that it would cost money to remove a post

2  related to his credibility. A true and correct copy of Czodor's email is attached hereto as

3  Exhibit 11.

4    12.  Czodor testified in the family court that he heard weird noises from scratching

5  for 20 minutes, it was dark so he did not see the damages to his door on Sep 18, 2018, and

6  the photo of the damaged door was taken on Sep 25, 2018. A true and correct copy of the

7  family court transcript is attached hereto as Exhibit 12. It makes total sense why the photo

8  of the damaged door was taken on Sep 25, 2018 because Czodor damaged his own door

9  that day and falsely filed the police report on Sep 26, 2018 for retaliation with all other

10  manufactured "paper evidence". A true and correct copy of the photo of Czodor's so-

11  called damaged door is attached hereto as Exhibit 13.

12    13.  The prosecution falsely alleged that I admitted to post Czodor's nudes while I

13  did not need his permission in the family court but such allegation was completely false.

14  A true and correct copy of the family court transcript is attached hereto as Exhibit 12.

15    14.  Czodor's interaction with the police officer was recorded. The police officer's

16  body camera footage shows that the officer did not read any text messages from Czodor's

17  phone and took all paper "evidence" as true and correct without collecting or even asking

18  for digital copy with metadata and timestamp. A true and correct copy of the officer's

19  statement on Sep 26, 2018 indicating no nude photos or videos observed is attached hereto

20  as Exhibit 14.

21    15.  On Sep 28, 2018 I received no prior notice and was not present at the ex parte

22  hearing regarding Czodor's request for TRO. There was no court reporter at that hearing

23  and therefore there is no transcript available. A true and correct copy of the TRO and

24  DVRO issued by the family court is attached hereto as Exhibit 15. Not a word in the

25  DVRO orders me to stay away from Czodor's facebook page. Not a word in the DVRO

26  orders anything related to Czodor's company and he did not have any company ever. Not

27  a word in the DVRO orders me to stop contacting Czodor's friends and clients. Not a

28  word in the DVRO orders me to stop stalking Czodor in cyberspace.

16.   Prior to trial, I informed public defender that Czodor was a nudist but I was told he would not present this fact at trial and the less information the better.

17.   The information of Czodor's prior criminal convictions was not available to me until December 2021. A true and correct copy of Tomas Czodor's criminal conviction records is attached hereto as Exhibit 16. Tomas Czodor's rap sheet was never disclosed by prosecution, including the information that Czodor was previously subject to deportation and arrested for impersonation. The facts that Czodor was subject to deportation and arrested for impersonation by California Highway Patrol were unavailable to me until February 2022.

18.   Czodor's yelp page is https://www.yelp.com/biz/gorgeous-painting-newport-beach. None of his customers on Yelp was named Lilly.

19.   I ran a research both with county and state authorities, which shows there was never a company or business named "Gorgeous Painting". A true and correct of the research is attached hereto as Exhibit 17. It can be easily searched on https://businesssearch.sos.ca.gov/ and https://cr.ocgov.com/FBNOnlineNet/.

20.   In August 2021 I made a public record request for all complaints and requests for assistance made by Tomas Czodor and Santa Ana Police Department produced two police field activity reports dated on Sep 10, 2018 and Sep 18, 2018. A true and correct copy of the reports is attached hereto as Exhibit 18.

21.   On Sep 13, 2021 I confirmed with my trial counsel that neither he nor any of his coworkers ever called Chris Kovacs for information. Not to mention Czodor's so-called friends and customers who may never exist. Due to public defender's failure to subpoena all texts between Czodor and me Czodor was free to lie about anything, including but not limited to the fabrication that I asked for his nudes and threatened him.

22.   From the very beginning I have maintained that the restraining orders are unlawful. I did not grant consent or authority to public defender to sign off a stipulation with the prosecution. Prior to signing off the stipulation public defender never discussed with me about the stipulation. Upon my repeated inquiry, public defender failed to

provide any explanation for their action or omission. A true and correct copy of the correspondence with public defender is attached hereto as Exhibit 19.

23.    Initially public defender was appointed as my counsel on direct appeal. In Nov 2021 public defender declared conflict and sought to be relieved. Mr Bullock was appointed to replace public defender as my counsel on direct appeal.

24.    I repeatedly asked my appeal counsel, Mr Bullock, for the issues he was going to raise on appeal and I was not informed until Feb 17, 2022 that he was not able to identify any issues on appeal.

25.    Although Czodor alleged the cheater post caused him damage and harm, he never spent a dime on the removal of the post.

26.    I was never properly and fully advised by my counsel about my right to a speedy trial. I was not advised, for example, that my case could be dismissed if it was not brought to trial within 30 days after I entered my plea, how a general time waiver was entered, and I could withdraw the time waiver any time I wanted.

