**F I L E D**
CLERK, U.S. DISTRICT COURT

01/19/2024

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ DVE _____ DEPUTY

1   XINGFEI LUO

2   PO BOX 4886,

3   El Monte, CA 91734

4

5   Petitioner in Pro Se

6

7

8               **UNITED STATES DISTRICT COURT**

9               **CENTRAL DISTRICT OF CALIFORNIA**

10

11   XINGFEI LUO,                          No. 8:22-CV-01640-MEMF-KES

12               Petitioner,

13      v.                                 **REPLY IN SUPPORT OF FIRST**
                                           **AMENDED PETITION FOR WRIT OF**
14   THE PEOPLE OF THE STATE OF            **HABEAS CORPUS**
     CALIFORNIA
15
                                           Action filed: September 6, 2022
16               Respondent.

17

18

19          Xingfei Luo (Petitioner) respectfully submits the following reply in support of her

20   First Amended Petition for writ of habeas corpus. ECF 33.

21      **I.      PETITIONER'S PREVIOUSLY UNEXHAUSTED CLAIMS RAISED**

22              **IN HER SECOND STATE HABEAS PETITION ARE NOT**

23              **PROCEDURALLY BARRED AS SUCCESSIVE CLAIMS**

24          Whenever a second or subsequent habeas petition is filed, the Supreme Court

25   engaged in the following **two-step analysis** to assess application of the procedural bar on

26   successive claims. First, the court would determine whether the petitioner who filed a

27   second or subsequent petition had "adequately justified his or her failure to present his or

28   her claims in an earlier petition." *In re Friend* (2021) 11 Cal.5th 720, 728, 280 Cal.Rptr.3d

1

313, 489 P.3d 309 (*Friend*).

Before considering the merits of a second or successive petition, a California court will first ask whether the failure to present the claims underlying the new petition in a prior petition has been adequately explained, and whether that explanation justifies the piecemeal presentation of the petitioner's claims. This requirement is reasonable in view of the interest of the state in carrying out its judgments, the interest of the respondent in having the ability to respond to the petition and to retry the case should the judgment be invalidated, and the burden on the judicial system. *In re Clark*, 5 Cal.4th 750, 775 (Cal. 1993) (*Clark*).

The Orange County Superior Court failed to follow the two-step analysis set forth by Supreme Court. First, under section 15 of her second state habeas petition, Petitioner does explain for the delay that she received ineffective assistance of counsel. ECF 51-1 at 6. And it's unquestionable that Petitioner received no assistance of counsel for her habeas petitions.

Second, assuming the Orange County Superior Court's acknowledgement is true that Petitioner (without assistance of counsel) does not explain why she is filing a second, similar petition for writ of habeas corpus one year after filing her previous petition, Petitioner was not given any meaningful opportunity to provide explanation despite all it took was to issue an order to show cause and ask Petitioner to explain. ECF 51-2 at 4-5. The rejection of Petitioner's second state habeas petition by the Orange County Superior Court is not grounded in a reasoned assessment that Petitioner's rationale fails to warrant the incremental submission of claims. This is because the superior court lacks knowledge of the specifics of Petitioner's explanations. Luo Decl., ¶¶ 2-6. Such rejection constitutes a violation of Petitioner's due process rights.

A petitioner will be expected to demonstrate due diligence in pursuing potential claims. If a petitioner had reason to suspect that a basis for habeas corpus relief was available, but did nothing to promptly confirm those suspicions, that failure must be justified. However, where the factual basis for a claim was unknown to the petitioner and

he had no reason to believe that the claim might be made, or where the petitioner was unable to present his claim, the court will continue to consider the merits of the claim if asserted **as promptly as reasonably possible**. *Clark*, supra, 5 Cal.4th 750, 775.

"[A]dequate justifications include the inability to bring the claim earlier," such as where the claim depends on newly available evidence, on certain changes in the law, or on **ineffective assistance of prior counsel**. *Friend*, supra, 11 Cal.5th at pp. 728, 731. If counsel failed to afford adequate representation in a prior habeas corpus application, that failure may be offered in explanation and justification of the need to file another petition. *Clark*, supra, 5 Cal.4th 780. Courts will look to what petitioner and/or his counsel knew at the time of the appeal or the filing of the first habeas corpus petition, and demand that the failure to raise all issues in a single, timely petition be justified. In limited circumstances, consideration may be given to a claim that prior habeas corpus counsel did not competently represent a petitioner. *Clark*, supra, 5 Cal.4th 750, 779.

Claims 7, 8, 25, 26, 28, and 29 were pre-screened as unexhausted. ECF 12 at 12. Those claims are grounded on newly discovered legal theories rather than newly discovered facts. Petitioner, without assistance of counsel, has demonstrated her due diligence and she has presented all claims reasonably known to her at the time of the filing of her first state habeas petition. There is no incentive for her to abuse writ practice by delaying the second state petition. Luo Decl., ¶¶ 2-5. The delay was simply because Petitioner, without any prior legal training, was unable to develop and present her claims all at once within her capacity. See *People v. Bermudez* (1989) 215 Cal.App.3d 1226, 1228–1230, 264 Cal.Rptr. 60 [assuming without deciding delay attributable to unrepresented defendant's ignorance of the law was "excusable"].

A prisoner who has knowledge of the facts upon which he believes that he is entitled to relief must explain any delay in seeking relief. *In re Shipp*, 62 Cal.2d 547, 553 [43 Cal.Rptr. 3, 399 P.2d 571]. He may rely on counsel who then represents him to include the claim in a petition to be filed by counsel if he has alerted counsel to the issue. If he is not represented by counsel, he need not "develop" the legal theory on which the

1   claim is based, but must fully and fairly state the facts which underlie the claim for relief.

2   *In re Swain* (1949) 34 Cal.2d 300, 304 [209 P.2d 793]. Here, Petitioner is not represented

3   by counsel, she fully and fairly stated the facts which underlie the claims for relief both in

4   her first and second state habeas petitions.

5       "In the rare instance in which the petitioner [was] able to adequately justify not

6   having raised the claim earlier, the successiveness bar [did] not apply." *Friend*, supra, 11

7   Cal.5th at p. 728. The successiveness bar does not apply here due to Petitioner's adequate

8   justification.

9       If there is no adequate justification for the petitioner's failure to raise the claim

10  earlier, the court proceeds to the second step of the analysis. *Friend*, supra, 11 Cal.5th at

11  p. 728. At that step, the court must generally apply the successiveness bar to preclude

12  consideration of the claim. But there is narrow exception for claims alleging "facts

13  demonstrating that a fundamental miscarriage of justice has occurred." *Clark*, supra, 5

14  Cal.4th at p. 775, 21 Cal.Rptr.2d 509, 855 P.2d 729. "In *Clark*, [the California Supreme

15  Court] identified four situations in which the fundamental miscarriage exception is

16  satisfied: (1) a highly prejudicial error of constitutional magnitude; (2) the petitioner's

17  actual innocence; (3) presentation in a capital trial of a grossly misleading and highly

18  prejudicial profile of the petitioner; or (4) conviction or sentencing under an invalid

19  statute." *Friend*, supra, 11 Cal.5th at p. 728. If the petitioner could not show that the claim

20  qualified for consideration under the fundamental miscarriage of justice exception, the

21  claim was barred as successive. *Ibid*.

22      As the Supreme Court explained, "the successiveness bar was 'designed to ensure

23  legitimate claims [were] pressed early in the legal process,' " and it operated to preclude

24  "consideration of claims that were **unjustifiably omitted from earlier petitions**" while

25  providing " 'a "safety valve" for those rare or unusual claims that could not reasonably

26  have been raised at an earlier time.' " *Friend*, supra, 11 Cal.5th at p. 728.

27      The Orange County Superior Court failed the second step of the analysis. ECF 51-2

28  at 4-5. The Superior Court did not consider whether Petitioner has made a showing that

would bring the claim within this four-part fundamental miscarriage exception. (1) highly prejudicial errors of constitutional magnitude: Introduction of perjured testimony, offered by the State with knowledge of their falsity (claim 7 and claim 8), Introduction of Inadmissible Evidence (claim 25), Permitting amendment to complaint one day before trial (claim 26), denial of motion to dismiss and *Marsden* motion (claim 28 and claim 29), and Improper Jury Instructions (claim 35). (2) the petitioner's actual innocence: Petitioner has presented clear and convincing evidence that the complaining witness is a compulsive liar. He cheats on his wife, his customers, his taxes, his income, and almost everyone crossed path with him. (3) presentation in a trial of a grossly misleading and highly prejudicial profile of the petitioner: due to defense counsel's failure to investigate, prosecution's withholding of exculpatory evidence, and introduction of perjury and inadmissible evidence, Petitioner was portrayed in a grossly misleading and highly prejudicial manner. (4) conviction or sentencing under an invalid statute: Petitioner has shown by clear and convincing evidence that her conviction and sentence were under invalid and unlawful restraining orders.

Federal courts retain the authority to issue the writ of habeas corpus in a further, narrow class of cases despite a petitioner's failure to show cause for a procedural default. These are extraordinary instances when a constitutional violation probably has caused the conviction of one innocent of the crime. This class of cases is described as implicating a fundamental miscarriage of justice. *McCleskey v. Zant* (1991) 499 U.S. 467, 494 [113 L.Ed.2d 517, 111 S.Ct. 1454]. In *Murray v. Carrier*, 477 U.S. 478, 495, 496 (1986), the Court ruled that the concept of "fundamental miscarriage of justice" applies to those cases in which the defendant was "**probably** . . . actually innocent."

Under the rule for federal practice announced in *McCleskey*, the petitioner will bear the burden, once the government pleads abuse of the writ, to disprove abuse by showing cause for the failure to raise his claims in an earlier petition and prejudice therefrom. Here, Respondent did not plead abuse of the writ, Petitioner need not disprove abuse by showing cause for the failure to raise her claims in an earlier petition and prejudice

1  therefrom.

2  In conclusion, Petitioner's lack of assistance of counsel adequately justified for her

3  failure to raise all claims previously. Even if Petitioner failed to provide adequate

4  justification for her failure to raise the claim earlier, Petitioner has made a showing that

5  she brought the claims within the four-part fundamental miscarriage exception. In

6  addition, a petitioner can demonstrate a fundamental miscarriage of justice by

7  "establishing] that under the probative evidence he has a colorable claim of factual

8  innocence." *Sawyer v. Whitley*, 505 U.S. 333, 339-40, 112 S.Ct. 2514, 120 L.Ed.2d 269

9  (1992) (quotation marks omitted).

10  This Court's refusal to hear Petitioner's claims even though the state court rejected

11  them on independent and adequate state grounds would result in a fundamental

12  miscarriage of justice. See, e.g., *Coleman v. Thompson*, 501 U.S. 722, 749-750 (1991);

13  *Cooper v. Neven*, 641 F.3d 322, 327 (9th Cir. 2011); *Luckett v. Matteson*, No. 18-cv-

14  07670-HSG (PR), 2020 WL 6868834, at *9, 11 (2020).

15  **II.  PETITIONER'S CLAIMS ARE NOT PROCEDURALLY BARRED**

16  **FROM FEDERAL HABEAS REVIEW**

17  In *Dixon*, the California Supreme Court held that, in order to bring a claim in a

18  state habeas corpus action, a petitioner must first, if possible, have pursued the claims **on**

19  **direct appeal** from his or her conviction unless the claim falls within certain exceptions.

20  See *Park v. California*, 202 F.3d 1146, 1151 (9th Cir. 2000). The exceptions are: (1)

21  fundamental constitutional error; (2) lack of jurisdiction over the petitioner; (3) the trial

22  court acting in excess of its jurisdiction; or (4) an intervening change in the law. See *Park*,

23  202 F.3d at 1152 (listing the exceptions to the *Dixon* rule as set forth by the California

24  Supreme Court in *In re Harris*, 5 Cal. 4th 813, 828 n.7 (1993)). Because Petitioner's

25  claims are fundamental constitutional errors and plain errors[1], *Dixon* does not bar her

26  claims.

27

28  [1] When a party fails to object to jury instructions before jury deliberations begin, a "plain error" standard of review must be applied. E.g., *United States v. Ward*, 914 F.2d 1340, 1344 (9th Cir.1990).

1    In all cases in which a state prisoner has defaulted his federal claims in state court

2    pursuant to an independent and adequate state procedural rule, federal habeas review of

3    the claims is barred unless the prisoner can demonstrate cause for the default and actual

4    prejudice as a result of the alleged violation of federal law, or demonstrate that failure to

5    consider the claims will result in a fundamental miscarriage of justice. *Coleman v.*

6    *Thompson*, 501 U.S. 722, 750 (1991).

