1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10

11    XINGFEI LUO,                          Case No. 8:22-cv-01640-MEMF-KES

12              Petitioner,

13        v.                                REPORT AND RECOMMENDATION
                                            OF U.S. MAGISTRATE JUDGE
14    THE PEOPLE OF CALIFORNIA,

15              Respondent.

16

17

18        This Report and Recommendation ("R&R") is submitted to the Honorable

19   Maame Ewusi-Mensah Frimpong, United States District Judge, pursuant to the

20   provisions of 28 U.S.C. § 636 and General Order 05-07 of the United States District

21   Court for the Central District of California.

22                                  **I.**

23                       **SUMMARY OF PROCEEDINGS**

24        On July 29, 2021, an Orange County Superior Court jury convicted Petitioner

25   of vandalism, violating a protective order, and unlawful dissemination of private

26   videos and recordings, all of which were misdemeanors.  (Dkt. 3 at 177-79.) [1]  She

27        [1] Page citations refer to the pagination imposed by the Court's electronic

28

1

1
2
was sentenced to thirty days in jail and three years of informal probation and ordered to pay $93,003.76 in restitution.  (See id. at 46-48; LD 2 at 2.)

3
4
5
6
7
8
9
10
Petitioner appealed, and the Appellate Division of the Superior Court affirmed the judgment on April 27, 2022, in a reasoned decision.  (See Dkt. 3 at 3-9.)  While her appeal was pending, she filed a habeas petition in the superior court, which denied it on October 19, 2021, in a reasoned decision.  (See Dkt. 6 at 17-22.)  She also filed a habeas petition in the California Court of Appeal, which denied it without prejudice as "premature," on November 21, 2021.  See Cal. App. Cts. Case Info., http://appellatecases.courtinfo.ca.gov/ (search for Case No. G060841 in 4th App. Dist., Div. 3) (last visited Apr. 12, 2024).

11
12
13
14
15
16
On February 18, 2022, after her judgment was affirmed on direct appeal, Petitioner filed a second habeas petition in the California Court of Appeal, which summarily denied it on March 3.  See id. (search for Case No. G061132 in 4th App. Dist., Div. 3).  On May 2, 2022, she filed a habeas petition in the California Supreme Court, which summarily denied it on August 31.  See id. (search for Case No. S274343 in Cal. Sup. Ct.)

17
18
19
20
21
22
23
24
25
On September 6, 2022, Petitioner filed pro se Petition for Writ of Habeas Corpus by a Person in State Custody in this Court.  (Dkt. 1 ("Petition").)  After the Court found that some of the Petition's claims were unexhausted, it granted Petitioner's motion to stay to allow her to exhaust those claims.  (See Dkt. 12, 13, 18.)  On October 10, 2022, she filed a second habeas petition in the superior court, which denied it in a reasoned decision on December 28.  (See LD 2.)  She then filed another habeas petition in the California Court of Appeal, which summarily denied it on January 26, 2023.  (See LD 3, 4.)  Thereafter, she filed another habeas petition in the California Supreme Court, which summarily denied it on May 17, 2023.

26
27
28
_____

filing system.

2

(See LD 7.)

On June 22, 2023, Petitioner filed a First Amended Petition, asserting thirty-five grounds for relief.  (Dkt. 33.)  On November 15, 2023, Respondent filed an Answer.  (Dkt. 50.)  On January 19, 2024, Petitioner filed a Reply.  (Dkt. 55.) Pursuant to the Court's orders (see Dkt. 58, 64), Respondent filed a Supplemental Response on May 23, 2024 (see Dkt. 70), and on June 13, Petitioner filed a Supplemental Reply (see Dkt. 72).

This matter is deemed submitted and is ready for a decision.

## II.

## FACTUAL BACKGROUND

The underlying facts are taken from the unpublished Orange County Superior Court, Appellate Division decision on Petitioner's direct appeal.  (See Dkt. 3 at 3-9.)  Unless rebutted by clear and convincing evidence, these facts are presumed correct.  Tilcock v. Budge, 538 F.3d 1138, 1141 (9th Cir. 2008); 28 U.S.C. § 2254(e)(1).  Because Petitioner challenges the sufficiency of the evidence, this Court has also conducted an independent review of the record.  See Jones v. Wood, 114 F.3d 1002, 1008 (9th Cir. 1997).

*The victim was the sole witness at trial.*

*In August 2018, the victim met [Petitioner] on a dating app, and they began communicating online about every other day.  After their first date, the victim sent [Petitioner] nude photos of himself.  After a second date, the victim told [Petitioner] they "should take it easy" and meet other people.*

*A few days later, the victim learned from friends that one of his photos from the dating app had been posted on Facebook under a fake profile.  He searched and found other photos of himself – including a nude photo he had sent only to [Petitioner] – on other websites.  The nude photo was also part of a YouTube video about the victim, with comments that he was a liar and a serial cheater.  Over*

*defense objection, the prosecution introduced several screenshots and photos from social media sites showing images and statements posted online about the victim. One screenshot, taken by the victim's friend from the Facebook messenger app, shows a photo of the victim without any clothes on – the same photo the victim had sent only to [Petitioner].*

*Around that time, [Petitioner] texted the victim, "Never met an asshole that's worse than u. You will soon become famous coz I will put all your stuff on social media." Two days later [Petitioner] texted, "You wanted to play me but u picked the wrong girl to cheat. You need to suffer for what I have suffered." When the victim texted [Petitioner] that he would contact the police, [Petitioner] responded, "Call the police for what? [¶] Did I tell u that I have a law degree?" She later texted, "Your best solution is to sincerely apologize to me. The only thing the police will do is to laugh at you." She also texted, "Next week u will have new surprise. I won't stop until I get my dignity back."*

*On September 18, 2018, [Petitioner] arrived uninvited at the victim's house, knocking on the front door for 5 to 20 minutes. The victim told [her] to "get out" and videotaped portions of their conversation. In the video, when the victim asked [Petitioner] whether she had posted "shit" about him, [she] replied, "I was emotional." [Petitioner] refused to leave until the police arrived, about 40 to 45 minutes later.*

*The next day, the victim found scratches on his front door, which were not there before [Petitioner] arrived. At trial, the prosecution introduced a video still showing [Petitioner] knocking on the door with a metal key in the same area the victim later found scratches. The victim spent a few hundred dollars to repair the door.*

*On September 28, 2018, the victim obtained a temporary restraining order (TRO) against [Petitioner].*

4

*At the October 19, 2018 hearing on the domestic violence restraining order (DVRO hearing), the victim obtained a permanent restraining order against [Petitioner], which required [her] to stay away from the victim, not to contact him, stay away from his Facebook page, not post online about him or his company, and remove online content [Petitioner] had posted about him.  [Petitioner] was served with the TRO and the permanent restraining order.*

*After October 2018, the victim continued to see his name or likeness on about 20 "cheater type" websites.  He also received between 10 and 20 harassing phone calls and calls from people informing him something new had been posted online.* (Dkt. 3 at 4-6.)

### III.

### GROUNDS FOR RELIEF

1.     Petitioner's conviction for unlawfully disseminating the victim's nude photographs violated her First Amendment right to free speech because the victim had no reasonable expectation of privacy in the photographs.  (See Dkt. 33 at 31-32.)

2.     The domestic-violence protective order underlying her conviction for violating a protective order was invalid because there was insufficient evidence that she and the victim were in a dating relationship.  (See id. at 32-36.)

3.     The family court's protective order underlying Petitioner's violation-of-a-protective conviction violated her First Amendment rights because it amounted to prior restraints on protected speech.  (See id. at 36-42.)

4.     The prosecutor violated his discovery obligations by withholding a September 10, 2018 police field report that undermined the victim's testimony.  (See id. at 42-43.)

5.     The prosecutor violated his discovery obligations by withholding a September 18, 2018 police field report chronicling the victim's 911 call to report

that Petitioner had come to his home to harass him.  (See id. at 43-46.)

6.     The prosecutor violated his discovery obligations by failing to disclose that the victim had two prior criminal convictions.  (See id. at 46-47.)

7.     The prosecutor knowingly presented the victim's false testimony concerning Petitioner's threats to publish the victim's nude photographs. (See id. at 47.)

8.     The prosecutor committed misconduct by relying on the victim's false testimony to argue that Petitioner was guilty of vandalism. (See id. at 47-48.)

9.     The trial court violated the Fifth Amendment's prohibition on the use of compelled testimony by allowing the prosecutor to question the victim about Petitioner's family-court testimony, and the prosecutor committed misconduct during closing argument by mispresenting it.  (See id. at 48-53.)

10.     Trial counsel provided ineffective assistance by failing to investigate and adequately cross-examine the victim.  (See id. at 52-56.)

11.     Trial counsel provided ineffective assistance by failing to introduce evidence that would have shown that the victim falsely accused Petitioner of vandalism and suffered no emotional harm from his nude photographs being disseminated online.  (See id. at 56.)

12.     Trial counsel provided ineffective assistance by failing to request an instruction concerning the definition of a "dating relationship." (See id. at 57-58.)

13.     Trial counsel provided ineffective assistance by stipulating to the validity of family court's protective order underlying her violation-of-a-protective-order conviction.  (See id. at 58-59.)

14.　Trial counsel provided ineffective assistance by failing to move to exclude Petitioner's family-court testimony.  (See id. at 59.)

15.　Trial counsel provided ineffective assistance by failing to expose the victim's false testimony that he did not initially notice that his door was vandalized because it was "dark."  (See id. at 59-60.)

16.　Trial counsel provided ineffective assistance by failing question the victim about his inconsistent statements concerning the vandalism to his door and failing to call any defense witnesses.  (See id. at 60-62.)

17.　Trial counsel provided ineffective assistance by failing to object to the trial court's refusal to excuse Juror No. 4 on financial-hardship grounds, to the prosecutor's misconduct, and to the admission of multiple prosecution exhibits. (See id. at 62-65.)

18.　Trial counsel provided ineffective assistance by failing to ensure Petitioner's right to a speedy trial.  (See id. at 65-66.)

19.　There was an unreasonable determination of facts and evidence concerning whether the victim had a reasonable expectation of privacy in his nude photographs.  (See id. at 66.)

20.　There was insufficient evidence to support Petitioner's conviction for violating a protective order because she and the victim were not in a dating relationship.  (See id.)

21.　There was insufficient evidence to support Petitioner's conviction for disorderly conduct by unlawfully disseminating private videos and recordings because the victim did not have an expectation of privacy in the photographs she posted online.  (See id. at 66-68.)

22.　There was insufficient evidence to support Petitioner's conviction for disorderly conduct by unlawfully disseminating private videos and recordings because the victim suffered no serious emotional distress.  (See id. at 68.)

23.     There was insufficient evidence to support the trial court's restitution order.  (See id. at 68-69.)

24.     Law enforcement violated Petitioner's right to due process by conducting an inadequate investigation, and trial counsel was ineffective in failing to demonstrate the investigation's shortcomings to the jury.  (See id. at 69-72.)

25.     The trial court deprived Petitioner of her right to confrontation by admitting text messages sent to the victim by various third parties who did not testify at trial.  (See id. at 72-73.)

26.     The trial court violated Petitioner's right to a fair trial by permitting the prosecutor to amend the complaint concerning the violation-of-a protective-order count on the day before trial.  (See id. at 73.)

27.     Petitioner was deprived of her Sixth Amendment right to a speedy trial.  (See id. at 73-74.)

28.     The trial court erred in refusing to consider Petitioner's pretrial motion to dismiss based on the denial of her right to a speedy trial.  (See id. 33 at 92.)

29.     The trial court violated Petitioner's right to counsel by denying her motion to substitute counsel.  (See id. at 92-93.)

30.     The prosecutor committed misconduct by making inflammatory arguments, referring to facts not in evidence, vouching for the victim's credibility, and expressing improper opinions.  (See id. at 93-99.)

31.     The cumulative effect of the foregoing errors deprived Petitioner of her right to a fair trial.  (See id. at 99-102.)

32.     Appellate counsel provided ineffective assistance by failing to raise any grounds on appeal.  (See id. at 102.)

33.     Petitioner is actually innocent.  (See id. at 102.)

8

34.     Section 2254(d) does no bar relief on Petitioner's ineffective-assistance-of-trial-counsel claims because, in denying those claims, the superior court erroneously faulted Petitioner for failing to provide transcripts in support the claims without first giving her any opportunity to supplement her petition.[2]  (See id. at 102-03.)

35.     The trial court violated due process by failing to properly instruct the jury on the charged crime of violating a protective order, trial counsel was ineffective for failing to object to the instruction, and appellate counsel was ineffective for failing to challenge the instruction on appeal.  (See id. at 103; Dkt. 60 at 3; Dkt. 63 at 1.)

# IV.

## STANDARD OF REVIEW

Under 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may not grant a writ of habeas corpus on behalf of a person in state custody "with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  As explained by the Supreme Court, § 2254(d)(1) places a "constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the

---

[2] The Court has already ruled that this claim is not an independent claim but rather an argument as to why Petitioner is entitled to relief on her ineffective-assistance claims asserted in grounds ten through eighteen.  (See Dkt. 12 at 9.)  As related below, none of her ineffective-assistance claims warrants habeas relief.

merits in state court." <u>Williams v. Taylor</u>, 529 U.S. 362, 412 (2000).  In <u>Williams</u>, the Court held that:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

<u>Id.</u> at 412-13; <u>see</u> <u>Weighall v. Middle</u>, 215 F.3d 1058, 1061-62 (9th Cir. 2000) (discussing <u>Williams</u>).  A federal court making the "unreasonable application" inquiry asks "whether the state court's application of clearly established federal law was objectively unreasonable." <u>Williams</u>, 529 U.S. at 409; <u>Weighall</u>, 215 F.3d at 1062.  The <u>Williams</u> Court explained that "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  529 U.S. at 411; <u>accord</u> <u>Lockyer v. Andrade</u>, 538 U.S. 63, 75-76 (2003).  Section 2254(d)(1) imposes a "highly deferential standard for evaluating state-court rulings," <u>Lindh v. Murphy</u>, 521 U.S. 320, 333 n. 7 (1997)**,** that "demands that state court decisions be given the benefit of the doubt," <u>Woodford v. Visciotti</u>, 537 U.S. 19, 24 (2002) (per curiam).  A federal court may not "substitut[e] its own judgment for that of the state court, in contravention of 28 U.S.C. § 2254(d)." <u>Id.</u> at 25; <u>Early v. Packer</u>, 537 U.S. 3, 11 (2002) (per curiam) (holding that habeas relief is not proper where state court decision was only "merely erroneous").

1
2
3
4
5
6
7
8
9
10
11

      The only definitive source of clearly established federal law under AEDPA is the holdings (as opposed to the dicta) of the United States Supreme Court as of the time of the state court decision.  Williams, 529 U.S. at 412.  While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court law, Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir. 1999), only the Supreme Court's holdings are binding on the state courts and only those holdings need be reasonably applied, Williams, 529 U.S. at 412; Moses v. Payne, 555 F.3d 742, 759 (9th Cir. 2009).  Furthermore, under § 2254(e)(1), factual determinations by a state court "shall be presumed to be correct" unless the petitioner rebuts the presumption "by clear and convincing evidence."

12
13
14
15
16
17
18
19
20
21
22
23
24

      A federal habeas court conducting an analysis under § 2254(d) "must determine what arguments or theories supported, or, [in the case of an unexplained denial on the merits], could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court]."  Harrington v. Richter, 562 U.S. 86, 102 (2011) ("A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision.").  In other words, to obtain habeas relief from a federal court, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  Id. at 103.

25
26
27

      The Supreme Court has held that "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground."  Ylst v.

28

11

1   Nunnemaker, 501 U.S. 797, 803 (1991).  In those circumstances, federal courts

2   look through any silent denial and review the reasoned decision under AEDPA's

3   deferential standard.  See Nunnemaker, 501 U.S. at 803; Reis-Campos v. Biter, 832

4   F.3d 968, 973-74 (9th Cir. 2016) ("[W]ith respect to evaluating the state court's

5   reasoning, where a federal claim has been adjudicated in a reasoned decision, we

6   'look through' subsequent summary denials and review the last reasoned

7   decision.").

8        The Supreme Court, however, has explained that § 2254(d) "does not require

9   that there be an opinion from the state court explaining [its] reasoning," and a

10  summary denial does not relieve a petitioner from that provision's strict standard.

11  Richter, 562 U.S. at 98; see also id. at 99-100.  Thus, where only a summary denial

12  exits, federal courts conduct an independent review of the record to determine

13  whether the state court was objectively unreasonable in applying controlling federal

14  law.  See Haney v. Adams, 641 F.3d 1168, 1171 (9th Cir. 2011) (holding that

15  independent review "is not de novo review of the constitutional issue, but only a

16  means to determine whether the 'state court decision is objectively unreasonable'"

17  (citation omitted)).

18       AEDPA's deferential standard of review applies only to claims that were

19  actually "adjudicated on the merits in State court proceedings." § 2254(d).  When

20  the state courts did not reach a federal constitutional issue and the claim is not

21  otherwise barred, "the claim is reviewed de novo."  See Cone v. Bell, 556 U.S. 449,

22  472 (2009).

23

24

25

26

27

28

**V.**

**DISCUSSION**

**GROUNDS TWO, EIGHT, NINE, NINETEEN THROUGH TWENTY-TWO, TWENTY-FIVE, TWENTY-NINE, AND THRITY ARE PROCEDURALLY BARRED.**

Respondent asserts that many of the First Amended Petition's claims are procedurally defaulted for a variety of reasons.  First, he contends that the enforcement-of-the-protective-order claim (ground two), prosecutorial-misconduct claims (grounds eight and thirty), right-to-confrontation claim (ground twenty-five), and substitution-of-counsel claim (ground twenty-nine) are barred because the superior court cited Petitioner's failure to raise them on appeal in denying them. (See Dkt. 50-1 at 31-35, 41-42, 55-56, 91, 102-03, 104-05; see also LD 2 at 4 (citing In re Sakarias, 35 Cal. 4th 140, 169 (2005)).)  Second, he contends that Petitioner's claim concerning the admission of her family-court testimony at trial and the prosecutor's alleged misrepresentation of that testimony (ground nine) is barred because the Appellate Division of the Orange County Superior Court held that she forfeited it by failing to object at trial.  (See Dkt. 50-1 at 58; see also Dkt. 3 at 7.)  Third, he maintains that Petitioner's sufficiency-of-the-evidence claims (grounds nineteen, twenty, twenty-one, and twenty-two) are defaulted because the superior court cited California's prohibition on raising such claims in state habeas petitions.  (See Dkt. 50-1 at 83-84, 86; see also LD 2 at 3 (citing In re Reno, 55 Cal. 4th 428, 452 (2012)).)  Fourth, he asserts that the bulk of the claims that Petitioner raised for the first time in her second superior-court habeas petition are barred because the superior-court cited California's prohibition against piecemeal presentation of claims in denying them.  (See Dkt. 50-1 at 25, 30-31; see also LD 2 at 4-5.)  As explained below, Respondent is correct on the first three points but incorrect on the fourth.

13

### A.     Applicable Federal Law.

Habeas petitioners must provide the state an opportunity to address their claims before presenting them in a federal habeas petition.  See Davila v. Davis, 582 U.S. 521, 527 (2017).  A federal court will generally not review a constitutional claim if the state court denied it on a state-law ground that was independent of the federal issue and adequate to support the judgment.  Coleman v. Thompson, 501 U.S. 722, 729-30 (1991); see also id. at 732 (noting that "independent" means "independent of federal law"); Johnson v. Lee, 578 U.S. 605, 606 (2016) (per curiam) ("State rules count as 'adequate' if they are 'firmly established and regularly followed.'" (citation omitted)).  If a claim is so barred, the federal court can review its merits only if the petitioner shows "cause" to excuse the failure to comply with the rule and "actual prejudice resulting from the alleged constitutional violation," Davila, 528 U.S. at 528 (citation omitted), or a "fundamental miscarriage of justice," Schlup v. Delo, 513 U.S. 298, 314-15 (1995) (citation omitted).  "[T]he miscarriage of justice exception is limited to those extraordinary cases where the petitioner asserts his innocence and establishes that the court cannot have confidence in the contrary finding of guilt."  Johnson v. Knowles, 541 F.3d 933, 937 (9th Cir. 2008) (emphasis omitted).

In California, "habeas corpus cannot serve as a substitute for an appeal, and, in the absence of special circumstances constituting an excuse for failure to employ that remedy, the writ will not lie where the claimed errors could have been, but were not, raised upon a timely appeal from a judgment of conviction."  Dixon, 41 Cal. 2d at 759.  California's Dixon rule is both independent and adequate.  See Johnson, 578 U.S. at 609 (Dixon rule "qualifies as adequate to bar federal habeas review"); Corona v. McDowell, 853 F. App'x 179, 180 (9th Cir. 2021) (recognizing Dixon rule as "an independent and adequate state ground" (citing Johnson v. Montgomery, 899 F.3d 1052, 1060 (9th Cir. 2018))).

14

To preserve a constitutional claim on appeal, California requires a defendant to raise a timely and specific objection at trial.  See People v. Alvarez, 14 Cal. 4th 155, 186 (1996).  The contemporaneous-objection rule has been found by the Ninth Circuit to be an independent and adequate state bar.  See Tong Xiong v. Felker, 681 F.3d 1067, 1075 (9th Cir. 2012); Fairbank v. Ayers, 650 F.3d 1243, 1256-57 (9th Cir. 2011); see also Rich v. Calderon, 187 F.3d 1064, 1069-70 (9th Cir. 1999) (petitioner's prosecutorial-misconduct claims were procedurally barred because he failed to object to alleged misconduct at trial).

California courts do not consider sufficiency-of-the-evidence claims in state habeas petitions; rather, they must be raised on direct review.  See In re Lindley, 29 Cal. 2d 709, 721-42 (1947).  The Ninth Circuit has held that the Lindley rule is an independent and adequate state-law ground.  See Carter v. Giurbino, 385 F.3d 1194, 1197-98 (9th Cir. 2004).

California prohibits successive or piecemeal litigation in habeas cases.  In re Clark, 5 Cal. 4th 750, 767-79.  The Ninth Circuit has held that a citation to Clark bars federal habeas review absent evidence that it is inadequate, see Trieu v. Fox, 764 F. App'x 624, 624-25 (9th Cir. 2019), and numerous district courts within the Ninth Circuit have held that the Clark rule is sufficiently independent and adequate to bar federal habeas review, see, e.g., Knight v. Diaz, No. 18-CV-2884-AJB (BGS), 2020 WL 475221, at *11-12 (S.D. Cal. Jan. 29, 2020) (holding that the Clark rule "is independent and adequate" and thus bars federal habeas review absent a showing of either cause and prejudice or a fundamental miscarriage of justice; collecting cases), accepted by, 2020 WL 1508377 (S.D. Cal. Mar. 30, 2020); Guerrero v. Matterson, No. 20-cv-05923-WHO (PR), 2022 WL 17836598, at *3-4 (N.D. Cal. Dec. 21, 2022) (same), appeal filed, No. 23-15022 (9th Cir. filed Jan. 6, 2023).

When, as here, "the state has adequately pled the existence of an independent

1   and adequate state procedural ground as an affirmative defense, the burden to place

2   that defense in issue shifts to the petitioner."  Bennett v. Mueller, 322 F.3d 573, 586

3   (9th Cir. 2003) (as amended).  The petitioner can satisfy this burden "by asserting

4   specific factual allegations that demonstrate the inadequacy of the state procedure,

5   including citation to authority demonstrating inconsistent application of the rule."

6   Id.

7       **B.    Analysis.**

8           **1.    Procedural Default.**

9               **a.    Grounds two, eight, twenty-five, twenty-nine, and**

10                  **thirty.**

11      Petitioner's enforcement-of-the-protective-order claim (ground two),

12   prosecutorial-misconduct claims (ground eight and ground thirty), right-to-

13   confrontation claim (ground twenty-five), and substitution-of-counsel claim

14   (ground twenty-nine) are procedurally defaulted.  The superior court denied them

15   citing California's rule prohibiting raising claims in a habeas petition that could

16   have been raised on direct appeal but were not.  (See LD 2 at 4 (citing Sakarias, 35

17   Cal. 4th at 169).)[3]  Respondent has therefore asserted an independent and adequate

18   state procedural ground barring review of those claims.  Corona, 853 F. App'x at

19   180.

20

21

22

23

_____

24      [3] Although the superior court cited to the California Supreme Court's opinion
    in Sakarias rather than its opinion in Dixon, both set forth California's rule
25   prohibiting claims in a habeas petition that could have been raised on direct appeal
    but were not.  In fact, Sakarias cites Dixon for that proposition.  See Sakarias, 35
26   Cal. 4th at 169.

27

28

1

### b.    Ground nine.

Petitioner's claim that the prosecutor committed misconduct by eliciting her family-court testimony and referring to it during closing arguments is also procedurally defaulted.  The superior court's appellate division found that she had "forfeited" those claims by "fail[ing] to object at trial."  (Dkt. 3 at 7.)

Petitioner's independent Fifth Amendment challenge to the admission of her family-court testimony (see Dkt. 33 at 48-51) is also procedurally barred.  To be sure, she did not raise it on direct appeal.  But the superior court nevertheless found on habeas review that the appellate division's prior finding that she had forfeited her challenge to the prosecutor's use of her family-court testimony extended to her attempt to repackage that claim as a Fifth Amendment challenge.  (See LD 2 at 4 ("[A]lthough now alleged as Fifth Amendment and Confrontation Clause violations, petitioner already challenged the admission of family court testimony at the criminal trial.  On appeal, the Court found that petitioner forfeited such claims because she failed to object in the trial court.  They should not newly be considered here given the Court's rejection of the same issue on appeal.").)

### c.    Grounds nineteen through twenty-two.

Respondent has asserted an independent and adequate state procedural ground barring Petitioner's sufficiency-of-the-evidence claims in grounds nineteen through twenty-two.  The superior court denied those claims because they were not cognizable on habeas review.  (See LD 2 at 3 (citing Reno, 55 Cal. 4th at 452).)[4] Petitioner has not attempted to show that any of the foregoing procedural grounds were inadequate, nor could she because they are all adequate, as related above.

---

[4] Although the superior court cited to the California Supreme Court's opinion in Reno rather than its opinion in Lindley, both set forth California's rule prohibiting sufficiency-of the evidence claims in a habeas petition.  Indeed, Reno cites Lindley for that proposition.  See Reno, 55 Cal. 4th at 505.

