1  XINGFEI LUO
   PO BOX 4886,
2  EL MONTE, CA 91734

3  XINGFEI LUO, IN PRO PER

FILED

CLERK, U.S. DISTRICT COURT

10/31/2024

CENTRAL DISTRICT OF CALIFORNIA

BY_____DVE_____DEPUTY

DOCUMENT SUBMITTED THROUGH THE
ELECTRONIC DOCUMENT SUBMISSION SYSTEM

8  **UNITED STATES DISTRICT COURT**

9  **CENTRAL DISTRICT OF CALIFORNIA**

11  XINGFEI LUO,                        ) Case No.: 8:22-cv-01640-MEMF-KES
                                        )
12              Petition,               ) **OBJECTIONS TO REPORT AND**
                                        ) **RECOMMENDATION OF U.S.**
13      vs.                             ) **MAGISTRATE JUDGE**
                                        )
14  THE PEOPLE OF CALIFORNIA,           )
                                        ) Action Filed: September 6, 2022
15                                      )
                Respondent.             )
16                                      )
                                        )
17  _____    )

18      **TO THE COURT AND ALL PARTIES:**

19      Xingfei Luo (Petitioner) will and hereby does object to the Report and Recommendations

20  ("R&R") of Magistrate Judge in this matter.

21                          **ARGUMENT**

22      By clear and convincing evidence, Petitioner has demonstrated that Czodor is a calculated

23  manipulator and no reasonable factfinder would have convicted her of the crimes charged.

24  **GROUNDS TWO, EIGHT, NINE, NINETEEN THROUGH TWENTY-TWO, TWENTY-**

25  **FIVE, TWENTY-NINE, AND THIRTY ARE NOT PROCEDURALLY BARRED** (Dkt. 73 at

26  13)

27      **Procedural Default Based on Failure to Raise on Direct Appeal**

28      The magistrate found Petitioner's enforcement-of-the-protective-order claim (ground two) is

procedurally defaulted because it could have been raised on direct appeal but was not. Dkt. 73 at 16. However, jurisdictional issues or claims that render a judgment void can be raised on habeas review. As established in *In re Harris*, 5 Cal. 4th 813, 829 (1993), claims that demonstrate that a court acted without jurisdiction, or that a judgment is void due to constitutional infirmities, are not subject to the procedural default bar.

The magistrate found Petitioner's prosecutorial-misconduct claims (ground thirty) and independent Fifth Amendment challenge to the admission of her family-court testimony (ground nine) are procedurally barred because she did not raise them on direct appeal. Dkt. 73 at 16-17. This is factually false. See attachment 1.

The magistrate found an independent and adequate state procedural ground barring Petitioner's sufficiency-of-the-evidence claims in grounds nineteen through twenty-two because the state court denied those claims because they were not cognizable on habeas review. Dkt. 73 at 17.

Under federal law, claims regarding the sufficiency of the evidence are inherently tied to due process rights, specifically the guarantee that no individual will be convicted of a crime unless the prosecution has proven every element of the offense beyond a reasonable doubt.

The U.S. Supreme Court, in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), articulated the standard for evaluating sufficiency-of-the-evidence claims in the context of due process. The Court held that a conviction violates due process if, after reviewing the evidence in the light most favorable to the prosecution, no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This means that when a defendant challenges the sufficiency of the evidence, they are essentially asserting that their due process rights have been violated because the evidence presented at trial was not sufficient to meet the required constitutional standard.

The Jackson standard is the federal benchmark for sufficiency-of-the-evidence claims. Under this standard, the reviewing court does not weigh the evidence, resolve conflicts in testimony, or assess the credibility of witnesses. Instead, the court must determine whether any rational factfinder could have reached the conclusion that the defendant was guilty beyond a reasonable doubt. If not, the conviction cannot stand because it violates due process.

Sufficiency-of-the-evidence claims are inherently due process claims because the right to be

convicted only upon proof beyond a reasonable doubt is a fundamental constitutional protection. The Supreme Court in *In re Winship*, 397 U.S. 358, 364 (1970), affirmed that the Due Process Clause requires the prosecution to prove every element of a charged offense beyond a reasonable doubt. When a court is asked to review the sufficiency of the evidence, it is reviewing whether this constitutional standard has been met. Under the *Winship* decision, it is clear that a state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt has stated a federal constitutional claim. *Jackson v. Virginia*, 443 U.S. 307, 321 (1979).

If a conviction is based on insufficient evidence, the defendant's due process rights have been violated, as the conviction would have been obtained without meeting the burden of proof that the Constitution mandates.

On federal habeas corpus review, sufficiency-of-the-evidence claims are also considered due process claims under 28 U.S.C. § 2254. The reviewing court asks whether the state court's decision was contrary to or an unreasonable application of *Jackson*. Federal courts defer to the findings of the state court, but if the evidence is constitutionally insufficient, the habeas petition will be granted on due process grounds.

In this case, a rational trier of fact could not have reasonably found that Petitioner and Czodor were in a dating relationship based on only two social gatherings and limited interactions. Federal law requires more than mere speculation for a finding to meet the "beyond a reasonable doubt" standard.

As to Czodor's expectation of privacy in sending nude photos after meeting Petitioner once, the U.S. Supreme Court in *Katz v. United States*, 389 U.S. 347, 361 (1967), established that the reasonable expectation of privacy must be evaluated objectively, meaning it depends on what society is prepared to recognize as reasonable—not the subjective beliefs of the individual. A reasonable person does not expect privacy in such a context, particularly given the absence of a clear, established relationship, the lack of promise by Petition to keep the photos private, and the voluntary transmission of the photos.

Furthermore, in order to secure a conviction under California Penal Code § 647(j)(4)(A), the

prosecution must prove that the alleged victim suffered "serious emotional distress" as a result of the offense. Dkt. 3 at 160.

In California, "serious emotional distress" must be more than mere discomfort or temporary upset. For instance, in *People v. Ewing* (1999) 76 Cal.App.4th 199, the court explained that while the terms "substantial emotional distress" and "severe emotional distress" are similar, they are not synonymous because "severe" is a stronger adjective than "substantial." *Id* at 211. The court further explained: the prosecution presented only scant evidence of emotional distress. Ferguson testified that beginning the night of April 14 she feared Ewing; she was afraid for her own safety and that of her children. It was Ewing's conduct that evening that prompted Ferguson to make her first telephone call to the police department. Two days later, Ewing was arrested. Before the evening of April 14, there was no evidence that Ferguson feared Ewing. Ferguson's boyfriend, Goulding, testified she suffered sleepless nights and had joined a support group for battered women. While this evidence supports the conclusion that Ewing's conduct upset Ferguson, it fell far short of showing Ferguson suffered **substantial emotional distress**. No evidence was proffered as to the degree, frequency and duration of Ferguson's sleep disruption. Similarly, Goulding's statement Ferguson joined a support group, without further details as to the extent of her participation, adds little. Indeed, there was not even a showing that Ferguson, who had organized a foundation for battered women before meeting Ewing, joined the support group as a result of Ewing's conduct. Without evidence as to the severity, nature or extent of a victim's emotional distress, the burden of proof is not met. *Id*. at 211-212.

In the present case, the evidence offered by the prosecution is even weaker than in *Ewing* – a case required evidence of substantial instead of serious emotional distress. Here, Czodor testified only that he "thought about going to therapy a lot" without providing any further details about the emotional or psychological impact of the alleged conduct. There was no testimony or corroborating evidence of Czodor actually suffering from prolonged anxiety, or any other tangible impact resulting from the incident. Under the standard set in *Ewing*, where even evidence of sleepless nights and support group participation fell short of proving substantial emotional distress, Czodor's testimony that he thought about going to therapy is constitutionally insufficient to meet the burden

1  of proof required for serious emotional distress.

2       As the court in *Ewing* emphasized, the prosecution must provide more than just scant

3  evidence of emotional distress; it must show its severity, frequency, and duration. Without such

4  evidence, the claim of substantial emotional distress cannot be sustained, and the prosecution fails

5  to meet the requisite legal standard to secure a conviction.

6       California's Civil Code section 1708.85, which deals with privacy rights related to

7  unauthorized use of intimate images, requires that the distress be "serious" and supported by

8  evidence such as therapy, substantial mental health impact, or a significant disruption in the victim's

9  life. Merely thinking about going to therapy would not meet this standard.

10       **Exceptions to Procedural Bar**

11       A reviewing court ordinarily will not consider a habeas claim which could have been but

12  was not raised on direct appeal (the "*Dixon* rule"). *In re Dixon* (1953) 41 Cal.2d 756, 759.

13       The exceptions to the *Dixon* rule are: (1) fundamental constitutional error; (2) lack of

14  jurisdiction over the petitioner; (3) the trial court acting in excess of its jurisdiction; or (4) an

15  intervening change in the law. See *Park v. California*, 202 F.3d 1146, 1152 (9th Cir. 1999) (listing

16  the exceptions to the *Dixon* rule as set forth by the California Supreme Court in *In re Harris*, 5 Cal.

17  4th 813, 828 n.7 (1993)).

18       Because Petitioner's claims alleged federal constitutional error, *Dixon* is not an independent

19  bar as applied to those claims and her claims are not procedurally defaulted. *Park v. California*, 202

20  F.3d 1146, 1154 (9th Cir. 1999).

21       Petitioner contends that the trial court enforced two void family court orders, which means

22  the trial court had no legitimate authority or fundamental jurisdiction over Petitioner. This argument

23  invokes a critical exception to the *Dixon* rule.

24       Under California law, a court's jurisdiction is a fundamental prerequisite for any valid

25  judgment or order. A court acts in excess of its jurisdiction when it enforces void orders, and any

26  such action is null and void ab initio. The California Supreme Court has long recognized that a

27  judgment rendered by a court that lacks jurisdiction over the subject matter or the parties is void and

28  can be challenged **at any time**, even collaterally. As established in *In re Harris*, 5 Cal. 4th 813,

836-837 (1993), and *People v. American Contractors Indemnity Co.*, 33 Cal. 4th 653, 661 (2004), a court's jurisdictional overreach renders its orders and judgments void and subject to collateral attack, even in habeas corpus proceedings.

Moreover, under Federal law, it is well-established that a court's actions in the absence of jurisdiction are void and can be challenged at any time. The United States Supreme Court has consistently held that a judgment is void and subject to collateral attack if the court that rendered it acted without jurisdiction. In *United States v. Cotton*, 535 U.S. 625, 630 (2002), the Supreme Court emphasized that "subject-matter jurisdiction...can never be forfeited or waived," and that a judgment rendered without jurisdiction is void.

Because Petitioner has alleged that the trial court enforced void family court orders, the trial court acted beyond its jurisdiction. Consequently, Petitioner's claim falls within the exception to the *Dixon* rule, allowing Petitioner to challenge the trial court's jurisdiction in a habeas corpus proceeding despite the claim not being raised on direct appeal.

<u>Procedural Default Based on Failure to Object at Trial</u>

In *Ylst v. Nunnemaker*, 501 U.S. 797, 799, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991), the state appellate court held on direct appeal that Nunnemaker had waived his *Miranda* claim because he failed to object at trial. Nunnemaker re-raised his *Miranda* claim in several subsequent state habeas petitions, all of which were denied essentially without explanation. The issue before the United State Supreme Court was "whether the California Supreme Court's unexplained order denying his second state habeas petition to that court ... constituted a 'decision on the merits' of that claim sufficient to lift the procedural bar imposed on direct appeal." *Nunnemaker*, 501 U.S. at 801, 111 S.Ct. 2590. Although the Supreme Court concluded that an unexplained order did not constitute a decision on the merits, it noted that:

> State procedural bars are not immortal, however; they may expire because of later actions by the state courts. If the last state court to be presented with a particular federal claim reaches the merits, it removes any bar to federal-court review that might otherwise have been available. Id.

Here, because petitioner reasserted his Brady /false evidence claim in his first state habeas

1    petition and the state supreme court reached (and rejected) the merits of that claim, *Nunnemaker*

2    applies and the procedural bar based on the contemporaneous objection rule for petitioner's knowing

3    presentation of false evidence claim has been lifted.

4        **Cause and Prejudice (Dkt. 73 at 20)**

5        Ineffective assistance of counsel claims are not subject to the strictest procedural forfeiture

6    rules. See *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011) (citing *Strickland v. Washington*, 466

7    U.S. 668, 689-90 (1984)). In *Harrington*, the Court explained that:

8        An ineffective-assistance claim can function as a way to escape rules of waiver
         and forfeiture and raise issues not presented at trial, and so the *Strickland* standard
9        must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the
         integrity of the very adversary process the right to counsel is meant to serve.
10

11   *Id*.

12       "If the procedural default is the result of ineffective assistance of counsel, the Sixth

13   Amendment itself requires that responsibility for the default be imputed to the State." *Murray v.*

14   *Carrier*, 477 U. S. 478, 488 (1986). That is not because a constitutional error "is so bad that the

15   lawyer ceases to be an agent" of the prisoner, but rather because a violation of the right to counsel

16   "must be seen as an external factor" to the prisoner's defense. *Coleman v. Thompson*, 501

17   U. S. 722, 754 (1991) (internal quotation marks omitted).

18       A court "must consider the totality of the evidence" and ask "whether there is a reasonable

19   probability that, absent the [trial counsel's] errors, the result of the proceeding would have been

20   different" when evaluating a claim of ineffective assistance of counsel.

21       "A reasonable probability is a probability sufficient to undermine confidence in the

22   outcome. That requires a substantial, not just conceivable, likelihood of a different result."

23   Pinholster, 563 U. S., at 189 (citation and internal quotation marks omitted). This standard does not

24   require a defendant to show that it is more likely than not that adequate representation would have

25   led to a better result, but "[t]he difference" should matter "only in the rarest case." Strickland, 466

26   U. S., at 697. To determine whether a prisoner satisfies this standard, a court must "consider the

27   totality of the evidence before the judge or jury." Id., at 695. The magistrate departed from these

28   well-established rules in at least three ways. First, she failed adequately to take into account the

1  weighty exculpatory evidences in this case. As noted, the magistrate did not mention those

2  evidences at all.

3       Determining whether evidence would have created a reasonable probability of a different

4  result if it had been offered at trial necessarily requires an evaluation of the strength of that

5  evidence. And where that evidence undermines the prosecution's theory, it is hard to see how a

6  court could decide how much weight to give the evidence without making a comparative analysis.

7  The weakness of Czodor's testimony contrasts sharply with the strength of the evidence that

8  destroyed his credibility.

9       When a prisoner claims that he was prejudiced at trial because counsel failed to present

10  available mitigating evidence, a court must decide whether it is reasonably likely that the additional

11  evidence would have avoided a conviction. This analysis requires an evaluation of the strength of

12  all the evidence and a comparison of the weight of each evidence. The magistrate downplayed

13  Petitioner's evidence present here and overstated the strength of trial evidence.

14      **Appellate Counsel (Dkt. 21)**

15       The magistrate found that Petitioner's first habeas petition she filed in the state supreme

16  court asserted numerous ineffective-assistance-of-trial-counsel claims (see Dkt. 6 at 65-83) but no

17  corresponding ineffective-assistance-of-appellate counsel (IAAC) claims. Dkt. 73 at 21-22. This

18  finding overlooks the fact that Petitioner's first state court habeas petition was filed on October 13,

19  2021 which was before her appellate counsel filed a *People v. Wende* (1979) 25 Cal.3d 436 brief on

20  February 17, 2022. Dkt. 5 at 9. Therefore, Petitioner could not raise IAAC claims because her first

21  state court habeas petitioner was filed before her appellate counsel filed *Wende* brief.

22       The magistrate found that Petitioner did not exhaust her ineffective-assistance-of-appellate-

23  counsel (IAAC) claim because, in her second habeas petition to the California Supreme Court, she

24  only vaguely alleged that she "received zero assistance of counsel on appeal," which was

25  presumably based on the fact that appellate counsel filed a *People v. Wende* (1979) 25 Cal.3d 436

26  brief. The magistrate determined that Petitioner failed to identify specific claims that appellate

27  counsel should have raised. Dkt. 73 at 21-22.

28       However, since Petitioner is proceeding pro se, courts are charged with construing her

- 8 -

1  Petition and filings liberally in order to allow for the development of a potentially meritorious case.

2  See *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Martin v. Duffy*, 858 F.3d 239, 245 (4th Cir. 2017)

3  (noting that "when confronted with the objection of a pro se litigant, [the court] must also be

4  mindful of [its] responsibility to construe pro se filings liberally"). In addition, Petitioner relied on

5  the Court's initial review to exhaust her claims but nowhere in the Court's initial review alerts her

6  that the IAAC was unexhausted. Therefore, her IAAC claim is not procedurally barred. See *Walters*

7  *v. McCormick*, 122 F.3d 1172, 1174 n.1 (9th Cir. 1997) (exhaustion requirement excused because

8  failure to exhaust partially due to district court's ruling that claims were not barred, which allowed

9  statute of limitations to expire.)

10      Here, the nature of the ineffective assistance claim necessarily shows that the appellate

11  attorney's failure to raise any appropriate issues, except those that rely on evidence outside the

12  record, constituted deficient performance. (See Ground 2, 3, 8, 9, 10, 12-15, 17-22, 24-31, and 35. It

13  is self-evident that Petitioner asserts that all claims except those relying on evidence outside the

14  record are claims that appellate counsel should have raised, thus rendering the magistrate's

15  conclusion factually and legally incorrect.

16      Nominal representation on an appeal as of right — like nominal representation at trial —

17  does not suffice to render the proceedings constitutionally adequate; a party whose counsel is

18  unable to provide effective representation is in no better position than one who has no counsel at all.

19  *Evitts v. Lucey*, 469 U.S. 387, (1985). The attorney must play the role of an active advocate, rather

20  than a mere friend of the court assisting in a detached evaluation of the appellant's claim. See

21  *Anders v. California*, 386 U.S. 738 (1967); see also *Entsminger v. Iowa*, 386 U.S. 748 (1967)

22  (emphasizing that an attorney must assist a defendant in presenting claims and legal arguments

23  effectively, particularly in appeals where the right to counsel is guaranteed.)

24      In the context of ineffective assistance of appellate counsel, failure to raise meritorious

25  claims, especially those that could be preserved for federal habeas proceedings, can constitute

26  ineffective assistance. If appellate counsel fails to preserve claims for federal habeas proceedings,

27  resulting in the application of the highly deferential standard of review, such failure typically meets

28  the *Strickland* standard for ineffective assistance, as it directly impacts the ability of a defendant to

1  obtain meaningful relief in federal court. See *Anders v. California*, 386 U.S. 738, 744 (1967)

2  (holding that counsel has fulfilled his duty of advocate if he files a brief referring to anything in the

3  record that may support an appeal if he in good faith concludes the appeal is without merit.)

4  **The Domestic-Violence Protective Order (ground two) (Dkt. 73 at 23)**

5  The magistrate found that appellate counsel could not have performed unreasonably in

6  declining to assert a claim because trial counsel stipulated that the protective order was valid. Dkt.

7  73 at 23. This is legally flawed.

8  It is black letter law that fundamental jurisdiction may not be conferred by waiver, estoppel,

9  or consent. *People v. Lara*, 48 Cal.4th 216, 227 (Cal. 2010). This principle is similarly enshrined in

10  federal law. The consent of the parties is irrelevant. *California v. LaRue*, 409 U.S. 109 (1972). No

11  action of the parties can confer subject-matter jurisdiction. *Ins. Corp. of Ir. v. Compagnie Des*

12  *Bauxites De Guinee*, 456 U.S. 694, 702 (1982). A party does not waive the requirement by failing to

13  challenge jurisdiction early in the proceedings. *Id*.

14  California law specifically restricts the issuance of domestic violence restraining orders

15  (DVROs) to cases where the parties share a "qualifying" relationship under the Domestic Violence

16  Prevention Act (DVPA). Under California Family Code § 6211(c), a DVRO requires a close or

17  intimate relationship, such as dating or cohabitating, between the parties. If the relationship does not

18  meet these statutory qualifications, the family court lacks subject matter jurisdiction to issue the

19  order.

20  Orders issued without proper jurisdiction are legally void and may be challenged at any

21  stage. California courts recognize that a void order is "a nullity" and can be attacked in any

22  proceeding where its validity is at issue. *County of Ventura v. Tillett*, 133 Cal. App. 3d 105, 110

23  (1982), explains that a void order has no legal effect and may be challenged regardless of prior

24  stipulations. Subject-matter jurisdiction involves a court's power to hear a case, it can never be

25  forfeited or waived. *United States v. Cotton*, 535 U.S. 625, (2002). Consequently, defects in subject-

26  matter jurisdiction require correction regardless of whether the error was raised in trial court. See,

27  e.g., *Louisville Nashville R. Co. v. Mottley*, 211 U.S. 149 (1908).

28  Appellate counsel's failure to raise a jurisdictional issue amounts to ineffective assistance

1   under *Strickland v. Washington*, 466 U.S. 668 (1984), and this omission results in prejudice. Given

2   that jurisdictional arguments are non-waivable and central to the validity of court orders, appellate

3   counsel's neglect to assert this issue, especially on appeal, constitutes deficient performance.

4   Furthermore, in California, appellate courts have recognized that issues impacting jurisdiction—

5   especially those that affect the fundamental fairness of the proceedings—require heightened

6   scrutiny.

7        Under *Smith v. Robbins*, 528 U.S. 259, 285 (2000), appellate counsel has a duty to pursue

8   meritorious claims that affect the legitimacy of any court orders that resulted in Petitioner's

9   conviction. Because the family court's jurisdiction is essential to the validity of restraining orders,

10  any deficiencies in jurisdiction should have been raised by appellate counsel to protect Petitioner's

11  rights.

12       In addition, trial counsel's decision to stipulate to the validity of the family court's protective

13  order, despite having knowledge that the alleged facts would not legally support a dating

14  relationship, constitutes ineffective assistance of counsel, which is a colorful claim that should have

15  been raised by appellate counsel.

16       Here, trial counsel's decision to stipulate to the validity of the family court order falls below

17  the objective standard of reasonableness, as it was based on the rejection of a legal argument by the

18  trial court rather than a legitimate strategic decision. Dkt. 3 at 250-251. See *U.S. v. Swanson*, 943

19  F.2d 1070, 1071 (9th Cir. 1991) (holding that counsel's abandonment of his client's defense caused a

20  breakdown in our adversarial system of justice.)

21       The stipulation effectively deprived the jury—the appropriate fact-finder—of its role in

22  determining whether the interactions between Petitioner and Czodor met the legal standard of a

23  dating relationship and whether Czodor had a relationship engendering expectation of privacy.

24       A stipulation is a binding agreement that removes the need for the government to present

25  evidence to prove certain facts. When defense counsel agrees to a stipulation, it prevents the jury

26  from hearing critical evidence that might have influenced its decision. Stipulations should be

27  considered as strategic tools, but they must be based on sound legal grounds. In this case, the

28  stipulation concerning the family court's orders deprived Petitioner of her Sixth Amendment right

1  to a jury trial on a key factual issue—whether there was a dating relationship, a required element for

2  the issuance of the protective orders and of the expectation of privacy. By stipulating to the validity

3  of the orders, trial counsel waived this essential right, and this waiver was not made in furtherance

4  of any legitimate strategy, as the facts and evidence simply did not support a dating relationship.

5  This failure meets both the deficient performance and prejudice prongs of *Strickland*.

6      The magistrate's conclusion that Petitioner is bound by counsel's stipulation (Dkt. 73 at 24),

7  regardless of her knowledge or authorization, is legally flawed under federal law. While defense

8  counsel has authority over certain trial-related decisions, such as the strategic use of evidence or

9  stipulations, this authority is not absolute, particularly when it comes to fundamental rights.

10     Certain decisions regarding the exercise or waiver of basic trial rights are of such moment

11  that they cannot be made for the defendant by a surrogate. *Florida v. Nixon*, 543 U.S. 175, 187

12  (2004). A defendant has "the ultimate authority" to determine "whether to plead guilty, waive a

13  jury, testify in his' or her own behalf, or take an appeal." *Jones v. Barnes*, 463 U.S. 745, 751 (1983);

14  *Wainwright v. Sykes*, 433 U.S. 72, 93, n. 1 (1977) (Burger, C. J., concurring). As explained above,

15  trial counsel's stipulation effectively waived Petitioner's right to a jury determination of crucial

16  facts, a waiver that counsel did not have the authority to make. Waiving this right without

17  Petitioner's informed consent constitutes a violation of both the Sixth and Fourteenth Amendments.

18  Therefore, the magistrate's conclusion that Petitioner is bound by her counsel's unauthorized

19  stipulation is legally flawed and Petitioner is entitled to habeas relief. See *Brecht v. Abrahamson*,

20  507 U.S. 619, 629 (1993) (habeas relief is automatically granted for constitutional errors that are

21  "structural defects"); *Wash. v. Recuenco*, 548 U.S. 212, 218-19 (2006) (structural error "necessarily

22  render[s] a criminal trial fundamentally unfair or [] unreliable vehicle for determining guilt or

23  innocence"); *Miller v. Dormire*, 310 F.3d 600, 604 (8th Cir. 2002) (attorney's waiver of defendant's

24  right to jury trial without defendant's consent or understanding constituted structural defect).

25     In *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), "the

26  Supreme Court created an exception to the *Strickland* standard for ineffective assistance of counsel

27  and acknowledged that certain circumstances are so egregiously prejudicial that ineffective

28  assistance of counsel will be presumed." *Stano v. Dugger*, 921 F.2d 1125, 1152 (11th Cir. 1991) (en

banc).

The Supreme Court recognized in *Cronic* that there are "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *Cronic*, 466 U.S. at 658, 104 S.Ct. at 2046. The Court identified the complete denial of counsel or the deprivation of effective representation at a critical stage of an accused's trial as justifying a presumption of prejudice. Id. at 659, 104 S.Ct. at 2047. The Supreme Court stated that

> [c]ircumstances of that magnitude may be present on some occasions when although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial.

Id. at 659-60, 104 S.Ct. at 2047.

By stipulating with the prosecution, prejudice was presumed, because of an actual or constructive denial of the assistance of counsel during a critical stage of the criminal proceedings. See *Strickland*, 466 U.S. at 692, 104 S.Ct. at 2067 ("Actual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice.").

The Government has failed to identify any strategy that can justify trial counsel's stipulation. "[E]ven when no theory of defense is available, if the decision to stand trial has been made, counsel must hold the prosecution to its heavy burden of proof beyond reasonable doubt." *Cronic*, 466 U.S. at 656-57 n. 19, 104 S.Ct. at 2045-46 n. 19. By stipulating with the prosecution, trial counsel shouldered part of the Government's burden of persuasion.

Trial counsel's stipulation with prosecution demonstrates the constructive absence of an attorney dedicated to the protection of his client's rights under our adversarial system of justice. Trial counsel's stipulation with prosecution was not a tactical admission of certain facts in order to persuade the jury to focus on an affirmative defense such as insanity. See *Duffy v. Foltz*, 804 F.2d 50, 52 (6th Cir. 1986) (counsel's admission that his client committed the acts alleged but that he was not guilty by reason of insanity considered to be a trial tactic). Here, the stipulation told the jury that no reasonable doubt existed as to the validity of family court orders issued based on the dating

1  relationship between Petitioner and Czodor where whether a dating relationship existed was a key

2  fact to determine whether the family court had jurisdiction to issue the restraining orders and

3  whether Czodor had reasonable expectation of privacy in the photos he sent to Petitioner. Such

4  stipulation was not merely a negligent misstep in an attempt to champion his client's cause. See *U.S.*

5  *v. Swanson*, 943 F.2d 1070 (9th Cir. 1991).

6  **Prosecutorial misconduct (grounds eight and thirty) (Dkt. 73 at 25)**

7  The magistrate incorrectly characterized ground eight as prosecutorial misconduct. Dkt. 73

8  at 25. Ground eight involves the use of perjured testimony or false evidence at trial, which violates

9  Petitioner's right to a fair trial under Due Process Clause of the Fourteenth Amendment.

10  Czodor testified that Petitioner visited his home at night –when it would have been dark

11  outside – and that he claimed to have noticed the damage to his door the next day. This is a classic

12  manipulation - use assumption instead of actual objective evidence. Whether outside was dark is

13  irrelevant. The relevant question is whether Czodor's front door area was dark. Czodor's claim that

14  he only discovered the damage the next day is suspicious, especially given the evidence that his

15  front door area was well-lit. His explanation that it was "too dark" to notice the damage is

16  inconsistent with the facts, as photographs show the area was sufficiently illuminated. The

17  fabricated darkness and damage are an attempt to make his story of Petitioner's alleged misconduct

18  more believable and to provide a basis for seeking legal recourse. In cases where a party's

19  testimony is contradicted by objective evidence, courts often question the credibility of the

20  testimony.

21  Here, Czodor's credibility was a key issue in the case, and his testimony about the damage

22  to the door directly affected the jury's determination of Petitioner's guilt. The fact that he fabricated

23  an excuse for not noticing the damage sooner undermines his credibility and suggests that his

24  testimony about other events may also be false. This false testimony was material because it directly

25  affected the jury's assessment of the facts and the ultimate decision in the case. Had Petitioner

26  caused the damage, Czodor would not need to fabricate a story about the darkness to explain the

27  delay in his discovery of the damage. See *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3

28  L.Ed.2d 1217 (1959) (holding that "[t]he jury's estimate of the truthfulness and reliability of a given

1  witness may well be determinative of guilt or innocence").

2      The magistrate has misrepresented and ignored evidence presented by Petitioner,

3  particularly regarding the lighting conditions at Czodor's front door. The magistrate's finding that

4  Petitioner presents no evidence to show that Czodor's statement about being dark was false is not

5  only inaccurate but also disregards the evidence that contradicts Czodor's testimony. Dkt. 73 at 26-

6  27.

7      Here, the magistrate's conclusion that Petitioner provided no evidence to counter Czodor's

8  testimony is demonstrably false. Petitioner presented photographs showing that the front door area

9  was well-lit, which undermines Czodor's claim that he did not notice the damage until the following

10 day due to darkness. Dkt. 6 at 159-163. The magistrate's dismissal of these photos based on the lack

11 of a visible light bulb is irrelevant and constitutes a misrepresentation of the evidence. The proper

12 inquiry should have been whether the lighting was sufficient to notice the damage, not whether the

13 light bulb was visible.

14     The magistrate's finding that nothing suggests that it was so bright that it would have been

15 impossible for the victim to not notice the damage to the door is an unreasonable interpretation of

16 the evidence and a misrepresentation of what the photographs actually depict. Photographic

17 evidence demonstrates that light illuminated the entire front door area, strongly indicating a high

18 level of visibility at the time the photos were taken. The magistrate's assertion that the door was

19 "mostly covered in shadow" is incorrect when considering the clear, documented lighting on the

20 front entryway, which should have made any substantial damage readily apparent.

21     Here, the magistrate's interpretation of the lighting conditions does not align with the visual

22 evidence, undermining the credibility of the factual conclusions drawn. Therefore, the magistrate's

23 conclusion lacks evidentiary support.

24     Czodor's testimony that it was too dark to notice the damage to his door on September 18,

25 2018 is central to the prosecution's case. However, the photographic evidence submitted by

26 Petitioner, which shows significant lighting at the front door, directly contradicts Czodor's account.

27 Even people with poor eyesight can see the damages on the door if any. In addition, Czodor's

28 ability to take photos and videos during the night, yet his failure to capture any images showing the

alleged damage in the same frame as Petitioner, raises serious doubts about his credibility. Dkt. 4 at 54-66. The magistrate's failure to address these contradictions further supports the conclusion that Czodor's testimony was unreliable and false.

The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend. As stated by the New York Court of Appeals in a case very similar to this one, *People v. Savvides*, 1 N.Y.2d 554, 557; 136 N.E.2d 853, 854-855; 154 N.Y.S.2d 885, 887:

> "It is of no consequence that the falsehood bore upon the witness' credibility rather than directly upon defendant's guilt. A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth. . . . That the district attorney's silence was not the result of guile or a desire to prejudice matters little, for its impact was the same, preventing, as it did, a trial that could in any real sense be termed fair."

Petitioner suffered prejudice from appellate counsel's failure to raise this issue on appeal that rendered his performance ineffective under *Strickland*. In this case, appellate counsel's failure to challenge Czodor's perjured testimony, deprived Petitioner of a meaningful opportunity to contest the evidence used against her. Given that Czodor's testimony was critical to the prosecution's case, this failure likely affected Czodor's credibility and the outcome of the trial.

The magistrate's finding that "no light bulb is visible" does not negate the clear evidence that the front door was well illuminated. Courts must base their findings on the objective facts presented, not on speculative conclusions. Here, the magistrate's focus on the visibility of a light bulb misses the point: the photos showed sufficient light to disprove Czodor's claim of darkness, making it implausible that he could have missed the damage until the following day. This factual misrepresentation cannot stand under federal due process principles.

The magistrate's misrepresentation of the lighting evidence is a clear error. The introduction of false or misleading testimony violates due process. See *Napue v. Illinois*, 360 U.S. 264, 272 79 S.

- 16 -

1    Ct. 1173 (1959) (holding that a prosecutor's failure to correct a witness's false testimony that the

2    witness "had received no promise of consideration in return for his testimony" violated the

3    petitioner due process rights and may have impacted the jury's guilty verdict).

4           The magistrate's finding that Petitioner suffered no prejudice due to the brevity of the

5    prosecutor's remark is erroneous. The focus on word count rather than content misapplies the

6    relevant legal standards for assessing prosecutorial misconduct and its prejudicial effect.  The focus

7    is not on the length or number of the prosecutor's words but on whether the statement improperly

8    influenced the jury by misleading or distorting evidence crucial to the defense. A proper analysis

9    would consider the remark's substance and its potential influence on the jury's evaluation of a

10   critical issue in the case - Czodor's credibility.

11          The prosecutor's comment aimed to explain away Czodor's delayed discovery of the

12   damage by suggesting that darkness obscured his view, despite photographic evidence that Czodor's

13   front door area was well-lit. This directly undercut the defense's position and bolstered Czodor's

14   credibility. As such, the deceptive and misleading remark had improperly influenced the jury, which

15   makes it prejudicial regardless of its brevity.

16          The magistrate misrepresented the evidence regarding the alleged vandalism of Czodor's

17   door, omitting critical details that significantly undermine the conclusion of "overwhelming

18   evidence." Dkt. 73 at 28.

19          The photograph of the damaged door was not taken on the night of the alleged vandalism or

20   next day but rather seven days later. This substantial delay in documenting the damage undermines

21   Czodor's credibility and suggests fabrication. The magistrate omitted the fact that Czodor only

22   discovered the damage after learning about the financial cost of removing online comments about

23   his dishonesty. This timeline suggests a motive for fabricating the damage.

24          In *Alford v. United States*, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624 (1931), Justice Stone

25   reversed a district court conviction where the defense counsel was precluded from eliciting upon

26   cross-examination a witness' current place of residence. The basis of the trial court's exclusion was

27   that the particular witness was in custody at that time, a fact which might bear unfairly upon his

28   reputation and credibility. The trial judge did not, however, restrict any normal inquiry into whether

the witness had been convicted of a felony. The Supreme Court held that entirely apart from the right of the defense to show past convictions as bearing upon the general credibility of the witness, the defense counsel was entitled to bring out those facts which would bear upon any bias he might have in his testimony in the particular case, because given under a promise or expectation of immunity or under the coercive effect of his detention by officers of the United States. 282 U.S. at 693, 51 S.Ct. 218. Relying upon its supervisory powers, the Supreme Court held that the restriction constituted an abuse of discretion and hence prejudicial error requiring reversal.

In *United States v. Leja*, 568 F.2d 493 (6th Cir. 1977), the court recognized that the jury should be allowed to consider any possible bias of the witness and reversed conviction for failure to allow inquiry into the subject of the compensation, if any, that had been previously paid to the government's witness other than in the immediate case. Here, Czodor's September 24, 2018 email was highly relevant to the question of his potential bias and interest. Trial counsel's failure to bring out those facts which would bear upon any bias constituted ineffective assistance of counsel and prejudiced Petitioner.

Although the prosecution presented a photograph allegedly showing Petitioner "pressing" a metal key to Czodor's door, no damage is visible in the photograph. The magistrate omitted this crucial fact, which directly contradicts the claim that Petitioner caused visible damage during her visit. Additionally, Czodor testified that Petitioner knocked on his door for up to twenty minutes that night, allegedly causing the damage. Given that metal door knockers have been used for centuries, it is highly unlikely that knocking with a metal key would cause substantial scratches.

Notably, Czodor was capable of taking photos and videos throughout the entire night. Had Petitioner truly knocked on his door for twenty minutes and caused damage, it is implausible that Czodor failed to capture any footage showing both Petitioner and the damage together. This absence of video or photographic evidence strongly suggests that the alleged vandalism did not occur, further weakening the prosecution's case.

The magistrate's finding of overwhelming evidence is unsupported by the factual record. A reasonable inference may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work. [¶] . . . A finding of fact must be an inference

1   drawn from evidence rather than . . . a mere speculation as to probabilities without evidence. *People*

2   *v. Morris*, 46 Cal.3d 1, 21 (Cal. 1988). Petitioner is entitled to habeas corpus relief if it is found that

3   upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt

4   beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 324 (1979).

5   **Inappropriate and inflammatory arguments (subpart of Ground 30) (Dkt. 73 at 28)**

6   The magistrate found the prosecutor drew the jury's attention during closing argument to a

7   video in which she did not deny posting the victim's nude photographs when directly confronted

8   about it. Dkt. 73 at 28. In fact, Czodor stated "About name everything you like. It matters. Wrote

9   some shit about me every night. Who does that? Did you post it? Say the truth. Say the true. You

10   post it?" It's self-evident that Czodor's statement did not refer to nude photos. Dkt. 3 at 115.

11   A fair trial cannot be had when evidence is "misstated or presented in a false light."

12   Closing argument presents a legitimate opportunity to "argue all reasonable inferences from

13   evidence in the record." (ABA Standards, The Prosecution Function (1971) std. 5.8(a) (hereafter

14   cited as Prosecution Function).) For a number of years courts repeatedly warned "that statements of

15   facts not in evidence by the prosecuting attorney in his argument to the jury constitute misconduct."

16   *People v. Kirkes* (1952) 39 Cal.2d 719, 724 [249 P.2d 1]; see also *People v. Taylor* (1961) 197

17   Cal.App.2d 372, 381-384 [ 17 Cal.Rptr. 233].)

18   In assessing prosecutorial misconduct, the magistrate misrepresented the evidence by

19   overstating Petitioner's response to Czodor's accusation regarding the posting of nude photographs.

20   The magistrate's interpretation of the conversation between Czodor and Petitioner

21   significantly distorts the actual exchange. A careful review of the actual conversation shows that

22   Czodor's statement was vague and lacked a direct accusation. Czodor said, "About name everything

23   you like. It matters. Wrote some shit about me every night. Who does that? Did you post it? Say the

24   truth. Say the truth. You post it?" Petitioner responded, "I was emotional." This exchange does not

25   directly address the accusation that Petitioner posted nude photographs but rather reflects a

26   generalized conversation about the tensions between the two parties. Dkt. 3 at 115.

27   The prosecution bears the burden to show that all evidence presented is complete and

28   accurate. The magistrate's conclusion that Petitioner provided no testimony or evidence to support

1   Petitioner's claims that the video was manipulated or failed to capture her denying Czodor's

2   accusation improperly shifts this burden to Petitioner, requiring Petitioner to prove that the video

3   was incomplete, which contravenes due process principles.

4        Petitioner has provided substantial evidence to suggest that Czodor is a calculated

5   manipulator and chronic liar, creating grounds to question the integrity of the videos and print-outs

6   of screenshots and photos submitted as evidence in this case. This pattern of deceptive conduct

7   provides a sufficient basis to question the authenticity of these exhibits and raises concerns that the

8   evidence may have been manipulated in several ways, including by altering content, selectively

9   omitting portions, or otherwise misrepresenting events to support a particular narrative.

10        The magistrate found Petitioner claims that her response to Czodor's accusation was not an

11   admission under California law because she was innocent and thus had no reason to deny it, her

12   claim is not cognizable on federal habeas review because it exclusively concerns California's

13   evidence law.  Dkt. 73 at 31. This is legally flawed. A criminal defendant's conviction cannot rest

14   entirely on an uncorroborated extrajudicial confession." *United States v. Stephens*, 482 F.3d 669,

15   672 (4th Cir. 2007) (citing *Wong Sun v. United States*, 371 U.S. 471, 488-89 (1963)) (emphasis

16   added). An accused's extrajudicial admissions of essential facts or elements of the crime, made

17   subsequent to the crime, are of the same character as confessions, and corroboration by independent

18   evidence is required. *Opper v. United States*, 348 U.S. 84, 89-92 (1954). This means that, regardless

19   of any admission made by Petitioner, the state must still independently establish each fact necessary

20   to meet the crime's elements. Czodor's self-serving testimony and self-produced printouts are

21   insufficient to qualify as independent, credible evidence, especially when substantial evidence

22   suggests he has a history of manipulation and deceit.

23        A prosecutor's statement constitutes improper argument, if he attempts to smuggle in by

24   inference claims that could not be argued openly and legally. Here, the prosecutor invited the jury to

25   speculate about — and possibly base a verdict upon — "evidence" never presented at trial. In fact,

26   for centuries, door knockers have traditionally been crafted from metal.

27        The magistrate found a door knocker designed to alert residents of guests without damaging

28   the door is readily distinguishable from repeatedly using a metal key point against an otherwise

1    unprotected door. Dkt. 73 at 32. If, as alleged, Petitioner spent 20 minutes forcefully scratching

2    Czodor's door with a metal key, such a sound would be distinct from a standard knock due to the

3    loud, repetitive scraping noise produced by metal against wood. Czodor's claim that he heard

4    knocking, but no scratching, calls into question the credibility of his account, especially since a 20-

5    minute scratching session would likely be quite audible.

6         In *Jackson v. Virginia*, 443 U.S. 307 (1979), the Supreme Court established that evidence

7    must be sufficient for a rational factfinder to conclude guilt beyond a reasonable doubt. Here, the

8    absence of corroborating auditory evidence in Czodor's statements — i.e., the scratching sound,

9    which he failed to mention during his 911 call — weakens the claim that Petitioner caused the

10    damage as alleged.

11         Additionally, Czodor's failure to provide visual evidence linking Petitioner to the damage

12    adds weight to the argument for fabrication. Had Czodor actually documented a photograph or

13    video clearly showing both Petitioner and the damaged door in a single frame, this would have

14    significantly corroborated his version of events. His inability to produce such direct evidence

15    particularly he was able to take photos and videos throughout the night, along with the seven-day

16    delay before capturing a photo of the damaged door, further undermines the credibility of his claim.

17         Finally, Czodor's misrepresentation about the lighting conditions near his front door raises

18    additional questions. If he was aware of any evidence supporting the assertion that the front door

19    area was well-lit, such a claim could be interpreted as an attempt to obscure the absence of direct

20    evidence of Petitioner's alleged conduct. Taken together, the lack of auditory and visual

21    corroboration, the inconsistent lighting claim, and the delay in documenting the damage support an

22    inference that Czodor may have fabricated the damage to his door, casting substantial doubt on the

23    veracity of his testimony and the strength of the evidence presented against Petitioner. A rational

24    factfinder could not have found petitioner guilty beyond a reasonable doubt of vandalism.

25         Even if the photo of Czodor's damaged door and the screenshots provided by Czodor,

26    standing alone, could support a finding of guilt beyond a reasonable doubt, such a finding is

27    undermined by other undisputable evidence and by the absence of evidence that would normally be

28    forthcoming. See *People v. Hall*, 62 Cal.2d 104, 111 (Cal. 1964).

1    Here, the prosecution did not simply ask the jury in closing arguments to make reasonable

2  inferences from the evidence at trial. Instead, the prosecution overstepped the permissible bounds of

3  closing argument by misstating evidence and introducing facts not in evidence, thereby violating

4  Petitioner's right to a fair trial.

5    Accordingly, appellate counsel was ineffective in failing to challenge prosecution's

6  argument on appeal.

7    **Referring to facts not in evidence (subpart of ground 30) (Dkt. 73 at 32)**

8    The magistrate concluded that because neither party has lodged a copy of the video or

9  screenshots from websites, the Court cannot determine if the video or the websites included the

10  victim's nude photographs. Dkt. 73 at 33.

11    In habeas corpus proceedings, when the state court record is insufficient to resolve key

12  issues, federal courts have the authority to compel the state to provide additional evidence,

13  including trial exhibits. This principle aligns with federal due process requirements to ensure a

14  complete and accurate review of claims challenging a conviction. Where critical evidence is

15  missing or disputed, district courts may require the state to supplement the record to support a

16  thorough examination of potential constitutional violations.

17    A habeas petitioner has a right to access necessary materials that would illuminate facts

18  relevant to their claims. Evidentiary gaps in the habeas record warrant further inquiry. The

19  magistrate should have ordered the state to produce trial exhibits because such evidence is essential

20  to resolve specific claims.

21    Therefore, the magistrate's conclusion is at odds with habeas corpus principles if the failure

22  to obtain the video or website screenshots impedes the court's ability to fairly assess the petitioner's

23  arguments regarding the presence of Czodor's nude photographs.

24    Despite California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or

25  relying on opinions not certified for publication or ordered published, except as specified by rule

26  8.1115(b), in concluding Petitioner and Czodor had a dating relationship the magistrate relied on an

27  unpublished opinion *People v. Hill*, No. B296761, 2020 WL 4364640, at *4 (Cal. Ct. App. July 30,

28  2020). Dkt. 73 at 35. Such reliance is misplaced. In *Hill*, the two exchanged phone numbers, and the

next morning, they went to IHOP for what Beckwith described as a "breakfast date." A few days later, Hill invited Beckwith to her house and introduced him to her children. The two also spent time together at the barber shop, where Beckwith introduced Hill to his friends. On one occasion, Hill picked Beckwith up at Beckwith's mother's house, and Beckwith introduced Hill to his mother. Hill estimated that, over the course of approximately 10 days to two weeks, the two met three or four times and sent one another text messages.  They hugged and kissed, and on one occasion they had sexual intercourse. According to the uncle, Hill described Beckwith as her boyfriend, but said that the relationship was over. None of these facts are present in this case. Petitioner and Czodor never introduced each other to their family or friends. They never had intercourse. They never considered each other boy/girl friend.

The magistrate's conclusion that Petitioner and Czodor had a five-week dating relationship is unsupported by the record. Czodor's own testimony clearly contradicts this interpretation; he explicitly stated that he met Petitioner only once or twice and repeatedly emphasized the lack of any substantial relationship, saying, "Who are you to me? Nobody. You are to me nobody… I met you one or two times. And that's it." This direct testimony undermines any claim that there was a dating relationship as defined by California law. Without concrete evidence of an actual relationship, the magistrate's conclusion fails to align with the statutory requirements.

Under California Family Code § 6210, a "dating relationship" must be "frequent, intimate associations primarily characterized by the expectation of affectional or sexual involvement independent of financial considerations." The evidence does not support such a connection between Petitioner and Czodor. Casual, infrequent encounters, as Czodor described, do not meet the statute's criteria of "frequent, intimate associations," nor is there any suggestion of an expectation of an ongoing relationship. A dating relationship requires more than isolated interactions and must be characterized by mutual intent to form an affectionate or romantic bond.

Additionally, the magistrate's reliance on the Petitioner's comment that Czodor had "cheat[ed]" on her does not establish a dating relationship under § 6210. Feelings of betrayal or disappointment alone do not fulfill the statutory factors necessary to establish a "dating relationship." Such an assertion, without supporting evidence of mutual affection or an intimate

1    association, is legally insufficient. *People v. Upsher*, 155 Cal.App.4th 1311, 1321-22 (2007),

2    affirms that unsupported implications or misinterpretations of casual comments cannot be the basis

3    for determining the existence of a legally recognized dating relationship.

4         Therefore, the magistrate's finding lacks evidentiary support, misapplies the standards of §

5    6210, and disregards clear California precedent, rendering this conclusion both legally and factually

6    flawed.

7         As such, appellate counsel was ineffective in failing to argue on appeal that the prosecutor

8    referred to facts not in evidence.

9         **Vouching for the victim's credibility (subpart of ground 30) (Dkt. 73 at 36)**

10        Appellate counsel was ineffective by failing to argue on appeal that the prosecutor

11   impermissibly vouched for the victim's credibility.

12        The prosecutor's comments improperly suggested that Czodor's testimony was credible

13   because of his willingness to "admit" intimate and potentially embarrassing facts in front of the

14   jury. This suggestion of credibility based on personal vulnerability constitutes vouching, as it

15   attempts to enhance Czodor's reliability through emotional appeal rather than evidentiary support. It

16   is improper to make "statements designed to appeal to the passions, fears and vulnerabilities of the

17   jury." *United States v. Weatherspoon*, 410 F.3d 1142, 1149 (9th Cir.2005).

18        The prosecution's comments here implied that Czodor's testimony was credible merely

19   because he exposed himself to public scrutiny and embarrassment by testifying, a tactic that seeks

20   to leverage the jury's empathy rather than its logical assessment of evidence.

21        The prosecutor's statements mischaracterized the evidence, suggesting that Czodor was

22   reluctant to testify about his actions or uncomfortable with his nude photos being shared publicly.

23   However, evidence introduced at trial showed that Czodor was comfortable with public nudity, as

24   indicated by his actions of taking nude photos on a beach. This contradicts the prosecutor's

25   insinuation that Czodor's willingness to testify about sending nude photos indicates personal risk

26   and, by extension, credibility.

27        Here, the prosecution's deliberate mischaracterization of Czodor's motives and experiences

28   was an attempt to sway the jury based on an emotionally appealing but factually inaccurate

- 24 -

1   narrative. Such comments have led jurors to conclude that Czodor was more credible than the

2   evidence supported, impacting the fairness of the proceedings.

3          By suggesting Czodor's honest admission the he didn't see than happening when it's

4   happening, the prosecutor added extraneous details to justify Czodor's statements and rebut the

5   defense's counterpoints regarding delaying reporting. Yet, evidence showed that Czodor's front

6   door was well-lit, contradicting the prosecutor's implication that Petitioner's alleged actions could

7   have gone unnoticed.

8          Prosecutorial statements unsupported by the evidence is improper. Prosecutors comment

9   on a defendant's non-testimonial behavior may impinge on that defendant's fifth

10  amendment right not to testify. See *United States v. Schuler*, 813 F.2d 978, 981-982 (9th Cir.

11  1987). Prosecutors cannot introduce speculative scenarios or unsupported facts, especially where

12  those narratives are aimed at bolstering a witness's credibility. This tactic misleads jurors, causing

13  them to give undue weight to the witness's testimony rather than evaluating the case solely on

14  admissible evidence.

15          **Expressing opinions to the jury (subpart of ground 30) (Dkt. 73 at 39)**

16          The prosecutor's statement in closing argument—that any online post mentioning Czodor

17  would violate the restraining order—raised significant First Amendment concerns, as it suggested

18  that Petitioner could not even speak about Czodor in a neutral or positive way. This implication

19  reaches beyond the permissible restrictions on speech and into an unconstitutional overreach of the

20  restraining order, infringing upon Petitioner's right to free expression. In *Madsen v. Women's*

21  *Health Center, Inc.*, 512 U.S. 753, 764-65 (1994), the U.S. Supreme Court held that injunctions

22  limiting speech must be narrowly tailored to serve a compelling government interest, preventing

23  speech only as necessary to achieve that purpose. Here, a blanket prohibition against all speech

24  mentioning Czodor would not satisfy this narrow tailoring requirement, which renders the

25  restraining order unconstitutional.

26          Appellate counsel was ineffective in failing to raise this claim on appeal. The magistrate's

27  reliance on the trial counsel's stipulation regarding the validity of the protective orders overlooks

28  the principle that a stipulation is void if it effectively endorses an unconstitutional order. Given that

1  trial counsel did not inform Petitioner or obtain her consent, the stipulation is deemed void. The

2  prosecutor's statement is not an established fact. Instead, it's his endorsement of unconstitutional

3  restraining order. The lack of a curative instruction left the jury to rely on an inaccurate

4  understanding of the validity of the restraining order, prejudicing Petitioner's right to a fair trial.

5  **Sufficiency of the evidence (grounds nineteen, twenty, twenty-one, and twenty-two) (Dkt. 73 at**

6  **40)**

7  Appellate counsel's decision not to raise sufficiency-of-the-evidence claims was

8  unreasonable. As explained herein, trial counsel had no legal authority to stipulate with the

9  prosecution to waive Petitioner's right to jury trial as to material facts and elements. There is no

10  evidence showing that Petitioner and Czodor, a married man, were in a dating relationship.

11  The magistrate's finding that no California law supports the proposition that nudists have no

12  expectation of privacy in naked images of themselves they send to another person is misguided and

13  not supported by case law. Dkt. 73 at 43. While the magistrate relied on *Hernandez v. Hillsides,*

14  *Inc.*, 47 Cal.4th 272 (Cal. 2009), this case is distinguishable from the facts at hand.

15  The extent of [a privacy] interest is not independent of the circumstances. *Plante v.*

16  *Gonzalez*, 575 F.2d 1119, 1135 (5th Cir. 1978). Czodor does not have a blanket privacy interest in

17  his nude photos because of his evident comfort with public nudity, as demonstrated by his conduct

18  at a nude beach. A "reasonable" expectation of privacy is an objective entitlement founded on

19  broadly based and widely accepted community norms. *Hill v. Nat'l Collegiate Athletic Ass'n*, 7

20  Cal.4th 1, 37 (Cal. 1994). Under both California and federal law, societal norms play a critical role

21  in determining the reasonableness of privacy expectations.

22  Public nudity, while legally permissible in certain spaces (such as nude beaches), reflects a

23  lifestyle choice in which the individual voluntarily exposes their body in public. The magistrate

24  acknowledged that Czodor evidently felt comfortable being naked in the confines of a nude beach.

25  Dkt. 73 at 43. By choosing to engage in public nudity, Czodor demonstrates a belief that nudity is

26  acceptable in a public setting, thereby weakening any claim that society would recognize an

27  expectation of privacy in images of his nude body as reasonable. If an individual is comfortable

28  with their body being seen publicly without clothing, the argument follows that society may not

1   recognize a corresponding expectation of privacy in their nude photos.

2       People may forfeit privacy expectations when they voluntarily expose themselves in public.

3   Czodor's decision to be nude in a public space undermines the notion that he can reasonably expect

4   the same level of privacy regarding images of his nude body. Nudists believe nudity is acceptable in

5   public spaces. Czodor's engagement in public nudity is a manifestation of his belief that his nude

6   body need not be shielded from public view. As such, it is difficult for the society to find it

7   reasonable for someone like Czodor to expect that images of his nude body, voluntarily sent to

8   another person, would remain private.

9       In *California v. Greenwood*, 486 U.S. 35 (1988), the Court found that individuals have no

10  reasonable expectation of privacy in trash left out for collection because it was exposed to the

11  public. Similarly, Czodor's public nudity as a practicing nudist suggests that he has forfeited a

12  reasonable expectation of privacy in images of his naked body. Regardless, Petitioner did not have a

13  fair trial because whether a nudist's expectation of privacy in his nude photos is objectively

14  reasonable should have been determined by the jury but it was not.

15      The magistrate's conclusion that Petitioner necessarily understood Czodor's nude

16  photographs to be private, based solely on the circumstances of their exchange, is speculative and

17  omits essential context that counters any presumption of a reasonable expectation of privacy. Dkt.

18  73 at 42. This assumption conflicts with established standards regarding privacy and the expectation

19  thereof under both state and federal law, particularly where an individual's conduct suggests a

20  diminished expectation of privacy.

21      California law on privacy generally provides that an expectation of privacy must be

22  objectively reasonable. In *Hill v. National Collegiate Athletic Association*, 7 Cal.4th 1, 36-37

23  (1994), the California Supreme Court held that whether a person has a reasonable expectation of

24  privacy depends on (1) whether the individual has exhibited a subjective expectation of privacy, and

25  (2) whether that expectation is one that society is prepared to recognize as reasonable. In this case,

26  Czodor openly admitted to Petitioner that he was a nudist, conveying from the outset his comfort

27  with public nudity. Given this admission, it would be reasonable for Petitioner to infer that Czodor

28  had no expectation of privacy concerning his nude photographs, which were sent after only one

1    meeting and in a casual context. Czodor's own testimony and conduct undermine any claim of a

2    "subjective expectation" of privacy that would satisfy the *Hill* standard.

3        Further, federal privacy jurisprudence aligns with this analysis. Courts consistently hold that

4    the context and circumstances surrounding private information, such as its method of

5    communication and the relationship between parties, inform whether an expectation of privacy is

6    reasonable. For instance, in *Smith v. Maryland*, 442 U.S. 735, 736 (1979), the U.S. Supreme Court

7    noted that even if an individual did harbor some subjective expectation of privacy, the expectation

8    was not one that society is prepared to recognize as "reasonable." When an individual voluntarily

9    exposed his nude photos to someone he barely knew (Czodor testified he didn't know Petitioner's

10    name. See Dkt. 6 at 155), he assumed the risk that the stranger would reveal those photos. By

11    communicating nude photographs to a person he had met only once, Czodor diminished any

12    reasonable expectation of privacy in those images, especially given his stated identity as a nudist.

13        Additionally, the magistrate's reliance on the presumption that nude photographs are

14    inherently private overlooks Czodor's own actions. Sending nude photos taken in a public setting

15    further contradicts any alleged privacy interest, as a reasonable person could interpret such behavior

16    as an indication of comfort with those images being viewed by others. The *Smith* decision and

17    similar rulings underscore that an individual's actions can vitiate any claim to privacy, especially

18    where, as here, they communicate potentially private information to another in a casual and brief

19    context without restrictions or indications of confidentiality.

20        In sum, the magistrate's presumption is legally flawed, as Czodor's actions and the specific

21    context in which he disclosed the images undermine any reasonable expectation of privacy. This

22    context strongly suggests that Petitioner could reasonably interpret the photographs as non-private,

23    challenging the magistrate's conclusion and requiring reevaluation under established privacy

24    standards.

25        The magistrate's conclusion that the jury could infer Petitioner's knowledge of Czodor's

26    expectation of privacy in his nude photographs is legally flawed. This determination disregards the

27    requirement for an objectively reasonable expectation of privacy under both California and federal

28    law. The magistrate's reasoning relies on Petitioner's alleged threats to "make him famous" and

1   "put all [his] stuff on social media," yet fails to provide evidence that Petitioner's statements

2   referenced nude photographs specifically, rather than Czodor's character or other conduct.

3       Here, Czodor, as a self-admitted nudist, conveyed his openness regarding nudity by sending

4   these photographs to Petitioner, a person he had only recently met just once. Czodor's lack of

5   precautions and his nudist lifestyle would reasonably suggest a diminished expectation of privacy,

6   undermining the presumption that his photos were inherently private.

7       Federal privacy law also supports this analysis. By voluntarily sending nude images without

8   imposing confidentiality, Czodor reduced any legitimate privacy claim, particularly with respect to

9   someone he had just met.

10      Moreover, California case law holds that privacy expectations must be balanced against the

11  circumstances and nature of the interaction. In *People v. Nakai*, 183 Cal.App.4th 499, 515-517

12  (2010), the court emphasized that the individual's behavior and context affect the reasonableness of

13  their privacy expectation. Czodor's decision to send nude images after only one meeting and his

14  admitted nudist lifestyle indicate a lack of concern with restricting access to such images, which

15  would lead a reasonable observer to question any assumption of inherent privacy.

16      Petitioner's messages, even if potentially threatening, lack specificity regarding nude

17  photographs. The assumption that she understood these photos as "private" is speculative, as her

18  statements could have been aimed at exposing his dishonesty or other character issues, rather than

19  the images themselves. Because the prosecution did not substantiate Czodor's privacy interest

20  through objective, concrete evidence and failed to connect Petitioner's alleged threats specifically to

21  the photos, the magistrate's conclusion is legally unsound.

22      In sum, without a basis for an objectively reasonable expectation of privacy in Czodor's

23  images under California and federal standards, and without clear reference to these images in

24  Petitioner's messages, the magistrate's inference is unsupported. Courts must require evidence that

25  society would view the expectation as reasonable, which is lacking in this case.

26      The magistrate found the jury was aware that one of the nude photographs that Czodor sent

27  to Petitioner was taken at a nude beach and the jury's verdict evidenced its belief that Petitioner and

28  Czodor agreed or understood that the images shall remain private even though one of the

- 29 -

1   photographs was taken at a nude beach and sent by the victim after knowing Petitioner for only a

2   few weeks. However, the jury was never told the photo taken on a nude beach was evidence

3   showing Czodor's comfort level of public nudity.

4          During closing argument, the prosecution stated "But ask yourself, reasonably, why in the

5   word is she knocking on the door with keys – with metal keys? Why in the world would you be

6   knocking on the door with metal keys?" The insinuation was that defendant had been tried on

7   previous criminal charges, although no proof of such arguments was offered. *People v. Fosselman*,

8   33 Cal.3d 572, 580 (Cal. 1983). See also *Langston v. Smith*, 630 F.3d 310, 320 (2d Cir. 2011) (due

9   process violated because no evidence presented by prosecution to support theory besides "pure

10  conjecture.") The prosecution's implication that no one would knock on a door with metal object

11  was not supported by any evidence presented at trial. In reality, metal objects are commonly used

12  for knocking on doors, as door knockers themselves are typically made of metal.

13         **Right to confrontation (ground 25) Dkt. 73 at 45**

14         In order to secure a conviction under California Penal Code § 647(j)(4)(A), the prosecution

15  must prove that the defendant distributed the image. Dkt. 3 at 160.

16         Despite there was no sufficient guarantees of trustworthiness, through Czodor's testimony,

17  the prosecution introduced text messages from Czodor's so called friend and statements made by

18  Czodor's clients. Assuming they were authentic statements, they were given with the primary

19  purpose of offering evidence potentially relevant to a subsequent criminal prosecution. They were

20  used to establish an essential element of the prosecution's case, meaning they had a testimonial

21  nature.

22         The relevant inquiry is not the subjective or actual purpose of the individuals involved in a

23  particular encounter, but rather the purpose that reasonable participants would have had, as

24  ascertained from the individuals' statements and actions and the circumstances in which the

25  encounter occurred. *Michigan v. Bryant*, 562 U.S. 344, 360, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011).

26         A violation of the Confrontation Clause raises a federal constitutional issue, not just a matter

27  of state evidence law. The magistrate's finding that Petitioner's confrontation claim is not

28  reviewable because it concerns state evidence law is legally flawed.

**Substitution of counsel (ground 29) (Dkt. 73 at 47)**

Here, the trial court deprived Petitioner of her Sixth Amendment right to conflict-free counsel by denying her motion for substitution. Petitioner explicitly declared that she had a conflict with the office of public defender instead of only Mr. Dominguez. Dkt. 3 at 217.

**Adequacy of the Court's Inquiry**: In *United States v. Moore*, 159 F.3d 1154, 1158-59 (9th Cir. 1998), the Ninth Circuit stressed that the trial judge must actively engage with the defendant's complaints and ensure that the issues raised are fully addressed. In Petitioner's case, while the trial court asked trial counsel some basic questions about procedural matters like a general time waiver, it failed to explore critical aspects of the representation, such as what investigation had been conducted in the two years the public defender had the case and what justified the repeated time waivers. This failure indicates that the court's inquiry was inadequate and resulted in no developed record on counsel's reasons for their actions, or on the quality of communication between them and Petitioner. See *United States v. Walker*, 915 F.2d 480, 483 (9th Cir. 1990) (holding that the district court erred in making only a limited inquiry and failing to inquire into causes underlying defendant's dissatisfaction with his attorney). The inadequacy of inquiry was underscored by trial counsel explicit testimony that none of the continuances were attributable to his caseload. (See Dkt. 3 at 207 ("As to congestion of the courts in my caseload, no, Your Honor. I just requested time to prepare and review the filed in preparation for trial.") If none of the continuances were attributable to caseload, what exactly caused the two years delay?

**Extent of Conflict**: Petitioner alleged a significant breakdown, citing the rotation of six different public defenders over the two years leading to a failure to progress the case to trial in a timely manner, coupled with the lack of investigation and failure to inform Petitioner of court date which caused a bench warrant issued against Petitioner. Further, counsel's later decision to sign a stipulation with the prosecution without consulting Petitioner reflects this pre-existing conflict, signaling a lack of communication and trust between Petitioner and her counsel.

**Timeliness and Inconvenience**: Petitioner made her request for substitution as soon as she reasonably could, after realizing the extent of inadequacy of counsel's performance. Although the public defender had been on the case for two years, the fault for any delay does not rest with

1  Petitioner, particularly given the turnover of attorneys on her case. Even when the motion is made

2  on the day of trial, the trial court must make a balancing determination, carefully weighing the

3  resulting inconvenience and delay against the defendant's important constitutional right to counsel

4  of his choice. *United States v. Lillie*, 989 F.2d 1054, 1055-56 (9th Cir. 1993); *United States v.*

5  *Torres-Rodriguez*, 930 F.2d 1375, 1380 (9th Cir. 1991).

6       Delaying a trial is often a lesser evil compared to the damage that could be done by

7  proceeding with counsel who cannot effectively represent the defendant due to a breakdown in

8  communication or other serious issues. The defendant's right to a fair trial and competent

9  representation must be prioritized.

10      The magistrate's characterization of Petitioner's concerns as "strategical" issues ignores

11  whether counsel's performance was objectively reasonable. Dkt. 73 at 49. Petitioner's concerns go

12  beyond simple strategy. As the record shows, there was a significant delay of over two years, six

13  different public defenders cycled through the case, and failure to inform Petitioner of court date.

14  These are not mere tactical disagreements but legitimate concerns about the adequacy of

15  representation and neglect of the case. Counsel's failure to communicate and the significant delays

16  raise issues of ineffective assistance, rather than disagreements over tactics.

17      In supporting her conclusion that there was no conflict of interest between Petitioner and her

18  counsel, the magistrate found counsel testified that he explained to Petitioner what a time waiver

19  was so Petitioner knowingly and voluntarily agreed to waive time. Dkt. 73 at 50. However, the trial

20  continuances, attorney rotations, and absence of any benefit from the repeated time waivers suggest

21  that Petitioner's right to effective assistance of counsel was compromised. While counsel testified

22  about explaining a time waiver to Petitioner, he did not testify how he explained a time waiver.

23  There is no record in support that Petitioner made a knowing and intelligent choice of time waiver.

24  The broader context of attorney performance and trial delays need to be assessed. The fact that the

25  records offer no legitimate reason for a two-year delay, compounded by the rotation of six public

26  defenders, raises serious concerns about the adequacy of representation.

27      The magistrate further justified her conclusion by citing Covid-19. Dkt. 73 at 50. The two-

28  year delay—justified only by a two-month court shutdown due to COVID-19—is excessive.

1  Without any documented benefit from the continuances, the delay prejudiced Petitioner. The
2  magistrate's reliance on a two-month COVID-19 court disruption to justify a two-year delay is
3  factually incorrect and not supported by the records.

4          The magistrate faulted Petitioner for her failure to provide any evidence to substantiate her
5  assertion that appointed counsel caused an arrest warrant to be issued against her. Dkt. 73 at 51.
6  However, the record shows otherwise. Bench warrant was issued for defendant. Bail was set at
7  $15,000.00. Dkt. 3 at 21-22.

8          The magistrate concluded that even if Petitioner could establish a conflict of interest – she
9  cannot – she nevertheless could show no prejudice. Dkt. 73 at 51. The magistrate found trial counsel
10 filed a motion to dismiss for lack of evidence pursuant to California Penal Code 1118.1 at the close
11 of evidence. Dkt. 73 at 52. However, record shows that trial counsel orally requested the Court to
12 dismiss the case based on the People have not met their burden, based on 1118. Dkt. 4 at 124. He
13 provided no explanation how the evidence was insufficient as to what specific element. Then the
14 trial court made a conclusory statement that "as far as the 1118.1 motion is concerned, I think with
15 respect to Count I, the evidence provided is sufficient to get past an 1118.1 motion based on the
16 testimony and the exhibits that were received into evidence, similarly with Count II, the evidence
17 presented is sufficient to overcome an 1118.1 motion, and similarly as to Count III. So with respect
18 to all three counts, Defense counsel's 1118.1 motion is denied." Dkt. 4 at 131. The record does not
19 show trial counsel played the role of an active advocate. See *Evitts v. Lucey*, 469 U.S. 387, 394, 105
20 S.Ct. 830, 835, 83 L.Ed.2d 821 (1985).

21         However, the trial court's denial of Petitioner's request for substitution of counsel must be
22 evaluated based on whether counsel's performance was compromised, not merely on the success of
23 individual motions.

24         **Trial counsel (Ground 9) (Dkt. 73 at 53)**

25         As stated above, ineffective assistance of counsel claims are not subject to the strictest
26 procedural forfeiture rules. See *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011).

27         The magistrate found Petitioner waived her right against self-incrimination at the family-
28 court hearing because she never asserted it and no evidence suggested that her family-court

1  testimony was compelled. Dkt. 73 at 55. However, if the State, either expressly or by implication,

2  creates penalty situation, the failure to assert the privilege would be excused, and the  answers

3  would be deemed compelled and inadmissible in a criminal prosecution. See *Minnesota v. Murphy*,

4  465 U.S. 420, 435 (1984).

5       In the context of Petitioner's appearance in family court, the coercive nature of the

6  proceeding creates what is known as a "penalty situation," which implicates the protections of the

7  Fifth Amendment under the U.S. Constitution.

8       Petitioner was summoned to the family court to answer questions. See Attachment 2.

9  Petitioner was a party to a court hearing and was subject to a court order to appear. The prosecution

10  erroneously alleged that Petitioner was not even subpoenaed to attend the hearing. Dkt. 3 at 278.

11  However, the use of a subpoena is generally required only for third-party witnesses, not for parties

12  to the case. A notice of hearing issued to a party functions as a court order and compels the party's

13  appearance. The prosecution's claim that Petitioner was not "subpoenaed" to attend the hearing

14  ignores the distinction between subpoenas for third parties and court orders directed to parties

15  involved in the case. Since Petitioner was a direct party in the matter, her presence was mandated by

16  the court's notice of hearing, making the prosecution's argument factually and legally incorrect.

17       At the family court hearing, Petitioner was faced with a choice between remaining silent and

18  having an adverse judgment against her. Her silence was deemed as a waiver of argument in support

19  of an adverse judgment. Under the U.S. Supreme Court's rulings in *Lefkowitz v. Cunningham*,

20  *Garrity v. New Jersey*, and *New Jersey v. Portash*, Petitioner's testimony in family court was

21  compelled through the implied threat of an adverse judgment and her failure to assert the privilege

22  would be excused.

23       In *Solano-Godines*, the court rejected the argument that absence of warnings required

24  suppression because "[t]he immigration judge could not be expected to anticipate that two years

25  later [the defendant] would illegally reenter the United States and that his responses to questions at

26  his civil deportation hearing might incriminate him in a prosecution for this future crime." *United*

27  *States v. Solano-Godines*, 120 F.3d 957, 962 (9th Cir. 1997).

28       Unlike *Solano-Godines*, the judicial officer in the family court was fully aware of the

1  foreseeable criminal prosecution against Petitioner because she was addressing matters intertwined

2  with criminal liability. See *Jackson v. Conway*, 763 F.3d 115, 139-40 (2d Cir. 2014) (*Miranda*

3  violation because child protection services caseworker failed to give warning before questioning

4  that was reasonably likely to elicit incriminating response.) The family court hearing was in fact

5  equivalent to a criminal trial if Petitioner's testimony in that hearing was introduced in a criminal

6  trial. Petitioner's testimony in the family court was compelled and thus should be inadmissible in

7  her criminal case under the Fifth Amendment.

8  **Referring to Petitioner's family-court testimony during closing argument (Dkt. 73 at**

9  **56)**

10  In *Berger v. United States*, 295 U.S. 78, 88 (1935), the Court emphasized that improper

11  suggestions, insinuations and, especially, assertions of personal knowledge by prosecuting attorney

12  are apt to carry much weight against the accused when they should properly carry none. The

13  prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to

14  trust the Government's judgment rather than its own view of the evidence. *Id*. at 88-89. A

15  prosecutor's "vigorous" presentation of facts favorable to his or her side "does not excuse either

16  deliberate or mistaken misstatements of fact." *People v. Purvis* (1963) 60 Cal.2d 323, 343 [ 33

17  Cal.Rptr. 104, 384 P.2d 424].

18  The transcript of the family-court testimony reflects that Petitioner explained that she did not

19  need his permission to post a video because "that's about me, about my story." When being asked if

20  there was a picture of Czodor on the video, Petitioner testified no. (Dkt. 6 at 169.) Relying on

21  Petitioner's admission of posting a video, the prosecutor concealed Petitioner's denial of a picture

22  on the video and stated:

23  [Petitioner] said she didn't need his permission. It was her story. Did you post the

24  videos? "Well, maybe some of them." Under oath, spoke to the judge in that

25  hearing and admitted that. The evidence is abundantly and absolutely clear she's

26  guilty of Count III."

27  (Dkt. 4 at 175-76.)

28  While there was no picture on the video, Petitioner's admission of posting a video cannot be

used as evidence to convict her of unlawful dissemination of private photographs. By concealing the fact that there was no picture on the video such misrepresentation was egregious. By misrepresenting the content of Petitioner's testimony and using an incomplete and distorted version to suggest her guilt for Count III (unlawful dissemination of private photographs), the prosecutor violated Petitioner's due process rights under the Fifth and Fourteenth Amendments.

The prosecutor's manipulation of Petitioner's family court testimony by concealing the crucial fact that no photograph of Czodor appeared in the video constitutes prosecutorial misconduct. Such a misrepresentation is egregious, misled the jury, and violated Petitioner's constitutional rights to due process under the Fifth and Fourteenth Amendments. The misrepresentation deprived Petitioner of a fair trial.

The prosecution's selective use of Petitioner's response, "It's been taken down," to suggest she authored the posts, while omitting her further explanation that she searched for the posts after receiving the restraining order and found they were no longer there, constitutes prosecutorial misconduct. Dkt. 6 at 168. This tactic misrepresented the evidence and misled the jury by providing an incomplete and distorted view of Petitioner's statements. Such conduct violates Petitioner's constitutional rights under both California and federal law.

Misrepresenting facts to the jury, especially through selective omission of exculpatory information, constitutes prosecutorial misconduct. Here, by omitting Petitioner's complete explanation of why she stated "It's been taken down," the prosecution gave the false impression that Petitioner admitted authorship of the posts. This manipulation of evidence is precisely the type of misconduct the Supreme Court sought to prevent in Berger.

In *Napue v. Illinois*, 360 U.S. 264, 269 (1959), the Court held that due process is violated when a prosecutor knowingly uses false evidence or allows false impressions to stand uncorrected. In this case, by omitting the full context of Petitioner's statement, the prosecutor effectively created a false impression that her response indicated guilt. The jury was left with an incomplete picture, leading to a violation of Petitioner's due process rights.

Here, the prosecutor's omission of Petitioner's full response was highly material and prejudicial because the suggestion that she authored the posts went directly to the heart of the case.

1    By concealing the explanation that she simply discovered the posts were gone after searching, the

2    prosecutor distorted the evidence, influencing the jury's view of her culpability.

3         California law similarly recognizes prosecutorial misconduct when the prosecution distorts

4    evidence or misleads the jury. In *People v. Hill*, 17 Cal. 4th 800, 845 (1998), the California

5    Supreme Court held that prosecutorial misrepresentation or omission of crucial facts can lead to

6    reversible error if it prejudices the defendant's case. The prosecutor's failure to provide the full

7    context of Petitioner's statement amounts to such a misrepresentation, as it directly affected the

8    jury's understanding of her involvement in the posts.

9         Even each prosecutorial misconduct or other error is harmless standing alone, the combined

10   prejudicial effect on the overall fairness of the trial cannot be ignored. As such the magistrate's

11   finding trial counsel did not perform unreasonably in failing to object to either of the prosecutor's

12   comments is flawed. Dkt. 73 at 57.

13        **Fundamental Miscarriage of Justice (Dkt. 73 at 58)**

14        The magistrate's conclusion made no mention of the evidence that destroyed Czodor's

15   credibility, and it did not consider the relative strength of all evidence.

16        "Fundamental miscarriage of justice" is narrowly defined as consisting of four categories:

17   (1) [T]hat error of constitutional magnitude led to a trial that was so fundamentally unfair that

18   absent the error no reasonable judge or jury would have convicted the petitioner; [fn.] (2) that the

19   petitioner is actually innocent of the crime or crimes of which the petitioner was convicted; [fn.] (3)

20   that the death penalty was imposed by a sentencing authority which had such a grossly misleading

21   profile of the petitioner before it that absent the trial error or omission no reasonable judge or jury

22   would have imposed a sentence of death; [fn.] (4) that the petitioner was convicted or sentenced

23   under an invalid statute. (*In re Clark* (1993) 5 Cal.4th 750, 797-798.)

24        Claims of "lack of fundamental jurisdiction" (i.e., subject matter jurisdiction) or judicial acts

25   "in excess of jurisdiction" may be raised at any time, and the petitioner is not required to justify any

26   delay in asserting the claim. (*In re Harris* (1993) 5 Cal.4th 813, 836-842.)

27   **GROUNDS ONE AND THREE: FIRST AMENDMENT CHALLENGES** (Dkt. 73 at 59)

28        In concluding that Petitioner's conviction for unlawfully disseminating the victim's nude

1 photographs did not violate the First Amendment, the magistrate referenced the texts provided by

2 Czodor – with no metadata – stating that Petitioner wanted to make him "suffer" for "cheat[ing]" on

3 her and told him that she was going to make him "famous" by "put[ting]' all [his] stuff on social

4 media." (Dkt. 73 at 63) She further threatened to post additional "surprise[s]" and told him, "I will

5 not stop." However, the police filed activity report on September 10, 2018 tells a notably different

6 story. After allegedly being threatened by Petitioner to post additional surprises, Czodor called the

7 police, not to report the threatening texts sent by Petitioner, but to allege that unknown subjects had

8 threatened to come to his residence, not mentioning any reference to the threatening text messages

9 he later presented as evidence. This inconsistency suggests that the threatening texts were most

10 likely fabricated or manufactured by Czodor. The absence of metadata for the text messages further

11 weakens their credibility. Metadata, which includes details like timestamps and source information,

12 is essential to verify the origin, authenticity, and timing of digital communications.

13    In addition, Petitioner was not prosecuted for intending her speech as a threat. It is equally

14 significant that while Czodor was able to provide texts containing alleged threats, he failed to

15 present any messages indicating that Petitioner requested his nude photos, that he asked her to keep

16 them private, or that she agreed to maintain their confidentiality before receiving Czodor's nude

17 photos. The absence of these crucial communications strongly indicates that such exchanges never

18 occurred.

19    The magistrate failed to consider the unique circumstances in this case. Czodor, as a

20 practicing nudist, complicates the prosecution's argument that he had an objective expectation of

21 privacy in his nude photos. Courts have ruled that the context in which a person shares private

22 images matters. For instance, if someone knowingly sends intimate photos to a person they barely

23 know, it weakens the argument that they held a reasonable expectation of privacy in those images.

24 See *State v. Vanburen*, 214 A.3d 791, 2018 Vt. 95 (Vt. 2019).

25    In *United States v. Jacobsen*, 466 U.S. 109 (1984), the Supreme Court clarified that the

26 expectation of privacy is contextual and depends on whether the person's actions demonstrate they

27 intended to keep the material private. Czodor's sending of nude photos to Petitioner, whom he

28 barely knew, after a single meeting, significantly undermines his claim of a reasonable expectation

1  of privacy.

2       Furthermore, Czodor's nudist lifestyle plays a central role in this analysis. By engaging in a

3  lifestyle where nudity is normalized and openly displayed, Czodor arguably waived any reasonable

4  expectation of privacy in images of himself in that state. The magistrate's failure to consider this

5  fact is critical, as the public nature of his nudity as a nudist contradicts the claim that he held a

6  strong expectation of privacy in his nude photos.

7       The magistrate's ruling implies that Czodor can selectively assert privacy in his nude images

8  while maintaining a lifestyle of public nudity. However, courts have held that privacy claims must

9  be consistent with a person's overall behavior and lifestyle. In *Smith v. Maryland*, 442 U.S. 735

10  (1979), the Supreme Court held that an individual's behavior can diminish their claim to privacy

11  protections if their actions suggest they have exposed themselves to public view.

12       As a nudist, Czodor's consistent practice of publicly displaying his nude body suggests that

13  his subjective expectation of privacy in nude images shared with Petitioner is diminished.

14  Moreover, there is no authority cited by the magistrate to support the proposition that a nudist can

15  selectively claim privacy rights in certain circumstances, despite their broader lifestyle of public

16  nudity.

17       Czodor testified that his nude photo was taken at a nudist beach – a public space. He also

18  testified that taking a nude photo by someone else at a public beach was normal.

19       Q Okay. And do you recall when that photo of

20         yourself was taken, or where it is?

21       A Oh, it was on the -- on the naturalist beach.

22       Q On the naturalist beach.

23       A Naturalist beach.

24       See Dkt. 4 at 45.

25       Q Okay. And can you describe, I think it was

26         Exhibit Number 1, can you -- can you describe one of the

27         pictures that -- the nude photos?

28       A Just normal beach -- beach photo -- the photo

1      on the beach.

2    Q Okay. Did you take that photo?

3    A No, I couldn't do it, but somebody else was

4     there --

5    Q Okay.

6    A -- to do it, another person.

7    Q So another person took that photo.

8    A Yes.

9    Q And you were posing, correct?

10    A I wasn't --

11    Q In that photo.

12    A -- posing, just normal.

13    See Dkt. 4 at 101-102.

14    Czodor, being a practicing nudist, had no reasonable expectation of privacy in his nude photographs. For a nudist, not wearing clothes is a normal and intentional act, part of the lifestyle associated with nudism. Since Czodor voluntarily posed for a nude photograph in public while adhering to a lifestyle that openly embraces public nudity, his expectation of privacy regarding these photos is not one that society would recognize as reasonable.

19    See *Katz v. United States*, 389 U.S. 347, 351 (1967) (holding that there is no reasonable expectation of privacy in what a person "knowingly exposes to the public"). In Czodor's case, the public nature of nudist beaches, combined with his status as a nudist, challenges the legitimacy of any objective expectation of privacy in his nude photos.

23    The magistrate mischaracterized Ground One as a disguised sufficiency-of-the-evidence claim. Dkt. 73 at 63. However, Ground One relies on facts that were not made available to the jury during trial, coupled with facts presented to the jury. Specifically, the fact that Czodor is a nudist was not presented to the jury, and this information is critical to the claim. Habeas claims based on facts not presented at trial are distinct from sufficiency-of-the-evidence claims.

28    The magistrate found Ground One is procedurally barred. Dkt. 73 at 63. This is contradicted

1   to her conclusion that only grounds two, eight, nine, nineteen, twenty, twenty-one, twenty-two,

2   twenty-five, twenty-nine, and thirty are procedurally defaulted. Dkt. 73 at 19.

3          The magistrate vaguely concluded ample evidence showed that both Czodor and Petitioner

4   understood that the nude photographs he sent her were meant to remain private but failed to specify

5   any evidence. Dkt. 73 at 63. To the contrary, ample evidence supports that Czodor lacked a

6   reasonable expectation of privacy in the nude photographs he sent to Petitioner, and they were not

7   intended to remain private.

8          As a practicing nudist, he regularly engages in behavior where being unclothed is

9   normalized, making any claim of privacy in his nude photographs inconsistent with his lifestyle

10  choices. Furthermore, he sent the nude photographs to Petitioner after meeting her only once, while

11  not even knowing her name, and outside the context of any established relationship or dating

12  connection. This conduct significantly undermines any legitimate expectation of privacy in his

13  images.

14         Moreover, Czodor was a married man of over ten years, and his testimony that he never sent

15  nude photographs to anyone else except Petitioner is highly suspect, if not perjurious. Dkt. 4 at 105.

16  His inconsistent testimony, alongside this implausible assertion, casts doubt on his credibility,

17  suggesting he is manipulating the facts to serve his narrative. In light of his actions and the lack of a

18  reasonable or objective expectation of privacy, any dissemination of the photos by Petitioner would

19  not constitute a violation of privacy under the relevant legal standards.

20         Thus, based on the totality of circumstances, Czodor's claims of privacy in the nude

21  photographs are not only unreasonable but also unsupported by the facts, as shown by his

22  inconsistent testimony and lifestyle as a nudist.

23         Czodor's inconsistent allegations and perjured testimony reveal a clear and desperate

24  attempt to convict Petitioner, undermining the credibility of his statements and raising serious

25  concerns about the fairness of the trial. Multiple instances of conflicting testimony, including

26  Czodor's claims about the nature of his relationship with Petitioner, his privacy expectations

27  regarding the nude photographs, and his interactions with law enforcement, suggest that he altered

28  his narrative to fit the prosecution's case.

1    For example, Czodor claimed that he only sent his nude photographs to Petitioner, despite

2    being a married man for ten years and a practicing nudist, which contradicts both his lifestyle and

3    common behavior associated with nudism and marriage. Despite he failed to provide any texts,

4    Czodor's claim that he reached an agreement with Petitioner to keep his images private further

5    demonstrate an effort to manipulate the facts.

6    Czodor's shifting testimony, which lacks internal consistency and contradicts the evidence

7    presented, indicates a calculated effort to fabricate facts in pursuit of a conviction against Petitioner.

8    Such conduct taints the integrity of the legal process, demanding close scrutiny and a reevaluation

9    of the evidence supporting his claims.

10   Where the individual depicted did not have a reasonable expectation of privacy—a

11   prosecution of dissemination of photographs would not be a justifiable incursion upon First

12   Amendment protected speech. *State v. Vanburen*, 214 A.3d 791, 813, 820-21 (Vt. 2019). As such,

13   Petitioner is entitled to habeas relief.

14   **Petitioner' Conviction for Violating a Protective Order (Dkt. 73 at 63)**

15   The stipulation by trial counsel regarding the validity of the family court orders lacks

16   binding effect on Petitioner, as it was neither informed nor authorized by Petitioner, and moreover,

17   pertains to unconstitutional orders.

18   Under both federal and California law, individuals cannot be bound by stipulations that

19   relinquish constitutional rights without informed consent. Courts have held that counsel's power to

20   stipulate is limited, especially in criminal cases where fundamental rights are at stake. In *Boykin v.*

21   *Alabama*, 395 U.S. 238 (1969), the U.S. Supreme Court emphasized that certain rights—such as the

22   right to a jury trial, the right to confront one's accusers, and the right against self-incrimination—

23   cannot be waived without clear, informed consent by the defendant.

24   In this case, trial counsel's stipulation to the validity of family court orders on Petitioner's behalf,

25   without obtaining her explicit, informed consent, effectively relinquishes her constitutional right to

26   challenge invalid restraining orders.

27   If the family court orders are unconstitutional on their face, any stipulation of validity would

28   be void. In *United States v. Mendoza-Lopez*, 481 U.S. 828, 839-840 (1987), the Supreme Court held

1   that defendants have the right to challenge the constitutionality of prior orders used against them in

2   criminal proceedings.

3          Since Petitioner did not consent to stipulate the validity of these family court orders, and

4   considering that these orders may infringe upon her First Amendment rights by broadly restricting

5   all speech rather than narrowly tailored unprotected speech, any stipulation by counsel that they are

6   valid is void as against public policy. Orders that are unconstitutional cannot be validated by

7   stipulation, as doing so would contravene the due process rights of the individual involved.

8   The failure of trial counsel to inform Petitioner of the stipulation and its consequences constitutes

9   ineffective assistance of counsel. Under *Strickland v. Washington*, 466 U.S. 668 (1984), ineffective

10  assistance is established where counsel's performance falls below an objective standard of

11  reasonableness and prejudices the defendant. Petitioner's lack of knowledge and consent regarding

12  the stipulation left her unable to make an informed choice, violating her Sixth Amendment rights.

13  In addition, Petitioner's presence when the stipulation was read and the absence of her objection do

14  not equate to consent, especially when trial counsel failed to explain its implications.

15         In summary, trial counsel's stipulation to the validity of the family court orders was made

16  without Petitioner's informed consent, pertained to orders unconstitutional on their face, and

17  therefore is void under both California and federal law.

18         In concluding that Petitioner implicitly approved of trial counsel's stipulation because she

19  was present and raised no objection when counsel first proposed it and later when he entered into it,

20  the magistrate's reliance on *United States v. Edwards*, 897 F.2d 445, 446-47 (9th Cir. 1990) is

21  misplaced, in which it held that the court has no duty to advise the defendant of his right to testify,

22  nor is the court required to ensure that an on-the-record waiver has occurred.

23         The right to a jury trial is a structural constitutional guarantee, a fundamental right, essential

24  for preventing miscarriages of justice, distinct from a defendant's individual right to testify. In

25  *Edwards*, the court reasoned that because the right to testify is a personal right, it may be waived

26  implicitly by conduct. However, the right to a jury trial implicates different constitutional concerns

27  and typically requires an explicit, knowing, and voluntary waiver on the record (see *Duncan v.*

28  *Louisiana*, 391 U.S. 145, 157-58 (1968)). Consequently, while a defendant's silence may be

- 43 -

1    sufficient to waive the right to testify, it is not sufficient to waive the right to a jury trial or an

2    essential element related to the trial process, like a stipulation on material facts or elements.

3          The magistrate's inference that Petitioner's lack of objection constituted approval is

4    incorrect, as her lack of objection was a direct consequence of ineffective assistance of counsel.

5    Effective assistance of counsel requires that attorneys communicate key strategic decisions to their

6    clients, including the potential consequences of stipulations, in a way that enables the client to make

7    informed choices regarding their defense.

8          Here, trial counsel's failure to inform Petitioner about the stipulation with the prosecution,

9    including its strategic purpose and possible consequences, constitutes deficient performance.

10   Without this critical information, Petitioner could not have knowingly consented or objected,

11   stripping her of the ability to make an informed decision—a fundamental right in criminal

12   proceedings. Petitioner's confusion throughout the proceedings underscores that her counsel did not

13   provide her with the necessary context or information about the stipulation. Petitioner's lack of

14   objection was not a conscious waiver but rather a symptom of ineffective assistance of counsel.

15         Petitioner cannot be bound by this stipulation, as it infringes upon her due process and First

16   Amendment rights.

17         In concluding that Petitioner's conviction for violating a protective order did not infringe

18   upon her First Amendment rights, the magistrate overlooked a fundamental question: whether the

19   protective orders themselves were constitutional. This oversight is significant because a conviction

20   for violating an unconstitutional order cannot stand, as individuals cannot be penalized for failing to

21   comply with an unlawful restriction on their rights. Here, the restraining orders prohibited not only

22   unprotected speech, such as "true threats," but all forms of speech directed at or concerning Czodor.

23   This overbreadth renders the orders unconstitutional and thereby void, undermining the validity of

24   Petitioner's conviction.

25         Under both federal and California law, the First Amendment protects freedom of speech,

26   including the right to criticize, comment on, or even address others, with limited exceptions for

27   categories of unprotected speech, such as "true threats" or "fighting words" (*Virginia v. Black*, 538

28   U.S. 343, 359 (2003); *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942)). For a restraining

- 44 -

1    order to comply with the First Amendment, it must be narrowly tailored to prohibit only those forms

2    of speech that would qualify as unprotected; blanket restrictions on all speech are impermissibly

3    broad and restrict more speech than necessary.

4         The restraining orders in this case do not appear to meet these criteria. By prohibiting all

5    speech from Petitioner concerning Czodor, regardless of the nature or context of the speech, they

6    limit not only potentially threatening or harassing communications but also speech that could be

7    protected under the First Amendment. Courts have repeatedly invalidated similar overbroad

8    restrictions, finding that overly inclusive orders infringe upon constitutional rights. For example,

9    in *Madsen v. Women's Health Center*, 512 U.S. 753, 765 (1994), the U.S. Supreme Court

10   emphasized that injunctions restricting speech must be "narrowly tailored to burden no more speech

11   than necessary."

12        Federal precedent requires that any restriction on speech, including protective orders, be

13   narrowly tailored to specific concerns about unprotected speech. If the restraining orders here were

14   unconstitutional in their overbreadth, then Petitioner's conviction for violating them is legally

15   unsound. A person cannot be convicted for disobeying an order that itself violates constitutional

16   protections. As stated in *People v. Gonzalez*, 12 Cal.4th 804, 824-825 (1996), the interest of the

17   individual in avoiding the coercive effect of void injunctive orders is more substantial than the

18   interest of society in vindicating a court's power by maintaining deference even to void orders.

19   First Amendment rights are foundational and not easily overridden by court orders. Enforcing an

20   order that voids constitutional rights does more harm to justice than good by upholding judicial

21   power at the expense of individuals' freedoms. See Madsen v. Women's Health Center, Inc., 512

22   U.S. 753 (1994); Shuttlesworth v. Birmingham, 394 U.S. 147 (1969); Walker v. City of

23   Birmingham, 388 U.S. 307 (1967); Thornhill v. Alabama, 310 U.S. 88 (1940); and Near v.

24   Minnesota, 283 U.S. 697 (1931).

25        Further, the California Supreme Court established in In re Berry (1968) 68 Cal.2d 137, 147

26   [65 Cal.Rptr. 273, 436 P.2d 273], a case involving a misdemeanor contempt prosecution, that "the

27   violation of an order in excess of the jurisdiction of the issuing court cannot produce a valid

28   judgment of contempt [citations], and that the 'jurisdiction' in question extends beyond mere subject

matter or personal jurisdiction ...." Rather, " 'any acts which exceed the defined power of a court in any instance, whether that power be defined by constitutional provision, express statutory declaration, or rules developed by the courts and followed under the doctrine of stare decisis, are in excess of jurisdiction.' " (Ibid.) Specifically, the court held in Berry that a defendant should not be tried in the municipal court for misdemeanor contempt for violating a temporary restraining order issued by the superior court during a labor dispute, when the superior court's order was violative of defendant's First Amendment rights.

Here, since the restraining orders restrict all forms of speech—protected and unprotected alike—without a clear and specific basis, they fail the requirement of narrow tailoring necessary to limit speech-related restrictions. Therefore, they were violative of Petitioner's First Amendment rights and Petitioner should not have been prosecuted in the first place.

The magistrate's focus on what speech constituted unprotected speech misses a crucial analysis: whether the restraining orders themselves met constitutional standards. Given that these orders effectively prohibited all speech, they not only exceed permissible bounds but also lack any narrowly tailored purpose required for speech-related orders. This omission in the magistrate's review fails to account for the threshold requirement that any restriction on speech must first be constitutional. Convictions based on unconstitutional orders cannot be sustained, as established in *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150-151 (1969), where the Supreme Court held that a law subjecting the right of free expression, without narrow, objective, and definite standards is unconstitutional, and a person faced with such a law may ignore it and exercise his First Amendment rights.

The magistrate erred by not addressing the constitutional validity of the restraining orders themselves according to First Amendment. Given that these orders are overly broad and restrict more speech than permissible, they are unconstitutional and cannot support Petitioner's conviction. Thus, Petitioner's conviction should be vacated, as it rests on orders that violate the First Amendment.

**GROUNDS FOUR, FIVE, AND SIX: BRADY VIOLATIONS** (Dkt. 73 at 65)

September 10, 2018 Police Field Activity Report (Dkt. 6 at 200)

- 46 -

1       The Police Field Activity Report dated September 10, 2018, explicitly states that "CP HAS

2  BEEN REC'VG CALL FROM **UNK SUBJS** THREATNING TO COME TO HIS RESD AT 2521

3  N JACARANDA AND 242 HIM." This report clearly indicates that the complainant, identified as

4  Czodor, reported receiving threatening calls from "**unknown subjects**." Notably, nowhere in this

5  report is Petitioner identified, nor is there any mention of text messages or other forms of direct

6  communication from Petitioner.

7       Despite this clear language, the magistrate incorrectly interpreted the report, concluding that

8  on September 10, 2018 Czodor reported that Petitioner had threatened to come to his home and

9  commit battery. This interpretation is refuted by the evidence presented in the police field activity

10  report. If Petitioner had indeed made such threats, it stands to reason that Czodor, being the

11  complainant, would have identified Petitioner by name rather than referring to the caller as an

12  "**unknown subject**." The failure to identify Petitioner at the time of the report strongly suggests that

13  Czodor did not perceive Petitioner as the source of the threats.

14       Furthermore, had Petitioner sent threatening messages to Czodor, it is reasonable to expect

15  that Czodor would have presented this evidence to the police during the initial report on September

16  10, 2018. The absence of any mention of such messages in the report, combined with Czodor's

17  identification of the caller as unknown, casts significant doubt on the veracity of Czodor's later

18  claims. The fact that these allegations and text messages surfaced only at a later date further

19  supports the argument that they were fabricated after the fact.

20       In light of the above, the magistrate's reliance on Czodor's later allegations, which are

21  inconsistent with the original police report, constitutes a serious error. The initial report provides no

22  evidence linking Petitioner to the alleged threats. This lack of identification is a critical piece of

23  exculpatory evidence that undermines any subsequent claims that Petitioner was responsible for

24  these threats. The withholding of this initial report from Petitioner deprived her of the opportunity

25  to challenge the validity of the subsequent introduction of fabricated text messages and allegations.

26  By failing to disclose this report in a timely manner, the prosecution effectively prevented Petitioner

27  from demonstrating that the initial complaint did not implicate her and that the later evidence

28  presented was inconsistent with the original report.

- 47 -

1    The initial report, which failed to identify Petitioner as the source of the threats, is precisely

2    the type of exculpatory evidence that should have been disclosed. Its suppression fundamentally

3    prejudiced Petitioner's case by allowing the prosecution to introduce and rely on fabricated text

4    messages and allegations without allowing Petitioner the opportunity to challenge them based on

5    the initial, exculpatory report.

6    The withholding of this report not only deprived Petitioner of the opportunity to mount a full

7    and fair defense but also allowed the prosecution to build a case on inconsistent and unreliable

8    evidence. As such, this constitutes a clear *Brady* violation, warranting habeas corpus relief from the

9    conviction based on the tainted evidence.

10   The magistrate's conclusion that there is "no reason to believe that the report would have

11   shown the text messages Petitioner sent to the victim were doctored or that his testimony

12   concerning them was false" is critically flawed and overlooks significant inconsistencies in the

13   evidence. (Dkt. 73 at 69) The magistrate further dismisses the Petitioner's claims as "self-serving

14   speculation," ignoring the fact that the circumstances surrounding the alleged text messages and

15   Czodor's testimony strongly suggest that the evidence was fabricated.

16   If the text messages later presented by Czodor were genuine and not doctored, they should

17   have been included in the initial report made on September 10, 2018. However, the initial police

18   report, which Czodor filed that day, makes no mention of any text messages or threats from

19   Petitioner. This omission is significant because Czodor testified that he attempted to report

20   Petitioner's threats to post his nude photographs online on September 7, 2018, but was unable to do

21   so because the police station was closed. He claimed that he contacted the police "the following

22   week," which would have been around September 10, 2018, yet the report from that date fails to

23   mention any such threats or text messages.

24   This inconsistency between Czodor's testimony and the contents of the September 10 report

25   directly contradicts the magistrate's finding that nothing in the report "contradicted that testimony or

26   called it into question." On the contrary, the report's failure to document the alleged threats or text

27   messages—if they indeed existed—strongly suggests that Czodor did not report any such threats on

28   that date. This discrepancy is clear evidence that Czodor's testimony about reporting threats to post

- 48 -

his nude photographs online is false.

Furthermore, Czodor's actions are inconsistent with his testimony. If Czodor genuinely believed he was being threatened by Petitioner, particularly with something as serious as the release of nude photographs, it is implausible that he would fail to mention this when he contacted the police on September 10, 2018. The fact that these allegations only surfaced later indicates that Czodor's story evolved over time, likely as a result of fabricating evidence against Petitioner. This evolution of allegations is clear evidence that the charges were fabricated, not based on genuine threats made by Petitioner.

In sum, the magistrate's conclusions fail to account for the significant inconsistencies between Czodor's testimony and the evidence presented. The omission of any reference to the text messages or threats in the initial report, combined with the delayed and inconsistent nature of Czodor's allegations, strongly supports the argument that the text messages were doctored and that Czodor's testimony is perjury.

See *Ferrara v. U.S.*, 456 F.3d 278, 281 (1st Cir. 2006) (due process violated because prosecutor suppressed exculpatory evidence that manipulated defendant into taking plea agreement); *Fernandez v. Capra*, 916 F.3d 215, 230-31 (2d Cir. 2019) (due process violated because prosecution introduced perjured testimony at defendant's trial such that defendant was prejudiced); *Sims v. Hyatte*, 914 F.3d 1078, 1091-92 (7th Cir. 2019) (due process violated because prosecution withheld material impeachment evidence.)

**The September 18, 2018 Police Field Report and the September 24, 2018 Email Exchange (Dkt. 73 at 70)**

The magistrate's finding that the September 18, 2018, police field report "showed that Czodor did not report the damage to his door on the night Petitioner came to his house" overlooks critical details. Czodor's statement to the police at 20:09 (Dkt. 6 at 201), where he allegedly described Petitioner "knocking at his front door," makes no mention of any scratching sound, despite later claims of 20 minutes scratching and significant damage to the door. Given the extent of the alleged scratching damage (showing multiple X's and dots scratched into the door), it is implausible that Czodor would not have heard the noise and reported it immediately if it had, in

1   fact, occurred. This omission constitutes exculpatory evidence, as it casts doubt on Czodor's later

2   account of the event. The withholding of this field report violated Petitioner's constitutional right to

3   a fair trial by depriving her of material evidence that could have impacted the jury's assessment of

4   Czodor's credibility.

5        The absence of any mention of a scratching sound in the field report strongly suggests that

6   Czodor may have fabricated his later claims of damage to his door. This contradiction would likely

7   have influenced the jury's assessment of Czodor's credibility, making the field report's omission

8   material to Petitioner's defense. The Ninth Circuit has held that even seemingly minor

9   inconsistencies can be material when they form part of the foundation of the prosecution's case, as

10   seen in *Paradis v. Arave*, 240 F.3d 1169, 1179-81 (9th Cir. 2001) (finding Brady violation where

11   prosecutor's notes revealed inconsistency in medical examiner's opinions that would have been

12   useful to impeach examiner's testimony).

13        Petitioner's trial counsel was deprived of critical evidence to question Czodor about

14   inconsistencies between his initial report to the police and his subsequent testimony about the

15   alleged scratching. The absence of this cross-examination opportunity prevented Petitioner from

16   fully challenging Czodor's credibility and constructing an effective defense, thereby infringing

17   upon her confrontation rights. This is particularly true when prosecution's case is weak. The only

18   hard evidence the prosecution presented, a photo of Czodor's damaged door taken seven days after

19   Petitioner left his house, is far from overwhelming.

20        The magistrate's conclusion that Petitioner's purported text messages, coupled with the

21   photograph of her pressing a metal key to Czodor's door, establish her intent to harm him and

22   damage his property materially misrepresents the evidence and misleads on critical points.

23        The photograph allegedly depicting Petitioner pressing a key to Czodor's door does not

24   show any damage to the door. If Czodor had video evidence of Petitioner scratching his door for an

25   extended period, it stands to reason that he would have captured this with visible evidence of the

26   alleged damage. The absence of any photographs showing both Petitioner and visible damage to the

27   door in a single frame raises serious questions about the credibility of Czodor's narrative and the

28   thoroughness of the evidence presented.

1       The magistrate's conclusion that Petitioner's text messages demonstrate a specific intent to

2   damage Czodor's property lacks sufficient basis in the actual content of these messages. Even if

3   Petitioner expressed animosity or an intent to make Czodor "suffer," such statements are not, on

4   their face, indicative of a plan to damage property. The magistrate's interpretation of the photograph

5   and text messages overstates the evidence against Petitioner by implying a causal link between her

6   animosity toward Czodor and physical damage to his property.

7       The magistrate's conclusion dismissing the significance of the September 24, 2018 email

8   exchange between Czodor and the website removal company fails to address crucial contextual

9   details that, collectively, cast serious doubt on Czodor's credibility and the veracity of his

10   vandalism claims. This conclusion omits key considerations about the timing of events and related

11   evidence, which, when examined together, strongly suggests that the alleged vandalism might have

12   been fabricated by Czodor.

13       The email exchange on September 24, 2018, occurred only one day before Czodor took a

14   photograph of the damaged door. If, as Czodor alleges, the damage had already occurred due to

15   Petitioner's actions on September 18, he had ample time to document the damage prior to

16   September 24. His decision to wait until the day following his email exchange with the website

17   removal company raises legitimate concerns regarding the authenticity of the damage and his

18   motives. Evidence of timing or delay in presenting evidence can support an inference of fabrication

19   or manipulation. Unexplained delays in providing evidence is highly relevant to assessing

20   credibility.

21       Czodor's failure to provide corroborative evidence—such as video or images that include

22   both Petitioner and the damage to the door in a single frame—further undermines his claim. He

23   alleged that Petitioner scratched his door for approximately 20 minutes, yet provided no audio or

24   visual evidence to substantiate this. Additionally, in his initial call to the police and interactions

25   afterward, Czodor did not mention hearing any scratching sounds, a critical omission given the

26   purported extent of the damage. The absence of expected evidence or details can weaken a party's

27   credibility, particularly when the omitted details would naturally support their claim.

28

1   The September 18 police field report includes no reference to scratching sounds. This omission is

2   notable because there is no doubt that substantial damage from a metal key would produce audible

3   noise. Here, the omission of contemporaneous observations – despite Czosor alleged Petitioner

4   scratched his door for 20 minutes – raises significant questions about the truthfulness of Czodor's

5   later claims.

6          In addition to the issues of timing, the possibility that Czodor fabricated the damage to

7   deflect attention from his own misconduct or preemptively create a narrative that would protect him

8   if his wife or other individuals questioned his infidelity merits consideration. Evidence of Czodor's

9   efforts to shift blame could reasonably have influenced the jury's perception of his testimony and

10  overall credibility, especially where his testimony is uncorroborated by other physical evidence.

11  Courts allow inferences related to witness motivation under California Evidence Code § 780, which

12  authorizes the jury to consider the existence of any motive that could affect the witness's credibility.

13  The magistrate's conclusion that the email exchange, in combination with other evidence, lacked

14  relevance fails to account for critical details and timing that cast doubt on Czodor's credibility. The

15  unexplained timing of the photo, combined with the absence of corroborating evidence and failure

16  to report scratching sounds, collectively point to a scenario in which Czodor may have fabricated

17  the alleged vandalism. Properly considered, these factors could have had a material impact on the

18  jury's verdict. Omissions and unexplained delays in presenting evidence can be highly probative, as

19  they can support an inference of manipulation. Therefore, the magistrate's conclusion regarding the

20  insignificance of this evidence overlooks vital context that could have meaningfully impacted the

21  jury's assessment of Czodor's credibility and Petitioner's defense.

22          **Czodor's Prior Misdemeanor Convictions (Dkt. 73 at 71)**

23          In *Kyles v. Whitley*, 514 U.S. 419, 441-42 (1995), the Supreme Court held that the

24  suppression of impeachment evidence that could undermine the credibility of the prosecution's key

25  witness constitutes a violation of the defendant's due process rights. Similarly, the exclusion of

26  Czodor's prior convictions based on dishonesty deprived the jury of evidence that could have

27  undermined its trust in his testimony, thereby prejudicing Petitioner's defense.

28

The withholding of Czodor's two misdemeanor convictions for contracting without a license and advertising as a contractor without a license violated Petitioner's constitutional right to a fair trial by impairing her ability to impeach Czodor's credibility before the jury. These convictions are directly relevant to Czodor's moral character, which is particularly significant in a case where the Petitioner's conviction hinges heavily on his credibility due to the lack of substantial corroborative evidence.

Misdemeanor convictions are relevant for impeachment to the same extent as felony convictions and may therefore be admitted for that purpose if they reflect "moral turpitude" or a "readiness to do evil." *People v. Wheeler*, 4 Cal.4th 284, 289 (Cal. 1992). Contracting without a license and advertising as a contractor without a license reflect dishonesty and are crimes involving moral turpitude. Czodor's state convictions fall within this realm, as they inherently involve deceit and dishonesty, implicating his character for truthfulness. One way of discrediting the witness is to introduce evidence of a prior criminal conviction of that witness. By so doing, the cross-examiner intends to afford the jury a basis to infer that the witness' character is such that he would be less likely than the average trustworthy citizen to be truthful in his testimony. The introduction of evidence of a prior crime is thus a general attack on the credibility of the witness. *Davis v. Alaska*, 415 U.S. 308, 316 (1974).

Czodor's convictions, which reveal his willingness to operate outside the law, would likely have influenced the jury's assessment of his credibility, especially given that the prosecution relied heavily on his testimony rather than direct evidence. Preventing a defendant from effectively challenging a witness's credibility violates the Sixth Amendment right to confront witnesses and the Due Process Clause of the Fourteenth Amendment. Had the jury been aware of Czodor's criminal history, they might have been less inclined to believe his unsupported allegations against Petitioner, and more inclined to question the validity of his testimony overall.

The magistrate's conclusions that Petitioner repeatedly admitted to posting Czodor's information online and that there was little doubt she posted his photographs lack evidentiary support and mischaracterize the record:

- **No Concrete Admission**: The magistrate erred in interpreting Petitioner's ambiguous

1    statement, "I don't recall," in a family court hearing as an admission of posting the

2    photographs. This statement does not equate to an acknowledgment of guilt.

3    • **Inconsistencies in Czodor's Statements**: Czodor's testimony contains multiple

4    inconsistencies, including his claim that he had not sent nude photographs to anyone else.

5    Given that he is a married man of ten years engaging infidelity, this assertion strains

6    credibility, further supporting the argument that he may have committed perjury.

7    Uncorroborated testimony, especially from a witness with questionable credibility, cannot

8    alone sustain a conviction.

9    Trial counsel's failure to investigate undermines Petitioner's defense, amounting to

10   ineffective assistance of counsel. The U.S. Supreme Court in *Strickland v. Washington*, 466 U.S.

11   668, 686 (1984), established that failure to introduce crucial impeachment evidence can constitute

12   ineffective counsel if it deprives a defendant of a fair trial. Had the jury known about Czodor's

13   criminal history, they might have assessed his statements with greater skepticism.

14   The withholding of Czodor's prior misdemeanor convictions deprived Petitioner of her right

15   to a fair trial. Czodor's convictions, coupled with his infidelity, reflect a pattern of dishonesty,

16   should have been available to impeach Czodor, whose credibility was central to the prosecution's

17   case. The magistrate erred in failing to properly address these factors and misrepresenting the

18   factual evidence.

19   **GROUND 7: FALSE EVIDENCE (Dkt. 73 at 73)**

20   Ground 8 is also based on false evidence but the magistrate incorrectly characterized it as

21   prosecutorial misconduct.

22   Czodor testified that the week following September 7, 2018 (Friday) he reported to the

23   police about Petitioner's threats from her text messages to post his nude photos. Dkt. 4 at 51-52.

24   However, the September 10, 2018 police field report shows a completely different allegation –

25   Czodor reported at 14:34 that he received phone calls from unknown subjects threatening to come

26   to his residence. Dkt. 6 at 200. Such a stark contradiction cannot be dismissed as a "minor

27   discrepancy."

28

1      The magistrate's conclusion that the brief notations in the September 10, 2018 police field

2  report do not accurately reflect Czodor's allegations is not supported by the record, and the

3  discrepancies strongly suggest perjury by Czodor regarding his interactions with law enforcement.

4      The September 10, 2018 police field activity report, documents that Czodor claimed he

5  received calls from unknown individuals threatening to come to his residence. Nowhere does the

6  report indicate that Czodor mentioned Petitioner or threats made by her via text messages to post his

7  nude photos. This is not merely a difference in wording; rather, it is a fundamental deviation in the

8  identity of the alleged threat and its source. Given the importance of accurate information in law

9  enforcement reports, significant inconsistencies in police records, particularly when contradicting a

10  witness's later statements under oath, can be strong evidence of fabrication or perjury.

11      This discrepancy suggests that Czodor's testimony regarding Petitioner's threats and his

12  report to law enforcement were likely false. If Petitioner had threatened Czodor on September 7,

13  2018, it is implausible that Czodor would report an entirely unrelated threat from "unknown

14  subjects." Given the importance of this alleged threat to establishing motive or intent in the

15  underlying case, Czodor's failure to consistently report the source of the threat significantly

16  undermines his credibility.

17      Significant inconsistencies between a witness's account and documented evidence can

18  substantially undermine that witness's credibility. Presenting false testimony violates due process,

19  especially if the false testimony concerns material facts. Here, the magistrate's dismissal of the

20  police field report's notations fails to account for the impact of Czodor's inconsistent statements on

21  his credibility.

22      Discrepancies in official reports, when weighed against witness testimony, suggest

23  deliberate falsehood or reckless disregard for the truth. Here, the magistrate's conclusion that the

24  police notations may be inaccurate fails to consider that these discrepancies actually support an

25  inference of Czodor's intent to deceive, as the field report does not align with his later testimony.

26      The magistrate found Petitioner has not shown that the prosecutor knew it was false. Dkt. 73

27  at 75. However, the prosecutor had access to the September 10, 2018, police field activity report

28  which makes it unlikely the prosecutor did not know Czodor's testimony was false because a simple

comparison of Czodor's testimony (reported to police about Petitioner's threats from text messages the week after September 7, 2018) and the September 10, 2018 police filed activity report (phone calls from unknown subjects threatening to come to his home) is self-explanatory.

Here, the police report's absence of any mention of Petitioner as the source of threats should have been treated as exculpatory evidence in Petitioner's favor, especially since it directly conflicts with Czodor's statements about alleged threats made by Petitioner.

In light of these inconsistencies, it was incumbent upon trial counsel to challenge Czodor's conflicting accounts as part of an effective defense. The magistrate's conclusion that the September 10, 2018 police filed activity report may inaccurately reflect Czodor's report is unsupported by the evidence. The glaring discrepancy between Czodor's testimony of Petitioner's threats and his actual report of calls from "unknown subjects" undermines Czodor's credibility and suggests that his allegations against Petitioner may have been fabricated. The omission of Petitioner's name and any threats from her text messages in the report, the inconsistency in Czodor's testimony, and the lack of scrutiny applied by the magistrate collectively warrant habeas relief.

**IAC - (grounds 10 through 18) (Dkt. 73 at 76)**

Ineffective assistance of counsel claims are not subject to the strictest procedural forfeiture rules. See *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011) (citing *Strickland v. Washington*, 466 U.S. 668, 689-90 (1984)). In *Harrington*, the Court explained that:

> An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve.

Id.

The inquiry usually proceeds in three stages.

First, is there merit to the underlying claim? Second, is it likely that the outcome of the trial or sentencing would have been different had counsel presented the claim? Third, is there a good reason why counsel did not pursue the claim during trial or sentencing? When a court can answer yes to the first two questions and no to the third, it is very likely to entertain the habeas petition. *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994).

1    The magistrate found that it is unclear if Petitioner exhausted two claims of IAC because no

2    state court issued a reasoned decision concerning those claims (grounds eleven and fifteen). Dkt. 73

3    at 77. However, record shows that Petitioner gave the state courts a "fair opportunity to act" on each

4    of his claims. Dkt. 19-1 at 52, 39-40.

5    **Failure to Present Facts (email and nudist) to the Jury (Ground 11) (Dkt. 73 at 78)**

6    The Court recognized in *Martinez* that determining whether there has been IAC often

7    requires factual development in a collateral proceeding. The Court emphasized that IAC claims can

8    require "investigative work" and development of an "evidentiary basis" that "often turns on

9    evidence outside the trial record." *Martinez v. Ryan,* 132 S. Ct. 1309, 1317 (2012); *cf. id.* at 1318

10   (explaining that some states require delaying trial-counsel IAC claims until post-conviction

11   proceedings because "[d]irect appeals, without evidentiary hearings, may not be as effective as

12   other proceedings for developing the factual basis for the claim.").

13   For example, to determine whether an attorney's performance was deficient, it is often

14   necessary to ask the attorney to state the strategic or tactical reasons for his or her actions. To

15   determine prejudice, it is often necessary to authorize discovery and conduct an evidentiary hearing

16   to assess the effect of the attorney's deficient performance. *Detrich v. Ryan*, 740 F.3d 1237, 1246-47

17   (9th Cir. 2013).

18   The magistrate's denial of Petitioner's request for discovery and an evidentiary hearing,

19   followed by the speculative conclusion that trial counsel's strategy was sound, is contrary to legal

20   standards, which require the court to have a factual basis for assessing counsel's performance.

21   The State provided no hard evidence that Petitioner scratched Czodor's front door. The

22   State's case rests entirely on circumstantial evidence and the testimony of Czodor, which is riddled

23   with inconsistencies, contradictions, and clear evidence of a motive to fabricate his claims. The

24   limited evidence presented, including a photo of Petitioner standing in front of Czodor's undamaged

25   door, a video showing Petitioner tapping the door, and a photo of scratches on the door taken seven

26   days later, is insufficient to prove Petitioner caused the damage.

27   A photograph showing Petitioner standing in front of Czodor's undamaged door holding a

28   metal key simply places Petitioner near the door but does not establish any connection to the

1   scratches discovered later. There is no indication from this image that Petitioner used the key to

2   scratch the door or cause any damage. The photograph fails to show any act of vandalism or any

3   damages to Czodor's door. A video showing Petitioner tapping Czodor's front door is in no way

4   equivalent to causing significant scratches or damage. The video does not show any scratching, nor

5   does it indicate any malicious intent. Had there been any, as he later alleged that Petitioner

6   scratched his door for 20 minutes, Czodor would have reported the scratching to the police upon

7   their arrival. He would not have needed to fabricate the claim that darkness prevented him from

8   noticing the scratches, especially since his front door was well-lit. A photograph of scratches on

9   Czodor's front door was taken seven days - a significant lapse of time - after Petitioner had left the

10  premises. Dkt. 6 at 175. The State provided no evidence to suggest that these scratches were caused

11  by Petitioner or that they even existed. Given the time gap, it is entirely possible that the scratches

12  occurred after Petitioner left or were fabricated. In the absence of contemporaneous evidence

13  capturing Petitioner in the act of causing the scratches—despite Czodor's ability to take photos and

14  videos throughout the night while Petitioner was in front of his door—this photograph is inadequate

15  to establish guilt.

16       Evidence regarding Czodor's dishonesty and the timing of his discovery of the scratches

17  calls into question his credibility and motives. The photo of the scratches was taken after Czodor

18  learned that it would cost him money to remove online comments about his dishonesty. This

19  financial motivation undermines the credibility of his claim that Petitioner caused the damage. The

20  email showing Czodor's knowledge of the cost involved in removing the comments suggests a

21  highly possible motive for fabricating the alleged damage to his door in order to retaliate against

22  Petitioner or shift blame. Trail counsel's failure to present Czodor's email and cross-examine his

23  motive constitutes deficient performance. See *Reynoso v. Giurbino*, 462 F.3d 1099, 1115 (9th Cir.

24  2006) (explaining that the "failure to cross-examine [a] witness about their motivation for testifying

25  as they did . . . [is] unreasonable").

26       Czodor's testimony contains several inconsistencies, further calling his credibility into

27  question. Czodor claimed that it was too dark to notice the scratches on the night they allegedly

28  occurred, yet the lighting conditions were impossible to prevent him from seeing the scratches if

they had truly been caused by Petitioner. Additionally, the fact that Czodor only "discovered" the scratches days later raises serious doubts about whether the damage was genuinely caused by Petitioner, or whether it was fabricated after Czodor learned of the financial implications of the online comments.

Czodor claimed that Petitioner scratched his door for 20 minutes. However, the scratches shown in the photograph are inconsistent with such a lengthy and sustained effort. Had Petitioner scratched the door for that amount of time, the damage would likely have been far more severe and Czodor would have reported to the police upon their arrival. This inconsistency between the alleged duration of the scratching and the actual damage casts further doubt on Czodor's narrative.

The inconsistencies in his narrative, combined with his financial motivations and the evidence of his history of dishonesty, suggest that Czodor is a chronic liar and manipulator who cannot be relied upon to provide truthful testimony.

The magistrate erroneously concluded that the evidence corroborating the victim's testimony – including the video of the victim trying to convince Petitioner to leave his house the night the door was vandalized, the still photograph of Petitioner pressing a metal key to his door, and Petitioner's various text messages – was overwhelming. Dkt. 73 at 79. The evidence cited by the magistrate does not establish that Petitioner vandalized Czodor's door; it merely confirms that Petitioner was present in front of Czodor's door. This is far from the "overwhelming" evidence needed to support the conclusion of guilt, as the magistrate suggests. The mere fact that Petitioner was present at the scene does not prove that she caused the scratches on the door, and thus this evidence cannot be considered overwhelming.

The State provided no credible evidence that Petitioner disseminated Czodor's nude photos or Czodor suffered emotional distress from their dissemination. See *Fiore v. White*, 531 U.S. 225, 228-29 (2001) (per curiam) (habeas relief possible because due process violated by conviction of defendant without proving each element of crime beyond reasonable doubt.)

**Failure to Request a Dating-Relationship Instruction and Stipulating to Validity of the Family Court's Protective Order (Grounds 12 and 13) (Dkt. 73 at 81)**

1    Although a judge may direct a verdict for the defendant if the evidence is legally insufficient

2    to establish guilt, he may not direct a verdict for the State, no matter how overwhelming the

3    evidence. *Sullivan v. Louisiana*, 508 U.S. 275, 277 (1993). See also *United States v. Martin Linen*

4    *Supply Co.*, 430 U.S. 564, 572-573 (1977); *Carpenters v. United States*, 330 U.S. 395, 410 (1947).

5    What the factfinder must determine to return a verdict of guilty is prescribed by the Due

6    Process Clause. It is self-evident that the Fifth Amendment requirement of proof beyond a

7    reasonable doubt and the Sixth Amendment requirement of a jury verdict are interrelated. *Sullivan*

8    *v. Louisiana*, 508 U.S. 275, 278 (1993).

9    The prosecution bears the burden of proving all elements of the offense charged, see,  e.g.,

10   *Patterson v. New York*, 432 U.S. 197, 210 (1977); *Leland v. Oregon*, 343 U.S. 790, 795 (1952), and

11   must persuade the factfinder "beyond a reasonable doubt" of the **facts necessary to establish each**

12   **of those elements**, see, e.g., *In re Winship*, 397 U.S. 358, 364 (1970); *Cool v. United States*, 409

13   U.S. 100, 104 (1972) (per curiam). This beyond-a-reasonable-doubt requirement, which was

14   adhered to by virtually all common law jurisdictions, applies in state, as well as federal,

15   proceedings. *Winship*, supra.

16   The proposed dating-relationship instruction was obviously pertinent to determining whether

17   Czodor was involved in a relationship that created a reasonable expectation of privacy in his nude

18   photos sent to Petitioner and to assessing the validity of the family court orders, elements of

19   violation of a protective order (Pen. Code,§ 273.6(a)) and disorderly conduct (unlawful

20   dissemination of private photographs and recordings) (Pen. Code, § 647(j)(4))(A). Dkt. 33 at 31-32,

21   57-58.

22   The magistrate's conclusion that Petitioner's IAC claims fail because they involved strategic

23   decisions by trial counsel is erroneous and unsupported by the record. While decisions regarding

24   trial strategy are generally given deference under *Strickland v. Washington*, 466 U.S. 668 (1984),

25   counsel's decisions in this case were objectively unreasonable. The magistrate's reasoning, which

26   suggests that trial counsel's failure to request a dating-relationship instruction and his decision to

27   stipulate to the validity of the family court's protective order were strategic, is contradicted by the

28   record and established legal authority.

1      As explained in *Reynoso v. Giurbino*, 462 F.3d 1099, 1115 (9th Cir. 2006), habeas courts are

2  not required to defer to strategic decisions when no reasonable justification for such decisions is

3  provided.

4      In this case, despite being asked, trial counsel failed to provide any explanation for

5  stipulating to the validity of the orders. Dkt. 6 at 207. This absence of explanation undermines the

6  magistrate's assumption that the decision was strategic. The California Supreme Court in *People v.*

7  *Pope*, 23 Cal.3d 412 (1979), clarified that when counsel is asked to explain a tactical decision and

8  fails to provide a justification, this lack of explanation can be interpreted as a sign that counsel had

9  no reasonable basis for the decision. See also *Moore v. Johnson*, 194 F.3d 586, 610 (5th Cir. 1999)

10  (holding that a particular decision could not be labeled "strategic" where, inter alia, the attorney had

11  "no idea" why the decision had been taken); *Bean v. Calderon*, 163 F.3d 1073, 1079 (9th Cir. 1998)

12  (noting that a decision cannot be characterized as "strategic" where it was a result only of

13  "confusion"); and *Loyd v. Whitley*, 977 F.2d 149, 158 n. 22 (5th Cir. 1992) (distinguishing between

14  "strategic judgment calls" and "plain omissions") (collecting cases); and compare *United States v.*

15  *Gray*, 878 F.2d 702, 712 (3d Cir. 1989) ("counsel's behavior was not colorably based on tactical

16  considerations but merely upon a lack of diligence"); *Moore*, 194 F.3d at 615 (describing a

17  "strategic" decision as, inter alia, a decision "that . . . is expected . . . to yield some benefit or avoid

18  some harm to the defense.") A straightforward application of these principles reveals the extent of

19  the magistrate's error.

20      Stipulating to the validity of the protective orders without challenging their lawfulness was

21  objectively unreasonable, especially considering the lack of a dating relationship that would have

22  provided grounds to argue that the family court orders were void.

23      The magistrate erroneously concluded that there was no need to request a dating-relationship

24  instruction, reasoning that the existence of a dating relationship is not an element of the crime of

25  violating a protective order. However, this conclusion overlooks a critical element of the offense

26  under California Penal Code § 273.6(a), which requires that a lawful court order be in place. The

27  validity of the Temporary Restraining Order (TRO) and Domestic Violence Restraining Order

28  (DVRO) against Petitioner is contingent upon the family court's jurisdiction to issue those orders,

1  which, in this case, was dependent on the existence of a dating relationship between Czodor and

2  Petitioner. (See Dkt. 3 at 159 (CALCRIM 2701, setting forth the requisite elements to prove that

3  Petitioner violated a "protective or stay away order")); Cal. Penal Code § 273.6(a).

4      Trial courts have a sua sponte duty to instruct on "the general principles of law relevant to

5  and governing the case." *People v. Cummings* (1993) 4 Cal.4th 1233, 1311. "That obligation

6  includes instructions on all of the elements of a charged offense" (ibid.), and on recognized

7  "defenses . . . and on the relationship of these defenses to the elements of the charged offense."

8  *People v. Sedeno* (1974) 10 Cal.3d 703, 716, overruled on other grounds by *People v. Breverman*

9  (1998) 19 Cal.4th 142, 178, fn. 26. In this case, whether there was a qualifying dating relationship

10  between Czodor and Petitioner for the family court to issue valid TRO and DVRO and for Czodor

11  to expect privacy in his nude photos sent to Petitioner is an element of the offense and a defense.

12      In *People v. Flood*, 18 Cal.4th 470, 481 (1998), the California Supreme Court held that

13  questions of fact related to the elements of a crime must be resolved by the jury, not the judge. The

14  existence of a dating relationship is a factual element that should have been considered by the jury

15  in determining whether the family court had jurisdiction to issue its protective orders. By stipulating

16  to the validity of the protective orders, trial counsel deprived the jury of its role as fact-finder on this

17  critical issue. This denial of the jury's duty to decide the facts of the case violates Petitioner's right

18  to a jury trial under both the U.S. Constitution's Sixth Amendment and the California Constitution,

19  Article I, § 16.

20      Similarly, in *People v. Modesto* (1963) 59 Cal.2d 722 [ 31 Cal.Rptr. 225, 382 P.2d 33],

21  speaking of the effect of the lack of instruction on the included offense of manslaughter, the court

22  said (at p. 730): "Reversal is not required because of a reasonable probability that in the absence of

23  the error the jury would have reached a different verdict (see *People v. Watson*, 46 Cal.2d 818, 836

24  [299 P.2d 243]), but because the defendant has a constitutional right to have the jury determine

25  every material issue presented by the evidence. Regardless of how overwhelming the evidence of

26  guilt may be, the denial of such a fundamental right cannot be cured by article VI, section 4 1/2, of

27  the California Constitution, for the denial of such a right itself is a miscarriage of justice within the

28  meaning of that provision." In petitioner's case, there has been no jury verdict within the meaning of

1   the Sixth Amendment, the premise for harmless error analysis is absent. *Sullivan v. Louisiana*, 508

2   U.S. 275, (1993).

3       The inquiry is not whether, in a trial that occurred without the error, a guilty verdict would

4   surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely

5   unattributable to the error. That must be so, because to hypothesize a guilty verdict that was never in

6   fact rendered — no matter how inescapable the findings to support that verdict might be — would

7   violate the jury-trial guarantee. See *Rose v. Clark*, 478 U.S. 570, 578 (1986); id., at 593

8   (BLACKMUN, J., dissenting); *Pope v. Illinois*, 481 U.S. 497, 509-510 (1987) (STEVENS, J.,

9   dissenting).

10      Here, the jury was left with no instruction on the critical issue of whether the family court's

11  protective orders were lawfully issued, and they were not given the opportunity to assess whether a

12  dating relationship existed. Furthermore, the stipulation to the validity of the protective orders

13  prevented Petitioner from challenging the orders' lawfulness and whether there was a relationship

14  engendering a reasonable expectation of privacy in Czodor's nude photos sent to Petitioner, which

15  were central to Petitioner's defense.

16      Had trial counsel requested the dating-relationship instruction and contested the validity of

17  the protective orders, there is a reasonable probability that the outcome of the trial would have been

18  different. The jury could have found that there was no qualifying dating relationship between

19  Czodor and Petitioner engendering a reasonable expectation of privacy, the family court orders

20  were issued without jurisdiction, which would have resulted in Petitioner's acquittal of disorderly

21  conduct (unlawful dissemination of private photographs and recordings) (Pen. Code, § 647(j)(4))(A)

22  and violating those orders under California Penal Code § 273.6(a).

23      **Failure to Move to Exclude Petitioner's Family-Court Testimony (Ground 14) (Dkt. 73**

24  **at 83)**

25      The magistrate found that trial counsel objected to the testimony and initially convinced the

26  trial court to exclude it. Dkt. 73 at 83. This is factually misleading and incomplete. Trial counsel

27  objected to the transcript of the restraining order being admitted based on proffered Evidence Code

28  352 instead of Fifth Amendment. Dkt. 3 at 241. When being asked by the trial court if he would be

objecting to statements that Petitioner made in the family court transcript being introduced, trial
counsel answered he would but just based on hearsay instead of Fifth Amendment. Dkt. 3 at 242.
When the prosecution specified the statements made by Petitioner he intended to introduce at trial,
trial counsel still made no objection based on Fifth Amendment. Dkt. 3 at 243-244. The trial court
clearly stated that there was no indication that Petitioner fully understood the consequences of
making incriminating statements during the course of the family court hearing. In addition,
Petitioner did not have legal counsel at that hearing. Dkt. 3 at 246.

The magistrate found the trial court ruled that the prosecutor could question the victim about
Petitioner's testimony. Dkt. 73 at 83. In support his argument, the prosecution cited *People v.
Battaglia*, 156 Cal.App.3d 1058, 1065 (Cal. Ct. App. 1984) in which William Ruiz, a licensed
clinical social worker and full time employee at the emergency walkin psychiatric unit, was not
acting as a state agent. A scenario completely distinct from this case. Then the prosecution asserted
that coercive police activity is a necessary predicate to the finding that a confession is not
"voluntary" within the meaning of the Due Process Clause of the Fourteenth Amendment, citing
*Colorado v. Connelly*, 479 U.S. 157, 167 (1986). Dkt. 3 at 278. However, this argument overlooks
the broader protections provided under the Fifth Amendment. The Fifth Amendment not only
guards against involuntary self-incrimination in criminal prosecutions but also extends its privilege
to any official questioning in other proceedings—civil or criminal, formal or informal—where
responses may potentially incriminate the individual in future criminal proceedings. This principle
was established in *McCarthy v. Arndstein*, 266 U.S. 34, 40 (1924), where the Court recognized that
the Fifth Amendment privilege against self-incrimination applies beyond criminal trials.

In this case, the prosecution's reliance on the assertion that Petitioner's statements were
voluntary due to the absence of coercive police activity is misplaced. Although Petitioner was
summoned to appear in family court, the prosecution inaccurately claimed that Petitioner was not
required to be present, voluntarily chose to attend, and voluntarily spoke at the hearing. These
assertions are both factually and legally incorrect. Petitioner's appearance at the hearing and her
statements, regardless of the proceeding's nature, still invoke the protections of the Fifth
Amendment because the family court setting and the content of her testimony could have subjected

1  her to future criminal liability.

2      Furthermore, the prosecution's argument fails to account for the reality that the Fifth

3  Amendment privilege is not limited to custodial situations. As the Supreme Court emphasized in

4  McCarthy, the privilege applies in any scenario where answering questions could lead to self-

5  incrimination, whether or not the individual is in custody. Thus, the prosecution's contention is

6  fundamentally flawed, and Petitioner's Fifth Amendment rights should have been considered,

7  irrespective of whether coercive police activity was involved.

8      By introducing Petitioner's prior testimony from the family court hearing into evidence in

9  the criminal trial, the State effectively transformed the family court proceeding into the equivalent

10  of a criminal trial. Trial counsel's failure to object to the use of that testimony, based on Petitioner's

11  Fifth Amendment privilege against self-incrimination, constituted unreasonable and constitutionally

12  ineffective assistance of counsel.

13      In *Kastigar v. United States*, 406 U.S. 441, 444-45 (1972), the U.S. Supreme Court

14  emphasized that compelled testimony cannot be used, either directly or indirectly, in any criminal

15  case against the individual. The failure of Petitioner's trial counsel to invoke this established

16  protection by excluding her prior testimony at the family court hearing demonstrates

17  constitutionally ineffective representation.

18      Trial counsel's failure to object to the use of Petitioner's family court testimony is

19  particularly unreasonable in light of the high likelihood that the testimony could be incriminating in

20  the subsequent criminal case. The legal standards governing ineffective assistance of counsel

21  claims, as articulated in *Strickland v. Washington*, 466 U.S. 668 (1984), require that counsel's

22  performance meet an objective standard of reasonableness under prevailing professional norms. In

23  this case, trial counsel's failure to raise a clear and valid Fifth Amendment objection was

24  objectively unreasonable and fell below the standard of competent legal representation.

25      Additionally, Petitioner was prejudiced by counsel's failure to act. The use of her prior

26  testimony influenced the jury's assessment of the evidence and the ultimate verdict. Under the

27  *Strickland* standard, the ineffective assistance of counsel is prejudicial when there is a reasonable

28  probability that, but for counsel's errors, the result of the proceeding would have been different.

1  Given the incriminating nature of the testimony and its impact on the case, Petitioner has met the
2  prejudice prong of the *Strickland* test.

3        In conclusion, trial counsel's failure to exclude Petitioner's prior family court testimony,
4  based on her Fifth Amendment privilege, was both unreasonable and constitutionally ineffective.
5  This failure violated Petitioner's right against self-incrimination and prejudiced her defense,
6  warranting habeas relief.

7        **Failure to Expose the Victim's False Testimony and Inconsistent Statements and Call**
8  **Defense Witnesses (Grounds 15 and 16) ) (Dkt. 73 at 83)**

9        The photo taken in front of Czodor's door was well-lit, to the extent that the light showered
10 Petitioner from head to toe. Dkt. 6 at 159. The magistrate clearly erred in concluding no evidence
11 established that Czodor lied about it being too dark to see the damage to the door. Dkt. 73 at 84.

12       The magistrate found although Petitioner also alludes to the September 10, 2018 police field
13 report at issue in her first *Brady* claim, she presents no argument showing how trial counsel's
14 performance was deficient in relation to that report. Dkt. 73 at 84. However, it's self-explanatory
15 that trial counsel failed to investigate.

16       The magistrate erred in concluding that the introduction of the September 18, 2018 report
17 into evidence would not have had any impact on the jury's verdict. In *People v. Hall*, 62 Cal.2d 104,
18 41 Cal. Rptr. 284, 396 P.2d 700 (Cal. 1964), the California Supreme Court held that the absence of
19 expected evidence can support an inference of innocence if such evidence would naturally be
20 present. In *Hall*, the court emphasized that the "failure to find" certain evidence or for expected
21 circumstances to appear in the evidence presented can bolster an argument against the validity of
22 the accusations, especially when the alleged events would logically generate particular evidence or
23 reactions if they occurred as claimed. This reasoning can be analogously applied to Petitioner's
24 case, where the lack of a contemporaneous police report regarding alleged noises strengthens
25 Petitioner's argument that the allegations were fabricated.

26       Czodor alleged that Petitioner scratched his front door with a metal key for a prolonged
27 period, presumably generating a loud and continuous sound. Under the reasoning in *Hall*, one
28 would expect Czodor to have immediately reported such disturbing conduct to the police,

1  particularly given his immediate access to law enforcement. Yet, the September 18, 2018 police

2  field activity report contains no mention of any noise complaint or suspicion of property damage

3  caused by Petitioner, despite this being a situation that would likely prompt a report. This absence

4  of a report under circumstances where it would be anticipated supports the inference that the event

5  may not have occurred as claimed and raises questions about the credibility of Czodor's later

6  statements.

7       Further, the timing of Czodor's allegations raises substantial questions regarding their

8  credibility. Czodor received an email on September 24, 2018, detailing the cost to remove online

9  comments regarding his dishonesty. His claims regarding the scratched door only surfaced after this

10  email was exchanged. This context suggests a strong motivation for Czodor to fabricate claims

11  against Petitioner as a retaliatory measure rather than a factual recounting of actual events.

12       Relying on *Dows v. Wood*, 211 F.3d 480, 486 (9th Cir. 2000), in which there is no

13  evidence in the record that the potential witness actually exists, the magistrate concluded

14  Petitioner provided no declaration from any of potential witness demonstrating a

15  willingness to testify and setting forth the facts to which they would have testified.

16  However, notably distinguished from *Dows*, the potential witnesses here are police

17  officers, making it impossible that they don't actually exist. In addition, they should have

18  been subpoenaed to testify at trial regardless of their willingness. They were present at

19  the scene. It's self-explanatory that they would have testified what they seen on the night

20  on September 18, 2018. Therefore, the magistrate's reliance on *Dows* is misplaced.

21       **Failure to Object (Ground 17) (Dkt. 73 at 85)**

22       The Sixth Amendment and article I, section 15 require counsel's "diligence and active

23  participation in the full and effective preparation of his client's case." *People v. Vest* (1974) 43

24  Cal.App.3d 728, 736 [118 Cal.Rptr. 84]. Criminal defense attorneys have a "duty to investigate

25  carefully all defenses of fact and of law that may be available to the defendant. . . ." *In re Williams*

26  (1969) 1 Cal.3d 168, 175 [81 Cal.Rptr. 784, 460 P.2d 984]. This obligation includes conferring with

27  the client "without undue delay and as often as necessary . . . to elicit matters of defense. . . ." *Coles*

28  *v. Peyton* (4th Cir. 1968) 389 F.2d 224, 226. "Counsel should promptly advise his client of his

1  rights and **take all actions** necessary to preserve them. . . . Counsel should also be concerned with

2  the accused's right to be released from custody pending trial, and be prepared, where appropriate, to

3  make motions for a pretrial psychiatric examination or for the suppression of evidence. [Fns.

4  omitted.]" *United States v. DeCoster* (D.C. Cir. 1973) 487 F.2d 1197, 1203; *People v. Whittington*

5  (1977) 74 Cal.App.3d 806, 818-819, fn. 6 [141 Cal.Rptr. 742]. If counsel's failure to perform these

6  obligations results in the withdrawal of a crucial or potentially meritorious defense, "`the defendant

7  has not had the assistance to which he is entitled.'" *In re Saunders* (1970) 2 Cal.3d 1033, 1042 [88

8  Cal.Rptr. 633, 472 P.2d 921].

9       Ineffective assistance can be established by an attorney's forfeit of legal claims. See, e.g.,

10  *Miller v. Webb*, 385 F.3d 666, 674-75 (6th Cir. 2004) (holding that trial counsel's failure to

11  challenge a juror for cause after the juror made a statement that she thought she could be fair, but

12  immediately qualified the statement with a statement of partiality, was "objectively unreasonable").

13       A defendant must show that trial counsel failed to act in a manner to be expected of

14  reasonably competent attorneys acting as diligent advocates and establish that counsel's acts or

15  omissions resulted in the withdrawal of a potentially meritorious defense.

16       Once these burdens have been met, the reviewing court must look to see if the record

17  contains any explanation for the challenged aspect of representation. If it does, the court must

18  inquire whether the explanation demonstrates that counsel was reasonably competent and acting as

19  a conscientious, diligent advocate. For example, where the record shows that counsel's omissions

20  resulted from an informed tactical choice within the range of reasonable competence, the conviction

21  must be affirmed. (E.g., *People v. Fain* (1969) 70 Cal.2d 588, 600 [ 95 Cal.Rptr. 562].) In contrast,

22  where the record shows that counsel has failed to research the law or investigate the facts in the

23  manner of a diligent and conscientious advocate, the conviction should be reversed since the

24  defendant has been deprived of adequate assistance of counsel.

25       Although the magistrate faults Petitioner for her failure to lodge the voir dire transcript, the

26  currently available record has already shown that counsel's omission was not a result from an

27  informed tactical choice. Dkt. 4 at 4-6. Juror No. 4 clearly indicated that he's not paid for jury duty,

28  he had a financial hardship and he didn't want to be on jury duty anymore. He had anxiety so he's

1  not used to talking in front of other people so he didn't speak up. His dad was basically out of work

2  and his mom worked part time and so he could not miss work because he's supporting his parents.

3      Impartiality is not only determined by a juror's lack of bias toward the parties or issues in

4  the case, but also by the juror's capacity to fairly evaluate the evidence without undue personal or

5  emotional stress. Juror No. 4's anxiety, financial hardship, and fear to speak up created

6  circumstances that rendered it unreasonable to expect that he could serve as an impartial juror.

7  Anxiety, especially in conjunction with financial pressure, can impair a juror's ability to carefully

8  deliberate on the evidence, particularly when the juror is eager to conclude the proceedings due to

9  personal circumstances. The court's failure to excuse Juror No. 4 in light of these factors violated

10  Petitioner's Sixth Amendment right to an impartial jury. The trial judge, having been made aware of

11  these issues, should have engaged in a more thorough inquiry into whether Juror No. 4 could serve

12  without his impartiality being compromised. The trial judge made no effort to ensure Juror No. 4

13  could remain impartial, merely expressing sympathy for his financial hardship. The decision to

14  compel Juror No. 4 to remain on the jury was not based on his ability to be impartial despite his

15  financial hardship and anxiety; rather, the judge required him to stay solely because he had already

16  been sworn in as a juror.

17      Here, the record directly refutes the contention that trial counsel made a strategic decision.

18  Trial counsel's failure to adequately advocate for Juror No. 4's excusal fell below the standard of

19  reasonably competent attorneys. Counsel's decision to submit the issue to the court without fully

20  inquiring Juror No. 4's anxiety and financial concerns—factors that could affect his ability to

21  deliberate fairly—was a clear failure to act diligently. Reasonable counsel would have advocated

22  for the juror's removal due to his hardship, anxiety and fear to speak up, rather than passively

23  deferring to the court's discretion.

24      Juror No. 4's inability to speak freely due to anxiety and his financial situation increased the

25  likelihood that his vote was motivated by a desire to quickly end the trial rather than by a genuine

26  belief in the defendant's guilt. The magistrate's conclusion that Juror No. 4 did not explicitly

27  express that he voted guilty due to pressure is insufficient, given his fear to speak up. Juror No. 4's

28

1   anxiety, hardship, and fear to speak up alone make it unreasonable to assume he could deliberate

2   impartially.

3          The magistrate determined that Juror No. 4 only missed one day of work, noting that the

4   jury delivered its verdict on July 29, 2021, at 3:29 p.m., less than twenty-six hours after Juror No. 4

5   requested to be excused. However, the record shows that the jury was out at 3:35 p.m. Dkt. 4 at 210.

6   There was no evidence to suggest that Juror No. 4 could immediately return to work at 3:45 p.m.

7   which was close to the end of the business day.

8          Crucially, there were two alternate jurors available who could have replaced Juror No. 4.

9   This fact strengthens the argument that, had trial counsel objected to the court's decision not to

10  excuse Juror No. 4, the court would have been reasonably inclined to reconsider its ruling and allow

11  one of the alternate jurors to take his place.

12         In *People v. Pope*, 23 Cal.3d 412 (1979), the California Supreme Court established that

13  when counsel is asked for an explanation for their actions and fails to provide one, this strongly

14  suggests there was no reasonable tactical basis for the decision. In this case, despite being asked,

15  trial counsel provided no explanation for failing to support Juror No. 4's excusal. Dkt. 6 at 209.

16  Trial counsel's performance was objectively unreasonable in light of his knowledge of Juror No. 4's

17  anxiety, financial hardship and fear to speak up, coupled with the absence of any explanation for

18  counsel's action and inaction after being asked. *Reynoso v. Giurbino*, 462 F.3d 1099, 1115 (9th Cir.

19  2006). The magistrate's speculative conclusion that trial counsel may have strategically believed

20  Juror No. 4 to be advantageous is unsupported by the record and contrary to the reasoning in *Pope*

21  and *Reynoso*.

22         **Failure to Ensure Petitioner's Right to a Speedy Trial (Ground 18) (Dkt. 73 at 88)**

23         In concluding that Petitioner was not denied her right to a speedy trial, the magistrate failed

24  to apply the tests set forth in *Barker v. Wingo* (1972) 407 U.S. 514 and *Mathews v. Eldridge* (1976)

25  424 U.S. 319. Dkt. 73 at 88-89.

26         The magistrate's conclusion that there was no evidence supporting Petitioner's claim that she

27  did not personally and voluntarily waive time is factually incorrect. Petitioner provided a

28  declaration under penalty of perjury, which is an acceptable form of evidence under both California

1  and federal law. Dkt. 33 at 109-110. A declaration under penalty of perjury is treated as substantive

2  evidence and can serve as the basis for establishing facts in a legal proceeding. (See 28 U.S.C. §

3  1746; Cal. Code Civ. Proc. § 2015.5).

4      The magistrate essentially placed the credibility of Petitioner and her trial counsel under

5  scrutiny. However, in assessing the credibility of the public defender, the magistrate made a critical

6  omission—when the public defender was asked to explain the investigation conducted for each

7  period during which time waivers were entered, they provided no explanation whatsoever,

8  suggesting no legitimate reasons for continuing the trial date. Dkt. 6 at 209.

9      Moreover, it did not appear from the record that the continuances, two years in total, were

10  sought for actual trial preparation. Trial counsel's minimal performance during trial further

11  corroborates Petitioner's claim that public defender conducted minimal trial preparation during the

12  two years of the case's pendency prior to jury selection. This deficiency in preparation suggests that

13  Petitioner did not voluntarily waive her right to a speedy trial but was instead left uninformed and

14  inadequately represented. Under California law, a waiver of time must be made knowingly,

15  voluntarily, and intelligently (*People v. Johnson*, 26 Cal.3d 557, 566 (1980)), and the absence of

16  any meaningful explanation or investigation undermines the claim that Petitioner personally waived

17  time on multiple occasions and the validity of any purported waivers.

18      The magistrate's failure to fully evaluate the public defender's lack of trial preparation and

19  failure to provide explanations for the time waivers raises substantial doubt about the voluntariness

20  of Petitioner's waiver of time, rendering the conclusion legally and factually unsound.

21      The magistrate acknowledged that Petitioner's first trial date was set for March 24, 2020,

22  and justified the continuance of the trial due to the COVID-19 pandemic. However, this conclusion

23  lacks both a factual and legal basis. The record clearly demonstrates that the COVID-19-related jury

24  trial suspension lasted only two months, yet Petitioner's trial was delayed for two years. Dkt. 6 at

25  218. This extended delay cannot be attributed solely to the pandemic, as the continuance far

26  exceeded the reasonable time caused by the public health emergency.

27      The magistrate concluded that Petitioner failed to demonstrate resulting prejudice. However,

28  delay that is "uncommonly long" triggers a presumption of prejudice. *Doggett v. United States*

1   (1992) 505 U.S. 647, 651- 657. The magistrate further faulted Petitioner for not explaining how her

2   public defender's failures—such as not calling any witnesses, inadequately cross-examining the

3   victim, and failing to present evidence from any investigation—were connected to the denial of her

4   right to a speedy trial. However, this argument is flawed. It is self-evident that the public defender's

5   lack of investigation during the two-year pendency of the case prior to jury selection highlights the

6   unjustified nature of the trial's continuance. These failures underscore that the continuance was

7   unjustified, as no meaningful preparation was undertaken during this extended period.

8        Furthermore, under established precedent, a defendant need not identify specific prejudice

9   from an unreasonable delay in bringing the case to trial once the speedy trial right has attached. See

10  *Moore v. Arizona*, 414 U.S. 25, 94 S.Ct. 188, 38 L.Ed.2d 183 (1973) (per curiam) (finding

11  "fundamental error" in a ruling by the Arizona Supreme Court that a showing of prejudice to the

12  defense at trial was essential to establish a federal speedy trial claim.) The mere passage of time in

13  combination with the absence of a legitimate justification for the delay can be sufficient to

14  demonstrate a violation.

15       **Failure to Investigate and Adequately Cross-Examine the Victim (Ground 10) (Dkt. 73**

16  **at 89)**

17       The magistrate concluded that Czodor's prior convictions were irrelevant without addressing

18  the critical fact that this case was built solely on Czodor's credibility as the only witness. Where a

19  case hinges on witness credibility, prior convictions - based on dishonesty - become particularly

20  relevant. In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court noted that prejudice

21  can be shown when counsel's deficient performance prevents the jury from hearing evidence that

22  could impact its credibility determination. In this case, by omitting Czodor's prior convictions, the

23  jury was deprived of important information that could have cast doubt on his reliability.

24       Moreover, credibility is paramount when a case relies on the testimony of a single witness.

25  The magistrate's anecdotal of Czodor's prior convictions is therefore not only factually flawed but

26  also inconsistent with controlling legal authority. The jury, had it known of Czodor's past

27  dishonesty, would have been in a better position to assess whether his testimony could be trusted.

28

1   The magistrate also erroneously concluded that, even if admitted, Czodor's prior convictions

2   would not have affected the jury's assessment of his credibility. This conclusion is unsupported by

3   the facts of the case. Czodor's testimony was the linchpin of the prosecution's case, and his

4   credibility was the sole determining factor for the jury's verdict. Given the absence of any

5   independent evidence linking Petitioner to the crimes, the jury's verdict necessarily turned on

6   whether it believed Czodor's version of events.

7   Courts have recognized that evidence affecting the credibility of a key witness can have a

8   profound impact on the outcome of a trial. The duty to investigate is especially pressing where, as

9   here, the complaining witness and his credibility are crucial to the State's case. See *Huffington v.*

10  *Nuth*, 140 F.3d 572, 580 (4th Cir.1998) (collecting cases).

11  One way of discrediting the witness is to introduce evidence of a prior criminal conviction

12  of that witness. By so doing, the cross-examiner intends to afford the jury a basis to infer that the

13  witness' character is such that he would be less likely than the average trustworthy citizen to be

14  truthful in his testimony. The introduction of evidence of a prior crime is thus a general attack on

15  the credibility of the witness. *Davis v. Alaska*, 415 U.S. 308, 316 (1974). This is particularly true

16  when the prosecution's case depends on the witness's credibility, as it does here with Czodor. The

17  jury must have the opportunity to make a full assessment of the witness's "credibility, reliability,

18  and motivation" because prior convictions inform a witness's general credibility and reliability.

19  *Davis* established that general credibility, as influenced by past misconduct, is relevant and essential

20  for assessing the overall truthfulness of a witness's testimony.

21  Under *People v. Castro*, 38 Cal. 3d 301, 315 (1985), evidence of past convictions can be

22  introduced for the purpose of impeaching a witness's credibility, particularly when these

23  convictions reflect on a witness's honesty or integrity. Especially in cases hinging on testimonial

24  evidence, a witness's credibility must be fully evaluated to ensure a fair trial. See also *People v.*

25  *Burns* (1987) 189 Cal.App.3d 734 (20-year conviction not necessarily remote because of

26  subsequent lawlessness); *People v. DeCosse* (1986) 183 Cal.App.3d 404 (no abuse of discretion to

27  admit a burglary conviction from twelve years earlier).

28  Although trial counsel is typically afforded leeway in making tactical decisions regarding

1  trial strategy, counsel cannot be said to have made a tactical decision without first procuring the

2  information necessary to make such a decision. *Reynoso v. Giurbino*, 462 F.3d 1099, 1112 (9th Cir.

3  2006). See *Williams v. Washington*, 59 F.3d 673, 681 (7th Cir.1995) ("Because investigation [of the

4  witnesses] might have revealed evidence bearing upon credibility (which counsel believed was the

5  sole issue in the case), the failure to investigate was not objectively reasonable."); *cf. Sanders v.*

6  *Ratelle*, 21 F.3d 1446, 1457 (9th Cir.1994) ("Ineffectiveness is generally clear in the context of

7  complete failure to investigate because counsel can hardly be said to have made a strategic choice

8  when s/he [sic] has not yet obtained the facts on which such a decision could be made." (citations,

9  emphasis, and internal quotation marks omitted))

10     The magistrate found trial counsel's failure to address the reason why Czodor could not

11  provide digital evidence with metadata justified and no evidence suggests that any of the evidence

12  presented at trial was manipulated or incomplete. Dkt. 73 at 90.

13     Given social media's pervasiveness in our culture, and the frequency with which people use

14  it compared to other forms of communication, social media evidence is a broader and deeper trove

15  of courtroom evidence than has ever been available before. At the same time, however, social media

16  evidence is uniquely vulnerable to alteration or forgery, particularly as advances in technology

17  allow so-called "bot" accounts to create social media content autonomously. *See, e.g.,* Onur Varol et

18  al.,*Online Human-Bot Interactions: Detection, Estimation, and Characterization*,

19  ARXIV:1703.03107v2 [cs.SI] (Mar. 27, 2017). Offering text messages, instant messages, tweets,

20  and social media posts of all types at trial is now commonplace. In *United States v. Vayner*, 769

21  F.3d 125, 131 (2d Cir. 2014) the U.S. Second Circuit Court of Appeals reversed a district court's

22  decision to admit screenshots from a social media profile that contained the defendant's name,

23  photo, and work history. *Vayner* holds that merely presenting evidence proving that a post came

24  from a particular user's account is insufficient to authenticate the post as actually coming from that

25  user. In June 2020, the American Bar Association reported on a British family law proceeding in

26  which a party doctored a recording of her spouse to make it sound like he was threatening her. Matt

27  Reynolds, *Courts and lawyers struggle with growing prevalence of deepfakes*, ABA J. (June 9,

28  2020). See also *U.S. v. Jackson*, 208 F.3d 633,636 (7th Cir. 2000); *Griffin v. State*, 19 A.3d 415,423

1   (Md. 2011); *Com. v. Purdy*, 945 N.E.2d 372, 381 (Mass. 2011).

2   Metadata is a primary factor in confirming a file's origin, date, and content. If Czodor's

3   print-out was intended to be used against Petitioner, the absence of digital evidence undermines the

4   authentication process. Given the simplicity of providing metadata, withholding it here raises

5   serious concerns regarding his intent and the credibility of the evidence. The deliberate decision to

6   withhold digital evidence containing metadata suggests a strong intent to obstruct Petitioner's

7   access to crucial information needed to ensure a fair trial.

8   Czodor's motivation for his failure to provide digital evidence could have exposed

9   inconsistencies in Czodor's testimony, supporting Petitioner's right to a fair trial. Counsel's failure

10  to cross-examine the witness about his motivation for testifying as he did was, accordingly, equally

11  unreasonable and cannot be considered "sound trial strategy." *Reynoso v. Giurbino*, 462 F.3d 1099,

12  1115 (9th Cir. 2006). The magistrate's recommendation disregards how easy it is to present digital

13  evidence with metadata, overlooking the significant implications of Czodor's failure to include it.

14  Similar to the absence of digital evidence, the absence of texts messages regarding the

15  agreement to keep his nude photos private permits a negative inference regarding the authenticity

16  and completeness of the evidence presented and entitles Petitioner to an adverse inference regarding

17  Czodor's credibility and motive, and any resulting prejudice should be weighed in favor of

18  Petitioner's right to a fair trial. The magistrate's reliance on counsel's closing argument to mitigate

19  the failure to question Czodor effectively does not address the impact of failing to elicit a definitive

20  answer from Czodor on cross-examination. Closing arguments are insufficient to remedy critical

21  errors made during trial, particularly where effective cross-examination could have changed the

22  jury's perception of the evidence. A belated attempt to raise this issue in closing fails to adequately

23  counter the prejudicial effect of an unchallenged assumption of privacy.

24  The magistrate concluded that had counsel elicited testimony about the victim's marriage, it

25  would not have benefited Petitioner defense or made her any less culpable. Dkt. 73 at 91. However,

26  Czodor's willingness to go on dates with Petitioner while married could reflect on his character for

27  honesty, casting doubt on his integrity and, potentially, his entire narrative. Since Czodor's

28  credibility is pivotal to the prosecution's case, details that challenge his integrity—such as his

dishonesty toward his spouse and his pattern of behavior in interacting with multiple women—are highly relevant and admissible for impeachment purposes. Questions about Czodor's extramarital conduct would not only have been permissible but also relevant to establishing a pattern that may call his integrity and truthfulness into question. In *United States v. Abel*, 469 U.S. 45, 52 (1984), the Supreme Court noted that credibility attacks on a witness are permissible when they help the fact-finder evaluate the witness's motivations or propensity for honesty. Bias may be induced by a witness' like, dislike, or fear of a party, or by the witness' self-interest. Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony. The "common law of evidence" allowed the showing of bias by extrinsic evidence, while requiring the cross-examiner to "take the answer of the witness" with respect to less favored forms of impeachment. *See generally* E. Cleary, McCormick on Evidence § 40, p. 89 (3d ed.1984); Hale, Bias as Affecting Credibility, 1 Hastings L.J. 1 (1949).

Czodor's marital strain, if it existed, is entirely his responsibility, due to his own infidelity. Infidelity and deceit are relevant factors in assessing a witness's character and credibility, particularly when these actions involve dishonesty, concealment, or self-serving motives. Under California Evidence Code § 780, jurors may consider a witness's motive, interest, and relationship to the case in weighing their testimony. Czodor's decision to date Petitioner while married suggests a willingness to deceive his spouse, which bears directly on his credibility as a witness. Courts have also recognized that personal misconduct, such as infidelity, may indicate a character for dishonesty, as in *People v. Wheeler*, 4 Cal. 4th 284, 296 (1992), where the court permitted the impeachment of a witness with prior dishonest acts. Misconduct involving moral turpitude may suggest a willingness to lie (see *People v. Castro* (1985) 38 Cal.3d 301, 314-315 [211 Cal.Rptr. 719, 696 P.2d 111]; *People v. White* (1904) 142 Cal. 292, 294 [75 P. 828]; *People v. Carolan* (1886) 71 Cal. 195, 196 [12 P. 52]; *Gertz v. Fitchburg Railroad* (1884) 137 Mass. 77, 78).

Jurors may consider a witness's personal motives and misconduct if they may lead the witness to fabricate or exaggerate claims. Czodor's infidelity, and the potential marital strain it created, are thus self-inflicted and irrelevant to Petitioner's actions. In fact, Petitioner is another

1  victim of Czodor's infidelity. The possibility that Czodor fabricated allegations to appease his

2  spouse or minimize the consequences of his infidelity is highly relevant and should have been

3  explored. If Czodor faced the discovery of his infidelity by his spouse, he might have had a

4  compelling motive to shift blame to Petitioner in order to minimize the personal repercussions.

5  Jurors may consider motives that a witness may have to fabricate testimony, especially when they

6  stand to benefit from such deception.

7      The exploration of potential motives to fabricate is permissible, particularly where there is a

8  personal incentive to deflect blame or mitigate personal wrongdoing. In *Napue v. Illinois*, 360 U.S.

9  264, 269 (1959), the U.S. Supreme Court emphasized that jurors must be fully informed of any

10  potential bias or motives of a witness to testify untruthfully. Czodor's potential interest in deflecting

11  blame onto Petitioner is thus relevant to the jury's full understanding of his credibility and should

12  not have been dismissed by concerns about discussing his marital strain.

13      The magistrate's reliance on the idea that questioning Czodor's marriage would result in

14  damaging testimony is legally flawed. Czodor's marital strain, if it existed, was a product of his

15  own actions, not Petitioner's. The possibility that Czodor fabricated allegations to deflect blame

16  from his infidelity is both factually plausible and legally relevant.

17      Given the inadequacy of counsel's investigation into Czodor's motives for testifying against

18  Petitioner, his failure at trial to cross-examine Czodor about his marriage and the absence of Lilly

19  on his Yelp page further rendered his performance deficient. *Reynoso v. Giurbino*, 462 F.3d 1099,

20  1114 (9th Cir. 2006)   (counsel's conduct was deficient under *Strickland*.)

21      Prejudice was found even when the prosecution's case has been stronger than in the instant

22  case. See *Rios v. Rocha*, 299 F.3d 796, 810–13 (9th Cir.2002) (holding that counsel's failure to

23  investigate and present witnesses was prejudicial when no physical evidence tied the defendant to

24  the shooting and the state's case rested on the testimony of **three eyewitnesses**); *Lord v. Wood*, 184

25  F.3d 1083, 1094-96 (9th Cir.1999) (holding that counsel's failure to interview witnesses who had

26  claimed to see the victim alive after the murder was prejudicial even though physical evidence tied

27  the defendant to the murder and two inmates testified that the defendant had confessed to them);

28  *Brown v. Myers*, 137 F.3d 1154, 1155–57 (9th Cir.1998) (holding that counsel's failure to

1  investigate and to locate and produce witnesses was prejudicial when **three witnesses** identified the

2  defendant as the shooter).

3       The magistrate found that Yelp pages do not include a given company's roster of customers.

4  Instead, at most, they identify only those who leave a review. And there is no reason to believe that

5  each and every one of the victim's customers posted a review about his company or that any

6  customer posted information on Yelp concerning the things that Petitioner had posted there. Dkt. 73

7  at 91. However, Czodor testified that Lilly was the person who reviewed his company on Yelp. Dkt.

8  4 at 61. He further testified that his customers on Yelp had notified him they had received links to

9  YouTube video. Dkt. 4 at 92.

10       First, trial counsel knew that Czodor's testimony would be at the very heart of the

11  prosecution's case. In other words, with no hard evidence on hand, the prosecutor clearly planned to

12  use Czodor's testimony based on his credibility as powerful evidence. A reasonable defense lawyer

13  would have attached a high importance to obtaining any evidence showing Czodor's dishonesty and

14  inconsistent allegations, in order to anticipate and find ways of deflecting the prosecutor's

15  arguments.

16       Second, the weak circumstantial evidence and inconsistency of his statements, raised a

17  strong likelihood that the jury would reject Czodor's credibility had trial counsel effectively cross-

18  examined Czodor regarding Lilly.

19       Third, trial counsel's actions and inactions were not the result of an informed tactical

20  decision about how the lawyers' time would best be spent. Although trial counsel had ample time to

21  realize that Czodor's credibility would be critical to the case, his failure to investigate would not

22  necessarily have been deficient if it had resulted from the lawyers' careful exercise of judgment

23  about how best to marshal his time and serve his client. But trial counsel did not ignore Lilly in

24  order to spend his time on other crucial leads. Trial counsel did not determine not to investigate

25  because it would necessarily divert him from other trial-preparation tasks he thought more

26  promising. Rather, trial counsel's complete failure "was the result of inattention, not reasoned

27  strategic judgment." *Wiggins v. Smith*, 539 U.S. 510, 534 (2003). As a result, his conduct fell below

28  constitutionally required standards. See id., at 533 ("'[S]trategic choices made after less than

1  complete investigation are reasonable' only to the extent that 'reasonable professional judgments

2  support the limitations on investigation'" (quoting *Strickland*, 466 U.S., at 690-691)).

3         In light of Czodor's testimony (Lilly reviewed his company on Yelp), trial counsel's failure

4  to pursue Lilly's existence as an impeachment strategy weakened Petitioner's defense and was thus

5  constitutionally inadequate. Lilly's absence from Czodor's Yelp page raises serious questions about

6  the credibility of his testimony. Without examining Czodor's veracity about Lilly, trial counsel

7  missed an opportunity to cast doubt on Czodor's entire testimony. The non-existence of Lilly

8  suggests Czodor may have fabricated Lilly to corroborate his claims; thus, cross-examining him

9  could have exposed inconsistencies and highlighted his motives to distort facts.

10        In the particular circumstances of this case, the attorneys' failure did not meet standards of

11 "reasonable professional judgmen[t]." Id., at 691.

12        **GROUND 24: DEFICIENT POLICE INVESTIGATION (Dkt. 73 at 92)**

13        The magistrate concluded that Petitioner cites no evidence establishing or indicating that any

14 of the evidence presented at trial was manipulated or that Czodor withheld exonerating video or

15 photographic evidence. Dkt. 73 at 95. Petitioner's inability to cite evidence is the direct result of the

16 police's failure to provide digital evidence, including all photos, screenshots and videos taken by

17 Czodor.

18        The police's failure to preserve and provide complete digital evidence, including metadata,

19 hinders Petitioner's ability to challenge the evidence and determine whether it has been

20 manipulated. Print-outs without metadata offer no way to verify authenticity, especially in a case

21 involving screenshots and other digital materials. The lack of digital evidence prevents Petitioner

22 from determining the context, date, and authenticity of materials that Czodor provided, depriving

23 her of this essential right.

24        While police have discretion in their investigatory methods, they are not relieved of their

25 duty to gather potentially exculpatory evidence or to ensure a fair and impartial investigation. The

26 U.S. Supreme Court has established that when police or prosecutors fail to preserve potentially

27 exculpatory evidence, it may result in a due process violation if the evidence "might be expected to

28 play a significant role in the suspect's defense." (*California v. Trombetta*, 467 U.S. 479, 480

1    (1984)). By failing to provide digital evidence and relying solely on Czodor's submissions, the

2    police failed to fulfill their duty to evaluate and verify the credibility of his claims impartially. Here,

3    the police's lack of independent investigation into Czodor's materials, coupled with their failure to

4    provide digital evidence to Petitioner, signifies an investigative lapse that denied Petitioner a fair

5    opportunity to challenge the evidence.

6          The magistrate found Petitioner provides no evidence to substantiate her claims concerning

7    the police investigation of the crimes underlying her conviction. Dkt. 73 at 95. Again, Petitioner's

8    inability to provide evidence is the direct result of the lack of police investigation. When there was

9    no police investigation, of course there was no evidence of police investigation.

10         Trial counsel's closing argument relied on pointing out investigative shortcomings,

11   highlighting the lack of a search warrant and digital analysis of Petitioner's electronic devices.

12   However, trial counsel's argument was not supported by the actual metadata and digital records,

13   leaving the jury with no concrete evidence to assess the police's investigative deficiencies.

14         The failure to collect digital evidence effectively forced trial counsel to make arguments

15   unsupported by tangible data, undermining Petitioner's defense. The magistrate's assertion that trial

16   counsel's closing argument was sufficient ignores the fact that counsel was deprived of essential

17   digital evidence. Law enforcement's failure to collect and disclose digital evidence with metadata

18   deprived Petitioner of the opportunity to challenge the credibility and integrity of the evidence

19   against her. This failure directly impacted trial counsel's ability to construct a robust closing

20   argument, thus infringing upon Petitioner's due process rights.

21         **Ground 26 IMPROPER AMENDMENT OF THE COMPLAINT (Dkt. 73 at 96)**

22         One day before the jury trial began on July 27, 2021 (Dkt. 3 at 29 and 230), the original

23   complaint (filed 8/6/19) was amended (filed 7 /26/21) concerning Count 2 (Pen. Code, § 273.6). In

24   the original complaint, the People alleged that petitioner violated a protective order by coming

25   within 100 yards of the protected person. In the amended complaint, the People alleged that

26   petitioner violated a protective order by failing "to deactivate website and created new websites."

27         Here, it's self-evident that the amendment shifts from a physical violation of proximity to an

28   alleged online activity, which changes the nature of the defense entirely. The amendment here

1    requires different evidentiary proof, such as website creation records and online activity, which

2    would not have been relevant to the original allegation.

3           This last-minute amendment, filed just one day before trial, essentially blindsided Petitioner,

4    altering the defense strategy by requiring her to defend against online activity allegations rather than

5    physical proximity violations.

6           The magistrate erred in finding that the amendment did not violate Petitioner's rights,

7    particularly by improperly shifting the burden onto Petitioner to show prejudice, rather than

8    requiring the prosecution to show good cause for the untimely amendment. Further, the magistrate's

9    reliance on *Morrison v. Estelle*, 981 F.2d 425 (9th Cir. 1992) and *Calderon v. Prunty*, 59 F.3d 1005

10   (9th Cir. 1995) is misplaced, as the facts of this case are notably distinguishable.

11          In *Morrison*, the defendant was charged with murder and his counsel had two days to

12   prepare for the felony-murder instructions given at trial. The Ninth Circuit found no due process

13   violation because the felony-murder instruction was given in response to evidence presented at trial,

14   and Morrison's counsel had sufficient time to prepare his closing argument on that theory. Unlike in

15   *Morrison*, Petitioner had no advance notice of the theory change in her charge; instead, the change

16   was made one day before trial, with no opportunity for her counsel to respond effectively.

17          Similarly, *Calderon* is distinguishable. In that case, the defendant was on notice of a lying-

18   in-wait theory early in the proceedings, and the specific method of murder did not need to be

19   alleged in the information for the defendant to be adequately informed of the charge. Unlike in

20   *Calderon*, where the defendant had ample opportunity to address all aspects of the charge, here the

21   amendment changed the entire nature of the alleged violation—from physical presence to online

22   actions—without any advance notice or evidence suggesting Petitioner could reasonably anticipate

23   such a shift. This substantive change required new types of evidence and entirely different defenses,

24   fundamentally altering Petitioner's trial preparation.

25          The amendment, which altered the factual basis for the violation of a protective order from

26   physical proximity to online conduct, is a substantive change that would require different

27   evidentiary support. Courts have found that such last-minute amendments violate due process when

28   they substantially prejudice the defendant's ability to prepare a defense. The amendment introduced

1  new elements that demanded distinct evidentiary preparation—specifically, records of website

2  creation and online activities—rather than evidence of physical proximity. This shift deprived

3  Petitioner of her ability to meaningfully defend against the charge in a timely and prepared manner,

4  contravening due process standards as outlined in *People v. Pitts*, 223 Cal. App. 3d 606, 906-907

5  (1990) (the opportunity to prepare a meaningful defense would obviously be adversely affected,

6  since the change in alleged acts would affect medical testimony, cross-examination of the alleged

7  victim(s), etc).

8       The magistrate's finding that Petitioner should have requested a continuance to counter the

9  effects of the last-minute amendment is legally unsound. Under both state and federal law, a

10  defendant has a right to a speedy trial, and requiring Petitioner to waive this right by requesting a

11  continuance to accommodate the prosecution's delay violates this principle. In *Barker v. Wingo*,

12  407 U.S. 514, 530 (1972), the U.S. Supreme Court held that the right to a speedy trial is

13  fundamental and cannot be waived lightly or without careful consideration.

14       This principle was echoed in *People v. Martinez*, 22 Cal. 4th 750, 768 (2000), where the

15  court ruled that the right to a speedy trial is essential to prevent unfair surprise or prejudice. By

16  amending the complaint at such a late stage, the prosecution effectively forced Petitioner to choose

17  between her right to a speedy trial and her right to adequate preparation. Such a choice violates her

18  constitutional rights by shifting the burden of prosecutorial delay onto the defendant.

19       The magistrate's finding that trial counsel's withdrawal of the motion to preclude

20  amendment demonstrated his "anticipation" of the amendment is factually incorrect and

21  misrepresents the impact of the prosecution's actions on Petitioner's constitutional rights. In reality,

22  trial counsel withdrew the motion only after the prosecution had already amended the complaint

23  over his objection, thus leaving no procedural recourse to prevent the amendment.

24       The magistrate found Petitioner identifies no evidence that she might have presented or

25  defense she might have pursued if the complaint had been amended earlier. Dkt. 73 at 99. However,

26  Petitioner has a well-founded basis for asserting prejudice, as the timing of the amendment

27  prevented her from gathering and presenting essential testimony that could have supported her

28  defense.

1    Given that the amended charge related to online conduct, Petitioner's defense required a

2    different approach than what would be relevant to a physical proximity violation. To challenge the

3    allegations, it is self-evident Petitioner would likely have pursued testimony from witnesses who

4    could speak to the veracity of Czodor's allegation. Preparation time is especially critical when

5    defendants need to secure witness testimony and adapt their defense strategy. The last-minute

6    amendment deprived Petitioner of this opportunity and impeded her ability to mount a viable

7    defense. Altering the grounds of a charge close to trial could prevent a defendant from presenting a

8    fair defense if it denies them access to crucial witnesses or evidence.

9    **Ground 27 RIGHT TO A SPEEDY TRIAL (Dkt. 73 at 100)**

10   The major evils protected against by the speedy trial guarantee exist quite apart from actual

11   or possible prejudice to an accused's defense. *United States v. Marion*, 404 U.S. 307, 320 (1971).

12   Arrest is a public act that may seriously interfere with the defendant's liberty, whether he is free on

13   bail or not, and that may disrupt his employment, drain his financial resources, curtail his

14   associations, subject him to public obloquy, and create anxiety in him, his family and his friends. *Id*.

15   The Supreme Court has held that a one-year post accusation delay will generally require a

16   full review. *Doggett v. United States*, 505 U.S. 647, 652 n. 1, 112 S. Ct. 2686 (1992).

17   The magistrate found none of the delay was attributable to the prosecution. Dkt. 73 at 102. A

18   delay of two years in a misdemeanor case is presumptively prejudicial and requires a strong

19   justification from the prosecution, which was lacking here. See *Doggett*, 505 U.S. at 657, 112 S.Ct.

20   2686 (holding that "negligence [is not] automatically tolerable simply because the accused cannot

21   demonstrate exactly how it prejudiced him").

22   In *Barker*, the Supreme Court noted, "The government, and for that matter, the trial court are

23   not without responsibility for the expeditious trial of criminal cases. The burden for trial promptness

24   is not solely upon the defense." *Barker v. Wingo* (1972) 407 U.S. 514, 527 n. 27, 92 S.Ct. 2182, 33

25   L.Ed.2d 101 (quoting *Hodges v. United States*, 408 F.2d 543, 551 (8th Cir. 1969)). In *Brillon*, the

26   Supreme Court stated that "institutional problems" and other "[d]elay resulting from a systemic

27   breakdown . . . could be charged to the State." *Vermont v. Brillon*, 556 U.S. 81, 92-94, 129 S. Ct.

28   1283, 173 L. Ed. 2d 231 (2009).

1    In addition to failing to actively push for trial by the prosecution, there is no record of any

2    valid explanation for the two-year delay in Petitioner's case. Nothing in the record supports any

3    good cause for the two-year delay. There was no discovery dispute or any pending motions over the

4    course of two-year delay. The prosecution, the trial court and public defender failed to meet their

5    duty to actively bring the case to trial, a systemic breakdown not attributable to Petitioner.

6    The magistrate found Petitioner waited until less than two weeks before trial to assert her

7    right to a speedy trial. Dkt. 73 at 102. This delay in asserting her right was not due to any intentional

8    waiver or neglect on Petitioner's part, but rather the direct result of inadequate representation by her

9    public defender. Petitioner was "kept in the dark" regarding her right to a speedy trial and the true

10   meaning of time waiver. Accordingly, she could not assert her right to a speedy trial without

11   knowing the full legal ramifications of doing so.

12   The two-year delay in a misdemeanor case far exceed any reasonable timeframe which is a

13   direct result of the trial court and the prosecution's negligence and the public defender's inadequate

14   representation.

15   The magistrate's finding that *Mathews v. Eldridge*, 424 U.S. 319 (1976), does not apply to

16   delays between arraignment and trial in criminal cases is legally unfounded. Dkt. 73 at 105.

17   *Mathews*' three-part balancing test for determining whether due process rights have been violated

18   has been cited and applied in a wide variety of contexts. See *Martinez v. McAleenan*, 385 F. Supp.

19   3d 349 (S.D.N.Y. 2019). Though *Barker* is the appropriate test for delay-related claims, the

20   *Mathews* test provides a useful framework for analyzing delays and their due process implications.

21   The *Mathews* balancing test, applied alongside or as a complement to the *Barker* test, helps

22   highlight the procedural deficiencies that can arise from excessive delays between arraignment and

23   trial.

24   **GROUND TWENTY-EIGHT: DENIAL OF MOTION TO DISMISS (Dkt. 73 at 105)**

25   The magistrate's finding that Petitioner's claim is not cognizable because it concerns state

26   law is a misinterpretation of both federal and state legal standards, particularly when the claim

27   involves a fundamental right, such as the right to a speedy trial under the Sixth Amendment.

28   The magistrate incorrectly frames Petitioner's claim as a state law procedural issue, ignoring

the constitutional implications. A court's refusal to consider a pretrial motion to dismiss based on a

violation of the right to a speedy trial is inherently linked to constitutional concerns. The U.S.

Supreme Court has held that the Sixth Amendment's speedy trial right is "fundamental" and thus

subject to federal habeas review. The case of *Barker v. Wingo*, 407 U.S. 514, 92 S. Ct. 2182 (1972)

underscores that the failure of the state court to provide relief for a speedy trial violation is

cognizable on federal habeas review, as it raises constitutional due process questions.

Moreover, while the trial court may have claimed that Petitioner's motion was untimely or

improperly noticed, the denial of a motion addressing a constitutional right—such as a motion to

dismiss for violation of the right to a speedy trial—cannot be excused based solely on procedural

technicalities. In *Zedner v. United States*, 547 U.S. 489, 509 (2006), the U.S. Supreme Court noted

that the government, and by extension the courts, cannot ignore speedy trial claims on procedural

grounds where there has been a clear constitutional violation. Therefore, even if Petitioner's motion

was improperly noticed, the court had an obligation to substantively address the constitutional claim

raised.

The magistrate appears to imply that because the trial court allowed Petitioner the

opportunity to refile her motion, her right to raise the issue was not denied. However, this overlooks

the essential point that a court's failure to timely address a properly raised constitutional concern,

especially in cases involving the right to a speedy trial, itself constitutes a violation.

Even if the magistrate asserts that Petitioner cannot show that the trial court would have

granted the motion, this reasoning is flawed because it shifts the burden away from the government

to ensure a fair and speedy trial. Under *Barker v. Wingo*, the length of the delay itself can create a

presumption of prejudice. When a defendant has been forced to endure an unreasonable delay, the

presumption of prejudice weighs in favor of the defendant, and it is the prosecution's burden to

justify the delay.

The magistrate concluded that the trial court found that Petitioner personally and repeatedly

waived time. However, the trial court made no specific findings on the record to support any

continuance, despite there was no discovery dispute. See *Zedner v. United States*, 126 S. Ct. 1976

1   (2006) (Alito, J.) (holding that the parties lack power to waive the public's interest in a speedy

2   criminal trial).

3       The record also fails to establish that Petitioner voluntarily and knowingly waived her right

4   to a speedy trial. Under both federal and California law, waivers of fundamental constitutional

5   rights, including the right to a speedy trial, must be made voluntarily, knowingly, and intelligently.

6   This requirement is underscored by the Supreme Court's decision in *Johnson v. Zerbst*, 304 U.S.

7   458, 464 (1938), which held that any waiver of a constitutional right must be done "with sufficient

8   awareness of the relevant circumstances and likely consequences."

9       Repeated continuances initiated by counsel do not inherently equate to a defendant's

10   knowing and voluntary waiver. See Dkt. 33 at 109-110. With six different public defenders cycling

11   through without conducting any substantive investigation, underscores significant issues with the

12   adequacy of her legal representation. The record indicates that Petitioner's counsel failed to

13   communicate basic court dates, leading to a bench warrant. Dkt. 3 at 21-22. The totality of

14   circumstances, missed court date, lack of investigation, and attorney turnover without explanation

15   suggest a breakdown in her legal representation and indicate professional neglect and disinterest.

16   No evidence supports that Petitioner knowingly, voluntarily, and intelligently waived her right to a

17   speedy trial because she received no benefit from the trial continuance.

18       **GROUND 31: CUMULATIVE ERROR (Dkt. 73 at 106)**

19       Contrary to the magistrate's conclusion, each of Petitioner's grounds for relief is meritorious

20   as explained herein.

21       **GROUND 32: INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL (Dkt. 73**

22   **at 109)**

23       As an initial matter, the magistrate erred in characterizing trial counsel's failure to provide

24   explanation after being asked as Petitioner's unsuccessful attempt to obtain a declaration from trial

25   counsel concerning his purported shortcomings. Dkt. 73 at 109.

26       Relying on *Dunn v. Reeves*, 594 U.S. 731 (2021), the magistrate reached the result that

27   Petitioner's appellate counsel IAC claim fails for lack of evidence because it is not supported by a

28   declaration from appellate counsel concerning his actions. However, *Reeves* is notably

1 distinguishable. Reeves' records suggested that his intelligence was below average, they also
2 indicated that he was not intellectually disabled. Despite that, Reeves sought habeas relief due to his
3 counsel's failure to hire an expert to develop additional evidence of intellectual disability. The court
4 concluded that his determination not to offer testimony or other evidence from his lawyers is
5 particularly signifcant given the "range of possible reasons [Reeves'] counsel may have had for
6 proceeding as they did." The court explained that Reeves is not a case in which a lawyer "failed to
7 uncover and present any evidence of [Reeves'] mental health or mental impairment, [or] his family
8 background." The court found counsel's initial enthusiasm to collect Reeves' records and obtain
9 funding hardly indicates professional neglect and disinterest. *Id*. at 740.

10         First, *Reeves* concerned trial counsel's strategic decision-making, where the Court noted that
11 Reeves' attorneys had gathered extensive records and funding and had presented mitigating
12 evidence. In that context, the failure to present additional expert testimony on intellectual disability
13 was seen as a reasonable strategy given the range of mitigating evidence already available.

14         In contrast, appellate counsel in this case did not exercise a similarly strategic choice among
15 potential claims. Petitioner is not asserting a complex trial strategy where multiple plausible choices
16 exist, but rather is raising an appeal where failure to address potentially meritorious issues suggests
17 a lack of diligence, rather than a strategic decision.

18         Additionally, unlike *Reeves*, the appellate counsel here did not attempt to investigate,
19 present, or argue any potentially exculpatory issues. *Reeves* does not control here because the nature
20 of the decision-making in the appellate context differs significantly. When an attorney fails to raise
21 claims that have a reasonable probability of success, the presumption of competence is weaker.

22         The magistrate's conclusion that Petitioner "does not identify any nonfrivolous claim that
23 counsel failed to raise on appeal" is factually incorrect. Petitioner's claims – that do not require
24 evidence outside records on appeal – in this habeas petition are self-evident that they could have
25 been raised on direct appeal and do not require additional identification.

26         Further, any claims here that were subject to dismissal due to procedural bar on grounds that
27 they should have been raised on appeal imply that these claims are based on the record available
28 during appellate proceedings, refuting the magistrate's assertion that no identifiable claims exist.

1   The magistrate found appellate Counsel could not have raised the ineffective-assistance-of-

2   trial counsel (IATC) claims on direct appeal because in California such claims must generally be

3   raised on habeas review, not on appeal. Dkt. 73 at 110. The general rule articulated in *People v.*

4   *Mendoza Tello*, 15 Cal. 4th 264, 266-67 (1997), is not an absolute bar; rather, it emphasizes the

5   necessity of additional fact-finding in many, but not all, IATC cases.

6   **GROUND 35: INSTRUCTIONAL ERROR (Dkt. 73 at 114)**

7   The magistrate erred in concluding that the trial court's failure to provide the correct

8   instruction to the jury on the amended charge was harmless, relying on her version of

9   "overwhelming evidence" presented in arguments that did not conform to the jury instructions. Dkt.

10  73 at 117.

11  While the magistrate points to the prosecutor's and defense counsel's arguments focusing on

12  the amended charge, arguments by counsel cannot cure instructional errors. It is well established

13  that jury instructions, not attorney statements, define the law for the jury to follow. In *Boyde v.*

14  *California*, 494 U.S. 370 (1990), the Supreme Court held that instructions, rather than arguments,

15  guide the jury's understanding of the applicable law. Additionally, the trial court's instructions

16  specifically directed the jury to disregard any conflicts between counsel's statements and the court's

17  instructions. The trial court explicitly instructed the jury "If you believe that the attorneys'

18  comments on the law conflict with my instructions, you must follow my instructions." Dkt. 4 at

19  146. The presumption here is that the jury followed the court's directive, focusing solely on the

20  instruction related to contact and messages rather than any discussions of online conduct. The

21  closing arguments is insufficient to cure instructional defects.

22  The magistrate concluded that Czodor testified that after the family court issued the

23  protective order, Petitioner posted his private photographs, created fake social media accounts in his

24  name, and posted defamatory and private things about him – including his home address and phone

25  number – on other "cheater" websites. First, the magistrate's analysis was legally flawed because

26  she improperly focused on the issuance of the protective order rather than on the date when

27  Petitioner was served with the order and became aware of its terms. Under both California law and

28  federal due process requirements, Petitioner could not have violated the protective order unless she

1   had actual notice of it at the time of the alleged conduct. No evidence showed any timestamp of any

2   alleged postings. Consequently, if Petitioner's alleged posts regarding Czodor were made even an

3   hour before she received the family court order, she cannot be held liable for actions taken before

4   being formally notified, even if both events occurred on the same day.

5        Second, Czodor's testimony confirmed that the printed representation of all "digital

6   evidence" presented at trial—including social media accounts, defamatory posts, and private

7   photographs—was entirely self-produced and provided by Czodor, without any independent third-

8   party verification or forensic analysis. Even the police officer never saw any alleged postings. Dkt.

9   6 at 178.

10        The reliance on unverified, self-serving print-outs, combined with the State's intentional

11   failure to collect forensic evidence and withholding of Czodor's inconsistent statements and

12   dishonesty history, suggests that the State may have engaged in a strategic tactic designed to

13   obscure the truth and deny Petitioner a fair trial.

14        In criminal trials, prejudicial instructional errors can violate due process when they create a

15   reasonable likelihood that the jury applied the instructions incorrectly, leading to an unfair trial

16   outcome. Incorrect instructions or omissions that mislead the jury on key elements of the offense

17   can deprive a defendant of a fair trial. Here, the trial court's instruction described the written order

18   that the defendant no contact, send any messages to, follow, or disturb the peace of the protected

19   person, rather than the amended charge of failing to remove online posts and websites. This

20   significant deviation misled the jury, especially given the confusing and contradictory nature of

21   evidence presented. The risk of prejudice was high, as jurors may have convicted Petitioner based

22   on conduct unrelated to the actual amended charge, raising substantial due process concerns.

23        The magistrate's reliance on the purportedly "overwhelming" evidence to assert that

24   Petitioner suffered no prejudice is misplaced. A jury is presumed to follow its instructions.

25   *Richardson v. Marsh*, 481 U. S. 200, 211 (1987). Here, the jurors were instructed to assess different

26   conduct than what was alleged in the amended charge, creating a risk of confusion. The fact that

27   both the prosecutor and defense counsel referenced the amended charge in closing arguments does

28

1   not override the explicit jury instruction from the court, as it is presumed that jurors follow judicial

2   instructions over attorney arguments (see *Weeks v. Angelone*, 528 U.S. 225, 234 (2000)).

3                    **PETITIONER'S REQUEST FOR AN EVIDENTIARY HEARING (Dkt. 73 at 119)**

4          In *Schlup v. Delo*, 513 U.S. 298, 327-332 (1995), the Supreme Court held that to

5   satisfy Carrier's "actual innocence" standard, a petitioner must show that, in light of the new

6   evidence, it is more likely than not that no reasonable juror would have found him guilty beyond a

7   reasonable doubt. The focus on actual innocence means that a district court is not bound by the

8   admissibility rules that would govern at trial, but may consider the probative force of relevant

9   evidence that was either wrongly excluded or unavailable at trial. The district court must make a

10  probabilistic determination about what reasonable, properly instructed jurors would do, and it is

11  presumed that a reasonable juror would consider fairly all of the evidence presented and would

12  conscientiously obey the trial court's instructions requiring proof beyond a reasonable doubt. The

13  *Carrier* standard, although requiring a substantial showing, is by no means equivalent to the

14  standard governing review of insufficient evidence claims. *Jackson v. Virginia*, 443 U. S. 307,

15  distinguished. In applying the *Carrier* standard to a petitioner's request for an evidentiary hearing,

16  the District Court must assess the probative force of the newly presented evidence in connection

17  with the evidence of guilt adduced at trial. The court is not required to test the new evidence by a

18  standard appropriate for deciding a motion for summary judgment, but may consider how the

19  submission's timing and the affiants' likely credibility bear on the probable reliability of that

20  evidence.

21         The subsequent acquittal on identical evidence in Petitioner's second trial undermines

22  confidence in the outcome of the initial trial and serves as compelling evidence of innocence,

23  supporting her claim that constitutional error led to her prior conviction. Petitioner has met her

24  burden to demonstrate no reasonable juror would find her guilty beyond a reasonable doubt. See

25  *House v. Bell*, 547 U.S. 518, 536-540 (2006) (rather than requiring absolute certainty about guilt or

26  innocence, a petitioner's burden at the gateway stage is to demonstrate that more likely than not, in

27  light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt.)

28  The second jury's determination of her acquittal, despite awareness of her prior convictions,

1  highlights flaws in the first trial's process that could have been influenced by constitutional errors,

2  meriting review of the additional trial records. Therefore, Petitioner's request to expand the record

3  should have been granted to prevent a miscarriage of justice. See *Coleman v. Hardy*, 628 F.3d 314,

4  322-23 (7th Cir. 2010) (evidentiary hearing warranted to develop evidence that, "but for

5  constitutional error, no reasonable factfinder would have found [petitioner] guilty"); *Dugas v.*

6  *Coplan*, 506 F.3d 1, 7 n.4 (1st Cir. 2007) (evidentiary hearing not barred because lack of factual

7  development on petitioner's prejudice issue due to state court's decision not to reach issue, not

8  petitioner's lack of diligence); *Garner v. Lee*, 908 F.3d 845, 860 (2d Cir. 2018) (federal evidentiary

9  hearing warranted when state court did not address merits of claim); *Lambert v. Warden Greene*

10  *SCI*, 861 F.3d 459, 472-73 (3d Cir. 2017) (same); *Lee v. Kink*, 922 F.3d 772, 774-75 (7th Cir. 2019)

11  (federal evidentiary hearing warranted when state made unreasonable factual determination).

12       In addition, in denying Petitioner's request for discovery and an evidentiary hearing, the

13  magistrate erred by depriving her of essential procedural rights necessary to substantiate her claim

14  of ineffective assistance of counsel. As outlined by the Ninth Circuit in *Detrich v. Ryan*, 740 F.3d

15  1237, 1246-47 (9th Cir. 2013), when assessing ineffective assistance claims, courts must often

16  inquire directly into an attorney's reasoning for particular strategic or tactical choices.

17       Without allowing Petitioner to present evidence in a hearing, the court has effectively

18  precluded a thorough examination of whether her trial counsel's conduct impacted the trial's

19  outcome, a direct violation of her right to counsel. By refusing Petitioner's requests, the magistrate

20  has denied Petitioner the opportunity to establish her claims fully, infringing upon her fundamental

21  due process rights.

22  **CONCLUSION**

23       Based on the foregoing, Petitioner respectfully requests that the Court not adopt the Report

24  and Recommendations. In the alternative, Petitioner has made a showing that reasonable jurists

25  would find the district court's assessment of the constitutional claims debatable or wrong. *Slack v.*

26  *McDaniel*, 529 U.S. 473, 484 (2000). Accordingly, a certificate of appealability should be granted.

27

28  DATED: 10/31/2024

1

2

/s/ Xingfei Luo
In Pro Per

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OBJ TO R&R

**CERTIFICATE OF SERVICE**

I declare that I electronically filed the forgoing with the United States District Court, Central District of California. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

In addition, I electronically served the forgoing to the following email address:

michael.butera@doj.ca.gov

I declare under penalty of perjury under the laws of the State of California and United States of America that the foregoing is true and correct.

Executed on October 31, 2024

/s/ XINGFEI LUO

XINGFEI LUO, In Pro Per

OBJ TO R&R

Attachment 1

Electronically Filed by Superior Court of California, County of Orange, 02/18/2022 09:48:00 AM.
30-2021-01216615-CL-MC-CJC - ROA # 22 - DAVID H. YAMASAKI, Clerk of the Court By Michael Porter, Deputy Clerk.

Case 8:23-cv-01640-MEMF-KES    Document 77    Filed 01/31/24    Page 95 of 264    Page
ID #:3111

# IN THE APPELLATE DIVISION OF THE SUPERIOR COURT
## OF THE STATE OF CALIFORNIA
## IN AND FOR THE COUNTY OF ORANGE

XINGFEI LUO,
Appellant and Defendant,

v.

THE PEOPLE OF THE STATE OF CALIFORNIA,
Respondent and Plaintiff.

No. 30-2021-01216615

Superior Court
No. 19CM06724

### SUPERIOR COURT OF ORANGE COUNTY
### CASE No. 19CM06724

Hon Robert A Knox, Presiding

---

## APPELLANT'S SUPPLEMENTAL OPENING BRIEF

---

*/s/ Xingfei Luo*
Xingfei Luo
Appellant and Defendant, In Pro Per

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ 2

STATEMENT OF THE CASE ..................................................................................... 3

STATEMENT OF FACTS ............................................................................................ 8

MEMORANDUM OF POINTS AND AUTHORITIES ....................................... 13

  I.   ARGUMENT ................................................................................................. 13

    A.   PROSECUTION'S WITHHOLDING MATERIAL EXCULPATORY EVIDENCE .. 13

    B.   PROSECUTORIAL MISCONDUCT AT TRIAL ......................................... 21

    C.   PUBLIC DEFENDER'S INEFFECTIVE ASSISTANCE OF COUNSEL HELPED CONVICT THE INNOCENT ....................................................................... 34

    D.   SLOPPY POLICE WORK .......................................................................... 56

    E.   PROSECUTION, PUBLIC DEFENDER AND TRIAL COURT'S VIOLATION OF APPELLANT'S RIGHT TO A SPEEDY TRIAL ......................................... 59

  II.  CONCLUSION ............................................................................................ 83

DECLARATION OF XINGFEI LUO ..................................................................... 85

## STATEMENT OF THE CASE

This is a textbook case of fabricated evidence, committed perjury, sloppy police work, prosecutorial misconduct, and bad lawyering.

After a nudist faked his damages and injuries, on August 6, 2019 Xingfei Luo ("Appellant") was charged by misdemeanor complaint with vandalism {Pen. Code,§ 594{a)/{b){2){A)), violation of a protective order {Pen. Code,§ 273.6(a)), and disorderly conduct (unlawful dissemination of private photographs and recordings) {Pen. Code, § 647{j)(4))(A). During the two years prior to jury selection, despite Appellant did not request reassignment of counsel, six public defenders cycled through her case. One trial date was set on Mar 24, 2020, Decl. Luo, ¶28, CT: 006, but later vacated due to building closure, CT:007. Despite the building closure lasted for only about two months, despite the Trial Court resumed jury trial since late May 2020, Decl. Luo, ¶29, Exhibit B, more than ten continuances were granted without a single objection raised by the prosecution, and the trial court repeatedly allowed the matter to be continued without finding good cause on the record despite Appellant did not request any continuance due to her own inability to appear at trial. Decl. Luo, ¶30.

During Appellant's arraignment while in custody on August 12, 2019, Appellant's appointed counsel failed to properly and fully advise her about her right to a speedy trial, a general time waiver was entered without Appellant's willful and intelligent consent and knowledge. Decl. Luo, ¶19 – 22, 26 – 31. Had Appellant known of the consequences flowing from agreeing to have trial at a later date, she would never have agreed on that but would have insisted on going to trial as soon as possible.

At the pretrial on September 6, 2019, the pretrial was continued to October 18, 2019 at the request of public defender instead of Appellant, despite no good cause stated on the record, the general time waiver was maintained without Appellant's willful and intelligent consent. Decl. Luo, ¶30. On October 18, 2019, the pretrial was continued to January 10, 2020 at the request of public defender instead of Appellant, despite no good cause stated on the record, the general time waiver was again maintained without Appellant's willful and intelligent consent. Despite "the state's need to investigate is presumably satisfied once it has filed charges" *Serna v. Superior Court*, 40 Cal.3d 239, 270 (Cal. 1985), five months after Appellant's charges were filed, on January 10, 2020, the pretrial was continued at the People's request to February 14, 2020, and a jury trial was set on March 24, 2020. Decl. Luo, ¶28, Exhibit A. On February 14, 2020, the pretrial was continued to March 20, 2020 at the request of public defender instead of Appellant, and the jury trial was to remain. On March 20, 2020, counsel made an appearance pursuant to Penal Code section 977 and entered a general time waiver without Appellant's willful and intelligent consent. The jury trial was vacated and the pretrial was continued to June 26, 2020 without Appellant's willful and intelligent consent.

Despite in late May 2020 the Orange County Superior Court already initiated the process of reopening and a large number of prospective jurors heeded the call of duty and came to the Court to serve our community, on July 14, 2020, both prosecution and public defender jointly requested a pretrial date on December 4, 2020 without Appellant's willful and intelligent consent. Appellant was not informed of the July 14, 2020 hearing and was not present at the hearing. Outrageous enough, public defender failed to inform

4

Appellant of her court date, Appellant did not appear at the pretrial on December 4, 2020 and a bench warrant was issued for her arrest. Decl. Luo, ¶31 – 34. On December 12, 2020, counsel appeared for Appellant pursuant to Penal Code section 977, the warrant was recalled, and a pretrial was set on March 5, 2021 with the general time waiver remaining without Appellant's willful and intelligent consent, with no good cause stated on the record. On March 5, 2021, the pretrial was continued to May 7, 2021, with the general time waiver remaining without Appellant's willful and intelligent consent. On May 7, 2021, a pretrial and mandatory settlement conference were set on June 8, 2021, with Appellant ordered to appear, and the general time waiver remaining without Appellant's willful and intelligent consent. On June 8, 2021, a jury trial was set on July 19, 2021, as day 0 of 10. Decl. Luo, ¶28 – 39.

Appellant did not discover the general time waivers until July 13, 2021. Decl. Luo, ¶28, Exhibit A. Waiver requires "an intentional relinquishment or abandonment of a known right or privilege". *Barker v. Wingo* (1972) 407 U.S. 514, 525 92 S.Ct. 2182, 33 L.Ed.2d 101. There is no doubt that none of the general time waivers was entered or maintained with Appellant's intentional relinquishment or abandonment of her right to a speedy trial. Appellant was unable to withdraw any of the general time waivers because she did not even know they existed. Had Appellant known of the general time waiver, she would never have failed to withdraw it. Decl. Luo, ¶33.

On July 19, 2021, public defender answered ready, but the People answered not ready despite the charges were filed almost two years ago, so the trial was trailed to July 26, 2021. Appellant made an oral motion for a *Marsden* hearing on Jul 19, 2021. CT: 042

– 065. The motion was denied after the hearing. RT: 1 – 32. Appellant requested to be granted self-representation so that she could file a *Serna* motion, but requested that she be represented by appointed counsel at trial. Appellant was advised of the perils, pitfalls, dangers, and disadvantages of self-representation, but she did not fill out the *Faretta* waiver. She stated that she wanted to have counsel but she wanted to file a motion to dismiss on her own. Later that day, Appellant filed a *Marsden* motion and a motion to dismiss. Despite a pretrial hearing on a motion to dismiss for denial of a speedy trial may exclude prosecution, *Shleffar v. Superior Court* (1986) 178 Cal.App.3d 937, the court informed Appellant that the motion to dismiss was not being accepted or considered because it was untimely and the People were not present. Appellant then stated that she no longer wished to represent herself. On July 26, 2021, the People requested a continuance of the jury trial, but it was denied. 720 days after the complaint was filed, despite of no finding of good cause to justify any belated amendment, the People amended the complaint, and the trial was trailed until the next day.

721 days after the complaint was filed, jury trial commenced on July 27, 2021. Public defender had nothing to offer, made no effort to suppress the introduction of Appellant's prior involuntary testimony in a family court, called no witness to the stand, presented no evidence from his own investigation, engaged in a lackadaisical and ineffective cross-examination of the prosecution's sole/star witness, stipulated with prosecution over an unlawful family court order, and allowed prosecution to introduce and misrepresent Appellant's prior testimony in a family court in violation of her Fifth, Sixth, and Fourteenth Amendment rights etc. On July 28, 2021, after the Accuser put on a

one man show, the People rested and Appellant's counsel made a motion pursuant to Penal Code section 1118.1, which was denied. On July 29, 2021, the jury found Appellant guilty of the three counts based on false evidence and perjured testimony. Society was the loser in this trial. The greatest crime of all in a civilized society is a wrongful conviction. It is truly a scandal, which reflects unfavorably on all the participants in the criminal justice system.

On August 13, 2021, Appellant was placed on informal probation for three years with terms and conditions including domestic violence terms and a jail term of 30 days. Due to the prosecution, public defender, and the trial court's violation of Appellant's right to a speedy trial, Appellant is subject to over $20,000 interest stemming from restitution. The case is currently pending on appeal.

Appellant's restraint, judgment of conviction, and sentence were unlawfully and unconstitutionally imposed in violation of her rights to (1) a trial by a fair and impartial jury, (2) a reliable, fair, non-arbitrary, and non-capricious determination of guilt and penalty, (3) effective assistance of counsel, (4) present a defense, (5) confrontation and compulsory process, (6) the privilege against self-incrimination, (7) the enforcement of mandatory state laws, (8) a trial free of materially false and misleading evidence, (9) a fair trial, (10) an impartial and disinterested tribunal, (11) equal protection, (12) due process of law, and (13) a speedy trial, as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, Article I, sections 1, 7, 9, 12, 13, 14, 15, 16, 17, 24, 27, and 28 of the California Constitution, state statutory and decisional law.

Appellant filed a pro se petition for writ of habeas corpus in the Superior Court of Orange County on Oct 13, 2021, Case # M-19285. Despite Appellant established a prima facie case for relief, Appellant's first habeas corpus petition was denied on Oct 19, 2021. The minute order was put in the mail three days later on Oct 22, 2021 and Appellant received the ruling on Oct 28, 2021.

On Nov 8, 2021 Appellant filed a pro se petition for writ of habeas corpus with this Court which was denied on Nov 10, 2021 without prejudice as premature.

## STATEMENT OF FACTS

While many of us prefer to spend our days fully clothed, some prefer to live their lives au naturel. In their birthday suits. Nude. Unclothed. They are naturists. Tomas Czodor ("Accuser" or "Czodor") grew up in Europe and was raised as a naturist. Decl. Luo, ¶56, Exhibit Q. Naturism is a lifestyle of social nudity, and the cultural movement which advocates for and defends that lifestyle. Both may also be referred to as nudism. However, these facts were not presented to the jury at trial, not even investigated by trial counsel which resulted in the withdrawal of a potentially meritorious defense. Trial counsel did not even bother to cross examine the Accuser after the nudist/accuser testified that his nude photo was taken on a nude beach. RT: 144 – 145.

The Accuser connected with Appellant through an online dating app in early August 2018. Prior to even meeting Appellant in person he openly told Appellant about his upbringing right off the bat while Appellant was a total stranger to him. Decl. Luo, ¶56, Exhibit Q. After the very first time the Accuser met Appellant in person he sent his nudes to Appellant while they were not in a dating relationship. Those nude photos were

taken on a nude beach when the Accuser was comfortable with public nudity. Decl. Luo, ¶67, Exhibit T. RT: 144 – 145. https://en.wikipedia.org/wiki/Nude_beach

Despite the Accuser met Appellant face to face only one time, he invited Appellant to a nudist ranch in Riverside named Olive Dell Ranch. Decl. Luo, ¶56, Exhibit Q, this exhibit was not presented to the jury.

In order to get rid of Appellant, the Accuser told her that he was going back to Europe prior to their second and last in-person gathering. Later Appellant discovered that the Accuser did not go back to Europe as he claimed. Decl. Luo, ¶56.

In Sep 2018 Appellant invoked her free speech right and expressed her opinion online regarding the Accuser's credibility. On Sep 10, 2018 it is unclear what was going through a sociopath's mind the Accuser made a false police report alleging terrorism. Decl. Luo, ¶41, Exhibit C, this exhibit was withheld by the prosecution. On Sep 18, 2018 Appellant peacefully showed up at the Accuser's residence and left without causing any damage to anything. On the night of Sep 18, 2018 the Accuser's secretly recorded his conversation with Appellant while he said to her "Who are you to me? Nobody. You are to me nobody. What you think, what we was? It was my wife, girlfriend, boyfriend, what have you been to me. Jesus Christ. I met you one or two times." RT: 101: 18 – 22.

On Sep 18, 2018 at 7:54 pm, the Accuser took a video showing Defendant tapping (not scratching) on his door with a key. Decl. Luo, ¶46, Exhibit H. The video shows the Accuser's front door area was brightly lit. Decl. Luo, ¶48 – 49, Exhibit J&K. The Accuser declared that he called his friend Chris Kovacs and he went outside of his residence to confront Appellant. The Accuser went on and declared that his friend

suggested to call 911, but not due to scratching his door. Decl. Luo, ¶47, Exhibit I. Prior to 8:07 pm the Accuser already went outside to confront Appellant but he testified he did not see Appellant scratching his front door. On Sep 18, 2018 at 8:07 pm, despite the Accuser testified he heard weird noises from scratching his door for 20 minutes, the 911 call was made alleging Appellant was knocking, instead of scratching the Accuser's front door. Decl. Luo, ¶42, Exhibit D. This fact was withheld by the prosecution and was not investigated by public defender. On Sep 18, 2018 at 8:13 pm, the Accuser secretly took a video obviously both parties were outside his residence while Appellant was unable to reach his front door. Decl. Luo, ¶46, Exhibit H. Between 7:54 pm and 8:13 pm on Sep 18, 2018, in the space of 19 minutes, the Accuser showed no difficulty in constantly taking photos and videos. Despite the Accuser testified that he heard Appellant weird noises from scratching his front door for 20 minutes he did not provide any photos or videos showing Appellant's action together with the damage. Oddly enough, prior to the 911 call was made, the Accuser already went outside to confront Appellant but he testified he did not see Appellant scratching his door after he heard Appellant scratching his door. The evidence regarding the time frame in which the events of that night unfolded raises serious questions as to whether there was foul play by the Accuser. Where was the Accuser and what was the Accuser doing during his hearing of 20 minutes' scratching?

On Sep 24, 2018 the Accuser learned that the removal of a post related to his credibility would cost money. In response, the Accuser indicated his plan to manufacture criminal charges. Decl. Luo, ¶44, Exhibit F, this exhibit was not presented to the jury and

10

not investigated by public defender. On Sep 25, 2018 the Accuser damaged his own front door and took a photo of the damaged door. Decl. Luo, ¶45, Exhibit G, the fact that the photo of the damaged door was taken on Sep 25, 2018 was not provided by the prosecution and was not investigated by public defender. The Accuser alleged that he did not notice his door was damaged until the following day after Appellant left his residence even though he heard 20 minutes of scratching and his front door area was brightly lit. Decl. Luo, ¶48 – 49, Exhibit J&K.

On Sep 26, 2018 the Accuser provided a stack of manufactured paper evidence to Santa Ana Police Department, including printout of screenshots and photos with no time stamp or metadata. This is by all accounts 21st century. The police did not bother to collect the electronic evidence and simply accept the paper evidence which made forensic examination unavailable to ascertain whether the screenshots and photos were tampered, manipulated, or manufactured. The police did not even bother to read the text messages from the Accuser's phone to ascertain whether those messages ever existed despite of the ease to create fake messages. Moreover, the paper evidence does not have time stamp to establish timeline of the events. No police officer ever observed the Accuser's nudes online and his damaged door. Decl. Luo, ¶61, Exhibit R, these facts were not presented to the jury.

The Accuser requested a domestic violence restraining order ("DVRO") against Appellant in Sep 2018 despite he did not have a dating relationship with Appellant. A temporary restraining order ("TRO") was served upon Appellant on Oct 2, 2018 at 11:34 am. Despite the mere fact of two face to face meetings between the parties was not

sufficient to establish a dating relationship, despite there was no legal basis and foundation whatsoever, the family court issued a DVRO against Appellant after a hearing on Oct 19, 2018 while Appellant was not represented by counsel. Decl. Luo, ¶55, Exhibit P.

At the family court hearing on Oct 19, 2018 the Accuser testified that he did not discover the door's damage on Sep 18, 2018 because it was dark but the photos and videos he took show otherwise. Decl. Luo, ¶45 – 50, Exhibit G – L. However, the fact that the Accuser lied about being dark was not presented to the jury.

Appellant sat through her jury trial. The jury was not instructed to decide whether the Accuser and Appellant had a dating relationship. Decl. Luo, ¶62, Exhibit S. Appellant was a percipient witness to the trial court proceedings and the events in the case. She requested and possesses the entire discovery file from public defender. Appellant has personal knowledge of what investigation counsel did or did not do. In September 2021 Appellant also confirmed with Mr. Jorge Dominguez that neither he nor any of his coworkers ever make contact with Chris Kovacs, the 911 operator, and the police officer arrived at the scene on Sep 18, 2018, or any of the accuser's so-called customers or friends. Decl. Luo, ¶64.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   ARGUMENT

When address whether the circumstances were so prejudicial as to require reversal the *Chapman* reversible error standard applies. *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065]; *People v. Ruthford* (1975) 14 Cal.3d 399, 408 [121 Cal.Rptr. 261, 534 P.2d 1341, A.L.R.4th 3132]. Under this test, "[a]n accused . . . is entitled to relief in such circumstances unless we can declare a belief that the denial 'was harmless beyond a reasonable doubt.' [Citation.]" (Ibid.) Thus, "[t]he defendant must make a showing of substantial materiality and even after this showing is made reversal is not required if the prosecution established the failure to was harmless beyond a reasonable doubt." *Id*. at p. 409.

### A.   PROSECUTION'S WITHHOLDING MATERIAL EXCULPATORY EVIDENCE

"There is an epidemic of *Brady* violations abroad in the land. Only judges can put a stop to it." *United States v. Olsen*, 737 F.3d 625, 626 (9th Cir. 2013).

The United States Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland* (1963) 373 U.S. 83, 87 83 S.Ct. 1194, 10 L.Ed.2d 215(*Brady*). The high court has "since held that the duty to disclose such evidence is applicable even though there has been no request by the accused, [citation], and that the duty encompasses impeachment evidence as well as exculpatory evidence, [citation].

13

Such evidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Strickler v. Greene* (1999) 527 U.S. 263, 280, 119 S.Ct. 1936, 144 L.Ed.2d 286. "Moreover, the rule encompasses evidence 'known only to police investigators and not to the prosecutor.' [Citation.] In order to comply with *Brady*, therefore, 'the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police.' " (Id. at pp. 280-281, 119 S.Ct. 1936.) "The obligation under *Brady* and *Giglio* is the obligation of the government, not merely the obligation of the prosecutor." *U.S. v. Blanco* (9th Cir. 2004) 392 F.3d 382, 393. Accordingly, " '[e]xculpatory evidence cannot be kept out of the hands of the defense just because the prosecutor does not have it, where an investigating agency does.' " (Id . at pp. 393-394.) In *In re Ferguson* (1971) 5 Cal.3d 525, 532-533 [96 Cal.Rptr. 594, 487 P.2d 1234], the California Supreme Court imposed a strict duty upon prosecutors by requiring them to disclose substantial material evidence favorable to the accused without request.

Evidence favorable to the accused is equated to exculpatory material, and includes impeachment evidence. See *Giglio v. United States*, 405 U.S. 150 (1972). Material evidence in this context is evidence "which `tends to influence the trier of fact because of its logical connection with the issue.' [Citation.]" *People v. Morris* (1988) 46 Cal.3d 1, 30, fn. 14 [249 Cal.Rptr. 119, 756 P.2d 843].) The duty to disclose evidence favorable to the accused extends to evidence which may reflect on the credibility of a material witness. *People v. Ruthford* (1975) 14 Cal.3d 399, 406 [121 Cal.Rptr. 261, 534 P.2d

14

1341, A.L.R.4th 3132]; see also *Giglio v. United States* (1972) 405 U.S. 150, 153 [31 L.Ed.2d 104, 108, 92 S.Ct. 763]. The above cited cases hold this duty on the part of the prosecution to disclose all substantial material evidence favorable to an accused at trial stems from the due process clause of the Fourteenth Amendment of the Constitution. "The prosecution's duty of disclosure extends to all evidence that reasonably appears favorable to the accused, not merely to that evidence which appears likely to affect the verdict." *Morris*, supra, 46 Cal.3d 30, fn. 1, original italics. The duty of disclosure, however, does not end when the trial is over. "[A]fter a conviction the prosecutor also is bound by the ethics of his office to inform the appropriate authority of after-acquired or other information that casts doubt upon the correctness of the conviction." *Imbler v. Pachtman* (1976) 424 U.S. 409, 427, fn. 25 [47 L.Ed.2d 128, 141-142, 96 S.Ct. 984]; see also *People v. Gonzalez* (1990) 51 Cal.3d 1179, 1261 [275 Cal.Rptr. 729, 800 P.2d 1159]; rule 5-220, Rules Prof. Conduct of State Bar; ABA Model Code Prof. Responsibility, DR 7-103(B), EC 7-13; ABA Model Rules Prof. Conduct, rule 3.8(d).) The Ninth Circuit Court of Appeals found the prosecution had a duty to turn over exculpatory evidence relevant to a habeas corpus proceeding. *Thomas v. Goldsmith* (9th Cir. 1992) 979 F.2d 746, 749-750.

"The duty of the district attorney is not merely that of an advocate. His duty is not to obtain convictions, but to fully and fairly present to the court the evidence material to the charge upon which the defendant stands trial, and it is the solemn duty of the trial judge to see that the facts material to the charge are fairly presented. [Citations.] In the light of the great resources at the command of the district attorney and our commitment

that justice be done to the individual, restraints are placed on him to assure that the power committed to his care is used to further the administration of justice in our courts and not to subvert our procedures in criminal trials designed to ascertain the truth. "The search for truth is not served but hindered by the concealment of relevant and material evidence. Although our system of administering criminal justice is adversary in nature, a trial is not a game. Its ultimate goal is the ascertainment of truth, and where furtherance of the adversary system comes in conflict with the ultimate goal, the adversary system must give way to reasonable restraints designed to further that goal."

The following evidence was never provided by the government to Appellant at any point prior to, during, or after jury trial.

### 1. Police Field Activity Report on Sep 10, 2018

At trial, the prosecution presented the text messages provided by the Accuser in paper form, not extracted from the Accuser's phone by the police, to establish that Appellant was telling the Accuser beforehand what she was going to do. Appellant threatened the Accuser to post his nudes, allegedly on Sep 7, 2018. Decl. Luo, ¶67, Exhibit T. RT: 120 – 124, 150 – 153, 264 – 265. The Accuser also testified at trial he called the police the following week after Sep 7, 2018.

The police field activity report on Sep 10, 2018 clearly constituted evidence relating to the Accuser's credibility as the prosecution's ONLY witness with respect to whether Petition threatened and posted the Accuser's nude photos. Decl. Luo, ¶41, Exhibit C. Had Appellant threatened him and posted his nudes, the option to tell the truth was available to the Accuser at that time. Yet, he called the police and alleged unfounded

terrorism on Sep 10, 2018. While considering evidence, the Court should keep in mind that the police never properly collected evidence. The "evidence" admitted at trial was a stack of paper printout provided by the Accuser. No metadata or time stamp was ever examined. The Sep 10, 2018 report alone constituted exculpatory evidence the District Attorney was obligated to turn over to Appellant. *Giglio*, supra, 405 U.S. 150; *Ruthford*, supra, 14 Cal.3d 399. What reasonable person, when they're being threatened by dissemination of nudes, would just sit there and not call the police or call the police but said something else? What reasonable person, after they were threatened by dissemination of nudes, would just sit there and wait until the police cannot see the nudes to call the police?

It is uncontroverted that the government possessed the Sep 10, 2018 report and Appellant's counsel had no knowledge of it prior to, during, or after trial. This evidence alone "leaves no room for doubt" that the government wrongfully deprived Appellant of exculpatory evidence bearing on the credibility of the Accuser. *Morris*, supra, 46 Cal.1181 3d 30, 31.

## 2. Police Field Activity Report on Sep 18, 2018

Here is the chronology of events that took place on the night of Sep 18, 2018 and afterwards:

Sep 18, 2018 7:54 pm The accuser took a video showing Defendant tapping (not scratching) on his door with a key. Decl. Luo, ¶46. It is reasonably believed that Appellant arrived at the Accuser's residence at 7:54 pm.

Sep 18, 2018 7:55 pm – 8:06 pm The Accuser already came outside from his

house. Decl. Luo, ¶47, Exhibit I.

Sep 18, 2018 8:07 pm The 911 call was made, no mention of scratching or weird noises. Decl. Luo, ¶42.

Sep 18, 2018 8:13 pm The Accuser secretly took a video obviously both parties were outside his residence on the street while Appellant was unable to reach his front door. Decl. Luo, ¶46.

Sep 19, 2018 The Accuser discovered the damage to his door. RT: 168.

Sep 24, 2018 The Accuser learned that it would cost him money to remove a post related to his credibility. Decl. Luo, ¶44, Exhibit F.

Sep 25, 2018 The Accuser took a photo of his allegedly damaged door. Decl. Luo, ¶45, Exhibit G.

Sep 26, 2018 police report was made.

On Oct 19, 2018 the Accuser testified that he heard weird noises while Appellant scratched his door for 20 minutes on Sep 18, 2018. Decl. Luo, ¶45, Exhibit G. Family court transcript at p. 34. The police field activity report on Sep 18, 2018 shows that at 8:07 pm, the 911 call was made alleging Appellant was knocking, instead of scratching the Accuser's front door. Decl. Luo, ¶42, Exhibit D. Had Appellant scratched the Accuser's door creating weird noises for 20 minutes, the option to tell the truth was available to him when he called 911. Yet, he told 911 operator that Appellant simply knocked on his door. Throughout the night on Sep 18, 2018 the Accuser had no trouble in constantly taking photos and shooting videos but he provided no videos showing the weird noises he testified he heard for 20 minutes, not a single clip or second. Again, what

reasonable person, when they're hearing their door being scratched for 20 minutes, would just called 911 emergency and said an uninvited person knocked on his door? What reasonable person, after they heard their door being scratched for 20 minutes, would not suspect damage and check the door right away? What reasonable person, after they heard their door being scratched for 20 minutes, would lie about being dark to explain away his failure to discover the damage right away? What reasonable person, after they discovered their door's damage on Sep 19, 2018, would sit there and call the police six days later? RT: 168. What reasonable person, after they discovered their door's damage on Sep 19, 2018, would just sit there and wait, until he learned on Sep 24, 2018 that it would cost money to remove a post related to his credibility, then right after he learned such fact he took a photo of the allegedly damaged door and went to the police on Sep 26, 2018? Decl. Luo, ¶61, Exhibit R. It turns out what prompted the Accuser to immediately approach the police was neither the damaged door nor his nude photos but the fact that it would cost him money to do certain thing, namely revenge. See *Carter v. Burch*, 34 F.3d 257, 260 (4th Cir. 1994) [Prior to the shooting, alleged victim said "I hate him so much . . . I would shoot myself even if I died if I could make it look like he did it so he would spend the rest of his life in jail, ruin the rest of his life".]

However, there is no court in the United States can enjoin Appellant from forming or expressing her opinion about someone's credibility. Although the accuser alleged the cheater post caused him damage and harm, he never spent a dime on the removal of the post despite he made more than sufficient money to remove any post. Decl. Luo, ¶45, Exhibit N.

19

Had Appellant posted the Accuser's nude photos the option to call the police right away was available to him yet he waited until the police could not observe any nude photos to approach the police or he was buying time to fabricate evidence? Both the reports on Sep 10, 2018 and Sep 18, 2018 show that the Accuser kept changing his story and was untruthful, from unfounded terrorism to posting nude photos and extortion, from knocking his door to scratching his door. "[S]uppression of substantial material evidence bearing on the credibility of a key prosecution witness is a denial of due process. . . ." *Ruthford*, supra, 14 Cal.3d at p. 408.

### 3.  Tomas Czodor's Prior Criminal Convictions and Deportation Record

The Accuser, Tomas Czodor, was prosecution's sole witness. He was previously convicted of, by OCDA, same prosecuting agency who prosecuted Appellant, advertising as a general contractor while he was not which is no different than fraud. He was also convicted of probation violation. His convictions rested upon facts establishing dishonesty or false statement. Decl. Luo, ¶43, Exhibit E. Czodor's criminal record could have been obtained with a simple click of a computer mouse. Instead, the prosecution engaged in strategic and willful ignorance, even though it knew that Czodor's credibility was central to proving the case. To make matters worse, the prosecution went on to bolster Czodor's testimony with the argument that in the dark of the night Czodor might not have seen when she was scratching his door, when in fact Czodor's front door was ablaze with light, and then compounded this error by urging the jury to credit his testimony because of his lie. RT: 292.

Not only the Accuser has proven records of untruthfulness with the intent to

defraud the general public, he was also arrested by FBI, arrested by local police for impersonation, and subject to deportation. Decl. Luo, ¶43.

Here, the Government's case depended almost entirely on Czodor's testimony and his self-made evidence; Czodor's credibility as a witness was therefore an important issue in the case, and evidence of his criminal background and deportation record would be relevant to his credibility. Coupled with other exculpatory evidence withheld by the prosecution, the withheld evidence combined does more than merely impeach this nudist/accuser — it tends to destroy his testimony by raising grave doubts about his veracity and credibility. Contrary to Czodor's rap sheet, Appellant was never arrested, convicted, or even ticketed before she crossed path with this nudist/accuser who has been proven to be a habitable liar.

*United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) set out a three part test for obtaining relief based on suppression of exculpatory evidence. (1) The prosecution withheld or suppressed evidence; (2) The evidence was favorable to the defense; (3) The evidence was material to either guilt or punishment. As discussed above, there is no doubt that Appellant did not receive a fair trial. It is more than obvious that prosecution's intentional failure to disclose exculpatory evidence under *Brady* was made with the specific intent to avoid the possibility of an acquittal. Appellant is entitled to a reversal.

## B. <u>PROSECUTORIAL MISCONDUCT AT TRIAL</u>

That the prosecuting attorney overstepped the bounds of that propriety and

fairness which should characterize the conduct of such an officer in the prosecution of a criminal offense is clearly shown by the record. RT: 117 – 125, 214 – 216, 262 – 298. He was guilty of misstating the facts in his presentation of case; of putting into the mouth of Appellant things which she had not said; of suggesting by his questions that he had proved his case beyond reasonable doubt; of assuming prejudicial facts not in evidence; and in general, of conducting himself in a thoroughly indecorous and improper manner.

As a public official charged with representing the general interest and attaining justice, a prosecutor may have special stature in the eyes of the jury, and so his or her misstatements may carry significant weight. See *People v. Donaldson* (2001) 93 Cal.App.4th 916, 932. "While he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one. … [i]mproper suggestions, insinuations and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none." *Berger v. United States*, 295 U.S. 78, 88 (1935).

## 1. Unlawfully Introducing Appellant's Compelled Testimony, While At the Same Time Misrepresenting Appellant's Prior Testimony

"Every criminal defendant is privileged to testify in his own defense, or to refuse to do so." *Harris v. New York* (1971) 401 U.S. 222, 225 [28 L.Ed.2d 1, 91 S.Ct. 643, 645].) The defendant's 'absolute right not to be called as a witness and not to testify' arises from the Fifth Amendment to the United States Constitution and article I, section 15 of the California Constitution. *Cramer v. Tyars* (1979) 23 Cal.3d 131, 137 [151

Cal.Rptr. 653, 588 P.2d 793]. The Fifth Amendment provides that no person 'shall be compelled in any criminal case to be a witness against himself.' The Amendment not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings. *McCarthy v. Arndstein*, 266 U.S. 34, 40, 45 S.Ct. 16, 17, 69 L.Ed. 158 (1924), squarely held that '(t)he privilege is not ordinarily dependent upon the nature of the proceeding in which the testimony is sought or is to be used. It applies alike to civil and criminal proceedings, wherever the answer might tend to subject to criminal responsibility him who gives it. The privilege protects a mere witness as fully as it does one who is also a party defendant.'

In order to be admitted in our courts, inculpatory statements obtained must have been made voluntarily. See *In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 177, 200 (2d Cir. 2008); see id. at 208 (noting that "statements obtained under . . . circumstances" where suspects were "forced to speak" to the agents of a foreign state "could not be admitted in a U.S. trial if the situation indicated that the statements were made involuntarily"); *Brulay v. United States*, 383 F.2d 345, 349 n.5 (9th Cir. 1967) ("[I]f the statement is not voluntarily given, whether given to a United States or foreign officer[ ]—the defendant has been compelled to be a witness against himself when the statement is admitted."); *United States v. Allen*, 864 F.3d 63, 101 (2d Cir. 2017) (holding that "the Self–Incrimination Clause prohibits the use and derivative use of compelled testimony in an American criminal case against the defendant who provided that

23

testimony"); As a general matter, courts' descriptions of statements as "compelled" (invoking the text of the Self-Incrimination Clause) and/or "involuntary" (invoking, arguably, the Due Process Clause) are often used interchangeably and the words often treated synonymously.

Although tactical decisions at trial are generally counsel's responsibility, the decision whether to testify, a question of fundamental importance, is made by the defendant after consultation with counsel. *People v. McKenzie* (1983) 34 Cal.3d 616, 631, fn. 9 [194 Cal.Rptr. 462, 668 P.2d 769]; *U.S. v. Martinez* (9th Cir. 1989) 883 F.2d 750, 755, vacated on other grounds (1991) 928 F.2d 1470; see also *People v. Robles* (1970) 2 Cal.3d 205, 215 [85 Cal.Rptr. 166, 466 P.2d 710].)" *People v. Hines* (1997) 15 Cal.4th 997, 1032 [64 Cal.Rptr.2d 594, 938 P.2d 388].

It is indisputable that, in a family court proceeding, Appellant was entitled to invoke the Fifth Amendment right. No court could have forced Appellant to testify in a deposition or at a trial so long as the potential for criminal charges remained. Here, however, when called to respond in a family court proceeding, Appellant could not afford counsel and was compelled to testify. With no legal mechanism available to avoid testifying in a family court proceeding Appellant could not invoke her right to remain silent without counsel. Appellant's testimony was involuntarily given in a family court and therefore was compelled.

*McCarthy v. Arndstein* reflected the settled view that the object of the Fifth Amendment 'was to insure that a person should not be compelled, when acting as a witness in any investigation, to give testimony which might tend to show that he himself

24

had committed a crime.' *Counselman v. Hitchcock*, 142 U.S. 547, 562, 12 S.Ct. 195, 198, 35 L.Ed. 1110 (1892). See also *Bram v. United States*, 168 U.S. 532, 542—543, 18 S.Ct. 183, 186—187, 42 L.Ed. 568 (1897); *Brown v. Walker*, 161 U.S. 591, 16 S.Ct. 644, 40 L.Ed. 819 (1896); *Boyd v. United States*, 116 U.S. 616, 634, 637—638, 6 S.Ct. 524, 534, 536—537, 29 L.Ed. 746 (1886); *United States v. Saline Bank*, 1 Pet. 100, 7 L.Ed. 69 (1828). A witness protected by the privilege may rightfully refuse to answer unless and until he is protected at least against the use of his compelled answers and evidence derived therefrom in any subsequent criminal case in which he is a defendant. *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). Absent such protection, if he is nevertheless compelled to answer, his answers are inadmissible against him in a later criminal prosecution. *Bram v. United States*, supra; *Boyd v. United States*, supra.

In its holding, the *Kastigar* Court emphasized the breadth of use and derivative use protection. Such protection "prohibits the prosecutorial authorities from using the compelled testimony in any respect, . . . therefore insur[ing] that the testimony cannot lead to the infliction of criminal penalties on the witness." *Kastigar*, 406 U.S. at 445. As the *Kastigar* Court observed, "[t]his total prohibition on use provides a comprehensive safeguard, barring the use of compelled testimony as an investigatory lead, and also barring the use of any evidence obtained by focusing investigation on a witness as a result of his compelled disclosures." Because this "very substantial protection[] [is] commensurate with that resulting from invoking the privilege itself," it "leaves the witness and the prosecutorial authorities in substantially the same position as if the

witness had claimed the Fifth Amendment privilege." *Kastigar*, 406 U.S. at 460 – 462.

*Kastigar* also established a doctrine to enforce this protection. When a witness has been compelled to testify relating to matters for which he is later prosecuted, the government bears "the heavy burden of proving that all of the evidence it proposes to use was derived from legitimate independent sources." This burden is "not limited to a negation of taint; rather, it imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony." *Kastigar*, 406 U.S. at 460. The Government must prove it has met this heavy, albeit not insurmountable, burden by a preponderance of the evidence. *United States v. Nanni*, 59 F.3d 1425, 1431–32 (2d Cir. 1995).

In this prosecution, Appellant's compelled testimony in the family court was unlawfully "used" against her through the testimony provided by prosecution's sole witness at trial. Decl. Luo, ¶51, Exhibit G. Family court transcript at p. 9 – 10. RT: 173 – 179. The introduction of Appellant's prior testimony in a civil proceeding when she was not represented by counsel violated her Fifth, Sixth, and Fourteenth Amendments rights.

Further, the prosecution falsely alleged that "She said she didn't need his permission. It was her story. Did you post the videos? "Well, maybe some of them." Under oath, spoke to the judge in that hearing and admitted that. The evidence is abundantly and absolutely clear she's guilty of Count III," Decl. Luo, ¶67, Exhibit T. RT: 274 – 275, when in fact the original testimony in family court is:

THE COURT: YOU CREATED ONE?

MS. LUO: YEAH.

26

THE COURT: WITH HIS PERMISSION?

MS. LUO: BECAUSE --

THE COURT: YES OR NO WITH HIS PERMISSION?

MS. LUO: BUT IT DEPENDS ON WHAT CONTENT OF THAT VIDEO.

THE COURT: WELL, MA'AM, YOU SAID YOU

POSTED ONE. I JUST WANT TO KNOW IF YOU HAD HIS

PERMISSION TO PUT HIM ON YOUTUBE.

MS. LUO: BECAUSE THAT'S ABOUT ME, ABOUT

MY STORY. I DON'T NEED HIS PERMISSION.

THE COURT: IS THERE A PICTURE OF HIM ON IT?

MS. LUO: NO.

Decl. Luo, ¶51, Exhibit G.

The prosecution falsely alleged that "Her response was, "It's been taken down."

Ask yourself -- I invite you to ask you – amongst yourselves when you deliberate, how

would she know it's been taken down if she's not the one that put it up, and she has no

idea? Why at that point would she not say the court, I never posted that. What are you

talking about?", RT: 267, while in fact the original testimony in the family court is:

THE COURT: MY QUESTION IS, DID YOU CREATE THIS?

MS. LUO: I DON'T RECALL.

THE COURT: BUT YOU DO KNOW IT WAS TAKEN DOWN?

MS. LUO: BECAUSE I SEARCHED WHEN I GOT

THE REQUEST FOR RESTRAINING ORDER, I SEARCHED.

IT'S BEEN TAKEN DOWN.

Decl. Luo, ¶51, Exhibit G.

Prosecution's false representation is outrageous. This is a senseless frame job. This prosecutor should be disbarred.

### 2.  Making Inappropriate or Inflammatory Suggestions

Although prosecutors have wide latitude to draw inferences from the evidence presented at trial, mischaracterizing the evidence is misconduct. *People v. Avena* (1996) 13 Cal.4th 394, 420 [53 Cal.Rptr.2d 301, 916 P.2d 1000].

Throughout the trial the prosecution repeatedly called Appellant's failure to deny to the jury's attention and proceeded to argue that it was indicative of guilt. The prosecution stated "At no point does she say anything to say that she didn't to that, right? She never said, what are you talking about? I would never do that. This is a misunderstanding. No way. What reasonable person, when they're being directly accused of that, would just sit there and not in some way deny it? And she doesn't deny it in any way. "I was emotional." And she admits it again in court, and you should find that she's fully admitting to that crime. And it's clear that she did it, and she is absolutely guilty of Count III." RT: 268. Based on an edited and incomplete video obviously, in the setting of an altercation that was about to be upgraded in the middle of the street—such as it was—it is likely that Appellant denied it while her denial was not recorded, or Appellant disdained to deny while it was so obvious a hoax, or her failure to deny may be an attempt to avoid further altercation, or the Accuser, who was the aggressor, withheld the recording of the next part of the altercation showing Appellant denied it, or she

thought it was unnecessary to deny because she was in fact innocent. Innocent people falsely accused often believe in "a just world and in the transparency of their own blameless status.... [T]hose who stand falsely accused also have faith that their innocence will become self-evident to others. As a result, they are not calculated to choose their words or action, often not realizing that they are being framed or set up and later trapped by false evidence and perjured testimony. The "lesson of history," our Supreme Court has observed, is "that a system of criminal law enforcement which comes to depend on the 'confession' will, in the long run, be less reliable and more subject to abuses than a system which depends on extrinsic evidence independently secured through skillful investigation." *Escobedo v. Illinois* (1964) 378 U.S. 478, 489–490, 84 S.Ct. 1758, 12 L.Ed.2d 977, fns. omitted.

The prosecution stated "But ask yourself, reasonably, why in the word is she knocking on the door with keys -- with metal keys? Why in the world would you be knocking on the door with metal keys?" RT: 292. Such line of questions implies that the only purpose to use a metal object to knock on a door is to damage the door. However, there are five materials that are most commonly used to make door knockers - cast iron, pewter, copper, stainless-steel and brass. Each comes with different benefits such as copper does not rust, stainless-steel has anti-freezing properties, brass and cast iron are most durable. https://foter.com/best-door-knockers Such suggestion tends to make the prosecutor his own witness-offering unsworn testimony not subject to crossexamination. It has been recognized that such testimony, 'although worthless as a matter of law, can be "dynamite" to the jury because of the special regard the jury has for the prosecutor, thereby

effectively circumventing the rules of evidence.' [Citations.]" *People v. Bolton* (1979) 23 Cal.3d 208, 213-214 [152 Cal.Rptr. 141, 589 P.2d 396; *People v. Benson* (1990) 52 Cal.3d 754, 794 [276 Cal.Rptr. 827, 802 P.2d 330] ["a prosecutor may not go beyond the evidence in his argument to the jury"]; *People v. Miranda* (1987) 44 Cal.3d 57, 108 [241 Cal.Rptr. 594, 744 P.2d 1127]; *People v. Kirkes* (1952) 39 Cal.2d 719, 724 [249 P.2d 1]; *Berger v. United States*, 295 U.S. 78, 85 (1935) [The prosecuting attorney's argument to the jury was undignified and intemperate, containing improper insinuations and assertions calculated to mislead the jury]; "Statements of supposed facts not in evidence ... are a highly prejudicial form of misconduct, and a frequent basis for reversal." (5 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Trial, § 2901, p. 3550.)

### 3.  Referring to Facts Not in Evidence

In his opening statement, the prosecutor stated "…when this order is still in effect, … he's seeing postings on YouTube with his nude photos October 4th after the order had been served." RT: 123 – 124. No evidence supports such statement.

There was no evidence supports that the Accuser and Appellant engaged in any dating relationship.

Decl. Luo, ¶67, RT: 132 reads as follow:

10  Q Okay. So you went on a date around some time

11   near September of 2018.

12  A First time it was -- it was like second or

13  third week of August.

14  Q Okay. And leading up to that you had been

15  messaging each other, would you say it was frequently

16  through the dating app?

17 A Not sure, what is frequently.

18  Q Do you mean that it was a like a daily thing

19 or?

20 A No.

21 Q Okay. Like semi-weekly.

22 A Something like that.

23 Q Okay.

24 A Every second day, every third day you know.

Decl. Luo, ¶67, RT: 133 reads as follow:

6 Q Okay. And the first date that you two -well,

7 let me ask, how many total dates did you go on

8 with Ms. Luo?

9 A Total dates was two dates.

Decl. Luo, ¶67, RT: 134 reads as follow:

16 Q Okay. Now, at what point -- at some point did

17 your dating relationship in your view Ms. Luo end?

18 A When she left, actually I don't even know if

19 it started. I just would like to know her as a person

20 first, you know, and when she was leaving my house on

21 the second time and she was texting me. I told her

31

22 clearly that we should take it easy and if she's on the

23 app she would like meet other people, that's totally

24 fine with me you know.

Decl. Luo, ¶53, Exhibit N reads as follow:

18 TC: I did. It's none of your business. Who are you to me? Nobody. You are to me nobody.

19 What you think, what we was? It was my wife, girlfriend, boyfriend, what have you been

20 to me. Jesus Christ. I met you one or two times. And that's it. This is freedom this is not I

21 really wanted be with you forever. If l don't feel like you or don't feel like me it's no

22 problem. Evidently for you it is.

Yet in opening statement the prosecutor stated that "through the witnesses you'll hear is about a dating relationship that went awfully bad." Decl. Luo, ¶67, Exhibit T. RT: 117. In closing argument the prosecutor mislead the jury by stating that this case starts out with a fallout in the relationship. Decl. Luo, ¶67, Exhibit T. RT: 264.

The prosecution stated "in the dark of the night, no, he might not have seen when she was doing that." RT: 292. The evidence refutes such false statement. Decl. Luo, ¶48 – 49, Exhibit J&K. There was a light bulb installed right above the Accuser's front door. The light showered Appellant from head to toe.

### 4. Vouching for the Sole Witness, While At the Same Time Withholding Exculpatory Evidence

The prosecution stated "Really, he's not credible? A guy who walked into a room, took an oath in front of multiple strangers. More than -- I was going to say 14 or more, including court staff. And he went up there, and guess what? He had to tell this room full

of strangers he had to get up there on that stand in front of all of you and admit that, I was dating this girl. And yeah, I sent her nude photos after a week. And think about what it takes (indiscernible) actually admit that you're doing that, knowing that you're not just admitting doing that, but guess what? Every single one of these strangers is going to get to see those nude photos of you now, as well. And he went up there and told you that yes, in fact, he did do that. My point is he is credible. He admitted to things that he didn't see when he was asked, did you actually see her scratching up the door? He said, no, I didn't see that happening when it was happening." Decl. Luo, ¶67, Exhibit T. RT: 288 – 291. The prosecution vouched for the witness's truthfulness because the witness said he did not see Appellant scratching his door. The truth is the witness could not make his story straight if he said he saw Appellant scratching his door but he did not report to the police on Sep 18, 2018. The prosecution also vouched for the witness's emotional distress by alleging the witness had to testify in a room full of strangers despite the witness testified he took a nude photo on a nudist beach which was a public place. It is difficult to believe a nudist who was comfortable with public nudity, took nude photos on a nude beach which was on a public land, exposed himself in public, would feel uneasy to testify in a room full of strangers. Especially when the Accuser allowed a stranger to take his nude photos on a nude beach. Decl. Luo, ¶67, Exhibit T. RT: 144 – 145.

## 5. Improper Expression of Opinions to The Jury

During his summation, the prosecutor made numerous prejudicial expressions of opinion. There is no court in the United States can order Appellant not to post online indicating that Mr. Czodor is a nice guy without infringement of Appellant's First

Amendment right. Despite the restraining order did not pass constitutional muster, the prosecution stated that "So the -- by the rules of the restraining order, if she posted a post that said, like, hey, Tomas Czodor, he's a nice guy, that's a violation of the restraining order." RT: 293 – 294.

These statements were improper expressions of the prosecutor's personal opinion about Appellant's guilt and about the evidence introduced at trial. See *Berry*, 627 F.2d at 198; *Beach*, 147 Cal. App. at 628 - 629. Even if defense counsel had objected to the improper statements, such an objection would not have cured the resulting harm, not to mention defense counsel failed to object. Under the circumstances of this close case, it was reasonably likely that the jury misconstrued or misapplied the prosecutor's remarks. *Sanders*, 11 Cal. 4th at 526.

## C. <u>PUBLIC DEFENDER'S INEFFECTIVE ASSISTANCE OF COUNSEL HELPED CONVICT THE INNOCENT</u>

A competent, committed defense lawyer is often the last, best, and only hope an innocent defendant has. "Left without the aid of counsel he may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible. He lacks both the skill and knowledge adequately to prepare his defense, even though he have a perfect one. He requires the guiding hand of counsel at every step in the proceedings against him. Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence." *Powell v. Alabama*, 287 U.S. 45, 69 (1932).

The integrity of our criminal justice system and the fairness of the adversary

criminal process is assured only if an accused is represented by an effective attorney. See *United States v.Morrison*, 449 U.S. 361, 364, 101 S.Ct. 665, 667, 66 L.Ed.2d 564 (1981). Absent the effective assistance of counsel "a serious risk of injustice infects the trial itself." *Cuyler v. Sullivan*, 446 U.S.335, 343, 100 S.Ct. 1708, 1715, 64 L.Ed.2d 333 (1980). Thus, a defendant is constitutionally entitled to have effective counsel acting in the role of an advocate. See *Anders v. California*, 386U.S. 738, 743, 87 S.Ct. 1396, 1399, 18 L.Ed.2d 493 (1967). These are some errors that "are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified" thus making it unnecessary to establish the prejudice prong of *Strickland*. Prejudice is presumed in situations where the likelihood of counsel having provided effective assistance is extremely small such as where counsel failed completely to subject the prosecution's case to "meaningful adversarial testing." *United States v. Cronic*, 466 U.S. 648, 658, 104 S.Ct. 2039, 2046 – 2017, 80 L.Ed.2d657 (1984).

Here, Appellant's trial counsel had nothing to offer to test or attack the prosecution's case. He failed to prepare any defense whatsoever. He failed to suppress Appellant's prior compelled/involuntary testimony, call any fact witnesses, including the police officer who accepted a stack of paper printout as evidence and did nothing to properly collect evidence using forensic technology. No matter how hard, tapping on wood furniture with a key is not going to damage the furniture. Trial counsel didn't even bother to make a court room reenactment and tap on wood furniture with a key in front of the jury. Public defender failed to provide any explanation for its tactical reason. Decl. Luo, ¶66, Exhibit P. In *People v. Pope*, 23 Cal.3d 412 (Cal. 1979), the court suggests that

if counsel was asked for an explanation and failed to provide one, this could prove he or she had no tactical reason for the action taken.

For the reasons discussed below, there was a "reasonable probability" of a different result absent counsel's error. See *Bonin v. Calderon* (9th Cir. 1995) 59 F.3d 815, 834 [in assessing prejudice, the court should "compare the evidence that actually was presented to the jury with the evidence that might have been presented had counsel acted differently."]

**1. Trial Counsel's Failure to Request The Trial Court to Give Proper Jury Instruction And Unreasonable Tactical Decision to Signed Off a Stipulation with the Prosecution Were Prejudicially Ineffective**

A trial court should instruct the jury upon every material question upon which there is any evidence deserving of consideration whatever. *People v. Flannel* (1980) 25 Cal. 3d 668, 684.

The trial court's failure to instruct the jury on dating relationship violated Appellant's right to have the jury determine all the issues presented by the evidence. Decl. Luo, ¶62, CT: 111 – 162. Substantial evidence is evidence from which a jury composed of reasonable persons could conclude that the particular facts underlying the instruction exist. *Flannel*, 25 Cal. 3d at 684; *People v. Lemus* (1988) 203 Cal. App. 3d 470, 477.

In deciding whether or not there is substantial evidence, courts should not evaluate the weight of the evidence, because that is a task for the jury. *Flannel*, 25 Cal. 3d at 684; *Breverman*, 19 Cal. 4th at 162; *Lemus*, 203 Cal. App. 3d at 477. Importantly, "doubts as to the sufficiency of the evidence to warrant instructions should be resolved in favor of

the accused." *Flannel*, Id. at 685; *People v. Wilson* (1967) 66 Cal. 2d 749, 763. As will be

set out more fully below, there was sufficient evidence to warrant dating relationship

instructions, and all doubts should have been resolved in Appellant's favor.

Such failure is particularly critical because the sua sponte duty to instruct on the

general principles of law includes an obligation to instruct on relevant defenses.

*Breverman*, 19 Cal. 4th at 157; *Middleton*, 52 Cal. App. 4th at 30; *Gonzales*; 88 Cal.

Rprtr. 2d at 116 - 117. No dating relationship between the Accuser and Appellant was a

relied upon theory that the TRO or DVRO was unlawful due to lack of dating

relationship and the Accuser did not have a reasonable expectation of privacy in his nude

photos as a nudist. See *State v. Vanburen*, 214 A.3d 791, 820 (Vt. 2019) [concluding that

dismissal is appropriate after finding no evidence in the record showing the complainant

and the recipient of naked pictures had any kind of relationship engendering a reasonable

expectation of privacy.]

Trial counsel's failure to request the trial court to give instructions deprived the

jury of "considering the full range of possible verdicts." *Breverman*, 19 Cal. 4th at 155.

Such failure resulted in a deprivation of Appellant's constitutional right to have the jury

decide all issues presented by the evidence. *Lopez*, 19 Cal. 4th at 288; *Oskins*, 69 Cal.

App. 4th at 139.

Whether the Accuser and Appellant had a dating relationship is a question for the

jury, not the judge, to decide. See *People v. Cleaves* (1991) 229 Cal. App. 3d 367 (stating

that a defendant's right to instructions does not turn on the court's assessment of the

credibility or the strength of evidence); see also *Lemus*, 203 Cal. App. 3d at 477; *Lopez*,

19 Cal. 4th at 288; *Oskins*, 69 Cal. App. 4th at 139. It is reasonably likely the result would have been different had counsel done the right thing to request the trial court to instruct the jury on dating relationship because substantial evidence suggests that there was no dating relationship between the Accuser and Appellant. Decl. Luo, ¶53, Exhibit N. Had the jury been instructed to decide whether the Accuser and Appellant had a dating relationship it is highly probable that no jurors would found any dating relationship between the Accuser and Appellant.

Public defender not only presented no defense but also did prosecution a favor so that the prosecution did not need to prove the lawfulness of the TRO and DVRO. Trial counsel signed off a stipulation on Jul 28, 2021 with the prosecution without prior discussion with Appellant, nor did he ask for Appellant's consent despite he was well aware that there was no dating relationship between the Accuser and Appellant. Appellant was uninvolved in that stipulation. Decl. Luo, ¶54, RT: 217 – 219.

Not a word in the DVRO orders Appellant to stay away from Czodor's facebook page. Not a word in the DVRO orders anything related to Czodor's company and he did not have any company ever. Not a word in the DVRO orders Appellant to stop contacting Czodor's friends and clients. Not a word in the DVRO orders Appellant to stop stalking Czodor in cyberspace. Decl. Luo, ¶54 – 55, Exhibit O&P. Appellant was kept out of the decision-making process.

Substantial evidence supports the fact that Appellant and the accuser did not have a dating relationship. At trial, the Accuser testified he met Appellant only two times and he did not have frequent interaction with Appellant. The Accuser's secret recording

indicates his own words "Who are you to me? Nobody. You are to me nobody. What you think, what we was? It was my wife, girlfriend, boyfriend, what have you been to me. Jesus Christ. I met you one or two times." Decl. Luo, ¶53, CT: 101: 18 – 22.

"'Dating relationship' means frequent, intimate associations primarily characterized by the expectation of affection or sexual involvement independent of financial considerations." Stats. 2001, ch. 110, § 1.; Cal. Fam. Code §6210. "Dating relationship" does not apply to 'a casual relationship or an ordinary fraternization between [two] individuals in a business or social context.'" *People v. Upsher* (2007) 155 Cal.App.4th 1311, 1323 (*Upsher*), citing *People v. Rucker* (2005) 126 Cal.App.4th 1107, 1117 (*Rucker*). On the other hand, the fact the parties are sexually intimate does not, alone, create a dating relationship. See *People v. Shorts* (2017) 9 Cal.App.5th 350, 360-361 (Shorts) [defendant and victim had sexual relations one to two times].

Not only the TRO and DVRO have no legal foundation due to the lack of dating relationship, they do not pass constitutional muster, as they are not sufficiently narrowly tailored. Both the TRO and DVRO impose content-and speaker-based restrictions, they are invalid unless they can pass strict scrutiny. "'The right to free speech is . . . one of the cornerstones of our society,' and is protected under the First Amendment of the United States Constitution and under an 'even broader' provision of the California Constitution." *Evans v. Evans* (2008) 162 Cal.App.4th 1157, 1166 (*Evans*), quoting *Hurvitz v. Hoefflin* (2000). "Temporary restraining orders and permanent injunctions—i.e., court orders that actually forbid speech activities—are classic examples of prior restraints." *Alexander v. United States* (1993) 509 U.S. 544, 550. A prior restraint is "'the most serious and the

least tolerable infringement on First Amendment rights.'" *Near v. Minnesota* (1931) 283 U.S. 697, 713. "Prior restraints are highly disfavored and presumptively violate the First Amendment. [Citations.] This is true even when the speech is expected to be of the type that is not constitutionally protected." (*Evans*, supra, 162 Cal.App.4th at p. 1167; citing *Near v. Minnesota*, supra, 283 U.S. at pp. 704-705 [rejecting restraint on publication of any periodical containing "malicious, scandalous and defamatory" matter]) "[P]rior restraints on speech ... are the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart* (1976) 427 U.S. 539, 559, 96 S.Ct. 2791, 49 L.Ed.2d 683 (*Nebraska Press*). Orders enjoining the right to speak on a particular topic are disfavored and presumptively invalid. (Id . at p. 558, 96 S.Ct. 2791.)

To establish a valid prior restraint under the federal Constitution, a proponent has the heavy burden to show the countervailing interest is compelling, the prior restraint is necessary and would be effective in promoting this interest, and less extreme measures are unavailable. See *Hobbs v. County of Westchester* (2d Cir. 2005) 397 F.3d 133, 149 (*Hobbs*); see also *Nebraska Press*, supra, 427 U.S. at pp. 562-568, 96 S.Ct. 2791. A permissible order restraining future speech "must be couched in the narrowest terms that will accomplish the pin-pointed objective permitted by constitutional mandate and the essential needs of the public order." *Carroll v. President & Com'rs of PrincessAnne* (1968) 393 U.S. 175, 183-184, 89 S.Ct. 347, 21 L.Ed.2d 325.

The California Constitution is more protective of free speech rights than the federal Constitution, and California courts require "extraordinary circumstances" before a prior restraint may be imposed. *Wilson v. Superior Court of Los Angeles County* (1975)

13 Cal.3d 652, 658-661, 119 Cal.Rptr. 468, 532 P.2d 116; *In re Marriage of Candiotti* (1995) 34 Cal.App.4th 718, 724, 40 Cal.Rptr.2d 299 (*Candiotti*). Nonetheless, in determining the validity of a prior restraint, California courts engage in an analysis of various factors similar to the federal constitutional analysis *Aguilar*, supra, 21 Cal.4th at pp. 145-146, 87 Cal.Rptr.2d 132, 980 P.2d 846, and injunctive relief restraining speech under the California Constitution may be permissible where the relief is necessary to "protect private rights" and further a "sufficiently strong public policy" (id . at p. 167, 87 Cal.Rptr.2d 132, 980 P.2d 846 (conc. opn. of Werdegar, J.) ).

Applying these principles, the court in *Candiotti* held a custody order limiting a parent's right to communicate with third parties about matters related to the custody proceeding was an unconstitutional prior restraint. *Candiotti*, supra, 34 Cal.App.4th at pp. 724-726, 40 Cal.Rptr.2d 299. There, the order prohibited a mother from disclosing negative information about her former husband's new wife to anyone except certain specified professionals. *Id*. at p. 720, fn. 3, 40 Cal.Rptr.2d 299. The *Candiotti* court recognized that courts "are given broad authority to supervise and promote the welfare of children" and may constitutionally order parents to refrain from disparaging their former spouse in front of their children. *Id*. at p. 725, 40 Cal.Rptr.2d 299. However, the court observed the challenged order "went further, actually impinging on a parent's right to speak about another adult, outside the presence of the children." (Ibid.) The court held the order was overbroad in this respect and constituted an undue prior restraint of speech under the California Constitution, reasoning the order "would prevent [the mother] from talking privately to her family, friends, coworkers, or perfect strangers about her

dissatisfaction with her children's living situation." (Ibid.) Although the trial court "certainly ha[d] the power to prevent [the mother] from undermining [the father's] parental relationship by alienating the children from [the stepmother]," the *Candiotti* court found the challenged order to be "much more far-reaching, aimed at conduct that might cause others, outside the immediate family, to think ill of [the stepmother]." *Id.* at p. 726, 40 Cal.Rptr.2d 299. The court explained: "Such remarks by [the mother] may be rude or unkind. They may be motivated by hostility. To the extent they are libelous, they may be actionable. But they are too attenuated from conduct directly affecting the children to support a prior restraint on [the mother's] constitutional right to utter them." (Ibid.)

In *Molinaro v. Molinaro*, 33 Cal.App.5th 824 (Cal. Ct. App. 2019) the Court held that the part of the restraining order prohibiting Michael Molinaro from posting "anything about the case on Facebook" is reversed, and the trial court is directed to strike the provision from the order.

"When enjoining activities in the sensitive area of First Amendment freedoms, courts must draft temporary restraining orders 'couched in the narrowest terms that will accomplish the pinpointed objective permitted by constitutional mandate and the essential needs of the public order.'" *United Farm Workers of America v. Superior Court* (1975) 14 Cal.3d 902, 909.

Any orders require Appellant to remove ALL posts about the Accuser from social media and blogs, and bar Appellant from future posting of ANY material are clearly overbroad and unlawful, as they encompass speech the court itself recognized as

constitutionally protected.

No reasonable attorney would make a tactical decision and sign a stipulation with the prosecution when he was well aware that the Accuser did not have a dating relationship with Appellant, the stipulation is a far cry from the DVRO, and the DVRO was unlawful in the first place. Did trial counsel want to defend Appellant or did he just want to get rid of the case and move on to the next?

Prior to trial Appellant already informed her counsel that the Accuser was a nudist but he told Appellant he would not bring up this fact at trial. Decl. Luo, ¶56 – 57. It is reasonably probable that the presentation of the fact that the Accuser is a nudist who is comfortable to be naked in public, along with the truth that the Accuser did not have a dating relationship with Appellant, would have led one or more jurors to harbor reasonable doubt about the Accuser's expectation of privacy and emotional distress, and Appellant's knowledge that the distribution of the images would cause a nudist serious emotional distress. Coupled with other exculpatory evidence, it turns out to be clearer that the entire thing was fabrication, namely a hoax. Even if counsel has legitimate tactical reasons for introducing no evidence, his performance is still inadequate if evidence supporting a potentially meritorious defense remains unexplored. *In re Cordero* (1988) 46 Cal.3d 161, 181.

## 2. Trial Counsel's Failure to Exclude Appellant's Prior Testimony In a civil Proceeding Prejudiced Appellant in Violation of Appellant's Fifth, Sixth, and Fourteenth Amendments rights

Trial counsel's failure to exclude or object to the introduction of Appellant's prior compelled testimony in a family court was prejudicially ineffective. When the

prosecution cherry picked and misrepresented Appellant's prior testimony in a civil proceeding when she was not represented by counsel, trial counsel failed to object and did nothing. Trial counsel presented zero legal argument to suppress Appellant's prior compelled testimony in a family court. RT: 78 – 102. Trial counsel's conduct was so outrageous that no competent attorney would have engaged in it.

3. **Trial Counsel's Failure to Conduct Factual and Legal Investigations or Potentially Meritorious Defenses Prejudiced Appellant**

Criminal defense attorneys have a duty to investigate carefully all defenses of fact and of law that may be available to the defendant. *People v. Pope* (1979) 23 Cal.3d 412, 425-426.

Trial counsel failed to subpoena evidence and make necessary inquiry. During the two years of the case's pendency prior to jury selection, six public defenders cycled through Appellant's case but no meaningful investigation was conducted, none of them ever made any effort to subpoena phone records, screenshots, the Accuser's medical records, all videos and photos the Accuser took on Sep 18, 2018 and all text messages between the Accuser and Appellant, or to contact or secure the testimony of Chris Kovacs, the 911 call operator, and the police officers arrived on Sep 18, 2018 at the Accuser's residence. Decl. Luo, ¶ 1, 64. The most critical point in any trial is the timeline of the crime. The core of the prosecution's theory regarding Appellant's possibility to commit the vandalism rested on the accuser's testimony that he heard Appellant scratching his door for 20 minutes on Sep 18, 2018 and took a photo of the damaged door 7 days after Appellant left his residence due to being unable to see Appellant's scratching

44

action and late discovery of the damage due to the darkness on Sep 18, 2018. A reasonably competent defense attorney would have recognized the importance of investigating the sequence of the events on Sep 18, 2018, whether the police was called during the course of Appellant's scratching, what was said to the 911 call operator, whether the testimony of Chris Kovacs, the 911 call operator, and the police officers arrived are consistent, and whether the accuser withheld evidence from the police while the accuser provided two videos shot on Sep 18, 2018 but none of those videos show Appellant was scratching the accuser's door. In any event, there is no reason why competent counsel would not have at least inquired. Such failure is objectively unreasonable and prejudicial to Appellant.

The Accuser provided to the police a photo depicting Appellant holding a key and standing in front of his door which was taken from his kitchen window. Decl. Luo, ¶48, Exhibit J. The second photo provided to the police by the accuser depicting Appellant standing in front of his door view window. Decl. Luo, ¶49, Exhibit K. The third photo provided to the police shows Appellant was standing in front of the accuser's garage door which was nowhere close to his front door. Decl. Luo, ¶50, Exhibit L. Because all these photos were not provided in digital form with metadata, no one knows at what time they were taken which is the main goal that the Accuser provided paper evidence to the police. If any of these photos were taken between 7:55 pm and 8:10 pm it picks apart the accuser's statement that he did not report the scratching on Sep 18, 2018 because he did not see Appellant scratching his door and did not discover the damage that night.

The Accuser alleged damages to his business reputation. Trial counsel failed to

45

obtain evidence showing that the Accuser did not have a company Gorgeous Painting. Decl. Luo, ¶52, Exhibit M. Had the jury learned that the Accuser lied about having a company Gorgeous Painting, it would have produced a significantly different impression of the witness's credibility.

It is reasonably probable that, the above stated facts, had them been presented to the jury, would have affected the outcome of the trial.

**4. Trial Counsel's Failure to Call Any Defense Witnesses Was Prejudicially Ineffective**

To make out Appellant's defense at trial, trial counsel relied solely on the prosecution's witness, who was the Accuser and provided no help to the theory of the defense. Trial counsel took this tack not for lack of better options, but simply because he failed to conduct an adequate investigation into potential witnesses who might have provided helpful testimony. As a consequence, trial counsel failed to introduce significant testimony that would have raised doubts about Appellant's guilt.  Trial counsel failed to call to testify Chris Kovacs, the 911 call operator, the police officers arrived on Sep 18, 2018 at the accuser's residence and the police officers who "collected" evidence. The 911 call was made at 8:07 pm on Sep 18, 2018. When the 911 call was made Chris Kovacs already arrived at the accuser's residence and met the accuser, and saw both the accuser and Appellant. These facts pick apart the accuser's statement that Appellant scratched his door for 20 minutes and he didn't report to the police on Sep 18, 2018 because he didn't see Appellant's scratching. Had Appellant scratched his door, the Accuser had ample opportunity to see it right away. Those people's testimony, even if imperfect, would have

provided a potentially meritorious defense and inconsistency with the Accuser's theory ruling out Appellant's guilt.

Police officers were not called to testify how the evidence was collected and the evidence was not examined. Why digital evidence was not collected in 21st century? What evidence protocol should the police follow? Why didn't the police collect evidence following protocol to avoid any foul play? Why paper evidence was accepted in 21st century? Why didn't the police collect any and all photos and videos taken on Sep 18, 2018? Why did the police allow the Accuser to cherry pick evidence? By not collecting digital evidence following protocol it is no different from not collecting DNA evidence in a homicide case. By not collecting digital evidence following protocol how did the police know the evidence was not manufactured, tampered, or fabricated?

Trial counsel failed to call the police officers to the stand and engaged in a lackadaisical and ineffective cross-examination of the prosecution's sole/star witness. There was no opportunity to attack the improperly gathered, mischaracterized, or fabricated evidence.

## 5. Trial Counsel's Failure to Adequately Cross Examine and Impeach Prosecution's ONLY Witness Prejudiced Appellant

Trial counsel failed to adequately cross-examine and impeach the prosecution's ONLY witness on the following key issues: (1) from what time to what time on Sept 18, 2018 Appellant was scratching Czodor's door; (2) why Czodor was unable to provide any videos or photos showing Appellant's scratching motion or sound and the door's fresh damage even after he heard 20 minutes' scratching, when he was able to constantly film

and take photos throughout the night on Sep 18, 2018; (3) why the damage of the door was discovered days later even when the front door area had more than enough lighting on Sep 18, 2018; (4) why Czodor lied about being dark on Sep 18, 2018 when the photos and videos show otherwise; (5) why police was told on Sep 18, 2018 that Appellant was knocking instead of scratching Czodor's door even after Czodor heard scratching; (6) why the photo of the damaged door was taken right after Czodor discovered that it would cost money to remove Appellant's online post; (7) it would take only a second to create a scratch, 20 minutes have 1,200 seconds, why the damage on the photo is not consistent with 20 minutes scratching; (8) how did Czodor not know his door was damaged after hearing 20 minutes of scratching; (9) how was it believable that a reasonable person noticed the damage of his own front door the next day even after he heard 20 minutes' scratching; (10) what prevented Czodor to report the door's damage on Sep 19, 20, 21, 22, 23, 24, 2018; (11) from what date to what date Appellant posted Czodor's nude photos; (12) why Czodor did not call police immediately after Appellant threatened Czodor; (13) what happened after Appellant threatened Czodor and what backed up Czodor's version of event; (14) Czodor's upbringing, lifestyle, and public nudity as a nudist; (15) what Czodor knew about Appellant prior to sending her nude photos while he deemed Appellant "nobody"; (16) the terrorism report filed on Sep 10, 2021 suggests that Czodor had no difficulty in calling police, why did he waited to report to the police that Appellant posted his nudes while there was no nude photo of him online; (17) why the Accuser didn't report to the police right after his nude photo was posted online; (18) why the Accuser waited until the police officer could not observe his nude photos online to

make that report; (19) why the Accuser could not provide digital evidence with metadata; (20) in this 21st century why there was only paper evidence. RT: 196 – 214.

Such a cross-exam could have undermined Czodor's story, and raised the issue that he may have manufactured evidence to frame Appellant. Under these circumstances, it is reasonable to expect that defense counsel would question the sequence of events. These questions, along with questions of inconsistency and concerning why Czodor lied about having a business and being dark while the light showered Appellant from head to toe in front of his door on Sep 18, 2018, would have undermined Czodor's credibility. They would also have cast doubt on the jury's mind as to Czodor's door was damaged on Sep 18, 2018 and the purpose he sent nudes to Appellant while he deemed Appellant "nobody". Even if Czodor provided "satisfactory" explanations to such questions, the mere asking of the questions would have led the jury to consider that Czodor was involved in the planting and manufacturing of the evidence. In a case as close as this one, such doubt was essential. Counsel's failure to question along these lines thus constituted a failure to test the adversarial process, and undermines confidence that the trial produced a just result.

Even if Czodor provided a "believable" answer, his credibility and the issues of the photo of the damaged door taken right after Czodor discovered the cost to remove a post related to his credibility and the delay in reporting until the police could not observe any nude photos online would have been clearly raised. Such evidence would have raised at least some doubt in the jury's mind, as to Appellant's guilt. A failure to bring these issues to the jury's attention was a performance error of constitutional significance.

The inconsistencies would have alerted any reasonably competent attorney and would have produced effective questioning of Czodor on these issues. Such questioning could have tied Czodo to his motive to frame Appellant after learning it would cost money to remove a post related to his credibility, and further connected Czodor to the fabrication of evidence. Again, whether any credible answers were given or not, the issue would have been placed in the jury's mind for adequate consideration. Instead, Czodor walked away not having been tested by defense counsel.

When the newly discovered evidence contradicts the strongest evidence introduced against Appellant, it reopens the critical gap in the prosecution's chain of proof. If the jurors even found a reasonable possibility that the Accuser's testimony was untrue, it is unlikely that they would find Appellant's guilt proved beyond a reasonable doubt. See *People v. Martinez*, 36 Cal.3d 816, 823 (Cal. 1984) [holding that to acquit defendant, the jury need not find Torrez' recollection accurate and Gerhis' inaccurate. It need only decide that Torrez' testimony raised a reasonable doubt as to the time when the drill press was repainted, and thus a reasonable doubt as to defendant's guilt.] Any reasonable attorney would have raised these issues in examining the prosecution's only witness. Counsel's failure to adequately cross-examine Czodor on the issues presented above constituted ineffective assistance of counsel and prejudiced Appellant. Trial counsel's woefully inadequate and grossly insufficient legal representation allowed witness perjury to occur unchallenged.

   **6. Trial Counsel's Failure to Exclude or Object on Evidence Code §352 grounds
       Prejudiced Appellant**

Pursuant to Evidence Code §352, the court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. (*People v. Roscoe* (1985) 168 Cal.App.3d 1093, 1100)

While the prosecution presented screenshots and secretly recorded videos trial counsel failed to exclude or object on Evidence Code §352 grounds. The prosecution failed to demonstrate that the recordings were complete and that something said or done was not being taken out of context. The prosecution failed to establish that the recordings were of good audio / visual quality and were demonstrably records of the entire meeting or interview rather than an edited selection. The prosecution has not shown that there is no possibility that where Appellant did not know a conversation was being recorded, the content was not manipulated with a view to drawing Appellant, the party who was unaware, into some statement that can be taken out of context. Same to screenshots of the text messages presented by prosecution. The prosecution failed to establish that the text messages were complete, not being manipulated or manufactured.

"At no point does she say anything to say that she didn't to that, right? She never said, what are you talking about? I would never do that. This is a misunderstanding. No way. What reasonable person, when they're being directly accused of that, would just sit there and not in some way deny it? And she doesn't deny it in any way. "I was emotional." And she admits it again in court, and you should find that she's fully admitting to that crime. And it's clear that she did it, and she is absolutely guilty of Count

III." RT: 268.

The prosecution attempted to establish Appellant's guilt from adoptive admission.
Considering Appellant's silence in the context of her one and only statement to the
Accuser, her failure to deny is of little probative value to a claim of acquiescence since
the nude photos at the heart of the questioning—and of this prosecution—were sent to
Appellant by a nudist without any expectation of privacy. Thus, in the setting of an
altercation that was about to be upgraded in the middle of the street—such as it was—it is
likely that Appellant denied it while her denial was not recorded, or Appellant disdained
to deny while it was so obvious a hoax, or her failure to deny may be an attempt to avoid
further altercation, or the Accuser, who was the aggressor, withheld the recording of the
next part of the altercation showing Appellant denied it, or she thought it was
unnecessary to deny because she was in fact innocent. Thus, an adverse inference would
be too speculative to pass §352 muster. Innocent people falsely accused often believe in
"a just world and in the transparency of their own blameless status.... [T]hose who stand
falsely accused also have faith that their innocence will become self-evident to others. As
a result, they are not calculated to choose their words or action, often not realizing that
they are being framed or set up and later trapped by false evidence and perjured
testimony. The "lesson of history," our Supreme Court has observed, is "that a system of
criminal law enforcement which comes to depend on the 'confession' will, in the long
run, be less reliable and more subject to abuses than a system which depends on extrinsic
evidence independently secured through skillful investigation." *Escobedo v. Illinois*
(1964) 378 U.S. 478, 489–490, 84 S.Ct. 1758, 12 L.Ed.2d 977, fns. omitted.

Though jurors were told to follow instructions and accept with no adverse inference defendant's right not to testify at trial, it was nevertheless concerning that allowing the Government to introduce evidence and comment on defendant's silence without anything to measure that silence against invites a degree of confusion in the minds of the jurors that an instruction is unlikely to remedy. See *Bruton v. United States*, 391 U.S. 123, 135–36, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) ("[T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored."). Here, the implications of defendant's minimally probative silence would have been powerfully incriminating because of its alluring logical appeal to ordinary, innocent people—i.e., jurors—who naturally would be unaware of the reality of each circumstance. In the end, given jurors' lack of healthy skepticism the danger of unfair prejudice to Appellant substantially outweighed the de minimis probative value of her silence to establish acquiescence.

Trial counsel's failure to suppress or object on evidence code §352 grounds and the introduction of screenshots and secretly recorded videos prejudiced Appellant.

### 7.  Trial Counsel's Failure to Object to the Trial Court's Denial of Hardship Request by Juror #4 Prejudiced Appellant

After the jury was sworn in, Juror #4, who was a delivery driver, alleged that he must go to work and requested to be excused due to financial hardship. Decl. Luo, ¶67, Exhibit T. RT: 103 – 105. Trial counsel failed to object the trial court's denial of his hardship request. Juror #4 was a delivery driver struggling to put food on his family's

table. It's difficult to see he would devote himself to the trial due to his frustration. He may want to finish as soon as possible and gave up his insight and position during deliberation.

**8. Trial Counsel's Failure to Make Objections to Prosecutorial Misconduct Prejudiced Appellant**

As a public official charged with representing the general interest and attaining justice, a prosecutor may have special stature in the eyes of the jury, and so his or her misstatements may carry significant weight. See *People v. Donaldson* (2001) 93 Cal.App.4th 916, 932. Trial counsel's failure to object to prosecutorial misconduct was prejudicially ineffective.

**9. Trial Counsel's Failure to Prepare for Trial in a Timely Manner and File *Serna* Motion Prejudiced Appellant**

Public defender's failure to prepare for trial in a timely manner violated Appellant's right to a speedy trial. It also violated Appellant's right to a competent counsel that would not violate her right to a speedy trial. Decl. Luo, ¶36, 37, 68.

A Penal Code section 1382 violation entitles the defendant to pretrial dismissal regardless of prejudice. *People v. Anderson* (2001) 25 Cal.4th 543, 604-605; *People v. Martinez* (2000) 22 Cal.4th 750, 769. "Waiver" refers to an explicit and intentional relinquishment of a right. *In re S.B.* (2004) 32 Cal.4th 1287, 1293, fn. 2. Appellant never knowingly, voluntarily, and intelligently waived her right to a speedy trial. Decl. Luo, ¶19 – 34. Appellant did not request any continuance due to her inability to appear for trial. Appellant did not benefit at all from any continuance. Nor did Appellant request any reassignment of counsel. Decl. Luo, ¶34. Appellant was taken advantage of and put on a

spot to choose to go to trial with an unprepared counsel or go to trial at a later date. Trial

counsel failed to file a *Serna* motion upon Appellant's request. Defense counsel took this

tack not for lack of merit, but simply because he did not want to admit his office was

substantially responsible for the violation of Appellant's right to a speedy trial.

Eventually, trial counsel called no witness to the stand, engaged in a lackadaisical and

ineffective cross-examination of the prosecution's sole/star witness, and presented no

evidence from his investigation. RT: 196 – 214. Trial counsel's performance supports the

fact that the delay of the trial was substantially caused by the office of public defender

and no good cause was ever found for the continuance. Appellant was unable to have

both her constitutional rights to a speedy trial and a prepared and competent counsel.

Public defender's lack of loyalty was a stunning betrayal. Decl. Luo, ¶36.

### 10. Trial Counsel's Failure to Submit A Sentencing Factor and Improperly Admitted Guilt Prejudiced Appellant

After trial, trial counsel asked Appellant for consent to sentence continuance

because he said he would need time to prepare a brief. Prior to this conversation he did

not explain to Appellant that misdemeanor sentences must be pronounced not less than

six hours nor more than five days after a conviction unless the defendant waives that

timeframe. Neither did he explain such continuance would lead to a waiver. Decl. Luo,

¶63. Despite Appellant repeatedly told her counsel she was framed trial counsel wrote in

his brief that Appellant made poor choices. Had Appellant known there would be a

waiver entered and her counsel would write such thing she would have insisted on being

sentenced right after trial instead of wasting two more weeks. Despite trial counsel was

well aware of Appellant's health condition he presented no information or evidence at sentence. Decl. Luo, ¶40. Trial counsel also failed to object to the fees, assessments and fines at sentencing based on inability to pay. All these failures and actions were constitutionally ineffective.

### D. **SLOPPY POLICE WORK**

Law enforcement officers have the obligation to convict the guilty and to make sure they do not convict the innocent. They must be dedicated to making the criminal trial a procedure for the ascertainment of the true facts surrounding the commission of the crime.  ----- Justice Byron White

Not every police department honors Justice White's words like Chicago Police Department that caught Jussie Smollett's hate crime hoax, and Santa Ana Police Department certainly did not. When accusations go undetected as false, they gain traction and viability among actors in the criminal justice system.

Law enforcement personnel are on the front lines of lie detection in the criminal justice system. When a civilian witness alleges that a crime was committed, the police bear the responsibility of determining whether that witness is telling the truth. Police was supposed to routinely and consistently to pursue all evidence, rather than those facts that confirm their initial theory. If the complainant's story is contradictory or inconsistent, the police should carefully consider all explanations, including whether the complainant had lied. When police accept the complaining witness's version of events at face value and fail the conduct even basic investigations, the entire adversarial system crumbles.

Here in this case, every word coming out from the Accuser went unchecked and unchallenged. Every piece of self-made evidence provided by the Accuser went unchecked and unchallenged. For instance, the police could have retrieved the Accuser's phone and download all messages, screenshots, go to the Accuser's residence to take photos of the damaged door and his entire front door area which will show the lighting installation, and retrieve all photos and videos taken on Sep 18, 2018. Had the police done their job the Accuser's complaint would have immediately collapsed.

Whatever crime is reported the person who goes out to collect evidence should be a police officer instead of the accuser. This is not the case here. Not a single piece of evidence presented at trial was collected and processed following protocol. Not a single screenshot or photo has metadata or timestamp. The police didn't even bother to collect all text messages, photos and videos to see whether something was intentionally left out, such as the Accuser had sent his nude photos to multiple people, the photos and the videos that the Accuser had withheld show Appellant's innocence. It is common sense that incomplete and edited screenshots, photos, or videos could be manipulated and misrepresented. Yet, other than taking an oral statement and accepting a stack of paper printout the police did nothing. There was absolutely no meaningful investigation. Decl. Luo, ¶59.

If a citizen discovers his property was maliciously damaged he would call the police to investigate the crime scene. He would let the police take the crime scene photos and observe the damaged property. Similar to a home burglary, a real victim would call the police to his residence. Here in this case, the accuser did not call the police to his

residence although he alleged his front door was maliciously damaged. He did not let the

police investigate the crime scene or take any photos of the damaged property. Not a

single police officer ever observed the allegedly damaged door or any nude photos

online. The accuser took photos of the "crime scene" on his own, made screenshots,

printed out on a piece of paper as evidence and went to the police station to report the

alleged crimes. He did not even provide a digital copy of the screenshots and photos with

metadata for forensic examination to ascertain whether the screenshots and photos were

tampered or forged. The accuser took the "crime investigation" and "evidence collection"

into his own hands. Same as the screenshots the accuser provided. All screenshots were

printed out on paper by the accuser without providing digital copies of the screenshots

with metadata. None of those can be submitted for forensic examination. Trial counsel

should have explained to the jury how easily the print-outs may be tampered or forged

without forensic examination. The police report also documented that "upon checking

these websites there were no photographs or video's depicting Czodor's genitalia". Decl.

Luo, ¶61, Exhibit R. The jurors did not have special knowledge regarding how to

evaluate the genuineness of evidence and trial counsel failed to educate the jurors. Trial

counsel failed to demonstrate to the jury that the police did not conduct any investigation.

Neither did the police collect any evidence following their protocol. All paper evidence in

this case is the accuser's self-made and self-manufactured evidence with no way to

forensically examine and the accuser has serious credibility issue. Such sloppy police

work amounts to violation of Appellant's federal and state rights to due process.

E.  **PROSECUTION, PUBLIC DEFENDER AND TRIAL COURT'S**
    **VIOLATION OF APPELLANT'S RIGHT TO A SPEEDY TRIAL**

A California defendant generally has three sources of the right to a speedy trial:

(1) the Sixth Amendment to the federal Constitution, as applied to the states through the

due process clause of the Fourteenth Amendment; (2) article I, section 15 of the

California Constitution ; and (3) statutory enactments, such as Penal Code section 1382.

*People v. Harrison* (2005) 35 Cal.4th 208, 225, 25 Cal.Rptr.3d 224, 106 P.3d 895.

California Courts of Appeal have consistently applied the tests to alleged due

process violations articulated in *Barker v. Wingo* (1972) 407 U.S. 514, 92 S.Ct. 2182, 33

L.Ed.2d 101 (*Barker*) and *Mathews v. Eldridge* (1976) 424 U.S. 319, 96 S.Ct. 893, 47

L.Ed.2d 18 (*Mathews*). E.g. *People v. Bradley* (2020) 51 Cal.App.5th 32, 38–39, 264

Cal.Rptr.3d 819 (Bradley); *In re Butler* (2020) 55 Cal.App.5th 614, 638, 269 Cal.Rptr.3d

649 (*Butler*); *People v. DeCasas* (2020) 54 Cal.App.5th 785, 806–813, 268 Cal.Rptr.3d

663 (*DeCasas*); *People v. Superior Court* (*Vasquez*) (2018) 27 Cal.App.5th 36, 238

Cal.Rptr.3d 14 (*Vasquez*).

i. Barker test

*Barker*, supra, 407 U.S. at 514, 92 S.Ct. 2182, set forth a nonexhaustive list of four

factors for courts to consider when determining whether the right to a speedy trial has

been violated: (1) the length of the delay; (2) who is to blame for the delay; (3) the

defendant's assertion of the right; and (4) prejudice. (Id. at p. 530, 92 S.Ct. 2182 ; *People*

*v. Williams* (2013) 58 Cal.4th 197, 233, 165 Cal.Rptr.3d 717, 315 P.3d 1 (*Williams*).

None of these factors is "a necessary or sufficient condition to the finding of a

deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant.... [T]hese factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process." *Barke*, supra, at p. 533, 92 S.Ct. 2182.

ii. Mathews test

*Mathews*, supra, 424 U.S. 319, 96 S.Ct. 893, articulated a more general balancing test of three factors "for resolving what process is constitutionally due" *Butler*, supra, 55 Cal.App.5th at p. 639, 269 Cal.Rptr.3d 649: (1) the private interest affected by the government action; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) the government's interest. *Mathews*, supra, at p. 335, 96 S.Ct. 893. Like the Barker test, the Mathews test "involve[s] careful balancing of the competing interests ...." *People v. Litmon* (2008) 162 Cal.App.4th 383, 399, 76 Cal.Rptr.3d 122 (*Litmon*).

<u>Analysis of the Barker factors</u>

Courts address the *Barker* factors in the following order: the length of the delay, who is to blame for the delay, defendant's assertion of the right, and prejudice to balance these factors to determine whether defendant was deprived of due process.

1. Length of the delay

721 days elapsed between the filing of complaint and jury selection. 721 days have 17,304 hours. A delay of more than one year between the arrest and prosecution in a misdemeanor case is unreasonable and prejudice is presumed, with "dismissal being

constitutionally compelled in the absence of a demonstration of good cause for the delay." *Serna v. Superior Court* (1985) 40 Cal.3d 239, 253-254 [219 Cal.Rptr. 420, 707 P.2d 793]; see *People v. Booker* (2011) 51 Cal.4th 141, 157 [119 Cal.Rptr.3d 722, 245 P.3d 366]. On Jan 10, 2020 jury trial was set on Mar 24, 2020 which was suspended due to COVID. Orange County Superior Court resumed jury trial in late May 2020. Decl. Luo, ¶29, Exhibit B. However, more than ten continuances in this case were granted without a statement of facts proved and entered in the minutes. No facts proved were stated on the record justifying the court's finding that there was good cause to continue. Decl. Luo, ¶28, Exhibit A.

2. Blame for the delay

The protracted delay between the filing of the complaint and the jury trial was mostly attributable to the constant change of public defender, prosecution's inability to provide evidence and failure to prosecute, the trial court's failure to manage its docket, and covid-19. To determine where the blame lies for these delays, the role of the defense, the prosecution, and the trial court should be considered in turn.

i. The defense

As a general rule, "delays caused by defense counsel are properly attributed to the defendant, even where counsel is assigned." *Vermont v. Brillon* (2009) 556 U.S. 81, 94, 129 S.Ct. 1283, 173 L.Ed.2d 231 (*Brillon*). This rule, however, "is not absolute. Delay resulting from a systemic 'breakdown in the public defender system,' [citation], could be charged to the State." (Ibid.) If counsel's motivation for the continuance is not in the best interests of his client, counsel may not waive his client's right to a speedy trial under

section 1382. *People v. Johnson* (1980) 26 Cal.3d 557, 566-569 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255]; accord *Owens v. Superior Court* (1980) 28 Cal.3d 238, 250, fn. 12 [168 Cal.Rptr. 466, 617 P.2d 1098]; *Eshaghian v. Municipal Court* (1985) 168 Cal.App.3d 1070, 1080 [214 Cal.Rptr. 712].

In *Williams*, our state Supreme Court held that although "several of defendant's [eight] attorneys appeared to make little or no progress in preparing his case for trial," there was no evidence of institutional problems that would indicate a systemic breakdown. *Williams*, supra, 58 Cal.4th at p. 248, 165 Cal.Rptr.3d 717, 315 P.3d 1. The court, however, suggested the kind of evidence that might indicate such problems, including "a flaw in the public defender's mechanism for identifying and avoiding conflicts," "problems in the criminal defense panel's assignment system," "unreasonable resource constraints, misallocated resources, [or] inadequate monitoring or supervision." (Id. at p. 249, 165 Cal.Rptr.3d 717, 315 P.3d 1, italics added.) In *Litmon*, the Court of Appeal identified the following as examples of a systemic breakdown: "understaffed public prosecutor or public defender offices facing heavy caseloads, underdeveloped expert witness pools, or insufficient judges or facilities to handle overcrowded trial dockets." *Litmon*, supra, 162 Cal.App.4th at p. 403, 76 Cal.Rptr.3d 122, italics added. As the italicized language illustrates, a systemic breakdown is not limited to situations where the state has failed to provide adequate funding for defense counsel.

A defendant's right to a speedy trial may be denied simply by the failure of the state to provide enough courtrooms or judges to enable defendant to come to trial within the statutory period. The right may also be denied by failure to provide enough public

defenders or appointed counsel, so that an indigent must choose between the right to a speedy trial and the right to representation by competent counsel. "[U]nreasonable delay in run-of-the-mill criminal cases cannot be justified by simply asserting that the public resources provided by the State's criminal-justice system are limited and that each case must await its turn." *Barker v. Wingo*, supra, 407 U.S. 514, 538 [33 L.Ed.2d 101, 121], White, J., conc.

The American Bar Association's Standards for Speedy Trial (ABA Project on Standards for Crim. Justice, Stds. Relating to Speedy Trial (Approved Draft 1968)) discusses the problem of delay caused by court congestion. It states that "delay arising out of the chronic congestion of the trial docket should not be excused. . . . [¶] But, while delay because of a failure to provide sufficient resources to dispose of the usual number of cases within the speedy trial time limits is not excused, the standard does recognize congestion as justifying added delay when 'attributable to exceptional circumstances.' Although it is fair to expect the state to provide the machinery needed to dispose of the usual business of the courts promptly, it does not appear feasible to impose the same requirements when certain unique, nonrecurring events have produced an inordinate number of cases for court disposition." (Pp. 27-28.)

"The same reasoning, distinguishing between chronic conditions and exceptional circumstances, applies to the delay caused by the crowded calendars of public defenders. The state cannot reasonably provide against all contingencies which may create a calendar conflict for public defenders and compel postponement of some of their cases. On the other hand, routine assignment of heavy caseloads to understaffed offices, when

such practice foreseeably will result in the delay of trials beyond the 60-day period without defendant's consent, can and must be avoided. A defendant deserves not only capable counsel, but counsel who, barring exceptional circumstances, can defend him without infringing upon his right to a speedy trial. Thus the state cannot rely upon the obligations which an appointed counsel owes to other clients to excuse its denial of a speedy trial to the instant defendant." *People v. Johnson*, 26 Cal.3d 557, 572 (Cal. 1980) A facile assumption that conflicts in the calendar of the public defender constitute good cause for delay may result in denying indigent defendants the equal protection of the laws. As a dissenting opinion in *Townsend v. Superior Court* (1975) 15 Cal.3d 774, 779-784 [126 Cal.Rptr. 251, 543 P.2d 619], points out: "If an affluent defendant chooses to employ counsel who is involved in many other cases, then the courts, quite appropriately can require the defendant to wait until his selected counsel is ready for trial; if the delay is unacceptable to the defendant, he can always engage another, less burdened attorney. The indigent defendant, however, can exercise no such option. If the public defender who is appointed to represent him is already handling so many cases that the defendant's case must 'trail' beyond the 60-day period, the indigent necessarily loses his statutory right to a speedy trial." (15 Cal.3d 774, 788, dis. opn. of Tobriner, J.)

The *Vasquez* court acknowledged that, generally, "the public defender's office must have the flexibility to decide when it is necessary internally to change the assignment of an attorney" *Vasquez*, supra, 27 Cal.App.5th at p. 73, 238 Cal.Rptr.3d 14, that "flexibility must yield to the individual's right to a timely trial." (Id. at p. 74, 238 Cal.Rptr.3d 14.)

At least six public defenders appeared in Appellant's case during the two years in which the Orange County Public Defender represented Appellant. "[W]hen inadequate representation is alleged, the critical factual inquiry ordinarily relates to matters outside the trial record: whether the defendant had a defense which was not presented; whether trial counsel consulted sufficiently with the accused, and adequately investigated the facts and the law; whether the omissions charged to trial counsel resulted from inadequate preparation rather than from unwise choice of trial tactics and strategy." *Brubaker v. Dickson* (9th Cir. 1962) 310 F.2d 30, 32. Over the last two years prior to jury selection, Appellant never got a chance to discuss the defense with her counsel at length. Prior to the jury trial, Appellant had no clue whether her counsel adequately investigated the facts and the law. Decl. Luo, ¶38 – 39.

Here, the following specific acts violated Appellant's due process rights and together, if not separately, manifest a systemic breakdown. These include: failing to take steps to ensure an earlier trial; reassigning the case to multiple attorneys again and again; requesting continuances due to reassignment of defense counsel; DA's failure in providing evidence and subpoena witness, the trial court's failure to manage its docket. On one occasion no one informed Appellant of the date set for hearing prior to trial which caused Appellant fail to appear on that date. Decl. Luo, ¶31 – 32.

In *Butler*, supra, 55 Cal.App.5th at p. 658, 269 Cal.Rptr.3d 649, the Court of Appeal concluded that "substantial evidence support[ed] the [superior] court's determination that the bulk of the delay may be attributed to the actions (and inactions) by the state." (Ibid.)

In *Williams*, supra, 58 Cal.4th 197, 165 Cal.Rptr.3d 717, 315 P.3d 1, where the California Supreme Court considered whether a seven-year delay between a criminal defendant's arrest and the start of his trial violated his right to a speedy trial, (Id. at pp. 215–252, 165 Cal.Rptr.3d 717, 315 P.3d 1), "[t]he record indicate[d] that several of [the] defendant's attorneys appeared to make little or no progress in preparing his case for trial." (Id. at p. 248, 165 Cal.Rptr.3d 717, 315 P.3d 1.)

"Upon a subsequent motion to dismiss, however, the court must inquire into whether the delay is attributable to the fault or neglect of the state; if the court so finds, the court must dismiss." *People v. Johnson*, 26 Cal.3d 557, 572-73 (Cal. 1980). Although *Johnson*'s requirement of "stricter speedy trial rights" is expressly limited to in-custody defendants, *Rhinehart v. Municipal Court* (1984) 35 Cal.3d 772 [200 Cal.Rptr. 916, 677 P.2d 1206], subsequently extended the principals of *Johnson* to noncustody defendants accused of committing misdemeanors.

ii. The prosecution

During the two years this case was pending, at least ten different prosecutors appeared on the matter. The People never objected, on the record, to a single continuance made by public defender, in a total of eleven continuances. "Since the People are responsible for prosecuting the case, the People cannot avoid their duties to move the case forward by passively deferring to the defense and the court." *In re Butler*, 55 Cal.App.5th 614, 653-54 (Cal. Ct. App. 2020). Each criminal case is about the State's constitutional obligations. As the United States Supreme Court declared in *Barker*, the state has the duty to bring an accused individual to trial "as well as the duty of insuring

that the trial is consistent with due process." *Barker*, supra, 407 U.S. at p. 527, 92 S.Ct. 2182; see *Dickey v. Florida* (1970) 398 U.S. 30, 37–38, 90 S.Ct. 1564, 26 L.Ed.2d 26 ["[a]lthough a great many accused persons seek to put off the confrontation as long as possible, the right to a prompt inquiry into criminal charges is fundamental and the duty of the charging authority is to provide a prompt trial," italics added]. See *Litmon*, supra, 162 Cal.App.4th at p. 406, 76 Cal.Rptr.3d 122 ["The ultimate responsibility for bringing a person to trial on an SVP petition at a 'meaningful time' rests with the government."]. Certain examples illuminate when the government's conduct may fall on the wrong side of the divide between "diligent prosecution" and "official negligence" in bringing the accused to trial. *Doggett*, supra, 505 U.S. at p. 656–657, 112 S.Ct. 2686. For example, the prosecutors in both *Williams* and *Vasquez* were excused from any culpability for the extraordinary delays in those cases only because they took proactive measures to push the matters towards trial. *Williams*, supra, 58 Cal.4th at pp. 218, 239–240, 165 Cal.Rptr.3d 717, 315 P.3d 1; *Vasquez*, supra, 27 Cal.App.5th at p. 64, 238 Cal.Rptr.3d 14. In *Williams*, the prosecution objected throughout the proceedings to continuances of the trial date, stated on the record it was ready for trial, and urged the trial court to revoke the defendant's Faretta status when his self-representation led to unnecessary delays. *Williams*, at pp. 218, 228–230, 239–240, 165 Cal.Rptr.3d 717, 315 P.3d 1. In *Vasquez*, the prosecution repeatedly objected to further continuances of the trial date and urged the trial court to remove the public defender's office and appoint new counsel so that the case could proceed to trial. *Vasquez*, at p. 64, 238 Cal.Rptr.3d 14.

These authorities make clear that the People's due process obligation in a criminal

67

proceeding requires that it diligently prosecute the case. This may entail stating on the record that it is prepared to go to trial, taking affirmative steps to set a trial date, promptly requesting clinical evaluations and records, and securing the attendance of witnesses in a timely manner. Continuance requests, whether by defense counsel or the prosecution, should be supported by an affirmative showing of good cause, and where such a showing is lacking, an objection to the request may be warranted. Where the prosecution encounters repeated continuances of a setting hearing or trial date, or other dilatory tactics, diligent prosecution may necessitate objecting to the delays, insisting upon trial deadlines, and making the trial court aware of the length of time since the filing of the case or other pertinent details from the record. The prosecution may even find it necessary to seek the removal of appointed counsel, the appointment of new or additional counsel, or other measures to ensure that a defendant is brought to trial at a meaningful time and in a meaningful manner.

Turning to the present case, district attorneys never objected to a single continuance requested by public defender. The district attorneys never stated on record that they were ready for trial. After several continuances, no formal motions were ever filed to relieve the public defender or to compel the trial court to set a timely trial date. Nor did the district attorneys state on the record that they were so ready for trial. The People did not actively pursue prosecution in this case. The People was informed on Jun 8, 2021 that the trial was set on Jul 19, 2021. Then the prosecutor did not subpoena the witness they wished to call to testify. The prosecutor failed to diligently prosecute this matter. Even if Appellant's counsel was ready for trial the district attorneys did not seem

to be able to bring the case to trial.

Given the extensive delay in this case and the district attorney's abdication of its duty to ensure that Appellant received a timely trial, the prosecution should bear significant responsibility for the delay. At the very least, its actions (or lack thereof) supply the official negligence necessary to presume prejudice.

iii. The trial court

"The trial court has an affirmative constitutional obligation to bring the defendant to trial in a timely manner." *Vasquez*, supra, 27 Cal.App.5th at p. 74, 238 Cal.Rptr.3d 14. *Vasquez* criticized the trial court for failing to take "meaningful action to set deadlines or otherwise control the proceedings and protect Vasquez's right to a timely trial". In *DeCasas*, the trial court "enabled and compounded the delays resulting from the [public defender's office] staffing cuts" by failing to set deadlines and hold the parties accountable to them. Defense counsel failed to obtain a time waiver as suggested by the court, and instead waived time without DeCasas's permission. *DeCasas*, supra, 54 Cal.App.5th at pp. 792, 806, 810-811. When a defense attorney requests more time to prepare for trial, the trial court must balance a defendant's right to a speedy trial with his right to competent counsel. *People v. Lomax* (2010) 49 Cal.4th 530, 556, 112 Cal.Rptr.3d 96, 234 P.3d 377(*Lomax*) "If counsel seeks reasonable time to prepare a defendant's case, and the delay is for defendant's benefit, a continuance over the defendant's objection is justified." (Ibid.) At the same time, the high court has said that "the primary burden [falls] on the courts and the prosecutors to assure that cases are brought to trial." *Barker*, supra, 407 U.S. at p. 529, 92 S.Ct. 2182.

Section 1382 does not define "good cause" as that term is used in the provision, but numerous California appellate decisions that have reviewed good-cause determinations under this statute demonstrate that, in general, a number of factors are relevant to a determination of good cause: (1) the nature and strength of the justification for the delay, (2) the duration of the delay, and (3) the prejudice to either the defendant or the prosecution that is likely to result from the delay. See, e.g., *Stroud v. Superior Court* (2000) 23 Cal.4th 952, 969-970; *People v. Szeto* (1981) 29 Cal.3d 20, 29-30; *Jensen v. Superior Court* (2008) 160 Cal.App.4th 266, 271-275. Past decisions further establish that in making its good-cause determination, a trial court must consider all of the relevant circumstances of the particular case, "applying principles of common sense to the totality of circumstances . . . ." *Stroud*, supra, 23 Cal.4th 952, 969; see, e.g., *Jensen v. Superior Court*, supra, 160 Cal.App.4th 266, 270-275.

During the two years pendency of the case, at least nine judicial officers cycled through the case. The trial court repeatedly indulged defense counsel's requests for continuances due to lack of preparation, neither actively set trial dates nor sought to move the case along. During the two years of the pretrial delay, the matter was continued eleven (11) times, at defense counsel's request, and it did not appear from the record that the trial court took meaningful action to set deadlines or otherwise control the proceedings and protect Appellant's right to a timely trial. The trial court repeatedly allowed the matter to be continued without ever requiring an on-the-record showing of good cause and without ever finding good cause on the record. When the trial date was first set on Mar 24, 2020 by Appellant's fourth attorney it should mean Appellant was

personally ready for trial even before Mar 24, 2020. Despite the knowledge that the trial date was initially set on Mar 24, 2020 the trial Court still allowed multiple continuances by her counsel without showing good cause on the record pursuant to Penal Code section 1050.

"[E]ven where the attorneys stipulate to continue a trial date, the trial court has an obligation to determine whether there is a good cause for the continuance." *Vasquez*, supra, 27 Cal.App.5th at p. 75, 238 Cal.Rptr.3d 14. The *Vasquez* court concluded that the trial court "could have acted sooner" to address the later delay caused by the systemic issues in the public defender's office. It discussed at length the options the court should have considered, including the possible removal of the public defender's office so that an attorney with adequate time could have been appointed to prepare defendant's trial. (Id. at pp. 75–81, 238 Cal.Rptr.3d 14.) The appellate court cautioned: "As the 'captain of the ship,' the trial court cannot passively preside over a case as it moves forward at a snail's pace without a trial date in sight." (Id. at p. 81, 238 Cal.Rptr.3d 14.) "Upon learning of counsel's inability to represent the Appellant due to other trial commitments, the trial court, pursuant to the decisions in *Johnson* and *Rhinehart*, should have inquired whether counsel could be replaced by another counsel. The court failed to do this. In fact, it did nothing to ensure the Appellant's speedy trial. The trial court incorrectly justified its position by holding *Rhinehart* inapplicable to the case before it. When the Appellant subsequently made his motion to dismiss, the court perpetuated its error by denying the motion for the same reasons." *Gomez v. Municipal Court*, 169 Cal.App.3d 425, 435 (Cal. Ct. App. 1985).

Compliance with the speedy trial rule could not be excused if it were impossible to safely hold a trial as the deadline approached due to an emergency court closure. (See generally Civ. Code, § 3531 ["The law never requires impossibilities"]; *National Shooting Sports Foundation, Inc. v. State* (2018) 5 Cal.5th 428, 434, 235 Cal.Rptr.3d 54, 420 P.3d 870 ["a statute may contain an implied exception for noncompliance based on impossibility where such an exception reflects a proper understanding of the legislative intent behind the statute"]. COVID-19 pandemic did not create an impossibility. See *Favor v. Superior Court*, 59 Cal.App.5th 984, 993 (Cal. Ct. App. 2021). There was no situation where it was impossible to timely hold a jury trial with the covid emergency protocols in place. On Jan 10, 2020 jury trial of this case was set on Mar 24, 2020 and later was suspended due to COVID but the Court resumed jury trial since June 2020. Since June 2020 this Court did nothing to move the case forward knowing the fact that the jury trial was previously set on Mar 24, 2020.

"To the extent the trial court is responsible for a portion of the delay, it is attributable to the state." *Vasquez*, supra, 27 Cal.App.5th at p. 74, 238 Cal.Rptr.3d 14. In sum, the lengthy delay in bringing a misdemeanor case to trial warrants dismissal. "Because Baca was in custody at the time of arraignment, trial had to commence within 30 days of the March 10 date of entry of plea. Thus, the trial court properly granted Baca's motion to dismiss the misdemeanor complaint 33 days later on April 12, 1988." *People v. Baca*, 211 Cal.App.3d 675, 681 (Cal. Ct. App. 1989)

3. Appellant's assertion of her right

In *Barker*, the United States Supreme Court rejected the "demand" rule,

72

"explaining that a defendant's mere silence in the face of a continuance does not waive the constitutional right to speedy trial because a waiver occurs only when there is a conscious relinquishment of a known right." *People v. Seaton* (2001) 26 Cal.4th 598, 633, 110 Cal.Rptr.2d 441, 28 P.3d 175. Under *Barker*, a defendant's failure to assert a speedy trial violation is not dispositive. "A defendant has no duty to bring himself to trial; the State has that duty as well as the duty of insuring that the trial is consistent with due process." *Barker*, supra, 407 U.S. at p. 527, 92 S.Ct. 2182. "The Constitution guarantees a criminal defendant both a speedy trial right and effective representation, and it puts the burden of securing both guarantees on the state." *Williams*, supra, 58 Cal.4th at p. 238, 165 Cal.Rptr.3d 717, 315 P.3d 1.

"Although the court found that DeCasas had not asserted his right to a speedy trial, he had been 'forced to acquiesce to his counsel's demand for more time and forced to choose between proceeding to trial without prepared counsel or giving up his right to a speedy trial.' The court therefore did not 'give significant weight to [DeCasas's] failure to assert his right to a speedy trial." *People v. DeCasas*, 54 Cal.App.5th 785, 800-01 (Cal. Ct. App. 2020).

Vasquez "was forced to choose between proceeding to trial with an unprepared attorney, or giving up his right to a speedy trial—truly a Hobson's choice. Under these circumstances, it is unfair to give significant weight to Mr. Vasquez's failure to assert his right to a speedy trial. "'The serial representation was very disruptive to the clients because each time somebody has to start anew.' The dysfunctional manner in which the Public Defender's Office handled Mr. Vasquez's case was precisely the type of systemic

73

or institutional breakdown contemplated by *Brillon* and [*People v. Williams* (2013) 58 Cal.4th 197, 232, 165 Cal.Rptr.3d 717, 315 P.3d 1]. Accordingly, the reason for the delay in bringing the case to trial should be attributed to the state, and not to Mr. Vasquez." *People v. Superior Court*, 27 Cal.App.5th 36, 54 (Cal. Ct. App. 2018).

Here, Appellant was in the same position as Mr. Vasquez's and DeCasas's. On Aug 12, 2019 Appellant did not knowingly and voluntarily waive her constitutional right to a speedy trial. No one ever explained to Appellant what was general time waiver and what was the consequence to enter a general time waiver. Given Appellant's lack of experience in criminal proceedings and traumatic events during incarceration she was most likely not competent to comprehend issues of speedy trial through counsel, or to assist or meaningfully authorize counsel to handle legal proceedings on her behalf. Simply put, had public defender told Appellant, on Aug 12, 2019, that he was ready for trial next week Appellant would have been more than happy to appear at trial.

Appellant was not aware of any general time waiver in this case until Jul 13, 2021. Decl. Luo, ¶28, Exhibit A. At the time Appellant was under the impression that she either went to trial now with an unprepared counsel or went to trial on a later date with a prepared counsel. Appellant did not make a voluntary, knowing and intelligent waiver of her right to a speedy trial.

"[T]he consent of appointed counsel to a postponement of trial beyond the statutory period, if given solely to resolve a calendar conflict and not to promote the best interests of his client, cannot stand unless supported by the express or implied consent of the client himself. [Fn. omitted.]" *People v. Johnson*, supra, 26 Cal.430 3 3d at p. 567.

74

On Mar 5, 2021 Appellant asked Mr Daniel Maher if there was any possibility to dismiss the case. Mr Maher spent less than two seconds in considering the totality of the circumstances and told Appellant NO.

Section 1382 "confers a right upon the defendant, but that right becomes meaningless if counsel can disregard defendant's views and interests and waive the right. Routine waivers to accommodate crowded calendars of defense counsel, moreover, defeat the public interest in speedy criminal trials." *People v. Johnson*, 26 Cal.3d 557, 567 (Cal. 1980). In the present case, no one ever explained to Appellant what was general time waiver and what was the consequence to enter a general time waiver. Waiver requires "an intentional relinquishment or abandonment of a known right or privilege". *Barke*, supra, 407 U.S. at p. 525, 92 S.Ct. 2182. Appellant was not aware of any general time waiver in this case until Jul 13, 2021. Decl. Luo, ¶21. Not to mention no one ever told Appellant that she could withdraw the time waiver. How could Appellant withdraw the time waiver if she was not even aware of its existence? Appellant did not voluntarily waive her right to a speedy trial. Appellant did not voluntarily enter a general waiver of the 30-day trial requirement. Neither did she, due to her personal reason, request the setting of a trial date beyond the 30-day period. See *Barker* supra, 407 U.S. at pp. 531–532, 92 S.Ct. 2182 ["The defendant's assertion of his speedy trial right ... is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right"]. The power of appointed counsel to control judicial strategy and to waive nonfundamental rights despite his client's objection (see *Townsend v. Superior Court* (1975) 15 Cal.3d 774, 781 [126 Cal.Rptr. 251, 543 P.2d 619] and cases there cited)

75

presumes effective counsel acting for the best interest of the client. As the court pointed out in *People v. Corona* (1978) 80 Cal.App.3d 684, 720 [145 Cal.Rptr. 894], "[e]ffectiveness . . . is not a matter of professional competence alone. It also includes the requirement that the services of the attorney be devoted solely to the interest of his client undiminished by conflicting considerations." Thus when the public defender, burdened by the conflicting rights of clients entitled to a speedy trial, seeks to waive one client's right, that conduct cannot be justified on the basis of counsel's right to control judicial proceedings. The public defender's decision under these circumstances is not a matter of defense strategy at all; it is an attempt to resolve a conflict of interest by preferring one client over another. "Counsel lacked authority to waive defendant's right to a speedy trial under section 1382." *People v. Johnson*, 26 Cal.3d 557, 566 (Cal. 1980). "Counsel alone could not waive his client's rights under section 1382: if counsel were "ineffective" (See 15 Cal.3d at p. 781), "inadequate" (p. 784), "lazy or indifferent" (ibid.)." *People v. Johnson*, 26 Cal.3d 557, 567 (Cal. 1980).

This Court should consider: (1) whether the general time waiver was valid while Appellant did not knowingly, voluntarily, and intelligently enter the waiver; (2) what was the real reason behind the entrance of the general time waiver? Was it beneficial solely for the State or Appellant? (3) even though the general time waiver was valid the State still had a constitutional obligation to bring a case to trial at a meaningful time and in a meaningful manner. Is it ok for the State to drag an innocent person to court and let her hang on the criminal docket for two years? Then caused Appellant subject to over $20,000 interests from restitution. (4) what investigation and preparation was done

76

between each continuance? (5) whether the trail counsel's performance required two years of preparation? The fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner." *People v. Litmon* (2008) 162 Cal.App.4th 383, 395, 76 Cal.Rptr.3d 122 (*Litmon*), quoting *Armstrong v. Manzo* (1965) 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62. An accused is entitled under the due process clause to a timely trial even despite the absence of a specific statutory requirement. *People v. DeCasas* (2020) 54 Cal.App.5th 785, 799–802, 268 Cal.Rptr.3d 663 (DeCasas); *Vasquez*, supra , 27 Cal.App.5th at p. 56, 238 Cal.Rptr.3d 14 ; *People v. Landau* (2013) 214 Cal.App.4th 1, 27, 154 Cal.Rptr.3d 1; *Litmon*, supra, 162 Cal.App.4th at pp. 399–402, 76 Cal.Rptr.3d 122.

Here, the state of California provided no reason to believe that the continuous reassignment of district attorneys and public defender would benefit the resolve of the case. The constant reassignment of counsels denied both Appellant's right to have a trial in a timely manner and her right to have a prepared counsel. Appellant's counsel was deliberately subordinating Appellant's statutory right to a speedy trial to their crowded or mismanaged calendar rather than promoting the best interest of Appellant. Appellant did not request the setting of a trial date beyond the 30-day period due to her own inability to appear at trial. "The postponements granted by the trial court in the present case at the instance of the public defender were not granted "at the request of the Appellant or with his consent" within the meaning of section 1382, subdivision 2." *People v. Johnson*, 26 Cal.3d 557, 568-69 (Cal. 1980).

4. Prejudice to Appellant

A Appellant is subject to "the actual restraints imposed by arrest and holding to answer a criminal charge," for purposes of triggering the Sixth Amendment speedy trial guarantee even when he has been released on bond. (Id. at pp. 761-762 [discussing *Dillingham v. United States* (1975) 423 U.S. 64, 65]; *People v. Martinez* (2000) 22 Cal.4th 750, 761 [same].) Under a federal constitutional speedy trial analysis, "[p]rejudice is presumed when it is reasonable to assume sufficient time elapsed to affect adversely one or more of the interests protected by the speedy trial clause." *Ogle v. Superior Court* (1992) 4 Cal.App.4th 1007, 1020 [ 6 Cal.Rptr.2d 205] . Because delay that is "uncommonly long" triggers a presumption of prejudice *Doggett v. United States* (1992) 505 U.S. 647, 651, 652, 656, 657, a defendant can establish a speedy trial claim under the Sixth Amendment without making an affirmative demonstration that the government's want of diligence prejudiced the defendant's ability to defend against the charge. Under the federal Constitution, the defendant need not identify any specific prejudice from an unreasonable delay in bringing the Appellant to trial after the speedy trial right has attached. *Moore v. Arizona* (1973) 414 U.S. 25, 26.

Prejudice is assessed in view of three "interests of defendants which the speedy trial right was designed to protect"—namely, "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Barker*, supra, 407 U.S. at p. 532, 92 S.Ct. 2182.

"A man's constitutional liberty means more than his personal freedom." *People v. Holder*, 53 Cal.App. 45, 52 (Cal. Ct. App. 1921). Appellant was required to appear in

court on a date certain subjected Appellant to restraints on her liberty sufficient to trigger the Sixth Amendment speedy trial guarantee. See *People v. Martinez*, supra, 22 Cal.4th at pp. 761-762. Nearly two years of pretrial delay with a criminal restraining order restricting Appellant's liberty was undoubtedly oppressive and would do little to minimize the anxiety and concern of the accused. For the last two years, public record shows that Appellant was being accused of three crimes. The damage and harm to Appellant's character cannot be compensated or redone. "[T]ime once past can never be recovered." *Vasquez*, supra, 27 Cal.App.5th at p. 64, 238 Cal.Rptr.3d 14.

"Excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify." *Doggett v. United States* (1992) 505 U.S. 647, 655, 112 S.Ct. 2686, 120 L.Ed.2d 520. "While such presumptive prejudice cannot alone carry a Sixth Amendment claim without regard to the other *Barker* criteria, [citation], it is part of the mix of relevant facts, and its importance increases with the length of delay." (Id. at pp. 655–656, 112 S.Ct. 2686, italics added.)

The high court in *Doggett* went on to discuss how the importance of presumptive prejudice varies with the reason for the delay, explaining: "Between diligent prosecution and bad-faith delay, official negligence in bringing an accused to trial occupies the middle ground. While not compelling relief in every case where bad-faith delay would make relief virtually automatic, neither is negligence automatically tolerable simply because the accused cannot demonstrate exactly how it has prejudiced him.... [¶] ... Although negligence is obviously to be weighed more lightly than a deliberate intent to harm the accused's defense, it still falls on the wrong side of the divide between

acceptable and unacceptable reasons for delaying a criminal prosecution once it has begun. And such is the nature of the prejudice presumed that the weight we assign to official negligence compounds over time as the presumption of evidentiary prejudice grows. Thus, our toleration of such negligence varies inversely with its protractedness, [citation], and its consequent threat to the fairness of the accused's trial." *Williams*, supra, 58 Cal.4th at p. 237, 165 Cal.Rptr.3d 717, 315 P.3d 1, quoting *Doggett*. Here, "a presumption of prejudice" can be drawn because the record does show that the state was responsible for the delay. *Williams*, supra, 58 Cal.4th at p. 252, 165 Cal.Rptr.3d 717, 315 P.3d 1. "Even if the delay did not impair the defense, the prejudice factor weighs in favor of finding a violation of a speedy trial right." *People v. DeCasas*, 54 Cal.App.5th 785, 812 (Cal. Ct. App. 2020).

5. Balancing of factors

The length of the delay, Appellant's assertion of her right, and prejudice weigh in her favor. The various continuances were almost entirely due to public defender's crowded or mismanaged calendar and they were not intended for Appellant's direct benefit. Appellant should not bear responsibility for the delays. Appellant's ability to prepare her defense was adversely affected by the continuing change of counsel because each new counsel needed time to prepare for new evaluations, as such Appellant has shown that she suffered the 'most serious' type of prejudice"—that is, "the inability to adequately prepare his defense [citation.]" *Williams*, supra, 58 Cal.4th at p. 236, 165 Cal.Rptr.3d 717, 315 P.3d 1. Balancing these factors, Appellant's due process right to a timely trial was brutally violated.

<u>Analysis of the *Mathews* factors</u>

*Mathews* factors should be addressed in the following order: the private interest affected, the risk of erroneous deprivation of that private interest, and the government's interest.

1. Private interest affected

Appellant had been subjected to a significant curtailment of her liberty during her extended pretrial and criminal restraining order.

2. Risk of erroneous deprivation of private interest through the procedures used

No additional or substitute procedural safeguards can be employed other than a dismissal.

3. Government's interest

There is no question that the state has a compelling protective interest in speedy trial. Cal. Const. art. 1, § 29 ["In a criminal case, the people of the State of California have the right to due process of law and to a speedy and public trial "]; see *Today's Fresh Start, Inc. v. Los Angeles County Office of Education* (2013) 57 Cal.4th 197, 212, 213 (*Today's Fresh Start*); cf. *Trueblood v. Washington State Dept. of Social & Health Services* (W.D. Wash. 2015) 101 F.Supp.3d 1010, 1023 (*Trueblood*) ["An efficient system that moves people through the competency process quickly will . . . increase the speed at which competent people are brought to trial, will increase the percentage of incompetent people who can be restored and thus brought to trial, and will reduce the amount of money that the public spends incarcerating people"].)

4. Balancing of factors

The same conclusion weighing the *Mathews* factors can be drawn as with the *Barker* factors: Appellant's right to due process was brutally violated. Any risk of an erroneous deprivation of Appellant's Constitutional rights cannot be reasonably mitigated at this time in point. The state's compelling interest in protecting society from the risk Appellant posed to it is entitled to significant weight and tips the scales in favor of a reversal and dismissal.

Trial counsel's failure to (1) prepare for trial in a timely manner and (2) file a *Serna* Motion forced Appellant to sit for a trial that should not have been held in the first place. Such failure was prejudicially ineffective. As the *Barker* court stated, "[t]he amorphous quality of the [speedy trial] right also leads to the unsatisfactorily severe remedy of dismissal of the indictment when the right has been deprived. This is indeed a serious consequence because it means that a defendant who may be guilty of a serious crime will go free, without having been tried. Such a remedy is more serious than an exclusionary rule or a reversal for a new trial, but it is the only possible remedy." (*Barker*, supra, 407 U.S. at p. 522, 92 S.Ct. 2182, fn. omitted; accord, *Williams*, supra, 58 Cal.4th at p. 233, 165 Cal.Rptr.3d 717, 315 P.3d 1; *Vasquez*, supra, 27 Cal.App.5th at p. 83, 238 Cal.Rptr.3d 14.)

"We find that the trial court erred in failing to grant defendant a hearing on his motion to dismiss charges under section 1382, and so denied defendant his right to a speedy trial. As we have explained, the state is in no position to deny a defendant his right to a speedy trial because the state is unable to provide counsel who can bring the case to trial within the statutory limits. If the state wants to incarcerate a citizen it cannot

do so in violation of the state's own obligations and in violation of its own self-imposed conditions of confinement. The state must be a model of compliance with its own precepts." *People v. Johnson*, 26 Cal.3d 557, 580 (Cal. 1980).

As a result of the state's failure to bring the case to trial in a timely manner, Appellant is subject to over $20,000 interest from restitution because the restitution is over $80,000. There is no remedy other than a reversal of judgment for the violation of Appellant's due process right and her right to a conflict-free counsel.

## II.   CONCLUSION

For all the foregoing reasons, Appellant's rights to due process, a fair and speedy trial, and competent counsel were violated and Appellant's conviction should be vacated and the case should be dismissed. Appellant has sustained her burden of proving there is newly discovered and credible evidence that undermines the entire case of the prosecution. Relief by habeas corpus is therefore warranted. *In re Hall* (1981) 30 Cal.3d 408, 417 [179 Cal.Rptr. 223, 637 P.2d 690]; see also Pen. Code, § 1473.

Further, Appellant has now thoroughly controverted and discredited the evidence originally presented to prove her guilt. Appellant's guilt has not only been called into question, she has proven that no reasonable juror would have found her guilty beyond a reasonable doubt. Her innocence is a matter of reality. This Court must act to find Appellant actually innocent. This Court must grant this petition and issue a finding of factual innocence. In the alternative, this Court should order an evidentiary hearing at which Appellant will be permitted to offer further proof in support of her claims for habeas relief.

Dated: Feb 18, 2022                          Respectfully submitted,


                                             */s/ Xingfei Luo*
                                             Xingfei Luo
                                             Appellant and Defendant, In Pro Per

## DECLARATION OF XINGFEI LUO

I, XINGFEI LUO, declares and states:

1. I am the Appellant in this petition. I sat through the jury trial commenced on Jul 27, 2021. I requested and received the entire discovery file from public defender in Sep 2021. I have personal knowledge of all facts stated herein. If called as a witness, I could and would competently testify thereto.

2. Prior to Aug 2019 I was never arrested by any law enforcement. I did not have any prior knowledge concerning criminal proceeding. In my entire life I did not even have a traffic ticket.

3. On August 8, 2019 at around 10:00 am I was arrested by SAPD in City of Industry. I did not resist arrest and was not violent. During the arrest, SAPD personnel conducted a pat-down search on me and no weapon or contraband was found.

4. The arresting officer took possession of my cell phone and demanded the passcode to my cell phone but I refused to submit. Before the arresting officer demanded my passcode she did not tell me why she would need to search my phone. Nor did she ever ask for my consent to search. Not to mention she never advised me that I had a right to refuse to search. The entire encounter was recorded and I have a copy of the footage.

5. At around 10:50 am on August 8, 2019 I arrived at Women's central jail ("WCJ") which was operated by Orange County Sheriff's Department ("OCSD"). Because I did not memorize any phone numbers, while I requested for the return of my cell phone to get my friend or family's phone number the arresting officer denied my request because I didn't submit to her the passcode to my cell phone. Therefore, I was not able to arrange bail through friends or family and had to be housed as a pre-trial detainee which caused me to spend four days in hell between Aug 8 and Aug 12, 2019.

6.   On Aug 8, 2019 I told a deputy in WCJ that I was on menstrual cycle and I would need to use the restroom. However, I was ordered to sit down but I politely explained I could not sit down because my pad was full and if I sat down period blood would come out. The deputy didn't care and pushed my shoulder to force me to sit down.

7.   I, a petite less than 100 lb soft-spoken woman, was arrested, helpless, shocked, and frightened. I was also unarmed and defenseless, thus, in a vulnerable position in WCJ at the hands of law enforcement that had the power to do anything to me.

8.   After I got a chance to change my pad I told a deputy that I was cold to death and politely asked for blanket or clothing to keep warm but the deputy maliciously replied "It's JAIL. Don't come to jail next time." even though the deputy was well aware that I was in great discomfort and denial of basic human needs would cause harm.

9.   I was less than 100 lbs and wearing a thin T-shirt at the time. The jail facility was kept bone chillingly cold. It was worse than being in winter without heater. I told myself "This is not jail. This is hell."

10.  On Aug 8, 2019 I told a female nurse that I was cold to death but the nurse laughed at me intentionally and stated that she didn't feel cold even though the nurse was well aware that I was in great discomfort and denial of basic human needs would cause harm. Then I was held in a concrete icing cold holding cell while I was shaking from head to toe. Later I was transferred to another area and I told a male nurse that I was cold to death. Again, the nurse was well aware that I was in great discomfort and denial of basic human needs would cause harm but I was ignored intentionally. After being continuously exposed to low temperature my heartbeat dropped from 90 to 57.

11.  20 plus hours without food along with 12 plus hours in bone chillingly cold environment constituted unlawful punishment because my repeated requests for food and

blanket were intentionally denied by OCSD personnel.

12.  I didn't even want to be naked in front of my mother, not to mention a bunch of strangers. However, on Aug 8, 2019 I was ordered to shower in the presence of strangers despite my objection. In the presence and view of OCSD personnel and other inmates, I had to take off all of my clothing, being completely naked, hand over my clothing to OCSD personnel before going to shower. When my naked body being observed the distance between me and OCSD personnel or other inmates was within two feet. After this mandatory shower I didn't take any shower for four days until I got home due to the significant and negative impact on me grown out of the horrible shower experience I endured.

13.  After my arrival around 11 am on Aug 8, 2019 I was not provided with lunch in WCJ. My last meal before arrival at WCJ was a quick and small breakfast around 7 am. Between 5 pm and 9 pm I repeatedly requested food but my requests were denied by falsely being told three times she would get food later but she didn't get any food until the next day morning. Each time when I requested food OCSD personnel was well aware that I was starving and food was life necessity.

14.  Between August 8 and 12, 2019 I was strip searched for seven times: (a) Before being housed in general population and after a mandatory shower in the presence and view of OCSD personnel on August 8, 2019; (b) Before going up to the patio on August 10, 2019; (c) Upon return from the patio on August 10, 2019; (d) Before leaving for court on August 12, 2019; (e) Upon arrival at court on August 12, 2019; (f) Upon return from court with approval of release on own recognizance on August 12, 2019; (g) Right before leaving WCJ on August 12, 2019.

15.  The above searches were all conducted in open hall way, without privacy, under

surveillance camera, and in the presence and view of other inmates. At each time of the search, OCSD personnel did not have probable cause or reasonable suspicion that I was in the possession of contraband, any other substance or weapon that would justify or necessitate the strip searches.

16.  During each strip search, since I was menstruating I was ordered to pull down my underwear, lift up my period pad with my blood on it, so that OCSD personnel could inspect underneath the pad. While my pad was lifted up I was ordered to twist it in front of OCSD personnel so that it could be inspected if there was anything in the pad. I was not provided with a new period pad or allowed to use the restroom before putting my underwear with the used pad back on. All of these occurred in the open hallway in a group of inmates under surveillance camera.

17.  On August 11, 2019, in the early morning after midnight, forty (40) inmates in my cell were awoken and locked up in the dayroom. While being locked up in the dayroom all inmates' bedding were searched without reasonable suspicion. During the shakedown one deputy loudly announced that such searches would continue regularly unless and until all inmates would keep quiet during the day. The deputy went on and declared in a degrading manner that dayroom and phone service would be shut down unless and until all inmates would shut up during the day.

18.  For the consecutive four nights in WCJ, I got little to no sleep. Forty (40) women shared four toilets with no doors. The entire nights were surrounding the loud noise of toilet flushing. The lights were 24 hours on.

19.  On Aug 12, 2019 I did not voluntarily waive reading and advisement of the Original Complaint. During the entire arraignment I was confused what was going on. Before I left the arraignment I had to request a copy of the complaint from public

defender and I did not get a chance to read it until I got home after being released from custody.

20.  I was never properly and fully advised by my counsel about my right to a speedy trial. I was not advised, for example, that my case could be dismissed if it was not brought to trial within 30 days after I entered my plea, how a general time waiver was entered, and I could withdraw the time waiver any time I wanted.

21.  On Aug 12, 2019 I did not voluntarily and intelligently waive my constitutional right to a speedy trial. No one ever explained to me what was general time waiver and what was the consequence to enter a general time waiver. I was not aware of any general time waiver in my case until Jul 13, 2021. I did not make a voluntary, knowing and intelligent waiver of my right to a speedy trial. I was forced to choose between my right to a speedy trial and my right to be represented by competent counsel as a result of being represented by public defender and not knowing that I could file a *Marsden* motion until Jul 12, 2021.

22.  Throughout my case, no one ever asked me whether I was asserting or willing to waive my due process right to a speedy trial. No one ever asked for my authority to waive my constitutional right to a speedy trial. No one ever told me that I could withdraw the time waiver. More importantly, I could not withdraw the time waiver because I was not even aware that there was a general time waiver.

23.  On or about Aug 16, 2019, less than a week after my release from custody, I ended up in ER for dysfunctional menstrual bleeding. In my entire life it was my very first time to visit ER. On or about Aug 30, 2019 I was transported by sheriff to the hospital and put on suicide watch for five days.

24.  Even though I was released from 5150 hold just days prior, on Sep 6, 2019 I still

managed to appear at a pretrial hearing set by the trial Court.

25.  On Nov 28, 2019 I attempted suicide by trying to overdose sleeping aid.

26.  Before and during the pretrial hearings on 08/12/2019, 09/06/2019, 10/18/2019, 01/10/2020, 02/14/2020, 03/20/2020, 07/14/2020, 12/22/2020, 03/05/2021, 05/07/2021, 06/08/2021, no one ever explained to me what was general time waiver and what was the consequence to enter a general time waiver. Each time I was simply informed by my counsel that there would be a continuance and as far as I was concerned continuances were required to enable my attorney to be prepared for trial. To me, there is a big difference between a general time waiver and continuance. General time waiver means that I voluntarily and knowingly waive my right to a speedy trial. Continuance means that my counsel is not prepared for trial even though I do not want to waive my right to a speedy trial. Given my lack of experience in criminal proceedings and traumatic events during incarceration I was most likely not competent to comprehend issues of speedy trial through counsel, or to assist or meaningfully authorize counsel to handle legal proceedings on my behalf.

27.  I never waived my right to be present at any hearings pending trial. Each time I was simply informed by my counsel whether or not I would need to be present at the hearing.

28.  On Jan 10, 2020 jury trial was set on Mar 24, 2020. I was not aware of any general time waiver in my case until Jul 13, 2021. A true and correct copy of the correspondence with public defender and minute order is attached hereto as Exhibit A.

29.  The jury trial was suspended due to COVID but the Court resumed jury trial since late May 2020. A true and correct copy of the jury release is attached hereto as Exhibit B.

30.  I never requested any continuances due to my own inability to appear at trial or

any hearing. All the continuances were caused by the prosecution, public defender, and the trial court.

31.  I was not informed that there was a pretrial hearing on Jul 14, 2020. I did not appear in court on Jul 14, 2020 and nobody ever asked me for my authority to enter a general time waiver or waive my appearance. I was not even informed that the next pretrial was set on Dec 4, 2020. A true and correct copy of the minute order is attached hereto as Exhibit A.

32.  I failed to appear at the hearing on Dec 4, 2020 because I did not know there was a hearing due to public defender's failure to notify. I was so frustrated about my failure to appear in Court because I was at no fault. I felt like I was a piece of meat on the chopping board. I cannot afford private counsel and at the time I did not know I could file a *Marsden* motion.

33.  Had I been represented by competent counsel, there would not have been a general time waiver. Had I been represented by competent counsel, the general time waiver would have been withdrawn by the end of August 2019. Had I been represented by competent counsel I would not have failed to appear in court on Dec 4, 2020. Had I been represented by competent counsel my charges should have been dismissed long time ago. My constitutional rights to competent counsel and a speedy trial had been substantially impaired.

34.  I did not request any continuances due to my inability to appear for trial. I did not request any reassignment of counsel prior to I filed the *Marsden* Motion.

35.  On Mar 5, 2021, after learning that DA could not provide credible or admissible evidence and realizing the fact that the charges had been draining my life for quite some time, I asked Mr Daniel Maher if there was any possibility to dismiss the case. Mr Maher

spent less than two seconds in considering the totality of the circumstances and told me NO. I could not do anything about it because I was still under the impression that I either had public defender or no counsel at all. I did not know I could file *Marsden* motion at the time. More importantly, I had no access to the records. I have no idea what really happened at each pretrial hearing and what's on the records. For example, whether the district attorney objected to each continuance. Until Jul 18, 2021, I did not learn the fact that the district attorney never made objection to each continuance and never stated on record that they were ready for trial.

36.  On Jul 12, 2021 I called public defender Supervising Attorney Ray Jones and expressed my frustration. Instead of advising me to file *Marsden* request he simply told me to represent myself, which manifests that public defender did not have my best interest in mind.

37.  On Jul 12, 2021 I asked Mr Jorge Dominguez to file a motion to dismiss and on Jul 13, 2021 I was informed by Mr Dominguez that he would not do so.

38.  Since I was arraigned I was left in the dark throughout the entire process. At each hearing I was told to wait outside the courtroom in the hallway. I had no idea what happened in the courtroom. When I was called inside the courtroom I was simply told when my next court day was.

39.  Over the last two years, I never got a chance to discuss the defense with my counsel at length. My constitutional rights seem like a joke to the State of California. The Legislature should have criminalized violation of constitutional rights.

40.  I have been seeing psychiatrist and therapist for over two years. I constantly have nightmares seeing myself dying in jail or being strangled. From time to time I cry uncontrollably in the shower fighting the intrusive memory coming from my

incarceration in WCJ. Each menstrual cycle seems torture to me because it reminds me of the strip searches in WCJ and how I twisted my bloody pad in front of a bunch of strangers. I have become supper paranoid and am constantly worried that I am being watched. I stay in bed between 12 to 15 hours per day. I have difficulty in concentration. I am currently taking three medications for my PTSD, depression and anxiety. My counsel was well aware of my health condition prior to trial.

41.  On Sep 10, 2018 Tomas Czodor falsely alleged terrorism. A true and correct copy of the Police field activity report on Sep 10, 2018 is attached hereto as Exhibit C. The report or information was never disclosed by prosecution.

42.  The 911 call on Sep 18, 2018 was made at 8:07 pm. My counsel never bothered to make such inquiry. I made a public record request after I was stunned by my counsel's performance at trial. A true and correct copy of the Police Field Activity on Sep 18, 2018 is attached hereto as Exhibit D. The report on Sep 18, 2018 or related information was never disclosed by prosecution.

43.  A true and correct copy of Tomas Czodor's criminal conviction records is attached hereto as Exhibit E. Tomas Czodor's rap sheet was never disclosed by prosecution, including the information that Czodor was previously subject to deportation and arrested for impersonation.

44.  On Sep 24, 2018 the accuser expressed his plan to manufacture criminal charges and file a restraining order after he learned that it would cost money to remove a post related to his credibility. A true and correct copy of the accuser's email is attached hereto as Exhibit F.

45.  The Accuser testified in the family court that he heard weird noises from scratching for 20 minutes, it was dark so he did not see the damages to his door on Sep

18, 2018, and the photo of the damaged door was taken on Sep 25, 2018. A true and correct copy of the family court transcript is attached hereto as Exhibit G. It makes total sense why the photo of the damaged door was taken on Sep 25, 2018 because the accuser damaged his own door that day and falsely filed the police report on Sep 26, 2018 for retaliation with all other manufactured "paper evidence". Although the accuser alleged the cheater post caused him damage and harm, he never spent a dime on the removal of the post despite he made more than sufficient money to remove any post. A true and correct copy of the tax returns provided by Tomas Czodor is attached hereto as Exhibit N.

46.  The accuser confirmed that two videos he provided to the police were taken at 7:54 pm and 8:13 pm respectively. A true and correct copy of his declaration under oath is attached hereto as Exhibit H.

47.  The accuser declared that on Sep 18, 2018 he called his friend Chris Kovacs and went outside to confront me. His friend suggested to call 911 because I did not want to leave, but not because I was scratching his door. A true and correct copy of the accuser's declaration submitted to family court is attached hereto as Exhibit I.

48.  The accuser provided to the police a photo, printed out on paper with no trace of time stamp or metadata, depicting me standing and holding a key in front of his door which was taken from his kitchen window. A true and correct copy of the photo is attached hereto as Exhibit J. It clearly shows the lighting came from the top of my head showering me from head to toe. The entire front door area was nice and bright enough to see anything, including damages if any. However, the accuser, a professional liar, lied about being dark and unable to see the damage on Sep 18, 2018. A true and correct copy of the accuser's testimony is attached hereto as Exhibit G.

49.  The second photo provided to the police by the accuser, also printed out on paper

94

with no trace of time stamp, depicting me standing in front of his door viewer. The photo clearly shows there was bright light coming from the top which backs up the first photo showing strong light coming from the ceiling. A true and correct copy of the photo is attached hereto as Exhibit K.

50. The third photo provided to the police, printed out on paper with no trace of time stamp, shows I was standing in front of the accuser's garage door which was nowhere close to his front door. A true and correct copy of the photo is attached hereto as Exhibit L. Because all these photos were not provided in digital form with metadata, I cannot obtain the time stamp of each photo.

51. The prosecution falsely alleged that I admitted to post the Accuser's nudes while I did not need his permission in the family court but such allegation was completely false. A true and correct copy of the family court transcript is attached hereto as Exhibit G.

52. I ran a research both with county and state authorities, which shows there was never a company or business named "Gorgeous Painting". A true and correct of the research is attached hereto as Exhibit M. It can be easily searched on https://businesssearch.sos.ca.gov/ and https://cr.ocgov.com/FBNOnlineNet/.

53. The accuser admitted that he just met me twice and I was nobody to him.

54. Prior to signing off a stipulation with the prosecution public defender did not have any discussion with me. I was unaware of or involved in the stipulation.

55. A true and correct copy of the DVRO issued by the family court is attached hereto as Exhibit O. Not a word in the DVRO orders me to stay away from Czodor's facebook page. Not a word in the DVRO orders anything related to Czodor's company and he did not have any company ever. Not a word in the DVRO orders me to stop contacting Czodor's friends and clients. Not a word in the DVRO orders me to stop stalking Czodor

in cyberspace.

56.  The accuser told me he was a nudist right after we started texting in early August 2018. He invited me to a nudist ranch. I never asked for his nudes. He told me he was going back to Europe before our second and last face to face meeting. A true and correct copy of his texts and the introduction of the nudist ranch is attached hereto as Exhibit Q.

57.  Prior to trial I informed my counsel that the accuser was a nudist but I was told he would not present this fact at trial and the less information the better.

58.  During my jury trial, my counsel called no witness to the stand and presented no evidence that was from his investigation. Had I known such "preparation" beforehand, no defense witness would be called and no evidence would be presented, I would have insisted on having the trial right away and filed the appeal two years ago instead of subjecting myself an extra two years' of criminal protective order and other restraints between 2019 and 2021.

59. On Sep 18, 2018 the accuser took more videos and photos than he provided to the police. He withheld those videos and photos because they would show I did not scratch his door and I denied posting his nudes.

60.  For centuries, door knocker has been made with metal. The accuser had neither doorbell nor door knocker on his door in Sep 2018. There is nothing wrong to use any metal object as a door knocker.

61.  The accuser's interaction with the police officer was recorded. The police officer's body camera footage shows that the officer did not read any text messages from the accuser's phone and took all paper "evidence" as true and correct without collecting or even asking for digital copy with metadata and timestamp. A true and correct copy of the officer's statement indicating no nude photos or videos observed is attached hereto as

Exhibit R.

62.  I sat through my jury trial. The jury was not instructed to decide whether the Accuser and I had a dating relationship.

63.  After trial, trial counsel asked me for consent to sentence continuance because he said he would need time to prepare a brief. Prior to this conversation he did not explain to me that misdemeanor sentences must be pronounced not less than six hours nor more than five days after a conviction unless the defendant waives that timeframe. Neither did he explain such continuance would lead to a waiver. Had I been fully and properly advised about my rights I would never have agreed to any continuances.

64.  On Sep 13, 2021 I confirmed with my trial counsel that neither he nor any of his coworkers ever called Chris Kovacs for information. Not to mention the accuser's so-called friends and customers who may never exist. Due to public defender's failure to subpoena all texts between the accuser and me the accuser was free to lie about anything, including the fabrication that I asked for his nudes and threatened him.

65.  Throughout the entire process, the accuser took full advantage of our sloppy government actors. The police did not bother to collect evidence following protocol. The police did not bother to preserve the tape of 911 call. The public defender did not bother to conduct any discovery. Poor police work and bad lawyering lead to millions of wrongful convictions, including mine.

66.  Upon my inquiry, public defender failed to provide any explanation for its action or omission. A true and correct copy of the correspondence with public defender is attached hereto as Exhibit P.

    I, XINGFEI LUO, declare under penalty of perjury that the foregoing is true and correct.

Executed in El Monte, CA on Feb 18, 2022.

*/s/ XINGFEI LUO*

**PROOF OF SERVICE**

1. I am over the age of 18 and not a party of this cause. I am a resident of or employed in the county where the mailing occurred.  My residence or business address is 4550 Huddart Ave, El Monte, CA 91731.

2. I served the Appellant's Supplemental Brief for new counsel for appeal by enclosing a true copy in a sealed envelope addressed to each person whose name and address is shown below and depositing the envelope in the US mail with the postage fully prepaid.
Date of Mailing: Feb 18, 2022                    Place of Mailing: El Monte, CA

3. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: Feb 18, 2022
Jessica Li

_____                    _____

(PRINT NAME)                                                        Signature

<u>Name and Address of each Person to whom Notice was Mailed</u>

Orange County District Attorney's Office
300 N Flower St,
Santa Ana, CA 92703

99

# IN THE APPELLATE DIVISION OF THE SUPERIOR COURT
## OF THE STATE OF CALIFORNIA
### IN AND FOR THE COUNTY OF ORANGE

XINGFEI LUO,
Appellant and Defendant,

v.

THE PEOPLE OF THE STATE OF
CALIFORNIA,
Respondent and Plaintiff.

No. 30-2021-01216615

Superior Court
No. 19CM06724

## SUPERIOR COURT OF ORANGE COUNTY
## CASE No. 19CM06724

Honorable Robert A Knox, Judge
_____

## APPELLANT'S EXHIBITS
_____

Xingfei Luo
PO BOX 4886,
El Monte, CA 91734
Appellant and Defendant, In Pro Per

TABLE OF CONTENTS

EXHIBIT A (Jul 13, 2021 email with minute order from public defender) ................................... 3

EXHIBIT B (OC court News release on Jun 3, 2020) ..................................................................... 10

EXHIBIT C (Police field activity report on Sep 10, 2018) ............................................................ 13

EXHIBIT D (Police field activity report on Sep 18, 2018) ............................................................ 15

EXHIBIT E (Tomas Czodor's conviction records) ........................................................................ 17

EXHIBIT F (Tomas Czodor's email on Sep 24, 2018) .................................................................. 20

EXHIBIT G (Family court transcript excerpt) ............................................................................... 22

EXHIBIT H (Declaration of the time stamp of two videos) ........................................................... 30

EXHIBIT I (Declaration of 20 minutes scratching) ...................................................................... 32

EXHIBIT J (Photo of Appellant holding a key in front of the Accuser's door) .......................... 34

EXHIBIT K (Photo of Appellant taken through front door viewer) ............................................. 36

EXHIBIT L (Photo of Appellant in front of the Accuser's garage) ............................................. 38

EXHIBIT M (Business name search result) ................................................................................... 40

EXHIBIT N (Tomas Czodor's Tax Returns) .................................................................................. 43

EXHIBIT O (DVRO) ..................................................................................................................... 47

EXHIBIT P (No Explanation from Public Defender) .................................................................... 56

EXHIBIT Q (Text message admitting as a nudist) ........................................................................ 61

EXHIBIT R (Police report on Sep 26, 2018) ................................................................................. 66

**EXHIBIT A (Jul 13, 2021 email with minute order from public defender)**



## Min Order

**Dominguez, Jorge** <Jorge.Dominguez@pubdef.ocgov.com>                    Tue, Jul 13, 2021 at 4:00 PM
To: xxx@gmail.com>

Here is the Min Order for all your hearings

Jorge Dominguez

Deputy Public Defender

**Orange County Public Defender**

801 Civic Center Drive West, Suite 300

Santa Ana, California 92701

Office: (657) 251-6460

E-mail: jorge.dominguez@pubdef.ocgov.com

CONFIDENTIAL EMAIL: The information contained in this email is confidential and may also be attorney-client privileged and constitute attorney work product. The information is intended only for the use of the individual or entity to whom it is addressed. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify sender immediately.

CONFIDENTIAL EMAIL: The information contained in this email is confidential and may also be attorney-client privileged and constitute attorney work product. The information is intended only for the use of the individual or entity to whom it is addressed. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify sender immediately.

 **Luo Min Order.pdf**
2147K

| | Date | Hearing Type - Reason | Courtroom | | |
|---|---|---|---|---|---|
| | 07/19/2021 | Jury Trial - | C55 | | |

**Heard Hearings:**

| | Date | Hearing Type - Reason | Courtroom | Hearing Status | Special Hearing Result |
|---|---|---|---|---|---|
| | 08/12/2019 | Arraignment In Custody | C54 | Heard | General Time Waiver |
| | 09/06/2019 | Pre Trial - | C4 | Cancel | |
| | 09/06/2019 | Pre Trial - | C48 | Heard | General Time Waiver |
| | 10/18/2019 | Pre Trial - | C4 | Cancel | |
| | 10/18/2019 | Pre Trial - | C48 | Heard | General Time Waiver |
| | 01/10/2020 | Pre Trial - | C4 | Cancel | |
| | 01/10/2020 | Pre Trial - | C64 | Cancel | |
| | 01/10/2020 | Pre Trial - | C58 | Heard | General Time Waiver |
| | 02/14/2020 | Pre Trial - | C4 | Cancel | |
| | 02/14/2020 | Pre Trial - | C49 | Heard | waives statutory time for |
| | 03/20/2020 | Pre Trial - | C4 | Cancel | |
| | 03/20/2020 | Pre Trial - | C49 | Heard | General Time Waiver |
| | 03/24/2020 | Jury Trial - | C5 | Cancel | |
| | 06/26/2020 | Pre Trial - | C4 | Cancel | |
| | 07/14/2020 | Chambers Work - | C27 | Heard | General Time Waiver |
| | 12/04/2020 | Pre Trial - | C4 | Cancel | |
| | 12/04/2020 | Pre Trial - | C62 | Cancel | |
| | 12/04/2020 | Pre Trial - | C51 | Heard | |
| | 12/22/2020 | Pre Trial - | C52 | Heard | General Time Waiver |
| | 03/05/2021 | Pre Trial - | C50 | Cancel | |
| | 03/05/2021 | Pre Trial - | C56 | Heard | General Time Waiver |
| | 05/07/2021 | Pre Trial - | C50 | Heard | General Time Waiver |
| | 06/08/2021 | Pre Trial Mandatory Settlement Conference | C48 | Heard | waives statutory time for |

**Warrants:**

| | Status | Status Date | Judge | Warrant # | Issuing Court | Reason | Release Condition | Amount |
|---|---|---|---|---|---|---|---|---|
| | Recalled | 08/12/2019 | Joseph, Jeannie | 4033415 | C | Warrant of Arrest | Mandatory Appearance | 15000.0 |
| | Recalled | 12/22/2020 | Roberts, Kathleen | 4090467 | C | Bench | Mandatory Appearance | 15000.0 |

**Register of Actions:**

| Date Action | Seq Nbr | Docket Code | Text |
|---|---|---|---|
| 08/06/2019 | 1 | FLDOC | Original Complaint filed on 08/06/2019 by Orange County District Attorney. |
| | 2 | FLNAM | Name filed: Luo, Xingfei |
| | 3 | FLCNT | MISDEMEANOR charge of 594(a)/(b)(2)(A) PC filed as count 1. Date of violation: 09/26/2018. |
| | 4 | FLCNT | MISDEMEANOR charge of 273.6(a) PC filed as count 2. Date of violation: 09/26/2018. |
| | 5 | FLCNT | MISDEMEANOR charge of 647(j)(4)(A) PC filed as count 3. Date of violation: 09/07/2018. |
| | 6 | FI959 | Accusatory pleading filed by the prosecutor pursuant to Penal Code section 959.1. |
| | 8 | FIFCI2 | Police/Arrest Report filed. |
| | 10 | FIFCI2 | Declaration/Affidavit in Support of Arrest filed. |
| | 11 | FIBWCPO | Body Worn Camera Protective Order filed. |
| | 12 | WAARS | Misdemeanor Warrant of Arrest requested. |
| | 13 | WAWTS | Walk-through warrant submitted for bail amount and signature. |
| | 14 | WAWSD | Warrant of Arrest warrant signed by Jeannie Joseph and issued for defendant. Night Service: No. Expedite: Yes. PC 853.6: No. Bail set at $15, 000.00, Mandatory Appearance. |
| | 16 | WFNBR | Warrant File Number 04033415 sent from AWSS for Warrant # 3294527. |
| 08/08/2019 | 1 | WASVD | Warrant 04033415 for Xingfei Luo DEFENDANT served by Santa Ana Police Department on 08/08/2019. |
| 08/12/2019 | 1 | CLADD | At the request of Court, case calendared on 08/12/19 at 10:00 AM in C54 for ARGN IC. |
| | 2 | HHELD | Hearing held on 08/12/2019 at 10:00:00 AM in Department C54 for Arraignment In Custody. |
| | 3 | OFJUD | Judicial Officer: Gary M Pohlson, Judge |
| | 4 | OFJA | Clerk: N. Robles |
| | 5 | OFBAL | Bailiff: K. Fonseca |
| | 6 | APDDA | People represented by Elise Levy, Deputy District Attorney, present. |
| | 7 | APDPD | Court appoints Public Defender to represent Defendant. |
| | 8 | APDWPD | Defendant present in court with counsel Michael Morrison, Public Defender. |
| | 9 | WAREC | Warrant issued on 08/06/2019 ordered recalled for defendant. |
| | 10 | CPACK | Counsel acknowledges receipt of the charging document. |
| | 11 | WVRAA | Defendant waives reading and advisement of the Original Complaint. |
| | 12 | DFSFC | Defendant invokes state, federal and constitutional rights. |
| | 13 | MORES | Defense reserves all motions. |
| | 14 | DFIRD | Informal request for discovery made by Defense. |
| | 15 | PLNGA | To the Original Complaint defendant pleads NOT GUILTY to all counts. |

| | | | |
|---|---|---|---|
| | 16 | CLSET | Pre Trial set on 09/06/2019 at 08:30 AM in Department C4. |
| | 17 | WVTGN | Defendant enters general time waiver. |
| | 18 | DFOTR | Defendant ordered to appear. |
| | 19 | NTRCO | Defendant released on this case only. Release issued. |
| | 20 | NTJAL | Notice to Sheriff issued. |
| | 21 | DSROR | Court orders defendant released on own recognizance. |
| | 22 | FIDVO | Protective Order signed, served and filed. |
| | 23 | DOCTO | Comply with all terms of Protective Order. |
| | 24 | DONOC | Do not have any contact with the victim(s) directly, indirectly, or through a third party except an attorney of record. |
| | 25 | DOYRD | Do not go within 100 yards of person(s) named in the Protective Order. |
| | 26 | DOPOS | Court orders the protective order sealed pursuant to Penal Code section 293, 293.5, and/or California Rules of Court 2.550. |
| | 27 | DOPOF | Protective Order faxed to Protective Order Registry. |
| | 28 | COBWCA | Court orders the Body Worn Camera Protective Order filed on 08/06/2019 approved, issued and in full effect. |
| 08/13/2019 | 1 | DOORG | Protective Order entered in the Protective Order Registry. |
| 09/05/2019 | 1 | CLTRAN | Calendar Line for PT transferred from C4 on 09/06/2019 at 08:30 AM to C48 on 09/06/2019 at 08:30 AM. |
| 09/06/2019 | 1 | HHELD | Hearing held on 09/06/2019 at 08:30:00 AM in Department C48 for Pre Trial. |
| | 2 | OFJUD | Judicial Officer: Larry Yellin, Judge |
| | 3 | OFJA | Clerk: M. Johnson |
| | 4 | OFBAL | Bailiff: M. Sanchez |
| | 6 | APDDA | People represented by Matthew Bradbury, Deputy District Attorney, present. |
| | 7 | APDWPD | Defendant present in court with counsel Kevin Stephens, Public Defender. |
| | 8 | FICON | Request for Continuance - Misdemeanor filed. |
| | 9 | CLCON | Pre Trial continued to 10/18/2019 at 08:30 AM in Department C4 at request of Defense. |
| | 10 | WVTGN | Defendant enters general time waiver. |
| | 11 | DFOTR | Defendant ordered to appear. |
| | 12 | DSOCN | Defendant's release on own recognizance continued. |
| | 13 | OFMCD | Minutes entered by N. Herrera on 09/06/2019. |
| 10/16/2019 | 1 | CLTRAN | Calendar Line for PT transferred from C4 on 10/18/2019 at 08:30 AM to C48 on 10/18/2019 at 08:30 AM. |
| 10/18/2019 | 1 | HHELD | Hearing held on 10/18/2019 at 08:30:00 AM in Department C48 for Pre Trial. |
| | 2 | OFJUD | Judicial Officer: Larry Yellin, Judge |
| | 3 | OFJA | Clerk: M. Johnson |
| | 4 | OFBAL | Bailiff: I. Bodell |
| | 5 | APDDA | People represented by Jessica Le, Deputy District Attorney, present. |
| | 6 | APDWPD | Defendant present in court with counsel Alison Chabot, Public Defender. |
| | 7 | FICON | Request for Continuance - Misdemeanor filed. |
| | 8 | CLCON | Pre Trial continued to 01/10/2020 at 08:30 AM in Department C4 at request of Defense. |
| | 9 | WVTGN | Defendant enters general time waiver. |
| | 10 | DSOCN | Defendant's release on own recognizance continued. |
| | 11 | OFMCD | Minutes entered by G. Sandoval on 10/18/2019. |
| 01/09/2020 | 1 | CLTRAN | Calendar Line for PT transferred from C4 on 01/10/2020 at 08:30 AM to C64 on 01/10/2020 at 08:30 AM. |
| | 2 | CLTRAN | Calendar Line for PT transferred from C64 on 01/10/2020 at 08:30 AM to C58 on 01/10/2020 at 08:30 AM. |
| 01/10/2020 | 1 | HHELD | Hearing held on 01/10/2020 at 08:30:00 AM in Department C58 for Pre Trial. |
| | 2 | OFJUD | Judicial Officer: Craig E. Robison, Judge |
| | 3 | OFJA | Clerk: G. Sandoval |
| | 4 | OFBAL | Bailiff: J. Hanson |
| | 5 | APDDA | People represented by Sharlene Mandella, Deputy District Attorney, present. |
| | 6 | APDWPD | Defendant present in court with counsel Gagandeep Waraich, Public Defender. |
| | 7 | FICON | Request for Continuance - Misdemeanor filed. |
| | 8 | CLCON | Pre Trial continued to 02/14/2020 at 08:30 AM in Department C4 at request of Defense. |
| | 9 | DFOTR | Defendant ordered to appear. |
| | 10 | WVTGN | Defendant enters general time waiver. |
| | 11 | CLSET | Jury Trial set on 03/24/2020 at 08:30 AM in Department C5. |
| | 12 | DFOTR | Defendant ordered to appear. |
| | 13 | DSOCN | Defendant's release on own recognizance continued. |
| | 14 | OFMCD | Minutes entered by M. Aikman on 01/10/2020. |
| 02/11/2020 | 1 | CLTRAN | Calendar Line for PT transferred from C4 on 02/14/2020 at 08:30 AM to C49 on 02/14/2020 at 08:30 AM. |
| 02/14/2020 | 1 | HHELD | Hearing held on 02/14/2020 at 08:30:00 AM in Department C49 for Pre Trial. |
| | 2 | OFJUD | Judicial Officer: Craig E. Robison, Judge |
| | 3 | OFJA | Clerk: K. Perez |
| | 4 | OFBAL | Bailiff: S. Strong |
| | 5 | APDDA | People represented by Alyssa Gossett-Ornelas, Deputy District Attorney, present. |
| | 6 | APDWPD | Defendant present in court with counsel Gagandeep Waraich, Public Defender. |
| | 7 | FICON | Request for Continuance - Misdemeanor filed. |
| | 8 | CLCON | Pre Trial continued to 03/20/2020 at 08:30 AM in Department C4 at request of Defense. |
| | 9 | DFOTR | Defendant ordered to appear. |

| | | | |
|---|---|---|---|
| | 10 | CLTRM | Jury Trial for 03/24/2020 08:30 AM in C5 to remain. |
| | 11 | DFOTR | Defendant ordered to appear. |
| | 12 | WVTIM | Defendant waives statutory time for Jury Trial. |
| | 13 | TEXT | Day 0 of 10 |
| | 14 | DSOCN | Defendant's release on own recognizance continued. |
| | 15 | OFMCD | Minutes entered by G. Sandoval on 02/14/2020. |
| 03/19/2020 | 1 | CLTRAN | Pursuant to the provisions of Section 68115 of the Government Code and due to building closure, the Court makes a finding of good cause and orders this case to be continued for PT to 03/20/2020 at 08:30 AM in Department C49. |
| 03/20/2020 | 1 | HHELD | Hearing held on 03/20/2020 at 08:30:00 AM in Department C49 for Pre Trial. |
| | 2 | OFJUD | Judicial Officer: Craig E. Robison, Judge |
| | 3 | OFJA | Clerk: K. Perez |
| | 4 | OFBAL | Bailiff: B. McDermott |
| | 5 | APNDA | District Attorney not present in Court. |
| | 6 | APSPC | Daniel Maher makes a special appearance for Gagandeep Waraich, Public Defender. Defendant not present. |
| | 7 | WV977 | Defendant's appearance is waived pursuant to Penal Code 977(a). |
| | 8 | WVTGN | Defendant enters general time waiver. |
| | 9 | FICON | Request for Continuance - Misdemeanor filed. |
| | 10 | CLVAC | Jury Trial vacated for 03/24/2020 at 08:30 AM in C5. |
| | 11 | CLCON | Pre Trial continued to 06/26/2020 at 08:30 AM in Department C4 at request of Defense. |
| | 12 | DSOCN | Defendant's release on own recognizance continued. |
| | 13 | OFMCD | Minutes entered by A. Villa on 03/20/2020. |
| 07/14/2020 | 1 | HHELD | Hearing held on 07/14/2020 at 09:00:00 AM in Department C27 for Chambers Work. |
| | 2 | OFJUD | Judicial Officer: Maria Hernandez, Judge |
| | 3 | OFJA | Clerk: E. Verduzco |
| | 4 | APNAP | No appearance by parties. |
| | 5 | COVIDAO | Due to the COVID-19 pandemic and pursuant to the Third Implementation Order RE: Emergency Order dated April 24, 2020, and the Supplemental Emergency Order authorized by the Judicial Council of California dated April 24, 2020, the court was closed March 17, 2020 through May 25, 2020. |
| | 6 | TEXT | Request for Continuance received electronically. |
| | 7 | FICON | Request for Continuance - Misdemeanor filed. |
| | 8 | CLVAC | Pre Trial vacated for 06/26/2020 at 08:30 AM in C4. |
| | 9 | CLSET | Pre Trial set on 12/04/2020 at 08:30 AM in Department C4. |
| | 10 | WVTGN | Defendant enters general time waiver. |
| | 11 | DSOCN | Defendant's release on own recognizance continued. |
| 10/16/2020 | 1 | CLTRF | Calendar Line for PT transferred from C4 on 12/04/2020 at 08:30 AM to C62 on 12/04/2020 at 08:30 AM. |
| 12/03/2020 | 1 | CLTRF | Calendar Line for PT transferred from C62 on 12/04/2020 at 08:30 AM to C51 on 12/04/2020 at 08:30 AM. |
| 12/04/2020 | 1 | HHELD | Hearing held on 12/04/2020 at 08:30:00 AM in Department C51 for Pre Trial. |
| | 2 | OFJUD | Judicial Officer: Kathleen Roberts, Judge |
| | 3 | OFJA | Clerk: E. Figueroa |
| | 4 | OFBAL | Bailiff: A. McMillan |
| | 5 | COVIDLVS | Per applicable law, including Code of Civil Procedure 124, this proceeding is being live streamed as described on the Orange County Court Website. The court notes that we are currently in the COVID-19 pandemic and previous judicial orders issued in that regard. |
| | 6 | APDDA | People represented by Ashley Dee Mettler, Deputy District Attorney, present. |
| | 7 | APSPC | Peter Boldin makes a special appearance for Daniel Maher, Public Defender. Defendant not present. |
| | 8 | TEXT | No contact with defendant. |
| | 9 | WAISD | Bench warrant ordered issued for defendant. Bail set at $15, 000.00, Mandatory Appearance. |
| | 10 | WAWSD | Bench warrant signed by Kathleen Roberts and issued for defendant. Night Service: No. Expedite: No. PC 853.6: No. Bail set at $15, 000.00, Mandatory Appearance. |
| | 11 | WFNBR | Warrant File Number 04090467 sent from AWSS for Warrant # 3355350. |
| 12/18/2020 | 1 | FITXT | COVID-19 Misdemeanor Action Request filed. |
| | 2 | CLADD2 | At the request of Defense Counsel, case added to calendar for 12/22/2020 at 09:00 AM in Department C52 for Pre Trial. |
| | 3 | TEXT | District Attorney and Defense Counsel notified of hearing date via email. |
| 12/22/2020 | 1 | HHELD | Hearing held on 12/22/2020 at 09:00:00 AM in Department C52 for Pre Trial. |
| | 2 | OFJUD | Judicial Officer: H. Shaina Colover, Judge |
| | 3 | OFJA | Clerk: N. Herrera |
| | 4 | OFBAL | Bailiff: J. Duarte |
| | 5 | APDDA | People represented by Breanna Piper, Deputy District Attorney, present. |
| | 6 | APNDC | Defendant not present in Court represented by Daniel Maher, Public Defender. |
| | 7 | WV977 | Defendant's appearance is waived pursuant to Penal Code 977(a). |
| | 8 | APTXT | All parties appearing via Webex. |
| | 9 | TRPRT | Proceedings recorded electronically. The recording equipment is functioning normally, and all of the proceedings in open court between designated times of day will be recorded, except for such matters as were expressly directed to be "off the record" or as otherwise specified. |
| | 10 | COVIDLVS | Per applicable law, including Code of Civil Procedure 124, this proceeding is being live streamed as described on the Orange County Court Website. The court notes that we are currently in the COVID-19 pandemic and previous judicial orders issued in that regard. |
| | 11 | WAREC | Warrant issued on 12/04/2020 ordered recalled for defendant. |

| | | | |
|---|---|---|---|
| | 12 | CLSET | Pre Trial set on 03/05/2021 at 08:30 AM in Department C50. |
| | 13 | WVTGN | Defendant enters general time waiver. |
| | 14 | DSROR | Court orders defendant released on own recognizance. |
| | 15 | OFMCD | Minutes entered by K. Goins on 12/22/2020. |
| 03/03/2021 | 1 | CLTRF | Calendar Line for PT transferred from C50 on 03/05/2021 at 08:30 AM to C56 on 03/05/2021 at 08:30 AM. |
| 03/05/2021 | 1 | HHELD | Hearing held on 03/05/2021 at 08:30:00 AM in Department C56 for Pre Trial. |
| | 2 | OFJUD | Judicial Officer: Michael Murray, Judge |
| | 3 | OFJA | Clerk: M. Ruiz |
| | 4 | OFBAL | Bailiff: J. N. Hernandez |
| | 5 | COVIDLVS | Per applicable law, including Code of Civil Procedure 124, this proceeding is being live streamed as described on the Orange County Court Website. The court notes that we are currently in the COVID-19 pandemic and previous judicial orders issued in that regard. |
| | 6 | APDDA | People represented by Louis Laverone, Deputy District Attorney, present. |
| | 7 | APDWPD | Defendant present in court with counsel Daniel Maher, Public Defender. |
| | 8 | CLCON | Pre Trial continued to 05/07/2021 at 09:00 AM in Department C50 at request of Defense. |
| | 9 | WVTGN | Defendant enters general time waiver. |
| | 10 | DFOTR | Defendant ordered to appear. |
| | 11 | DSOCN | Defendant's release on own recognizance continued. |
| 05/07/2021 | 1 | HHELD | Hearing held on 05/07/2021 at 09:00:00 AM in Department C50 for Pre Trial. |
| | 2 | OFJUD | Judicial Officer: Nick A Dourbetas, Judge |
| | 3 | OFJA | Clerk: G. Cooper |
| | 4 | OFBAL | Bailiff: D. Clifton |
| | 5 | APDDA | People represented by John M Sinclair, Deputy District Attorney, present. |
| | 6 | APDWPD | Defendant present in court with counsel Daniel Maher, Public Defender. |
| | 7 | ADSCD | Pursuant to the California Code of Judicial Ethics, Canon 3, subsection E(2), Court Disclosure regarding the criminal case filed in the People of the State of California v. Isaac Jones, case number 19CF0869 given by Nick A Dourbetas, Judge in court. |
| | 8 | COVIDLVS | Per applicable law, including Code of Civil Procedure 124, this proceeding is being live streamed as described on the Orange County Court Website. The court notes that we are currently in the COVID-19 pandemic and previous judicial orders issued in that regard. |
| | 9 | CLTXT | Due to the COVID-19 pandemic and based on previous judicial orders issued, the court finds good cause to handle this matter as follows: |
| | 10 | CLSET2 | Pre Trial re: Mandatory Settlement Conference set on 06/08/2021 at 08:30 AM in Department C48. |
| | 11 | DFOTR | Defendant ordered to appear. |
| | 12 | WVTGN | Defendant enters general time waiver. |
| | 13 | TEXT | The People submitted a Victim Impact Statement. However, in light of the Victim having an attorney and the Victim not being present, the Court did not read the statement and returned it to the People. |
| | 14 | DSOCN | Defendant's release on own recognizance continued. |
| 06/08/2021 | 1 | HHELD | Hearing held on 06/08/2021 at 08:30:00 AM in Department C48 for Pre Trial Mandatory Settlement Conference. |
| | 2 | OFJUD | Judicial Officer: James H. Poole, Judge |
| | 3 | OFJA | Clerk: M. Khan |
| | 4 | OFBAL | Bailiff: J. L. Mc Million |
| | 5 | COVIDLVS | Per applicable law, including Code of Civil Procedure 124, this proceeding is being live streamed as described on the Orange County Court Website. The court notes that we are currently in the COVID-19 pandemic and previous judicial orders issued in that regard. |
| | 6 | APDDA | People represented by Emily Johnson, Deputy District Attorney, present. |
| | 7 | APNDC | Defendant not present in Court represented by Jorge Dominguez, Public Defender. |
| | 8 | WV977 | Defendant's appearance is waived pursuant to Penal Code 977(a). |
| | 9 | CLSET | Jury Trial set on 07/19/2021 at 08:30 AM in Department C55. |
| | 10 | WVTIM | Defendant waives statutory time for Jury Trial. |
| | 11 | CLTXT | day 0 of 10. |
| | 12 | DFOTN | Defense Counsel to notify defendant to appear on 07/19/21. |
| | 13 | DSOCN | Defendant's release on own recognizance continued. |

 Gmail

**Olivia Luo <xxx@gmail.com>**

---

**Request for Continuance**

---

**Olivia Luo** <xxx@gmail.com>                                                               Wed, Jul 21, 2021 at 7:02 PM
To: "Dominguez, Jorge" <Jorge.Dominguez@pubdef.ocgov.com>

Attached please see the court's ruling:
The government's interest in preventing the nonconsensual disclosure of nude or sexual images of a person obtained in the context of a confidential relationship is at least as strong as its interest in preventing the disclosure of information concerning that person's health or finances obtained in the context of a confidential relationship.

The State's evidence is insufficient to establish the requisite confidential relationship between complainant and Mr. Coon to support a reasonable expectation of privacy in the photos complainant sent him. There is no evidence in the record showing they had any kind of relationship engendering a reasonable expectation of privacy, we conclude the State has not met its burden.

The State has not presented evidence to demonstrate that, in contrast to a stranger, Mr. Coon had a relationship with complainant of a sufficiently intimate or confidential nature that she could reasonably assume that he would not share the photos she sent with others.

The State failed to prove complainant had a reasonable expectation of privacy in the nude picture she sent to Mr. Coon.

Turning to the present case, the accuser just got my contact information from a dating website. He barely knew me, no different than a stranger, and he was not engaging in an exclusive relationship with me. He should not have any reasonable expectation of privacy.

On Tue, Jul 20, 2021 at 7:14 AM Olivia Luo <xxx@gmail.com> wrote:
> Mr Dominguez,
>
> Would you please send me all Requests for Continuance filed by public defender?
>
> Thank you.
> Luo

---

📄 **State v. Vanburen 214 A.3d 791 (Vt. 2019).pdf**
346K

**EXHIBIT B (OC court News release on Jun 3, 2020)**



# Superior Court of California
# County of Orange
## *News Release*

Public Information Office
Contact:  Kostas Kalaitzidis,
PIO@occourts.org

June 3, 2020

## Citizens of Orange County Step Up and Answer the Call to Serve as Jurors

**Santa Ana, CA** – Jury trials began once again as Orange County Superior Court initiated the process of reopening last week and a large number of prospective jurors heeded the call of duty and came to the Court to serve our community.

Due to the pandemic, the Court modified juror waiting areas to assure strict enforcement of safety precautions. Prospective jurors expressed their appreciation for the Court's efforts to establish social distancing and keep everyone safe.



Judge Thomas Delaney greeted the prospective jurors, expressed the gratitude of the Court and provided information about the Court's **Safe Access to Justice Initiative**, which is designed to keep all those who enter Court facilities be healthy and safe.

"We are now ready to resume jury trials and resume them safely" Judge Delaney announced to the audience of prospective jurors.  "And you are a critical part of that work."

For his part, Orange County Superior Court Presiding Judge Kirk Nakamura, said, "Today is the day that we recognize jurors for their contribution, as they step up to serve our community."

As part of the soft reopening, the Court kicked off the **"Safe Access to Justice Initiative**," a program designed to assure strict enforcement of safety precautions in order to protect jurors and all members of the public who enter Court facilities. **The use of facemasks or face coverings is mandatory for anyone entering a courthouse. Physical distancing rules will also be strictly enforced in all facilities,** thus the number of individuals entering public courtrooms and elevators will be subject to space limitations.

**Persons displaying possible coronavirus symptoms will not be allowed in court facilities.**

"Jurors will continue to be called as needed over the next weeks as we work to normalize our operations," said Jury Services Manager Pete Hernandez.

To alleviate concerns regarding physical distancing, the Court recently implemented a mobile device-based check-in process for jurors. "Our jurors may now skip the check-in line altogether and take a seat directly in the jury assembly room," said Jury Services Manager Pete Hernandez, adding "by accessing a dedicated Court network for jurors on their mobile device, they can check-in for jury service and obtain access to the free Wifi. All they need to use is their 9-digit juror ID number that is printed on their summons. It's as simple as that." The Juror Mobile-Check-in is currently available at the Central Justice Center in Santa Ana, but will be available at the Harbor, North and West Justice Centers later this year.

Jurors are encouraged to follow step one of their summons and complete their online questionnaire before they come to the Court. For more information on jury service, visit www.occourts.org and click on "Jury Service," or call the Office of the Jury Commissioner at (657) 622-7000.

###

**EXHIBIT C (Police field activity report on Sep 10, 2018)**



# Police Field Activity
Incident # 180906020

---

**Incident: 180906020    (CLOSED)**

---

Created:        09/10/18 14:34:02 Monday by PHN4 TORREZ, NANCY
Dispatched:
Closed:        09/10/18 16:11:30

Final call type: **422R** (4) TERRORISM REPORT
Init. call type:  **422R** (4) TERRORISM REPORT
Primary unit:   233
Case Number:  None
Disposition:    NR:2

Grid: **222**   Disp. group: NEBeat3   Source: TELEPHONE   Sub Type:
Location: **60 CIVIC CENTER PLAZA :STATION**
RP Name: TOMS
RP Phone

---

| Date/Time | Operator | Type | Comment |
|-----------|----------|------|---------|
| 09/10/18 14:34:34 | 2989 | | CP HAS BEEN REC'VG CALL FROM UNK SUBJS |
| 09/10/18 14:34:48 | 2989 | | THREATNING TO COME TO HIS RESD AT 2521 N JACARANDA AND 242 HIM |
| 09/10/18 16:10:36 | Mobile2 | | Incident Closed. |
| 09/10/18 16:10:36 | Mobile2 | | 422:unfounded. |

**EXHIBIT D (Police field activity report on Sep 18, 2018)**



# Police Field Activity
Incident # 180911177

**Incident: 180911177   (CLOSED)**

Created:       09/18/18 20:07:25 Tuesday by DSP3 VAUGHN, LAUREN
Dispatched: 09/18/18 20:19:58 unit 232G by DSP2 3156
Enroute:       09/18/18 20:20:11 unit 232G
On Scene:
Closed:        09/18/18 20:43:39

Final call type: **DV** (2) DOMESTIC VIOLENCE
Init. call type:  **DV** (2) DOMESTIC VIOLENCE
Primary unit:   236
Case Number:  None
Disposition:    AS:1

Grid: **222**  Disp. group: NEBeat3  Source: TELEPHONE  Sub Type:
Location: **2521 N JACARANDA ST**
RP Name:   ███████
RP Phone:  ███████████

| Date/Time | Operator | Type | Comment |
|---|---|---|---|
| 09/18/18 20:09:33 | 3472 | 1 | CP ADVING FEM HE MET ONLINE T97 AT HIS RESD KNOCKING AT HIS FRONT DOOR |
| 09/18/18 20:10:15 | 3472 | 1 | ████████ ,F/ A, BLK SHIRT, BLK PANTS |
| 09/18/18 20:11:20 | 3472 | 1 | CP ADVING FEM HAS BEEN HARASSING HIM TRYING EXTORT HIM FOR MONEY |
| 09/18/18 20:11:31 | 3472 | 1 | HAS BEEN POSTING NUDE PHOTOS OF HIM ONLINE |
| 09/18/18 20:11:51 | 3472 | 1 | CP ADVD FEM HE WAS CALLING PD AND SHE IS REFUSING TO LEAVE |
| 09/18/18 20:12:09 | 3472 | 1 | ADV FEM CALLS HIM MULTIPLE TIMES A DAY FROM SEVERAL DIFFERENT T21'S |
| 09/18/18 20:19:58 | DSP2 3156 | 3 | 232G: DSPTCH (GOMEZ, ALEX) |
| 09/18/18 20:20:11 | 232G | 3 | 232G: ENROUTE |
| 09/18/18 20:20:11 | 232G | 3 | 232G: Responding From = N MAIN ST\E CIVIC CENTER DR |
| 09/18/18 20:43:22 | 236 | | Incident Closed. |
| 09/18/18 20:43:22 | 236 | | cp wanted female removed. female left loc when asked to do so. cp adv to call back if she returns |

**EXHIBIT E (Tomas Czodor's conviction records)**

# Case Summary

| | |
|---|---|
| Case Number: | 09CF3055 |
| OC Pay Number: | 5865304 |
| Originating Court: | Central |
| Defendant: | Czodor, Tomas |

## Demographics:

| | | |
|---|---|---|
| | Sex: | Male |
| | Eyes: | Brown |
| | Hair: | Brown |
| | Height(ft/in) : | 6'2" |
| | Weight (lbs): | 190 |
| | Race: | Hispanic |
| | Address: | 15671 Williams #71 Tustin, CA 92780 |

## Identifiers:

| | Type | ID# |
|---|---|---|
| | CII | A26029586 |
| | Driver's License | D7955320 |
| | Driver's License | IAA1204677-CDF |
| | Driver's License | 1AA1204677CD |
| | FBI | 874614FC7 |

## Names:

| | Last Name | First Name | Middle Name | Type | Date of Birth |
|---|---|---|---|---|---|
| | Czodor | Tomas | | Alias | 04/19/1982 |
| | Czodor | Tomas | | Alias | 04/19/1982 |
| | Czodor | Tomas | | Alias | 04/19/1982 |
| | Czodor | Thomas | | Real Name | 04/19/1982 |

## Case Status:

| | | |
|---|---|---|
| | Status: | Closed |
| | Case Stage: | |
| | Release Status: | |
| | Warrant: | N |
| | DMV Hold : | N |
| | Charging Document: | Complaint |
| | Mandatory Appearance: | Y |
| | Owner's Resp: | N |
| | Amendment #: | 1 |
| | DA Case #: | |
| | DR #: | |

## Counts:

| | Seq | S/A | Violation Date | Section Statute | OL | Violation | Plea | Plea Date | Disposition | Disposition Date |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 0 | 11/19/2009 | 7028(a) BP | M | Contracting Without A License | NOT GUILTY | 06/14/2010 | Found Guilty by Jury | 06/15/2010 |
| | 2 | 0 | 11/19/2009 | 7027.1(a) BP | M | Advertise As Contractor Without License | NOT GUILTY | 06/14/2010 | Found Guilty by Jury | 06/15/2010 |
| | 3 | 0 | 11/01/2009 | 16240 BP | M | Engage In Business Without License | NOT GUILTY | 06/14/2010 | Found Guilty by Jury | 06/15/2010 |

## Professionals:

| | Role | Badge | Agency | Name | Vacation Start | Vacation End |
|---|---|---|---|---|---|---|
| | Public Defender | | OCPD | Sparks, William | | |
| | District Attorney | | OCDA | Young, James | | |
| | District Attorney | | OCDA | Nevers, Elizabeth | | |
| | Interpreter | | OCSC | George, Patricia | | |
| | Retained Attorney | | RETAT | Glazer, Nicolette | | |

## Other Cases:

| | Case | Case Status | Violation Date |
|---|---|---|---|
| | 08NM05806 | Closed | 03/13/2008 |
| | 30433KR | Closed | 05/18/2009 |
| | 28765MW | Closed | 01/03/2011 |
| | 39248PS | Closed | 08/24/2012 |
| | NBE00026548 | Closed | 06/22/2018 |

## Heard Hearings:

# Case Summary

| | |
|---|---|
| Case Number: | 08NM05806 |
| OC Pay Number: | 4901070 |
| Originating Court: | North |
| Defendant: | Czodor, Tomas |

**Demographics:**

| | | |
|---|---|---|
| | Sex: | Male |
| | Eyes: | Brown |
| | Hair: | Brown |
| | Height(ft/in) : | 6'2" |
| | Weight (lbs): | 190 |
| | Race: | White |
| | Address: | 15671 Williams Street 71 Tustin, CA 92780 USA |

**Identifiers:**

| | Type | ID# |
|---|---|---|
| | CII | A26029586 |
| | Driver's License | D7955320 |
| | Driver's License | IAA1204677-CDF |
| | Driver's License | 1AA1204677CD |
| | FBI | 874614FC7 |

**Names:**

| | Last Name | First Name | Middle Name | Type | Date of Birth |
|---|---|---|---|---|---|
| | Czodor | Tomas | | Alias | 04/19/1982 |
| | Czodor | Tomas | | Alias | 04/19/1982 |
| | Czodor | Tomas | | Alias | 04/19/1982 |
| | Czodor | Thomas | | Real Name | 04/19/1982 |

**Vehicles:**

| | State | License Plate | Warrant | Year | Make | Model | Color |
|---|---|---|---|---|---|---|---|
| | | | N | - | | | |

**Case Status:**

| | | |
|---|---|---|
| | Status: | Closed |
| | Case Stage: | |
| | Release Status: | |
| | Warrant: | N |
| | DMV Hold : | N |
| | Charging Document: | Citation |
| | Mandatory Appearance: | Y |
| | Owner's Resp: | N |
| | Amendment #: | 0 |
| | DA Case #: | - |
| | DR #: | A12298 |

**Counts:**

| | Seq | S/A | Violation Date | Section Statute | OL | Violation | Plea | Plea Date | Disposition | Disposition Date |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 0 | 03/13/2008 | 7027.1(a) BP | M | Advertise As Contractor Without License | | | Dismissed | 05/29/2008 |
| | 2 | 0 | 03/13/2008 | 7028(a) BP | M | Contracting Without A License | GUILTY | 05/29/2008 | Pled Guilty | 05/29/2008 |

**Professionals:**

| | Role | Badge | Agency | Name | Vacation Start | Vacation End |
|---|---|---|---|---|---|---|
| | Public Defender | | OCPD | Deputy Public Defender, | | |
| | City Attorney | | CTYATT | Ahle, Patrick | | |
| | City Attorney | | CTYATT | Iriarte, Richard A | | |
| | District Attorney | | OCDA | Young, James | | |
| | District Attorney | | OCDA | Nevers, Elizabeth | | |
| | Interpreter | | OCSC | George, Patricia | | |
| | Retained Attorney | | RETAT | Glazer, Nicolette | | |

**Other Cases:**

| | Case | Case Status | Violation Date |
|---|---|---|---|
| | 30433KR | Closed | 05/18/2009 |
| | 09CF3055 | Closed | 11/01/2009 |
| | 28765MW | Closed | 01/03/2011 |
| | 39248PS | Closed | 08/24/2012 |

**EXHIBIT F (Tomas Czodor's email on Sep 24, 2018)**

18-23280
10/16/18 12:45 PM

@yahoo.com – Yahoo Mail

Want a better search experience?



**Cheater Link Removal - Contact information (5)**

↩ Reply   ↩ Reply to All   → Forward   ••• More

Aaron Baker <aaron@guaranteedremovals.com>                    Sep 24 at 11:35 AM
To        @yahoo.com

Hi Tomas,

Thanks for getting those links over. Fortunately, we've worked with most of these sites in the past. I'm confident we'll be able to help you move past this. I took a look Friday, and I found this link as well.

http://liarsandcheaters.com/tomas-czarlor-santa-sun-orange-county-ca.html

In terms of our fee's, if we take them all on at the same time I can reduce the per-link cost. In terms of our fee's, you'd be looking at $1,500/link once we're able to have them deleted.

If you have any questions or would like to proceed, please let me know and I'll be happy to help.

Thank you,

> Show original message

—



Aaron Baker
*Reputation Specialist*

1-866-689-2261 x 248 | aaron@guaranteedremovals.com
www.guaranteedremovals.com

*To book a scheduled call back, click the link below*

https://www.guaranteedremovals.com/aaron/

GuaranteedRemovals

↩ Reply   ↩ Reply to All   → Forward   ••• More

Tomas Fit <        @yahoo.com>                    Sep 24 at 11:45 AM
To Aaron Baker

That's crazy these days.
Someone whoever can post whatever what is not even truth to harm your name and wallet.
What's happen if they post this again?
Are you guys doing cease and desist emails to delete all this immediately or face civil and criminal charges?
Maybe it will help if I fill restraining order first against these person?

Tomas

> Show original message

**EXHIBIT G (Family court transcript excerpt)**

```
 1        BEEN YOUR JOB TO SUBPOENA SOMEONE FROM THE

 2        POLICE DEPARTMENT OR SUBPOENA THE RECORDS.  WE

 3        DON'T MAKE PHONE CALLS WHEN WE'RE IN THE MIDDLE

 4        OF TRIAL.

 5   BY MS. LUO

 6        Q    ON SEPTEMBER 18, 2018, YOU TOOK THIS

 7   PHOTOGRAPH OF ME IN FRONT OF YOUR DOOR WITH YOUR

 8   CELL PHONE, DIDN'T YOU?

 9        A    YES, I DID.

10        Q    YOU TOOK THIS PHOTOGRAPH WITHOUT MY

11   PERMISSION, CORRECT?

12        A    I DID IT.

13        Q    ISN'T IT TRUE THAT IN THIS PHOTOGRAPH,

14   YOUR DOOR WAS IN GOOD CONDITION?

15        A    IT WAS IN PERFECT CONDITION.

16        Q    ON YOUR REQUEST, YOU CLAIM THAT I

17   SCRATCHED YOUR DOOR FOR 20 MINUTES, CORRECT?

18        A    YES.  APPROXIMATELY 20 MINUTES YOU KNOCK

19   ON MY DOOR WITH A KEY AND WAS SCRATCHING THE DOOR.

20        Q    DURING --

21        A    I HEARD WEIRD NOISES, LIKE THIS WITH THE

22   KEY, YOU MADE A DIFFERENT NOISE.

23        Q    DURING THOSE 20 MINUTES, YOU DID NOT TAKE

24   ANY PHOTOGRAPH OF ME DOING THE DAMAGE, CORRECT?

25        A    I MAKE THE PICTURE WHAT I JUST SUBMITTED.
```

```
 1   I MAKE LIKE 4 OR 5 PHOTOS.

 2        Q    WHEN I WAS IN THE PICTURE, THE DOOR WAS IN

 3   GOOD CONDITION?

 4        A    YES, IT WAS.  I DISCOVERED THIS AFTER --

 5   ACTUALLY, AFTER YOU LEFT.

 6        Q    HOW COME YOU SAID THAT I SCRATCHED THE

 7   DOOR FOR 20 MINUTES?

 8        A    YOU WERE SCRATCHING AND KNOCKING ON THE

 9   DOOR ABOUT FOR 20 MINUTES.  IT WAS DARK THERE.  I

10   COULDN'T SEE IT.  WHEN I SEE IT, I SEE IT AFTERWARDS

11   WHEN WE OPENED THE DOOR, AND YOU LEFT.

12        Q    YOU DIDN'T HEAR ANYTHING?

13        A    WHAT I DIDN'T HEAR ANYTHING?

14        Q    SCRATCHING?

15        A    I HEAR THAT YOU KNOCKING WITH THE KEY.

16        Q    YEAH.

17        A    AND I TOLD YOU TOO MANY TIMES TO STOP.

18        Q    YOU TOLD ME TO STOP KNOCKING, NOT

19   SCRATCHING.

20        A    WITH THE KEY.

21        Q    YOU TOOK THIS PHOTOGRAPH OF YOUR DAMAGED

22   PROPERTY WITH YOUR CELL PHONE, DIDN'T YOU?

23        A    YES, I DID.  YES, I DID.

24        Q    EVERY PHOTOGRAPH YOU TOOK WITH YOUR CELL

25   PHONE HAS A TIME STAMP, CORRECT?
```

```
 1        A    YES, IT IS.

 2             MS. LUO:  YOUR HONOR, WOULD YOU LIKE TO

 3     ORDER THE PLAINTIFF TO SHOW YOU THE TIME STAMP

 4     OF THESE TWO PHOTOGRAPHS?

 5             THE COURT:  DO YOU HAVE THEM IN YOUR

 6     PHONE?

 7             MR. CZODOR:  YES.

 8             THE COURT:  THIS IS THE REQUEST OF THE

 9     RESPONDENT, WHICH THE PETITIONER IS COMPLYING,

10     AND THE PHONE WILL NOT COME INTO EVIDENCE.

11     IT'S JUST FOR THE PURPOSES OF ANSWERING THE

12     QUESTION IF THEY WERE TIME STAMPED.  WHAT WAS

13     THE TIME?

14             MR. CZODOR:  UH-HUH.  I UNDERSTAND.

15             THE COURT:  ALL RIGHT.  THE COURT WILL

16     LOOK AT THE TIME STAMP.  IT SHOWS SEPTEMBER.

17             THE WITNESS:  25

18             THE COURT:  SSHH.

19             THE WITNESS:  SORRY.

20             THE COURT:  AT 9:59 A.M. THAT IS THE DOOR

21     WITHOUT SCRATCHES.

22             THE WITNESS:  THAT'S THE DOOR WITH THE

23     SCRATCHES.

24             THE COURT:  OKAY.  I'M GOING TO TOUCH IT

25     TO BLOW IT UP.  NOW I SEE THE SCRATCHES.  ALL
```

```
 1      RIGHT.  MA'AM.

 2           MS. LUO:  SEPTEMBER 25TH?

 3           THE WITNESS:  YES.  THAT'S WHEN I WENT TO

 4      POLICE.  IT WAS DURING THE DAY.  THE NIGHT IS

 5      BAD VISIBILITY THERE.  YOU CANNOT MAKE NICE

 6      PICTURES.

 7  BY MS. LUO

 8      Q    SO YOU CLAIM I SCRATCHED YOUR DOOR ON

 9  SEPTEMBER 18TH?

10      A    YES.

11      Q    BUT YOU TOOK THE PICTURE ON

12  SEPTEMBER 25TH?

13      A    BECAUSE THAT'S WHEN I WENT TO THE POLICE,

14  AND THAT'S WHEN I WAS MAKING THE -- MAKING THE --

15  THIS CASE.

16      Q    THERE'S NOTHING ON THE POLICE REPORT

17  REGARDING --

18           THE COURT:  MA'AM, WE DON'T HAVE THE

19      POLICE REPORT, SO WE CAN'T SAY THERE'S NOTHING.

20      WE HAVEN'T ADMITTED INTO EVIDENCE.  I WOULD

21      LIKE TO SEE IF YOU DON'T MIND THE PICTURE OF

22      HER STANDING WITH THE KEY.

23           MR. CZODOR:  YES.

24           THE COURT:  SINCE SHE BROUGHT UP THE

25      DATES.  I'D LIKE TO SEE THAT.  I'LL LOOK AT
```

```
1        GORGEOUS PAINTING.

2             THE COURT:  HOW DID SHE GET THE VIDEO,

3        SIR?

4             MR. CZODOR:  SHE DIDN'T GET THE VIDEO.

5        SHE MAKE.  I SENT HER THE PICTURE.  IT WAS MY

6        MISTAKE, AND SHE GET THE OTHER PICTURES FROM

7        THE FACEBOOK, FROM MY FACEBOOK.  I DIDN'T --

8             THE COURT:  YOU HAVE NAKED PICTURES ON

9        YOUR FACEBOOK?

10            MR. CZODOR:  NO.  NO.  THE OTHER PICTURES

11       IT WAS BUNCH OF DIFFERENT PICTURES, BUT SOME OF

12       THE PICTURES WERE --

13            THE COURT:  WHERE WERE YOUR NAKED PICTURES

14       THAT SHE OBTAINED THEM?

15            MR. CZODOR:  I SENT HER SOME.  YEAH.

16            THE COURT:  ALL RIGHT.  AND WERE THE ONES

17       IN THE PHOTOS -- STRIKE THAT.  WERE THE ONES IN

18       EXHIBIT B, WERE THOSE THE ONES THAT YOU HAD

19       GIVEN TO HER?

20            MR. CZODOR:  YES.  I HAVE IT IN MY PHONE

21       WITH HER PHONE NUMBER.  SO THIS IS THE OTHER

22       ONE.  SHE CREATE.

23            THE COURT:  OKAY.  MA'AM, LOOK AT THIS.

24       DID YOU CREATE THAT?

25            MS. LUO:  IT'S BEEN TAKEN DOWN.
```

```
1            THE COURT:  MY QUESTION IS, DID YOU CREATE
2       THIS?
3            MS. LUO:  I DON'T RECALL.
4            THE COURT:  BUT YOU DO KNOW IT WAS TAKEN
5       DOWN?
6            MS. LUO:  BECAUSE I SEARCHED WHEN I GOT
7       THE REQUEST FOR RESTRAINING ORDER, I SEARCHED.
8       IT'S BEEN TAKEN DOWN.
9            THE COURT:  BUT YOU DON'T RECALL IF YOU
10      PUT THIS UP?
11           MS. LUO:  I DON'T RECALL.
12           THE COURT:  THAT'S C.  WHAT ELSE?  OR 3.
13              (EXHIBIT 3 IS MARKED FOR
14      IDENTIFICATION)
15           MR. CZODOR:  OKAY.  SO I CAN GO ON?  ALSO
16      SHE POSTED 10 YOUTUBE VIDEOS ABOUT ME.  WHEN I
17      WAS ABLE TO REMOVE THESE YOUTUBE VIDEOS, SHE
18      POSTED AGAIN, AND AGAIN THE SAME VIDEOS WITH
19      SAME CONTENT.  SOMETIMES SHE SHARED ONE PICTURE
20      OR SHE'S COVER MY GENITALIAS.
21           THE COURT:  MA'AM, DID YOU CREATE ONE
22      VIDEO OF HIM?  OR WHAT IS IT AGAIN, A VIDEO?
23           MR. CZODOR:  YOUTUBE.
24           THE COURT:  DID YOU CREATE A YOUTUBE VIDEO
25      OF HIM?
```

```
 1          MS. LUO:  WHAT KIND OF VIDEO?

 2          THE COURT:  A YOUTUBE VIDEO.

 3          MR. CZODOR:  YEAH.  YOUTUBES.

 4          THE COURT:  STOP, MA'AM.

 5          MS. LUO:  YES.

 6          THE COURT:  DID YOU CREATE A YOUTUBE VIDEO

 7     OF HIM AND POST IT?

 8          MS. LUO:  BUT WHAT SPECIFIC VIDEO?

 9          THE COURT:  ANY.

10          MS. LUO:  YES.  ONE.  YEAH.

11          THE COURT:  YOU CREATED ONE?

12          MS. LUO:  YEAH.

13          THE COURT:  WITH HIS PERMISSION?

14          MS. LUO:  BECAUSE --

15          THE COURT:  YES OR NO WITH HIS PERMISSION?

16          MS. LUO:  BUT IT DEPENDS ON WHAT CONTENT

17     OF THAT VIDEO.

18          THE COURT:  WELL, MA'AM, YOU SAID YOU

19     POSTED ONE.  I JUST WANT TO KNOW IF YOU HAD HIS

20     PERMISSION TO PUT HIM ON YOUTUBE.

21          MS. LUO:  BECAUSE THAT'S ABOUT ME, ABOUT

22     MY STORY.  I DON'T NEED HIS PERMISSION.

23          THE COURT:  IS THERE A PICTURE OF HIM ON

24     IT?

25          MS. LUO:  NO.
```

**EXHIBIT H (Declaration of the time stamp of two videos)**

18-23280

| | | |
|---|---|---|
| T | | 9/5/18 22:01 B Ph channel on Youtube using my text messages between me and Xingfei<br>Same as in DV 120 |

V · · · · · · · · picture collage in attachment/page 7  DV 120 - response to request for
Domestic Violence restraining order (made by Xinfei Luo)
same picture collage used in Sam Tsu, Anonymous, STO RY channel and B Ph

Xingfui Luo used only same pictures what I sent her
and 3 from facebook what she was able search for me on the facebook site
(one profile picture and 2 other ones) and 1 from plenty of fish site
She used always same collage

U · · · · · · · · Damaged door

Video 1 · · · · · · · · I recorded on September 18 7:54 pm
Xingfei Luo knocking on my door with hard object (key) and sckretching my
door with this object. I have a picture of damaged doors.

Video 2 · · · · · · · · I recorded on September 18 8:13 pm
Xingfei Luo outside of my house waiting on police because she did not want to
leave. Answering on my question:

| | |
|---|---|
| Me: Say it thrue. Did you posted? | 1:58 |
| Xingfei Luo: I was emotional | 1:53 |
| Me: It is criminal offense. | 1:48 |
| Xingfei Luo: How come? | 1:45 |

My friend Chris Kovacs is in presence

**EXHIBIT I (Declaration of 20 minutes scratching)**

**DW 100 - RECENT ABUSE**

18 V 0 0 2 3 7 4

9/18/18

8:00 pm Xingfei Luo aka Olivia (never told me her name and real age, she claimed to be 34) knocked on my door and scratched my door for about 20 minutes and did not stop after I told her to. She claimed she wanted talk and would not leave. I have recording of this I told her to leave multiple time but she did not want to. I called my friend Chris Kovacs to come so I have a witness of this incident. He came over and I went outside of my doors to confront her. My friend suggest to call 911 because she did not want to move and leave. Police came in 45min aprox. and order her to leave otherwise they charge her with tresspassing. After she left Police suggested that I will immediatly file restraining order. Also I have on recording confession that she did online what she did and that she posted the videos.

**EXHIBIT J (Photo of Appellant holding a key in front of the Accuser's door)**



gfei LUO used key to damage my door september 18. On the door till today are dots and sccratches

**EXHIBIT K (Photo of Appellant taken through front door viewer)**



**EXHIBIT L (Photo of Appellant in front of the Accuser's garage)**



**EXHIBIT M (Business name search result)**



# Dr. Shirley N. Weber
## California Secretary of State

Skip to Main Content | Skip to Footer

**About    Business    Notary & Authentications    Elections    Campaign & Lobbying    State Archives    Registries    News    Contact**

## Business Entities (BE)

**Online Services**

File LLC Statement of Information

File Corporation Statement of Information

Business Search

Publicly Traded Disclosure Search

Current Processing Dates

**Service Options**

Name Availability

Forms, Samples & Fees

Statements of Information (annual/biennial reports)

Filing Tips

Information Requests (certificates, copies & status reports)

Service of Process

FAQs

Contact Information

**Resources**

Business Resources

Tax Information



##  Business Search - Results

The California Business Search is updated daily and reflects work processed through Monday, August 16, 2021. Please refer to document Processing Times for the received dates of filings currently being processed. The data provided is not a complete or certified record of an entity.

- Select an entity name below to view additional information. Results are listed alphabetically in ascending order by entity name, or you can select a column title to change the sort order.
- To refine the search results, enter a word or a string of words in the "Narrow search results" box. The "Narrow search results" will search on all fields of the initial search results.
- For information on checking or reserving a name, refer to Name Availability.
- For information on requesting a more extensive search, refer to Information Requests.
- For help with searching an entity name, refer to Search Tips.
- For descriptions of the various fields and status types, refer to Frequently Asked Questions.

Results of search for LP/LLC Name keyword "gorgeous painting" returned 0 entity records (out of 0 records found).

Show    10 ▼   entities per page          Narrow search results:

| Entity Number ⇅ | Registration Date ⇅ | Status ⇅ | Entity Name ⇊ | Jurisdiction ⇅ | Agent for Service of Process ⇅ |
|---|---|---|---|---|---|
| | | No matching entities found | | | |

Showing 0 to 0 of 0 entities

**Modify Search**    **New Search**

**Previous**    **Next**



**EXHIBIT N (Tomas Czodor's Tax Returns)**

SCHEDULE C
(Form 1040)

**Profit or Loss From Business**
(Sole Proprietorship)

▶ Go to *www.irs.gov/ScheduleC* for instructions and the latest information.
▶ Attach to Form 1040, 1040NR, or 1041; partnerships generally must file Form 1065.

Department of the Treasury
Internal Revenue Service (99)

**2017**
Attachment
Sequence No. **09**

Name of proprietor
TOMAS CZODOR

Social security number (SSN)

| | |
|---|---|
| A | Principal business or profession, including product or service (see instructions) |
| | PAINTING |

B  Enter code from instructions ▶

| | |
|---|---|
| C | Business name. If no separate business name, leave blank. |
| | FOR GORGEOUS & CLEASN PAINTING |

D  Employer ID number (EIN) (see instr.)

E  Business address (including suite or room no.) ▶
City, town or post office, state, and ZIP code

F  Accounting method:  (1) [X] Cash  (2) [ ] Accrual  (3) [ ] Other (specify) ▶

G  Did you "materially participate" in the operation of this business during 2017? If "No," see instructions for limit on losses . . . . [X] Yes [ ] No

H  If you started or acquired this business during 2017, check here . . . . . . . . . . . . . . . . . . ▶

I  Did you make any payments in 2017 that would require you to file Form(s) 1099? (see instructions) . . . . . . . . [ ] Yes [X] No

J  If "Yes," did you or will you file required Forms 1099? . . . . . . . . . . . . . . . . . . . . . . [ ] Yes [ ] No

**Part I    Income**

| | | | |
|---|---|---|---|
| 1 | Gross receipts or sales. See instructions for line 1 and check the box if this income was reported to you on Form W-2 and the "Statutory employee" box on that form was checked . . . . . . . . . . ▶ [ ] | 1 | 108,681 |
| 2 | Returns and allowances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2 | |
| 3 | Subtract line 2 from line 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3 | 108,681 |
| 4 | Cost of goods sold (from line 42) . . . . . . . . . . . . . . . . . . . . . . . . . | 4 | 37,108 |
| 5 | Gross profit. Subtract line 4 from line 3 . . . . . . . . . . . . . . . . . . . . . . | 5 | 71,573 |
| 6 | Other income, including federal and state gasoline or fuel tax credit or refund (see instructions) . . . . | 6 | |
| 7 | Gross income. Add lines 5 and 6 . . . . . . . . . . . . . . . . . . . . . . ▶ | 7 | 71,573 |

Department of the Treasury
Internal Revenue Service (99) ▶ Go to www.irs.gov/ScheduleC for instructions and the latest information.
▶ Attach to Form 1040, 1040NR, or 1041; partnerships generally must file Form 1065.

**18**

Attachment
Sequence No. **09**

Name of proprietor
**TOMAS CZODOR**

Social security number (SSN)

| A | Principal business or profession, including product or service (see instructions) | B | Enter code from instructions |
|---|---|---|---|
| | PAINTING | | ▶ |

| C | Business name. If no separate business name, leave blank. | D | Employer ID number (EIN) (see instr.) |
|---|---|---|---|
| | FOR GORGEOUS & CLEASN PAINTING | | |

E  Business address (including suite or room no.) ▶
   City, town or post office, state, and ZIP code

F  Accounting method:  (1) [X] Cash  (2) [ ] Accrual  (3) [ ] Other (specify) ▶

G  Did you "materially participate" in the operation of this business during 2018? If "No," see instructions for limit on losses . . . .  [X] Yes  [ ] No

H  If you started or acquired this business during 2018, check here . . . . . . . . . . . . ▶ [ ]

I  Did you make any payments in 2018 that would require you to file Form(s) 1099? (see instructions) . . . . . . . .  [ ] Yes  [X] No

J  If "Yes," did you or will you file required Forms 1099? . . . . . . . . . . . .  [ ] Yes  [ ] No

## Part I    Income

| | | | |
|---|---|---|---|
| 1 | Gross receipts or sales. See instructions for line 1 and check the box if this gross income was reported to you on Form W-2 and the "Statutory employee" box on that form was checked . . . . . . . . . . ▶ [ ] | 1 | 90,014 |
| 2 | Returns and allowances . . . . . . . . . . . . . . . . . . . . | 2 | |
| 3 | Subtract line 2 from line 1 . . . . . . . . . . . . . . . . . . | 3 | 90,014 |
| 4 | Cost of goods sold (from line 42) . . . . . . . . . . . . . . . . | 4 | 35,733 |
| 5 | Gross profit. Subtract line 4 from line 3 . . . . . . . . . . . . . | 5 | 54,281 |
| 6 | Other income, including federal and state gasoline or fuel tax credit or refund (see instructions) . . . . | 6 | |
| 7 | Gross income. Add lines 5 and 6 . . . . . . . . . . . . . . ▶ | 7 | 54,281 |

Form 1040 or 1040-SR

**Profit or Loss From Business**

Sole Proprietorship

Department of the Treasury
Internal Revenue Service (99)

▶ Go to *www.irs.gov/ScheduleC* for instructions and the latest information.
▶ Attach to Form 1040, 1040-SR, 1040-NR, or 1041; partnerships generally must file Form 1065.

2019

Attachment Sequence No. 09

Name of proprietor

TOMAS CZODOR

Social security number (SSN)

| A | Principal business or profession, including product or service (see instructions) | B | Enter code from instructions |
|---|---|---|---|
| | PAINTING | | ▶ |

| C | Business name. If no separate business name, leave blank. | D | Employer ID number (EIN) (see instr.) |
|---|---|---|---|
| | FOR GORGEOUS & CLEASN PAINTING | | |

| E | Business address (including suite or room no.)   ▶ |
|---|---|
| | City, town or post office, state, and ZIP code |

F  Accounting method:   (1) [X] Cash   (2) [ ] Accrual   (3) [ ] Other (specify) ▶

G  Did you "materially participate" in the operation of this business during 2019? If "No," see instructions for limit on losses . . . . [X] Yes [ ] No

H  If you started or acquired this business during 2019, check here . . . . . . . . . . . . . ▶ [ ]

I  Did you make any payments in 2019 that would require you to file Form(s) 1099? (see instructions) . . . . . . . . [ ] Yes [X] No

J  If "Yes," did you or will you file required Forms 1099? . . . . . . . . . . . . . . . . . [ ] Yes [ ] No

**Part I    Income**

| | | | |
|---|---|---|---|
| 1 | Gross receipts or sales. See instructions for line 1 and check the box if this income was reported to you on Form W-2 and the "Statutory employee" box on that form was checked . . . . . . . . ▶ [ ] | 1 | 98,760 |
| 2 | Returns and allowances . . . . . . . . . . . . . . . . . . . . . . . . | 2 | |
| 3 | Subtract line 2 from line 1 . . . . . . . . . . . . . . . . . . . . . . | 3 | 98,760 |
| 4 | Cost of goods sold (from line 42) . . . . . . . . . . . . . . . . . . . . | 4 | 36,393 |
| 5 | Gross profit. Subtract line 4 from line 3 . . . . . . . . . . . . . . . . . | 5 | 62,367 |
| 6 | Other income, including federal and state gasoline or fuel tax credit or refund (see instructions) . . . . | 6 | |
| 7 | Gross income. Add lines 5 and 6 . . . . . . . . . . . . . . . . . . . . ▶ | 7 | 62,367 |

**EXHIBIT O (DVRO)**

Domestic Violence Assistance

| **DV-130** | **Restraining Order After Hearing** **(Order of Protection)** |

☒ **Original Order**  ☐ _____ **Amended Order**

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
LAMOREAUX JUSTICE CENTER

OCT 19 2018

DAVID H. YAMASAKI, Clerk of the Court

B. WILLIAMS ____, DEPUTY

_Clerk stamps date here when form is filed._

① **Name of Protected Person:**

Tomas Czodor

**Your lawyer in this case** _(if you have one):_
Name: _____  State Bar No.: _____
Firm Name: _____
**Address** _(If you have a lawyer for this case, give your lawyer's information. If you do not have a lawyer and want to keep your home address private, give a different mailing address instead. You do not have to give your telephone, fax, or e-mail.):_
Address: 2521 N. Jacaranda
City: Santa Ana   State: CA   Zip: 92705
Telephone: 714-330-4746   Fax: _____
E-Mail Address: _____

_Fill in court name and street address:_
**Superior Court of California, County of**
Orange
341 The City Drive South
Orange, 92868-3205
Lamoreaux Justice Center

② **Name of Restrained Person:**

Xingbi Luo

_Clerk fills in case number when form is filed._
**Case Number:**
18VD002374

**Description of restrained person:**

Sex: ☐ M ☒ F   Height: 5'1"   Weight: 95   Hair Color: black   Eye Color: black
Race: Asian-Chinese   Age: 40   Date of Birth: 12/31/77
Mailing Address _(if known):_ 10628 Hallwood Dr.
City: Temple City   State: California   Zip: 91780
Relationship to protected person: former partner

③ ☐ **Additional Protected Persons**
In addition to the person named in ①, the following persons are protected by orders as indicated in items ⑥ and ⑦ _(family or household members):_

| Full name | Relationship to person in ① | Sex | Age |
|-----------|------------------------------|-----|-----|
| | | | |
| | | | |

☐ _Check here if there are additional protected persons. List them on an attached sheet of paper and write,_ "DV-130, Additional Protected Persons," _as a title._

④ **Expiration Date**
The orders, except as noted below, end on

| _(date):_ 10 9 23 | at _(time):_ | ☐ a.m. ☐ p.m. or ☑ midnight |

- _If no date is written, the restraining order ends three years after the date of the hearing in item ⑤(a)._
- _If no time is written, the restraining order ends at midnight on the expiration date._
- _Note: Custody, visitation, child support, and spousal support orders remain in effect after the restraining order ends. Custody, visitation, and child support orders usually end when the child is 18._
- **_The court orders are on pages 2, 3, 4, and 5 and attachment pages (if any)._**

This order complies with VAWA and shall be enforced throughout the United States. See page 5.

**This is a Court Order.**

Judicial Council of California, www.courts.ca.gov
Revised July 1, 2016, Mandatory Form
Family Code, § 6200 et seq. Approved by DOJ

**Restraining Order After Hearing (CLETS—OAH)**
**(Order of Protection)**
**(Domestic Violence Prevention)**

DV-130, Page 1 of 7

Westlaw Doc & Form Builder →

Domestic Violence Assistance

Case Number: **18V002374**

---

**(5) Hearings**

a. The hearing was on *(date)*: 10/9/18 **L4** with *(name of judicial officer)*: **COMMISSIONER RENEE E. WILSON**

b. These people were at the hearing *(check all that apply)*:
- ☑ The person in (1)
- ☐ The lawyer for the person in (1) *(name)*: _____
- ☑ The person in (2)
- ☐ The lawyer for the person in (2) *(name)*: _____

c. The people in (1) and (2) must **return to Dept.** _____ of the court on (date): _____

   at *(time)*: _____ ☐ a.m. ☐ p.m. to review *(specify issues)*: _____

---

### To the person in ❷

**The court has granted the orders checked below. Item (9) is also an order. If you do not obey these orders, you can be arrested and charged with a crime. You may be sent to jail for up to one year, pay a fine of up to $1,000, or both.**

**(6) ☑ Personal Conduct Orders**

a. The person in (2) must **not** do the following things to the protected people in (1) and (3):
- ☑ Harass, attack, strike, threaten, assault *(sexually or otherwise)*, hit, follow, stalk, molest, destroy personal property, disturb the peace, keep under surveillance, impersonate *(on the Internet, electronically or otherwise)*, or block movements.
- ☑ Contact, either directly or indirectly, by any means, including, but not limited to, by telephone, mail, e-mail, or other electronic means.
- ☑ Take any action, directly or through others, to obtain the addresses or locations of any protected persons. *(If this item is not checked, the court has found good cause not to make this order.)*

b. Peaceful written contact through a lawyer or process server or another person for service of legal papers related to a court case is allowed and does not violate this order.

c. ☐ Exceptions: Brief and peaceful contact with the person in (1), and peaceful contact with children in (3), as required for court-ordered visitation of children, is allowed unless a criminal protective order says otherwise.

**(7) ☑ Stay-Away Order**

a. The person in (2) must stay at least *(specify)*: 1 0 yards away from *(check all that apply)*:
- ☑ The person in (1)
- ☐ School of person in (1)
- ☑ Home of person in (1)
- ☐ The persons in (3)
- ☑ The job or workplace of person in (1)
- ☐ The child(ren)'s school or child care
- ☑ Vehicle of person in (1)
- ☐ Other *(specify)*: _____

b. ☐ Exceptions: Brief and peaceful contact with the person in (1), and peaceful contact with children in (3), as required for court-ordered visitation of children, is allowed unless a criminal protective order says otherwise.

**(8) ☐ Move-Out Order**

The person in (2) must move out immediately from *(address)*: _____

**(9) No Guns or Other Firearms or Ammunition**

a. The person in (2) cannot own, possess, have, buy or try to buy, receive or try to receive, or in any other way get guns, other firearms, or ammunition.

### This is a Court Order.

Domestic Violence Assistance

| Case Number: |
|---|
| 18V002374 |

(9) b.  The person in (2) must:
- Sell to, or store with, a licensed gun dealer, or turn in to a law enforcement agency, any guns or other firearms within his or her immediate possession or control. Do so within 24 hours of being served with this order.
- Within 48 hours of receiving this order, file with the court a receipt that proves guns have been turned in, sold, or stored. *(Form DV-800, Proof of Firearms Turned In, Sold, or Stored, may be used for the receipt.)* Bring a court filed copy to the hearing.

c. ☐ The court has received information that the person in (2) owns or possesses a firearm.

d. ☐ The court has made the necessary findings and applies the firearm relinquishment exemption under Family Code section 6389(h). Under California law, the person in (2) is not required to relinquish this firearm *(specify make, model, and serial number of firearm):* _____

The firearm must be in his or her physical possession only during scheduled work hours and during travel to and from his or her place of employment. Even if exempt under California law, the person in (2) may be subject to federal prosecution for possessing or controlling a firearm.

(10) ☑ **Record Unlawful Communications**

The person in (1) has the right to record communications made by the person in (2) that violate the judge's orders.

(11) ☐ **Care of Animals**

The person in (1) is given the sole possession, care, and control of the animals listed below. The person in (2) must stay at least _____ yards away from and not take, sell, transfer, encumber, conceal, molest, attack, strike, threaten, harm, or otherwise dispose of the following animals: _____

(12) ☐ **Child Custody and Visitation**

Child custody and visitation are ordered on the attached Form DV-140, *Child Custody and Visitation Order* or *(specify other form):* _____

(13) ☐ **Child Support**

Child support is ordered on the attached Form FL-342, *Child Support Information and Order Attachment* or *(specify other form):* _____

(14) ☐ **Property Control**

Only the person in (1) can use, control, and possess the following property: _____

(15) ☐ **Debt Payment**

The person in (2) must make these payments until this order ends:

Pay to: _____ For: _____ Amount: $ _____ Due date: _____
Pay to: _____ For: _____ Amount: $ _____ Due date: _____
Pay to: _____ For: _____ Amount: $ _____ Due date: _____

☐ *Check here if more payments are ordered. List them on an attached sheet of paper and write "DV-130, Debt Payments" as a title.*

(16) ☐ **Property Restraint**

The ☐ person in (1) ☐ person in (2)  must not transfer, borrow against, sell, hide, or get rid of or destroy any property, including animals, except in the usual course of business or for necessities of life. In addition, the person must notify the other of any new or big expenses and explain them to the court. *(The person in (2) cannot contact the person in (1) if the court has made a "No-Contact" order.)*

Peaceful written contact through a lawyer or a process server or other person for service of legal papers related to a court case is allowed and does not violate this order.

**This is a Court Order.**

**Restraining Order After Hearing (CLETS—OAH)**
**(Order of Protection)**
**(Domestic Violence Prevention)**

Domestic Violence Assistance

| Case Number: |
|---|
| KbV002374 |

**(17)** ☐ **Spousal Support**
Spousal support is ordered on the attached Form FL-343, *Spousal, Partner, or Family Support Order Attachment* or *(specify other form):* _____

**(18)** ☐ **Rights to Mobile Device and Wireless Phone Account**

    **a.** ☐ **Property Control of Mobile Device and Wireless Phone Account**
      Only the person in ① can use, control, and possess the following property:
      Mobile device *(describe)* _____ and account *(phone number):* _____
      Mobile device *(describe)* _____ and account *(phone number):* _____
      ☐ *Check here if you need more space. Attach a sheet of paper and write "DV-130 Rights to Mobile Device and Wireless Phone Account" as a title.*

    **b.** ☐ **Debt Payment**
      The person in ② must make these payments until this order ends:
      Pay to *(wireless service provider):* _____ Amount: $ _____ Due date: _____

    **c.** ☐ **Transfer of Wireless Phone Account**
      The court has made an order transferring one or more wireless service accounts from the person in ② to the person in ①. These orders are contained in a separate order (Form DV-900).

**(19)** ☐ **Insurance**
    ☐ The person in ①   ☐ the person in ②   is ordered NOT to cash, borrow against, cancel, transfer, dispose of, or change the beneficiaries of any insurance or coverage held for the benefit of the parties, or their child(ren), if any, for whom support may be ordered, or both.

**(20)** ☐ **Lawyer's Fees and Costs**
The person in ② must pay the following lawyer's fees and costs:
Pay to: _____ For: _____ Amount: $ _____ Due date: _____
Pay to: _____ For: _____ Amount: $ _____ Due date: _____

**(21)** ☐ **Payments for Costs and Services**
The person in ② must pay the following:
Pay to: _____ For: _____ Amount: $ _____ Due date: _____
Pay to: _____ For: _____ Amount: $ _____ Due date: _____
Pay to: _____ For: _____ Amount: $ _____ Due date: _____
☐ *Check here if more payments are ordered. List them on an attached sheet of paper and write "DV-130, Payments for Costs and Services" as a title.*

**(22)** ☐ **Batterer Intervention Program**
The person in ② must go and pay for a 52-week batterer intervention program and show written proof of completion to the court. This program must be approved by the probation department under Penal Code § 1203.097. The person in ② must enroll by *(date):* _____ or if no date is listed, must enroll within 30 days after the order is made. The person in ② must complete, file and serve Form 805, Proof of Enrollment for Batterer Intervention Program.

**(23)** ☑ **Other Orders**
Other orders *(specify):* _See attached_
_____

**(24)** ☐ **No Fee to Serve (Notify) Restrained Person**
If the sheriff or marshal serves this order, he or she will do it for free.

**This is a Court Order.**

Domestic Violence Assistance

Case Number: **18V002374**

**(25) Service**

a. ☑ The people in ① and ② were at the hearing or agreed in writing to this order. No other proof of service is needed.

b. ☐ The person in ① was at the hearing on the request for original orders. The person in ② was not present.

(1) ☐ Proof of service of Form DV-109 and Form DV-110 (if issued) was presented to the court. The judge's orders in this form are the same as in Form DV-110 except for the end date. The person in ② must be served. This order can be served by mail.

(2) ☐ Proof of service of Form DV-109 and Form DV-110 (if issued) was presented to the court. The judge's orders in this form are different from the orders in Form DV-110, or Form DV-110 was not issued. The person in ② must be personally "served" (given) a copy of this order.

c. ☐ Proof of service of Form FL-300 to modify the orders in Form DV-130 was presented to the court.

(1) ☐ The people in ① and ② were at the hearing or agreed in writing to this order. No other proof of service is needed.

(2) ☐ The person in ☐ ① ☐ ② was not at the hearing and must be personally "served" (given) a copy of this amended order.

**(26) ☑ Criminal Protective Order**

a. ☐ Form CR-160, *Criminal Protective Order—Domestic Violence*, is in effect.
Case Number: _____   County: _____   Expiration Date: _____

b. ☐ Other Criminal Protective Order in effect *(specify)*: _____
Case Number: _____   County: _____   Expiration Date: _____

*(List other orders on an attached sheet of paper. Write "DV-130, Other Criminal Protective Orders" as a title.)*

c. ☑ No information has been provided to the judge about a criminal protective order.

**(27) ☑ Attached pages are orders.**

- Number of pages attached to this seven-page form: 1
- All of the attached pages are part of this order.
- Attachments include *(check all that apply)*:
  ☐ DV-140   ☐ DV-145   ☐ DV-150   ☐ FL-342   ☐ FL-343   ☐ DV-900
  ☑ Other *(specify)*:   Item 23 attachment

Date:   **OCT 1 9 2018**

*Judge (or Judicial Officer)*   COMMISSIONER RENEL E. WILSON

**Certificate of Compliance With VAWA**

This restraining (protective) order meets all "full faith and credit" requirements of the Violence Against Women Act, 18 U.S.C. § 2265 (1994) (VAWA) upon notice of the restrained person. This court has jurisdiction over the parties and the subject matter; the restrained person has been or will be afforded notice and a timely opportunity to be heard as provided by the laws of this jurisdiction. **This order is valid and entitled to enforcement in each jurisdiction throughout the 50 states of the United States, the District of Columbia, all tribal lands, and all U.S. territories, commonwealths, and possessions and shall be enforced as if it were an order of that jurisdiction.**

**This is a Court Order.**

Domestic Violence Assistance

**Case Number:** 18V002374

### Warnings and Notices to the Restrained Person in ❷

**If you do not obey this order, you can be arrested and charged with a crime.**

- If you do not obey this order, you can go to jail or prison and/or pay a fine.
- It is a felony to take or hide a child in violation of this order.
- If you travel to another state or to tribal lands or make the protected person do so, with the intention of disobeying this order, you can be charged with a federal crime.

### You cannot have guns, firearms, and/or ammunition.



You cannot own, have, possess, buy or try to buy, receive or try to receive, or otherwise get guns, other firearms, and/or ammunition while the order is in effect. If you do, you can go to jail and pay a $1,000 fine. Unless the court grants an exemption, you must sell to, or store with, a licensed gun dealer, or turn in to a law enforcement agency, any guns or other firearms that you have or control. The judge will ask you for proof that you did so. If you do not obey this order, you can be charged with a crime. Federal law says you cannot have guns or ammunition while the order is in effect. Even if exempt under California law, you may be subject to federal prosecution for possessing or controlling a firearm.

### Instructions for Law Enforcement

**Start Date and End Date of Orders**

The orders *start* on the earlier of the following dates:
- The hearing date in item ⑤ (a) on page 2, or
- The date next to the judge's signature on this page.

The orders *end* on the expiration date in item ④ on page 1. If no date is listed, they end three years from the hearing date.

**Arrest Required if Order Is Violated**

If an officer has probable cause to believe that the restrained person had notice of the order and has disobeyed the order, the officer must arrest the restrained person. (Pen. Code, §§ 836(c)(1), 13701(b).) A violation of the order may be a violation of Penal Code section 166 or 273.6.

**Notice/Proof of Service**

Law enforcement must first determine if the restrained person had notice of the orders. If notice cannot be verified, the restrained person must be advised of the terms of the orders. If the restrained person then fails to obey the orders, the officer must enforce them. (Fam. Code, § 6383.)

Consider the restrained person "served" (notified) if:
- The officer sees a copy of the *Proof of Service* or confirms that the *Proof of Service* is on file; *or*
- The restrained person was at the restraining order hearing or was informed of the order by an officer. (Fam. Code, § 6383; Pen. Code, § 836(c)(2).) An officer can obtain information about the contents of the order in the Domestic Violence Restraining Order System (DVROS). (Fam. Code, § 6381(b)-(c).)

### If the Protected Person Contacts the Restrained Person

Even if the protected person invites or consents to contact with the restrained person, the orders remain in effect and must be enforced. The protected person cannot be arrested for inviting or consenting to contact with the restrained person. The orders can be changed only by another court order. (Pen. Code, § 13710(b).)

### This is a Court Order.

Domestic Violence Assistance | **Case Number:** 18VD0737A

## Child Custody and Visitation

The custody and visitation orders are on Form DV-140, items ③ and ④. They are sometimes also written on additional pages or referenced in DV-140 or other orders that are not part of the restraining order.

## Enforcing the Restraining Order in California

Any law enforcement officer in California who receives, sees, or verifies the orders on a paper copy, in the California Law Enforcement Telecommunications System (CLETS), or in an NCIC Protection Order File must enforce the orders.

## Conflicting Orders—Priorities for Enforcement

If more than one restraining order has been issued protecting the protected person from the restrained person, the orders must be enforced in the following priority (see Pen. Code, § 136.2 and Fam. Code, §§ 6383(h)(2), 6405(b)):

1. *EPO:* If one of the orders is an *Emergency Protective Order* (Form EPO-001) and it is more restrictive than other restraining or protective orders, it has precedence in enforcement over all other orders.

2. *No-Contact Order:* If there is no EPO, a no-contact order that is included in a restraining or protective order has precedence in enforcement over any other restraining or protective order.

3. *Criminal Order:* If none of the orders includes a no-contact order, a domestic violence protective order issued in a criminal case takes precedence in enforcement over any conflicting civil court order. Any nonconflicting terms of the civil restraining order remain in effect and enforceable.

4. *Family, Juvenile, or Civil Order:* If more than one family, juvenile, or other civil restraining or protective order has been issued, the one that was issued last must be enforced.



*(Clerk will fill out this part.)*

### —Clerk's Certificate—

I certify that this *Restraining Order After Hearing (Order of Protection)* is a true and correct copy of the original on file in the court. DAVID H. YAMASAKI

Date: _____ Clerk, by _____, Deputy

**This is a Court Order.**

**DV130, item 23, "other orders" attachment-18V002374 Czodor v Luo:**

Responding Party is ordered to cease posting the picture or likeness of the Moving Party or refer to him by name on any social media website or blog. Responding Party is further ordered to remove any pictures or references of the Moving Party from any social media website or blog she may have posted.

Commissioner Renée E. Wilson

**EXHIBIT P (No Explanation from Public Defender)**

**m**ail.com

## RE: Case 19CM06724 - tactical reasons

| | |
|---|---|
| **From:** | "Jones, Ray" <Ray.Jones@pubdef.ocgov.com> |
| **To:** | "Olivia Luo" <CPRArq@mail.com> |
| **Date:** | Nov 24, 2021 9:54:47 AM |

Good morning Ms. Luo,


The Public Defender's office has conflicted off your case.  Accordingly, Mr. Dominguez will not respond to your questions.  Any further questions or concerns should be addressed to your current attorney.


Thank you

Ray Jones


---

**From:** Olivia Luo <CPRArq@mail.com>
**Sent:** Tuesday, November 23, 2021 5:00 PM
**To:** Dominguez, Jorge <Jorge.Dominguez@pubdef.ocgov.com>; Jones, Ray <Ray.Jones@pubdef.ocgov.com>; RLBULLOCKLAWTWC.COM <RLBULLOCKLAW@TWC.COM>; Mikhail, Marian [ALTDEF] <Marian.Mikhail@altdef.ocgov.com>
**Subject:** Case 19CM06724 - tactical reasons


Dear Mr Dominguez,


I'm writing to follow up my **inquiries** as to your office's strategy in the handling of Case #19CM06724. Please note that in *People v. Pope*, 23 Cal.3d 412 (Cal. 1979), the court suggests that if counsel was asked for an explanation and failed to provide one, this could prove he or she had no tactical reason for the action taken. I ask that you respond to my inquiries as soon as possible.


Thank you.

Luo


> **Sent:** Tuesday, November 16, 2021 at 8:41 PM
> **From:** "Olivia Luo" <CPRArq@mail.com>
> **To:** Jorge.Dominguez@pubdef.ocgov.com, ray.jones@pubdef.ocgov.com, RLBULLOCKLAW@TWC.COM
> **Subject:** Case 19CM06724 - tactical reasons
>
> Dear Mr Dominguez,
>
>
> I just noticed my oversight that I didn't include your in the email that was supposed to send you. Below please find the email that was sent on Nov 5, 2021. Although you are no longer representing me you still have a professional obligation to explain your office's strategy with respect to the approach you took (or didn't take) in the handling of Case #19CM06724.

Please respond to my inquries at your earliest convenience.

Thank you.

Luo

---

**Sent:** Friday, November 05, 2021 at 11:55 AM
**From:** "Olivia Luo" <CPRArq@mail.com>
**To:** Abby.Taylor@pubdef.ocgov.com, ray.jones@pubdef.ocgov.com
**Subject:** Case 19CM06724 - tactical reasons

Dear Mr Dominguez,

As you may have known that I'm seeking habeas corpus relief. The purpose of this correspondence is to seek your office's tactical reasons for the acts or omissions in the handling of Case #19CM06724. Accordingly I'm writing to request a response on or before Nov 10, 2021 as I know you will be back in the office on Nov 8, 2021.

The lack of dating relationship should have been a relied upon theory that the DVRO was unlawful and Czodor did not have any expectation of privacy in anything he sent to Defendant. The critical fact whether Czodor and Defendant had a dating relationship should have been decided by the jury instead of a judge. Why didn't you request the trial court to instruct the jury on dating relationship?

Why did you sign off a stipulation with the prosecution while the lawfulness of the DVRO could be in question?

Why did you sign off a stipulation with the prosecution without prior discussion with Defendant?

Why did you think a family court can go above constitution to restrain Defendant's free speech regarding her opinion about a person's credibility?

Why did you think the TRO and DVRO passed constitutional muster, as they are not sufficiently narrowly tailored? A permissible order restraining future speech "must be couched in the narrowest terms that will accomplish the pin-pointed objective permitted by constitutional mandate and the essential needs of the public order." (*Carroll v. President & Com'rs of PrincessAnne* (1968) 393 U.S. 175, 183-184, 89 S.Ct. 347, 21 L.Ed.2d 325.)   The California Constitution is more protective of free speech rights than the federal Constitution, and California courts require "extraordinary circumstances" before a prior restraint may be imposed. (*Wilson v. Superior Court of Los Angeles County* (1975) 13 Cal.3d 652, 658-661, 119 Cal.Rptr. 468, 532 P.2d 116 ; *In re Marriage of Candiotti* (1995) 34 Cal.App.4th 718, 724, 40 Cal.Rptr.2d 299 (*Candiotti*).)

Why didn't you discover *Brady* violation?

The prosecution failed to disclose the police field activity reports on Sep 10, 2018 and Sep 18, 2018 which are impeachment and exculpatory evidence. Why didn't you request a new trial due to *Brady* violation?

Why didn't you ask Czodor from what time to what time on Sep 18, 2018 Defendant was scratching his door?

Why didn't you ask Czodor why he told the 911 call operator Defendant was knocking his door instead of scratching despite it does not require damage to tell the 911 operator if he heard his door was being scratched?

Czodor testified in the family court that Defendant scratched his door for 20 minutes. Why didn't you ask Czodor what he was doing during these 20 minutes as he failed to take photos or videos of Defendant's vandalism?

Czodor had no difficulty to take photos or shoot videos throughout the night on Sep 18, 2018. Why didn't you ask Czodor why he didn't take photos or shoot videos during the 20 minutes while Defendant was scratching his door?

Czodor testified in the family court he didn't discover the door's damage because it was dark on Sep 18, 2018 but the photos and videos show otherwise. Why didn't you impeach Czodor in front of the jury by displaying the lighting in the photos and videos?

Czodor testified that he heard Defendant scratching his door for 20 minutes. Why didn't you ask Czodor in front of the jury "how did you not know your door was damaged after hearing 20 minutes scratching?"

Why didn't you ask what prevented Czodor to discover his door's damage on Sep 19, 2018?

Why didn't you ask what prevented Czodor to discover his door's damage on Sep 20, 2018?

Why didn't you ask what prevented Czodor to discover his door's damage on Sep 21, 2018?

Why didn't you ask what prevented Czodor to discover his door's damage on Sep 22, 2018?

Why didn't you ask what prevented Czodor to discover his door's damage on Sep 23, 2018?

Why didn't you ask what prevented Czodor to discover his door's damage on Sep 24, 2018?

Why didn't you ask Czodor from what date to what date Defendant posted his nude photos online?

Why didn't you ask Czodor why he waited until the police officer could not observe any nudes online to make the report?

Why didn't you ask why Czodor didn't report to the police once his nude photo was posted online while he had no difficulty in calling the police on Sep 10, 2021 alleging terrorism?

Why didn't you introduce Czodor's email on Sep 24, 2018 to the jury?

Czodor testified in the family court that the photo of the damaged door was taken on Sep 25, 2018. Why didn't you introduce a theory that, in order to manufacture a criminal charge, Czodor damaged his own door after he learned, on Sep 24, 2018, that it would cost money to remove Defendant's post and that's why the photo of the damaged door was taken on Sep 25, 2018?

Why didn't you present a theory that the paper evidence was manufactured after Czodor learned, on Sep 24, 2018, that it would cost money to remove Defendant's post?

Why didn't you perform a court room reenactment and show the jury no matter how hard to use a key to tap on wood furniture it would not cause any damage?

Why didn't you ask Czodor whether Defendant constantly scratch his door for 20 minutes? Any pause between the first scratch and the others?

Why didn't you ask Czodor why the damage showing on the photo was not consistent with 20 minutes scratching? Did you know 20 minutes scratching could produce thousands of scratches?

Why didn't you attack the mischaracterized evidence because the video clearly shows Defendant knocking instead of scratching the door?

Why didn't you telephone any of Czodor's friends or customers to ascertain whether these people existed or whether Czodor's version of story was true?

Why didn't you call the 911 call operator to the stand?

Why didn't you call the police officers to the stand and attack the improperly gathered evidence? In this 21st century why is it ok while the police had technical ability but they accept paper evidence to deprive defendant's rights to conduct forensic examination to ascertain whether the evidence was tampered, manufactured, or manipulated in any way?

Why didn't you subpoena any and all text messages between Czodor and Defendant because it could reveal what texts were manufactured or manipulated?

Why didn't you subpoena any and all photos and videos Czodor took on Sep 18, 2018 because the time stamp of the photos and videos could pick apart Czodor's story?

Why didn't you ask Czodor how many photos and videos he took in total on Sep 18, 2018?

Why didn't you subpoena Czodor's medical records relating to his alleged emotional distress?

Why didn't you explore, in front of the jury, Czodor's upbringing and lifestyle as a nudist?

Why didn't you ask Czodor what he knew about Defendant prior to sending her nude photos?

The secret recording indicates Czodor's own words "Who are you to me? Nobody. You are to me nobody. What you think, what we was? It was my wife, girlfriend, boyfriend, what have you been to me. Jesus Christ. I met you one or two times." Why didn't you ask why Czodor expected privacy in his nudes from nobody?

Why didn't you ask Czodor what caused him to take nude photos on a beach which was a public area?

Why didn't you attack Czodor's so called emotional distress while he was comfortable with public nudity?

Why didn't you ask Czodor what nude activities he did on nudist beach or camp?

Why didn't you ask Czodor if going naked was empowering as a nudist?

Why didn't you ask Czodor if becoming nude would increases confidence for nudists?

Why didn't you ask Czodor what Defendant did after she threatened him?

Why didn't you object to the introduction of Defendant's prior testimony while she was not represented by counsel due to violation of Fifth and Sixth Amendments?

Why didn't you object to the trial court's denial of Juror #4's hardship request to be excused?

The prosecution failed to demonstrate that the screenshots and recordings were complete and that something said or done was not being taken out of context. The prosecution failed to establish that the recordings were good audio / visual quality and were demonstrably records of the entire meeting or interview rather than an edited selection. The prosecution has not shown that there is no possibility that where Defendant did not know a conversation was being recorded, the content was not manipulated with a view to drawing Defendant, the party who was unaware, into some statement that can be taken out of context. Why didn't you object to the introduction of screenshots and recordings on Evidence Code §352 grounds?

Why didn't you object to the prosecutorial misconduct at trial?

What investigation and preparation was done between 08/12/2019 and 09/06/2019?

What investigation and preparation was done between 09/06/2019 and 10/18/2019?

What investigation and preparation was done between 10/18/2019 and 01/10/2020?

What investigation and preparation was done between 1/10/2020 and 02/14/2020?

What investigation and preparation was done between 02/14/2020 and 03/20/2020?

What investigation and preparation was done between 03/20/2020 and 07/14/2020?

What investigation and preparation was done between 07/14/2020 and 12/22/2020?

What investigation and preparation was done between 12/22/202 and 03/05/2021?

What investigation and preparation was done between 03/05/2021 and 05/07/2021?

What investigation and preparation was done between 05/07/2021 and 06/08/2021?

Why didn't you file a *Serna* Motion prior to trial?

Why didn't you submit defendant's health condition as a sentencing factor?

Why did you present to the Court that Defendant made some terrible choices despite Defendant repeatedly told you she was framed?

Thank you.

Luo

---

CONFIDENTIAL EMAIL: The information contained in this email is confidential and may also be attorney-client privileged and constitute attorney work product. The information is intended only for the use of the individual or entity to whom it is addressed. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify sender immediately.

**EXHIBIT Q (Text message admitting as a nudist)**







For more Olive Dell Ranch...
Don't forget to follow us on
FACEBOOK and INSTAGRAM!





Home | Annual 5K Bare Burro Race! | About | Rates | Contact us!

Home › About

# About



**HoursGatehouse hours: Thursday-Monday 8:00 am to 8:00 pm**
*Closed to non members on Tuesdays & Wednesday's*

*Olive Dell Ranch is Southern California's favorite nudist resort for families and couples.*
*Located in Colton, California Just a few miles from San Bernardino and Riverside.*
*Olive Dell's central location is close to many of Southern California's main tourist*

## Calendar 2021

### January

| | | |
|---|---|---|
| 1 | New Year's Brunch Potluck | 11am |
| | Polar Bear Swim | 1pm |
| 2 | Bingo | 7pm |
| 3 | Activities Meeting | Noon |
| 16 | Thru the Years Prom | 8pm |
| 19 | Potluck | 6:30pm |
| 23 | Comedy Show | 8pm |
| 30 | Texas Holdem | 1pm |
| | Karaoke | 8pm |

### February

| | | |
|---|---|---|
| 6 | Bingo | 7pm |
| 7 | Super Bowl Party | 2pm |
| 13 | Valentine's Dance | 8pm |
| 14 | Activities Meeting | Noon |
| 16 | Potluck | 6:30pm |
| 27 | Karaoke | 8pm |

### March

| | | |
|---|---|---|
| 6 | Bingo | 7pm |
| 7 | Activities Meeting | Noon |
| 13 | St Patrick's Dance | 8pm |
| 16 | Potluck | 6:30pm |
| 27 | Karaoke | 8pm |

### APRIL

| | | |
|---|---|---|
| 3 | Bingo | 7pm |
| 4 | Activities Meeting | Noon |
| 20 | Potluck | 6:30pm |
| 23 | Karaoke | 8pm |
| 24 | Naked Beer Mile | 3pm |
| | Toga Dance | 8pm |
| 25 | Bare Burro 5K | 10:30am |

*attractions.*
*It's the ideal spot to enjoy the nudist/naturist lifestyle whether visiting for the day or an overnight stay.*

*Our nudist club offers:*
*Rental cabins, Hookups, Camp sites for extended stays*

*Numerous amenities such as:*
*Tennis court, Hiking, Swimming pool, Jacuzzi, Sauna*

## Cafe Delicious, run by the Olive Dell family and renowned for it's outstanding home cooking!

## *Cafe hours:*

Closed Monday – Friday

Saturday – 8:00 am to 8:00 pm
Sunday – 8:00 am to 7:00 pm





### May

| | | |
|---|---|---|
| 1 | Texas Holdem | 1pm |
| | Bingo | 7pm |
| 2 | Activities Meeting | Noon |
| 15 | Game Night | 8pm |
| 18 | Potluck | 6:30pm |
| 28 | *Memorial Weekend: Pirates* | |
| 31 | Karaoke | |
| | Memorial Day | |

### June

| | | |
|---|---|---|
| 5 | Bingo | 7pm |
| 6 | Activities Meeting | Noon |
| 15 | Potluck | 6:30pm |
| 19 | Trailer Trash Dance | 8pm |
| 26 | Summer Acoustic Concert Series | 1-4pm |
| | Karaoke | 8pm |

### July

| | | |
|---|---|---|
| 2 | Bingo | 7pm |
| 3 | Pool Party | |
| 11 | Activities Meeting | Noon |
| 20 | Potluck | 6:30pm |
| 24 | United Naturist Weekend | — |
| | Watermelon Games | 2pm |
| 31 | Texas Holdem | 1pm |
| | Summer Acoustic Concert Series | 1-4pm |
| | Karaoke | 8pm |

### August

| | | |
|---|---|---|
| 6 | Bingo | 7pm |
| 7 | SCNA Summer Games | |
| 8 | Activities Meeting | Noon |
| 14 | Comedy Show | 8pm |
| 17 | Potluck | 6:30pm |
| 28 | Summer Acoustic Concert Series | 1-4pm |
| | Karaoke | 8pm |

### September

| | | |
|---|---|---|
| 4 | Luau Weekend | |
| | Live Band | 8pm |
| 5 | Luau Dinner & Show | 6:30pm |
| 6 | Labor Day | |
| 11 | Bingo | 7pm |
| 12 | Activities Meeting | Noon |
| 17 | Karaoke | 8pm |
| 18 | 3rd Annual Gay Camping Wkend | |
| | Glow Party | 8pm |
| 21 | Potluck | 6:30pm |

### October

| | | |
|---|---|---|
| 2 | Bingo | 7pm |
| 3 | Activities Meeting | Noon |
| 9 | 60's Dance | 8pm |
| 19 | Potluck | 6:30pm |
| 23 | Karaoke | 8pm |
| 30 | Halloween Party | 8pm |

### November

| | | |
|---|---|---|
| 6 | Texas Holdem | 1pm |
| | Bingo | 7pm |
| 7 | Activities Meeting | Noon |
| 16 | Potluck | 6:30pm |
| 20 | Dinner in Restaurant | 6:30pm |
| 25 | Thanksgiving Potluck | 4:30pm |
| 27 | Karaoke | 8pm |

### December

| | | |
|---|---|---|
| 4 | Bingo | 7pm |
| 5 | Activities Meeting | Noon |
| 11 | Tree Trimming | 1pm |
| | Santa Party | 7pm |
| 18 | Karaoke | 8pm |
| 21 | Potluck | 6:30pm |
| 25 | Christmas Potluck | 4:30pm |
| | New Year's Eve Party | 8pm |





© 2021 copyright Olivedell inc.

**EXHIBIT R (Police report on Sep 26, 2018)**

| SAPD Personnel: | Lopez, Diego 2938 |
| Involvement: | Report Approver |

**Item 1)**   Involvement (Evidence)

Document, Record of conversations between victim and suspect,

---

**Narrative:** *Narrative*

**INVESTIGATION:**

On 09/26/2018 at approximately 1123 hours, I was wearing my department issued AXON body worn camera which was fully operational and functioning. I was dispatched to 60 Civic Center Plaza, for a meeting with a citizen.

I arrived on scene at approximately 1123 hours, and made contact with a male subject, identified as Tomas Czodor. Czodor provided me with the following statement in summary (for exact statements and descriptions refer to AXON body worn camera footage).

*STATEMENT OF VICTIM TOMAS CZODOR:*

On or about 08/05/2018, Czodor was using the online dating site POF, when he began corresponding with a female adult, identified as Xingfei Luo. Czodor and Luo corresponded for approximately three weeks, during which they went on approximately 2 dates, and Czodor sent Luo two photographs depicting his genitalia. Czodor stated he sent the photographs of his genitalia to Luo with the understanding the pictures where to remain private between the two of them.

After approximately three weeks of correspondence and two dates, Czodor decided the relationship was not working out and expressed a desire to terminate their communication. Upon hearing Czodor's desire to terminate the relationship, Luo accused Czodor of being a serial dater and a cheat. Luo threatened to post all of Czodor's "stuff" on social media, so he will suffer as much as she has suffered. Luo went on to state she would not stop until she got her dignity back.

Over the next few days, Czodor began to notice, by way of notifications of his friends, various videos and blogs had been posted on various social media outlets, including Youtube, Google and Vemo, depicting the photographs of his genitalia he sent to Luo. Based on the threats made by Luo, Czodor believes Luo is the one who posted photographs to over 35 social media outlets.

(End of Czodor's statement)

Czodor provided me with a list of a few of the social media outlets baring the videos and photographs of his genitalia, however, upon checking these websites there were no photographs or video's depicting Czodor's genitalia.

Czodor stated he was in the process of obtaining a restraining order but was told to obtain a police report to facilitate the process. Czodor stated in addition to facilitating the restraining order process he also wished to have Luo prosecuted for posting the photographs.

I provided Czodor a case number and encouraged him to contact the Santa Ana Police Department if he locates any additional photographs of his genitalia online.

I attempted to contact Luo via the contact number provided to me by Czodor but there was no answer upon multiple attempts.

**DISPOSITION:**

This case is forwarded to the District Attorney's Office for prosecution of Luo for violation of PC 647(j)(4) - Distribution of intimate photographs.

---

Author: Pratt, Aaron 3383   **BWC Activated**

Attachment 2

## DV-109    Notice of Court Hearing

Clerk stamps date here when form is filed.

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
LAMOREAUX JUSTICE CENTER
SEP 2 8 2018
DAVID H. YAMASAKI, Clerk of the Court
BY: L. WUNSCH ...... DEPUTY

**(1) Name of Person Asking for Order:**
Tomas Czodor

Your lawyer in this case *(if you have one)*:
Name: _____ State Bar No.: _____
Firm Name: _____
**Address** *(If you have a lawyer for this case, give your lawyer's information. If you do not have a lawyer and want to keep your home address private, give a different mailing address instead. You do not have to give your telephone, fax, or e-mail.):*
Address: 2521 N Jacaranda
City: Santa Ana    State: CA   Zip: 92705
Telephone: 714-330-4746    Fax: _____
E-Mail Address: _____

Fill in court name and street address:
Superior Court of California, County of
OC SUPERIOR COURT
LAMOREAUX JUSTICE CENTER
341 THE CITY DRIVE
ORANGE, CA 92868-3205

Clerk fills in case number when form is filed.
**Case Number:**
18V002374

**(2) Name of Person to Be Restrained:**
Xingfei Luo

*The court will fill out the rest of this form.*

**(3) Notice of Court Hearing**
A court hearing is scheduled on the request for restraining orders against the person in ②.

| **Hearing Date** | Date: 10-19-18 Time: 8:30 a.m. | Name and address of court if different from above: |
| | Dept.: L11   Room: _____ | _____ |

**(4) Temporary Restraining Orders (any orders granted are attached on Form DV-110)**

a. Temporary restraining orders for personal conduct, stay away, and protection of animals, as requested in Form DV-100, *Request for Domestic Violence Restraining Order,* are:

(1) ☒ **All granted** until the court hearing

(2) ☐ **All denied** until the court hearing *(specify reasons for denial in (b)):*

(3) ☐ **Partly granted** and partly **denied** until the court hearing *(specify reasons for denial in (b)):*

b. Requested temporary restraining orders for personal conduct, stay away, and protection of animals are denied because:

(1) ☐ The facts as stated in form DV-100 do not show reasonable proof of a past act or acts of abuse. (Family Code, §§ 6320 and 6320.5)

(2) ☐ The facts do not describe in sufficient detail the most recent incidents of abuse, such as what happened, the dates, who did what to whom, or any injuries or history of abuse.

(3) ☐ Further explanation of reason for denial, or reason not listed above: _____
_____
_____

---

**This is a Court Order.**

Judicial Council of California, www.courts.ca.gov
Revised January 1, 2012, Mandatory Form
Family Code, § 242, Approved by DOJ

**Notice of Court Hearing**
(Domestic Violence Prevention)

DV-109, Page 1 of 3 →

Case Number:
1 8 V 0 0 2 3 7 4

**(5) Service of Documents and Time for Service—for Person in ①**

At least ☒ five or ☐ ___ days before the hearing, someone age 18 or older—**not you or anyone else to be protected**—must personally give (serve) a court's file-stamped copy of this form (DV-109, *Notice of Court Hearing*) to the person in ② along with a copy of all the forms indicated below:

a. Form DV-100, *Request for Domestic Violence Restraining Order*, (file-stamped) with applicable attachments

b. ☒ Form DV-110, *Temporary Restraining Order* (file-stamped) with applicable attachments **if granted by the judge**

c. Form DV-120, *Response to Request for Domestic Violence Restraining Order* (blank form)

d. Form DV-250, *Proof of Service by Mail* (blank form)

e. ☐ Other *(specify):* _____

Date: SEP 28 2018 _____

*Judicial Officer*   JOHN L. FLYNN III

---

**Right to Cancel Hearing: Information for the Person in ①**

- If item ④(a)(2) or ④(a)(3) is checked, the judge has denied some or all of the temporary orders you requested until the court hearing. The judge may make the orders you want after the court hearing. You can keep the hearing date, or you can cancel your request for orders so there is no court hearing.
- If you want to cancel the hearing, use Form DV-112, *Waiver of Hearing on Denied Request for Temporary Restraining Order*. Fill it out and file it with the court as soon as possible. You may file a new request for orders, on the same or different facts, at a later time.
- If you cancel the hearing, do not serve the documents listed in item ⑤ on the other person.
- If you want to keep the hearing date, you must have all of the documents listed in item ⑤ served on the other person within the time listed in item ⑤.
- At the hearing, the judge will consider whether denial of any requested orders will jeopardize your safety and the safety of children for whom you are requesting custody or visitation.
- You must come to the hearing if you want the judge to make restraining orders or continue any orders already made. If you cancel the hearing or do not come to the hearing, any restraining orders made on Form DV-110 will end on the date of the hearing.

---

**To the Person in ①**

- The court cannot make the restraining orders after the court hearing unless the person in ② has been personally given (served) a copy of your request and any temporary orders. To show that the person in ② has been served, the person who served the forms must fill out a proof of service form. Form DV-200, *Proof of Personal Service* may be used.
- For information about service, read Form DV-210-INFO, *What Is "Proof of Personal Service"?*
- If you are unable to serve the person in ② in time, you may ask for more time to serve the documents. Read Form DV-115-INFO, *How to Ask for a New Hearing Date.*

---

**This is a Court Order.**

Revised January 1, 2012       **Notice of Court Hearing**       DV-109, Page 2 of 3
                                        **(Domestic Violence Prevention)**                        →

Case Number:
**18 V 0 0 2 3 7 4**

**To the Person in ❷**

- If you want to respond in writing, mail a copy of your completed Form DV-120, *Response to Request for Domestic Violence Restraining Order,* to the person in ① and file it with the court. You cannot mail Form DV-120 yourself. Someone age 18 or older—**not you**—must do it.
- To show that the person in ① has been served by mail, the person who mailed the forms must fill out a proof of service form. Form DV-250, *Proof of Service by Mail,* may be used. File the completed form with the court before the hearing and bring it with you to the hearing.
- For information about responding to a restraining order and filing your answer, read Form DV-120-INFO, *How Can I Respond to a Request for Domestic Violence Restraining Order?.*
- Whether or not you respond in writing, go to the court hearing if you want the judge to hear from you before making orders. You may tell the judge why you agree or disagree with the orders requested. You may bring witnesses and other evidence.
- **At the hearing, the judge may make restraining orders against you that could last up to five years.**
- **The judge may also make other orders about your children, child support, spousal support, money, and property and may order you to turn in or sell any firearms that you own or possess.**



### Request for Accommodations
Assistive listening systems, computer-assisted real-time captioning, or sign language interpreter services are available if you ask at least five days before the hearing. Contact the clerk's office or go to *www.courts.ca.gov/forms* for *Request for Accommodations by Persons With Disabilities and Response* (Form MC-410). (Civil Code, § 54.8.)

*(Clerk will fill out this part.)*

### —Clerk's Certificate—
I certify that this *Notice of Court Hearing* is a true and correct copy of the original on file in the court.

SEP 2 8 2018

Date: _____    Clerk, by_____, Deputy

**LEANNE WUNSCH**

**This is a Court Order.**

Revised January 1, 2012

**Notice of Court Hearing**
**(Domestic Violence Prevention)**

DV-109, Page 3 of 3

Page 44