27.    On Aug 12, 2019 I did not voluntarily and intelligently waive my constitutional right to a speedy trial. No one ever explained to me what was general time waiver and what was the consequence to enter a general time waiver. I was not aware of any general time waiver in my case until Jul 13, 2021. I did not make a voluntary, knowing and intelligent waiver of my right to a speedy trial. I was forced to choose between my right to a speedy trial and my right to be represented by competent counsel as a result of being represented by public defender and not knowing that I could file a *Marsden* motion until Jul 12, 2021.

28.    Throughout my case, no one ever asked me whether I was asserting or willing to waive my due process right to a speedy trial. No one ever asked for my authority to waive my constitutional right to a speedy trial. No one ever told me that I could withdraw the time waiver. More importantly, I could not withdraw the time waiver because I was not even aware that there was a general time waiver.

29.    Before and during the pretrial hearings on 08/12/2019, 09/06/2019, 10/18/2019,

1   01/10/2020, 02/14/2020, 03/20/2020, 07/14/2020, 12/22/2020, 03/05/2021, 05/07/2021,

2   06/08/2021, no one ever explained to me what was general time waiver and what was the

3   consequence to enter a general time waiver. Each time I was simply informed by my

4   counsel that there would be a continuance and as far as I was concerned continuances

5   were required to enable my attorney to be prepared for trial. To me, there is a big

6   difference between a general time waiver and continuance. General time waiver means

7   that I voluntarily and knowingly waive my right to a speedy trial. Continuance means that

8   my counsel is not prepared for trial even though I do not want to waive my right to a

9   speedy trial. Given my lack of experience in criminal proceedings and traumatic events

10  during incarceration I was most likely not competent to comprehend issues of speedy trial

11  through counsel, or to assist or meaningfully authorize counsel to handle legal

12  proceedings on my behalf.

13      30.   I never waived my right to be present at any hearings pending trial. Each time I

14  was simply informed by my counsel whether or not I would need to be present at the

15  hearing.

16      31.   On Jan 10, 2020 jury trial was set on Mar 24, 2020. I was not aware of any

17  general time waiver in my case until Jul 13, 2021. A true and correct copy of the

18  correspondence with public defender and minute order is attached hereto as Exhibit 20.

19      32.   The jury trial was suspended due to COVID but the Court resumed jury trial

20  since late May 2020. A true and correct copy of the jury release is attached hereto as

21  Exhibit 21.

22      33.   I never requested any continuances due to my own inability to appear at trial or

23  any hearing. All the continuances were caused by the prosecution, public defender, and

24  the trial court.

25      34.   I was not informed that there was a pretrial hearing on Jul 14, 2020. I did not

26  appear in court on Jul 14, 2020 and nobody ever asked me for my authority to enter a

27  general time waiver or waive my appearance. I was not even informed that the next

28  pretrial was set on Dec 4, 2020.

35. I failed to appear at the hearing on Dec 4, 2020 because I did not know there was a hearing due to public defender's failure to notify. I was so frustrated about my failure to appear in Court because I was at no fault. I felt like I was a piece of meat on the chopping board. I cannot afford private counsel and at the time I did not know I could file a *Marsden* motion. An arrest warrant was issued for my failure to appear in court on Dec 4, 2020, although I was at no fault.

36. Had I been represented by competent counsel, there would not have been a general time waiver. Had I been represented by competent counsel, the general time waiver would have been withdrawn by the end of August 2019. Had I been represented by competent counsel I would not have failed to appear in court on Dec 4, 2020. Had I been represented by competent counsel my charges should have been dismissed long time ago. My constitutional rights to competent counsel and a speedy trial had been substantially impaired.

37. I did not request any continuances due to my inability to appear for trial. I did not request any reassignment of counsel prior to I filed the *Marsden* Motion.

38. I could not do anything about the case because I was still under the impression that I either had public defender or no counsel at all. More importantly, I had no access to the records. I have no idea what really happened at each pretrial hearing and what's on the records. For example, whether the district attorney objected to each continuance. Until Jul 18, 2021, I did not learn the fact that the district attorney never made objection to each continuance and never stated on record that they were ready for trial.

39. On Jul 12, 2021 I called public defender Supervising Attorney Ray Jones and expressed my frustration. Instead of advising me to file Marsden request he simply told me to represent myself, which manifests that public defender did not have my best interest in mind.

40. On Jul 12, 2021 I asked Mr Jorge Dominguez to file a motion to dismiss and on Jul 13, 2021 I was informed by Mr Dominguez that he would not do so.

41. Since I was arraigned I was left in the dark throughout the entire process. At

70

1   each hearing I was told to wait outside the courtroom in the hallway. I had no idea what

2   happened in the courtroom. When I was called inside the courtroom I was simply told

3   when my next court day was.

4       42.   Over the last two years prior to trial, I never got a chance to discuss the defense

5   with my counsel at length. My constitutional rights seem like a joke to the State of

6   California.

7       Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

8   is true and correct.

9   Date: October 10, 2022                    */s/ XINGFEI LUO*
                                              XINGFEI LUO, In Pro Per

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

APPENDIX TO PETITION FOR WRIT OF HABEAS CORPUS