7    Cause For The Default

8    Petitioner received ineffective assistance of counsel both at trial and on direct

9    appeal. As *Coleman* recognized, an attorney's errors during an appeal on direct review

10   may provide cause to excuse a procedural default; for if the attorney appointed by the

11   State to pursue the direct appeal is ineffective, the prisoner has been denied fair process

12   and the opportunity to comply with the State's procedures and obtain an adjudication on

13   the merits of his claims. See 501 U.S., at 754, 111 S.Ct. 2546; *Evitts v. Lucey*, 469 U.S.

14   387, 396, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985); *Douglas v. California*, 372 U.S. 353,

15   357-358, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963).

16   Actual Prejudice

17   The right to the effective assistance of counsel at trial is a bedrock principle in our

18   justice system. It is deemed as an "obvious truth" the idea that "any person haled into

19   court, who is too poor to hire a lawyer, cannot be assured a fair trial unless counsel is

20   provided for him." *Gideon v. Wainwright*, 372 U.S. 335, 344, 83 S.Ct. 792, 9 L.Ed.2d 799

21   (1963). Indeed, the right to counsel is the foundation for our adversary system. Defense

22   counsel tests the prosecution's case to ensure that the proceedings serve the function of

23   adjudicating guilt or innocence, while protecting the rights of the person charged. See,

24   e.g., *Powell v. Alabama*, 287 U.S. 45, 68–69, 53 S.Ct. 55, 77 L.Ed. 158 (1932) ("[The

25   defendant] requires the guiding hand of counsel at every step in the proceedings against

26   him. Without it, though he be not guilty, he faces the danger of conviction because he

27   does not know how to establish his innocence"). Effective trial counsel preserves claims

28   to be considered on appeal, see, e.g.,  Fed. Rule Crim. Proc. 52(b), and in federal habeas

proceedings, *Edwards v. Carpenter*, 529 U.S. 446, 120 S.Ct. 1587, 146 L.Ed.2d 518 (2000).

When a petitioner is entirely deprived of an appellate procedure due to ineffective assistance of counsel, prejudice is presumed. See *Dearinger ex ret. Volkova v. Reno*, 232 F.3d 1042, 1045 (9th Cir. 2000). Here, Petitioner's appellate counsel failed to raise any issue on appeal and provided no substantive legal assistance whatsoever. Petitioner is entitled to a presumption of prejudice. See *Ray v. Gonzales*, 439 F.3d 582, 589 (9th Cir. 2006) (Ray was entitled to a presumption of prejudice because his second attorney failed to file a timely motion to reconsider or reopen and his third attorney provided no substantive legal assistance whatsoever.)

The deficiencies in legal representation are not merely theoretical; they have tangible consequences that substantially affected the outcome of the case leading to an unjust conviction. If the contemporaneous objection rule bars Petitioner's claims despite of the deficiencies in legal representation, the State can secure every conviction simply by appointing incompetent counsel.

In conclusion, Petitioner was prevented from preserving her claims in both state and federal habeas proceedings due to errors of her trial and appellate counsel, the errors prejudice Petitioner and deprive her of the habeas proceedings entirely.

Federal Review Is Necessary To Prevent A Fundamental Miscarriage of Justice

Regardless of how overwhelming the evidence of guilt may be, the denial of a fundamental right . . . is a miscarriage of justice. . . ." *People v. Modesto* (1963) 59 Cal.2d 722, 730 [31 Cal.Rptr. 225, 382 P.2d 33]; see also *People v. Sedeno* (1974) 10 Cal.3d 703, 720 [112 Cal.Rptr. 1, 518 P.2d 913].

A conviction based on insufficient evidence violates a defendant's due process rights. *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). See also *People v. Blanco*, 10 Cal.App.4th 1167, 1173, 13 Cal.Rptr.2d 176 (Cal.Ct.App. 1992) (considering due process claim despite lack of proper objection at trial). Evidence is insufficient if, viewed in the light most favorable to the prosecution, no reasonable trier of

1   fact could have found the defendant guilty beyond a reasonable doubt. *Jackson v.*
2   *Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

3   "A habeas petitioner challenging his state criminal conviction under 28 U.S.C. §
4   2254 based on sufficiency of the evidence 'is entitled to habeas corpus relief if it is found
5   that upon the record evidence adduced at the trial no rational trier of fact could have found
6   proof of guilt beyond a reasonable doubt.' " *Turner v. Calderon*, 281 F.3d 851, 881 (9th
7   Cir.2002). The Fourteenth Amendment requires that the evidence has been sufficient to
8   persuade the factfinder beyond a reasonable doubt. See *In re Winship*, 397 U.S. 358, 90
9   S.Ct. 1068, 25 L.Ed.2d 368 (1970). *Jackson* holds that the writ of habeas corpus is
10  available to assure state compliance with this fundamental constitutional requirement. 443
11  U.S. at 319-20, 99 S.Ct. at 2789-90.

12  Petitioner has made colorable showing of factual innocence as to the guilt stage of
13  her trial. The alleged constitutional errors not only precluded the development of true facts
14  but also resulted in the admission of false ones which affect the reliability of the guilt
15  determination. See *Murray v. Carrier*, 477 U.S. 478, 496 (1986) ("[W]here a
16  constitutional violation has probably resulted in the conviction of one who is actually
17  innocent, a federal habeas court may grant the writ even in the absence of a showing of
18  cause for the procedural default").

19  **CLAIM 1 - Prosecution of Dissemination of A Nudist's Nude Photos**

20  Under the Antiterrorism and Effective Death Penalty Act (AEDPA), § 2254 habeas
21  petitions "shall not be granted with respect to any claim that was adjudicated on the merits
22  in State court proceedings unless the adjudication of the claim — (1) resulted in a decision
23  that was contrary to, or involved an unreasonable application of, clearly established
24  Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a
25  decision that was based on an unreasonable determination of the facts in light of the
26  evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); see also *Lockyer*
27  *v. Andrade*, 538 U.S. 63, 70-73, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003).

28  Unreasonable Application of Clearly Established Federal Law

1   Respondent contends that California Penal Code, section 647 (j)(4)(A) is not

2   unconstitutional in general under the First Amendment. However, Petitioner did not allege

3   the statute itself violated her First Amendment rights.

4   A "legitimate" expectation of privacy by definition means more than a subjective

5   expectation of not being discovered. *United States v. Jacobsen*, 466 U.S. 109, 123 n.22

6   (1984). See also *Robbins v. California*, 453 U.S. 420, 428 (1981) (plurality opinion)

7   ("Expectations of privacy are established by general social norms.")

8   Under exacting scrutiny, the Government may regulate protected speech only if

9   such regulation promotes a compelling interest and is the least restrictive means to further

10  the articulated interest. See *Sable Communications of Cal., Inc. v. FCC*, 492 U.S. 115,

11  126, 109 S. Ct. 2829, 106 L. Ed. 2d 93 (1989).

12  Respondent did not and cannot articulate any compelling interest in enforcing

13  California Penal Code, section 647 (j)(4)(A) in the context of the dissemination of a

14  nudist's nude photos (taken on the naturalist beach in public), sent by the nudist to a

15  stranger during a period of his infidelity without any legitimate expectation of privacy.

16  In conclusion, Petitioner's conviction involved an unreasonable application of

17  clearly established federal law.

18  <u>Unreasonable Determination of The Facts In Light of The Evidence Presented</u>

19  When a petitioner challenges a state court's factual findings based on evidence in

20  the state record, habeas relief is warranted only if "any appellate court to whom the defect

21  is pointed out would be unreasonable in holding that the state court's fact-finding process

22  was adequate." *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004). Although this is a

23  "daunting standard," id., it can be met when the state courts "plainly misapprehend or

24  misstate the record in making their findings, and the misapprehension goes to a material

25  factual issue that is central to the petitioner's claim," id. at 1001, or where "the state court

26  has before it, yet **apparently ignores, evidence that supports petitioner's claim**," id.

27  (citing *Miller-El v. Cockrell*, 537 U.S. 322, 346 (2003)). In addition "[t]o fatally

28  undermine the state fact-finding process, and [to] render the resulting finding

unreasonable, the overlooked or ignored evidence must be highly probative and central to petitioner's claim." *Id*.

Respondent made no attempt to argue the determination of the facts was reasonable by citing evidence. Instead, Respondent simply repeated the superior court's opinion that the jury rejected Petitioner's argument. (RT 282-283.)

The nature of the interaction between Czodor and Petitioner was notably limited. Petitioner and Czodor met only once when Czodor sent his nude photos to Petitioner. RT 144. There was no indication of a continuing or meaningful connection between them. Petitioner never told Czodor her real name. RT 130. Even after they met the second time, Czodor didn't even know if a dating relationship started. RT 134. Given the absence of personal identification and the minimal contact between the parties, it is unreasonable to assert that Czodor held a legitimate expectation of privacy in the nude photos he sent to Petitioner. The act of voluntarily sharing sensitive content with a total stranger, such as nude photos, implies a degree of assumed risk and a waiver of privacy. Czodor's decision to share such intimate material without establishing a more substantial connection weakens the argument for a reasonable expectation of privacy. The lack of physical evidence, such as text messages indicating his expectation of privacy, his request to keep his photos private, and Petitioner's agreement to keep his photos private, further supports the unreasonable determination of Czodor's expectation of privacy and the parties' agreement to keep the photos private. CT p. 147. See *Jeffries v. Wood*, 114 F.3d 1484, 1500 (9th Cir. 1997) ( en banc) (holding that a state court's factual decision is unreasonable if the decision is "clearly incorrect.") Simply put, Czodor's expectation of privacy in his nude photos sent to Petitioner and the parties' agreement to keep the images private are not supported by the record.

In addition, Respondent purposefully omits the facts that the jury did not hear: Czodor was married at the time he made contact with Petitioner, Czodor was raised as a nudist, Czodor has prior criminal conviction rested upon dishonesty, Czodor's wife is ten years senior than him, Czodor was arrested for impersonation, and Czodor was subject to

deportation. Had the jury heard those facts, no reasonable jury would find Czodor is a decent person who had a legitimate expectation of privacy in his nude photos.

One of the core principles of nudism is body positivity, which involves accepting and appreciating one's body as it is. Nudists aim to promote a healthier body image by normalizing nudity and reducing the stigma surrounding the naked human form. By willingly shedding their clothing, nudists challenge societal norms and advocate for body acceptance.

According to the legal doctrine of reasonable expectation of privacy, a person's privacy rights are only violated if they have a subjective expectation of privacy that society recognizes as reasonable. In other words, a person's privacy rights depend on the context and circumstances of the situation. In the context of nudism, the conventional notion of privacy in naked photos can be seen as contradictory, as it suggests a need to hide or conceal the very thing nudists celebrate.

Nudists believe that going nude allows them to express themselves authentically and break free from societal expectations and constraints. Naked skin is nudists' clothing. By being naked, they feel liberated and empowered to embrace their true selves. In this context, the expectation of privacy in naked photos contradicts the very purpose of nudism, which is to share and celebrate their bodies without shame or inhibition.

Nudists believe that by exposing their bodies, they create an atmosphere of trust and vulnerability, facilitating meaningful connections with others. Consequently, the sharing of naked photos within this context can be viewed as an extension of this communal bond, where privacy expectations may be different from mainstream social norms.

While nudism is a lifestyle centered around body positivity and self-expression, it is highly possible for individuals within nudist communities to exploit the societal discomfort around nudity by falsely claiming an expectation of privacy in their naked photos.

Nudism is founded upon the principles of openness, acceptance, and a willingness

to share one's naked body. By claiming an expectation of privacy in naked photos, nudists contradict their own philosophy of embracing nudity as a form of self-expression and body acceptance.

It is essential to maintain a critical perspective and consider the broader implications when evaluating the authenticity of privacy claims made by nudists or anyone else in similar contexts. While nudism promotes body positivity, self-expression, and a sense of freedom from societal norms, it is important to recognize that there can be instances where individuals may attempt to manipulate the legal system to their advantage.

Married individuals have an existing commitment to their spouse, which involves maintaining trust and fidelity in their relationship. Infidelity inherently involves a breach of trust and a violation of the commitment made within a marriage. In the context of infidelity, the absence of an established intimate relationship with the person to whom the naked photos are sent further diminishes the expectation of privacy. The lack of emotional and physical intimacy suggests that the sender did not expect the same level of responsibility in maintaining privacy as one would expect within a committed relationship.