Although she argues that the state courts erred in applying those grounds (see Dkt. 55 at 1-7), the Court "lacks jurisdiction . . . to review state court applications of state procedural rules."  Poland v. Stewart, 169 F.3d 573, 584 (9th Cir. 1999) (as amended); Trieu, 764 F. App'x at 624-25 (federal court could not "review the legitimacy" of state court's application of "procedural bar against successive or piecemeal litigation"); see also Carey v. Saffold, 536 U.S. 214, 226 (2002) (when state court rejects petition as improperly filed, that is "the end of the matter").

### d.    Claims not raised in Petitioner's first state habeas petition.

The superior court's citation to the rule against the presentation of piecemeal litigation does not bar any of the claims in the First Amended Petition.  To begin, the superior court did not indicate the claims to which the citation applied.[5]  What's more, the court did not find that three of Petitioner's direct challenges to her conviction were procedurally barred but instead addressed them on their merits. (See LD 2 at 6-7 (addressing claim that the complaint was improperly amended and Petitioner's two First Amendment claims).)  To be sure, the Supreme Court has made clear that an alternative ruling on the merits does not affect a state court's reliance on a procedural rule.  See Harris v. Reed, 489 U.S. 255, 264 n.10 (1989). But the superior court did not address the merits of any claim it found to be procedurally barred.  (See LD at 5 ("Notwithstanding the aforementioned procedural bars, petitioner's remaining claims fail on the merits." (emphasis added)).)

Moreover, the citation to the rule against piecemeal litigation could not have

---

[5] The superior identified each claim to which its many other citations to state procedural rules applied.  (See LD at 3-4.)  The only rule that the superior court cited but failed to identify the claims to which it applied was the rule against piecemeal presentation of claims.  (See id. at 4-5.)

18

applied to any claim in Petitioner's second habeas petition other than to any ineffective-assistance-of-trial-counsel claims that she failed to raise in her first superior-court petition.  The citation concerned only the prior petition that Petitioner had filed in the superior court.  (LD 2 at 5 ("Petitioner does not explain why she is filing a second, similar petition for writ of habeas corpus one year after filing her previous petition."); compare Dkt. 5 at 9 (reflecting that Petitioner's first habeas petition in superior court was filed on Oct. 13, 2021), with LD 1 at 1 (reflecting that Petitioner's second habeas petition in superior court was filed on Oct. 10, 2022); see also id. at 3 (declining to address claims that Petitioner had raised in Case No. M-19285); Dkt. 6 at 17-22 (reflecting that Case No. in Petitioner's first superior-court habeas petition was M-19285).  But other than ineffective-assistance claims, Petitioner could not have raised any of the challenges to her conviction in her first superior-court petition that she later asserted in her second.  Indeed, when she filed the first petition, her direct appeal was still pending. (See Dkt. 6 at 19.)  Consequently, the superior court lacked jurisdiction over any challenge to her conviction other than those alleging ineffective-assistance, as the superior court noted in denying the first petition.  (See id. (explaining that the court lacked jurisdiction to address any claim that was raised in or could have been raised in Petitioner's then-pending appeal from her conviction).)

In sum, only grounds two, eight, nine, nineteen, twenty, twenty-one, twenty-two, twenty-five, twenty-nine, and thirty are procedurally defaulted.  Petitioner, therefore, cannot prosecute them here unless she can show either that there was cause for the default and resulting prejudice or that a fundamental miscarriage of justice will result if the merits of her claims are not considered.  As related below, she has not done so.

**2.      Cause and Prejudice.**

Petitioner contends that the default of the claims she raised in her second superior-court habeas petition is attributable to her appellate counsel's deficient performance and that the default of her direct-appeal claims challenging the admission and use of her family-court testimony is attributable to her trial counsel's deficient performance.  (See Dkt. 55 at 7-8.)

"An attorney error does not qualify as 'cause' to excuse a procedural default unless the error amounted to constitutionally ineffective assistance of counsel." Davila v. Davis, 582 U.S. 521, 524 (2017).  The Ninth Circuit has held that ineffective-assistance claims "in the cause-and-prejudice context" should be reviewed "de novo, thereby applying a 'differing standard for evaluating constitutional error as a substantive basis of relief and as a cause to avoid default of other claims.'"  Visciotti v. Martel, 862 F.3d 749, 769 (9th Cir. 2016) (quoting Fischetti v. Johnson, 384 F.3d 140, 154 (3d Cir. 2004)).  Thus, in deciding whether the failure to raise a constitutional argument is "cause" to excuse the procedural default of a claim, courts apply "a straightforward analysis whether denial of counsel was 'an independent constitutional violation'" under Strickland v. Washington, 466 U.S. 668 (1984).  Visciotti, 862 F.3d at 769 (quoting Fischetti, 384 F.3d at 154-55).

A petitioner claiming ineffective assistance of counsel must show that counsel's performance was deficient and that the deficient performance prejudiced her defense.  Strickland, 466 U.S. at 687.  "Deficient performance" means unreasonable representation falling below professional norms prevailing at the time of trial.  Id. at 687-89.  The petitioner must overcome a "strong presumption" that her lawyer "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  Id. at 689-90.  Further, the petitioner "must identify the acts or omissions of counsel that are alleged not to

have been the result of reasonable professional judgment." Id. at 690.

To meet her burden of showing the distinctive kind of "prejudice" required by Strickland, the petitioner must affirmatively show that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. Id. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Id.; see also Richter, 562 U.S. at 111 ("In assessing prejudice under Strickland, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently.").

Here, Petitioner cannot establish that she was denied ineffective assistance on appeal or at trial.   Each is discussed in turn below.

### a.   Appellate counsel.

An appellate counsel's failure to raise an issue on appeal cannot establish cause to excuse a procedural default unless the petitioner first raises in a separate ground that appellate counsel was ineffective for failing to raise the issue and exhausts that claim in state court. Edwards v. Carpenter, 529 U.S. 446, 451-52 (2000); Murray v. Carrier, 477 U.S. 478, 488-89 (1986); Tacho v. Martinez, 862 F.2d 1376, 1381 (9th Cir. 1988) (holding that court was prohibited from considering ineffective assistance of appellate counsel as cause for default because that claim had not been raised and exhausted separately in state court).

Here, Petitioner never exhausted an ineffective-assistance-of-appellate-counsel claim concerning the failure to raise any of the defaulted claims on appeal. See McMonagle v. Meyer, 802 F.3d 1093, 1099 (9th Cir. 2015) (en banc) (other than claims asserted on direct review, California misdemeanants must exhaust claims in the California Supreme Court). The first habeas petition she filed in the state supreme court asserted numerous ineffective-assistance-of-trial-counsel claims

1
2
3
4
5
6
7
8
9

(see Dkt. 6 at 65-83) but no corresponding ineffective-assistance-of-appellate-counsel claims.  Although she alluded to appellate counsel's performance (see id. at 65), she did not identify any specific error on appellate counsel's part.  Nor did she exhaust an ineffective-assistance-of-appellate-counsel claim concerning the defaulted claims in her second habeas petition to the California Supreme Court.  In that petition, she merely alleged that she "received zero assistance of counsel on appeal," presumably because appellate counsel filed a Wende brief.[6]  (LD 5 at 72.)[7]  She did not, however, identify which claims counsel should have raised, let alone the defaulted ones.

10
11
12
13
14
15
16
17

In any event, even if Petitioner had exhausted the ineffective-assistance claim concerning the defaulted claims, she has not shown that appellate counsel performed deficiently.  The standards for assessing the performance of trial and appellate counsel are the same.  See Evitts v. Lucey, 469 U.S. 387, 395-99 (1985); Cockett v. Ray, 333 F.3d 938, 944 (9th Cir. 2003).  In assessing whether appellate counsel performed reasonably, reviewing courts must be mindful that counsel has no constitutional duty to raise an issue when in the attorney's judgment it has little or no likelihood of success.  See McCoy v. Wisconsin, 486 U.S. 429, 436 (1988).

18
19
20

As explained below, appellate counsel could not have performed unreasonably in opting not to raise the defaulted claims because each claim is meritless.

21
22
23
24

[6] Under People v. Wende, 25 Cal. 3d 436, 441-42 (1979), counsel may file a brief summarizing the history of the case, raising no specific issue on appeal, and asking the court of appeal to conduct an independent review of the record for error.

25
26
27

[7] Petitioner evidently raised a similar claim in her second superior-court habeas petition.  (See LD 2 at 5 (noting that "Petitioner essentially argues that [appellate] counsel provided ineffective of counsel for filing Wende brief instead of presenting substantive arguments on appeal").)

28

**(1)    The Domestic-Violence Protective Order (ground two).**

Petitioner contends that the domestic-violence protective order underlying one of her convictions was invalid because she and the victim were not in a dating relationship, which was a requisite element to the victim obtaining the protective order.[8]  (See Dkt. 33 at 32-36.)

Appellate counsel could not have performed unreasonably in declining to assert this claim because trial counsel stipulated that the protective order was valid.[9] (See Dkt. 3 at 233-38.)  As such, any challenge to its validity or the evidence underpinning it would have failed.  See United States v. Dade, 136 F. App'x 973, 974 (9th Cir. 2005) ("Stipulation to a fact at trial constitutes waiver of a challenge to it on appeal."); see also United States v. Branch, 46 F.3d 440, 442 (5th Cir. 1995) ("Once a stipulation is entered, even in a criminal case, the government is relieved of its burden to prove the fact which has been stipulated by the parties.  Appellant . . . cannot now claim that the government failed to offer evidence on an element to which he confessed"); United States v. Muse, 83 F.3d 672, 679 (4th Cir. 1996) ("Because a stipulation induces the government not to offer evidence to prove the facts involved in the stipulation, a defendant may not argue at trial or on appeal that

---

[8] Pursuant to California's Domestic Violence Prevention Act (DVPA"), a person can obtain a domestic-violence protective order against someone "with whom the [person] is having or has had a dating . . . relationship."  Cal. Penal Code § 6211(c).  A "dating relationship" under the DVPA "means frequent, intimate associations primarily characterized by the expectation of affection or sexual involvement independent of financial considerations."  Phillips v. Campbell, 2 Cal. App. 5th 844, 848 (2016) (citation and internal quotations omitted)).

[9] In a separate claim, Petitioner contends that trial counsel was ineffective in stipulating to the validity of the family court's protective order.  (See Dkt. 33 at 58-59.)  The Court addresses that claim when it addresses Petitioner's other ineffective-assistance claims.  (See infra.)

the stipulation is insufficient to prove beyond a reasonable doubt the facts or elements to which he has stipulated"); Jackson v. United States, Nos. 1:06-cr-00134-AWI, 1:101cv-022241AWI, 2012 WL 2953058, at *13 (E.D. Cal. July 19, 2012) (stipulation that bank's deposits were insured by the FDIC when petitioner robbed them "relieved the government of its obligation to show the banks were federally insured").

Moreover, any argument that Petitioner did not authorize or know about counsel's stipulation would also have failed.  (See Dkt. 55 at 16.)  "Defense counsel has the ultimate authority to decide issues concerning 'what evidence should be introduced and what stipulations should be made.'"  United States v. Benoit, 545 F. App'x 171, 174 (3d Cir. 2013) (quoting Gov't of the V.I. v. Weatherwax, 77 F.3d 1425, 1434 (3d Cir. 1996)).  Although Petitioner now takes issue with counsel's decision, she is nevertheless bound by it.  See New York v. Hill, 528 U.S. 110, 114-15 (2000) (holding that defendant is bound by counsel's decisions relating to conduct of trial).  Her claim that she was unaware of the stipulation likewise fails because she is "considered to have 'notice of all facts, notice of which can be charged upon the attorney.'"  Id. at 115 (quoting Link v. Wabash R. Co., 370 U.S. 626, 634 (1962)).  In any event, no Supreme Court precedent supports the proposition that a trial counsel must seek prior approval from the defendant before entering into an evidentiary stipulation.  See Hill, 528 U.S. at 114-15 (identifying only the right to plead not guilty and the right to counsel among fundamental rights that cannot be waived by counsel absent defendant's public acknowledgment).  And even if it did, Petitioner implicitly approved of the stipulation because she was present and raised no objection when counsel first proposed it and later when he entered into it.  (See Dkt. 3 at 230, 233-38; Dkt. 4 at 118-20); United States v. Edwards, 897 F.2d 445, 446-47 (9th Cir. 1990) (defendant's silence at trial effectively waived his right to testify on his own behalf despite his contentions that

24

trial counsel refused to allow him to testify and that he was unaware of his right to testify); Johnson v. Sullivan, No. 2:20-cv-01198-RGK (PD), 2021 WL 2786340, at *8 (C.D. Cal. Apr. 16, 2021) (petitioner was bound by counsel's representations to court that no Miranda violation occurred when he "was present and voiced no disagreement or objection to counsel's representations"), accepted by 2021 WL 2433795 (C.D. Cal. June 15, 2021).

In short, any claim challenging the stipulation would have failed, and thus counsel did not perform unreasonably in opting not to assert one.  See Kimmelman v. Morrison, 477 U.S. 365, 375 (1986); Boag v. Raines, 769 F.2d 1341, 1344 (9th Cir. 1985) (counsel's failure to raise meritless argument does not constitute ineffective assistance).

### (2)   Prosecutorial misconduct (grounds eight and thirty).

In her eighth and thirtieth grounds for relief, Petitioner contends that the prosecutor committed numerous acts misconduct.  As explained below, the prosecutor did not commit misconduct, and thus appellate counsel was not ineffective in failing to raise any of the proposed prosecutorial-misconduct claims on appeal.

### (a)   Dark-of-night argument (ground eight).

Petitioner maintains that the prosecutor committed misconduct in his rebuttal argument concerning the vandalism count.  (See Dkt. 33 at 47-48.)  In particular, she faults the prosecutor for echoing the victim's supposed lies concerning the damage to his door underlying the vandalism count.  (See id.)

The following background is necessary to understand the nature of the claim. As related above, the victim obtained a temporary restraining order against Petitioner in September 2018 after she had come to his home and allegedly vandalized his door by scratching it.  (See Dkt. 3 at 5.)  A few weeks later, a

family-court judge conducted a hearing on whether to make that order permanent. (See id.)  Both Petitioner and the victim testified at the hearing.  (See Dkt. 4 at 116-17; Dkt. 6 at 167-73.)  As is pertinent here, the victim testified that he did not notice that Petitioner had vandalized his front door when it occurred because it was "dark."  (Dkt. 6 at 171.)  The victim's trial testimony mirrored his family-court testimony on this point.  Specifically, he testified at trial that he did not initially notice the damage to the door because it was dark and only realized it had been damaged the next day when his saw the scratches in the daylight.  (See Dkt. 4 at 69.)

In his closing argument, trial counsel argued that the only reliable evidence the prosecutor offered to prove Petitioner's guilt as to the vandalism count was a video showing her knocking on the victim's door.  (See id. at 177-78.)  That evidence, according to trial counsel, was insufficient to prove Petitioner's guilt. (See id.)  On rebuttal, the prosecutor addressed trial counsel's argument and, as is pertinent here, stated: "And in the dark of the night, no, [the victim] might not have seen [Petitioner] was [damaging the door]."  (Id. at 193.)

Petitioner contends that this statement amounted to misconduct because the prosecutor knew that the victim's testimony about it being too dark to see the damage to the door was false.  In truth, according to Petitioner, a lightbulb above the victim's door "showered" the area with light; thus, if she had damaged the door, the victim necessarily would have seen it the night he confronted her outside his home or later that evening when the police responded to his 911 call.[10]  (Id. at 47-48.)

Appellate counsel was not ineffective in declining to raise this claim on

---

[10] The First Amended Petition repeats this allegation of error in ground thirty. (See Dkt. 33 at 97-98.)

appeal.  First, Petitioner presents no evidence to show that the victim's statement was false or that the prosecutor's argument concerning it was improper.  To be sure, she disputes that she damaged the victim's door, but it is undisputed that she came to the victim's home at night – that is, when it would have been dark outside – and that the victim claimed to have noticed the damage to his door the next day.  (See Dkt. 4 at 69.)  Although Petitioner maintains that there was a lightbulb "shower[ing]" light on the victim's door (Dkt. 33 at 47-48), she cites no evidence to support that contention.  To the contrary, in a photograph attached to her First Amended Petition depicting her at the victim's door on the night it was allegedly vandalized, no light bulb is visible.  (See Dkt. 6 at 159.)  And assuming a light near the door existed, nothing suggests that it was so bright that it would have been impossible for the victim to not notice the damage to the door.  In fact, the photograph shows that the door was mostly covered in shadow, and thus no damage to it is visible.  (See id.; cf. id. at 175 (photograph showing that the damage to the door was clearly visible in the daylight).)  Put simply, the victim's testimony at trial supported the prosecutor's argument, and as such, the prosecutor committed no misconduct in making it.  In turn, appellate counsel had no basis to challenge the argument on appeal.

In any event, even assuming error, Petitioner suffered no prejudice from counsel's failure to raise this claim on appeal.  The prosecutor's remark was isolated, comprising less than twenty words in a closing argument that spanned twenty-five pages of the reporter's transcript.  (See Dkt. 4 at 163-76.)  As such, it was unlikely to have impacted the jury's verdict.  See Harrell v. Addison, No. 3:21-cv-0255-RBM-AHG, 2022 WL 1292142, at *24 (S.D. Cal. Apr. 29, 2022) (prosecutor's misstatement of fact during closing argument did not deprive petitioner of a fair trial when the misstatement "was an isolated comment during a lengthy closing argument" spanning 45 pages of transcript), cert. of appealability

denied, No. 22-55510, 2023 WL 8320029 (9th Cir. Aug. 30, 2023); Williams v. Lewis, No. CV 11–3303 PA (FFM), 2012 WL 5499552, at *8 (C.D. Cal. Sept. 19, 2022) (prosecutor's improper comments did not prejudice petitioner when they consisted of four lines in an argument that spanned 14 pages of the trial transcript), accepted by 2012 WL 5499427 (C.D. Cal. Nov. 9, 2012).

What's more, there was overwhelming evidence that Petitioner vandalized the victim's door. The victim testified that before Petitioner came to his house, the door was not damaged but afterwards had multiple scratches and dots on it. (See id. at 68; see also Dkt. 6 at 175 (photograph of the victim's door taken after Petitioner came to his house showing multiple X's and dots scratched into the door).) Moreover, the jury saw a photograph of Petitioner pressing a metal key to the victim's door (see Dkt. 6 at 159), and the victim testified that he heard her knocking at his door for up to twenty minutes on the night it was damaged. (See Dkt. 4 at 114, 116.) Given these facts, Petitioner cannot show a reasonable probability that the court of appeal would have reversed her vandalism conviction (or any of her other convictions) if appellate counsel had raised this claim.

Accordingly, Petitioner cannot show cause for the default of ground eight.

**(b)** **Inappropriate and inflammatory**
**arguments (subpart of ground 30).**

Petitioner contends that the prosecutor committed misconduct by making several inappropriate and inflammatory arguments. (See Dkt. 33 at 94-96.) First, she faults the prosecutor for drawing the jury's attention during closing argument to a video in which she did not deny posting the victim's nude photographs when directly confronted about it. In particular, Petitioner takes issue with the following argument:

*At no point does [Petitioner] say anything to say that she didn't [post the victim's nude photographs online], right? She never said, what are you talking*

28

*about? I would never do that. This is a misunderstanding. No way. What*

*reasonable person, when they're being directly accused of that, would just sit there*

*and not in some way deny it? [¶] And she doesn't deny it in any way. "I was*

*emotional." And she admits it again in court, and you should find that she's fully*

*admitting to that crime. And it's clear that she did it, and she is absolutely guilty of*

*[unlawfully disseminating the victim's private photographs].*

(Dkt. 4 at 169.) This argument was inappropriate, according to Petitioner, because

the video on which the prosecutor relied was "obviously . . . edited and

incomplete." (Dkt. 33 at 94.) Furthermore, she contends that she "likely" denied

posting the photographs when she was not being recorded or simply did not deem it

necessary to deny the accusation because she was innocent. (Id.)

　　　　Second, Petitioner contends that the prosecutor committed misconduct by

suggesting that she was guilty of vandalizing the victim's door because there was

no reason to use a metal key against it other than to damage it. (See id. at 95-96.)

Specifically, she faults the prosecutor for making the following argument:

*And defense [counsel] is trying to argue to you, well, all you have is that [the*

*victim] heard her knocking. It's not a crime to knock. No, it's not a crime to*

*knock. But ask yourself, reasonably, why in the word is she knocking on the door*

*with keys – with metal keys? Why in the world would you be knocking on the door*

*with metal keys?*

(Dkt. 4 at 193.) This argument, according to Petitioner, was inappropriate because

it falsely implied that the only purpose of using a metal object to knock on a door is

to damage it when, in fact, many "door knockers" are made of metal. (See Dkt. 33

at 95.) Petitioner further contends that the argument effectively transformed the

prosecutor into an "unsworn" witness against her. (Id.)

　　　　Appellate counsel was not ineffective declining to raise either of these

allegations of prosecutorial misconduct on appeal. First, the prosecutor committed

no misconduct in arguing that Petitioner effectively admitted that she posted the victim's photographs online by failing to deny doing so when he confronted her about it.  California Evidence Code section 1221 provides that "[e]vidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth."  A "direct accusation in so many words is not essential" as long as the statement was made "under circumstances that would normally call for a response if the statement were untrue."  People v. Riel, 22 Cal. 4th 1153, 1189 (2000) (citation omitted). "[S]ilence, evasion, or equivocation may be considered as a tacit admission of the statements."  Id. (citing Estate of Neilson, 57 Cal. 2d 733, 746 (1962)).  "[W]hether [a] defendant's conduct actually constituted an adoptive admission [is] a question for the jury to decide."  People v. Edelbacher, 47 Cal. 3d 983, 1011 (1989) (citation omitted).

Here, the victim directly accused Petitioner of posting his nude photographs online, and Petitioner did not deny doing so, responding instead that she "was emotional" and asking the victim if they could "just talk."  (Dkt. 3 at 112.) Similarly, when the family-court judge asked her if she had posted the photographs online, she responded, "I don't recall."  (Dkt. 6 at 168; see also Dkt. 4 at 79.) Given that evidence, the prosecutor was free to urge the jury to find that her failure to deny posting the photographs constituted an admission of guilt and that, therefore, she was guilty of the unlawful-dissemination count.

There is, moreover, not merit to Petitioner's claim that the video in which she failed to deny the victim's accusations was manipulated.  (See Dkt. 33 at 70, 94.) Although she claims that it "obviously" was, she provides no evidence to show as much.  Such unsupported allegations do not warrant habeas relief.  James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994) ("Conclusory allegations which are not supported by

a statement of specific facts do not warrant habeas relief."); <u>Jones v. Gomez</u>, 66 F.3d 199, 205 (9th Cir. 1995) (habeas relief not warranted when claims for relief are unsupported by facts). Nor is there any testimony or evidence to support her claim that the video failed to capture her denying the victim's accusation. Finally, to the extent she claims that her response to the victim's accusation was not an admission under California law because she was innocent and thus had no reason to deny it, her claim is not cognizable on federal habeas review because it exclusively concerns California's evidence law. <u>See</u> <u>Waddington v. Sarausad</u>, 555 U.S. 179, 192 n.5 (2009) ("[W]e have repeatedly held that 'it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.'" (quoting <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991)); <u>McMillian v. Montgomery</u>, No. CV 16-3194-JAK (PLA), 2019 WL 988696, at *10 (C.D. Cal. Jan. 10, 2019) (rejecting petitioner's claim concerning the admission of jailhouse recordings as adoptive admissions, noting that "[f]ederal habeas corpus relief . . . is not available as a remedy for state law errors"), <u>accepted by</u> 2019 WL 1746024 (C.D. Cal. Apr. 18, 2019). In short, the prosecutor's argument was proper; as such, there was no basis to challenge it on appeal.

Second, the prosecutor committed no misconduct concerning his argument about Petitioner's use of a metal key against the victim's door. A prosecutor does not commit misconduct by asking the jury in closing arguments to make reasonable inferences from the evidence at trial. <u>See</u> <u>United States v. Cabrera</u>, 201 F.3d 1243, 1250 (9th Cir. 2000); <u>United States v. Patel</u>, 762 F.2d 784, 795 (9th Cir. 1985) ("When a prosecutor's remarks . . . constitute reasonable inferences from the evidence, no prosecutorial misconduct can be demonstrated."). Indeed, "[c]ounsel are given latitude in the presentation of their closing arguments, and courts must allow the prosecution to strike hard blows based on the evidence presented and all reasonable inferences therefrom." <u>Ceja v. Stewart</u>, 97 F.3d 1246, 1253-54 (9th Cir.

31

1996).

Here, counsel did not exceed the latitude afforded to him. The evidence adduced at trial showed that Petitioner used a metal key against Petitioner's door and that the victim later noticed that the door had been vandalized. (See Dkt. 4 at 69; Dkt. 6 at 159.) The prosecutor's argument highlighted that evidence and did nothing more than ask the jury to infer that Petitioner used the key to damage the victim's door. That inference was reasonable and based on the evidence at trial; as such, the prosecutor committed no misconduct.[11] Accordingly, appellate counsel was not ineffective in failing to challenge that argument on appeal, and if he had, there is no reasonable probability that it would have succeeded.

### (c)    Referring to facts not in evidence (subpart of ground 30).

Petitioner contends that the prosecutor committed misconduct during his opening statement by referring to facts not evidence. (See Dkt. 33 at 96-98.) First, she faults the prosecutor for stating that ". . . when [the family court's initial restraining order] [was] still in effect, . . . [the victim was] seeing postings on YouTube with his nude photos October 4th after the order had been served." (Id. at 96 (quoting Dkt. 4 at 24-25).) Second, she asserts that no evidence supported the prosecutor's statement that the case involved "a dating relationship that went awfully bad." (Id. 96-97 (quoting Dkt. 4 at 18).) According to Petitioner, the evidence at trial affirmatively established that she and the victim were not in a dating relationship (see id. at 96-97 (quoting Dkt. 4 at 33-35; Dkt. 3 at 114)).[12]

---

[11] Petitioner's argument concerning metal 'door knockers" is not persuasive or sufficient to show that the prosecutor committed misconduct. A door knocker designed to alert residents of guests without damaging the door is readily distinguishable from repeatedly using a metal key point against an otherwise unprotected door.