By engaging in extramarital activities, including sending unsolicited naked photos to someone other than his spouse, a married nudist demonstrates a lack of regard for the expectations of privacy within the confines of his marriage. By sending unsolicited naked photos to someone other than his spouse, a married nudist is voluntarily disclosing his images to a third party in the absence of established intimacy. This act itself suggests no expectation of privacy, as he has chosen to share these images with someone outside the boundaries of his marriage. The breach of trust in marriage, the absence of established intimacy with a third party, and the voluntary disclosure, contribute to the significantly diminished expectation of privacy when it comes to unsolicited naked photos shared during infidelity.

**CLAIM 2 - Lack of Dating Relationship**

An absence of jurisdiction in the convicting courts is a basis for federal habeas corpus relief cognizable under the due process clause. See, e.g., *Lowery v. Estelle*, 696 F.2d 333, 337 (5th Cir. 1983) (state court jurisdiction); cf. *Schlomann v. Moseley*, 457 F.2d 1223, 1227 (10th Cir. 1972) (military court martial), cert. denied, 413 U.S. 919, 93 S.Ct. 3068, 37 L.Ed.2d 1041 (1973).

As explained in Section I and II, Claim 2 is not procedurally barred.

Petitioner did not assert exclusivity or an intention to pursue a serious courtship as criteria for qualifying as a dating relationship. Instead, Czodor's concealment of his marriage serves as evidence that he either lacked or did not intend to establish frequent and intimate associations with Petitioner. The encounter between Czodor and Petitioner was a married man's casual hook-up instead of dating relationship.

In arguing Czodor and Petitioner had a dating relationship, Respondent purposefully ignored Czodor's own admission: Who are you to me? …. Jesus Christ. I met you one or two times. CT p. 101. Actually I don't even know if a dating relationship started. RT 134.

During their entire encounter, Petitioner never told Czodor her real name or full name. RT 130 and ECF 6 at 155. Two individuals met in person only twice, a limited and casual interaction that does not align with the frequency typically associated with dating relationships. The communication between the parties was limited to a three-week texting exchange. While communication is a factor in relationships, the brevity and nature of the interaction do not establish the kind of intimate association contemplated by the statutory definition. Interpreting such limited interactions as constituting a dating relationship has the potential to overextend the application of domestic violence statutes. This risk is particularly acute when individuals casually meet, especially if one party conceals important information such as marital status. These facts make clear that the nature of the association between Czodor and Petitioner was neither frequent nor intimate as a dating relationship under DVPA.

Respondent also argues that the trier of fact may draw its own inferences and

conclusions from the evidence and has the "power to factually find a 'dating relationship' within the meaning of the DVPA even though the parties characterize their relationship as a friendship that does not involve 'dating' as that term is commonly understood."

"Dating" commonly refers to a social activity where two individuals spend time together, typically in a romantic or potentially romantic context, with the aim of getting to know each other better. It often involves activities such as going out to dinner, seeing a movie, attending events, or engaging in other shared experiences. Dating is a phase in which individuals explore mutual interests, values, and compatibility to determine if they want to pursue a more serious and exclusive romantic relationship. The nature and expectations of dating can vary widely based on cultural, personal, and societal factors.

While common dating involves various levels of intimacy, the statutory definition specifically emphasizes the frequency and intimacy of associations as key components of a dating relationship. The legal standard requires a certain level of intensity beyond what may be present in casual or occasional dating. The statutory definition explicitly highlights the expectation of affection or sexual involvement as essential criteria for a dating relationship. This goes beyond the common understanding of dating, adding a specific legal requirement that may not be present in all romantic or social interactions.

At trial, the jury was never given the statutory definition of dating relationship. See Claim 12. The jury was never asked to determine whether Czodor and Petitioner had a dating relationship within the meaning defined by DVPA. The determination of a dating relationship between Czodor and Petitioner is unreasonable and not supported by the record.

Relief may be permitted by challenging the substance of the state court's factual findings and showing that those findings were not supported by substantial evidence on the record. *Hibbler v. Bendetti*, 693 F.3d 1140, 1146 (9th Cir. 2012). A petitioner can also attempt to show that the state court's fact-finding process itself was materially deficient. *Id*. Irrespective of the type of challenge, a petitioner must establish that the state court's decision was not merely incorrect, but objectively unreasonable. Id.; *Stanley v. Cullen*,

633 F.3d 852, 859 (9th Cir. 2011).

A state court's factual findings are unreasonable if a federal appellate panel, applying the normal standards of review, could not reasonably conclude that the finding is supported by the record. Id.; *Pizzuto v. Yordy*, 947 F.3d 510, 523 (9th Cir. 2019).

If reasonable minds reviewing the record could disagree, the state court factual determinations are not unreasonable. See, e.g., *Brumfield v. Cain*, 576 U.S. 305, 314 (2015); *Pizzuto v. Yordy*, 947 F.3d 510, 523 (9th Cir. 2019).

No reasonable mind would consider a married man concealing his marriage to have had a dating relationship with a woman he met only twice when she never disclosed her name, applying the general principles of dating relationships and the reasonable expectations in such circumstances.

### CLAIM 3 - Blanket Prohibition of speech on all contents

Petitioner never authorized her trial counsel to stipulate with prosecution as to the lawfulness of the restraining orders. Prior to signing off the stipulation, public defender never discussed with Petitioner about the stipulation which indicates a serious breakdown in communications. Public defender's action deprived Petitioner of her right to participate in the making of decisions on her own behalf. The stipulation with prosecution demonstrates that Petitioner's trial counsel was grossly incompetent.

An injunction, if upon its face it abridges rights guaranteed by the First Amendment, should be struck down. *United Transportation Union v. Michigan Bar*, 401 U.S. 576, 581 (1971). "So the -- by the rules of the restraining order, if she posted a post that said, like, hey, Tomas Czodor, he's a nice guy, that's a violation of the restraining order." ECF 4 at 194-195. The prosecution already identified the unconstitutionality of the restraining order.

Respondent made no attempt to demonstrate any compelling interest or the restraining order are the least restrictive means to further the articulated interest.

The Orange County Superior Court identified certain legal principles and authority. However, it failed to apply any factual analysis to these laws. Namely, the superior court

1   made no analysis at all.

2       The TRO issued on Sep 28, 2018 orders Petitioner to remove content from pages

3   on internet what she or her accomplices created to destroy Czodor's online reputation and

4   to stop posting about Czodor online. A defamation injunction, if allowed at all, can only

5   forbid republication of the precise statements proven defamatory at trial. Respondent did

6   not and cannot articulate what content was proven defamatory. Nor did Respondent

7   explain how requiring Petitioner to stop posting about Czodor online is constitutional.

8       Item 23 of the DVRO issued on Oct 19, 2018 provides that Petitioner is ordered to

9   cease posting the picture or likeness of Czodor or refer to him by name on **any** social

10  media website or blog. Petitioner is further ordered to remove **any** pictures or references

11  of Czodor from **any** social media website or blog she may have posted. Respondent did

12  not and cannot articulate how these broad terms are constitutional.

13      Just as the prosecution admitted, "So the -- by the rules of the restraining order, if

14  she posted a post that said, like, hey, Tomas Czodor, he's a nice guy, that's a violation of

15  the restraining order." RT pp. 293-294. The prosecution has articulated why the

16  restraining orders are unconstitutional.

17      Both restraining orders should have been struck down under clearly established

18  federal law.

19          **CLAIM 4 - Withholding of Sep 10, 2018 Police Field Activity Report**

20      In a case lacking physical and forensic evidence and the complaining witness is the

21  only testifying witness, any evidence related to the credibility of the witness is material.

22  See, e.g., *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972)

23  (finding violation because "the Government's case depended almost entirely" on the

24  cooperating witness's testimony, making impeachment crucial); *Carriger v. Stewart*, 132

25  F.3d 463, 480 (9th Cir. 1997) (finding violation because lack of corroborating evidence at

26  trial made impeachment evidence material). Evidence that would show bias, motive to lie

27  or exaggerate, or dishonesty of the witness is within the scope of *Brady*.

28      On September 10, 2018 at 14:34 Czodor reported and Santa Ana Police recorded

1   "THREATNING TO COME TO HIS RESD AT 2521 N JACARANDA AND 242 HIM."

2   ECF 6 at 200. [2]

3        A summary report indicates that Czodor called the police on September 10, 2018

4   for only one time. ECF 6 at 202.

5        The Appellate Division of the Orange County Superior Court's conclusion that

6   nothing in the document supports Czodor was the source of the reference to "a terrorism

7   report" in that document is plainly incorrect.

8        Czodor testified that after discovering his nude photos online, he informed the

9   petitioner that he would involve the police. He visited the police station on September 7,

10   2018, but it was closed. According to his testimony, he contacted the police the following

11   week about the incident. RT 150-151.

12        However, the police field activity report on September 10, 2018, indicates a call

13   from Czodor reporting unfounded terrorism, rather than the alleged incident of the

14   distribution of nude photos. ECF 6 at 200.

15        The inconsistency between Czodor's testimony and the content of the September

16   10, 2018, police field activity report raises questions about the accuracy of the information

17   provided. If Petitioner had indeed posted Czodor's nude photos online, one would expect

18   the police report to document this incident rather than referencing unfounded terrorism.

19        The email correspondence on September 24, 2018, with Guaranteed Removals

20   introduces the possibility that Czodor may have contemplated fabricating revenge porn

21   allegations to get even. This is particularly relevant given that he expressed seeking

22   criminal charges after learning that removing online content related to his extramarital

23   encounter would incur costs and potentially expose him to his spouse.

24        The withholding of the September 10, 2018, police field activity report has the

25   potential to significantly alter the narrative surrounding the alleged distribution of

26   Czodor's nude photos given the fact that all paper documentary evidence presented at trial

27   lack forensic examination. The inconsistency with Czodor's testimony and the timing of

28
---
[2] 2521 N JACARANDA ST is Czodor's residence. ECF 6 at 177.

subsequent actions raises questions about the credibility and motivations involved in this case. Had the report been disclosed, trial counsel might have pursued different lines of inquiry, seeking additional evidence or exploring avenues to challenge Czodor's credibility, therefore it would have changed the outcome of the trial.

The Appellate Division of the Orange County Superior Court's conclusion that the disclosure of the September 10, 2018 report could not reasonably have resulted in a different outcome at trial is contravened established federal law.

**CLAIM 5 - Withholding of Sep 10, 2018 Police Field Activity Report**

The Sep 18, 2018 Police Field Activity report would have changed the outcome of the trial. Had the report been disclosed, trial counsel might have pursued different lines of inquiry, seeking additional evidence or exploring avenues to challenge Czodor's credibility.

During the trial, a video taken by Czodor's cell phone on September 18, 2018, at 19:54 (ECF 6 at 157) was presented to the jury, alleging that Petitioner scratched his door. While the video was taken, Czodor was outside of his house. RT 158. Czodor made a call to the police at 20:09 on the same night, reporting that Petitioner was knocking on his door. ECF 6 at 201. Czodor alleged that Petitioner scratched his door for 20 minutes and did not stop after he told her to. ECF 6 at 155 and 170; RT 213. If Czodor was able to tell Petitioner to stop scratching his door, it is implausible that he could not tell the police on the phone about the scratching or be unaware of the damage on the same night.

However, during this call and the subsequent police response, Czodor did not mention that Petitioner had allegedly scratched his door. ECF 6 at 201.

If the scratching had occurred and recorded by the video, there was a 15-minute window between the video and the phone call in which Czodor could have informed the police, yet he did not do so. If the scratching had occurred and Petitioner did not stop after being told by Czodor, Czodor could have informed the police about the scratching before the police left, yet he did not do so. Where was Czodor in the 15-minute window?

The area in front of Czodor's front door was brightly lit, and he had access to his

cell phone throughout the night when Petitioner scratched his door for 20 minutes. If the scratching had occurred as alleged, he would have had ample opportunity to discover and record the damage. However, the video provided as evidence lasts less than one minute, showing only the sound of knocking instead of scratching.

The September 18, 2018 police field activity report is crucial in verifying the accuracy of Czodor's allegations. It would document the events surrounding Czodor's allegations, shedding light on the sequence of events and the veracity of the vandalism claim.

The appellate division emphasized the scratches found on Czodor's door the day after Petitioner repeatedly knocked on it but ignored overwhelming evidence showing that if the scratching had occurred, it is inconceivable that Czodor didn't see or know it while it was happening or Czodor would not have discovered before he called the police or Czodor was not initially aware that Petitioner had damaged his door on the night of the incident. RT 168.