[12] Petitioner also claims that the prosecutor committed misconduct during his

1    Appellate counsel was not ineffective in declining to raise either claim on

2    appeal.  First, the evidence supported the prosecutor's statement that Petitioner

3    violated the family-court's initial restraining order by continuing to post online

4    about the victim and failing to remove her existing posts.  (See Dkt. 4 at 74, 77, 79,

5    81-86, 91, 95.)  To the extent the prosecutor incorrectly stated that the victim's

6    nude photographs appeared online after the initial restraining order was issued, that

7    fact – if true – was not remarkable.[13]  To the contrary, the Supreme Court has

8    recognized that "[m]any things might happen during the course of the trial which

9    would prevent the presentation of all the evidence described in advance." Frazier v.

10   Cupp, 394 U.S. 731, 736 (1969).

11       In any event, there is no reason to believe that the prosecutor's isolated

12   comment at the beginning of the trial deprived Petitioner of her right to a fair trial.

13   Before the parties' opening statements and at the close of evidence, the trial court

14   instructed the jury that the statements of counsel were not evidence and that the

15   verdict could be based only the evidence admitted at trial.  (See Dkt. 4 at 8 ("Your

16   verdict must be based only on the evidence presented during trial in this court."), 14

17   ("Nothing the attorneys say is evidence.  In their opening statements and closing

18   arguments, the attorneys will discuss the case, but their remarks are not evidence.");

19   see also id. at 6, 142-45 (reflecting that each juror was given a printed copy of the

20   trial court's instructions)); Dkt. 3 at 129, 133 (written copy of relevant

21   instructions)).  The jury is presumed to have followed those unambiguous

22   closing argument by stating that "this case starts out with a fallout in the

23   relationship."  (Dkt. 33 at 97; Dkt. 4 at 165.)

24       [13] The testimony at trial showed that a video of the victim and several
25   websites containing information about him appeared online after the family court's
     initial restraining order was issued.  (Dkt. 4 at 79-86.)  Because neither party has
26   lodged a copy of the video or screenshots from websites, the Court cannot
27   determine if the video or the websites included the victim's nude photographs.

28

instructions.  See Weeks v. Angelone, 528 U.S. 225, 234 (2000).  Thus, any minor variance between the prosecutor's opening statement and the evidence at trial could not have been prejudicial.  See Cupp, 394 U.S. at 736 (prosecutor's opening statement summarizing expected testimony from defendant's accomplice who ultimately was not called to testify did not warrant reversal of defendant's conviction when the jury was instructed that the statements of counsel were not evidence and nothing suggested that the jury failed to follow that instruction); United States v. Jones, 592 F.2d 1038, 1043-44 (9th Cir. 1979) (same when the prosecutor referred to expected identification testimony from witness whom he ultimately did not call to testify because of the witness's "psychological disorders"); Goodwin v. Hill,  No. CV 15-9156 JFW (PVC), 2024 WL 967908, at *61 (C.D. Cal. Feb. 2, 2024) (same in double-murder case when no evidence at trial supported the prosecutor's opening statement concerning the details of one of the murders), accepted by 2024 WL 969453 (C.D. Cal. Mar. 6, 2024).  If appellate counsel had raised this claim on appeal, there is no reason to believe it would have succeeded.

Second, the prosecutor committed no misconduct in stating that the case involved "a dating relationship that went awfully bad" (Dkt. 33 at 96-97 (quoting Dkt. 4 at 18)) because ample evidence at trial supported it.  Although Petitioner and the victim were not exclusive, their five-week relationship bore all the hallmarks of a dating relationship and none of those associated with any other kind of relationship.  See People v. Upsher, 155 Cal. App. 4th 1311, 1323 (2007) (explaining that "dating relationships" under California law can be short-term arrangements and are defined by "emotional and privacy aspects that do not exist in other social or business relationships"); see also People v. Hosein, No. H044984, 2018 WL 6604224, at *3 (Cal. Ct. App. Dec. 17, 2018) (explaining that a "dating relationship" for the purposes of obtaining a domestic-violence protective order "is

not limited only to serious courtships, long-term relationships, or exclusive
relationships" (citations and internal quotations omitted)).  They met on a dating
app.  (See Dkt. 4 at 31.)  They also went on two dates – one of which was at the
victim's home – and exchanged many flirtatious text messages before and
afterwards.  (See id. at 32-34, 101.)  And between their first and second date,
Petitioner asked the victim to send her a nude photo of himself, which he did.  (See
id. at 34, 104); People v. Hill, No. B296761, 2020 WL 4364640, at *4 (Cal. Ct.
App. July 30, 2020) (sufficient evidence of dating relationship when defendant and
her victim dated each other for only four weeks, during which they "interacted
frequently and in a manner that suggested they were in a romantic relationship");
compare Oriola v. Thaler, 84 Cal. App. 4th 397, 412 (2000) (evidence of dating
relationship was insufficient to support injunctive relief under Domestic Violence
Prevention Act when "[i]mmediately after their first date, . . . appellant told
respondent she was not interested in a romantic relationship with him").

Petitioner's pretrial statements, moreover, betray her after-the-fact claim that
she did not consider herself to be in a dating relationship with the victim.  Indeed,
in one of her texts to the victim, she explained that she was posting his private
images and information online because he had "cheat[ed]" on her.  (Dkt. 3 at 5);
Upsher, 155 Cal. App. 4th at 1323 (sufficient evidence of dating relationship
existed in part because defendant's pretrial statements showed that he believed he
and his victim were in a relationship).  Put simply, the evidence at trial supported a
reasonable inference that Petitioner and the victim were in a dating relationship.  As
such, the prosecutor committed no misconduct in characterizing their relationship
as such.[14]

---

[14] As related above, Petitioner's claim challenging the validity of the family-
court protective order for lack of a dating relationship (ground two) fails because
trial counsel stipulated to its validity.  But even if no stipulation had existed, her
claim would fail because there was sufficient evidence that she was in a dating

Accordingly, appellate counsel was not ineffective in failing to argue on appeal that the prosecutor referred to facts not in evidence, and even if he had, the court of appeal in all likelihood would have rejected it.  Petitioner, therefore, cannot show cause for the default of these claims.

### (d)   <u>Vouching for the victim's credibility (subpart of ground 30).</u>

Petitioner contends that the prosecutor impermissibly vouched for the victim's credibility.  (Dkt. 33 at 98-99.)  Specifically, she faults the prosecutor for making the following statement in his rebuttal in response to trial counsel's efforts to attack the victim's credibility:

*Really, he's not credible?  A guy who walked into a room, took an oath in front of multiple strangers.  More than – I was going to say 14 or more, including court staff.  And he went up there, and guess what?  He had to tell this room full of strangers – he had to get up there on that stand in front of all of you and admit that, I was dating this girl.  And yeah, I sent her nude photos after a week. [¶]  And think about what it takes (indiscernible) actually admit that you're doing that, knowing that you're not just admitting doing that, but guess what?  Every single one of these strangers is going to get to see those nude photos of you now, as well. [¶]  And he went up there and told you that yes, in fact, he did do that.  My point is he is credible.  He admitted to things that he didn't see when he was asked, did you actually see her scratching up the door?  He said, no, I didn't see that happening when it was happening.*

(Dkt. 4 at 189.)[15]

_____

relationship with the victim for the reasons stated above.

[15] In connection with this claim, Petitioner asserts that the prosecutor withheld a September 18, 2018 police field report showing that the victim committed perjury.  (<u>See</u> Dkt. 33 at 98.)  Because she asserts an independent

Appellate counsel was not ineffective by failing to argue on appeal that the prosecutor impermissibly vouched for the victim's credibility.  A prosecutor may not vouch for the credibility of a prosecution witness.  See United States v. Young, 470 U.S. 1, 18-19 (1985); United States v. Jackson, 84 F.3d 1154, 1158 (9th Cir. 1996). "Vouching may occur in two ways: the prosecution may place the prestige of the government behind the witness or may indicate that information not presented to the jury supports the witness's testimony." United States v. Roberts, 618 F.2d 530, 533 (9th Cir. 1980) (citing Lawn v. United States, 335 U.S. 339, 359-60 n.15 (1958).

For example, impermissible vouching occurs when the prosecutor personally assures the jury that a prosecution witness is honest.  Hein v. Sullivan, 601 F.3d 897, 912-13 (9th Cir. 2010) (prosecutor impermissibly vouched for witness's credibility when he described the witness as a "very powerful and credible witness" and "the model of a perfect witness," who was "painfully honest," and "so honest about it," and possessed "the kind of integrity that our system would like to see"); United States v. Weatherspoon, 410 F.3d 1142, 1146 (9th Cir. 2005) (prosecutor improperly vouched for testifying officers by arguing that they had no reason to lie and that, if they lied, they would risk losing their jobs and being prosecuted for perjury).

By contrast, no vouching occurs when the prosecutor argues about the truthfulness of a witness's statements based upon evidence in the record, provided that the argument does not imply that the prosecution is personally assuring the witness's veracity or reflect the prosecutor's personal beliefs.  See United States v. Necoechea, 986 F.2d 1273, 1276 (9th Cir. 1993), as amended on denial of reh'g

_____

discovery-violation claim based on that report (see id. at 43-46 (ground five)), the Court addresses this issue when it discusses her discovery-violation claims.  (See infra.)

(Apr. 15, 1993) (holding that prosecutor did not vouch for witness when he argued that "if [the witness is] lying, isn't she doing a better job of it?  I submit to you, ladies and gentlemen, that she's not lying.  I submit to you that she's telling the truth" because argument was "simply an inference from evidence in the record"); United States v. Preston, 845 F. App'x 526, 529 (9th Cir. 2021) (prosecutor's statements "Why do we think he's credible" and "I would submit to you he's a very credible witness" were permissible because prosecutor was arguing that jury should find witness credible based on evidence in record and inferences to be drawn therefrom).

        Here, the prosecutor did not impermissibly vouch for the victim.  At bottom, the prosecutor simply argued that the victim's willingness to be forthcoming about embarrassing things he had done and concede that he did not actually see Petitioner inflict the damage to his door added credibility to his testimony.  That argument was proper because it was based on the victim's testimony at trial and did not imply that the prosecutor had personal knowledge concerning the victim's credibility.  See Tyler v. Martinez, No. CV 22-08250-FMO (DFM), 2023 WL 9348064, at *11, *13 (C.D. Cal. Dec. 4, 2023) (prosecutor did not impermissibly vouch for a witness by arguing that the witness's willingness to admit that he had been a drug dealer for several years showed that he was being "straight up" because prosecutor merely relied on testimony at trial to argue that the witness was credible), accepted by, 2024 WL 1256275 (C.D. Cal. Mar. 25, 2024), appeal filed, No. 24-1887 (9th Cir. Mar. 28, 2024); Phipps v. McDowell, No. EDCV 18-1302-PA (JEM), 2019 WL 4920961, at *25 (C.D. Cal. Aug. 16, 2019) (same when prosecutor characterized witness as "a very straightforward, honest kid" because prosecutor immediately supported comment with summary of witness's testimony and never implied "that she had personal knowledge of [the witness's] credibility"), accepted by, 2019 WL 4918268 (C.D. Cal. Sept. 26, 2019).

1   Consequently, appellate counsel did not perform unreasonably in declining to

2   argue on appeal that the prosecutor impermissibly vouched for the victim's

3   credibility.  Petitioner, therefore, cannot show cause for the default of this claim.

4   **(e)**    **Expressing opinions to the jury (subpart**

5   **of ground 30).**

6   Petitioner contends that the prosecutor committed misconduct by making

7   "numerous prejudicial expressions of opinion."  (Dkt. 33 at 99.)  Although she

8   refers to "numerous" instances of misconduct (id.), she identifies only one –

9   namely, that the prosecutor argued that "by the rules of the restraining order, if

10  [Petitioner] posted a post that said, . . . [the victim], he's a nice guy, that's a

11  violation of the restraining order."  (Id. (quoting Dkt. 4 at 195.)  That argument was

12  an improper expression of opinion, according to Petitioner, because the First

13  Amendment prohibited any court from ordering her not to post complimentary

14  things about the victim.  (See id.)

15  Appellate counsel was not ineffective in failing to raise this claim on appeal.

16  As related above, trial counsel stipulated that the protective order was valid and

17  prohibited Petitioner from, among other things, "posting online content about [the

18  victim] and his company Gorgeous Painting."  (Dkt. 4 at 119-20.)  The stipulation

19  did not differentiate between defamatory content and complimentary content.  (See

20  id.)  The trial court, moreover, instructed the jury "that the facts contained in t[he]

21  stipulation [were] true."  (Id. at 118.)  Consequently, the prosecutor's challenged

22  statement was not an opinion but an established fact.  As such, his argument was

23  proper.[16]  See Ruffin v. Gastelo, No. 2:20-cv-10503-JGB (MAR), 2021 WL

24  6845544, at *17 (C.D. Cal. Dec. 8, 2021) (prosecutor committed no misconduct in

25

26  [16] In a separate claim, Petitioner contends that the protective order violated
    the First Amendment.  (See Dkt. 33 at 37-42.)  The Court addresses that claim

27  separately.  (See infra.)

28

arguing that petitioner had two prior felonies because parties stipulated to that fact),
accepted by 2022 WL 393193 (C.D. Cal. Feb. 9, 2022).

In any event, even if the prosecutor's statement was improper, it resulted in
no prejudice.  The prosecutor did not argue that Petitioner had violated the
protective order by posting complimentary things about the victim, and no evidence
at trial suggested that she had done so.  Rather, immediately after making the
challenged statement, the prosecutor argued that Petitioner had violated the
protective order by posting derogatory statements about the victim.  (See id. at 195
("Well, guess what she actually posted about him that you know?  Manipulative,
cheater, pathological liar, specifically talking about specific dating experiences that
only she had with him on only two different dates.").)  Consequently, there is no
reason to believe that the prosecutor's isolated comment concerning hypothetical
complimentary posts had any impact on the jury's verdict.  As such, appellate
counsel had no reason to raise this claim on appeal, and if he had, it would have
failed.

Accordingly, Petitioner has not established cause for the default of this claim.

### (3)    Sufficiency of the evidence (grounds nineteen, twenty, twenty-one, and twenty-two).

Petitioner asserts four sufficiency-of-the-evidence challenges to her
convictions.[17]  (See Dkt. 33 at 66-68.)  In her twentieth ground for relief, she
challenges the evidence supporting her violation-of-a-protective-order conviction,
contending that there was insufficient evidence to show that she and the victim
were in a dating relationship.  (See id. at.)  In her nineteenth and twenty-first
grounds for relief, she contends that there was insufficient evidence to support her

---

[17] Although Petitioner asserts a fifth insufficient-evidence claim (see Dkt. 33
at 68-69 (ground twenty-three), that claim concerns the evidence supporting the
trial court's restitution order rather than the evidence supporting her convictions.

conviction for unlawfully disseminating the victim's private photographs because the prosecutor failed to prove that the victim had an expectation of privacy in the photographs.[18]  (See id. at 66-68.)  According to Petitioner, the victim could not have had an expectation of privacy in the photographs because he was unfaithful husband who sent nude images of himself to someone whom he had met only once.  (See id.)  Moreover, she asserts that the victim was a "nudist" and, as such, had no expectation of privacy in any nude image of himself.  (See id. at 68.)  In her twenty-second ground for relief, she challenges the evidence showing that the victim suffered serious emotional harm from the dissemination of his nude photographs.  (See id.)

Appellate counsel's decision not to raise these sufficiency-of-the-evidence claims was not unreasonable.  First, establishing the existence of a dating relationship was unnecessary to prove the crime of violating a protective order.  Rather, that crime required proof only that Petitioner knowingly and intentionally violated a valid protective order requiring her to refrain from specified conduct.  (See Dkt. 3 at 159 (CALCRIM 2701, setting forth requisite elements for prosecutor to prove that Petitioner violated a "protective or stay away order")); Cal. Penal Code § 273.6(a).  Thus, challenging the evidence showing a dating relationship between Petitioner and the victim would have been pointless.  Although Petitioner evidently believes that appellate counsel should have challenged the sufficiency of the evidence supporting the issuance of the domestic-violence protective order (see Dkt. 33 at 32-33), any such challenge would have failed because trial counsel

---

[18] Although Petitioner styles her nineteenth ground for relief as § 2254(d)(2) claim involving an "unreasonable determination of the facts in light of the evidence presented in the state court proceedings" (Dkt. 33 at 66), that claim is duplicative of her twenty-first ground for relief (see id. at 66-67), as the Court has already found (see Dkt. 12 at 5.)

stipulated to its validity.  (See Dkt. 4 at 118-20.)  In any event, there was sufficient evidence to show that Petitioner and the victim were in a dating relationship, as discussed above.  (See Dkt. 3 at 5; Dkt. 4 at 32-34, 101, 104); Campbell, 2 Cal. App. 5th at 849-51; Upsher, 155 Cal. App. 4th at 1323; Hill, 2020 WL 4364640, at *4.

Second, appellate counsel did not err in failing to challenge the evidence supporting Petitioner's conviction for disorderly conduct by unlawfully disseminating the victim's nude photographs.  Although Petitioner asserts that an unfaithful husband lacks any expectation of privacy in naked images of himself that he sends to someone other than his spouse, there is no law to support that assertion.  Instead, a person unlawfully disseminates a private image of another person when the relevant circumstances showed that "the persons agree[d] or underst[ood] that the image [was to] remain private" and "the person [who] distribut[ed] the image kn[ew] or should [have] know[n] that distribution of the image [would] cause serious emotional distress."  See Cal. Penal Code § 647(j)(4)(A).  Here, ample evidence showed that both the victim and Petitioner understood that the nude photographs were meant to remain private.  Indeed, the victim testified that the messages he sent her containing the photographs were "private."  (Dkt. 4 at 104.)  What's more, he testified that he had never sent a nude photo of himself to anyone else (see id.), nor did he ever indicate to Petitioner that she could share the photographs with anyone else.

Petitioner, likewise, necessarily understood that the nude photographs were private.  Indeed, the photographs and the circumstances under which they were sent – namely, nude photographs sent at Petitioner's request after several flirtatious texts and a date – would have led anyone to understand that they were private.  And Petitioner's statements after posting the photographs online showed that she knew she was publicizing private images.  Not only did she threaten to make him

"famous" by "put[ting]' all [his] stuff on social media," she explicitly stated that she was doing so to make him "suffer" for "cheat[ing]" on her.  (Dkt. 3 at 5; Dkt. 4 at 96.)  When he threatened to report her to police, she taunted him by saying that the police would "laugh" at him and then threatened to post another "surprise," ominously warning, "I will not stop."  (Dkt. 4 at 50, 54.)  Given that evidence, the jury could easily infer that Petitioner knew the victim's nude photographs were private and posted them specifically to embarrass and punish him.  Accordingly, appellate counsel could not have performed unreasonably in declining to challenge the sufficiency of the evidence on that point.

It is, moreover, of no consequence that Petitioner believes that the victim was a "nudist."  (Dkt. 33 at 31.)  As an initial matter, nothing in California law supports the proposition that nudists have no expectation of privacy in naked images of themselves that they send to another person.  To the contrary, the California Supreme Court has "made clear that the mere fact that a person can be seen by someone does not automatically mean that he or she can legally be forced to be subject to being seen by everyone."  Hernandez v. Hillsides, Inc., 47 Cal. 4th 272, 291 (2009) (citation and internal quotations omitted).  And even though the victim evidently felt comfortable being naked in the confines of a nude beach (see Dkt. 4 at 45-46 (reflecting that one of the nude photographs that the victim sent to Petitioner was taken at a nude beach)), that does not mean he acquiesced to having images of his naked body posted on the Internet for the entire world to see.  See York v. Story, 324 F.2d 450, 455 (9th Cir. 1963) ("The desire to shield one's unclothed figured from view of strangers . . . is impelled by elementary self-respect and personal dignity.")

Putting that aside, the jury was aware that one of the nude photographs that the victim sent to Petitioner was taken at a nude beach.  (See Dkt. 4 at 45-46.)  The jury was also instructed that it could not find Petitioner guilty of unlawfully

43

disseminating the victim's private photographs unless "[Petitioner] received or acquired the image or images of [the victim] under circumstances in which [Petitioner] and [the victim] agreed or understood that the images shall remain private." (Dkt. 3 at 160.)  The jury's verdict evidenced its belief that this showing had been made even though one of the photographs was taken at a nude beach and sent by the victim after knowing Petitioner for only a few weeks.  (See id. at 179l see also Dkt. 4 at 184 (trial counsel arguing Petitioner could not have believed that the photograph was to remain private because the victim sent it to her after knowing her for only "few weeks").)  Thus, any attempt by counsel to challenge the sufficiency of the evidence on this point would have amounted to nothing more than an invitation to reweigh the evidence at trial and intrude on the jury's exclusive province to resolve factual conflicts.  Reviewing courts are prohibited from doing either.  See Long v. Johnson, 736 F.3d 891, 896 (9th Cir. 2013) (explaining that reviewing courts must respect exclusive province of the factfinder to determine credibility of the witnesses, resolve evidentiary conflicts, and draw reasonable inferences from the proven facts).  Accordingly, counsel did not perform deficiently in declining to challenge the sufficiency of the evidence on that basis.

Petitioner's claim that there was insufficient evidence that the victim suffered the requisite "serious emotional distress" to support her conviction for unlawfully disseminating his nude photographs is equally meritless.  (See Dkt. 33 at 68); Cal. Penal Code § 647(j)(4)(A).  California law defines emotional distress as "any highly unpleasant mental reaction such as fright, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment or worry[.]"  Wong v. Jing, 189 Cal. App. 4th 1354, 1376 (2010) (citation and internal quotations omitted); see People v. Iniguez, 247 Cal. App. 4th Supp. 1, 9 (2016) (explaining that Penal Code § 647(j)(4)(A)'s use of "serious" emotional distress means "[s]ignificant or worrying because of possible danger or risk; not slight or negligible").

44

Here, there was ample evidence that the victim experienced serious emotional distress.  As a result of Petitioner's actions, he resorted to googling himself "like ten times a day" to see if she had posted additional images or information about him.  (Dkt. 4 at 64.)  When asked how he felt when he was "going through all this," he answered, "disgust[ed]."  (<u>Id.</u>).  Indeed, the mental toll on him was so significant that he had been thinking about going to therapy "a lot." (<u>Id.</u>).  And as related above, Petitioner told him that she wanted to make him "suffer."  (Dkt. 3 at 5.)  Accordingly, there was no basis to argue on appeal that there was insufficient evidence of serious emotional distress.

Petitioner, therefore, cannot show cause for the default of her sufficiency-of-the-evidence claims.

### **(4)     Right to confrontation (ground twenty-five).**

In her twenty-fifth claim, Petitioner contends that the trial court deprived her of her right to confrontation by admitting text messages sent to the victim by various third parties who did not testify at trial.  (<u>See</u> Dkt. 33 at 72-73.)

Counsel could not have performed unreasonably in declining to raise this claim on appeal.  The Confrontation Clause prohibits the introduction at trial of testimonial hearsay against the accused unless the witness is unavailable and the accused had a prior opportunity for cross-examination.  <u>Crawford v. Washington</u>, 541 U.S. 36, 68 (2004).  "But not all out-of-court statements implicate the Confrontation Clause – only statements whose 'primary purpose' was testimonial trigger the constitutional requirement.  <u>United States v. Fryberg</u>, 854 F.3d 1126, 1135 (quoting <u>Ohio v. Clark</u>, 576 U.S. 237, 244 (2015)). Testimonial statements resemble "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact."  <u>Crawford</u>, 541 U.S. at 51. "Examples can include affidavits, depositions, prior testimony, or police interrogation."  <u>United States v. Latu</u>, 46 F.4th 1175, 1180 (9th Cir. 2022).

45

Here, none of the text messages were testimonial.  Instead, they were private communications from the victim's friends and customers concerning what they had seen online about him.  See Perdomo v. Madden, No. CV 17-2282 JFW (SHK), 2018 WL 6071109, at *9 (C.D. Cal. Oct. 3, 2018) (co-defendant's text messages to his girlfriend were not testimonial, and thus did not violate Confrontation Clause, because they "were private messages made casually to an acquaintance, rather than a more formal statement to be used later at trial"), accepted by, 2018 WL 6067245 (C.D. Cal. Nov. 19, 2018); Sissac v. Montgomery, No. 16-cv-2287-BAS (JLB), 2018 WL 3375110, at *22 (S.D. Cal. July 11, 2018) (text messages between petitioner and his best friend were not testimonial under Crawford).  Consequently, there was no basis to assert a Confrontation Clause challenge to their admission.

Moreover, there is no merit to Petitioner's claim that the admission of the text messages violated California's rule against hearsay evidence.  (See Dkt. 33 at 72.)  To be sure, California generally prohibits the admission of "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated."  Cal. Evid. Code § 1200(a).  But here, the text messages about which Petitioner complains were not admitted for the truth of the matter asserted.  (See, e.g., Dkt. 4 at 44, 128.)  Thus, counsel had no reason to challenge their admission as inadmissible hearsay.

Even assuming Petitioner's hearsay claim is not procedurally barred, it is nevertheless not cognizable on federal habeas review because it exclusively concerns state evidence law.  See Waddington, 555 U.S. at 192 n.5; see also Bresnak v. Koenig, No. 2:21-cv-03206-VAP (SK), 2023 WL 3766534, at *2-3 (C.D. Cal. Mar. 20, 2023) (petitioner's claim that his mother's recorded statements were inadmissible hearsay was not cognizable because it only challenged the "state courts' interpretation and application of their own state's evidence rules"), accepted by 2023 WL 3766510 (C.D. Cal. June 1, 2023).

1
2
Accordingly, Petitioner has not established cause for the default of her right-to-confrontation claim.

3
### (5)    Substitution of counsel (ground twenty-nine).

4
5
6
7
8
9
10
In her twenty-ninth claim, Petitioner contends that the trial court violated her Sixth Amendment rights by denying her motion to substitute counsel.  (See Dkt. 33 at 92-93.)  According to Petitioner, substitution was warranted because she lost faith in her appointed counsel after he failed to inform her of a court date and infringed on her right to a speedy trial.  (See id. at 93.)  As explained below, appellate counsel did not perform unreasonably in declining to raise this issue on appeal.