The email correspondence on September 24, 2018, with Guaranteed Removals introduces the possibility that Czodor may have scratched his own door and contemplated fabricating vandalism allegations to get even. This is particularly relevant given that he expressed seeking criminal charges after learning that removing online content related to his extramarital encounter would incur costs and potentially expose him to his spouse. This is consistent with the fact that the photo of the damaged door was taken on September 25, 2018. ECF 6 at 172. If the scratching had occurred on September 18, 2018, and Czodor discovered the damages on September 19, 2018, what was the reason he waited until September 25, 2018, right after he discovered the costs to remove online content related to his extramarital encounter, to take the photo of the damaged door?

The September 18, 2018 police filed activity report exposed the inconsistencies in the timing of events and Czodor's theory.

### CLAIM 6 - Withholding Czodor's Prior Conviction

The withholding of Czodor's prior conviction significantly affected the defense

counsel's ability to formulate an effective discovery strategy and assess the credibility of the prosecution's sole witness.

The appellate division minimized the importance of Czodor's criminal conviction by noting that it occurred more than ten years ago. However, this timeline may have influenced the prosecution's decision-making process, possibly contributing to their reluctance to bring the case to trial and their repeated attempts to continue the trial beyond the ten-year mark. Furthermore, Czodor's credibility, being the prosecution's sole witness in a case lacking physical and independent evidence, is of paramount importance. His prior conviction, which was based on dishonesty, is particularly relevant to the assessment of his credibility.

Had Czodor's prior conviction been disclosed, trial counsel might have pursued different lines of inquiry, seeking additional evidence or exploring avenues to challenge Czodor's credibility, therefore it would have changed the outcome of the trial.

The appellate division's downplaying of the significance of Czodor's prior conviction and the subsequent withholding of this information has far-reaching implications on the trial proceedings and defense counsel's discovery strategy. It not only raises questions about the prosecution's motives and trial strategy but also underscores the importance of Czodor's credibility in the absence of physical and independent evidence.

### CLAIM 7 - Perjured Testimony/False evidence – report to police the following week after Sep 7, 2018

As explained in Section I and II, this claim is not procedurally barred.

First, Czodor's testimony was actually false. Czodor testified that after discovering his nude photos online, he informed Petitioner that he would involve the police. He visited the police station on September 7, 2018, but it was closed. According to his testimony, he contacted the police the following week about the incident. RT 150-151. However, the police field activity report on September 10, 2018, indicates a call from Czodor reporting unfounded terrorism, rather than the alleged incident of the distribution of nude photos. ECF 6 at 200.

Second, the prosecution knew or should have known that Czodor's testimony was actually false. The police field activity report September 10, 2018 has been in possession of the State.

And third, Czodor's testimony was material. If Petitioner had posted Czodor's nude photos online between September 5 and September 7 (RT 140-151), Czodor's contact with police on September 10, 2018 made no mention of any nude photos which strongly indicates that Czodor was not telling the truth and the revenge porn allegation may have been fabricated.

**CLAIM 8  - Perjured Testimony/False evidence – It was dark on Sep 18, 2018**

As explained in Section I and II, this claim is not procedurally barred.

First, Czodor testified that he did not see the damage Petitioner had caused to his door on the night of September 18th until the next day. RT 168. The only possible reason was dark, same as he testified in the family court "It was dark there. I couldn't see it." ECF 6 at 171. The inference from Czodor's testimony "In the dark of the night" was actually false. The photo, ECF 6 at 159, shows light showering Petitioner from head to toe in front of Czodor's front door.

Second, the prosecution knew or should have known that Czodor's testimony was actually false. The photo, ECF 6 at 159, showing Czodor's front door area brightly lit, was in possession of the prosecution and presented at trial. RT 169-170.

And third, whether it was dark was material. It is inconceivable that Czodor could capture a well-lit photograph of his front door and Petitioner and yet remain unaware of the damage to the door on the same night.

**CLAIM 9 – UNLAWFUL INTRODUCTION AND MISREPRESENTATION OF PETITIONER'S PRIOR INVOLUNTARY TESTIMONY**

As explained in Section I and II, this claim is not procedurally barred.

Petitioner did not assert she had a federal right to counsel at a civil proceeding. Instead, Petitioner contends that absent protection from self-incrimination, if she was

nevertheless compelled to answer, her answers are inadmissible against her in a later

criminal prosecution. ECF 33 at 50.

Respondent contends that the October 19, 2018 family court proceeding was not

part of a police investigation into a particular crime, and occurred before any prosecution

was initiated. However, Respondent failed to demonstrate that Petitioner's testimony

during the October 19, 2018 family court proceeding was voluntary. Respondent also

failed to respond to Petitioner's argument that absent privilege protection, if she was

nevertheless compelled to answer, her answers are inadmissible against her in a later

criminal prosecution. *Bram v. United States*, 168 U.S. 532, 542—543, 18 S.Ct. 183,

186—187, 42 L.Ed. 568 (1897); *Boyd v. United States*, 116 U.S. 616, 634, 637—638, 6

S.Ct. 524, 534, 536—537, 29 L.Ed. 746 (1886).

Respondent asserts that Petitioner does not contend that she attempted to invoke

her constitutional privilege against self-incrimination and was prevented from doing so in

the civil proceedings. Petitioner, representing herself, faced limitations in informatively

invoking her constitutional privilege against self-incrimination due to the lack of legal

representation. A person cannot attempt to exercise a right if they are unaware of their

ability to do so. The absence of personal counsel forced Petitioner to directly answer

questions in family court and prevented her from asserting her available constitutional

privilege because she was not informed to do so.

Intention to waive the privilege against self-incrimination is not "lightly to be

inferred" and that vague and uncertain evidence will not support a finding of waiver.

*Smith v. United States*, 337 U.S. 137, 150, relying on *Johnson v. Zerbst*, 304 U.S. 458,

464, and cases there cited. In the case of this petitioner, there is no evidence that she

intended to give up her privilege of silence in family court. Later in the criminal

prosecution while being represented by public defender Petitioner informatively asserted

the privilege against self-incrimination.

Respondent contends that Petitioner's guilt of the charged offenses was

independently established through direct testimony, documentary evidence of Petitioner's

incriminating texts and online activity, as well as recorded adoptive admissions made voluntarily by her to Czodor. Petitioner will address each of them in turn.

Direct testimony: Petitioner has provided overwhelming evidence showing that Czodor is a compulsive liar and Czodor's direct testimony is false and inconsistent. Overwhelming evidence shows Czodor has a strong motive to lie, exaggerate, and manufacture evidence. Despite of his enduring marriage, Czodor consistently presented himself during the trial as a single, innocent individual seeking a dating relationship. RT 199. Czodor's one man show at trial demonstrates he is a skilled manipulator.

Documentary evidence: All documentary evidence presented at trial was in paper form without metadata or forensic examination. They were provided by Czodor instead of being collected by police through forensic technology. They were unreliable given the fact that Czodor is not credible. The omission of metadata or forensic evidence was particularly significant given there was only one testifying witness at trial.

Recorded adoptive admissions: The video allegedly with adoptive admissions is incomplete and manipulated. In the recorded video Czodor asked "Did you send my naked pictures to my customers on Yelp. Huh?" ECF 3 at 115. At trial, Czodor testified that Lilly was the person who reviewed his company and received the naked video. RT 160. However, none of Czodor's customers on Yelp had a name "Lilly." Lilly was never called to testify whether she received any videos. In the recorded video Czodor asked "Did you send, **Chris, come over here**. Unbelievable this one. Did you send Chris my Yelp site? Send him naked videos of me, huh?" ECF 3 at 115. Chris was never interviewed by public defender. ECF 33 at 108. Chris was never called to testify regarding the naked videos and the completeness of the conversation took place on September 18, 2018.

It is a settled principle of the administration of criminal justice that a conviction must rest upon firmer ground than the uncorroborated admission or confession of the accused. Criminal confessions and admissions of guilt require extrinsic corroboration. *Wong Sun v. United States*, 371 U.S. 471, 488-89 (1963). Petitioner's adoptive admissions do not furnish competent or credible corroborative evidence, such as forensic evidence.

24

1    Petitioner's trial counsel never bothered to interview several key witnesses, he

2  could not possibly have made professionally responsible decisions regarding which

3  witnesses to call and which evidence to introduce.

4    Overwhelming evidence shows that the videos are just Czodor's another

5  manipulation. Same as Petitioner's act of knocking on his door was fabricated as

6  scratching his door. Petitioner's convictions are completely unreliable.

7    **CLAIM 10 – IAC – FAILURE TO INVESTIGATE AND CROSS-**

8    **EXAMINE**

9    "[C]ounsel has a duty to make reasonable investigations or to make a reasonable

10  decision that makes particular investigations unnecessary." *Strickland v. Washington*, 466

11  U.S. 668, 691 (1984). "A lawyer who fails adequately to investigate, and to introduce into

12  evidence, [information] that demonstrates his client's factual innocence, or that raises

13  sufficient doubts as to that question to undermine confidence in the verdict, renders

14  deficient performance." *Reynoso v. Giurbino*, 462 F.3d 1099, 1112 (9th Cir. 2006)

15  (quoting *Lord v. Wood*, 184 F.3d 1083, 1093 (9th Cir. 1999) (brackets in Lord)). In that

16  same vein, we have held that "[f]ailure to investigate possible exculpatory witnesses can

17  be ineffective assistance." *United States v. Mendoza*, 107 F.3d 878, 1997 WL 97279, at *1

18  (9th Cir. Mar. 4, 1997) (citing *Sanders v. Ratelle*, 21 F.3d 1446, 1456-58, 1461 (9th Cir.

19  1994)); see also *United States v. Tucker*, 716 F.2d 576, 583 (9th Cir. 1983) (failure to

20  even attempt to interview key prosecution witnesses constitutes deficient performance).

21    In *People v. Pope*, 23 Cal.3d 412 (Cal. 1979), the court suggests that if counsel was

22  asked for an explanation and failed to provide one, this could prove he or she had no

23  tactical reason for the action taken. Despite Petitioner repeatedly asked public defender

24  with respect to the approach they took (or didn't take) in the handling of Petitioner's case

25  #19CM06724, no explanation was ever given. ECF 6 at 206-209. Trial counsel had been

26  given the chance to explain, they failed to point to any information justifying the strategic

27  decision. The state court's decision is unreasonable that Petitioner has not shown the

28  record contains affirmative evidence that counsel had no "rational tactical purpose" for an

1   action or omission.

2       In denying Petitioner's first state habeas petition, the superior court identified

3   certain legal principles and authority. However, it failed to apply any factual analysis to

4   these laws. ECF 6 at 19-20. Namely, it failed to conduct any evaluation.

5       First prong: What is the objective standard of reasonableness under prevailing

6   professional norms?

7       In 2023 the prosecution, based on the exact same old evidence, prosecuted

8   Petitioner once again alleging Petitioner failed to remove Czodor's nude photos posted in

9   2018, Case No.: **23CM00067**. ECF 45. The actions of defense counsel at trial in 2023 sets

10  forth the objective standard of reasonableness.

11      Trial counsel's failure to at least interview Naomi, Lilly and Chris was inexcusable,

12  as those witnesses might have discovered some of them are fictitious individuals and

13  exposed Czodor's lies. These "multiple deficiencies have the cumulative effect of denying

14  a fair trial" to Petitioner. *Ewing v. Williams*, 596 F.2d 391, 396 (9th Cir. 1979).

15      Second prong: Is there a reasonable probability the result of the proceeding would

16  have been different?

17      Definitely yes.

18      Czodor's testimony reads as follow:

19      ECF 4 at 101:

20      Q And from the first time you started talking to

21       her to your second date, how long was that time period?

22       A First date to second date I would say one and

23       a half week, two weeks. One and a half week. Yeah.

24       Q And you sent her nude photos, correct?

25       A Yes. Correct.

26      ………..(ECF 4 at 105):

27      Q Have you sent naked pictures to other people

28       that you didn't meet online?

1    A No, I was not.

2    Q I'm sorry. What was that?

3    A No, I did not.

4    **Q So you would say you've only sent naked**

5    **pictures to only one person; is that correct?**

6    **A Yes. That's correct.**

7        As of 2018, Czodor had a marriage of almost 10 years. He never sent his naked

8    pictures to his wife but he sent his naked pictures to Petitioner, a woman he just met once?

9        Czodor's testimony, as presented, appears to strain credibility given the significant

10   duration of his marriage. The principle of common experience and human behavior,

11   suggest that it is inherently implausible for an individual in a nearly decade-long marriage

12   to have never exchanged intimate photographs with their spouse. This line of reasoning

13   does not necessarily challenge the admissibility of evidence but seeks to undermine the

14   credibility of a key witness, who is also the sole witness in this case.