11
12
13
14
15
16
17
18
19
In evaluating Sixth Amendment claims, "the appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer as such." Wheat v. United States, 486 U.S. 153, 159 (1988).  Thus, "while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is [not] to ensure that a defendant will inexorably be represented by the lawyer whom he prefers."  Id.  The Sixth Amendment guarantees effective assistance of counsel, not a "meaningful relationship" between an accused and his counsel.  Morris v. Slappy, 461 U.S. 1, 14 (1983).

20
21
22
23
24
25
26
27
Nevertheless, the Ninth Circuit has recognized that compelling a criminal defendant to undergo a trial with the assistance of an attorney with whom the defendant has become embroiled in an irreconcilable conflict deprives the defendant of any counsel whatsoever.  United States v. Moore, 159 F.3d 1154, 1159-60 (9th Cir. 1998).  The denial of a criminal defendant's motion for substitution of counsel, therefore, may violate the defendant's Sixth Amendment right to counsel.  See, e.g., id. at 1160 (trial court's failure to appoint substitute counsel was reversible error when irreconcilable conflict existed between defendant

28

and counsel); Brown v. Craven, 424 F.2d 1166, 1170 (9th Cir. 1970) (refusal to substitute new counsel violated the Sixth Amendment when relationship between defendant and particular public defender had completely collapsed).

"Given the commands of Sixth Amendment jurisprudence, a state trial court has no discretion to ignore an indigent defendant's timely motion to relieve an appointed attorney." Schell v. Witek, 218 F.3d 1017, 1025 (9th Cir. 2000) (en banc). "[I]t is well established and clear that the Sixth Amendment requires on the record an appropriate inquiry into the grounds for such a motion, and that the matter be resolved on the merits before the case goes forward." Id.

In determining whether a refusal to allow substitution of attorney resulted in a denial of the constitutional right to effective assistance of counsel, three factors are considered: (1) the timeliness of the motion, (2) the adequacy of the court's inquiry into the defendant's complaint, and (3) whether the conflict between defendant and counsel was so great that it resulted in a total lack of communication preventing an adequate defense. United States v. Cassel, 408 F.3d 622, 637 (9th Cir. 2005). The ultimate constitutional question, however, is whether the trial court's error "actually violated" the petitioner's constitutional right to counsel because the conflict between the petitioner and his attorney "had become so great that it resulted in a total lack of communication or other significant impediment that resulted in turn in an attorney-client relationship that fell short of that required by the Sixth Amendment." Schell, 218 F.3d at 1026. If the petitioner shows that a serious conflict existed that resulted in the constructive denial of counsel, no showing of prejudice is required. Id. at 1028. However, if a serious conflict existed but did not rise to the level of the denial of counsel, the petitioner must show that he was prejudiced by the conflict. Id.

Here, the trial court did not deprive Petitioner of her Sixth Amendment right to counsel by denying her motion for substitution. First, the record shows that

before rejecting the substitution motion, the trial court conducted an adequate inquiry into the nature of Petitioner's complaints.  Cf. Schell, 218 F.3d at 1027-28 (remanding for further development of the record when the trial court failed to address petitioner's substitution motion to determine the nature of the conflict between petitioner and counsel and whether the conflict deprived petitioner of his Sixth Amendment right to counsel); Brown, 424 F.2d at 1169 (granting habeas relief based on denial of substitution motion when, among other things, trial court summarily denied motion to substitute counsel without conducting any inquiry into petitioner's repeated requests for appointment of new counsel).  Specifically, once the complaint arose, the trial court allowed Petitioner to enumerate each of trial counsel's purported shortcomings and thereafter asked trial counsel to respond. (See Dkt. 3 at 198-221.)  Rather than ruling on the motion then, the trial court instead allowed Petitioner to elaborate on her complaints and respond to counsel's representations.  (See id. at 221-23.)  Only then did the trial court deny Petitioner's motion.  (See id. at 223.)  Although Petitioner may disagree with the court's ruling, she cannot show that it shirked its duty to adequately investigate her complaints.

Second, nothing in the record suggests that Petitioner and her trial counsel became embroiled in an irreconcilable conflict that deprived her of any counsel whatsoever.  As the Ninth Circuit has recognized, "[d]isagreements over strategical or tactical decisions do not rise to [the] level of a complete breakdown in communication."  Stenson v. Lambert, 504 F.3d 873, 886 (9th Cir. 2007) ("Disagreements over strategical or tactical decisions do not rise to [the] level of a complete breakdown in communication."); Schell, 218 F.3d at 1026 (noting that "decisions that are committed to the judgment of the attorney and not the client" do not deprive criminal defendant of Sixth Amendment right to conflict-free counsel); see also Brookhart v. Janis, 384 U.S. 1, 8 (1966) ("[A] lawyer may properly make a tactical determination of how to run a trial even in the face of his client's

incomprehension or even explicit disapproval.").

This precedent forecloses Petitioner's claim because, at bottom, her complaints concerning counsel's performance consist of disagreements about trial tactics. For example, she told the trial court shortly before trial began that counsel should not have requested or agreed to continuances of the trial date. (See Dkt. 3 at 217-21.) But that fact did not establish a conflict of interest because, as the trial court noted, Petitioner repeatedly agreed to waive time. (See id. at 202-04, 211-12.) Although she claimed that counsel never explained to her what a time waiver was (see id. at 203), counsel testified that he did so on the day he began representing her (see id. at 205). What's more, the record shows that there were legitimate reasons for counsel to seek or agree to continue the trial date. Counsel explained that he wanted additional time to prepare and "review the file in preparation for trial" (id. at 207),[19] and Petitioner's original trial date coincided with the outbreak of COVID-19 (see id. at 19 (reflecting that Petitioner's first trial date was scheduled for March 24, 2020)), which understandably necessitated continuances over the ensuing months. See United States v. Olsen, 21 F.4th 1036, 1047 (9th Cir. 2022) ("[S]urely a global pandemic that has claimed more than [one million lives] . . . in this country falls within such unique circumstances to permit a court to temporarily suspend jury trials in the interest of public health."). And as the trial court observed, many trials were conducted during the COVID-19 pandemic but only "for those defendants that requested a trial." (Id. at 211.) Petitioner, however, repeatedly waived time. (See id. at 202-04, 211-12.) Indeed,

---

[19] Petitioner contends that counsel requested continuances because of the Public Defender Office's congested calendars and caseloads. (See Dkt. 33 at 75-78; Dkt. 3 at 206.) This contention is meritless because trial counsel explicitly testified that none of the continuances were attributable to his caseload. (See id. at 207 ("As to congestion of the courts in my caseload, no, Your Honor. I just requested time to prepare and review the filed in preparation for trial.").)

1  even on the day she filed the motion for substitution, she declared that she was not

2  prepared for trial, whereas counsel was.  (See id. at 202, 207.)

3        Petitioner, likewise, cannot establish a conflict of interest based on trial

4  counsel's refusal to move to dismiss the charges against her based on a purported

5  speedy-trial violation.[20]  (See id. at 212, 221.)  Again, counsel's decision not to file

6  the motion represented only a disagreement with Petitioner concerning trial tactics

7  and strategy.  And in any event, counsel made an informed, strategic decision not to

8  file the motion.  (See id. at 221 (characterizing decision of whether to file the

9  motion as an "impasse" between him and Petitioner and explaining that he was

10  "unwilling" to file it).)  Such strategic decisions are "virtually unchallengeable" on

11  federal habeas review.  See Strickland, 466 U.S. at 690; Silva v. Woodford, 279

12  F.3d 825, 844 (9th Cir. 2002) (counsel commits no error when making informed

13  strategic decision).  Considering that counsel had requested multiple continuances

14  and Petitioner had personally and repeatedly waived time, that decision was

15  sound.[21]

16        Moreover, even if Petitioner could establish a conflict of interest – and she

17  cannot – she nevertheless could show no prejudice.  Counsel's decision to request

18  or agree to continuances of the trial date was not prejudicial because Petitioner

19  identifies no evidence that became unavailable at trial due to the continuances.

20        [20] Petitioner did not cite counsel's decision not to file a pretrial motion to
21  dismiss in connection with her substitution-of-counsel claim.  (See Dkt. 33 at 92-
22  93.)  At the hearing on Petitioner substitution-of-counsel motion, however, counsel
   identified his decision not to file the motion as "the only impasse" he and Petitioner
23  had.  (See Dkt. 3 at 221.)

24        [21] Petitioner also asserts that appointed counsel caused an arrest warrant to be
25  issued against her.  (See Dkt. 33 at 93.)  She does not, however, provide any
   evidence to substantiate that assertion, nor does she claim that she was in fact
26  arrested pursuant to the alleged warrant or suggest that its issuance prejudiced her
27  in any way.

28

Although she raises an independent ineffective-assistance claim based on counsel's failure to call several witnesses to testify (see Dkt. 33 at 61-62), she does not allege that any of those witnesses became unavailable as a result of the trial date being continued. To the contrary, the necessary premise of that claim is that the witnesses were available to testify. (See id.) And as related above, she personally waived time on several occasions.

She likewise can show no prejudice from counsel's decision not to file a pretrial motion to dismiss. Indeed, counsel filed a motion to dismiss for lack of evidence pursuant to California Penal Code 1118.1[22] at the close of evidence, which the trial court denied. (See Dkt. 4 at 123-24, 131.) As such, there is no reason to believe that a pretrial motion to dismiss would have fared any better. See Ahumada v. Lizarraga, No. LACV 14-4684-SVW (LAL), 2016 WL 11758460, at *16 (C.D. Cal. Sept. 9, 2016) (holding that there was no reason to believe that pretrial motion to dismiss would have been successful when court denied section 1118.1 motion to dismiss all counts at the close of evidence), accepted by 2016 WL 11758515 (C.D. Cal. Nov. 22, 2016). In any event, as far as the Court can discern, Petitioner sought to move to dismiss the charges against her based only on the failure to timely bring her case to trial. (See Dkt. 3 at 55 (identifying Cal. Penal Code §§ 1382 & 1385 as the basis for her proposed motion to dismiss).) But even if trial counsel had brought such a motion, the trial court would have denied it because it explicitly found that Petitioner had personally waived time on multiple occasions (see Dkt. 4 at 202-04, 211-12), and as related above, she was bound by counsel's decisions

---

[22] California Penal Code section 1118.1, in pertinent part, provides: "In a case tried before a jury, the court on motion of the defendant or on its own motion, at the close of the evidence on either side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal."

1  concerning the continuance of the trial date.

2      Accordingly, Petitioner has not shown cause for the default of her

3  substitution-of-counsel claim.

4                 **b.**     **Trial counsel (ground nine).**

5      As related above, the appellate division found that Petitioner forfeited her

6  claims concerning the prosecutor's use of her family-court testimony by failing to

7  object at trial.  (See Dkt. 3 at 7; see also Dkt. 33 at 48-53.)  Petitioner cannot show

8  that trial counsel's failure to object deprived her of her Sixth Amendment right to

9  effective assistance.

10              **(1)**     **Eliciting testimony concerning Petitioner's**

11                     **family-court testimony**.

12      Trial counsel did not perform deficiently in failing to object to the

13  prosecutor's eliciting testimony from the victim about Petitioner's family-court

14  testimony.  To the contrary, counsel argued that the testimony should have

15  excluded as more prejudicial than probative, but the trial court ruled it admissible.

16  (See Dkt. 3 at 241-47, 276-78.)  In doing so, the court found that its admission did

17  not violate Petitioner's Fifth Amendment rights.  (See id. at 276-78).

18  Consequently, had counsel objected when the prosecutor questioned the victim

19  about that testimony, the trial court would have overruled it.  As such, counsel

20  could not have performed deficiently in failing to object.[23]  See Kimmelman, 477

21  U.S. at 375; Boag, 769 F.2d at 1344.

22      Moreover, even if trial counsel had preserved a Fifth Amendment challenge

23  on appeal to her family-court testimony, that claim would also have failed.  "The

24  Fifth Amendment privilege against self-incrimination is not ordinarily self-

---

25      [23] In a separate claim, Petitioner faults trial counsel for failing object to the

26  admission of her family-court testimony.  (See Dkt. 33 at 59 (ground fourteen).)

27  The Court addresses that claim below.

28

1
2
3
4
5
6
7
8

executing and must be affirmatively claimed by a person whenever self-incrimination is threatened." United States v. Jenkins, 785 F.2d 1387, 1393 (9th Cir. 1986) (citing Minnesota v. Murphy, 465 U.S. 420, 429 (1984)); see also United States v. Unruh, 855 F.2d 1363, 1374 (9th Cir. 1987) ("The defendant's failure to invoke the privilege against self-incrimination waives a later claim of privilege."). "An individual may lose the benefit of the privilege inadvertently, without a knowing and intelligent waiver." United States v. Anderson, 79 F.3d 1522, 1527 (9th Cir. 1996).

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

When "a state 'compels testimony by threatening to inflict potent sanctions unless the constitutional privilege is surrendered, that testimony is obtained in violation of the Fifth Amendment.'" Anderson, 79 F.3d at 1526 (quoting Lefkowitz v. Cunningham, 431 U.S. 801, 805 (1977)). "The test is whether, considering the totality of the circumstances, the free will of the witness was overborne." United States v. Washington, 431 U.S. 181, 188 (1977). If the state "either expressly or by implication asserts" that the invocation of the privilege against self-incrimination will result in a penalty, "the failure to assert the privilege [is] excused, and the [individual's] answers [are] deemed compelled and inadmissible in a criminal prosecution." Murphy, 465 U.S. at 434-35 (probationer's statements to probation officer were not compelled when the terms of his probation required him to meet with his probation officer and answer questions truthfully because nothing suggested that his probation could be revoked if he refused to answer questions calling for incriminating responses); cf. United States v. Saechao, 418 F.3d 1073, 1081 (9th Cir. 2005) (distinguishing Murphy and holding that probationer's statements to his probation officer were compelled because he was required to answer questions truthfully and "the terms of his probation provided that a failure to comply could result in its revocation").

27
28

Here, the admission of Petitioner's family-court testimony did not violate the

Fifth Amendment.  First, she waived her right against self-incrimination at the family-court hearing because she never asserted it.  See Jenkins, 785 F.3d at 1393 (rejecting defendant's claim that trial court improperly admitted his deposition testimony from a civil action arising out of the same facts as those underlying his subsequent criminal case because he never invoked his Fifth Amendment privilege during the civil case); United States v. Rakow, No. CR 04-01563 MMM, 2006 WL 8445943, at *10 (C.D. Cal. July 3, 2006) (rejecting defendant's Fifth Amendment challenge to the admission of his testimony from a bankruptcy proceeding at his subsequent criminal trial despite that he was not advised of his right against self-incrimination before testifying in the bankruptcy proceeding).

Second, Petitioner points to no evidence suggesting that her family-court testimony was compelled.  To the contrary, based on the record, it does not even appear that she was required to attend the family-court hearing.  (See Dkt. 3 at 278.) Even if she had been, nothing prevented her from asserting her right against self-incrimination when she was confronted with questions that called for incriminating responses.  It is of no consequence that the family-court judge might have drawn an adverse inference against her had she had she done so.  See United States v. Solano-Godines, 120 F.3d 957, 962 (9th Cir. 1997) ("In civil proceedings, . . . the Fifth Amendment does not forbid fact finders from drawing adverse inferences against a party who refuses to testify.").  To the extent that she believes that the prospect of being restrained from coming in close proximity to the victim or posting online about him was sufficient to render her family-court testimony involuntary, she is mistaken.  See Baxter v. Palmigiano, 425 U.S. 308, 318 (1976) (Fifth Amendment did not prohibit prison authorities from drawing an adverse inference against an inmate based on his silence at his disciplinary proceeding); Solano-Godines, 120 F.3d at 962 (defendant's prior testimony at deportation hearing was not compelled, and thus admissible at his subsequent criminal trial, because he, "like all civil

1  defendants, had to balance the benefits of not testifying against the risk that the

2  immigration judge might draw an adverse inference from his silence").

3       Accordingly, Petitioner has failed to show cause for the default of her claims

4  concerning the admission of her family-court testimony.

5       **(2)    Referring to Petitioner's family-court testimony**

6  **during closing argument.**

7       Petitioner contends that the prosecutor made two arguments that

8  misrepresented her family-court testimony.  (See Dkt. 33 at 51-52.)  The first

9  argument concerned Petitioner's admission in family court that she had posted a

10  video of the victim online.  (See Dkt. 4 at 77.)  According to the victim's

11  recollection of Petitioner's family-court testimony, Petitioner conceded that she had

12  posted a YouTube video about him in response to the family-court judge's

13  question.  (See Dkt. 4 at 77.)  The transcript of her family-court testimony reflects

14  that she explained that she did not need his permission to do so because "that's

15  about me, about my story."  (Dkt. 6 at 57.)  Relying on those admissions, the

16  prosecutor stated:

17      *[Petitioner] said she didn't need his permission.  It was her story.  Did*

18  *you post the videos?  "Well, maybe some of them."  Under oath, spoke to the*

19  *judge in that hearing and admitted that.  The evidence is abundantly and*

20  *absolutely clear she's guilty of Count III."*

21  (Id. at 175-76.)

22       The second argument concerned Petitioner's response, "It's been taken

23  down," to the family-court judge's question of whether she had created a website

24  on which she posted nude photographs of the victim.  (See id. at 79-80; Dkt. 6 at

25  167.) Specifically, the prosecutor stated:

26      *Her response was, "It's been taken down."  Ask yourself – I invite you*

27  *to ask you – amongst yourselves when you deliberate, how would she know*

28

*it's been taken down if she's not the one that put it up, and she has no idea?*

*Why at that point would she not say [to] the court, I never posted that. What*

*are you talking about?*

(Dkt. 4 at 168.)  According to Petitioner, both statements were "outrageous" misrepresentations of her family-court testimony.  (Id. at 51-52.)

Trial counsel did not perform unreasonably in failing to object to either of the prosecutor's comments.  Attorneys may strategically decide not to object to improper closing arguments "to avoid highlighting them."  Cunningham v. Wong, 704 F.3d 1143, 1159 (9th Cir. 2013); see United States v. Necoechea, 986 F.2d 1273, 1281 (9th Cir. 1993) (observing that "many lawyers refrain from objecting during opening statement and closing argument").  The Ninth Circuit has "repeatedly held that, 'absent egregious misstatements,' failing to object to error during closing argument falls within the 'wide range' of reasonable assistance." Demirdjian v. Gipson, 832 F.3d 1060, 1073 (9th Cir. 2016) (quoting Cunningham, 704 F.3d at 1159).

Here, the prosecutor did not misrepresent Petitioner's family-court testimony, let alone "egregious[ly]" mispresent it.  Indeed, as to the first statement, Petitioner concedes that she testified at the family-court hearing that she posted a video of Petitioner without his permission and stated that she believed she did not need his permission because it was "about me . . . about my story."  (Dkt. 33 at 51; see Dkt. 6 at 169.)  She has likewise identified no misrepresentation in the second statement. To the contrary, she admits that she told the family-court judge that one of the posts concerning Petitioner had been taken down in response to the judge's question about whether she posted the victim's nude photographs online.  (See id. at 52.)  To the extent prosecutor urged the jury to rely on those admissions as evidence of Petitioner's guilt, he committed no misconduct because he merely asked the jury to draw reasonable conclusions based on evidence adduced at trial.  See United States

57

v. Henderson, 241 F.3d 638, 652 (9th Cir. 2000) ("Prosecutors have considerable leeway to strike 'hard blows' based on the evidence and all reasonable inferences from the evidence."). Accordingly, there was no basis for trial counsel to object to either statement, and had he done so, he might have drawn unnecessary and unwanted attention to them.

In short, Petitioner has failed to show cause as to any of her defaulted claims. Absent cause, there is no need to consider prejudice. See Thomas v. Lewis, 945 F.2d 1119, 1123 n.10 (9th Cir. 1991). In any event, each of the claims is meritless for the reasons set forth above. Accordingly, Petitioner is unable to demonstrate that the purported errors she challenges "worked to [her] actual and substantial disadvantage, infecting [her] entire trial with error of constitutional dimensions," United States v. Frady, 456 U.S. 152, 170 (1982) (emphasis omitted), or that a "reasonable probability" exists that the outcome of the trial would have been different without them, Frost v. Gilbert, 835 F.3d 883, 890 (9th Cir. 2016) (citation omitted).

### 2.      Fundamental Miscarriage of Justice.

Petitioner has not shown that her case "falls within the 'narrow class of cases . . . implicating a fundamental miscarriage of justice.'" Schlup, 513 U.S. at 314-15 (citation omitted). Although she contends that she is "factual[ly] innocen[t]" (Dkt. 55 at 9), she cites no facts establishing her innocence. To the extent she claims that there was insufficient to support her convictions (see id.), that claim is meritless. Indeed, the victim's testimony, Petitioner's pretrial statements, and various videos, photographs, and Internet screenshots established that she unlawfully disseminated nude photographs of the victim (see Dkt. 3 at 112, 115; Dkt. 4 at 40, 45-48, 54, 77, 79; Dkt. 6 at 167-68), violated the protective order prohibiting her from posting information about him (see Dkt. 4 at 74, 81, 85-86, 95), and vandalized his front door (see id. at 66-71, 111-13, 115-16; Dkt. 6 at 159). Although she claims that

58

some or all of the videos and other exhibits were altered or manipulated (see, e.g., Dkt. 33 at 70, 94), she provides no evidence to substantiate that claim, and nothing in the record supports it.  Put simply, there was ample evidence to support her convictions, and she has provided no evidence to show that she was actually innocent of any of the charged crimes.  Consequently, she cannot show that a fundamental miscarriage of justice will occur if the Court does not consider her defaulted claims.

Accordingly, the Court cannot consider them.

**GROUNDS ONE AND THREE: FIRST AMENDMENT CHALLENGES.**

Petitioner asserts two different First Amendment challenges to her convictions.  First, she contends that her conviction for unlawfully disseminating the victim's nude photographs violated her First Amendment right to free speech. (See Dkt. 33 at 31-32.)  Specifically, she claims that because the victim was a "nudist," he had no reasonable expectation of privacy in the photographs, and thus she had a First Amendment right to publish them.  (Id.)

Second, Petitioner contends that the enforcement of the family court's protective order amounted to a prior restraint on protected speech.  (See Dkt. at 36-42.)  In particular, she claims that the order requiring her to "remove ALL posts about [the victim] from social media and blogs, and bar [her] from future posting of ANY material [were] clearly overbroad and unlawful" because it necessarily encompassed protected speech.  (Id. at 38-39.)  As such, according to Petitioner, her conviction for violating a protective order must be overturned.[24]  (See id. at 42.)

---

[24] Respondent contends that this claim is procedurally barred because the superior court cited California's rule prohibiting claims in habeas petitions that could have been raised on appeal.  (See Dkt. 50-1 at 41 (citing LD 2 at 4).)  The superior court did not, however, identify this claim when it cited that state-law rule, and it identified each of the claims to which the rule applied.  (See LD at 4.) What's more, the superior court addressed the merits of this claim and designated it as one of the "remaining claims" to which its citations to various state-law

### A.    The Superior Court's Decision.

The superior court rejected both of Petitioner's First Amendment challenges as follows:

*Petitioner claims that her prosecution for dissemination of nude photographs violates her First Amendment rights because the victim lacked a reasonable expectation of privacy . . .  To the extent that petitioner challenges the constitutionality of the statute in general, courts have upheld the validity of Pen. Code, § 647 (j)(4)A) and found that the statute is not unconstitutionally vague or overbroad.  (See e.g. People v. Iniguez (2016) 247 Cal. App. 4th Supp. 1.)*

*To the extent that petitioner argues that she never promised to keep the images private, that claim goes to the sufficiency of the evidence.  The jury in petitioner's case was instructed that in order to find petitioner guilty under Count 3, they had to find in part that "The defendant received or acquired the image or images of the other person under circumstances in which the defendant and the other person agreed or understood that the images shall remain private."  Moreover, petitioner's trial counsel raised the same argument to the jury during closing arguments, which the jury rejected: "[The People] have not provided that information to show that there was an agreement or understanding those photos would remain private and would not be disseminated . . .  There was no implicit understanding or agreement that photo remained private, right?  Why would there? . . .  Prosecution has not presented any credible evidence that Ms. Luo posted those pictures without an agreement."  (RT p. 282-283.)  Since whether or not the victim and/or petitioner believed the images would remain private was a factual determination made by the jury, petitioner's factual claims contradicting the jury's*

---

procedural bars did not apply.  (Id. at 5, 7.)  Accordingly, this claim is not procedurally barred.

*findings are not cognizable on habeas corpus.*

*Petitioner also claims that the enforcement of a domestic violence restraining order constituted a blanket prohibition on her speech in violation of the First Amendment. This argument fails. Per Fam. Code 6322, "The court may issue an ex parte order enjoining a party from specified behavior that the court determines is necessary to effectuate orders under Section 6320 or 6321." A prohibition against dissemination of nude photographs is not protected speech for purposes of First Amendment protections. "Although stated in broad terms, the right to free speech is not absolute. '[T]here are categories of communication and certain special utterances to which the majestic protection of the First Amendment does not extend because they 'are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.'" (In re Marriage of Evilsizor & Sweeney (2015) 237 Cal. App. 4th 1416, 1427-1428, internal citations omitted.) Furthermore, the Domestic Violence Protection Act, which governs domestic violence restraining orders, has been upheld as constitutional and withstood facial challenges. "A statute that is otherwise valid, and is not aimed at protected expression, does not conflict with the First Amendment simply because the statute can be violated by the use of spoken words or other expressive activity." (Citation.) Statutes that purportedly "'restrict or burden the exercise of First Amendment rights must be narrowly drawn and represent a considered legislative judgment that a particular mode of expression has to give way to other compelling needs of society.' [Citation.] The 'protection of innocent individuals from fear, abuse or annoyance at the hands of persons who employ the telephone, not to communicate, but for other unjustifiable motives,' is such a compelling interest. [Citation.]" (Altafulla v. Ervin (2015) 238 Cal. App. 4th 571, 581.)*

(Id. at 6-7.)