15       The claimed absence of intimate photo exchanges within a marital relationship is

16   so implausible that it warrants skepticism and consideration in evaluating the overall

17   credibility of Czodor's statements. The jury should have had the opportunity to assess the

18   believability of Czodor's testimony regarding sending naked pictures to only Petitioner

19   while maintaining that he had never done so within his long-term marriage. The inherent

20   implausibility of this assertion is presented as a factor that should be considered in

21   assessing the reliability and credibility of the witness's testimony.

22       The boldness of the false narrative is presented as evidence of a pattern of deceit,

23   demonstrating Czodor as a compulsive liar and skillful manipulator, and suggesting a

24   calculated attempt to deceive and manipulate the proceedings.

25       The failure to discovery Czodor's marriage significantly prejudiced Petitioner

26   beyond a reasonable doubt.

27       In addition, Case No. 23CM00067 constitutes a new trial of the same matters

28   addressed in Case No. 19CM06724. In a surprising turn of events, Petitioner was

27

acquitted, even after Petitioner's 2021 conviction was disclosed to the jury.

## CLAIM 11 – IAC – FAILURE TO PRESENT MATERIAL FACTS

The court should take into consideration that Respondent misrepresents the evidence by asserting that Czodor's email shows he would need to pay to remove nude photos. ECF 50-1 at 42. In actuality, Czodor was attempting to address a post labeling him as a liar. ECF 6 at 165.

In *People v. Pope*, 23 Cal.3d 412 (Cal. 1979), the court suggests that if counsel was asked for an explanation and failed to provide one, this could prove he or she had no tactical reason for the action taken. Despite Petitioner repeatedly asked public defender with respect to the approach they took (or didn't take) in the handling of Petitioner's case #19CM06724, no explanation was ever given. ECF 6 at 206-209.

As explained in Claim 1, whether Czodor was a "nudist" had a reasonable probability of altering the outcome of the trial because Czodor, who was raised as a nudist, was in fact attempting to exploit the societal discomfort around nudity by falsely claiming an expectation of privacy in his naked photos.

In addition, whether Czodor was a nudist also goes to the element "Defendant distributed the image and knew or should have known that distribution of the image or images would cause the person depicted serious emotional distress." Due to her knowledge of Czodor as a nudist, Petitioner could not know or should not have known that distribution of the image or images would cause the person depicted serious emotional distress because of her understanding of nudism, as explained in Claim 1. The prosecution failed to prove this element beyond a reasonable doubt.

Respondent contends that Petitioner provides no persuasive argument on the relevance of evidence that Czodor would have to pay to have his private photos removed from the internet. This argument is grounded on the false assumption that Czodor attempted to pay to have his private photos removed. In fact, in Czodor's September 24, 2018 email, what he requested to remove from the internet was simply comments about his credibility instead of his private photos. ECF 6 at 165. Upon discovering the cost of

removing comments affecting his credibility and becoming incensed by the expenses and the potential risk of being discovered by his wife, he proceeded to fabricate criminal charges to get even. This is particularly true when considering the timeline and sequence of all the events (the September 10, 2018 police field activity report and the photo of the damaged door taken on September 25, 2018). On September 26, 2018, the police officer wrote "Czodor provided me with a list of a few of the social media outlets baring the videos and photographs of his genitalia, however, upon checking these websites there were no photographs or video's depicting Czodor's genitalia." ECF 6 at 178. The September 24, 2018 email reveals Czodor's motive to manufacture criminal charges.

The failure to unveil crucial information regarding Czodor's marital status has significantly prejudiced Petitioner. The role of Czodor's wife remains ambiguous, adding an additional layer of doubt to the case. Czodor's extramarital affair might have been discovered by his wife. In an attempt to portray himself as innocent, Czodor fabricated multiple allegations against Petitioner to appease his spouse. These facts are material to Czodor's motive to lie, and the failure to uncover these details constitutes ineffective assistance of counsel.

The failure to address material facts related to Czodor's marital situation, coupled with the failure to present Czodor's nudist upbringings, raises concerns about the adequacy of legal representation.

### CLAIM 12 – IAC – FAILURE TO REQUEST JURY INSTRUCTION

First, Petitioner never authorized her trial counsel to stipulate with prosecution as to the lawfulness of the restraining orders. Prior to signing off the stipulation, public defender never discussed with Petitioner about the stipulation which indicates a serious breakdown in communications. Public defender's action deprived Petitioner of her right to participate in the making of decisions on her own behalf. The stipulation with prosecution demonstrates that Petitioner's trial counsel was grossly incompetent.

As explained in Claim 2, two casual dates with a man who concealed his marriage status do not form any dating relationship defined by DVPA.

1  Petitioner did not confuse the requirements for issuing a DVRO and the elements

2  required for conviction of unlawfully distributing private images.

3  In order to convict, the prosecution is obligated to establish, beyond a reasonable

4  doubt, that "defendant received or acquired the image or images of the other person under

5  circumstances in which the defendant and the other person agreed or understood that the

6  images shall remain private."

7  As explained in Claim 1, it is difficult to see how Czodor would have a reasonable

8  expectation of privacy in pictures sent to a stranger, a woman he just met once.

9  In the absence of a genuine dating relationship, there is no inherent understanding

10  or agreement between Petitioner and Czodor that the images would be treated as private.

11  The nature of their interaction does not establish the necessary circumstances for such an

12  agreement.

### CLAIM 13 – IAC – NO RATIONAL TACTICAL PURPOSE TO SIGN OFF A STIPULATION WITH PROSECUTION

15  In *People v. Pope*, 23 Cal.3d 412 (Cal. 1979), the court suggests that if counsel was

16  asked for an explanation and failed to provide one, this could prove he or she had no

17  tactical reason for the action taken. Despite Petitioner repeatedly asked public defender

18  with respect to the approach they took (or didn't take) in the handling of Petitioner's case

19  #19CM06724, no explanation was ever given. ECF 6 at 206-209.

20  Trial counsel had no rational tactical purpose for the decision to enter into the

21  stipulation because he failed to provide one. The appellate division's decision is

22  unreasonable that Petitioner had failed to show from the record "that counsel had no

23  rational tactical purpose" for the decision to enter into the stipulation.

24  Respondent contends that trial counsel's decision to enter a more limited

25  stipulation regarding their validity and terms appears to be a calculated strategy to

26  preclude admission of these exhibits. This is completely false. In order to convict, the

27  prosecution is obligated to establish, beyond a reasonable doubt, that the restraining orders

28  were lawfully issued. The stipulation effectively did prosecution a favor and the

1    preclusion of these exhibits serves no rational tactical purpose. No competent lawyer

2    would have chosen to sign a stipulation while the restraining orders are invalid and

3    unconstitutional. See Claim 2 and Claim 3.

4           First prong: What is the objective standard of reasonableness under prevailing

5    professional norms?

6           In 2023 the prosecution, based on the exact same old evidence, prosecuted

7    Petitioner once again alleging Petitioner failed to remove Czodor's nude photos posted in

8    2018, Case No.: **23CM00067**. ECF 45. The actions of defense counsel at trial in 2023 sets

9    forth the objective standard of reasonableness.

10          Second prong: Is there a reasonable probability the result of the proceeding would

11   have been different?

12          Definitely yes. Essentially, Case No. 23CM00067 constitutes a new trial of the

13   same matters addressed in Case No. 19CM06724. In a surprising turn of events, Petitioner

14   was acquitted, even after Petitioner's 2021 conviction was disclosed to the jury.

15          **CLAIM 14 – IAC – FAILURE TO EXCLUDE PRIOR COMPELLED**

16                              **TESTIMONY**

17          Defense counsel moved through the motion in limine to exclude all statements

18   made by Petitioner in all the civil restraining order hearings, based on California Evidence

19   codes 352 and 400 instead of Fifth Amendment. ECF Doc. 3 at 93 [CT 80].

20          As explained in Claim 9, Petitioner's testimony in a family court proceeding was

21   involuntary and her answers are inadmissible against her in a later criminal prosecution.

22          Defense counsel's failure to preserve federal law issue was inexcusable.

23          **CLAIM 15 – IAC – FAILURE TO EXPOSE PERJURED**

24                              **TESTIMONY**

25          On October 19, 2018, Czodor testified under oath, "IT WAS DARK THERE. I

26   COULDN'T SEE IT. WHEN I SEE IT, I SEE IT AFTERWARDS WHEN WE OPENED

27   THE DOOR, AND YOU LEFT." ECF 6 at 171. Trial counsel received the family court

28   transcript before trial. At trial, when being asked if he saw Petitioner scratch his door,

Czodor testified "No, I wasn't seeing her[3]. If I see her, I report it to the police. … I took a photo of her with the key." ECF 6 at 159.

Any competent counsel, in possession of the family court transcript and the photograph depicting Petitioner holding a key in front of Czodor's door, would likely raise inquiries about why the front door was well-lit, yet no damage was discovered, despite Czodor's claim that Petitioner had scratched his front door for 20 minutes. Additionally, questions would arise about Czodor's misrepresentation of the lighting conditions during family court proceedings. The only reason Czodor lied about the lighting is he lied about the scratching of his door.

## CLAIM 16 – IAC – FAILURE TO DISCOVER INCONSISTENT STATEMENTS

After petitioner was convicted, she requested and received the entire discovery file from public defender. ECF 33 at 105. Petitioner has direct personal knowledge of what investigation counsel did or did not do.

Respondent tactically admits that Czodor's testimony is directly contracted to the September 10, 2018 police filed activity report, leaving the IAC obvious.

While the front door area was well-lit, after 20 minutes of alleged scratching and video-taping the scratching, the absence of any contemporaneous allegations made on the scene meaningfully impacted the determination of her guilt or innocence of vandalism.

The front door area was adequately illuminated, providing a conducive environment for observation and assessment. It is illogical for Czodor to have produced a video purportedly demonstrating the act of vandalism, yet he purportedly failed to report the incident promptly to the police at the scene. The act of filming a video, presumably capturing the vandalism, implies a level of awareness and engagement with the alleged offense. If Czodor had the presence of mind to record the incident, it is asserted that he should have also been capable of promptly reporting the vandalism to law enforcement

---

[3] The only possible reason that Czodor could not see Petitioner scratch his door was dark. The prosecution's comment "in the dark of night" was drawn from Czodor's family court testimony.

1  authorities.

2        The incongruity between providing a video as evidence and the failure to report the

3  vandalism on the spot raises questions about the credibility and consistency of Czodor's

4  account. It is argued that the logical course of action for an individual who witnesses or

5  captures evidence of a crime, such as vandalism, would be to promptly notify the police to

6  ensure timely intervention and investigation.

7        This temporal gap between the occurrence of the alleged scratching and the

8  subsequent reporting introduces an element of doubt regarding the authenticity of the

9  events as portrayed.

10                    **CLAIM 17: IAC – FAILURE TO OBJECT**

11        In *People v. Pope*, 23 Cal.3d 412 (Cal. 1979), the court suggests that if counsel was

12  asked for an explanation and failed to provide one, this could prove he or she had no

13  tactical reason for the action taken. Despite Petitioner repeatedly asked public defender

14  with respect to the approach they took (or didn't take) in the handling of Petitioner's case

15  #19CM06724, no explanation was ever given. ECF 6 at 206-209.

16        In order to prevail on her ineffective assistance of counsel claim, Petitioner need

17  not prove conclusively that the trial court would have sustained counsel's objections.

18  Rather, Petitioner must demonstrate only a "reasonable probability" that she would have

19  prevailed had it been raised by his trial counsel. *Carrera v. Ayers*, 699 F.3d 1104, 1108

20  (9th Cir.2012) (en banc).

21        A delivery driver, uncompensated for jury duty, resides with his father who was

22  laid off from work, asserts facing financial hardship and explicitly told the court that "I

23  have anxiety" and "I can't really miss work." The trial court asked if either counsel would

24  want to be heard as to that particular juror and defense counsel submitted the issue to the

25  Court. ECF 4 at 4-5.

26        The juror's explicit statement expressing anxiety and difficulty in missing work,

27  coupled with the backdrop of financial hardship, this combination of factors constitutes a

28  valid basis for a legitimate concern regarding the juror's ability to impartially fulfill his

duties. The juror's economic circumstances and the explicit communication of anxiety and hardship create a reasonable probability that the court would consider dismissal. The availability of two alternative jurors was a key factor supporting the proposition that the court could dismiss the juror without undermining the trial process. The presence of alternative jurors mitigates any potential disruption to the proceedings, ensuring that the juror's dismissal would not jeopardize the fairness of the trial. The failure of the defense counsel to raise the issue and seek the dismissal of the juror was a missed opportunity to address a valid concern which constitutes ineffective assistance of counsel.