## B.   Applicable Federal Law.

The Supreme Court has long maintained that speech integral to engaging in criminal conduct does not warrant First Amendment protection.  See Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 498 (1949).  Consequently, "[s]pecific criminal acts are not protected speech even if speech is the means for their commission."  Packingham v. North Carolina, 582 U.S. 98, 107 (2017).  In Giboney, for example, the Court held that enjoining otherwise lawful picketing activities did not violate the First Amendment when its only purpose was to force a company to enter an unlawful agreement in violation of Missouri's criminal antitrust laws.  336 U.S. at 501-02.  Such a restraint was justified because the otherwise lawful expressive activity was done for "the sole immediate purpose of continuing a violation of law."  Id. at 501.  The Court "reject[ed] the contention" that "the constitutional freedom for speech and press extends its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute."  Id. at 498.

Relying on Giboney, federal circuit courts, including the Ninth Circuit, have rejected First Amendment challenges to criminal convictions when the online speech at issue was integral to criminal conduct and designed to harass or cause emotional distress to another person.  See, e.g., United States v. Osinger, 753 F.3d 939, 947-48 (9th Cir. 2014) (defendant's conviction for cyberstalking based on his creating fake a social media account in his former girlfriend's name and posting sexually-explicit photographs of her did not violate the First Amendment because the defendant's speech was "'integral to criminal conduct' in intentionally harassing, intimidating or causing substantial emotional distress to [his former girlfriend]"); United States v. Sayer, 748 F.3d 425, 434 (1st Cir. 2014) (same when defendant was convicted of cyberstalking based on his posting explicit photographs

of his former girlfriend on pornography websites and creating fake social media accounts inviting men to her house for sexual encounters); United States v. Petrovic, 701 F.3d 849, 856 (8th Cir. 2012) (same when defendant was convicted of cyberstalking and extortion for creating a publicly-accessible website on which he posted nude videos and photographs of his former girlfriend and then offered to take them down in exchange for money).

**C.    Analysis.**

Neither of Petitioner's First Amendment claims warrants habeas relief.  Each is addressed in turn below.

**1.    Petitioner's Conviction for Unlawfully Disseminating the Victim's Nude Photographs.**

Petitioner's conviction for unlawfully disseminating the victim's nude photographs did not violate the First Amendment.  Like the defendant in Osinger, Petitioner posted the victim's private photographs online with the express intention to harass him and cause him emotional distress.  Indeed, she flatly announced that she wanted to make him "suffer" for "cheat[ing]" on her and told him that she was going to make him "famous" by "put[ting]' all [his] stuff on social media."  (Dkt. 3 at 5; Dkt. 4 at 96.)  She further threatened to post additional "surprise[s]" and told him, "I will not stop."  (Dkt. 4 at 50, 54.)  Because any speech she engaged in was integral to criminal conduct, see Giboney, 336 U.S. at 501-02, her conviction did not violate the First Amendment.  Moreover, to the extent Petitioner's First Amendment claim is merely a disguised sufficiency-of-the-evidence claim, the Court cannot consider it because it is procedurally barred.  In any event, ample evidence showed that both the victim and Petitioner understood that the nude photographs he sent her were meant to remain private, as related above.

Accordingly, Petitioner is not entitled to habeas relief on this claim.

**2.      Petitioner' Conviction for Violating a Protective Order.**

Petitioner's challenge to the validity of the family court's protective order

and her corresponding conviction for violating it is meritless. First, she cannot

challenge the validity of the family court's order because she stipulated at trial that

it was valid and enforceable.  (See Dkt. 3 at 238, 291; Dkt. 4 at 119-20); Dade,136

F. App'x at 974; Muse, 83 F.3d at 679.  Although she faults counsel for making that

stipulation (see Dkt. 33 at 58-59), she is nevertheless bound by it.  See Hill, 528

U.S. 110, 114-15.  As related above, she implicitly approved of the stipulation

because she was present when counsel proposed it (see Dkt. 3 at 230, 233-38),

when he agreed to it (see Dkt. 4 at 118, 120), and when it was it was read to the jury

(id. at 118-20).  At no point did Petitioner object to or raise any concern with the

stipulation.  See Edwards, 897 F.2d at 446-47; Johnson, 2021 WL 2786340, at *8.

Based on the stipulation, the trial court omitted the portion from the standard jury

instruction concerning the violation-of-a-protective-order count requiring proof that

the protective order was valid, and counsel did not object other than to ask the court

to clarify that the order was issued by the family court.  (See Dkt. 4 at 136.)

Consequently, Petitioner cannot now challenge her conviction for violating that

order on First Amendment grounds.

Moreover, to the extent Petitioner contends that she was convicted for

engaging in protected speech (see Dkt. 33 at 42), her claim fails.  Although she

suggests that the family court's protective order underlying her violation-of-a-

protective-order conviction prohibited her from engaging in protected speech (see

id. at 39), her acts underlying that conviction involved no such speech.  Rather, the

evidence at trial showed that after family court's initial restraining order was issued,

Petitioner posted the victim's private photographs, created fake social-media

accounts in the victim's name on which she posted defamatory things concerning

him, and posted defamatory and private things about him (including his home

address and phone number) on other "cheater" websites.  (See Dkt. 4 at 74, 77, 79, 81-86, 91, 95.)  As related above, her intent to harass him and cause him emotional distress was clear.  (See Dkt. 3 at 5; Dkt. 4 at 50, 54, 96.)  What's more, her actions achieved their desired result.  The victim received numerous "harass[ing]" phone calls from strangers who had read about him on various "cheater" websites (see id. at 87, 91, 95), and as a result, he felt "disgust[ed]" and gave serious consideration to undergoing therapy (id. at 96).  Because the speech in which Petitioner actually engaged was "integral to criminal conduct in intentionally harassing, intimidating or causing substantial emotional distress to [the victim]," Osinger, 753 F.3d at 947 (citation omitted), it was not protected.  Consequently, her conviction for violating a protective order did not violate the First Amendment.

**GROUNDS FOUR, FIVE, AND SIX: <u>BRADY</u> VIOLATATIONS.**

Petitioner asserts that the prosecutor violated his discovery obligations under Brady v. Maryland, 373 U.S. 83 (1963), by withholding three pieces of evidence that were material to her defense.  (See Dkt. 33 at 43-47.)  First, she contends that the prosecutor withheld a September 10, 2018 police field report in which the victim reported that Petitioner had threatened to come to his home and commit battery.  (See id. at 42-43 (ground four); see also Dkt. 6 at 200 (copy of Sept. 10, 2018 report stating that "CP has been rec'vg call from unk subjs threatening to come to his [residence] . . . and 242 him").)[25]  This report was material, according to Petitioner, because it showed that the victim did not report that she had had threatened to post his nude photographs online three days earlier.  (See id.)  As such, Petitioner believes that it would have proven that the victim doctored the text messages he claimed to have received from her threatening to post his photographs

---

[25] The report's reference to "242" appears to be a reference to California Penal Code section 242, which defines the crime of battery.

online and later lied at trial.  (See id.)  She also claims that a reference in the report to "terrorism" would have shown that the victim falsely accused her of committing acts of terrorism.  (See id. at 43.)

Second, Petitioner contends that the prosecutor withheld a September 18, 2018 police field report chronicling the victim's 911 call to report that Petitioner had come to his home to harass him.  (See Dkt. 33 at 43-46 (ground five); see also Dkt. 6 at 201 (copy of report, stating among other things that Petitioner was "at [the victim's residence] knocking at his front door").)  According to Petitioner, the report might have caused the jury to find her not guilty of vandalizing the victim's door because it made no mention of any scratches on the door and the victim did not notify police until nearly a week later that the door had been scratched.  (See Dkt. 33 at 44-45.)  What's more, according to Petitioner, a September 24, 2018 email that the victim sent to a website removal company showed that he decided to report the scratches on his door only after learning that he would have pay a substantial fee to remove the defamatory websites that Petitioner created.  (See id. at 45; see also Dkt. 6 at 165 (copy of email exchange between the victim and Guaranteed Removals stating that cost to remove each website was $1,500.00).)[26] Petitioner maintains that having considered that evidence, the jury might have concluded that the victim falsely accused her of vandalizing his door in order to exact "revenge" for causing him to incur expenses to remove the websites.  (Id.)

Third, Petitioner contends that the prosecutor failed to disclose that the victim had two misdemeanor convictions (and a related probation violation) for contracting without a license and advertising as a contractor without a license.[27]

---

[26] Petitioner does not allege that this email was withheld.  Counsel did not present it at trial.  In a separate claim, Petitioner contends that her trial counsel was ineffective for failing to do so.  (See Dkt. 33 at 56 (ground eleven).)

[27] Although Petitioner does not identify the crimes of which the victim was

(See id. at 46-47 (ground six).)  According to Petitioner, both crimes "rested upon facts establishing dishonesty or false statement[s] no different than fraud."  (Id. at 46.)  As such, they would have undermined the victim's credibility.  (See id.)

### A.    The Court of Appeal's Decision.

The court of appeal rejected Petitioner's Brady claims as follows:

*[Petitioner] complains the prosecutor violated **Brady** by failing to disclose three pieces of allegedly favorable evidence: two police department documents and the victim's criminal record.  [Petitioner] does not identify anything in either of the police department documents that could reasonably have resulted in a different outcome at trial.  [Petitioner] contends a reference to "a terrorism report" in one of the documents could have been used to impeach the victim's credibility.  Nothing in the document supports [Petitioner's] unsupported claim the victim was the source of the reference to "a terrorism report" in that document.  Indeed, it appears more likely that phrase refers to section 422, a reference to which appears on the same line of the document, and to the former description of charges pursuant to section 422 as "making terrorist threats."  (See People v. Crayton (2002) 28 Cal. 4th 346, 351 [describing § 422 as "making terrorist threats"].)  [Petitioner] contends the second document supports her contention she knocked on the victim's door rather than scratched it.  This argument ignores other evidence introduced at trial that the victim found scratches on his door the day after defendant repeatedly knocked on it.  The victim's criminal record reflects he was convicted more than ten years before the trial of misdemeanor violations of contracting without a license and advertising as a contractor without a license.  [Petitioner] does not identify*

_____

convicted and misleadingly refers to them as "impersonation" convictions (Dkt. 55 at 11), the appellate division found that the victim's only prior convictions were for contracting without a license and advertising as a contractor without a license (see Dkt. 3 at 7).

*any relevance of these old convictions to the charges at trial and we cannot discern*

*any. In sum, [Petitioner] has not demonstrated prejudice from the People's alleged*

*failure to disclose these materials. (See* Strickler v. Greene *(1999) 527 U.S. 263,*

*281-282 [*Brady *violation requires prejudice resulting from withholding of*

*evidence].)*

(Dkt. 3 at 6-7.)

## B.    Applicable Federal Law.

In Brady, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. Three elements must be proved to establish a Brady violation: (1) the evidence at issue was favorable to the defendant, either as exculpatory evidence or impeachment material; (2) the evidence was suppressed by the State, either willfully or inadvertently; and (3) prejudice resulted. United States v. Wilkes, 662 F.3d 524, 535 (9th Cir. 2011). Suppression of evidence is prejudicial if a "reasonable probability" exists that had the evidence been disclosed to the defense, the result of the trial would have been different. Sivak v. Hardison, 658 F.3d 898, 911-12 (9th Cir. 2011).

## C.    Analysis.

The appellate division reasonably rejected Petitioner's Brady claims. Each is addressed in turn below.

### 1.    The September 10, 2018 Police Field Report.

The September 10, 2018 police field report was not favorable to Petitioner. Although she claims that it would have shown that the victim made unfounded terrorism accusations, it showed no such thing. The report contains no statement from the victim accusing Petitioner of terrorism. Rather, it shows that the victim complained only that she had threatened to come to his home and commit battery.

(See Dkt. 6 at 200.)  As the court of appeal observed (see Dkt. 3 at 7), its reference to "terrorism" and "422" in all likelihood reflected the responding officer's classification of the victim's complaint as one involving making terrorist threats.

There is also no reason to believe that the report would have shown the text messages Petitioner sent to the victim were doctored or that his testimony concerning them was false.  Petitioner cites no evidence to support her self-serving speculation that the text messages were doctored.  See Wood v. Bartholomew, 516 U.S. 1, 8 (1995) (federal courts cannot grant habeas relief "on the basis of little more than speculation").  And putting that aside, the victim testified that he went to the police station on September 7, 2018 to report Petitioner's threats to post his nude photographs online but the station was closed.  (See Dkt. 4 at 52.) Consequently, he contacted with the police "the following week."  (Id.).  Nothing in the report contradicted that testimony or called it into question.

In any event, the purported suppression of the September 10, 2018 police field report resulted in no discernable prejudice.  Petitioner repeatedly admitted that she had posted private and defamatory statements about the victim online.  (See Dkt. 3 at 112 (recorded conversation in which the victim directly asked Petitioner is she had "post[ed] some shit about [him] everyday," to which Petitioner responded, "I was emotional"); Dkt. 4 at 77 (reflecting that Petitioner admitted at a family-court hearing that she had posted YouTube video of the victim), 79-80 (reflecting that Petitioner admitted creating cheater websites concerning the victim); see also id. at 79 (reflecting that Petitioner responded, "I don't know," when asked by the family-court judge if she had posted the victim's nude photographs online).) Indeed, she flatly told the victim that would make him "famous" by "put[ting]' all [his] stuff on social media," and explained that was doing so to make him "suffer" for "cheat[ing]" on her.  (Dkt. 3 at 5; Dkt. 4 at 96.)  When he threatened to report her to police, she taunted him by saying that the police would "laugh" at him and

then threatened to post another "surprise," promising that she would "not stop." (Dkt. 4 at 50, 54.)  Given this overwhelming evidence, there is no reason to believe that the September 10, 2018 police field report would have had any impact on the jury's verdict.

### 2.    The September 18, 2018 Police Field Report and the September 24, 2018 Email Exchange.

The September 18, 2018 police field report would have been equally unhelpful to Petitioner's defense.  Although it showed that the victim did not report the damage to his door on the night Petitioner came to his house, the jury was already aware of that fact.  See Mejorado v. Hedgpeth, 629 F. App'x 785, 787 (9th Cir. 2015) ("Neither the exclusion nor the admission of cumulative evidence is likely to cause substantial prejudice." (citing Wong v. Belmontes, 558 U.S. 15, 22-23 (2009))).  Indeed, he testified that he had not noticed the damage when he called the police because it was dark outside at the time.  (See Dkt. 4 at 69.)  He further testified that he noticed the damage the next day when he saw it in the daylight.  (See id.).  The report did not contradict that testimony.

In any event, the evidence of Petitioner's guilt on the vandalism count was overwhelming.  The victim testified that before Petitioner came to his house on September 18, 2018, the door had no scratches but afterwards had multiple scratches and dots on it.  (See id. at 68; see also Dkt. 6 at 175 (photograph of the victim's door taken after Petitioner came to his house showing multiple X's and dots scratched into the door).)  He also testified that he heard Petitioner knocking a key against the door for up to twenty minutes and video evidence corroborated that testimony.  (See Dkt. 4 at 114, 116.)  What's more, the jury saw a photograph of Petitioner pressing a metal key to the victim's door.  (See Dkt. 6 at 159.)  And as related above, Petitioner's text messages showed that she was determined to make the victim suffer.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17

The September 24, 2018 email exchange between the victim and a website removal company, likewise, would not have benefited Petitioner's defense. Although she claims that it would have shown the victim falsely accused her of vandalizing his door in order to exact "revenge" (Dkt. 33 at 45), it showed no such thing.  Rather, it simply reflected that the victim was informed how much it would cost to take down Petitioner's online post about him.  (See Dkt. 6 at 165.)  The victim said nothing in the exchange that would have supported a reasonable inference that he himself damaged his door or that he planned to do so and then falsely accuse Petitioner.  To the contrary, the only future action that the victim mentioned in the email was seeking a restraining order to stop Petitioner from creating more online posts about him.  (See id. ("What's [sic] happen [sic] if they post this again?  Are you guys doing cease and desist emails to delete all this immediately or face civil and criminal charges?  Maybe it will help if I fill [sic] restraining order against these [sic] person?").)  As such, there is no reason to believe that the email exchange – either on its own or in combination with the September 18, 2021 police field report – would have had any impact on the jury's verdict concerning the vandalism count.

18

### 3.     The Victim's Prior Misdemeanor Convictions.

19
20
21
22
23
24
25
26

Petitioner cannot establish a successful Brady claim based on the prosecutor's purported failure to disclose the victim's two ten-year-old misdemeanor convictions for contracting without a license and advertising as a contractor without a license.  To begin, there is no reason to believe that the trial court would have allowed trial counsel to use them to impeach the victim because, as the court of appeal noted, there were not relevant.  (See Dkt. 3 at 7 (court of appeal noting that it was unable to "discern any" relevance to the victim's "old convictions").)

27

Moreover, even assuming that the crimes were admissible as crimes

28

involving moral turpitude, see Harrington v. Dep't of Real Estate, 214 Cal .App. 3d 394 (1989) (contracting-without-a-license conviction involved moral turpitude for purposes of denying appellant a real estate license), Petitioner suffered no prejudice from their purported suppression.  To the contrary, they were ten years old and involved relatively minor crimes concerning the victim's operating a business without a contractor's license.  In the intervening ten years, the victim obtained a contractor's license (see Dkt. 4 at 106) and led an otherwise crime-free life.  What's more, there was substantial – if not overwhelming – evidence corroborating the victim's testimony.  As related above, Petitioner repeatedly admitted to posting the victim's private information online, and she was seen with a key pressed against the victim's door the night before the victim noticed the door had been severely scratched.  There was also little doubt that she posted the victim's nude photographs online.  Indeed, the victim testified that he had not sent the photographs to anyone else (see Dkt. 4 at 105), and when he asked her directly if she had posted the photographs, she admitted doing so (see Dkt. 3 at 112).  Moreover, when she was questioned at the family-court hearing about whether she had posted them, she again did not deny doing so.  Instead, she feebly answered, "I don't recall."  (See Dkt. 6 at 168; see also Dkt. 4 at 79.)  Consequently, there is no reason to believe that the victim's stale convictions would have impacted the jury's assessment of his credibility.  See Rivera v. Small, 2012 WL 6764523, at *8 (C.D. Cal. Aug. 21, 2012) (explaining that "[t]he age and relatively innocuous nature" of a prosecution witness's eleven-year-old misdemeanor conviction for receiving stolen property, "coupled with the substantial evidence of Petitioner's guilt, preclude[d] a finding that [he] was prejudiced" by his counsel's failure to use the conviction to impeach the witness), accepted by 2012 WL 6761568 (C.D. Cal. Dec. 28, 2012).[28]

---

[28] In connection with this claim, Petitioner also asserts that counsel was

1    Accordingly, Petitioner is not entitled to relief on any of her <u>Brady</u> claims.

2    **GROUND SEVEN: FALSE EVIDENCE.**

3        In her seventh ground for relief, Petitioner contends that the prosecutor

4    knowingly presented the victim's false testimony that she threatened to publish his

5    nude photographs on September 7, 2018, and carried through with that threat the

6    next week.  (<u>See</u> Dkt. 33 at 47.)  According to Petitioner, the September 10, 2018

7    police field report at issue in her first <u>Brady</u> claim (<u>see</u> <u>supra</u>) and its reference to

8    "unfounded terrorism" refuted that testimony.  (<u>See</u> Dkt. 33 at 47.)

9        The superior court denied Petitioner's false-evidence claim because she

10   could have raised it on appeal but did not.  (<u>See</u> LD 2 at 3 (identifying Petitioner's

11   "false/perjured evidence" claims), 4 (denying "claims regarding . . . prosecutorial

12   misconduct" because they could have been raised on appeal)); <u>see also</u> <u>Dow v.</u>

13   <u>Virga</u>, 729 F.3d 1041, 1043 (9th Cir. 2013) (characterizing the presentation of false

14   evidence as a form of prosecutorial misconduct).  Although Respondent argues that

15   this claim is procedurally barred (<u>see</u> Dkt. 50-1 at 52), he does not cite California's

16   <u>Dixon</u> rule as the basis for the default.  Instead, he argues that the claim is

17   procedurally barred because Petitioner failed to raise in her first state habeas

18   petition.  (<u>See</u> <u>id.</u>)  The Court, however, has already rejected that argument, as

19   discussed above.  The Court declines to <u>sua</u> <u>sponte</u> raise the <u>Dixon</u> bar because

20   Respondent could have raised it but did not and doing so would require the Court to

21   review Petitioner's appellate briefs, which neither party has lodged.  <u>See</u> <u>Vang v.</u>

22   <u>Nevada</u>, 329 F.3d 1069, 1073 (9th Cir. 2003).  Because no state court has addressed

23   this claim on its merits, the Court reviews it de novo.  <u>See</u> <u>Cone</u>, 556 U.S. at 472;

24   _____

25   ineffective for failing to use the victim's prior convictions to impeach his
     credibility.  (<u>See</u> Dkt. 33 at 52.)  That allegation is meritless for the same reasons

26   set forth above.  In any event, it is unclear how counsel could have done so because,

27   taking Petitioner's allegations as true, the convictions were suppressed.

28

see also Lambrix v. Singletary, 520 U.S. 518, 524-25 (1997) (holding that in the interests of judicial economy, federal courts may address an allegedly defaulted habeas claim on its merits if the issue of the claim's merits is clear but the procedural-default issues are not).

### A.    Applicable Federal Law.

The knowing use of false evidence by the state or the failure to correct false evidence violates due process.  See Napue v. Illinois, 360 U.S. 264, 269 (1959); see also Jackson v. Brown, 513 F.3d 1057, 1071 (9th Cir. 2008).  In Napue, the Supreme Court made clear that the prohibition against using false testimony applies even when the testimony in question is relevant only to a witness's credibility.  360 U.S. at 269.  To establish a due process violation under Napue, a petitioner must prove that (1) the testimony was actually false, (2) the prosecution knew or should have known the testimony was false, and (3) the false testimony was material.  Id. at 1071-72.

Mere inconsistencies in testimony by government witnesses are insufficient to show actual falsity under Napue.  See United States v. Bingham, 653 F.3d 983, 995 (9th Cir. 2011); cf. Hamilton v. Ayers, 583 F.3d 1100, 1111 n.4 (9th Cir. 2009).  False evidence is material if there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury."  United States v. Agurs, 427 U.S. 97, 103 (1976); see Dow, 729 F.3d at 1048.

### B.    Analysis.

Petitioner has not shown the prosecutor knowingly presented any false testimony.  As an initial matter, there is no reason to believe that the brief notations in the September 10, 2018 police field report accurately reflected everything the victim reported.  Thus, even if there were a discrepancy between the report and the victim's testimony, that discrepancy without more would not show that the victim's testimony was false.  See United States v. Zuno-Arce, 44 F.3d 1420, 1423 (9th Cir.

1995) (noting that discrepancies between witness's testimony "could as easily flow from errors in recollection as from lies"); <u>Escarcega v. Frauenheim</u>, No. CV 14-17490-PA (PLA), 2016 WL 9108856, at *7 (C.D. Cal. Sept. 30, 2016) (discrepancies between officer's testimony and police report he authored concerning charged crime did not establish that his testimony was false), <u>accepted by</u> 2017 WL 2468772 (C.D. Cal. June 6, 2017).

In any event, nothing in the report suggests that the victim's testimony was false.  As related above, the report does not show that the victim accused Petitioner of terrorism.  Rather, it states only that he claimed she had threatened to come to his house and commit battery.  (<u>See</u> Dkt. 6 at 200.)  It likewise does not show that the victim's testimony concerning Petitioner's earlier threats to publish his nude photographs online was false.  To the contrary, it says nothing concerning those threats.  And the fact that the victim did not immediately report Petitioner's threats concerning the nude photographs does not prove that she never made them or that she did not actually post the photographs online.  To the contrary, her text messages showed that she threatened to do so (<u>see</u> Dkt. 3 at 5),[29] and she admitted that she posted them because she "was emotional."  (Dkt. 4 at 77, 79-80.)

Put simply, Petitioner has not shown that the victim's testimony was false, let alone that the prosecutor knew it was false.  Accordingly, she is not entitled to relief on this claim.

_____

[29] Throughout her First Amended Petition, Petitioner asserts that her text messages, as well as various exhibits of Internet screenshots and video recordings may have been manipulated or doctored in some fashion.  (<u>See, e.g.</u>, Dkt. 33 at 70, 94.)  No evidence supports those assertions, and Petitioner's self-serving speculation concerning the authenticity and accuracy of the exhibits is not enough to call any of them into question.  <u>See</u> <u>Wood v. Bartholomew</u>, 516 U.S. 1, 8 (1995) (federal courts cannot grant habeas relief "on the basis of little more than speculation").

**GROUNDS TEN THROUGH EIGHTEEN: INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL.**

Petitioner asserts nine ineffective-assistance of counsel claims.  (See Dkt. 3 at 52-66 (grounds 10 through 18).)

### A.   The Superior Court Appellate Division's Decision.

Petitioner asserted all but two of her ineffective-assistance claims in her supplemental brief on appeal, and the superior court's appellate division rejected them as follows:

*[Petitioner] argues trial defense counsel rendered ineffective assistance, citing ten instances: (1) stipulating to facts of the protective order and failing to request jury instructions on whether [Petitioner] and the victim were in a dating relationship; (2) failing to move to exclude [Petitioner's] testimony in the DVRO hearing; (3) failing to investigate the facts, the law, and potential defenses; (4) failing to call any defense witnesses; (5) inadequately cross-examining the victim; (6) failing to object on Evidence Code section 352 grounds; (7) failing to object to the trial court's denial of a juror's hardship request; (8) failing to object to prosecutorial misconduct; (9) failing to prepare for trial in a timely manner and to file a motion to dismiss; and (10) waiving time for sentencing and improperly admitting [Petitioner's] guilt in the sentencing brief.[30]  Most of these instances (Nos. 1, 4, 5, 7, 8, 9 and 10) fail because [Petitioner] has not shown the record contains "affirmative evidence that counsel had 'no rational tactical purpose' for an action or omission."  (People v. Mickel (2016) 2 Cal. 5th 181, 198.)  Item Nos. 2 and 6 fail because counsel did object, albeit unsuccessfully, to the introduction of [Petitioner's] testimony at the DVRO hearing and to several exhibits on Evidence*

---

[30] Petitioner alleges no claim in the First Amended Petition that corresponds to her direct-appeal claim concerning counsel's performance at sentencing.

*Code section 352 grounds. Item No. 3 fails in this direct appeal because [Petitioner] relies on a declaration submitted with her supplemental brief on appeal, which is evidence outside the record.*

(Dkt 3 at 8.)