### CLAIM 18: IAC – Failure to bring the case to a speedy trial

In *People v. Pope*, 23 Cal.3d 412 (Cal. 1979), the court suggests that if counsel was asked for an explanation and failed to provide one, this could prove he or she had no tactical reason for the action taken. Despite Petitioner repeatedly asked public defender with respect to the approach they took (or didn't take) in the handling of Petitioner's case #19CM06724, no explanation was ever given. ECF 6 at 206-209.

The record contains affirmative evidence that counsel had "no rational tactical purpose" for the delay of the trial because during the pendency of the case, defense counsel did no investigation (see claims 10-12, 15-16).

Defense counsel's failure to investigate and prepare for trial indicates that no additional time was actually needed.

1) There is no evidence supporting that Petitioner personally and voluntarily waived her speedy trial rights; 2) the delay was attributable to negligent conduct by the government (the trial court's failure to manage the calendar, the prosecution's failure to bring the case to trial; the public defender's failure to prepare the case to trial); the continuance requested by the defense was unreasonable due to the lack of investigation; the unavoidable delays from the pandemic were limited to 68 days (from March 24, 2020 (initial trial date) to May 31, 2020 ECF 6 at 218); and 3) 720 days delay is presumed prejudice and the record suggests that Petitioner did not benefit from any of the continuance to prepare trial; in addition, the substantial delay caused Petitioner subject to

over $20,000 interests from restitution. ECF 3 at 193. The state court's denial of Petitioner's IAC claim was objectively unreasonable.

### CLAIM 19: Unreasonable Determination of Facts

See Claim 21.

### CLAIM 20: Insufficient Evidence – dating relationship

*Jackson v. Virginia* establishes a two-step analysis for a challenge to the sufficiency of the evidence. *United States v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc). "First, a reviewing court must consider the evidence in the light most favorable to the prosecution." Id. (citation omitted); see also *McDaniel v. Brown*, 558 U.S. 120, 133 (2010). At this step, a court "may not usurp the role of the trier of fact by considering how it would have resolved the conflicts, made the inferences, or considered the evidence at trial." *United States v. Nevils*, 598 F.3d at 1164 (citation omitted). "Rather, when faced with a record of historical facts that supports conflicting inferences a reviewing court must presume - even if it does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Id. (citations and internal quotations omitted); see also *Coleman v. Johnson*, 132 S. Ct. at 2064 ("Jackson leaves [the trier of fact] broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that [the trier of fact] draw reasonable inferences from basic facts to ultimate facts") (citation and internal quotations omitted); *Cavazos v. Smith*, 132 S. Ct. 2, 4 (2011) ("it is the responsibility of the jury — not the court — to decide what conclusions should be drawn from evidence admitted at trial"). The State need not rebut all reasonable interpretations of the evidence or "rule out every hypothesis except that of guilt beyond a reasonable doubt at the first step of Jackson [v. Virginia]." *United States v. Nevils*, 598 F.3d at 1164 (citation and internal quotations omitted). Circumstantial evidence and the inferences drawn therefrom can be sufficient to sustain a conviction. *Ngo v. Giurbino*, 651 F.3d 1112, 1114-15 (9th Cir. 2011).

The Court must conduct an independent review of the record when a habeas petitioner challenges the sufficiency of the evidence. See *Jones v. Wood*, 114 F.3d 1002,

1008 (9th Cir. 1997).

At the second step, the court "must determine whether this evidence, so viewed, is adequate to allow **any rational trier of fact** to find the essential elements of the crime **beyond a reasonable doubt**." *United States v. Nevils*, 598 F.3d at 1164 (citation and internal quotations omitted; original emphasis).

In applying these principles, a court looks to state law for the substantive elements of the criminal offense, but the minimum amount of evidence that the Constitution requires to prove the offense "is purely a matter of federal law." *Coleman v. Johnson*, 132 S. Ct. at 2064.

The evidence was insufficient to establish a dating relationship between a married man and Petitioner.

### CLAIM 21: Insufficient Evidence – Expectation of Privacy

Citing to no applicable legal authority[4], Respondent asserts that an individual, engaged in a person-to-person text exchange, holds a reasonable expectation of privacy regarding nude photographs, presuming that these images would remain confidential beyond the intended recipient. Respondent's argument is grounded in a false assumption, specifically, that Czodor is not a nudist and that his relationship with the Petitioner was genuine.

In *Vanburen*, under almost identical circumstances, complainant sent naked pictures of herself to Mr. Coon[5] through Facebook Messenger[6] without any promise on his part to keep the pictures private, the court held that the facts that complainant and Mr. Coon apparently knew each other, had each other's contact information, and had a conversation about whether Mr. Coon was sleeping with defendant, are not sufficient to support an inference that she had a reasonable expectation of privacy. In sum, the State has not offered sufficient evidence to permit a jury to conclude beyond a reasonable doubt

---

[4] The cases cited by Respondent involves reasonable expectation of privacy free from government intrusion which is not the issue at hand. The cases cited by Respondent related to naked body do not apply to nudists.
[5] Mr. Coon was a person with whom complainant had a past but not present relationship.
[6] Facebook Messenger is an application that allows one Facebook user to privately send text messages to another Facebook user.

that complainant had a reasonable expectation of privacy in the photos she sent to Mr.
Coon. *State v. Vanburen*, 214 A.3d 791 (Vt. 2019).

Respondent contends that Czodor's testimony, explaining that he sent Petitioner
solicited nude photographs in a "private conversation" through a nonpublic person-to-
person text message, and that he did not send them to anyone else or give her permission
to disseminate them, if believed, was sufficient to support the conviction, and the
resolution of any question as to his credibility was properly entrusted to the jury.

As explained in Claim 10, Czodor is a compulsive liar and master manipulator. His
testimony explaining that he did not send his naked pictures to anyone else is perjury
beyond a reasonable doubt.

The combination of Czodor's concealed marital status, nudist lifestyle, and the
limited acquaintance with Petitioner diminishes any legitimate expectation of privacy in
the exchanged photographs. Given the context of Czodor's actions, he cannot reasonably
expect that such intimate images would remain private, especially when shared with
someone he had minimal knowledge of and met on a single occasion. While there is no
doubt Czodor's naked pictures went sent through text messages, the lack of text messages
showing Czodor's request to keep his photos private or Petitioner's promise to keep his
photos private further supports that Czodor had no reasonable expectation of privacy in
the exchanged photos.

Finally, Respondent asserts that texts from Petitioner to Czodor explained that her
actions in posting the photos were intended to provide him negative notoriety in order to
make him "suffer," and she continued to spread them online after the victim asked her to
stop, threatened to go to the police, and obtained a restraining order. First, the texts
(ranging from September 4 to September 8, 2018) presented at trial in paper format were
provided by Czodor instead of being forensically collected by police and therefore have
serious authenticity issue. The genuineness of the texts remains at issue due to Czodor's
pattern of deceit. Second, Respondent intentionally misrepresents the texts presented at
trial because not a single word in the alleged texts from Petitioner mentioned posting the

photos. Third, given the time frame of the texts (ranging from September 4 to September 8, 2018), if the texts from Petitioner had been related to posting naked photos, Czodor's September 10, 2018 police contact would have indicated that. ECF 6 at 200. The discrepancy between Czodor's contact with police on September 10, 2018 and the alleged threatening texts from Petitioner raises significant doubt on Czodor's testimony and genuineness of the threatening texts allegedly sent from Petitioner. This is also the exact reason why the September 10, 2018 police activity report was withheld.

Given the severity of the threat to distribute explicit photos, any reasonable person would have promptly reported such a threat to law enforcement, especially when they were already in direct contact with the police. If the threat to post naked photos was genuine and substantial, Czodor's failure to report it on September 10, 2018 when he had direct contact with the police is inherently suspicious. The absence of a timely report could be indicative of a lack of truthfulness in Czodor's claims. The only plausible explanation for Czodor's failure to inform the police about the threat on September 10, 2018, is that he lied about being threatened to post his naked photos.

### CLAIM 22: Insufficient Evidence – Serious Emotional Distress

As explained in Section I and II this claim is not procedurally barred.

Czodor suffered unpleasant grief, shame, humiliation, embarrassment, or worry that was not slight or negligible because his extramarital affair was exposed, rather than his nude photos were distributed given his nudist lifestyle.

The record here establishes that Czodor is a compulsive liar and master manipulator with a pattern of deceit. See Claim 10. Whether Naomi and Lilly are real persons remains puzzling, so as the authenticity of other paper evidence. See Claim 25. It is pure speculation that Czodor's nude photos were viewed by hundreds or thousands of strangers on "cheater" websites.

Respondent's reliance is misplaced on *People v. Iniguez* which presents a different set of facts and circumstances. In *Iniguez*, an image showing Fajardo's bare breasts—which she believed would never be seen by anyone other than defendant—was posted on

a Facebook page, and Fajardo now felt nothing between her and defendant could be

hidden **from the public**. Fajardo was embarrassed, she worried about losing her job,

believed she needed psychological help but lacked **the money for treatment**, and she felt

so bad that she told her mother she wanted to "get in the car and go kill [herself]."

Here, there is no doubt that Czodor took his nude photos on public land, a beach.

ECF 4 at 45-46. Czodor, as a nudist, has nothing to hide from the public.

If the distress were indeed severe and impactful, one would reasonably expect an

individual to take prompt and proactive steps to address their emotional well-being. The

decision not to seek professional assistance suggests a lack of urgency or severity in the

emotional distress claimed by Czodor. Serious emotional distress typically entails a level

of intensity and impact on an individual's well-being that may necessitate professional

intervention. The failure to take such a step raises questions about the severity and

immediacy of the emotional turmoil purportedly experienced. Unlike *Iniguez*, Czodor

never testified that he lacked money for treatment as any treatment should be covered by

health insurance. Nor did Czodor testify that he wanted to kill himself.

### CLAIM 23: Insufficient Evidence – Loss of Income

Czodor's income pattern provides a contextual backdrop that raises questions about

the veracity of his claim regarding the loss of reputation and his motive to lie for financial

gain. Czodor's income pattern, when compared to his claim of loss of reputation, suggests

a pattern of deceit, implying that inconsistencies in various aspects of Czodor's narrative

that impacted the overall credibility of his testimony.

### CLAIM 24: Violation of due process – Improper form of evidence

Respondent contends that this claim is not cognizable because Petitioner fails to

allege a violation of federal law. The Supreme Court has instructed the federal courts to

liberally construe the "inartful pleading" of pro se litigants. *Boag v. MacDougall*, 454 U.S.

364, 365, 102 S.Ct. 700, 701, 70 L.Ed.2d 551 (1982) (per curiam).

Although Petitioner did not explicitly allege a violation of federal law, the

substance of her claims exhibits her argument of a violation of due process. Where a

1    simple fingerprint comparison can secure the release of an innocent person, it has been

2    held, failure to conduct such a comparison constitutes a violation of due process, see *Lee*

3    *v. City of L.A*., 250 F.3d 668, 684 (9th Cir.2001), particularly where the putative

4    "investigation" requires only review of "an easily available piece of physical evidence"

5    already in the government's possession. *Russo v. City of Bridgeport*, 479 F.3d 196, 209,

6    199 (2d Cir.2007). The failure to collect and preserve evidence that is potentially

7    exculpatory may violate a defendant's due process rights if that failure was motivated by

8    bad faith. *Arizona v. Youngblood*, 488 U.S. 51, 58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988)

9    ("[U]nless a criminal defendant can show bad faith on the part of the police, failure to

10   preserve potentially useful evidence does not constitute a denial of due process of law.");

11   *Miller v. Vasquez*, 868 F.2d 1116, 1120 (9th Cir. 1989) ("[A] bad faith failure to collect

12   potentially exculpatory evidence would violate the due process clause.").

13         The failure to collect forensic evidence of all texts, screenshots, videos and

14   Czodor's phone is a clear violation of Petitioner's due process rights. First, the texts,

15   screenshots, videos and Czodor's phone records were material beyond doubt. Evidence is

16   material to a defendant's case if it "possess[es] an exculpatory value that was apparent

17   before the evidence was destroyed, and [was] of such a nature that the defendant would be

18   unable to obtain comparable evidence by other reasonably available means." *California v.*

19   *Trombetta*, 467 U.S. 479, 488-89, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984). There is no

20   question that the evidence might have been exculpatory, since a forensic examination can

21   reveal whether they are genuine and complete. A forensic examination could have

22   supported Petitioner's claim that the texts, screenshots, videos and Czodor's phone

23   records include exculpatory evidence. Moreover, the evidence sought was of such a nature

24   that it was not reasonably available to the defendant. The incidents occurred in September

25   2018. Defense counsel was not appointed until Petitioner's arraignment on August 12,

26   2019, and had no indication that a forensic examination might be integral to his client's

27   case. Second, In 2018, forensic evidence was readily and wildly available. It's common

28   knowledge that texts, screenshot, photos, and videos are easy to manipulate. The

deliberate choice not to collect forensic evidence stems from the government's bad faith, supporting by the withholding of police activity reports on September 10 and 18, 2018.