No state court issued a reasoned decision concerning two of Petitioner's ineffective-assistance claims (grounds eleven and fifteen), and based on the parties' lodgments, it is unclear if she exhausted those claims. The Court need not, however, resolve this issue because, as explained below, those claims – indeed, all of Petitioner's ineffective-assistance claims – fail under de novo review. See Berghuis v. Thompkins, 560 U.S. 370, 389 (2010) (explaining that when a claim fails under de novo review, it also fails under AEDPA's deferential standard of review); see also Lambrix, 520 U.S. at 524-25.

### B. Applicable Federal Law.

As related above, a petitioner claiming ineffective assistance cannot succeed unless counsel's performance was unreasonable and a reasonable likelihood exists that but for counsel's errors, the result at trial would have been different.[31] See Strickland, 466 U.S. at 687, 694. In Richter, the Supreme Court reiterated that AEDPA review requires an additional level of deference to a state court decision rejecting an ineffective assistance of counsel claim:

The standards created by Strickland and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. . . . Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the

---

[31] Because the Court discussed the applicable legal standard for ineffective-assistance claims in its discussion concerning procedural default, there is no need to repeat that discussion here.

1
2
3

question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard.

4

562 U.S. at 105 (citations omitted).

5
6
7
8
9
10
11

In <u>Premo v. Moore</u>, 562 U.S. 115, 127-28 (2011), the Supreme Court reversed the Ninth Circuit's grant of habeas relief on an ineffective assistance claim based on Supreme Court precedent "that did not involve ineffective assistance of counsel" and "says nothing about the <u>Strickland</u> standard."  "The lesson of <u>Premo</u> is that <u>Strickland</u> bears its own distinct substantive standard for a constitutional violation; it does not merely borrow or incorporate other tests for constitutional error and prejudice."  <u>Walker v. Martel</u>, 709 F.3d 925, 940 (9th Cir. 2013).

12

**C.   Analysis.**

13
14

None of Petitioner's ineffective-assistance-of-trial-counsel claims warrant relief.  Each is addressed in turn below.

15

**1.   Failure to Present Facts to the Jury (Ground Eleven).**[32]

16
17
18
19
20
21

Petitioner asserts two ineffective-assistance claims in her eleventh ground for relief.  (See Dkt. 33 at 56-57.)  First, she faults counsel for failing to use the September 24, 2018 email exchange between the victim and a website removal company to show that the victim falsely accused her of vandalism.[33]  (See <u>id.</u> at 56.)  Second, she contends that counsel erred in failing to elicit testimony concerning the fact that the victim was a "nudist."  (See <u>id.</u>)  She maintains that testimony on this

22

_____

23
24

[32] Although Petitioner's tenth ground for relief alleges that trial counsel was ineffective, the Court addresses that claim after addressing her other ineffective-assistance claims because it is largely duplicative of those claims.

25
26
27

[33] The Court summarized the September 24, 2018 email exchange in connection with its discussion of Petitioner's second <u>Brady</u> claim.  (See <u>supra</u>; see also Dkt. 33 at 43-46; Dkt. 6 at 165.)

28

point would have led the jury to acquit her on the unlawful-dissemination-of-private-photographs count because it would have shown that the victim did not have any expectation of privacy in his nude photographs and suffered no emotional distress from their dissemination.  (See id.)

Both of these claims fail under de novo review.  First, Petitioner cannot show that counsel performed deficiently in failing to introduce the September 24, 2018 email exchange or that his decision not to do so prejudiced her.  As related above, the email exchange did not support a reasonable inference that the victim falsely accused Petitioner of vandalism (see Dkt. 6 at 165); consequently, counsel had no reason to introduce it.  And in any event, the evidence corroborating the victim's testimony – including the video of the victim trying to convince Petitioner to leave his house the night the door was vandalized (see id. at 55, 57-58) the still photograph of Petitioner pressing a metal key to his door (see id. at 70; Dkt. 6 at 175), and Petitioner's various text messages (see Dkt. 3 at 5; Dkt. 4 at 96) – was overwhelming.  Thus, there is no reason to believe that but for counsel's failure to introduce the email exchange, the jury likely would have returned a more favorable verdict to Petitioner on the vandalism count.

Second, Petitioner has not shown that counsel was ineffective in failing to elicit testimony that the victim was a nudist.  Taking Petitioner's allegations as true, counsel was aware that the victim was a nudist but strategically decided not to question him about it.  (See Dkt. 33 at 56 ("Petitioner, prior to trial, informed defense counsel that [the victim] was a nudist.").)  Indeed, according to Petitioner, trial counsel decided not to do so because he believed "the less information the better."  (Id. at 108.)  Counsel's decision is unchallengeable on federal habeas review.  See Strickland, 466 U.S. at 690; Silva, 279 F.3d at 844.  Moreover, it was sound because the premise of Petitioner's claim – that nudists lack any expectation of privacy in the indiscriminate dissemination of their naked images – is ludicrous.

1
2
3
4
5
6
7
8

The victim's testimony showed that he did not expect the nude photographs he sent Petitioner to be shared.  To the contrary, he had never sent a nude photograph to anyone else, and he characterized the photographs he sent Petitioner as "private" communications.  (See Dkt. 4 at 104-05.)  His testimony likewise undercuts Petitioner's claim that he suffered no emotional distress from the dissemination of his nude photographs.  Indeed, he testified that "going through all this" left him feeling "disgust[ed]" and made him repeatedly contemplate getting therapy.  (Id. at 64).

9
10
11
12
13
14
15
16

Even assuming error, Petitioner suffered no prejudice.  The jury was aware that the victim frequented nude beaches.  He testified that one of the nude photographs he sent Petitioner was taken at a nude beach.  (See Dkt. 4 at 45-46.) The jury nevertheless found that both Petitioner and the victim understood that the photographs were private and that the victim experienced serious emotional distress from their dissemination.  (See Dkt. 3 at 173, 179.)  There is, therefore, no reason to believe additional testimony concerning whether the victim was a nudist would have had any effect on the jury's verdict.

17
18

Accordingly, Petitioner is not entitled to relief on her eleventh ground for relief.[34]

19
20
21
22
23
24
25
26
27

[34] The Court notes that Petitioner also alleges that Gorgeous Painting, the victim's company, "never existed."  (See Dkt. 33 at 56.) Petitioner does not explain how this allegation implicates trial counsel's performance.  In any event, the victim testified that he started the company in 2004.  (See Dkt. 4 at 30.)  That Petitioner was unable to find the company on two websites (see Dkt. 33 at 108) does not show that the victim's trial testimony was false.

28

1
2
3

### 2.  Failure to Request a Dating-Relationship Instruction and Stipulating to Validity of the Family Court's Protective Order (Grounds Twelve and Thirteen).

4        Petitioner contends that trial counsel erred in failing to request an instruction
5   concerning the definition of a "dating relationship."  (See Dkt. 33 at 57-58 (ground
6   twelve).)  She does not identify the crime to which the proposed dating-relationship
7   instruction was relevant.  Presumably, however, she believes it was relevant to the
8   violation-of-a-protective-order count because the underlying family-court
9   protective order required the existence of a dating relationship.  See Cal Fam. Code
10  § 6211(c).  She also contends that counsel erred in stipulating to the validity of the
11  family court's protective order underlying her conviction.  (See Dkt. 33 at 58-59
12  (ground thirteen).)

13       Both of these claims are meritless.  As an initial matter, both of Petitioner's
14  claims fail because they involve decisions that counsel made concerning how best
15  to defend against the charged crime of violating a protective order.  As for the
16  dating instruction, the record is clear that counsel knew about it but opted against
17  requesting the jury be instructed with it.  Indeed, he cited and paraphrased the
18  instruction in support of his unsuccessful argument against admissibility of video
19  evidence the prosecutor sought to admit.  (See Dkt. 3 at 250.)  He likewise
20  strategically decided the stipulate to the validity of the family court's protective
21  order underlying the violation-of-a-protective-order count.  Indeed, he actively
22  sought to keep the actual protective order away from the jury, arguing that its
23  admission would be prejudicial to Petitioner.  (Dkt. 3 at 234-37.)  The prosecutor,
24  moreover, opposed counsel's initial efforts to simply "make reference that there
25  [was] a lawful restraining order" rather than showing the order to the jury but
26  ultimately agreed to the proposed stipulation.  (Id.)  As the record makes clear,
27  Petitioner's challenges concern counsel's strategic decisions.  Those decisions

28

cannot be second-guessed on habeas review. See Strickland, 466 U.S. at 690; Silva, 279 F.3d at 844.

Furthermore, there was no reason to request the dating-relationship instruction because the existence of a dating relationship is not an element of the crime of violating a protective order.  (See Dkt. 3 at 159 (CALCRIM 2701, setting forth the requisite elements to prove that Petitioner violated a "protective or stay away order")); Cal. Penal Code § 273.6(a).  Nor was it an element of any other crime with which Petitioner was charged.  To the extent that Petitioner believes that the absence of a dating relationship between her and the victim was an affirmative defense, she is mistaken because whether or not they were in a dating relationship was relevant only to the validity of the family-court protective order.  But counsel stipulated that the order was valid.  (See Dkt. 3 at 230, 233-38; Dkt. 4 at 118, 120.)

Moreover, Petitioner could not have suffered any prejudice from counsel's decision not to challenge the validity of the protective order.  Any attempt to convince the trial court that it violated her First Amendment right to free speech would have failed because the superior court found on habeas review that it did not. (See LD 2 at 7); Hennagan v. Prosper, No. CIV S-04-1900 JAM (DAD), 2008 WL 4500225, at *19 (E.D. Cal. Oct. 6, 2008) (petitioner could not show reasonable probability that objection to imposition of his sentence would have led to a different result because the superior court found on habeas review that the sentence was proper), accepted by 2009 WL 55014 (E.D. Cal. Jan. 8, 2009), aff'd by 479 F. App'x 73 (9th Cir. 2012).  Likewise, any attempt to convince the court that the protective order was invalid due to the absence of a dating relationship would have failed because the trial court explicitly found that there was sufficient evidence to establish that Petitioner and the victim had been in a dating relationship.  (See Dkt. 3 at 253.)  There is no reason to believe that the jury would have found otherwise had it been tasked with resolving the question because there was ample evidence to

show the existence of a dating relationship, as summarized above.  (See Dkt. 3 at 5; Dkt. 4 at 32-34, 101); Upsher, 155 Cal. App. 4th at 1323; Hill, 2020 WL 4364640, at *4.

Accordingly, Petitioner is not entitled to habeas relief on these claims.

### 3. Failure to Move to Exclude Petitioner's Family-Court Testimony (Ground Fourteen).

In her fourteenth ground for relief, Petitioner faults counsel for "presenting zero legal argument" to exclude her family-court testimony.  (Dkt. 33 at 59.)  This claim is meritless because counsel objected to the testimony and initially convinced the trial court to exclude it.  (See Dkt. 3 at 241-47.)  Upon reflection, however, the trial court ruled that the prosecutor could question the victim about Petitioner's testimony.  (See id. at 276-80.)  In doing so, the court found that it was not obtained in violation of Petitioner's Fifth Amendment rights (see id.), and for the reasons discussed above, it was not.  Petitioner cites no argument that counsel failed to make that would have given rise to a reasonable likelihood that the court would have ruled otherwise.  See Borg, 24 F.3d at 26; Jones, 66 F.3d at 205.

Accordingly, this claim fails.

### 4. Failure to Expose the Victim's False Testimony and Inconsistent Statements and Call Defense Witnesses (Grounds Fifteen and Sixteen).

Petitioner's fifteenth and sixteenth grounds for relief primarily concern counsel's purported errors in failing to expose the victim's false and inconsistent statements concerning the damage to his door.  (See Dkt. 33 at 59-62.)  First, she claims that the victim lied when he testified that he did not notice the vandalism on the night it occurred because it was too dark at the time.  (See id. at 59-60 (ground fifteen).)  Second, she maintains that the September 18, 2018 police field report at issue in one of her Brady claims showed that the victim lied about how and when

the door was damaged.  (See id. at 60-61 (ground sixteen.).)  Accordingly, she faults counsel for failing to question the victim about these issues.

Both claims fail under de novo review.  The first fails because, as related above, no evidence established that the victim lied about it being too dark to see the damage to the door.  The second fails because the September 18, 2018 report contained no inconsistent or false statements on the victim's part, and its introduction into evidence would not have had any impact on the jury's verdict.[35]

Equally meritless is Petitioner's claim that counsel was ineffective for failing to call several witnesses who could have undermined the victim's testimony concerning the damage to his door.  (See Dkt. 33 at 61 (identifying the 911 operator and unnamed officers who responded to the 911 call and collected evidence as potential witnesses).)  That claim fails for lack of evidence because she has provided no declaration from any of such witness demonstrating a willingness to testify and setting forth the facts to which they would have testified.  See Dows v. Wood, 211 F.3d 480, 486 (9th Cir. 2000) (rejecting ineffective-assistance claim based on failure to call witness when petitioner presented no affidavit from witness showing witness was willing to provide testimony helpful to defense).  There is no reason to accept her self-serving speculation that the proposed witnesses would have provided any testimony beneficial to her defense.  See Borg, 24 F.3d at 26; Jones, 66 F.3d at 205.

Accordingly, Petitioner is not entitled to relief on grounds fifteen and sixteen.

---

[35] Although Petitioner also alludes to the September 10, 2018 police field report at issue in her first Brady claim (see Dkt. 33 at 60), she presents no argument showing how counsel's performance was deficient in relation to that report.  Even taking her allegations as true, counsel could not have used the report because it was suppressed.  (See Dkt. 33 at 43 ("It is uncontroverted that the government possessed the Sep[t.] 10, 2018 report and Petitioner's counsel had no knowledge of it prior to, during, or after trial.").)

84

1

5.        **Failure to Object (Ground Seventeen).**

2        In her seventeenth ground for relief, Petitioner contends that counsel was

3   ineffective by failing to raise several meritorious objections at trial.  (See Dkt. 33 at

4   62-65.)  First, she faults counsel for failing to object to the trial court's refusal to

5   excuse Juror No. 4 on financial-hardship grounds.  (See id. at 62.)  Second, she

6   maintains that counsel erred in failing to object to the prosecutor's misconduct.

7   (See id.)  Third, she asserts that counsel was ineffective by failing to object

8   pursuant to California Evidence Code section 352 to the admission of various

9   screenshots and "secretly recorded videos."[36]  (Id. at 63.)

10        This claim is meritless.  First, Petitioner has failed to show that counsel was

11   ineffective in failing to challenge the trial court's refusal to excuse Juror No. 4.

12   Indeed, counsel may have believed that Juror No. 4 was advantageous to Petitioner

13   and thus strategically decided not to support his efforts to be removed.  See Carrera

14   v. Ayers, 670 F.3d 938, 948 (9th Cir. 2011), on reh'g en banc, 699 F.3d 1104 (9th

15   Cir. 2012) ("[T]his court's jurisprudence demonstrates the high level of deference

16   given to counsel's decisions during jury selection."); United States v. Quintero-

17   Barraza, 78 F.3d 1344, 1349 (9th Cir. 1995) (federal review of counsel's tactical

18   decision not to strike a potentially biased juror "must be highly deferential").[37]

19        Even assuming error, Petitioner has shown no resulting prejudice.  She does

20   not allege that Juror No. 4 was biased or allege any facts that would suggest as

21   much.  Although she posits that Juror No. 4 was so consumed with the financial

22

23        [36] California Evidence Code section 352 provides: "The court in its discretion
may exclude evidence if its probative value is substantially outweighed by the
24   probability that its admission will (a) necessitate undue consumption of time or
(b) create substantial danger of undue prejudice, of confusing the issues, or of
25   misleading the jury."

26

27        [37] Neither party has lodged the voir dire transcript from Petitioner's case.

28

hardship of serving as a juror that he may have voted guilty out a desire to quickly end the trial rather than out of a strongly held conviction about the evidence, nothing supports such a conclusion.  Juror No. 4 never indicated as much.  The only financial hardship he cited was having to miss work.  (Dkt. 4 at 5.)  But that was exceedingly unlikely to have affected his ability to fairly assess the evidence at trial because, as the trial court noted in denying his request, the entire trial was expected to last only a day and a half.  (See id.).  In fact, the trial ended the next day, less than twenty-six hours after Juror No. 4 requested to be excused.  (Compare Dkt. 4 at 5 (reflecting that request was made on July 28, 2021 at 1:34 p.m.), with id. at 132, 206 (reflecting that jury reached its verdict on July 29, 2021 at 3:29 p.m.).)

Additionally, Petitioner cites no argument that counsel could have made that would have caused the trial court to change its decision concerning Juror No. 4's request, see Borg, 24 F.3d at 26; Jones, 66 F.3d at 205, and none are apparent to the Court.  Juror No. 4 did not ask to be excused until after the jury was sworn.  (See Dkt. No. 4 at 5.)  Considering that the entire trial was expected to last only one more day, there is no reason to believe that but for counsel's failure to object, the trial court would have been inclined to reconsider its decision to deny Juror No. 4's hardship request had counsel objected.

Second, Petitioner has not shown that counsel was ineffective in failing to object to the prosecutor's purported misconduct.  Indeed, she does not even identify the purported misconduct to which counsel should have objected.  To the extent she believes that counsel should have objected to the misconduct alleged in ground thirty (see Dkt. 33 at 93-99), that claim fails because the prosecutor committed no misconduct and any misconduct that he might have committed resulted in no discernible prejudice, as discussed above.  She cannot show that a reasonable likelihood exists that but for counsel's failure to object, the jury would have reached a verdict more favorable to her.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21

        Finally, counsel was not ineffective in failing to object to the various exhibits
and videos that were admitted at trial.  To the contrary, counsel unsuccessfully
objected to the proposed evidence on multiple grounds before trial (see Dkt. 3 at
94-100, 249-66), when it was presented at trial (see, e.g., Dkt. 4 at 37, 43, 44, 57,
60, 73, 88, 94), and after the prosecution rested its case (see id. at 124-25).
Although Petitioner maintains that counsel failed to object to the evidence pursuant
to California Penal Code section 352, she is mistaken as to the bulk of the evidence.
(See, e.g., Dkt. 3 at 98 (objecting on section 352 grounds, among other grounds, to
a photograph of "YouTube.com video" and photographs of "any Facebook.com
posting"), 100 (same concerning "photos or reference to any photo of any
Instagram email or report" and Facebook posting of photograph depicting the
victim), 249 (same concerning "secret" video), 260 (same concerning photographs
and YouTube video and video itself).)  To the extent counsel did not object to each
screenshot on section 352 grounds, his decision not to do so was neither
unreasonable nor prejudicial.  Indeed, all of the evidence underlying Petitioner's
claim – namely, screenshots of her website posts concerning the victim, videos
about him she posted on YouTube, and a video and photograph of her pressing a
metal key to the victim's door – was profoundly relevant to her guilt.  As such, any
objection to the evidence on section 352 grounds was doomed to fail.[38]  See
Kimmelman, 477 U.S. at 375; Boag, 769 F.2d at 1344.

22
23
24
25
26
27
28

---

[38] Petitioner suggests that an objection pursuant to section 352 would have
been successful because the prosecution failed to show that the screenshots and
videos were not manipulated or incomplete.  (See Dkt. 33 at 63.)  But section 352
does not concern such issues, see Cal. Penal Code § 352, and Petitioner cites
nothing other than sheer self-serving speculation to show that the evidence was
manipulated or incomplete.  In any event, counsel unsuccessfully objected to the
evidence "based on best evidence rule, hearsay within hearsay, speculation,
foundation, [and] authentication."  (Dkt. 4 at 124.)

87

1    Accordingly, Petitioner is not entitled to relief on her challenges to counsel's
2    failure to object.

3    **6.    Failure to Ensure Petitioner's Right to a Speedy Trial**
4    **(Ground Eighteen).**

5    In her eighteenth ground for relief, Petitioner faults counsel for failing to
6    ensure her right to a speedy trial.  (See Dkt. 33 at 65-66.)  According to Petitioner,
7    counsel requested or agreed to multiple continuances for no other reason than that
8    he had failed to timely prepare for trial.  (See id. at 65.)

9    This claim fails for a variety of reasons.  First, as related above, Petitioner
10   personally waived time on multiple occasions.  (See Dkt. 3 at 202-04, 211-12.)
11   Although she insists now that she did so only because she was "put on the spot,"
12   "lied to," and "taken advantage of" (Dkt. 33 at 59, 65), no evidence supports that
13   claim.  What's more, counsel explained to Petitioner what a time waiver was on the
14   day he began representing her.  (See Dkt. 3 at 205.)  Given these facts, she cannot
15   credibly claim that counsel's actions deprived her of her right to a speedy trial.

16   Second, the record shows that counsel had legitimate reasons for continuing
17   the trial date.  Indeed, counsel explained that he wanted additional time to prepare
18   and "review the file in preparation for trial."  (Dkt. 3 at 207); see Williams v.
19   Martel, No. 2:18-cv-2224 KJM DB P, 2021 WL 3401294, at *8 (E.D. Cal. Aug. 4,
20   2021) (denying ineffective-assistance claim based on failure to preserve petitioner's
21   right to a speedy trial when "it [did] appear from the record that the continuances
22   were sought for an improper purpose" but rather to allow counsel to prepare for
23   trial), accepted by 2022 WL 3579876 (C.D. Cal. Aug. 19, 2022), cert. of
24   appealability denied, No. 22-16370, 2024 WL 1014167 (9th Cir. filed Mar. 1,
25   2024); Canter v. Dotson, No. 7:23-cv-00004, 2024 WL 409731, at *5 (W.D. Va.
26   Feb. 1, 2024) (same).  Petitioner's original trial date coincided with the outbreak of
27   COVID-19.  (See id. at 19 (reflecting that Petitioner's first trial date was scheduled

28

88

for Mar. 24, 2020)); <u>Olsen</u>, 21 F.4th at 1047; <u>United States v. Roush</u>, No. 21-3820, 2021 WL 6689969, at *2 (6th Cir. Dec. 7, 2021) (district court did not abuse its discretion when it found postponing or limiting jury trials during the COVID-19 pandemic outweighed the defendant's right to a speedy trial). Given these facts, she cannot show that counsel's requests or agreements to continue the trial date constituted ineffective assistance.

Finally, even assuming error, Petitioner has shown no resulting prejudice. Although she cites many purported deficiencies in counsel's performance – such as his failure to call any witnesses, inadequate cross-examination of the victim, and failure to present any evidence "from his investigation" (Dkt. 33 at 65) – she does not explain how any of those purported errors were attributable to counsel's alleged failure to ensure her right to a speedy trial. She does not, for example, identify any witness who became unavailable because the trial date was continued or allege that counsel would have more effectively cross-examined the victim in the absence of the continuances. And per the discussion below concerning her independent speedy-trial claim (<u>see</u> Dkt. No. 33 at 73-74), she was not denied her right to a speedy trial.

Accordingly, Petitioner is not entitled to habeas relief on this claim.

**7.      Failure to Investigate and Adequately Cross-Examine the Victim (Ground Ten).**

In her tenth ground for relief, Petitioner contends that trial counsel failed to investigate and adequately cross-examine the victim. (<u>See</u> Dkt. 33 at 52-56.) She identifies numerous lines of questioning that counsel allegedly failed to pursue in his cross-examination of the victim and several facts that counsel could have discovered had he adequately investigated the case. (<u>See id.</u> at 52-54.)

This claim is meritless. To the extent it is premised on counsel's failure to impeach the victim with his ten-year-old misdemeanor convictions, it fails because,

as the court of appeal noted (see Dkt. 3 at 7), they were not relevant.  And as related above, even if they had been admitted at trial, they would not have affected the jury's assessment of the victim's credibility.

Petitioner's claim that counsel failed to adequately cross-examine the victim about various inconsistencies and lies concerning when he realized that his door had been vandalized is duplicative of her preceding claims and fails for the same reasons.  The same is true of her allegations concerning counsel's failure to elicit testimony about the victim being a nudist and the fact that he did not report Petitioner's threats to publish his nude photographs on the day she made them.

Petitioner's claim that counsel should have questioned the victim about issues related to "metadata" and the existence of "only paper evidence" used to establish her guilt is also meritless.  (See id. at 54.)  There is no reason to believe any such questioning would have been beneficial to Petitioner or that the victim was even qualified to testify about such issues.  No evidence suggests that any of the evidence presented at trial was manipulated or incomplete.

Equally meritless is Petitioner's claim that counsel failed to question the victim about his inability to provide proof that he asked Petitioner to keep his nude photographs private.  (See id. at 54.)  The victim never testified that he requested as much.  In any event, counsel asked the victim if he told Petitioner not to share the photographs, and the victim never said that he did, instead responding only that they were "private communication[s]."  (Dkt. 4 at 104.)  Counsel's closing argument, moreover, highlighted the victim's testimony on that point (see id. at 183 ("[The victim] testified that he does not have any evidence to show that there was actually an agreement or understanding that the photos he sent her were to remain private, right?"); see also id. at 183-84) and attacked the victim's credibility on multiple fronts (see, e.g., id. at 179-81).

Petitioner's claim that counsel erred in failing to question the victim about

90

1
2
3
4
5
6
7
8

the fact that he was married also fails.  (See Dkt. 33 at 52.)  As counsel explained, he strategically decided that "the less information [the jury knew about the victim], the better" (id. at 108).  That decision cannot be second-guessed on habeas review. Had counsel elicited testimony about the victim's marriage, it would not have benefited Petitioner defense or made her any less culpable.  In all likelihood, it would have led the prosecutor to question the victim about the strain to his marriage caused by Petitioner's action.  Such testimony would only have strengthened the evidence showing that the victim suffered serious emotional distress.

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

Finally, Petitioner has not shown that counsel was ineffective in failing to show that the victim falsely testified that a customer named "Lilly" notified him that his nude photographs had been posted on his company's Yelp page.  (See id. at 52; Dkt. 4 at 60-61.)  The only "proof" Petitioner offers to show that the victim's testimony was false is that fact that she, herself, was unable to find any reference to "Lilly" on the victim's Yelp page.  (See Dkt. 33 at 108).  But that fact is unremarkable because Yelp pages do not include a given company's roster of customers.  Instead, at most, they identify only those who leave a review.  And there is no reason to believe that each and every one of the victim's customers posted a review about his company or that any customer posted information on Yelp concerning the things that Petitioner had posted there.  The victim, moreover, never suggested as much.  Rather, he testified that a few of his customers, including "Lilly," saw what had been posted on the Yelp page and then "called" to notify him about it.  (Dkt. 4 at 61-62.)  In any event, there is no reason to believe that the isolated reference at trial to "Lilly" had any impact on the jury's verdict because, as discussed above, the evidence of Petitioner's guilt on both of the charged crimes concerning Petitioner's posting information online about the victim was overwhelming.