### CLAIM 25: ADMISSION OF INADMISSIBLE HEARSAY

*Dixon* did not bar this claim due to Petitioner's failure to raise this claim on direct appeal. Appellate counsel should have raised this claim on her behalf. *In re Smith* (1970) 3 Cal.3d 192, 202-203 [appellate counsel may be deemed ineffective if she fails to raise potentially successful contentions on appeal].

Respondent contends that the conversations at issue consisted of informal text exchanges between friends and colleagues, and the primary purpose of these communications was to inform the victim of disparaging and explicit materials online for the sake of his wellbeing. However, "Testimonial statements are those made primarily to memorialize facts relating to past criminal activity, which could be used like trial testimony." *People v. Sanchez*, 63 Cal.4th 665, 689 (Cal. 2016). The text exchanges were offered at trial to support that Petitioner had distributed Czodor's nude photos to his friends and clients and the reason why the person who distributed them was Petitioner was Petitioner was the only person who received Czodor's nude photos. The primary purpose of the text exchanges is related to preserving facts for later use at trial. Lay opinion testimony may not convey or rely on hearsay, because it is not helpful to the jury. *United States v. Freeman*, 498 F.3d 893, 904–05 (9th Cir.2007).

In *Nielsen*, during his testimony, Agent Faycosh related how Roxanne Volz was asked during the course of the search who had access to the floor safe where the methamphetamine was found, and she replied that Nielsen did. The Ninth Circuit held that such testimonial out-of-court statements are prohibited under the Confrontation Clause unless the declarant witness is shown to be unavailable and the defendant had an earlier opportunity to cross-examine the declarant. *U.S. v. Nielsen*, 371 F.3d 574, 581 (9th Cir. 2004).

Similar to *Nielsen*, Czodor's testimony reads as follows:

Q Okay. And can you -- can you describe to the

1       jury how you recognize what I showed you?

2       A So this is the text message from **my friend**

3       **Naomi Mateos** (phonetic) which one is on the -- on the

4       top.

5       …..

6       Q Yes. And you said this message you receive

7       from your friend Naomi. Is there a photo in that

8       message?

9       A Yes, it is.

10      Q What is the photo depicting?

11      A Of myself.

12      Q And can you elaborate on -- you recognize

13      yourself in the photo.

14      A Yes. Correct.

15      Q Are you wearing any clothes in that photo?

16      A I don't.

17      Q Okay. Do you recall sending that photo to Ms.

18      Luo at any point?

19      A Yes, I did.

20      Q Okay. Did you send that photo to Ms. Luo when

21      you were still -- at the time you were still dating her?

22      A Yeah, that was between first and second date.

23      …….. (ECF 4 at 61)

24      Q And is that a screenshot that you took?

25      A No, I did not.

26      Q Okay.

27      A Tomas C is again pretending somebody. It's a

28      fake account and **Lilly (phonetic) is the person who**

1    **review my company**[7] and Tomas C sent this video, which one

2    was posted before on Facebook, on Instagram, or on

3    YouTube, a bunch of different servers and one of the

4    servers was Yelp and all the customers -- five customers

5    that time I had there receive this video from Tomas C.

6    But they was thinking it's me, but it was not me.

7    Q And so you -- the document I handed you like

8    that shot from Yelp --

9    A Yes.

10    Q -- you've seen that before, correct?

11    A Yes, I did.

12    Q Okay.

13    A Yes.

14    Q And how did you first become aware it, did

15    somebody notify you --

16    A Yes.

17    Q -- or send you a message?

18    A Correct, there my clients called and let me

19    know.

20    Q Okay. And then through that you ended up

21    seeing that message.

22    A Yes.

23    ………. (ECF 4 at 105)

24    Q Have you sent naked pictures to other people

25    that you didn't meet online?

26    A No, I was not.

27

28

---

[7] On Czodor's company page on Yelp, Lilly was nowhere to be found. None of the people who reviewed Czodor's so-called company name Lilly.

1  Q I'm sorry. What was that?

2  A No, I did not.

3  Q So you would say you've only sent naked

4  pictures to only one person; is that correct?

5  A Yes. That's correct.

6       The statements made by Czodor's friend and customer, as conveyed through his

7  testimony, were offered for the truth of the matter asserted – namely, that disparaging and

8  explicit materials were circulating online by Petitioner. As such, these statements carry a

9  testimonial character, implicating the core concerns of the Confrontation Clause. The

10  Supreme Court in *Crawford* emphasized that testimonial hearsay, absent confrontation

11  and cross-examination, cannot be admitted without violating the defendant's constitutional

12  rights.

13       In improperly permitting admission of the hearsay, the trial court reasoned that the

14  communication is not being offered for the truth of the matter, but simply for the witness

15  to explain in his mind what it is. This is untrue. The prosecution's theory is that Czodor, in

16  his entire life until 2018 while he was 36 years old as a nudist, sent his nude photos to no

17  one else but Petitioner and his friends and clients received his nude photos that he sent no

18  one else but Petitioner. Czodor's nude photos must be sent by Petitioner to his friends and

19  clients.

20       "Evidence erroneously admitted in violation of the Confrontation Clause must be

21  shown harmless **beyond a reasonable doubt**, with courts considering the importance of

22  the evidence, whether the evidence was cumulative, the presence of corroborating

23  evidence, and the overall strength of the prosecution's case." *United States v. Bowman*,

24  215 F.3d 951, 961 (9th Cir. 2000) (holding that introduction of co-conspirator's out-of-

25  court statements was harmless considering the weight of the admissible evidence).

26       Considering the lack of forensic evidence and corroborating evidence, and

27  complaining witness' motive to lie, the paper evidence is insufficient to prove that

28  Petitioner distributed Czodor's nude photos beyond a reasonable doubt. It could be

1   Czodor's fabrication to appease his wife to cover his extramarital affair. Therefore, the

2   admission of impermissible hearsay is harmful beyond a reasonable doubt.

3       Petitioner was denied an opportunity to subject Naomi and Lilly to cross-

4   examination. She was not allowed to test the witness' recollection, to probe into the details

5   of the alleged distribution of Czodor's naked photos, or to verify the exchanges of

6   communication between them and Czodor so that the jury might judge for itself whether

7   Czodor's testimony was worthy of belief. *Mattox v. United States*, 156 U. S. 237, 242-243

8   (1895). The right of cross-examination is more than a desirable rule of trial procedure. It

9   is implicit in the constitutional right of confrontation, and helps assure the "accuracy of

10  the truth-determining process." *Dutton v. Evans*, 400 U. S. 74, 89 (1970); *Bruton v. United*

11  *States*, 391 U. S. 123, 135-137 (1968). It is, indeed, "an essential and fundamental

12  requirement for the kind of fair trial which is this country's constitutional goal." *Pointer v.*

13  *Texas*, 380 U. S. 400, 405 (1965). The denial or significant diminution to confront or to

14  cross-examine calls into question the ultimate "`integrity of the fact-finding process'" and

15  requires that the competing interest be closely examined. *Berger v. California*, 393 U. S.

16  314, 315 (1969).

17              **CLAIM 26: Violation of 6th & 14th Amendments – Improper**

18                              **permitting amendment**

19       Amendment only one day before trial did not permit adequate preparation of a

20  defense. Defendant should not be compelled to forfeit fundamental right to a speedy trial

21  in response to the prosecution's untimely introduction of amended charges.

22       Unlike the cases cited by Respondent, holding that the murder theory revealed

23  through the state's opening statement and jury instructions was constitutionally adequate

24  notice, the allegations of coming within 100 yards of the protected person and the failure

25  to deactivate and create websites are fundamentally distinct and requiring different

26  discovery processes.

27                              **CLAIM 27: SPEEDY TRIAL**

28       The state court's rejection of Petitioner's claim was contrary to or based on an

1   unreasonable application of *Barker*. ECF 33 at 74-89.

2       The government cannot show that it proceeded with reasonable diligence. ECF 33

3   at 76-84. Public defender, prosecution and the trial court all contributed to the substantial

4   delay that prejudiced Petitioner.

5       Public defender's assertion is entirely false that they explained Petitioner's speedy

6   trial rights and obtained her voluntary agreement to waive them. ECF 33 at 109-110.

7       The actual restraints imposed by arrest and holding to answer a criminal charge are

8   sufficient restraint on liberty, even without incarceration. Even without incarceration,

9   Petitioner had been in custody 720 days prior to trial. In addition, the substantial delay

10  caused Petitioner subject to over $20,000 interests from restitution. See *Smith v. Hooey*,

11  393 U.S. 374, 378, 89 S.Ct. 575, 21 L.Ed.2d 607 (1969) (a delay in bringing a defendant

12  to trial may create prejudice if it eliminates the possibility of serving concurrent

13  sentences).

14              **CLAIM 28: DENIAL OF THE PETITIONER'S MOTION TO**

15                      **DISMISS**

16      As explained in Section I and II, this claim is not procedurally barred. Respondent

17  contends that this claim is not cognizable because Petitioner fails to allege a violation of

18  federal law. The Supreme Court has instructed the federal courts to liberally construe the

19  "inartful pleading" of pro se litigants. *Boag v. MacDougall*, 454 U.S. 364, 365, 102 S.Ct.

20  700, 701, 70 L.Ed.2d 551 (1982) (per curiam).

21      Although Petitioner did not explicitly allege a violation of federal law, the

22  substance of her claims exhibits her argument of a violation of Sixth and Fourteenth

23  Amendments.

24      As explained in Claim 27, Petitioner's motion to dismiss should have been granted.

25              **CLAIM 29: DENIAL OF PETITIONER'S MARSDEN MOTION**

26      As explained in Section I and II, this claim is not procedurally barred.

27      Respondent contends that the trial court confirmed that counsel had conferred with

28  Luo at length on two occasions to discuss her rights, the charges and potential

punishment, and trial strategy, and obtained counsel's representation that any problems stemmed only from an "impasse" over the motion to dismiss and that he could effectively represent her. However, prior to signing off the stipulation public defender never discussed with Petitioner about the stipulation which indicates a serious breakdown in communications.

## CLAIM 30: PROSECUTORIAL MISCONDUCT AT TRIAL

As explained in Section I and II, this claim is not procedurally barred. Any failure to object in the proceedings below or to raise them on appeal was a result of ineffective assistance of counsel.

It will be especially sensitive to allegations of prejudice when the government's case rests on uncorroborated accomplice testimony. *United States v. Hibler*, 463 F.2d 455 (9th Cir. 1972). The *Hibler* "doctrine" may be restated more generally: the defendant is more likely to be prejudiced by error or misconduct when the government has a weak case.

The government's case against Petitioner rested on the virtually uncorroborated testimony of Czodor. It was a weak case in which the credibility of the prosecution witnesses was a critical element.

If the prosecutor's remarks "prejudiced a specific right, such as the privilege against compulsory self-incrimination, as to amount to a denial of that right," the remarks are considered misconduct and the analysis of the misconduct must include case law governing the particular constitutional provision governing that right. See *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). Here, the prosecution's unlawful introduction and misrepresentation of Petitioner's prior "compelled" testimony amount to a denial of her right against compulsory self-incrimination.

Courts "must consider the probable effect the prosecutor's [comments] would have on the jury's ability to judge the evidence fairly," and, where the prosecutor is attempting to respond to the defense, a court must also consider "defense counsel's conduct, as well as the nature of the prosecutor's response." *United States v. Young*, 470 U.S. 1, 12 (1985).

1  Comments that may amount to misconduct include attempts to "manipulate or misstate the

2  evidence." *Darden v. Wainwright*, 477 U.S. 168, 182 (1986). Here, the prosecution's

3  inappropriate or inflammatory suggestions, statement of facts not in evidence, improper

4  vouch for the prosecution witness "while at the same time withholding exculpatory

5  evidence, and telling the jury that hey, Tomas Czodor, he's a nice guy, that's a violation of

6  the restraining order, were not attempts to respond to the defense. Instead, they were

7  attempts to impair the jury's ability to judge the evidence fairly.

8  　　Any claim of prosecutorial misconduct must be reviewed within the context of the

9  entire trial. *Greer v. Miller*, 485 U.S. 756, 765-66 (1987); *United States v. Weitzenhoff*, 35

10  F.3d 1275, 1291 (9th Cir. 1994). The absence of forensic evidence, coupled with the

11  complaining witness being the sole testifying witness, magnifies the impact of the

12  prosecutorial misconduct on the overall fairness of the trial.