27
28

In sum, each of Petitioner's ineffective-assistance-of-trial-counsel claims is

meritless, whether viewed through AEDPA's deferential lens or under <u>de novo</u>
review.  As such, none of them – whether viewed alone or in combination – warrant
habeas relief.

**GROUND TWENTY-THREE: THE TRIAL COURT'S RESTITUTION
ORDER.**

In her twenty-third ground for relief, Petitioner challenges the evidence
supporting the trial court's restitution order.[39]  (<u>See</u> Dkt. 33 at 68-69.)

This claim is not cognizable on federal habeas review.  A federal court may
entertain a habeas petition "on behalf of a person in custody pursuant to the
judgment of a State court only on the ground that he is in custody in violation of the
Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Section
2254 "does not confer jurisdiction over a state prisoner's in-custody challenge to a
restitution order imposed as part of a criminal sentence."  <u>Bailey v. Hill</u>, 599 F.3d
976, 981-82 (9th Cir. 2010); <u>see also</u> <u>Williamson v. Gregoire</u>, 151 F.3d 1180, 1183
(9th Cir. 1998) (imposition of fine is "merely a collateral consequence of
conviction" and, as such, is insufficient to establish federal habeas jurisdiction).

As such, this Court lacks jurisdiction to consider Petitioner's challenge to the
trial court's restitution order.

**GROUND TWENTY-FOUR: DEFICIENT POLICE INVESTIGATION.**

In her twenty-fourth ground for relief, Petitioner contends that the police
violated her right to due process by conducting an inadequate investigation.  (<u>See</u>
Dkt. 33 at 69-72.)  Specifically, she faults the police for failing to collect all of the
victim's text messages and determine if they, as well as videos and Internet
screenshots that the prosecutor presented at trial, were authentic.  (<u>See</u> <u>id.</u> at 70.)

---

[39] Unlike Petitioner's other sufficiency-of-the-evidence claims (<u>see</u> Dkt. 66-
68 (grounds twenty, twenty-one, and twenty-two)), her challenge to the evidence
supporting the restitution order is not procedurally barred.

Had the police done so, according to Petitioner, they would likely have found that the victim manipulated or edited the evidence presented at trial and that he regularly sent nude photographs of himself to other people.  (See id.)  Petitioner also faults the police for failing to personally inspect the vandalism to the victim's door and take photographs of the damage and any light fixtures nearby.  (See id.)  Presumably, she believes that such an investigation would have shown that the victim's testimony that he did not see the damage to the door until the day after it occurred was false.

### A.    The Court of Appeal's Decision.

The court of appeal rejected this claim as follows:

*[Petitioner] complains of "sloppy police work," arguing the police should have more fully investigated the victim's claims.  The record does not support this contention.*

(Dkt. 3 at 8.)

### B.    Applicable Federal Law.

Generally, law-enforcement officials have a duty to preserve and collect "evidence that might be expected to play a significant role in the suspect's defense." California v. Trombetta, 467 U.S. 479, 488 (1984); Miller v. Vasquez, 868 F.2d 1116, 1120 (9th Cir. 1989) (bad-faith failure to collect potentially exculpatory evidence violates due process).  But this duty to preserve or collect evidence applies only to "material evidence, i.e., evidence whose exculpatory value was apparent before its destruction and that is of such nature that the defendant cannot obtain comparable evidence from other sources." Cooper v. Calderon, 255 F.3d 1104, 1113 (9th Cir. 2001) (citing Trombetta, 467 U.S. at 489).  "The mere failure to preserve evidence which could have been subjected to tests which might have exonerated the defendant does not constitute a due process violation." Phillips v. Woodford, 267 F.3d 966, 986-87 (9th Cir. 2001).

1
2
3
4
5
6

   The government's failure to preserve or collect potentially exculpatory evidence violates due process only when the "criminal defendant can show bad faith." Arizona v. Youngblood, 488 U.S. 51, 58 (1988); Miller, 868 F.2d at 1120-21. Bad faith is shown when "the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant." Youngblood, 488 U.S. at 58.

7

   **C.   Analysis.**

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

   Petitioner is not entitled to relief on this claim. There is no clearly established federal law recognizing a constitutional right to have the police investigate a crime in any particular way, let alone in the manner Petitioner identifies. See Musladin, 549 U.S. at 77 (where Supreme Court precedent gives no clear answer to question presented, "it cannot be said that the state court 'unreasonab[ly] appli[ed] clearly established Federal law'"). The Ninth Circuit has explicitly found that no such right exits. See Gini v. Las Vegas Metro. Police Dep't, 40 F.3d 1041, 1045 (9th Cir. 1994) ("The police have no affirmative obligation to investigate a crime in a particular way. . . ."); see also Baker v. McCollan, 443 U.S. 137, 146 (1979) (rejecting § 1983 claim alleging that sheriff executing arrest warrant violated plaintiff's right to due process by failing to first investigate plaintiff's claim of innocence and acknowledging that an accused has no constitutional right to "an error-free investigation"); Facundo v. Scribner, No. CV 05–7527 GW (JC), 2011 WL 3188562, at *6 (C.D. Cal. Jan. 25, 2011) (rejecting petitioner's claim that police deprived him of his "constitutional rights" by conducting shoddy investigation because no clearly established federal law established right "to have the police investigate a crime in any particular fashion"), accepted by 2011 WL 3204371 (C.D. Cal. July 26, 2011); Bisbee v. Ryan, No. CV-12-00682-PHX-ROS, 2018 WL 740927, at *7 (D. Ariz. Feb. 6, 2018) (same).

27

   Moreover, Petitioner cannot establish a due-process violation based on the

28

94

police's purported failure to investigate the authenticity of the prosecution's evidence or personally observe the victim's damaged door.  Even taking Petitioner's allegations as true,[40] her claim fails because she alleges no facts and cites no evidence suggesting that any police officer acted in bad faith.  See Bisbe, 2018 WL 740927, at *7 (denying petitioner's claim that police violated due process by failing to locate potential witnesses and collect evidence when she offered no evidence to show that police acted in bad faith).

        In any event, there is no reason to believe that the investigation Petitioner faults the police for failing to conduct would have benefited her.  See Iniguez-Delgadillo v. Frauenheim, No. EDCV 19-2369-DOC (JEM), 2021 WL 1132606, at *17 (C.D. Cal. Feb. 17, 2021) (rejecting petitioner's claim that the police conducted an inadequate investigation into charged attempted murder by failing to search for available video evidence, in part, because nothing suggested that further investigation would have benefited him), accepted by 2021 WL 1131218 (C.D. Cal. Mar. 24, 2021).  She cites no evidence establishing or indicating that any of the evidence presented at trial was manipulated or that the victim withheld exonerating video or photographic evidence.  Instead, she merely relies on self-serving speculation about what the investigation might have revealed (see, e.g., Dkt. 33 at 70 (opining that police might have found evidence that the victim had sent his nude photos to multiple people), 94 (alleging that video presented at trial was "obviously . . . edited and incomplete" and "likely" omitted portion in which Petitioner denied posting the victim's photographs online), 105 (alleging with no supporting evidence that the victim "withheld . . . videos and photos" because they would have shown that Petitioner did not damage his door and affirmatively denied "posting his

_____

        [40] Petitioner provides no evidence to substantiate her claims concerning the police investigation of the crimes underlying her conviction.

nudes").)  Such unsupported speculation does not warrant habeas relief.  See Wood, 516 U.S. at 8.

Finally, Petitioner's claim that trial counsel was ineffective for failing to "demonstrate to the jury that the police did not conduct any investigation" (Dkt. 33 at 71) also fails.  Indeed, counsel explicitly argued that no credible evidence established Petitioner's guilt and cited shortcomings in the police investigation to support that argument.  (See Dkt. 4 at 182 ("We're just basing all this information on the [victim]. . .  But you don't have any credible evidence to show that it was actually [Petitioner].  Okay?  We live in modern times, right?  The police could have gotten a warrant, could have gone to [Petitioner's] home, got her laptop and checked.").)  Ultimately, nothing suggests that the purported inadequate investigation caused unreliable evidence to be admitted at trial or exonerating evidence to be suppressed, as discussed above.  To the extent Petitioner claims that counsel should have presented expert testimony to show that the prosecution's evidence had been manipulated (see Dkt. 33 at 71-72), that claim fails for lack of evidence because she has provided no declaration from any of such expert demonstrating a willingness to testify and setting forth the facts to which the unidentified expert would have testified.  See Dows, 211 F.3d at 486.

Accordingly, Petitioner is not entitled to relief on ground twenty-four.

**GROUND TWENTY-SIX: IMPROPER AMENDMENT OF THE COMPLAINT.**

In her twenty-sixth claim for relief, Petitioner contends that the trial court violated her right to a fair trial by permitting the prosecutor to amend the complaint concerning the violation-of-a protective-count on the day before trial.  (See Dkt. 33 at 73.)  She argues that the amendment was prejudicial because she did not have time to mount a defense to the count as amended.

### A.   Superior Court's Decision.

The superior court rejected this claim as follows:

*Petitioner argues the court erred by allowing the People to file an amended complaint prior to trial on July 26, 2021.  Counsel for petitioner objected at the time, but the court overruled the objection.  The only change between the original complaint (filed 8/6/19) and the amended complaint (filed 7 /26/21) concerned Count 2 (Pen. Code, § 273.6).  In the original complaint, the People alleged that petitioner violated a protective order by coming within 100 yards of the protected person.  In the amended complaint, the People alleged that petitioner violated a protective order by failing "to deactivate website and created new websites."  The People moved for a trial continuance upon filing the complaint, to which the defense objected.  Petitioner does not explain how this amendment so prejudiced her case as to warrant relief from the judgment on habeas corpus, and yet the amendment was not so significant that it warranted a delay of her jury trial for counsel to prepare for the amended charge.  "Under the generally accepted rule in criminal law a variance [in pleadings] is not regarded as material unless it is of such a substantive character as to mislead the accused in preparing his defense . . . . And [n]o accusatory pleading is insufficient, nor can the trial, judgment, or other proceeding thereon be affected by reason of any defect or imperfection in matter of form which does not prejudice a substantial right of the defendant upon the merits."  (*People v. Peyton* (2009) 176 Cal. App. 4th 642, 659, internal citations omitted.)  Petitioner's conclusory argument regarding this claim fails to establish error.*

(LD 2 at 6.)

**B.    Applicable Federal Law.**

"In all criminal prosecutions, the accused shall enjoy the right ... to be informed of the nature and cause of the accusation. . . ."  U.S. CONST., amend. VI. The guarantee is applicable to the states through the Due Process Clause of the Fourteenth Amendment.  See Cole v. Arkansas, 333 U.S. 196, 201 (1948) ("No principle of procedural due process is more clearly established than that notice of the specific charge, and a chance to be heard in a trial of the issues raised by that charge, if desired, are among the constitutional rights of every accused in a criminal proceeding in all courts, state or federal."); see also Gray v. Raines, 662 F.2d 569, 571 (9th Cir. 1981).

"When determining whether a defendant has received fair notice of the charges against him, we begin by analyzing the content of the information."  Gautt v. Lewis, 489 F.3d 993, 1003 (9th Cir. 2007) (citing Cole, 333 U.S. at 198).  The information must "state the elements of an offense charged with sufficient clarify to apprise a defendant of what he must be prepared to defend against."  Givens v. Housewright, 786 F.2d 1378, 1380 (9th Cir. 1986) (citing Russell v. United States, 369 U.S. 749, 763-64 (1962)).  If the information by itself fails to provide adequate notice, courts may look to other sources to determine whether the defendant had constitutionally adequate notice of charged crimes.  Gautt, 489 F.3d at 1009 ("Our circuit has held in certain circumstances – for example, when a defendant has argued that he received insufficient notice of a particular theory of the case – a court can examine sources other than the information for evidence that the defendant did receive adequate notice.").

**C.    Analysis.**

The superior court reasonably rejected this claim.  Other than simply asserting that the amendment was prejudicial, Petitioner cites no specific facts to show how it prejudiced her defense.  Such unsupported allegations do not warrant

1 habeas relief.  See Borg, 24 F.3d at 26; Jones, 66 F.3d at 205.

2      Moreover, the record shows that Petitioner had adequate notice and adequate

3 time to mount a defense to the amended violation-of-a-protective order count.

4 Indeed, the count was amended two days before trial even began.  (See Dkt. 3 at 79

5 (reflecting that complaint was amended on July 26, 2021); Dkt. 4 at 4 (reflecting

6 that trial began on July 28, 2021)); cf. Morrison, 981 F.2d at 428-29 (rejecting

7 claim that petitioner had inadequate notice that he would be charged with felony

8 murder after close of evidence when ample testimony adduced at trial supported

9 felony-murder charge and defense counsel had two days after the charge was added

10 to prepare closing argument); Stephens v. Borg, 59 F.3d 932, 934-36 (9th Cir.

11 1995) (same where felony-murder charge was added while the petitioner was still

12 putting on his case in chief); Calderon v. Prunty, 59 F.3d 1005, 1009-10 (9th Cir.

13 1995) (petitioner had adequate notice that the State would add charge of first-

14 degree murder by lying in wait after petitioner testified because prosecutor's

15 opening statement and presentation of evidence provided notice that the charge

16 could be added).  What's more, counsel did not request a continuance after the

17 amendment was made.  (See Dkt. 3 at 266-67, 270.)  Although he had previously

18 moved to preclude any amendment to the complaint, he withdrew that motion after

19 the complaint was amended, explaining that he had "anticipated" the amendment.

20 (See Dkt. 3 at 266-67.)  Petitioner identifies no evidence that she might have

21 presented or defense she might have pursued if the complaint had been amended

22 earlier.

23      Put simply, Petitioner cannot show that she was deprived of adequate notice

24 of the violation-of-a-protective-order count.  Accordingly, she is not entitled to

25 relief on her improper-amendment claim.

26

27

28

**GROUND TWENTY-SEVEN: RIGHT TO A SPEEDY TRIAL.**

In her twenty-seventh ground for relief, Petitioner contends that she was deprived of her Sixth Amendment right to a speedy trial because "721 days elapsed between the filing of the criminal complaint and jury selection."  (Dkt. 33 at 73-74.)

**A.      The Court of Appeal's Decision.**

Petitioner raised this claim on direct review, and the court of appeal rejected it as follows:

*[Petitioner] argues her federal, state, and statutory speedy-trial rights were violated by the trial court's orders continuing her trial several times.  As the trial court noted, however, [Petitioner] consistently entered general or statutory time waivers from August 2019, when she was arraigned, to June 2021, a month before trial.  (See People v. Seaton (2001) 26 Cal. 4th 598, 634 ["Each time the trial court continued the case, [defendant] either sought the continuance or personally 'waived time': that is, he formally and knowingly relinquished his right to a speedy trial for the period covered by each continuance."].)*

(Dkt. 3 at 8-9.)

**B.      Applicable Federal Law.**

The Sixth Amendment guarantees criminal defendants the right to a speedy trial.  See Doggett v. United States, 505 U.S. 647, 651 (1992).  No per se rule has been devised to determine whether the right to a speedy trial has been violated.  Instead, courts must apply a flexible "functional analysis" in addressing speedy trial claims.  Barker v. Wingo, 407 U.S. 514, 522 (1972).  In conducting that analysis, courts consider and weigh the following factors: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of her right to a speedy trial; and (4) the prejudice the defendant suffered as a result of the delay.  Doggett, 505 U.S. at 651.

The length of the delay is to some extent a triggering mechanism for the

speedy trial analysis.  Unless the length of delay is long enough to be considered "presumptively prejudicial," there is no need to evaluate the four factors identified above.  Id. at 651-52.  Furthermore, although the four factors are relevant to resolving speedy trial claims, none alone is either necessary or sufficient for finding a speedy-trial deprivation.  Barker, 407 U.S. at 533.

In analyzing the reason for delay, courts consider "whether the government or the criminal defendant is more to blame" for the delay.  Doggett, 505 U.S. at 651.  Deliberate delay by the government "'to hamper the defense' weighs heavily against the prosecution."  Vermont v. Brillon, 556 U.S. 81, 90 (2009) (quoting Barker, 407 U.S. at 531).  By contrast, "delay attributable to the defendant's own acts or to tactical decisions by defense counsel will not bolster defendant's speedy trial argument," McNeely v. Blanas, 336 F.3d 822, 827 (9th Cir. 2003), because "[t]he Speedy Trial Clause primarily protects those who assert their rights, not those who acquiesce in the delay," United States v. Aguirre, 994 F.2d 1454, 1457 (9th Cir.1993).

Actual prejudice from delay can result from oppressive pretrial incarceration, the anxiety and concern of the accused, and the possibility that the accused's defense will be impaired by dimming memories and loss of exculpatory evidence.  See Doggett, 505 U.S. at 654; Barker, 407 U.S. at 532.  Of these three potential forms of prejudice, the last one – impairment of the accused's defense – is the most important.  See Doggett, 505 U.S. at 564; see also Barker, 407 U.S. at 534-35 (five-year delay between arrest and trial did not deprive defendant of his right to a speedy trial when he could show no impairment to his defense due to the delay).

**C.**     **Analysis.**

As an initial matter, Petitioner's claim that she was deprived of her state-law right to a speedy trial (see Dkt. 33 at 73) is not cognizable because it involves only the application of state law.  See McGuire, 502 U.S. at 68; Romero v. Kernan, No.

1  3:14-CV-1284-GPC (BLM), 2018 WL 2427179, at *22 (S.D. Cal. May 30, 2018)

2  (violation of state's speedy-trial statute was not cognizable on federal habeas

3  review; collecting cases), accepted by 2018 WL 4357769 (S.D. Cal. Sept. 13,

4  2018).

5       Petitioner's Sixth Amendment speedy-trial claim fares no better.  First,

6  although the length of the delay – nearly two years – raised a presumption of

7  prejudice, none of the delay was attributable to the prosecution.  As discussed

8  above, Petitioner's initial trial date coincided with the outbreak of the COVID-19

9  pandemic.  The delay it caused in bringing her case to trial cannot support a speedy-

10  trial violation.  See Olsen, 21 F.4th at 1047; United States v. Smith, 460 F. Supp. 3d

11  981, 984 (E.D. Cal. 2020) (noting that "[a]lmost every court faced with the question

12  of whether general COVID-19 considerations justify an ends-of-justice continuance

13  and exclusion of time [from speedy-trial considerations] has arrived at the same

14  answer: "yes"; collecting cases).

15       Putting that aside, the record shows that most of the delay in bringing

16  Petitioner's case to trial was attributable to her.  As the court of appeal observed

17  (see Dkt. 3 at 8-9), she personally waived time "over the one and half year since

18  [her] arraignment" (Dkt. 3 at 210; see also id. at 202-04, 211-12 (trial court finding

19  that petitioner personally and repeatedly waived time)).  Although she claims that

20  those waivers were invalid (see Dkt. 33 at 25-26), nothing in the record supports

21  that claim.  To the contrary, counsel declared in open court that he explained to her

22  "what a general time waiver was."  (Id. at 205.)  Although Petitioner now claims

23  that she did not want counsel to waive time, "[s]he never alerted the state trial court

24  to the disagreement," Cejas v. Blanas, 355 F. App'x 763, 765 (9th Cir. 2010)

25  (denying speedy trial claim when counsel waived time and Petitioner voiced no

26  objection), and she waited until less than two weeks before trial to assert her right

27  to a speedy trial (see Dkt. 3 at 205; Dkt. 33 at 85).

28

1    Even accepting Petitioner's unsupported assertions that she did not

2    personally agree to waive time, she nevertheless is not entitled to relief because

3    counsel repeatedly agreed to continue the trial date and was not required to obtain

4    her express permission to do so.  See Hill, 528 U.S. at 114-15 (an attorney may

5    waive his client's speedy-trial right without express permission because

6    "[s]cheduling matters are plainly among those for which agreement by counsel

7    generally controls," and "[r]equiring express assent from the defendant himself for

8    such routine and often repetitive scheduling determinations would consume time to

9    no apparent purpose"); see also United States v. Robinson, 67 F.4th 742, 749-50

10   (5th Cir. 2024) (siding with "every other circuit to have considered the issue" to

11   hold that "for the purposes of excluding time from a defendant's Speedy Trial Act

12   calculation, the defendant is bound by counsel's decision to seek a continuance, and

13   his personal consent is not required"; collecting cases).  Although Petitioner argues

14   that counsel requested or agreed to continue the trial because of a "systematic

15   breakdown in the public defender system" (Dkt. 33 at 75, 78 (citing Brillon, 556

16   U.S. at 85)), she cites no evidence to support that argument.  Counsel expressly

17   denied it.  (See Dkt. 3 at 207 (counsel stating in response to court's inquiry of

18   whether his caseload prompted continuances, "As to congestion of courts in my

19   caseload, no, Your Honor.  I just requested time to prepare and review the file in

20   preparation for trial").

21   Second, Petitioner has failed to show that she was meaningfully prejudiced

22   by the delay.  She was not subjected to pretrial incarceration, see United States v.

23   Alexander, 817 F.3d 1178, 1183 (9th Cir. 2016) (petitioner suffered no prejudice

24   from five-year delay when he was never incarcerated during that time); cf. Reep v.

25   Diaz, No. 2:11-cv-02892 TLN (ACP), 2014 WL 3840077, *7 (E.D. Cal. July 30,

26   2014) (petitioner could show no prejudice from two-year delay during which he

27   was incarcerated for six months), accepted by 2014 WL 5504626 (E.D. Cal. Sept.

28

103

23, 2014), and she cites no facts to show that the delay impaired her ability to present a defense.  That she had to abide by the family court's protective order during the near two-year delay and attend various court dates during that time (see Dkt. 33 at 88-89) does not establish the requisite prejudice to support a speedy-trial claim.  See Smith v. Maher, 468 F. Supp. 2d 466, 479 (W.D.N.Y. 2006) (petitioner's having to remain in New York City, comply with terms of his bail, and forego family functions were not "the types of prejudice that the Sixth Amendment's Speedy Trial clause was designed to prevent" (citations omitted)); see also United States v. Lagasse, 269 F. App'x 87, 89 (2d Cir. 2008) (rejecting speedy-trial claim when defendant "point[ed] to no prejudice apart from anxiety that normally attends the initiation and pendency of criminal charges").  Most importantly, she identifies no evidence or witness who became unavailable because of the delay in bringing her case to trial.  See Avelar v. Att'y Gen. Super. Ct., 2012 WL 2092400, at *3-4 (C.D. Cal. Feb. 23, 2012) (petitioner suffered no prejudice from one-year delay when he "identifie[d] no evidence that was destroyed or lost during the delay" or any witness whose memory diminished "to [petitioner's] detriment"), accepted by 2012 WL 2092395 (C.D. Cal. June 11, 2012).

Finally, Petitioner's reliance on Mathews v. Eldridge, 424 U.S. 319 (1976), is misplaced.  (See Dkt. 33 at 74, 90-91.)  In Mathews, the Supreme Court explained that "[d]ue process is flexible and calls for such procedural protections as the particular situation demands."  424 U.S. at 334.  Thus, to determine the requirements of due process, courts consider three factors: (1) the private interest affected; (2) the government's interest; and (3) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards."  Id. at 334-35.

Here, the only "interest" Petitioner cites is her being "subjected to a significant curtailment of her liberty during her extended pretrial and criminal

1  restraining order." (Dkt. 33 at 90.)  But she was not subjected to any such

2  curtailment, and the delay in bringing her case to trial was attributable to her.

3  Indeed, she personally and repeatedly waived time during the nearly two-year

4  period before her case was brought to trial.  As discussed above, she was not denied

5  her right to a speedy trial.  Consequently, even if Mathews were applicable, it

6  would not entitle her to relief.[41]

7      Accordingly, she is not entitled to relief on her speedy-trial claim.

8  **GROUND TWENTY-EIGHT: DENIAL OF MOTION TO DISMISS.**

9      In her twenty-eighth ground for relief, Petitioner contends that the trial court

10  erred in refusing to consider her pretrial motion to dismiss that was based on the

11  purported denial of her right to a speedy trial.  (See Dkt. 33 at 92.)  According to

12  Petitioner, the court erroneously found that the motion was untimely and

13  improperly noticed.[42]  (See id.)

14      This claim is not cognizable because it exclusively concerns state law.  See

15  Waddington, 555 U.S. at 192 n.5.  Specifically, it concerns whether or not the trial

16  court properly applied California law concerning the noticing of motions.  Putting

17  that aside, Petitioner cannot show that the trial court refused to consider the

18  proposed motion.  Although the court noted that it was improperly noticed when

19  Petitioner moved to dismiss, the court told her that she could pursue the motion if

20  she properly filed it.  (See Dkt. 3 at 213.)  In any event, even if the trial court had

21  considered the motion, there is no reason to believe that it would have granted it.

22  _____

23  [41] The Court has found no federal case – let alone a Supreme Court case – in

24  which Mathews was applied in the context of a delay between a criminal
    defendant's arraignment and trial.

25  [42] Petitioner attempted to bring the motion during a closed hearing

26  concerning her substitution-of-counsel motion at which the prosecutor was not
    present.  (See Dkt. 3 at 213-14.)

27

28

To the contrary, it was based on a purported denial of Petitioner's right to a speedy trial. But as related above, the trial court found that Petitioner personally and repeatedly waived time. As such, it would not have found that her right to a speedy trial was violated and would not have granted the proposed motion to dismiss.

To the extent Petitioner alleges that trial counsel erred in refusing to file the proposed motion on her behalf, that claim also fails. Counsel was aware of Petitioner's desire to file a motion to dismiss on speedy-trial grounds but explained that he was "unwilling" to file it. (See Dkt. 3 at 221.) In other words, he made an informed, strategic decision not to file the motion that cannot be second-guessed on habeas review. See Strickland, 466 U.S. at 690; Silva, 279 F.3d at 844. Considering that Petitioner repeatedly waived time and counsel requested and agreed to multiple continuances, that decision was sound.

Accordingly, Petitioner is not entitled to relief on this claim.