13  　　　　　　　　　　**CLAIM 31: CUMULATIVE ERROR**

14  　　In finding no cumulative error, the Orange County Superior Court identified certain

15  legal principles and authority. However, it failed to apply any factual analysis to these

16  laws. Namely, the superior court made no analysis at all.

17  　　A federal habeas court must apply the *Brecht* standard, whether or not the state

18  appellate court recognized the error and reviewed it for harmlessness under the *Chapman*

19  standard. *Fry v. Pliler*, 551 U.S. 112, 121-22 (2007); *Bains v. Cambra*, 204 F.3d 964, 977

20  (9th Cir. 2000).

21  　　Under the *Brecht* standard, an error is not harmless, and habeas relief must be

22  granted, if the federal court has "grave doubt about whether a trial error of federal law had

23  substantial and injurious effect or influence in determining the jury's verdict." *O'Neal v.*

24  *McAninch*, 513 U.S. 432, 436 (1995) (internal quotation marks omitted).

25  　　The "logical corollary" of this harmless error doctrine is that trial errors are more

26  likely to be prejudicial to a defendant — i.e., not harmless — when the government's case

27  on a critical element is weak. *U.S. v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996).

28  Accordingly, in determining whether the combined effect of multiple errors rendered a

criminal defense "far less persuasive" and had a "substantial and injurious effect or influence" on the jury's verdict, the overall strength of the prosecution's case **must be considered** because "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland v. Washington*, 466 U.S. 668, 696, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

The state court found no cumulative error simply because nearly all of petitioner's claims of error have already been considered and rejected either via direct appeal or prior petition for writ of habeas corpus. ECF 50-1 at 109. Nowhere in the record suggests that the overall strength of the prosecution's case was ever considered.

The fundamental question in determining whether the combined effect of trial errors violated a defendant's due process rights is whether the errors rendered the criminal defense "**far less persuasive**," *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973), and thereby had a "substantial and injurious effect or influence" on the jury's verdict, *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (internal quotations omitted).

As a result of the prosecution's misconduct and ineffective assistance of counsel, Petitioner was prevented from presenting critical evidence to support her claim that Czodor was a compulsive liar, and her primary defense was therefore "far less persuasive than it might [otherwise] have been."

Coupled with the wrongful admission of inadmissible hearsay and Petitioner's compelled testimony, the jury was left with only half the picture.

In light of the due process principles established in *Chambers* and the starkly one-sided impact of the errors in this case, the state court's conclusion of no cumulative error was an objectively unreasonable application of clearly established due process law as determined by the Supreme Court.

In conclusion, Petitioner is entitled to habeas corpus relief. See *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (Holding that the "substantial and injurious effect or influence" standard, as opposed to the "harmless beyond a reasonable doubt" standard, "applies in determining whether habeas relief must be granted because of constitutional

error of the trial type" (citing *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)).

### CLAIM 32:  IAC - DIRECT APPEAL

In *Smith v. Robbins*, 528 U.S. 259, 288 (2000), the Supreme Court endorsed the analysis suggested by the Seventh Circuit in *Gray v. Greer*:

> When a claim of ineffective assistance of counsel is based on failure to raise viable issues, the district court must examine the trial court record to determine whether appellate counsel failed to present significant and **obvious issues** in appeal. Significant issues which could have been raised should then be compared to those which were raised. Generally, only when ignored issues are clearly stronger that those presented, will the presumption of effective assistance of counsel be overcome.
>
> 800 F.2d 644, 646 (7th Cir. 1986).

In determining whether an attorney's appellate assistance was ineffective, a court must make "every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Strickland*, 466 U.S. at 689).

"So the -- by the rules of the restraining order, if she posted a post that said, like, hey, Tomas Czodor, he's a nice guy, that's a violation of the restraining order." ECF 4 at 194-195. Appellate counsel's decision to file a non-issue brief was professionally unreasonable and prejudicial because the prosecution already identified the unconstitutionality of the restraining order which should have been struck down under federal law. *United Transportation Union v. Michigan Bar*, 401 U.S. 576, 581 (1971). The issue was so obvious and the failure to raise the claim amounts to ineffective assistance of counsel.

The constitutional requirement of substantial equality and fair process can only be attained where counsel acts in the role of an active advocate in behalf of his client, as

opposed to that of amicus curiae. The no-merit letter and the procedure it triggers do not reach that dignity. *Anders v. California*, 386 U.S. 738, 744 (1967). The principles of *Griffin* required a State that afforded a right of appeal to make that appeal more than a "meaningless ritual" by supplying an indigent appellant in a criminal case with an attorney. *Douglas v. California*, 372 U.S. 353, 358 (1963). A meaningful appeal necessitates the identification and preservation of issues that are pertinent to the appellant's case and may impact the outcome. Appellate counsel's failure to fulfill this duty can result in a deprivation of the appellant's right to a fair and effective appellate process.

Appellate counsel's decision to file a *Wende* brief was ineffective assistance because the right to the aid of appellate counsel includes the right to preserve issues to avoid procedural bars. The superior court found that it was *Dixon* barred by her failure to raise her claims on direct appeal.

Therefore, the decision to file a *Wende* brief, without adequate consideration of potential issues and their preservation, amounts to ineffective assistance, compromising the appellant's right to a meaningful appeal. When there are potential issues that could be preserved to avoid procedural bars, appellate counsel's decision to file a *Wende* brief falls short of the required standard of effective assistance. Petitioner was prejudiced by appellate counsel's representation for his failure to preserve issues.

## CLAIM 33: ACTUAL INNOCENCE

To be credible, an actual innocence claim requires petitioner to support her allegations of constitutional error with new reliable evidence — whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence — that was not presented at trial. *Schlup v. Delo*, 513 U.S. 298, 324 (1995). The "new" evidence need not be newly available, just newly presented — that is, evidence that was not presented at trial. *Griffin v. Johnson*, 350 F.3d 956, 961 (9th Cir. 2003).

It is not enough that the new evidence show the existence of reasonable doubt; rather, petitioner must show "that it is more likely than not that no `reasonable juror'

would have convicted him." *Schlup*, 513 U.S. at 329. As the Ninth Circuit has stated, "the test is whether, with the new evidence, it is more likely than not that no reasonable juror would have found [p]etitioner guilty." *Van Buskirk v. Baldwin*, 265 F.3d 1080, 1084 (9th Cir. 2001). Thus, "actual innocence" means factual innocence, not merely legal insufficiency. *Bousley v. United States*, 523 U.S. 614, 623-24 (1998) (citing *Sawyer*, 505 U.S. at 339).

In this case, no physical or forensic evidence was presented, the complaining witness is the only testifying witness, all photos and screenshots were in paper format with no metadata provided by Czodor, Czodor served a dual role of complaining witness and detective, photos of the damaged door was taken right after Czodor learned about the cost to remove a post labeling him a liar, any evidence related to the credibility of the witness is material. Had the jury heard the evidence of Czodor's marriage, contradicted statements made directly to police on September 10 and September 18, 2018, the prosecution's misrepresentation of Petitioner's compelled testimony, no reasonable juror would have convicted her.

## CLAIM 34: Section 2254(d) Does Not Bar Relief

The state superior court's rejection of Petitioner's first habeas corpus claims of ineffective assistance was based on an unreasonable determination of the facts because the court did not review the trial transcript in violation of her due process rights. While Petitioner failed to provide trial transcript, the state court could have denied her petition without prejudice. See *Valdez v. People of State of California*, 439 F.2d 1405, 1406 (9th Cir. 1971) (reversing denial of habeas corpus petition without a transcript of the state court proceedings.)

Without a transcript of the state court proceedings the state court was therefore unable to determine whether counsel's assistance was effective. The state court itself admitted that it did not make a meaningful analysis of Petitioner's claims. The denial of Petitioner's claims was unreasonable.

## CLAIM 35: INCORRECT JURY INSTRUCTION

1    The trial court, in instructing the jurors on count 2 related to the violation of a court

2    order under California Penal Code § 273.6, included an incorrect element, not contacting,

3    sending messages, following, or disturbing the peace of Czodor, instead of the charged

4    element related to the failure to deactivate website and creating new websites.

5    Because of this error, it is unclear whether the jury indeed determined that the

6    prosecution has proved beyond a reasonable doubt that Petitioner failed to deactivate

7    website and created new websites. The incorrect jury instruction gave rise to a genuine

8    risk that the jury would convict petitioner on the basis of texting Czodor, rather than on

9    the failure to deactivate website and creation of new websites, a risk heightened by the

10   fact that Czodor alleged receipt of threatening messages. The stipulation regarding

11   restraining order did not obviate the necessity for a correct instruction in view of the

12   particular need for it in this case. See *In re Winship*, 397 U.S. 358, 364 (1970) (holding

13   that the Due Process Clause requires the prosecution to prove every element of a charged

14   offense beyond a reasonable doubt); *Taylor v. Kentucky*, 436 U.S. 478, 488, 98 S.Ct.

15   1930, 1936, 56 L.Ed.2d 468, 477 (1978) (holding that "arguments by counsel cannot

16   substitute for instructions by the court").

17   The evidence did not conclusively establish that Petitioner failed to comply with

18   the restraining orders. The only evidence, supporting that the nude photos and videos of

19   Czodor posted by Petitioner remained on multiple websites even up to the time of trial,

20   comes from Czodor's testimony instead of forensic evidence. The evidence conclusively

21   establish that Czodor is a compulsive liar and master manipulator with a strong motive to

22   lie.

23   **III.    EVIDENTIARY HEARING**

24   The claims cannot be resolved on the existing record. The court should allow

25   Petitioner to conduct a court room reenactment to compare the sound in the video and the

26   actual sound of knocking and scratching on wood furniture, an issue that cannot be

27   resolved by reference to the state court record. See *Anderson v. State of Texas*, 507 F.2d

28   105, 106 (5th Cir. 1975) (The judgment denying habeas corpus relief must be vacated

53

because the district court acted without reviewing petitioner's state trial transcript and did not hold an evidentiary hearing.)

## IV.    CERTIFICATE OF APPEALABILITY

If a court denies a habeas petition, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El, 537 U.S. at 327; *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Although the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." *Miller-El*, 537 U.S. at 338.

In the event that the court denies relief, Petitioner respectfully requests a Certificate of Appealability because her petition is pursued with good faith without frivolity.

## V.    CONCLUSION

For the reasons stated above, Petitioner respectfully requests an evidentiary hearing and her petition be granted. In the event the court denies the petitioner, Petitioner requests a certificate of appealability be issued.

Respectfully submitted,

Date: January 19, 2024

*/s/ Xingfei Luo*

54

# DECLARATION OF XINGFEI LUO

I, XINGFEI LUO, declare and state:

1.   I am the petitioner in this petition. I have personal knowledge of all facts stated herein. If called as a witness, I could and would competently testify thereto.

2.   I was born and raised in a foreign country in which English is not an official language. I did not attend any school in the United States. Nor did I receive any legal training in this country.

3.   As a brief overview of the timeline, I was convicted by a jury on July 29, 2021. ECF 3 at 177-179. Despite facing the challenges of being a non-English speaker and navigating the legal process without the assistance of counsel and prior legal training, I promptly filed my first state habeas petition (case no. M-19285) on October 13, 2021, within a mere 76 days after the wrongful conviction before the trial transcript was produced. ECF 5 at 9.

4.   This prompt filing is indicative of my conscientious efforts to present all claims, both factual and legal, that were reasonably known to me at that time. The constraints of language and the absence of legal representation and prior legal training did not deter me from diligently articulating the pertinent issues within my capacity and the given timeframe.

5.   While I faced inherent challenges in comprehending and navigating the legal intricacies, making the expeditious filing all the more commendable, the swift submission of the first state habeas petition reflects my commitment to securing a fair and just resolution in a timely manner.

6.   During the entire state and federal habeas corpus proceedings, I have not received any legal or professional assistance.

I declare under penalty of perjury under the laws of the State of California and United States of America that the foregoing is true and correct.

Executed in Los Angeles, CA on January 19, 2024.

*/s/ XINGFEI LUO*

55

**CERTIFICATE OF SERVICE**

I declare that I electronically filed the forgoing with the United States District Court, Central District of California. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

In addition, I electronically served the forgoing to the following email address: michael.butera@doj.ca.gov

I declare under penalty of perjury under the laws of the State of California and United States of America that the foregoing is true and correct.

Executed on January 19, 2024

*/s/ XINGFEI LUO*

XINGFEI LUO, In Pro Per