**GROUND THRITY-ONE: CUMULATIVE ERROR.**

In her thirty-first ground for relief, Petitioner contends that the cumulative effect of the foregoing errors deprived her of her right to a fair trial. (See Dkt. 33 at 99-102.)

According to the Ninth Circuit, the Supreme Court has "clearly established" that although individual errors may not each rise to the level of a constitutional violation or independently warrant reversal, a collection of such errors might. Parle v. Runnels, 505 F.3d 922, 927 (9th Cir. 2007) (citing Chambers v. Mississippi, 410 U.S. 284, 290 n.3, 298, 302-03 (1973)). Courts therefore must determine whether the errors "rendered the . . . defense 'far less persuasive,'" taking into consideration the overall strength of the prosecution's case. Id. at 928 (quoting Chambers, 410 U.S. at 294). But if none of the claims actually demonstrate error, no cumulative prejudice can stem from them. See Hayes v. Ayers, 632 F.3d 500, 524 (9th Cir. 2011) (finding that when "no error of constitutional magnitude occurred, no

1    cumulative prejudice is possible"); <u>Taylor v. Beard</u>, 616 F. App'x 344, 345 (9th

2    Cir. 2015) ("[Petitioner] has failed to demonstrate any error here; thus, there can be

3    no cumulative error.").

4         Here, each of Petitioner's grounds for relief is meritless, so there can be no

5    cumulative error.  Moreover, any collective prejudice from the purported errors

6    underlying her claims likewise would not have rendered her trial fundamentally

7    unfair.  <u>See</u> <u>Detrich v. Ryan</u>, 740 F.3d 1237, 1273 (9th Cir. 2013) (cumulative

8    effect of counsel's alleged errors did not amount to ineffectiveness because even

9    "[t]aken cumulatively, they still are not substantial").  Consequently, habeas relief

10   is unwarranted on this claim.

11   **GROUND THIRTY-TWO: INEFFECTIVE ASSISTANCE OF APPELLATE**

12   **COUNSEL.**

13        In her thirty-second ground for relief, Petitioner contends that she received

14   ineffective assistance of counsel on appeal.  (<u>See</u> Dkt. 33 at 102.)  Specifically, she

15   faults counsel for waiting over two months after being assigned as counsel to

16   determine that there were no grounds for appeal.  (<u>See</u> <u>id.</u>).  As a result, according

17   to Petitioner, she received "zero assistance of counsel on direct appeal."  (<u>Id.</u>)

18        **A.    <u>The Superior Court's Decision.</u>**

19        The superior court rejected Petitioner's ineffective-assistance-of-appellate-

20   counsel claim as follows:

21        *Petitioner essentially argues that counsel provided ineffective assistance of*

22   *counsel for filing a <u>Wende</u> brief instead of presenting substantive arguments on*

23   *appeal.  Petitioner does not establish that she was prejudiced by appellate*

24   *counsel's representation or that she would have obtained a different result had*

25   *appellate counsel argued specific issues.  First, "The mere fact appellate counsel*

26   *has not raised every possible or conceivable issue does not . . . establish that*

27   *appellate counsel is ineffective."  (<u>People v. Abilez</u> (2007) 41 Cal. 4th 472, 536.)*

28

*Pursuant to <u>People v. Wende</u> (1979) 25 Cal .3d 436, 442, when appellate counsel submits a brief on appeal that either raises no specific issues or describes the appeal as frivolous, the Court of Appeal is required to conduct a review of the entire record for potential issues. "This court's decision in <u>Wende</u> interpreted <u>Anders</u>[43] to require the appellate court 'to conduct a review of the entire record whenever appointed counsel submits a brief which raises no specific issues or describes the appeal as frivolous. This obligation is triggered by the receipt of such a brief from counsel and does not depend on the subsequent receipt of a brief from the defendant personally.' (Citation.) The court 'recognize[d] that under this rule counsel may ultimately be able to secure a more complete review for his client when he cannot find any arguable issues than when he raises specific issues, for a review of the entire record is not necessarily required in the latter situation. [Citations.]'" (<u>People v. Kelly</u> (2006) 40 Cal.4th 106, 107-108.)*

*Here, counsel filed a <u>Wende</u> brief on petitioner's behalf to trigger the reviewing court's obligation to consider the entire record for any potential issue. Under <u>Kelly</u>, <u>supra</u>, appellate counsel's brief invited a more complete review of petitioner's case. That appointed counsel for petitioner did not identify any arguable issues on appeal does not automatically render counsel's assistance ineffective. The reviewing court in petitioner's case not only independently reviewed the entire record as required by <u>Wende</u>, <u>supra</u>, and found no arguable issues, but allowed petitioner to request (and be appointed) new appellate counsel and file supplemental briefing. Based on this record, it does not appear that petitioner received ineffective assistance of appellate counsel, and her conclusory statements fail to establish error in light of the entire record.*

(LD 2 at 5-6.)

---

[43] <u>Anders v. California</u>, 386 U.S. 738, 744 (1967).

1

### B.    Applicable Federal Law.

The guarantees of due process entitle a criminal defendant to effective assistance of counsel on appeal.  See Pollard v. White, 119 F.3d 1430, 1435 (9th Cir. 1997) (citing Evitts v. Lucey, 469 U.S. 387, 391-405 (1985)).  The standards for assessing the performance of trial and appellate counsel are the same.  See Evitts, 469 U.S. at 395-99; Cockett v. Ray, 333 F.3d 938, 944 (9th Cir. 2003).  In assessing whether appellate counsel performed reasonably, reviewing courts must be mindful that counsel has no constitutional duty to raise an issue when in the attorney's judgment it has little or no likelihood of success.  See McCoy v. Wisconsin, 486 U.S. 429, 436 (1988).  When, as here, a petitioner faults appellate counsel for filing a Wende brief, the petitioner cannot prevail unless she shows that counsel unreasonably failed to discover a nonfrivolous issue and that a reasonable probability existed that the petitioner would have prevailed on appeal had counsel done so.  See Smith v. Robbins, 528 U.S. 259, 285 (2000).

### C.    Analysis.

The superior court reasonably rejected this claim.  As an initial matter, it fails for lack of evidence because it is not supported by a declaration from appellate counsel concerning his actions (or any evidence that Petitioner unsuccessfully sought one),[44] and as related below, reasons apparent from the record could explain counsel's decision not to raise any issues on appeal.  See Dunn v. Reeves, 594 U.S. 731, 743 (2021) (per curiam) (failure to submit declaration or elicit testimony from trial counsel about his actions defeated ineffective-assistance claim when record suggested strategic reasons for challenged actions because "silent record cannot discharge a petitioner's burden"); Gentry v. Sinclair, 705 F.3d 884, 900 (9th Cir.

_____

[44] By contrast, Petitioner has submitted evidence showing that she unsuccessfully attempted to obtain a declaration from trial counsel concerning his purported shortcomings.  (See Dkt. 6 at 206-09.)

109

2013) (state court was not unreasonable in concluding that trial counsel's performance was not deficient as to particular ineffective-assistance claim when petitioner presented counsel's affidavit only to "support . . . other ineffective assistance claims" and "had no evidence" to support first claim).

Putting that aside, Petitioner does not identify any nonfrivolous claim that counsel failed to raise on appeal. Indeed, she identifies no claim that counsel should have raised. Instead, she simply asserts that counsel was ineffective. For that reason alone, her claim fails. See Moore v. Chrones, 687 F. Supp. 2d 1005, 1035 (C.D. Cal. Jan. 14, 2010) ("Petitioner's unexplicated assertion that there were 'many colorable issues' [he] presented to appellate counsel that should have been raised on appeal is too vague and conclusory to warrant habeas relief." (citing Jones v. Gomez, 66 F.3d 199, 204-05 (9th Cir. 1995)); Thomas v. Walker, No. CV 11-132-MWF (MAN), 2012 WL 6964860, at *15 (C.D. Cal. Dec, 10, 2022) (petitioner could not establish that appellate counsel was ineffective when he identified no claim that counsel should have asserted on direct appeal but did not), accepted by 2013 WL 373466 (C.D. Cal. Jan. 28, 2013).

Moreover, even if Petitioner alleged that counsel should have raised the grounds for relief in the First Amended Petition, her ineffective-assistance claim would still fail. Counsel could not have raised the ineffective-assistance-of-trial-counsel claims on direct appeal because in California such claims must generally be raised on habeas review, not on appeal. See People v. Salcido, 44 Cal. 4th 93, 172 (2008) (as amended) (collecting cases); People v. Mendoza Tello, 15 Cal. 4th 264, 266-67 (1997) (as amended) (collecting cases); see also Rollins v. Sutton, No. 5:17–cv–00321-VAP-JC, 2019 WL 6040416, at *7 (C.D. Cal. Oct. 10, 2019) (appellate counsel was not unreasonable in failing to raise ineffective-assistance-of-trial-counsel claims on direct appeal because California law provides that such claims must ordinarily be raised on collateral review, not direct appeal), accepted

110

by 2019 WL 6039942 (C.D. Cal. Nov. 13, 2019); <u>Brown v. Asuncion</u>, No. CV 18-8892-MWF (FFM), 2019 WL 4509207, at *20 (C.D. Cal. Apr. 12, 2019) (same "even if some of those allegations had merit"), <u>accepted by</u> 2019 WL 7037768 (C.D. Cal. Dec. 19, 2019).  And as to the grounds that are defaulted, counsel did not perform unreasonably in failing to assert them on appeal because they are meritless, as related above.

Even assuming that counsel erred in filing a <u>Wende</u> brief, Petitioner can show no prejudice.  In accordance with California law, Petitioner was appointed counsel to file a supplemental brief in which she asserted several claims, including the First Amended Petition's <u>Brady</u> claims, many of its ineffective-assistance claims, its speedy-trial claim, and others.  (<u>See</u> Dkt. 3 at 6.)  She does not allege that the counsel she was appointed for that purpose was ineffective.  She can likewise show no prejudice based on the non-defaulted claims that she raised in her habeas petition to the superior court.  The superior court rejected those claims on their respective merits, and Petitioner cites no supporting argument that counsel could have advanced on appeal that she did not advance on habeas review.  <u>See</u> <u>Givens v. Neuschmid</u>, No. 2:17-cv-0328 KJM (CKD), 2022 WL 597159, at *3 (E.D. Cal. Feb. 28, 2022) ("Because California's courts, on collateral review, denied the claim petitioner believed his appellate counsel should have raised, he cannot show prejudice for counsel's failure to raise it."), <u>accepted by</u> 2022 WL 4182191 (E.D. Cal. Sept. 13, 2022); <u>Yong Bae Hong v. Santoro</u>, No. 8:16-cv–00904-AG (SK), 2018 WL 1665183, at *5 (C.D. Cal. Feb. 28, 2018) (appellate counsel's failure to raise claims on appeal was not prejudicial when state courts rejected same claims on collateral review; collecting cases), <u>accepted by</u> 2018 WL 1641236 (C.D. Cal. Mar. 31, 2018).

Finally, to the extent Petitioner believes that counsel's decision to file a <u>Wende</u> brief on appeal establishes an <u>Anders</u> error, she is mistaken.  (<u>See</u> Dkt. 33 at

102.)  In <u>Anders</u>, the Supreme Court held that appellate counsel could withdraw from representation only when certain safeguards were met.  <u>See</u> 386 U.S. at 744. But as the Supreme Court has found, California's <u>Wende</u> procedure satisfies the safeguards identified in <u>Anders</u>.  <u>See</u> <u>Robbins</u>, 528 U.S. at 276.  Accordingly, any claim under <u>Anders</u> fails.

For these reasons, Petitioner is not entitled to relief on her ineffective-assistance-of-appellate-counsel claim.

**GROUND THIRTY-THREE: ACTUAL INNOCENCE.**

In her thirty-third ground for relief, Petitioner contends that she is actually innocent of each of the charged crimes.  (<u>See</u> Dkt. 33 at 102.)  As to all of her convictions, she argues that there was insufficient evidence because the prosecutor relied only perjured testimony and inadmissible evidence.  (<u>See</u> <u>id.</u>)  Presumably referring to her conviction for violating a protective order, she asserts that the family-court protective order was unlawful.  (<u>See</u> <u>id.</u>).

The superior court rejected this claim as "wholly conclusory and unsupported by any evidence or legal authority."  (Dkt. 6 at 22.)  As explained below, it did not unreasonably apply or contravene clearly established federal law in doing so.

**A.**      **<u>Applicable Federal Law.</u>**

The United States Supreme Court has never recognized that an actual-innocence claim is cognizable on federal habeas review.  On the contrary, the Supreme Court expressly has left open the question.  See <u>McQuiggin v. Perkins</u>, 569 U.S. 383, 392 (2013) ("We have not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence."); <u>Dist. Att'y's Off. for the Third Jud. Dist. v. Osborne</u>, 557 U.S. 52, 71-72 (2009) (whether federal constitutional right to be released upon proof of "actual innocence" exists "is an open question").  Although the Supreme Court has suggested the possibility of a "hypothetical freestanding innocence claim," it has stated that such a claim, if

112

one is ever recognized, would be applicable only in capital cases.  House v. Bell, 547 U.S. 518, 554-55 (2006); see also Herrera v. Collins, 506 U.S. 390, 417 (1993).

In Jones v. Taylor, 763 F.3d 1242, 1246 (9th Cir. 2014), the Ninth Circuit, while noting the uncertainty of a viable freestanding actual-innocence claim in a federal habeas corpus proceeding in the non-capital context, set forth the standard that would govern such claims if, in fact, they were cognizable.  It began by noting that the standard is "extraordinarily high and . . . the showing [for a successful claim] would have to be truly persuasive."  Id. (citations and internal quotations omitted); see Herrera, 506 U.S. at 442-44 (Blackmun, J., dissenting).  "[A]t a minimum, the petitioner must go beyond demonstrating doubt about his guilt, and must affirmatively prove that he is probably innocent."  Taylor, 763 F.3d at 1246.

The Ninth Circuit's opinion in Carriger v. Stewart, 132 F.3d 463 (9th Cir. 1997) (en banc), is instructive on this point.  There, the petitioner argued that he was actually innocent of murder.  Id. at 465-66.  In support of that argument, he presented the statement of another suspect, who credibly confessed to the murder and provided details about the murder that only would have been known to a participant in it.  Id. at 474-76.  The suspect further boasted that the petitioner had been set up, and, moreover, all of the other evidence presented at trial pointed as directly to the new suspect as it did to the petitioner.  Id.  Nevertheless, the Ninth Circuit held that the petitioner had failed to show that he was actually innocent because he had presented no evidence "demonstrating he was elsewhere at the time of the murder, nor [was] there any new and reliable physical evidence, such as DNA, that would preclude any possibility of [his] guilt."  Id. at 477.

**B.   Analysis.**

Petitioner is not entitled to habeas relief on this claim.  As discussed above, the Supreme Court has expressly left open the question of whether there is a right to federal habeas relief based on a freestanding claim of actual innocence.  In the

113

absence of clearly established Supreme Court authority on point, the superior court's rejection of the claim could not have been objectively unreasonable under AEDPA. See Wright v. Van Patten, 552 U.S. 120, 126 (2008) (per curiam); Carey v. Musladin, 549 U.S. 70, 77 (2006).

Even assuming that a freestanding claim of actual innocence in a non-capital case is cognizable, Petitioner has not made the showing necessary to warrant habeas relief. She cites no new evidence to show that she is actually innocent. Instead, she alleges that there was insufficient evidence to support her convictions. Even if that were true – and it is not – it would not be enough to support an actual-innocence claim. See Carriger, 132 F.3d at 476 (explaining that "the threshold for a freestanding claim of innocence . . . contemplates a stronger showing than insufficiency of the evidence to convict" (citation omitted)). Likewise, Petitioner's claim that her convictions were based on false and perjured testimony does not support an actual-innocence claim because, even if she were correct, she nevertheless offers no evidence to "affirmatively prove that [she] is probably innocent." Id. (citation omitted). As explained above, her false-evidence and perjured-testimony claims are meritless, as are her state-law evidentiary claims and her Fifth Amendment challenge to the admission of her family-court testimony.

Accordingly, Petitioner is not entitled to relief on her actual-innocence claim.

**GROUND THIRTY-FIVE: INSTRUCTIONAL ERROR.**

In her thirty-fifth ground for relief, Petitioner maintains that the trial court violated due process by failing to properly instruct the jury on the charged crime of violating a protective order. (See Dkt. 33 at 103; Dkt. 63 at 1; Dkt. 72 at 3-5.) She also faults trial counsel for failing to object to the instruction and appellate counsel for failing to challenge the instruction on appeal. (See Dkt No. 33 at 103; Dkt. 60 at 3; Dkt. 72 at 5-7.)

The California Supreme Court summarily denied Petitioner's claims. (See

LD 5-7).  As explained below, it was not objectively unreasonable in doing so.

### A.   Relevant Background.

In the original criminal complaint, Petitioner was charged with, among other things, violating a protective order by "coming within 100 yards of" a protected person.  (Dkt. 3 at 14.)  In the amended complaint, however, she was charged with violating a protective order by "fail[ing] to deactivate website [sic] and create[ing] new websites."  (Id. at 79.)  The amended complaint omitted any reference to her coming within one hundred yards of a protected person.

The parties stipulated that the family-court's protective order was valid and stipulated as to what it prohibited Petitioner from doing.  (See Dkt. 4 at 118-20.)  Accordingly, the trial court read the stipulation to the jury.  (See id.).  In pertinent part, the stipulation stated:

*[Petitioner] is to stop online bullying and harassing [the victim] and his company Gorgeous Painting.  [Petitioner] is to stop posting online content about [the victim] and his company Gorgeous Painting. [Petitioner] is to stop contacting friends and clients of [the victim] regarding inappropriate videos, pictures, blogs, or websites about [the victim] created by [Petitioner].  [Petitioner] is to remove content on the Internet relating to video, pictures, blogs, or websites about [the victim] created by [Petitioner].  [Petitioner] is to stop stalking [the victim] in cyberspace or in person.  [Petitioner] is to stop posting the picture or likeness of [the victim], or refer to him by name on any social media website or blog.  And . . . [Petitioner] is to remove any pictures or references of [the victim] from any social media website or blog that she posted.*

(Id. at 119-20.)  The victim testified that after the family court issued the protective order, Petitioner posted his private photographs, created fake social media accounts in his name, and posted defamatory and private things about him – including his home address and phone number – on other "cheater" websites.  (See Dkt. 4 at 74,

77, 79-86, 91, 95.)

During closing arguments, both parties discussed the charged crime of violating a protective order. For his part, the prosecutor stated that Petitioner was guilty of the crime because she posted videos and other information about the victim after the order was issued. (See, e.g., id. at 171-75, 194-97.) He did not argue that Petitioner had violated the protective order by coming within a hundred yards of a protected person. Defense counsel's discussion of the violation-of-a-protective-order count likewise concerned only Petitioner's alleged posts online concerning the victim and failure to take down existing websites and posts after the issuance of the family-court order. (See, e.g., id. at 179-81.)

The trial court instructed the jury on the crime of violating a protective order. (See Dkt. 3 at 159.) The instruction, however, described only the prohibited conduct alleged in the original complaint – namely, that Petitioner had come into contact with a protected person. (See id. at 14, 159.) In pertinent part, the instruction stated that the prosecutor had to prove that "A court lawfully issued a written order that [Petitioner] not contact, send any messages to, follow, or disturb the peace of the protected person." (Id. at 159.) It made no mention of the conduct charged in the amended complaint – namely, that Petitioner had violated a protective order by "fail[ing] to deactivate website [sic] and create[ing] new websites." (Id. at 79.)

The jury found Petitioner guilty on all counts. (See id. at 177-79.)

**B.    Applicable Federal Law.**

"In a criminal trial, the State must prove every element of the offense, and a jury instruction violates due process if it fails to give effect to that requirement." Dixon v. Williams, 750 F.3d 1027, 1032 (9th Cir. 2014) (as amended) (per curiam). However, not every "ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation." Id.; see also Waddington, 555 U.S. at

116

190 ("Even if there is some 'ambiguity, inconsistency, or deficiency' in the instruction, such error does not necessarily constitute a due process violation." (citation omitted).  Rather, the pertinent inquiry is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violated due process." McGuire, 502 U.S. at 72 (1991).  In making this determination, the disputed instruction "'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record."  Id.

Even if constitutional error is established, habeas relief is unavailable unless the error had a substantial and injurious impact on the jury's verdict.  See Dixon, 750 F.3d at 1034-35 (citing Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)); see also California v. Roy, 519 U.S. 2, 5 (1996) (per curiam) (holding that Brecht standard applies to instructional-error claim concerning the definition of the elements of a charged offense); United States v. Conti, 804 F.3d 977, 980 (9th Cir. 2015) (failure to instruct on an essential element of a crime is subject to harmless-review analysis).

## C.    Analysis.

The California Supreme Court was not objectively unreasonable in rejecting Petitioner's instructional-error claim.  Although the trial court did not instruct the jury on the conduct alleged in the amended complaint, the resulting error did not have a substantial and injurious impact on the jury's verdict.  First, overwhelming evidence showed that Petitioner committed the conduct alleged in the amended complaint – namely, failing to take down Internet posts and websites and creating new websites concerning the victim.  Indeed, she admitted that she had posted at least one video concerning the victim after the first family-court order was issued. (See Dkt. 4 at 77.)  As the victim's testimony and numerous exhibits showed (see, e.g., Dkt. 3 at 180; Dkt. 4 at 72-77, 81-87, 93-95, 97), countless other websites containing private and derogatory information about him were either created or

remained online after the second family-court order was issued.  Although Petitioner argued at trial that someone else might have created those websites (see Dkt. 4 at 181-82), no evidence at trial supported that argument.  What's more, the websites contained information about the victim known only to her (see Dkt. 4 at 105), and she told the victim that she was going to make him "famous" by posting "everything online" and that she would "not stop" (id. at 54, 96.)  Further, the stipulation concerning the family-court protective order unequivocally stated that she was prohibited from posting information about the victim online and that she had to remove any existing online posts concerning him.  (See id. at 118-20.)  Given this evidence, there is no doubt that the jury would have found her guilty of the charged crime if it had been properly instructed.

Second, the arguments of the prosecutor and trial counsel leave little doubt that the jury understood that it could not find Petitioner guilty of violating a protective order unless it found that she failed to remove the online posts or created new websites about the victim.  Indeed, both the prosecutor's and trial counsel's closing arguments referenced only that activity when addressing the violation-of-a-protective-order count.  (See id. at 171-75, 179-81, 194-97.)  Neither argued that Petitioner committed any crime by coming within close proximity to the victim.  To be sure, "arguments of counsel generally carry less weight with a jury than do instructions from the court."  Boyde v. California, 494 U.S. 370, 384 (1990).  But here, both defense counsel and the prosecutor made the same arguments concerning the violation-of-a-protective-order count – at least insofar as what activity Petitioner did or did not do – and those arguments dovetailed with the evidence presented at trial, as summarized above.  Given these circumstances, their arguments undermine any claim that the faulty instruction had a substantial and injurious impact on the jury verdict.  Accordingly, Petitioner is not entitled to habeas relief on her instructional-error claim.

1    Petitioner is likewise not entitled to relief on her corresponding ineffective-

2 assistance claims.  Assuming counsel erred in not objecting to the trial court's

3 instruction – as opposed to strategically refraining from doing so – Petitioner

4 suffered no prejudice.  The evidence showing that she engaged in the criminal

5 conduct alleged in the amended complaint was overwhelming, and the prosecutor's

6 and counsel's arguments blunted the impact of any infirmity in the court's

7 instruction, as related above.  Consequently, she cannot show a reasonable

8 likelihood that the jury would have reached a more favorable verdict but for

9 counsel's purported error.  Had appellate counsel asserted the instructional-error

10 claim on appeal, it would have failed for the same reasons.

11    Accordingly, none of Petitioner's instructional-error related claims warrant

12 habeas relief.

13 **PETITIONER'S REQUEST FOR AN EVIDENTIARY HEARING.**

14    Petitioner requests an evidentiary hearing concerning her claims for relief.

15 (See Dkt. 55 at 54.)  Generally, federal habeas review under § 2254(d) is limited to

16 the state-court record.  Cullen v. Pinholster, 563 U.S. 170, 181-82 (2011).  When a

17 state court has denied claims on their merits – as is the case here – Pinholster

18 precludes "further factual development of these claims" through an evidentiary

19 hearing to determine whether § 2254(d) is satisfied.  Gulbrandson v. Ryan, 738

20 F.3d 976, 993-94 (9th Cir. 2013); see also Stokley v. Ryan, 659 F.3d 802, 809 (9th

21 Cir. 2011) ("Pinholster's limitation on the consideration of . . . new evidence . . . in

22 federal habeas proceedings also forecloses the possibility of a federal evidentiary

23 hearing").  Finally, in habeas proceedings, "an evidentiary hearing is not required

24 on issues that can be resolved by reference to the state court record."  Totten v.

25 Merkle, 137 F.3d 1172, 1176 (9th Cir. 1998).  Because the Court can determine

26 whether Petitioner is entitled to relief based on the existing record and exhibits, an

27 evidentiary hearing is not required.  Accordingly, Petitioner's request for an

28

evidentiary hearing should be denied.[45]

## VI.

## RECOMMENDATION

IT IS THEREFORE RECOMMENDED that the District Court issue an Order: (1) approving and accepting this R&R; (2) denying Petitioner's request for an evidentiary hearing; and (3) directing that Judgment be entered denying the First Amended Petition with prejudice.

DATED:  August 28, 2024

_Karen E. Scott_
KAREN E. SCOTT
United States Magistrate Judge

## NOTICE

Reports and Recommendations are not appealable to the Court of Appeals but are subject to the right of any party to timely file objections as provided in the Federal Rules of Civil Procedure and the instructions attached to this Report.  This Report and any objections will be reviewed by the District Judge whose initials appear in the case docket number.

---

[45] The Court notes Petitioner's ongoing efforts to expand the record in this matter to include discovery from her second criminal trial, where she was charged with violating the family court's protective order, as modified in 2021, by failing to remove or disable two posts about the victim that were originally created in 2018 but remained active in 2022.  (See Dkt. 59 at 4, 32.)  She was acquitted in that case.  (See id. at 15, 16, 18, 30.)  The Court has already found that expansion of the record is not warranted in light of Pinholster.  (See Dkt. 62.)  Petitioner has appealed that decision under Federal Rule of Civil Procedure 72.  (See Dkt. 65.)