1  XINGFEI LUO
   PO BOX 4886,
2  EL MONTE, CA 91734

3  XINGFEI LUO, IN PRO PER

FILED

CLERK, U.S. DISTRICT COURT

10/31/2024

CENTRAL DISTRICT OF CALIFORNIA

BY_____DVE_____DEPUTY

DOCUMENT SUBMITTED THROUGH THE
ELECTRONIC DOCUMENT SUBMISSION SYSTEM

8  **UNITED STATES DISTRICT COURT**

9  **CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| XINGFEI LUO, | ) Case No.: 8:22-cv-01640-MEMF-KES |
| Petition, | ) **OBJECTIONS TO REPORT AND** |
| | ) **RECOMMENDATION OF U.S.** |
| vs. | ) **MAGISTRATE JUDGE** |
| THE PEOPLE OF CALIFORNIA, | ) |
| | ) Action Filed: September 6, 2022 |
| Respondent. | ) |
| | ) |

**TO THE COURT AND ALL PARTIES:**

Xingfei Luo (Petitioner) will and hereby does object to the Report and Recommendations ("R&R") of Magistrate Judge in this matter.

**ARGUMENT**

By clear and convincing evidence, Petitioner has demonstrated that Czodor is a calculated manipulator and no reasonable factfinder would have convicted her of the crimes charged.

**GROUNDS TWO, EIGHT, NINE, NINETEEN THROUGH TWENTY-TWO, TWENTY-FIVE, TWENTY-NINE, AND THIRTY ARE NOT PROCEDURALLY BARRED** (Dkt. 73 at 13)

**Procedural Default Based on Failure to Raise on Direct Appeal**

The magistrate found Petitioner's enforcement-of-the-protective-order claim (ground two) is

procedurally defaulted because it could have been raised on direct appeal but was not. Dkt. 73 at 16. However, jurisdictional issues or claims that render a judgment void can be raised on habeas review. As established in *In re Harris*, 5 Cal. 4th 813, 829 (1993), claims that demonstrate that a court acted without jurisdiction, or that a judgment is void due to constitutional infirmities, are not subject to the procedural default bar.

The magistrate found Petitioner's prosecutorial-misconduct claims (ground thirty) and independent Fifth Amendment challenge to the admission of her family-court testimony (ground nine) are procedurally barred because she did not raise them on direct appeal. Dkt. 73 at 16-17. This is factually false. See attachment 1.

The magistrate found an independent and adequate state procedural ground barring Petitioner's sufficiency-of-the-evidence claims in grounds nineteen through twenty-two because the state court denied those claims because they were not cognizable on habeas review. Dkt. 73 at 17.

Under federal law, claims regarding the sufficiency of the evidence are inherently tied to due process rights, specifically the guarantee that no individual will be convicted of a crime unless the prosecution has proven every element of the offense beyond a reasonable doubt.

The U.S. Supreme Court, in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), articulated the standard for evaluating sufficiency-of-the-evidence claims in the context of due process. The Court held that a conviction violates due process if, after reviewing the evidence in the light most favorable to the prosecution, no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This means that when a defendant challenges the sufficiency of the evidence, they are essentially asserting that their due process rights have been violated because the evidence presented at trial was not sufficient to meet the required constitutional standard.

The Jackson standard is the federal benchmark for sufficiency-of-the-evidence claims. Under this standard, the reviewing court does not weigh the evidence, resolve conflicts in testimony, or assess the credibility of witnesses. Instead, the court must determine whether any rational factfinder could have reached the conclusion that the defendant was guilty beyond a reasonable doubt. If not, the conviction cannot stand because it violates due process.

Sufficiency-of-the-evidence claims are inherently due process claims because the right to be

1   convicted only upon proof beyond a reasonable doubt is a fundamental constitutional protection.

2   The Supreme Court in *In re Winship*, 397 U.S. 358, 364 (1970), affirmed that the Due Process

3   Clause requires the prosecution to prove every element of a charged offense beyond a reasonable

4   doubt. When a court is asked to review the sufficiency of the evidence, it is reviewing whether this

5   constitutional standard has been met. Under the *Winship* decision, it is clear that a state prisoner

6   who alleges that the evidence in support of his state conviction cannot be fairly characterized as

7   sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt has stated a

8   federal constitutional claim. *Jackson v. Virginia*, 443 U.S. 307, 321 (1979).

9       If a conviction is based on insufficient evidence, the defendant's due process rights have

10  been violated, as the conviction would have been obtained without meeting the burden of proof that

11  the Constitution mandates.

12      On federal habeas corpus review, sufficiency-of-the-evidence claims are also considered due

13  process claims under 28 U.S.C. § 2254. The reviewing court asks whether the state court's decision

14  was contrary to or an unreasonable application of *Jackson*. Federal courts defer to the findings of

15  the state court, but if the evidence is constitutionally insufficient, the habeas petition will be granted

16  on due process grounds.

17      In this case, a rational trier of fact could not have reasonably found that Petitioner and

18  Czodor were in a dating relationship based on only two social gatherings and limited interactions.

19  Federal law requires more than mere speculation for a finding to meet the "beyond a reasonable

20  doubt" standard.

21      As to Czodor's expectation of privacy in sending nude photos after meeting Petitioner once,

22  the U.S. Supreme Court in *Katz v. United States*, 389 U.S. 347, 361 (1967), established that the

23  reasonable expectation of privacy must be evaluated objectively, meaning it depends on what

24  society is prepared to recognize as reasonable—not the subjective beliefs of the individual. A

25  reasonable person does not expect privacy in such a context, particularly given the absence of a

26  clear, established relationship, the lack of promise by Petition to keep the photos private, and the

27  voluntary transmission of the photos.

28      Furthermore, in order to secure a conviction under California Penal Code § 647(j)(4)(A), the

1  prosecution must prove that the alleged victim suffered "serious emotional distress" as a result of

2  the offense. Dkt. 3 at 160.

3    In California, "serious emotional distress" must be more than mere discomfort or temporary

4  upset. For instance, in *People v. Ewing* (1999) 76 Cal.App.4th 199, the court explained that while

5  the terms "substantial emotional distress" and "severe emotional distress" are similar, they are not

6  synonymous because "severe" is a stronger adjective than "substantial." *Id* at 211. The court further

7  explained: the prosecution presented only scant evidence of emotional distress. Ferguson testified

8  that beginning the night of April 14 she feared Ewing; she was afraid for her own safety and that of

9  her children. It was Ewing's conduct that evening that prompted Ferguson to make her first

10  telephone call to the police department. Two days later, Ewing was arrested. Before the evening of

11  April 14, there was no evidence that Ferguson feared Ewing. Ferguson's boyfriend, Goulding,

12  testified she suffered sleepless nights and had joined a support group for battered women. While

13  this evidence supports the conclusion that Ewing's conduct upset Ferguson, it fell far short of

14  showing Ferguson suffered **substantial emotional distress**. No evidence was proffered as to the

15  degree, frequency and duration of Ferguson's sleep disruption. Similarly, Goulding's statement

16  Ferguson joined a support group, without further details as to the extent of her participation, adds

17  little. Indeed, there was not even a showing that Ferguson, who had organized a foundation for

18  battered women before meeting Ewing, joined the support group as a result of Ewing's conduct.

19  Without evidence as to the severity, nature or extent of a victim's emotional distress, the burden of

20  proof is not met. *Id*. at 211-212.

21    In the present case, the evidence offered by the prosecution is even weaker than in *Ewing* – a

22  case required evidence of substantial instead of serious emotional distress. Here, Czodor testified

23  only that he "thought about going to therapy a lot" without providing any further details about the

24  emotional or psychological impact of the alleged conduct. There was no testimony or corroborating

25  evidence of Czodor actually suffering from prolonged anxiety, or any other tangible impact

26  resulting from the incident. Under the standard set in *Ewing*, where even evidence of sleepless

27  nights and support group participation fell short of proving substantial emotional distress, Czodor's

28  testimony that he thought about going to therapy is constitutionally insufficient to meet the burden

1   of proof required for serious emotional distress.

2          As the court in *Ewing* emphasized, the prosecution must provide more than just scant

3   evidence of emotional distress; it must show its severity, frequency, and duration. Without such

4   evidence, the claim of substantial emotional distress cannot be sustained, and the prosecution fails

5   to meet the requisite legal standard to secure a conviction.

6          California's Civil Code section 1708.85, which deals with privacy rights related to

7   unauthorized use of intimate images, requires that the distress be "serious" and supported by

8   evidence such as therapy, substantial mental health impact, or a significant disruption in the victim's

9   life. Merely thinking about going to therapy would not meet this standard.

10          **Exceptions to Procedural Bar**

11          A reviewing court ordinarily will not consider a habeas claim which could have been but

12   was not raised on direct appeal (the "*Dixon* rule"). *In re Dixon* (1953) 41 Cal.2d 756, 759.

13          The exceptions to the *Dixon* rule are: (1) fundamental constitutional error; (2) lack of

14   jurisdiction over the petitioner; (3) the trial court acting in excess of its jurisdiction; or (4) an

15   intervening change in the law. See *Park v. California*, 202 F.3d 1146, 1152 (9th Cir. 1999) (listing

16   the exceptions to the *Dixon* rule as set forth by the California Supreme Court in *In re Harris*, 5 Cal.

17   4th 813, 828 n.7 (1993)).

18          Because Petitioner's claims alleged federal constitutional error, *Dixon* is not an independent

19   bar as applied to those claims and her claims are not procedurally defaulted. *Park v. California*, 202

20   F.3d 1146, 1154 (9th Cir. 1999).

21          Petitioner contends that the trial court enforced two void family court orders, which means

22   the trial court had no legitimate authority or fundamental jurisdiction over Petitioner. This argument

23   invokes a critical exception to the *Dixon* rule.

24          Under California law, a court's jurisdiction is a fundamental prerequisite for any valid

25   judgment or order. A court acts in excess of its jurisdiction when it enforces void orders, and any

26   such action is null and void ab initio. The California Supreme Court has long recognized that a

27   judgment rendered by a court that lacks jurisdiction over the subject matter or the parties is void and

28   can be challenged **at any time**, even collaterally. As established in *In re Harris*, 5 Cal. 4th 813,

836-837 (1993), and *People v. American Contractors Indemnity Co.*, 33 Cal. 4th 653, 661 (2004), a court's jurisdictional overreach renders its orders and judgments void and subject to collateral attack, even in habeas corpus proceedings.

Moreover, under Federal law, it is well-established that a court's actions in the absence of jurisdiction are void and can be challenged at any time. The United States Supreme Court has consistently held that a judgment is void and subject to collateral attack if the court that rendered it acted without jurisdiction. In *United States v. Cotton*, 535 U.S. 625, 630 (2002), the Supreme Court emphasized that "subject-matter jurisdiction...can never be forfeited or waived," and that a judgment rendered without jurisdiction is void.

Because Petitioner has alleged that the trial court enforced void family court orders, the trial court acted beyond its jurisdiction. Consequently, Petitioner's claim falls within the exception to the *Dixon* rule, allowing Petitioner to challenge the trial court's jurisdiction in a habeas corpus proceeding despite the claim not being raised on direct appeal.

<u>Procedural Default Based on Failure to Object at Trial</u>

In *Ylst v. Nunnemaker*, 501 U.S. 797, 799, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991), the state appellate court held on direct appeal that Nunnemaker had waived his *Miranda* claim because he failed to object at trial. Nunnemaker re-raised his *Miranda* claim in several subsequent state habeas petitions, all of which were denied essentially without explanation. The issue before the United State Supreme Court was "whether the California Supreme Court's unexplained order denying his second state habeas petition to that court ... constituted a 'decision on the merits' of that claim sufficient to lift the procedural bar imposed on direct appeal." *Nunnemaker*, 501 U.S. at 801, 111 S.Ct. 2590. Although the Supreme Court concluded that an unexplained order did not constitute a decision on the merits, it noted that:

> State procedural bars are not immortal, however; they may expire because of later actions by the state courts. If the last state court to be presented with a particular federal claim reaches the merits, it removes any bar to federal-court review that might otherwise have been available. Id.

Here, because petitioner reasserted his Brady /false evidence claim in his first state habeas

petition and the state supreme court reached (and rejected) the merits of that claim, *Nunnemaker*
applies and the procedural bar based on the contemporaneous objection rule for petitioner's knowing
presentation of false evidence claim has been lifted.

**Cause and Prejudice (Dkt. 73 at 20)**

Ineffective assistance of counsel claims are not subject to the strictest procedural forfeiture
rules. See *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011) (citing *Strickland v. Washington*, 466
U.S. 668, 689-90 (1984)). In *Harrington*, the Court explained that:

> An ineffective-assistance claim can function as a way to escape rules of waiver
> and forfeiture and raise issues not presented at trial, and so the *Strickland* standard
> must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the
> integrity of the very adversary process the right to counsel is meant to serve.

*Id*.

"If the procedural default is the result of ineffective assistance of counsel, the Sixth
Amendment itself requires that responsibility for the default be imputed to the State." *Murray v.
Carrier*, 477 U. S. 478, 488 (1986). That is not because a constitutional error "is so bad that the
lawyer ceases to be an agent" of the prisoner, but rather because a violation of the right to counsel
"must be seen as an external factor" to the prisoner's defense. *Coleman v. Thompson*, 501
U. S. 722, 754 (1991) (internal quotation marks omitted).

A court "must consider the totality of the evidence" and ask "whether there is a reasonable
probability that, absent the [trial counsel's] errors, the result of the proceeding would have been
different" when evaluating a claim of ineffective assistance of counsel.

"A reasonable probability is a probability sufficient to undermine confidence in the
outcome. That requires a substantial, not just conceivable, likelihood of a different result."
Pinholster, 563 U. S., at 189 (citation and internal quotation marks omitted). This standard does not
require a defendant to show that it is more likely than not that adequate representation would have
led to a better result, but "[t]he difference" should matter "only in the rarest case." Strickland, 466
U. S., at 697. To determine whether a prisoner satisfies this standard, a court must "consider the
totality of the evidence before the judge or jury." Id., at 695. The magistrate departed from these
well-established rules in at least three ways. First, she failed adequately to take into account the

1    weighty exculpatory evidences in this case. As noted, the magistrate did not mention those

2    evidences at all.

3          Determining whether evidence would have created a reasonable probability of a different

4    result if it had been offered at trial necessarily requires an evaluation of the strength of that

5    evidence. And where that evidence undermines the prosecution's theory, it is hard to see how a

6    court could decide how much weight to give the evidence without making a comparative analysis.

7    The weakness of Czodor's testimony contrasts sharply with the strength of the evidence that

8    destroyed his credibility.

9          When a prisoner claims that he was prejudiced at trial because counsel failed to present

10   available mitigating evidence, a court must decide whether it is reasonably likely that the additional

11   evidence would have avoided a conviction. This analysis requires an evaluation of the strength of

12   all the evidence and a comparison of the weight of each evidence. The magistrate downplayed

13   Petitioner's evidence present here and overstated the strength of trial evidence.

14         **Appellate Counsel (Dkt. 21)**

15         The magistrate found that Petitioner's first habeas petition she filed in the state supreme

16   court asserted numerous ineffective-assistance-of-trial-counsel claims (see Dkt. 6 at 65-83) but no

17   corresponding ineffective-assistance-of-appellate counsel (IAAC) claims. Dkt. 73 at 21-22. This

18   finding overlooks the fact that Petitioner's first state court habeas petition was filed on October 13,

19   2021 which was before her appellate counsel filed a *People v. Wende* (1979) 25 Cal.3d 436 brief on

20   February 17, 2022. Dkt. 5 at 9. Therefore, Petitioner could not raise IAAC claims because her first

21   state court habeas petitioner was filed before her appellate counsel filed *Wende* brief.

22         The magistrate found that Petitioner did not exhaust her ineffective-assistance-of-appellate-

23   counsel (IAAC) claim because, in her second habeas petition to the California Supreme Court, she

24   only vaguely alleged that she "received zero assistance of counsel on appeal," which was

25   presumably based on the fact that appellate counsel filed a *People v. Wende* (1979) 25 Cal.3d 436

26   brief. The magistrate determined that Petitioner failed to identify specific claims that appellate

27   counsel should have raised. Dkt. 73 at 21-22.

28         However, since Petitioner is proceeding pro se, courts are charged with construing her

1  Petition and filings liberally in order to allow for the development of a potentially meritorious case.

2  See *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Martin v. Duffy*, 858 F.3d 239, 245 (4th Cir. 2017)

3  (noting that "when confronted with the objection of a pro se litigant, [the court] must also be

4  mindful of [its] responsibility to construe pro se filings liberally"). In addition, Petitioner relied on

5  the Court's initial review to exhaust her claims but nowhere in the Court's initial review alerts her

6  that the IAAC was unexhausted. Therefore, her IAAC claim is not procedurally barred. See *Walters*

7  *v. McCormick*, 122 F.3d 1172, 1174 n.1 (9th Cir. 1997) (exhaustion requirement excused because

8  failure to exhaust partially due to district court's ruling that claims were not barred, which allowed

9  statute of limitations to expire.)

10      Here, the nature of the ineffective assistance claim necessarily shows that the appellate

11  attorney's failure to raise any appropriate issues, except those that rely on evidence outside the

12  record, constituted deficient performance. (See Ground 2, 3, 8, 9, 10, 12-15, 17-22, 24-31, and 35. It

13  is self-evident that Petitioner asserts that all claims except those relying on evidence outside the

14  record are claims that appellate counsel should have raised, thus rendering the magistrate's

15  conclusion factually and legally incorrect.

16      Nominal representation on an appeal as of right — like nominal representation at trial —

17  does not suffice to render the proceedings constitutionally adequate; a party whose counsel is

18  unable to provide effective representation is in no better position than one who has no counsel at all.

19  *Evitts v. Lucey*, 469 U.S. 387, (1985). The attorney must play the role of an active advocate, rather

20  than a mere friend of the court assisting in a detached evaluation of the appellant's claim. See

21  *Anders v. California*, 386 U.S. 738 (1967); see also *Entsminger v. Iowa*, 386 U.S. 748 (1967)

22  (emphasizing that an attorney must assist a defendant in presenting claims and legal arguments

23  effectively, particularly in appeals where the right to counsel is guaranteed.)

24      In the context of ineffective assistance of appellate counsel, failure to raise meritorious

25  claims, especially those that could be preserved for federal habeas proceedings, can constitute

26  ineffective assistance. If appellate counsel fails to preserve claims for federal habeas proceedings,

27  resulting in the application of the highly deferential standard of review, such failure typically meets

28  the *Strickland* standard for ineffective assistance, as it directly impacts the ability of a defendant to

1   obtain meaningful relief in federal court. See *Anders v. California*, 386 U.S. 738, 744 (1967)

2   (holding that counsel has fulfilled his duty of advocate if he files a brief referring to anything in the

3   record that may support an appeal if he in good faith concludes the appeal is without merit.)

4       **The Domestic-Violence Protective Order (ground two) (Dkt. 73 at 23)**

5       The magistrate found that appellate counsel could not have performed unreasonably in

6   declining to assert a claim because trial counsel stipulated that the protective order was valid. Dkt.

7   73 at 23. This is legally flawed.

8       It is black letter law that fundamental jurisdiction may not be conferred by waiver, estoppel,

9   or consent. *People v. Lara*, 48 Cal.4th 216, 227 (Cal. 2010). This principle is similarly enshrined in

10  federal law. The consent of the parties is irrelevant. *California v. LaRue*, 409 U.S. 109 (1972). No

11  action of the parties can confer subject-matter jurisdiction. *Ins. Corp. of Ir. v. Compagnie Des*

12  *Bauxites De Guinee*, 456 U.S. 694, 702 (1982). A party does not waive the requirement by failing to

13  challenge jurisdiction early in the proceedings. *Id*.

14      California law specifically restricts the issuance of domestic violence restraining orders

15  (DVROs) to cases where the parties share a "qualifying" relationship under the Domestic Violence

16  Prevention Act (DVPA). Under California Family Code § 6211(c), a DVRO requires a close or

17  intimate relationship, such as dating or cohabitating, between the parties. If the relationship does not

18  meet these statutory qualifications, the family court lacks subject matter jurisdiction to issue the

19  order.

20      Orders issued without proper jurisdiction are legally void and may be challenged at any

21  stage. California courts recognize that a void order is "a nullity" and can be attacked in any

22  proceeding where its validity is at issue. *County of Ventura v. Tillett*, 133 Cal. App. 3d 105, 110

23  (1982), explains that a void order has no legal effect and may be challenged regardless of prior

24  stipulations. Subject-matter jurisdiction involves a court's power to hear a case, it can never be

25  forfeited or waived. *United States v. Cotton*, 535 U.S. 625, (2002). Consequently, defects in subject-

26  matter jurisdiction require correction regardless of whether the error was raised in trial court. See,

27  e.g., *Louisville Nashville R. Co. v. Mottley*, 211 U.S. 149 (1908).

28      Appellate counsel's failure to raise a jurisdictional issue amounts to ineffective assistance

under *Strickland v. Washington*, 466 U.S. 668 (1984), and this omission results in prejudice. Given that jurisdictional arguments are non-waivable and central to the validity of court orders, appellate counsel's neglect to assert this issue, especially on appeal, constitutes deficient performance. Furthermore, in California, appellate courts have recognized that issues impacting jurisdiction— especially those that affect the fundamental fairness of the proceedings—require heightened scrutiny.

Under *Smith v. Robbins*, 528 U.S. 259, 285 (2000), appellate counsel has a duty to pursue meritorious claims that affect the legitimacy of any court orders that resulted in Petitioner's conviction. Because the family court's jurisdiction is essential to the validity of restraining orders, any deficiencies in jurisdiction should have been raised by appellate counsel to protect Petitioner's rights.

In addition, trial counsel's decision to stipulate to the validity of the family court's protective order, despite having knowledge that the alleged facts would not legally support a dating relationship, constitutes ineffective assistance of counsel, which is a colorful claim that should have been raised by appellate counsel.

Here, trial counsel's decision to stipulate to the validity of the family court order falls below the objective standard of reasonableness, as it was based on the rejection of a legal argument by the trial court rather than a legitimate strategic decision. Dkt. 3 at 250-251. See *U.S. v. Swanson*, 943 F.2d 1070, 1071 (9th Cir. 1991) (holding that counsel's abandonment of his client's defense caused a breakdown in our adversarial system of justice.)

The stipulation effectively deprived the jury—the appropriate fact-finder—of its role in determining whether the interactions between Petitioner and Czodor met the legal standard of a dating relationship and whether Czodor had a relationship engendering expectation of privacy.

A stipulation is a binding agreement that removes the need for the government to present evidence to prove certain facts. When defense counsel agrees to a stipulation, it prevents the jury from hearing critical evidence that might have influenced its decision. Stipulations should be considered as strategic tools, but they must be based on sound legal grounds. In this case, the stipulation concerning the family court's orders deprived Petitioner of her Sixth Amendment right

1    to a jury trial on a key factual issue—whether there was a dating relationship, a required element for

2    the issuance of the protective orders and of the expectation of privacy. By stipulating to the validity

3    of the orders, trial counsel waived this essential right, and this waiver was not made in furtherance

4    of any legitimate strategy, as the facts and evidence simply did not support a dating relationship.

5    This failure meets both the deficient performance and prejudice prongs of *Strickland*.

6         The magistrate's conclusion that Petitioner is bound by counsel's stipulation (Dkt. 73 at 24),

7    regardless of her knowledge or authorization, is legally flawed under federal law. While defense

8    counsel has authority over certain trial-related decisions, such as the strategic use of evidence or

9    stipulations, this authority is not absolute, particularly when it comes to fundamental rights.

10        Certain decisions regarding the exercise or waiver of basic trial rights are of such moment

11   that they cannot be made for the defendant by a surrogate. *Florida v. Nixon*, 543 U.S. 175, 187

12   (2004). A defendant has "the ultimate authority" to determine "whether to plead guilty, waive a

13   jury, testify in his' or her own behalf, or take an appeal." *Jones v. Barnes*, 463 U.S. 745, 751 (1983);

14   *Wainwright v. Sykes*, 433 U.S. 72, 93, n. 1 (1977) (Burger, C. J., concurring). As explained above,

15   trial counsel's stipulation effectively waived Petitioner's right to a jury determination of crucial

16   facts, a waiver that counsel did not have the authority to make. Waiving this right without

17   Petitioner's informed consent constitutes a violation of both the Sixth and Fourteenth Amendments.

18   Therefore, the magistrate's conclusion that Petitioner is bound by her counsel's unauthorized

19   stipulation is legally flawed and Petitioner is entitled to habeas relief. See *Brecht v. Abrahamson*,

20   507 U.S. 619, 629 (1993) (habeas relief is automatically granted for constitutional errors that are

21   "structural defects"); *Wash. v. Recuenco*, 548 U.S. 212, 218-19 (2006) (structural error "necessarily

22   render[s] a criminal trial fundamentally unfair or [] unreliable vehicle for determining guilt or

23   innocence"); *Miller v. Dormire*, 310 F.3d 600, 604 (8th Cir. 2002) (attorney's waiver of defendant's

24   right to jury trial without defendant's consent or understanding constituted structural defect).

25        In *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), "the

26   Supreme Court created an exception to the *Strickland* standard for ineffective assistance of counsel

27   and acknowledged that certain circumstances are so egregiously prejudicial that ineffective

28   assistance of counsel will be presumed." *Stano v. Dugger*, 921 F.2d 1125, 1152 (11th Cir. 1991) (en

1  banc).

2      The Supreme Court recognized in *Cronic* that there are "circumstances that are so likely to

3  prejudice the accused that the cost of litigating their effect in a particular case is unjustified."

4  *Cronic*, 466 U.S. at 658, 104 S.Ct. at 2046. The Court identified the complete denial of counsel or

5  the deprivation of effective representation at a critical stage of an accused's trial as justifying a

6  presumption of prejudice. Id. at 659, 104 S.Ct. at 2047. The Supreme Court stated that

7          [c]ircumstances of that magnitude may be present on some occasions when

8          although counsel is available to assist the accused during trial, the likelihood that

9          any lawyer, even a fully competent one, could provide effective assistance is so

10         small that a presumption of prejudice is appropriate without inquiry into the actual

11         conduct of the trial.

12     Id. at 659-60, 104 S.Ct. at 2047.

13     By stipulating with the prosecution, prejudice was presumed, because of an actual or

14  constructive denial of the assistance of counsel during a critical stage of the criminal proceedings.

15  See *Strickland*, 466 U.S. at 692, 104 S.Ct. at 2067 ("Actual or constructive denial of the assistance

16  of counsel altogether is legally presumed to result in prejudice.").

17     The Government has failed to identify any strategy that can justify trial counsel's

18  stipulation. "[E]ven when no theory of defense is available, if the decision to stand trial has been

19  made, counsel must hold the prosecution to its heavy burden of proof beyond reasonable doubt."

20  *Cronic*, 466 U.S. at 656-57 n. 19, 104 S.Ct. at 2045-46 n. 19. By stipulating with the prosecution,

21  trial counsel shouldered part of the Government's burden of persuasion.

22     Trial counsel's stipulation with prosecution demonstrates the constructive absence of an

23  attorney dedicated to the protection of his client's rights under our adversarial system of justice.

24  Trial counsel's stipulation with prosecution was not a tactical admission of certain facts in order to

25  persuade the jury to focus on an affirmative defense such as insanity. See *Duffy v. Foltz*, 804 F.2d

26  50, 52 (6th Cir. 1986) (counsel's admission that his client committed the acts alleged but that he was

27  not guilty by reason of insanity considered to be a trial tactic). Here, the stipulation told the jury that

28  no reasonable doubt existed as to the validity of family court orders issued based on the dating

1  relationship between Petitioner and Czodor where whether a dating relationship existed was a key

2  fact to determine whether the family court had jurisdiction to issue the restraining orders and

3  whether Czodor had reasonable expectation of privacy in the photos he sent to Petitioner. Such

4  stipulation was not merely a negligent misstep in an attempt to champion his client's cause. See *U.S.*

5  *v. Swanson*, 943 F.2d 1070 (9th Cir. 1991).

6  **Prosecutorial misconduct (grounds eight and thirty) (Dkt. 73 at 25)**

7  The magistrate incorrectly characterized ground eight as prosecutorial misconduct. Dkt. 73

8  at 25. Ground eight involves the use of perjured testimony or false evidence at trial, which violates

9  Petitioner's right to a fair trial under Due Process Clause of the Fourteenth Amendment.

10  Czodor testified that Petitioner visited his home at night –when it would have been dark

11  outside – and that he claimed to have noticed the damage to his door the next day. This is a classic

12  manipulation - use assumption instead of actual objective evidence. Whether outside was dark is

13  irrelevant. The relevant question is whether Czodor's front door area was dark. Czodor's claim that

14  he only discovered the damage the next day is suspicious, especially given the evidence that his

15  front door area was well-lit. His explanation that it was "too dark" to notice the damage is

16  inconsistent with the facts, as photographs show the area was sufficiently illuminated. The

17  fabricated darkness and damage are an attempt to make his story of Petitioner's alleged misconduct

18  more believable and to provide a basis for seeking legal recourse. In cases where a party's

19  testimony is contradicted by objective evidence, courts often question the credibility of the

20  testimony.

21  Here, Czodor's credibility was a key issue in the case, and his testimony about the damage

22  to the door directly affected the jury's determination of Petitioner's guilt. The fact that he fabricated

23  an excuse for not noticing the damage sooner undermines his credibility and suggests that his

24  testimony about other events may also be false. This false testimony was material because it directly

25  affected the jury's assessment of the facts and the ultimate decision in the case. Had Petitioner

26  caused the damage, Czodor would not need to fabricate a story about the darkness to explain the

27  delay in his discovery of the damage. See *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3

28  L.Ed.2d 1217 (1959) (holding that "[t]he jury's estimate of the truthfulness and reliability of a given

1  witness may well be determinative of guilt or innocence").

2      The magistrate has misrepresented and ignored evidence presented by Petitioner,

3  particularly regarding the lighting conditions at Czodor's front door. The magistrate's finding that

4  Petitioner presents no evidence to show that Czodor's statement about being dark was false is not

5  only inaccurate but also disregards the evidence that contradicts Czodor's testimony. Dkt. 73 at 26-

6  27.

7      Here, the magistrate's conclusion that Petitioner provided no evidence to counter Czodor's

8  testimony is demonstrably false. Petitioner presented photographs showing that the front door area

9  was well-lit, which undermines Czodor's claim that he did not notice the damage until the following

10  day due to darkness. Dkt. 6 at 159-163. The magistrate's dismissal of these photos based on the lack

11  of a visible light bulb is irrelevant and constitutes a misrepresentation of the evidence. The proper

12  inquiry should have been whether the lighting was sufficient to notice the damage, not whether the

13  light bulb was visible.

14      The magistrate's finding that nothing suggests that it was so bright that it would have been

15  impossible for the victim to not notice the damage to the door is an unreasonable interpretation of

16  the evidence and a misrepresentation of what the photographs actually depict. Photographic

17  evidence demonstrates that light illuminated the entire front door area, strongly indicating a high

18  level of visibility at the time the photos were taken. The magistrate's assertion that the door was

19  "mostly covered in shadow" is incorrect when considering the clear, documented lighting on the

20  front entryway, which should have made any substantial damage readily apparent.

21      Here, the magistrate's interpretation of the lighting conditions does not align with the visual

22  evidence, undermining the credibility of the factual conclusions drawn. Therefore, the magistrate's

23  conclusion lacks evidentiary support.

24      Czodor's testimony that it was too dark to notice the damage to his door on September 18,

25  2018 is central to the prosecution's case. However, the photographic evidence submitted by

26  Petitioner, which shows significant lighting at the front door, directly contradicts Czodor's account.

27  Even people with poor eyesight can see the damages on the door if any. In addition, Czodor's

28  ability to take photos and videos during the night, yet his failure to capture any images showing the

1   alleged damage in the same frame as Petitioner, raises serious doubts about his credibility. Dkt. 4 at

2   54-66. The magistrate's failure to address these contradictions further supports the conclusion that

3   Czodor's testimony was unreliable and false.

4          The jury's estimate of the truthfulness and reliability of a given witness may well be

5   determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the

6   witness in testifying falsely that a defendant's life or liberty may depend. As stated by the New York

7   Court of Appeals in a case very similar to this one, *People v. Savvides*, 1 N.Y.2d 554, 557; 136

8   N.E.2d 853, 854-855; 154 N.Y.S.2d 885, 887:

9          "It is of no consequence that the falsehood bore upon the witness' credibility

10         rather than directly upon defendant's guilt. A lie is a lie, no matter what its

11         subject, and, if it is in any way relevant to the case, the district attorney has the

12         responsibility and duty to correct what he knows to be false and elicit the truth. . .

13         . That the district attorney's silence was not the result of guile or a desire to

14         prejudice matters little, for its impact was the same, preventing, as it did, a trial

15         that could in any real sense be termed fair."

16         Petitioner suffered prejudice from appellate counsel's failure to raise this issue on appeal

17  that rendered his performance ineffective under *Strickland*. In this case, appellate counsel's failure

18  to challenge Czodor's perjured testimony, deprived Petitioner of a meaningful opportunity to

19  contest the evidence used against her. Given that Czodor's testimony was critical to the

20  prosecution's case, this failure likely affected Czodor's credibility and the outcome of the trial.

21         The magistrate's finding that "no light bulb is visible" does not negate the clear evidence that

22  the front door was well illuminated. Courts must base their findings on the objective facts presented,

23  not on speculative conclusions. Here, the magistrate's focus on the visibility of a light bulb misses

24  the point: the photos showed sufficient light to disprove Czodor's claim of darkness, making it

25  implausible that he could have missed the damage until the following day. This factual

26  misrepresentation cannot stand under federal due process principles.

27         The magistrate's misrepresentation of the lighting evidence is a clear error. The introduction

28  of false or misleading testimony violates due process. See *Napue v. Illinois*, 360 U.S. 264, 272 79 S.

- 16 -

1    Ct. 1173 (1959) (holding that a prosecutor's failure to correct a witness's false testimony that the

2    witness "had received no promise of consideration in return for his testimony" violated the

3    petitioner due process rights and may have impacted the jury's guilty verdict).

4            The magistrate's finding that Petitioner suffered no prejudice due to the brevity of the

5    prosecutor's remark is erroneous. The focus on word count rather than content misapplies the

6    relevant legal standards for assessing prosecutorial misconduct and its prejudicial effect.  The focus

7    is not on the length or number of the prosecutor's words but on whether the statement improperly

8    influenced the jury by misleading or distorting evidence crucial to the defense. A proper analysis

9    would consider the remark's substance and its potential influence on the jury's evaluation of a

10   critical issue in the case - Czodor's credibility.

11           The prosecutor's comment aimed to explain away Czodor's delayed discovery of the

12   damage by suggesting that darkness obscured his view, despite photographic evidence that Czodor's

13   front door area was well-lit. This directly undercut the defense's position and bolstered Czodor's

14   credibility. As such, the deceptive and misleading remark had improperly influenced the jury, which

15   makes it prejudicial regardless of its brevity.

16           The magistrate misrepresented the evidence regarding the alleged vandalism of Czodor's

17   door, omitting critical details that significantly undermine the conclusion of "overwhelming

18   evidence." Dkt. 73 at 28.

19           The photograph of the damaged door was not taken on the night of the alleged vandalism or

20   next day but rather seven days later. This substantial delay in documenting the damage undermines

21   Czodor's credibility and suggests fabrication. The magistrate omitted the fact that Czodor only

22   discovered the damage after learning about the financial cost of removing online comments about

23   his dishonesty. This timeline suggests a motive for fabricating the damage.

24           In *Alford v. United States*, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624 (1931), Justice Stone

25   reversed a district court conviction where the defense counsel was precluded from eliciting upon

26   cross-examination a witness' current place of residence. The basis of the trial court's exclusion was

27   that the particular witness was in custody at that time, a fact which might bear unfairly upon his

28   reputation and credibility. The trial judge did not, however, restrict any normal inquiry into whether

1  the witness had been convicted of a felony. The Supreme Court held that entirely apart from the

2  right of the defense to show past convictions as bearing upon the general credibility of the witness,

3  the defense counsel was entitled to bring out those facts which would bear upon any bias he might

4  have in his testimony in the particular case, because given under a promise or expectation of

5  immunity or under the coercive effect of his detention by officers of the United States. 282 U.S. at

6  693, 51 S.Ct. 218. Relying upon its supervisory powers, the Supreme Court held that the restriction

7  constituted an abuse of discretion and hence prejudicial error requiring reversal.

8      In *United States v. Leja*, 568 F.2d 493 (6th Cir. 1977), the court recognized that the jury

9  should be allowed to consider any possible bias of the witness and reversed conviction for

10  failure to allow inquiry into the subject of the compensation, if any, that had been previously paid to

11  the government's witness other than in the immediate case. Here, Czodor's September 24, 2018

12  email was highly relevant to the question of his potential bias and interest. Trial counsel's failure to

13  bring out those facts which would bear upon any bias constituted ineffective assistance of counsel

14  and prejudiced Petitioner.

15      Although the prosecution presented a photograph allegedly showing Petitioner "pressing" a

16  metal key to Czodor's door, no damage is visible in the photograph. The magistrate omitted this

17  crucial fact, which directly contradicts the claim that Petitioner caused visible damage during her

18  visit. Additionally, Czodor testified that Petitioner knocked on his door for up to twenty minutes

19  that night, allegedly causing the damage. Given that metal door knockers have been used for

20  centuries, it is highly unlikely that knocking with a metal key would cause substantial scratches.

21      Notably, Czodor was capable of taking photos and videos throughout the entire night. Had

22  Petitioner truly knocked on his door for twenty minutes and caused damage, it is implausible that

23  Czodor failed to capture any footage showing both Petitioner and the damage together. This absence

24  of video or photographic evidence strongly suggests that the alleged vandalism did not occur,

25  further weakening the prosecution's case.

26      The magistrate's finding of overwhelming evidence is unsupported by the factual record. A

27  reasonable inference may not be based on suspicion alone, or on imagination, speculation,

28  supposition, surmise, conjecture, or guess work. [¶] . . . A finding of fact must be an inference

1  drawn from evidence rather than . . . a mere speculation as to probabilities without evidence. *People*

2  *v. Morris*, 46 Cal.3d 1, 21 (Cal. 1988). Petitioner is entitled to habeas corpus relief if it is found that

3  upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt

4  beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 324 (1979).

5          **Inappropriate and inflammatory arguments (subpart of Ground 30) (Dkt. 73 at 28)**

6          The magistrate found the prosecutor drew the jury's attention during closing argument to a

7  video in which she did not deny posting the victim's nude photographs when directly confronted

8  about it. Dkt. 73 at 28. In fact, Czodor stated "About name everything you like. It matters. Wrote

9  some shit about me every night. Who does that? Did you post it? Say the truth. Say the true. You

10  post it?" It's self-evident that Czodor's statement did not refer to nude photos. Dkt. 3 at 115.

11          A fair trial cannot be had when evidence is "misstated or presented in a false light."

12          Closing argument presents a legitimate opportunity to "argue all reasonable inferences from

13  evidence in the record." (ABA Standards, The Prosecution Function (1971) std. 5.8(a) (hereafter

14  cited as Prosecution Function).) For a number of years courts repeatedly warned "that statements of

15  facts not in evidence by the prosecuting attorney in his argument to the jury constitute misconduct."

16  *People v. Kirkes* (1952) 39 Cal.2d 719, 724 [249 P.2d 1]; see also *People v. Taylor* (1961) 197

17  Cal.App.2d 372, 381-384 [ 17 Cal.Rptr. 233].)

18          In assessing prosecutorial misconduct, the magistrate misrepresented the evidence by

19  overstating Petitioner's response to Czodor's accusation regarding the posting of nude photographs.

20          The magistrate's interpretation of the conversation between Czodor and Petitioner

21  significantly distorts the actual exchange. A careful review of the actual conversation shows that

22  Czodor's statement was vague and lacked a direct accusation. Czodor said, "About name everything

23  you like. It matters. Wrote some shit about me every night. Who does that? Did you post it? Say the

24  truth. Say the truth. You post it?" Petitioner responded, "I was emotional." This exchange does not

25  directly address the accusation that Petitioner posted nude photographs but rather reflects a

26  generalized conversation about the tensions between the two parties. Dkt. 3 at 115.

27          The prosecution bears the burden to show that all evidence presented is complete and

28  accurate. The magistrate's conclusion that Petitioner provided no testimony or evidence to support

1   Petitioner's claims that the video was manipulated or failed to capture her denying Czodor's

2   accusation improperly shifts this burden to Petitioner, requiring Petitioner to prove that the video

3   was incomplete, which contravenes due process principles.

4           Petitioner has provided substantial evidence to suggest that Czodor is a calculated

5   manipulator and chronic liar, creating grounds to question the integrity of the videos and print-outs

6   of screenshots and photos submitted as evidence in this case. This pattern of deceptive conduct

7   provides a sufficient basis to question the authenticity of these exhibits and raises concerns that the

8   evidence may have been manipulated in several ways, including by altering content, selectively

9   omitting portions, or otherwise misrepresenting events to support a particular narrative.

10          The magistrate found Petitioner claims that her response to Czodor's accusation was not an

11  admission under California law because she was innocent and thus had no reason to deny it, her

12  claim is not cognizable on federal habeas review because it exclusively concerns California's

13  evidence law.  Dkt. 73 at 31. This is legally flawed. A criminal defendant's conviction cannot rest

14  entirely on an uncorroborated extrajudicial confession." *United States v. Stephens*, 482 F.3d 669,

15  672 (4th Cir. 2007) (citing *Wong Sun v. United States*, 371 U.S. 471, 488-89 (1963)) (emphasis

16  added). An accused's extrajudicial admissions of essential facts or elements of the crime, made

17  subsequent to the crime, are of the same character as confessions, and corroboration by independent

18  evidence is required. *Opper v. United States*, 348 U.S. 84, 89-92 (1954). This means that, regardless

19  of any admission made by Petitioner, the state must still independently establish each fact necessary

20  to meet the crime's elements. Czodor's self-serving testimony and self-produced printouts are

21  insufficient to qualify as independent, credible evidence, especially when substantial evidence

22  suggests he has a history of manipulation and deceit.

23          A prosecutor's statement constitutes improper argument, if he attempts to smuggle in by

24  inference claims that could not be argued openly and legally. Here, the prosecutor invited the jury to

25  speculate about — and possibly base a verdict upon — "evidence" never presented at trial. In fact,

26  for centuries, door knockers have traditionally been crafted from metal.

27          The magistrate found a door knocker designed to alert residents of guests without damaging

28  the door is readily distinguishable from repeatedly using a metal key point against an otherwise

- 20 -

1   unprotected door. Dkt. 73 at 32. If, as alleged, Petitioner spent 20 minutes forcefully scratching

2   Czodor's door with a metal key, such a sound would be distinct from a standard knock due to the

3   loud, repetitive scraping noise produced by metal against wood. Czodor's claim that he heard

4   knocking, but no scratching, calls into question the credibility of his account, especially since a 20-

5   minute scratching session would likely be quite audible.

6         In *Jackson v. Virginia*, 443 U.S. 307 (1979), the Supreme Court established that evidence

7   must be sufficient for a rational factfinder to conclude guilt beyond a reasonable doubt. Here, the

8   absence of corroborating auditory evidence in Czodor's statements — i.e., the scratching sound,

9   which he failed to mention during his 911 call — weakens the claim that Petitioner caused the

10  damage as alleged.

11        Additionally, Czodor's failure to provide visual evidence linking Petitioner to the damage

12  adds weight to the argument for fabrication. Had Czodor actually documented a photograph or

13  video clearly showing both Petitioner and the damaged door in a single frame, this would have

14  significantly corroborated his version of events. His inability to produce such direct evidence

15  particularly he was able to take photos and videos throughout the night, along with the seven-day

16  delay before capturing a photo of the damaged door, further undermines the credibility of his claim.

17        Finally, Czodor's misrepresentation about the lighting conditions near his front door raises

18  additional questions. If he was aware of any evidence supporting the assertion that the front door

19  area was well-lit, such a claim could be interpreted as an attempt to obscure the absence of direct

20  evidence of Petitioner's alleged conduct. Taken together, the lack of auditory and visual

21  corroboration, the inconsistent lighting claim, and the delay in documenting the damage support an

22  inference that Czodor may have fabricated the damage to his door, casting substantial doubt on the

23  veracity of his testimony and the strength of the evidence presented against Petitioner. A rational

24  factfinder could not have found petitioner guilty beyond a reasonable doubt of vandalism.

25        Even if the photo of Czodor's damaged door and the screenshots provided by Czodor,

26  standing alone, could support a finding of guilt beyond a reasonable doubt, such a finding is

27  undermined by other undisputable evidence and by the absence of evidence that would normally be

28  forthcoming. See *People v. Hall*, 62 Cal.2d 104, 111 (Cal. 1964).

- 21 -

1    Here, the prosecution did not simply ask the jury in closing arguments to make reasonable

2    inferences from the evidence at trial. Instead, the prosecution overstepped the permissible bounds of

3    closing argument by misstating evidence and introducing facts not in evidence, thereby violating

4    Petitioner's right to a fair trial.

5    Accordingly, appellate counsel was ineffective in failing to challenge prosecution's

6    argument on appeal.

7    **Referring to facts not in evidence (subpart of ground 30) (Dkt. 73 at 32)**

8    The magistrate concluded that because neither party has lodged a copy of the video or

9    screenshots from websites, the Court cannot determine if the video or the websites included the

10    victim's nude photographs. Dkt. 73 at 33.

11    In habeas corpus proceedings, when the state court record is insufficient to resolve key

12    issues, federal courts have the authority to compel the state to provide additional evidence,

13    including trial exhibits. This principle aligns with federal due process requirements to ensure a

14    complete and accurate review of claims challenging a conviction. Where critical evidence is

15    missing or disputed, district courts may require the state to supplement the record to support a

16    thorough examination of potential constitutional violations.

17    A habeas petitioner has a right to access necessary materials that would illuminate facts

18    relevant to their claims. Evidentiary gaps in the habeas record warrant further inquiry. The

19    magistrate should have ordered the state to produce trial exhibits because such evidence is essential

20    to resolve specific claims.

21    Therefore, the magistrate's conclusion is at odds with habeas corpus principles if the failure

22    to obtain the video or website screenshots impedes the court's ability to fairly assess the petitioner's

23    arguments regarding the presence of Czodor's nude photographs.

24    Despite California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or

25    relying on opinions not certified for publication or ordered published, except as specified by rule

26    8.1115(b), in concluding Petitioner and Czodor had a dating relationship the magistrate relied on an

27    unpublished opinion *People v. Hill*, No. B296761, 2020 WL 4364640, at *4 (Cal. Ct. App. July 30,

28    2020). Dkt. 73 at 35. Such reliance is misplaced. In *Hill*, the two exchanged phone numbers, and the

next morning, they went to IHOP for what Beckwith described as a "breakfast date." A few days later, Hill invited Beckwith to her house and introduced him to her children. The two also spent time together at the barber shop, where Beckwith introduced Hill to his friends. On one occasion, Hill picked Beckwith up at Beckwith's mother's house, and Beckwith introduced Hill to his mother. Hill estimated that, over the course of approximately 10 days to two weeks, the two met three or four times and sent one another text messages.  They hugged and kissed, and on one occasion they had sexual intercourse. According to the uncle, Hill described Beckwith as her boyfriend, but said that the relationship was over. None of these facts are present in this case. Petitioner and Czodor never introduced each other to their family or friends. They never had intercourse. They never considered each other boy/girl friend.

The magistrate's conclusion that Petitioner and Czodor had a five-week dating relationship is unsupported by the record. Czodor's own testimony clearly contradicts this interpretation; he explicitly stated that he met Petitioner only once or twice and repeatedly emphasized the lack of any substantial relationship, saying, "Who are you to me? Nobody. You are to me nobody… I met you one or two times. And that's it." This direct testimony undermines any claim that there was a dating relationship as defined by California law. Without concrete evidence of an actual relationship, the magistrate's conclusion fails to align with the statutory requirements.

Under California Family Code § 6210, a "dating relationship" must be "frequent, intimate associations primarily characterized by the expectation of affectional or sexual involvement independent of financial considerations." The evidence does not support such a connection between Petitioner and Czodor. Casual, infrequent encounters, as Czodor described, do not meet the statute's criteria of "frequent, intimate associations," nor is there any suggestion of an expectation of an ongoing relationship. A dating relationship requires more than isolated interactions and must be characterized by mutual intent to form an affectionate or romantic bond.

Additionally, the magistrate's reliance on the Petitioner's comment that Czodor had "cheat[ed]" on her does not establish a dating relationship under § 6210. Feelings of betrayal or disappointment alone do not fulfill the statutory factors necessary to establish a "dating relationship." Such an assertion, without supporting evidence of mutual affection or an intimate

1   association, is legally insufficient. *People v. Upsher*, 155 Cal.App.4th 1311, 1321-22 (2007),

2   affirms that unsupported implications or misinterpretations of casual comments cannot be the basis

3   for determining the existence of a legally recognized dating relationship.

4       Therefore, the magistrate's finding lacks evidentiary support, misapplies the standards of §

5   6210, and disregards clear California precedent, rendering this conclusion both legally and factually

6   flawed.

7       As such, appellate counsel was ineffective in failing to argue on appeal that the prosecutor

8   referred to facts not in evidence.

9       **Vouching for the victim's credibility (subpart of ground 30) (Dkt. 73 at 36)**

10      Appellate counsel was ineffective by failing to argue on appeal that the prosecutor

11  impermissibly vouched for the victim's credibility.

12      The prosecutor's comments improperly suggested that Czodor's testimony was credible

13  because of his willingness to "admit" intimate and potentially embarrassing facts in front of the

14  jury. This suggestion of credibility based on personal vulnerability constitutes vouching, as it

15  attempts to enhance Czodor's reliability through emotional appeal rather than evidentiary support. It

16  is improper to make "statements designed to appeal to the passions, fears and vulnerabilities of the

17  jury." *United States v. Weatherspoon*, 410 F.3d 1142, 1149 (9th Cir.2005).

18      The prosecution's comments here implied that Czodor's testimony was credible merely

19  because he exposed himself to public scrutiny and embarrassment by testifying, a tactic that seeks

20  to leverage the jury's empathy rather than its logical assessment of evidence.

21      The prosecutor's statements mischaracterized the evidence, suggesting that Czodor was

22  reluctant to testify about his actions or uncomfortable with his nude photos being shared publicly.

23  However, evidence introduced at trial showed that Czodor was comfortable with public nudity, as

24  indicated by his actions of taking nude photos on a beach. This contradicts the prosecutor's

25  insinuation that Czodor's willingness to testify about sending nude photos indicates personal risk

26  and, by extension, credibility.

27      Here, the prosecution's deliberate mischaracterization of Czodor's motives and experiences

28  was an attempt to sway the jury based on an emotionally appealing but factually inaccurate

1  narrative. Such comments have led jurors to conclude that Czodor was more credible than the

2  evidence supported, impacting the fairness of the proceedings.

3     By suggesting Czodor's honest admission the he didn't see than happening when it's

4  happening, the prosecutor added extraneous details to justify Czodor's statements and rebut the

5  defense's counterpoints regarding delaying reporting. Yet, evidence showed that Czodor's front

6  door was well-lit, contradicting the prosecutor's implication that Petitioner's alleged actions could

7  have gone unnoticed.

8     Prosecutorial statements unsupported by the evidence is improper. Prosecutors comment

9  on a defendant's non-testimonial behavior may impinge on that defendant's fifth

10  amendment right not to testify. See *United States v. Schuler*, 813 F.2d 978, 981-982 (9th Cir.

11  1987). Prosecutors cannot introduce speculative scenarios or unsupported facts, especially where

12  those narratives are aimed at bolstering a witness's credibility. This tactic misleads jurors, causing

13  them to give undue weight to the witness's testimony rather than evaluating the case solely on

14  admissible evidence.

15     **Expressing opinions to the jury (subpart of ground 30) (Dkt. 73 at 39)**

16     The prosecutor's statement in closing argument—that any online post mentioning Czodor

17  would violate the restraining order—raised significant First Amendment concerns, as it suggested

18  that Petitioner could not even speak about Czodor in a neutral or positive way. This implication

19  reaches beyond the permissible restrictions on speech and into an unconstitutional overreach of the

20  restraining order, infringing upon Petitioner's right to free expression. In *Madsen v. Women's*

21  *Health Center, Inc.*, 512 U.S. 753, 764-65 (1994), the U.S. Supreme Court held that injunctions

22  limiting speech must be narrowly tailored to serve a compelling government interest, preventing

23  speech only as necessary to achieve that purpose. Here, a blanket prohibition against all speech

24  mentioning Czodor would not satisfy this narrow tailoring requirement, which renders the

25  restraining order unconstitutional.

26     Appellate counsel was ineffective in failing to raise this claim on appeal. The magistrate's

27  reliance on the trial counsel's stipulation regarding the validity of the protective orders overlooks

28  the principle that a stipulation is void if it effectively endorses an unconstitutional order. Given that

1    trial counsel did not inform Petitioner or obtain her consent, the stipulation is deemed void. The

2    prosecutor's statement is not an established fact. Instead, it's his endorsement of unconstitutional

3    restraining order. The lack of a curative instruction left the jury to rely on an inaccurate

4    understanding of the validity of the restraining order, prejudicing Petitioner's right to a fair trial.

5    **Sufficiency of the evidence (grounds nineteen, twenty, twenty-one, and twenty-two) (Dkt. 73 at**

6    **40)**

7          Appellate counsel's decision not to raise sufficiency-of-the-evidence claims was

8    unreasonable. As explained herein, trial counsel had no legal authority to stipulate with the

9    prosecution to waive Petitioner's right to jury trial as to material facts and elements. There is no

10    evidence showing that Petitioner and Czodor, a married man, were in a dating relationship.

11          The magistrate's finding that no California law supports the proposition that nudists have no

12    expectation of privacy in naked images of themselves they send to another person is misguided and

13    not supported by case law. Dkt. 73 at 43. While the magistrate relied on *Hernandez v. Hillsides,*

14    *Inc.*, 47 Cal.4th 272 (Cal. 2009), this case is distinguishable from the facts at hand.

15          The extent of [a privacy] interest is not independent of the circumstances. *Plante v.*

16    *Gonzalez*, 575 F.2d 1119, 1135 (5th Cir. 1978). Czodor does not have a blanket privacy interest in

17    his nude photos because of his evident comfort with public nudity, as demonstrated by his conduct

18    at a nude beach. A "reasonable" expectation of privacy is an objective entitlement founded on

19    broadly based and widely accepted community norms. *Hill v. Nat'l Collegiate Athletic Ass'n*, 7

20    Cal.4th 1, 37 (Cal. 1994). Under both California and federal law, societal norms play a critical role

21    in determining the reasonableness of privacy expectations.

22          Public nudity, while legally permissible in certain spaces (such as nude beaches), reflects a

23    lifestyle choice in which the individual voluntarily exposes their body in public. The magistrate

24    acknowledged that Czodor evidently felt comfortable being naked in the confines of a nude beach.

25    Dkt. 73 at 43. By choosing to engage in public nudity, Czodor demonstrates a belief that nudity is

26    acceptable in a public setting, thereby weakening any claim that society would recognize an

27    expectation of privacy in images of his nude body as reasonable. If an individual is comfortable

28    with their body being seen publicly without clothing, the argument follows that society may not

1    recognize a corresponding expectation of privacy in their nude photos.

2         People may forfeit privacy expectations when they voluntarily expose themselves in public.

3    Czodor's decision to be nude in a public space undermines the notion that he can reasonably expect

4    the same level of privacy regarding images of his nude body. Nudists believe nudity is acceptable in

5    public spaces. Czodor's engagement in public nudity is a manifestation of his belief that his nude

6    body need not be shielded from public view. As such, it is difficult for the society to find it

7    reasonable for someone like Czodor to expect that images of his nude body, voluntarily sent to

8    another person, would remain private.

9         In *California v. Greenwood*, 486 U.S. 35 (1988), the Court found that individuals have no

10   reasonable expectation of privacy in trash left out for collection because it was exposed to the

11   public. Similarly, Czodor's public nudity as a practicing nudist suggests that he has forfeited a

12   reasonable expectation of privacy in images of his naked body. Regardless, Petitioner did not have a

13   fair trial because whether a nudist's expectation of privacy in his nude photos is objectively

14   reasonable should have been determined by the jury but it was not.

15        The magistrate's conclusion that Petitioner necessarily understood Czodor's nude

16   photographs to be private, based solely on the circumstances of their exchange, is speculative and

17   omits essential context that counters any presumption of a reasonable expectation of privacy. Dkt.

18   73 at 42. This assumption conflicts with established standards regarding privacy and the expectation

19   thereof under both state and federal law, particularly where an individual's conduct suggests a

20   diminished expectation of privacy.

21        California law on privacy generally provides that an expectation of privacy must be

22   objectively reasonable. In *Hill v. National Collegiate Athletic Association*, 7 Cal.4th 1, 36-37

23   (1994), the California Supreme Court held that whether a person has a reasonable expectation of

24   privacy depends on (1) whether the individual has exhibited a subjective expectation of privacy, and

25   (2) whether that expectation is one that society is prepared to recognize as reasonable. In this case,

26   Czodor openly admitted to Petitioner that he was a nudist, conveying from the outset his comfort

27   with public nudity. Given this admission, it would be reasonable for Petitioner to infer that Czodor

28   had no expectation of privacy concerning his nude photographs, which were sent after only one

1  meeting and in a casual context. Czodor's own testimony and conduct undermine any claim of a

2  "subjective expectation" of privacy that would satisfy the *Hill* standard.

3      Further, federal privacy jurisprudence aligns with this analysis. Courts consistently hold that

4  the context and circumstances surrounding private information, such as its method of

5  communication and the relationship between parties, inform whether an expectation of privacy is

6  reasonable. For instance, in *Smith v. Maryland*, 442 U.S. 735, 736 (1979), the U.S. Supreme Court

7  noted that even if an individual did harbor some subjective expectation of privacy, the expectation

8  was not one that society is prepared to recognize as "reasonable." When an individual voluntarily

9  exposed his nude photos to someone he barely knew (Czodor testified he didn't know Petitioner's

10  name. See Dkt. 6 at 155), he assumed the risk that the stranger would reveal those photos. By

11  communicating nude photographs to a person he had met only once, Czodor diminished any

12  reasonable expectation of privacy in those images, especially given his stated identity as a nudist.

13      Additionally, the magistrate's reliance on the presumption that nude photographs are

14  inherently private overlooks Czodor's own actions. Sending nude photos taken in a public setting

15  further contradicts any alleged privacy interest, as a reasonable person could interpret such behavior

16  as an indication of comfort with those images being viewed by others. The *Smith* decision and

17  similar rulings underscore that an individual's actions can vitiate any claim to privacy, especially

18  where, as here, they communicate potentially private information to another in a casual and brief

19  context without restrictions or indications of confidentiality.

20      In sum, the magistrate's presumption is legally flawed, as Czodor's actions and the specific

21  context in which he disclosed the images undermine any reasonable expectation of privacy. This

22  context strongly suggests that Petitioner could reasonably interpret the photographs as non-private,

23  challenging the magistrate's conclusion and requiring reevaluation under established privacy

24  standards.

25      The magistrate's conclusion that the jury could infer Petitioner's knowledge of Czodor's

26  expectation of privacy in his nude photographs is legally flawed. This determination disregards the

27  requirement for an objectively reasonable expectation of privacy under both California and federal

28  law. The magistrate's reasoning relies on Petitioner's alleged threats to "make him famous" and

1  "put all [his] stuff on social media," yet fails to provide evidence that Petitioner's statements

2  referenced nude photographs specifically, rather than Czodor's character or other conduct.

3       Here, Czodor, as a self-admitted nudist, conveyed his openness regarding nudity by sending

4  these photographs to Petitioner, a person he had only recently met just once. Czodor's lack of

5  precautions and his nudist lifestyle would reasonably suggest a diminished expectation of privacy,

6  undermining the presumption that his photos were inherently private.

7       Federal privacy law also supports this analysis. By voluntarily sending nude images without

8  imposing confidentiality, Czodor reduced any legitimate privacy claim, particularly with respect to

9  someone he had just met.

10       Moreover, California case law holds that privacy expectations must be balanced against the

11  circumstances and nature of the interaction. In *People v. Nakai*, 183 Cal.App.4th 499, 515-517

12  (2010), the court emphasized that the individual's behavior and context affect the reasonableness of

13  their privacy expectation. Czodor's decision to send nude images after only one meeting and his

14  admitted nudist lifestyle indicate a lack of concern with restricting access to such images, which

15  would lead a reasonable observer to question any assumption of inherent privacy.

16       Petitioner's messages, even if potentially threatening, lack specificity regarding nude

17  photographs. The assumption that she understood these photos as "private" is speculative, as her

18  statements could have been aimed at exposing his dishonesty or other character issues, rather than

19  the images themselves. Because the prosecution did not substantiate Czodor's privacy interest

20  through objective, concrete evidence and failed to connect Petitioner's alleged threats specifically to

21  the photos, the magistrate's conclusion is legally unsound.

22       In sum, without a basis for an objectively reasonable expectation of privacy in Czodor's

23  images under California and federal standards, and without clear reference to these images in

24  Petitioner's messages, the magistrate's inference is unsupported. Courts must require evidence that

25  society would view the expectation as reasonable, which is lacking in this case.

26       The magistrate found the jury was aware that one of the nude photographs that Czodor sent

27  to Petitioner was taken at a nude beach and the jury's verdict evidenced its belief that Petitioner and

28  Czodor agreed or understood that the images shall remain private even though one of the

1   photographs was taken at a nude beach and sent by the victim after knowing Petitioner for only a

2   few weeks. However, the jury was never told the photo taken on a nude beach was evidence

3   showing Czodor's comfort level of public nudity.

4         During closing argument, the prosecution stated "But ask yourself, reasonably, why in the

5   word is she knocking on the door with keys – with metal keys? Why in the world would you be

6   knocking on the door with metal keys?" The insinuation was that defendant had been tried on

7   previous criminal charges, although no proof of such arguments was offered. *People v. Fosselman*,

8   33 Cal.3d 572, 580 (Cal. 1983). See also *Langston v. Smith*, 630 F.3d 310, 320 (2d Cir. 2011) (due

9   process violated because no evidence presented by prosecution to support theory besides "pure

10  conjecture.") The prosecution's implication that no one would knock on a door with metal object

11  was not supported by any evidence presented at trial. In reality, metal objects are commonly used

12  for knocking on doors, as door knockers themselves are typically made of metal.

13        **Right to confrontation (ground 25) Dkt. 73 at 45**

14        In order to secure a conviction under California Penal Code § 647(j)(4)(A), the prosecution

15  must prove that the defendant distributed the image. Dkt. 3 at 160.

16        Despite there was no sufficient guarantees of trustworthiness, through Czodor's testimony,

17  the prosecution introduced text messages from Czodor's so called friend and statements made by

18  Czodor's clients. Assuming they were authentic statements, they were given with the primary

19  purpose of offering evidence potentially relevant to a subsequent criminal prosecution. They were

20  used to establish an essential element of the prosecution's case, meaning they had a testimonial

21  nature.

22        The relevant inquiry is not the subjective or actual purpose of the individuals involved in a

23  particular encounter, but rather the purpose that reasonable participants would have had, as

24  ascertained from the individuals' statements and actions and the circumstances in which the

25  encounter occurred. *Michigan v. Bryant*, 562 U.S. 344, 360, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011).

26        A violation of the Confrontation Clause raises a federal constitutional issue, not just a matter

27  of state evidence law. The magistrate's finding that Petitioner's confrontation claim is not

28  reviewable because it concerns state evidence law is legally flawed.

1    **Substitution of counsel (ground 29) (Dkt. 73 at 47)**

2         Here, the trial court deprived Petitioner of her Sixth Amendment right to conflict-free

3    counsel by denying her motion for substitution. Petitioner explicitly declared that she had a conflict

4    with the office of public defender instead of only Mr. Dominguez. Dkt. 3 at 217.

5         **Adequacy of the Court's Inquiry**: In *United States v. Moore*, 159 F.3d 1154, 1158-59 (9th

6    Cir. 1998), the Ninth Circuit stressed that the trial judge must actively engage with the defendant's

7    complaints and ensure that the issues raised are fully addressed. In Petitioner's case, while the trial

8    court asked trial counsel some basic questions about procedural matters like a general time waiver,

9    it failed to explore critical aspects of the representation, such as what investigation had been

10   conducted in the two years the public defender had the case and what justified the repeated time

11   waivers. This failure indicates that the court's inquiry was inadequate and resulted in no developed

12   record on counsel's reasons for their actions, or on the quality of communication between them and

13   Petitioner. See *United States v. Walker*, 915 F.2d 480, 483 (9th Cir. 1990) (holding that the district

14   court erred in making only a limited inquiry and failing to inquire into causes underlying

15   defendant's dissatisfaction with his attorney). The inadequacy of inquiry was underscored by trial

16   counsel explicit testimony that none of the continuances were attributable to his caseload. (See Dkt.

17   3 at 207 ("As to congestion of the courts in my caseload, no, Your Honor. I just requested time to

18   prepare and review the filed in preparation for trial.") If none of the continuances were attributable

19   to caseload, what exactly caused the two years delay?

20        **Extent of Conflict**: Petitioner alleged a significant breakdown, citing the rotation of six

21   different public defenders over the two years leading to a failure to progress the case to trial in a

22   timely manner, coupled with the lack of investigation and failure to inform Petitioner of court date

23   which caused a bench warrant issued against Petitioner. Further, counsel's later decision to sign a

24   stipulation with the prosecution without consulting Petitioner reflects this pre-existing conflict,

25   signaling a lack of communication and trust between Petitioner and her counsel.

26        **Timeliness and Inconvenience**: Petitioner made her request for substitution as soon as she

27   reasonably could, after realizing the extent of inadequacy of counsel's performance. Although the

28   public defender had been on the case for two years, the fault for any delay does not rest with

1   Petitioner, particularly given the turnover of attorneys on her case. Even when the motion is made

2   on the day of trial, the trial court must make a balancing determination, carefully weighing the

3   resulting inconvenience and delay against the defendant's important constitutional right to counsel

4   of his choice. *United States v. Lillie*, 989 F.2d 1054, 1055-56 (9th Cir. 1993); *United States v.*

5   *Torres-Rodriguez*, 930 F.2d 1375, 1380 (9th Cir. 1991).

6       Delaying a trial is often a lesser evil compared to the damage that could be done by

7   proceeding with counsel who cannot effectively represent the defendant due to a breakdown in

8   communication or other serious issues. The defendant's right to a fair trial and competent

9   representation must be prioritized.

10      The magistrate's characterization of Petitioner's concerns as "strategical" issues ignores

11  whether counsel's performance was objectively reasonable. Dkt. 73 at 49. Petitioner's concerns go

12  beyond simple strategy. As the record shows, there was a significant delay of over two years, six

13  different public defenders cycled through the case, and failure to inform Petitioner of court date.

14  These are not mere tactical disagreements but legitimate concerns about the adequacy of

15  representation and neglect of the case. Counsel's failure to communicate and the significant delays

16  raise issues of ineffective assistance, rather than disagreements over tactics.

17      In supporting her conclusion that there was no conflict of interest between Petitioner and her

18  counsel, the magistrate found counsel testified that he explained to Petitioner what a time waiver

19  was so Petitioner knowingly and voluntarily agreed to waive time. Dkt. 73 at 50. However, the trial

20  continuances, attorney rotations, and absence of any benefit from the repeated time waivers suggest

21  that Petitioner's right to effective assistance of counsel was compromised. While counsel testified

22  about explaining a time waiver to Petitioner, he did not testify how he explained a time waiver.

23  There is no record in support that Petitioner made a knowing and intelligent choice of time waiver.

24  The broader context of attorney performance and trial delays need to be assessed. The fact that the

25  records offer no legitimate reason for a two-year delay, compounded by the rotation of six public

26  defenders, raises serious concerns about the adequacy of representation.

27      The magistrate further justified her conclusion by citing Covid-19. Dkt. 73 at 50. The two-

28  year delay—justified only by a two-month court shutdown due to COVID-19—is excessive.

Without any documented benefit from the continuances, the delay prejudiced Petitioner. The magistrate's reliance on a two-month COVID-19 court disruption to justify a two-year delay is factually incorrect and not supported by the records.

The magistrate faulted Petitioner for her failure to provide any evidence to substantiate her assertion that appointed counsel caused an arrest warrant to be issued against her. Dkt. 73 at 51. However, the record shows otherwise. Bench warrant was issued for defendant. Bail was set at $15,000.00. Dkt. 3 at 21-22.

The magistrate concluded that even if Petitioner could establish a conflict of interest – she cannot – she nevertheless could show no prejudice. Dkt. 73 at 51. The magistrate found trial counsel filed a motion to dismiss for lack of evidence pursuant to California Penal Code 1118.1 at the close of evidence. Dkt. 73 at 52. However, record shows that trial counsel orally requested the Court to dismiss the case based on the People have not met their burden, based on 1118. Dkt. 4 at 124. He provided no explanation how the evidence was insufficient as to what specific element. Then the trial court made a conclusory statement that "as far as the 1118.1 motion is concerned, I think with respect to Count I, the evidence provided is sufficient to get past an 1118.1 motion based on the testimony and the exhibits that were received into evidence, similarly with Count II, the evidence presented is sufficient to overcome an 1118.1 motion, and similarly as to Count III. So with respect to all three counts, Defense counsel's 1118.1 motion is denied." Dkt. 4 at 131. The record does not show trial counsel played the role of an active advocate. See *Evitts v. Lucey*, 469 U.S. 387, 394, 105 S.Ct. 830, 835, 83 L.Ed.2d 821 (1985).

However, the trial court's denial of Petitioner's request for substitution of counsel must be evaluated based on whether counsel's performance was compromised, not merely on the success of individual motions.

**Trial counsel (Ground 9) (Dkt. 73 at 53)**

As stated above, ineffective assistance of counsel claims are not subject to the strictest procedural forfeiture rules. See *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011).

The magistrate found Petitioner waived her right against self-incrimination at the family-court hearing because she never asserted it and no evidence suggested that her family-court

1    testimony was compelled. Dkt. 73 at 55. However, if the State, either expressly or by implication,

2    creates penalty situation, the failure to assert the privilege would be excused, and the  answers

3    would be deemed compelled and inadmissible in a criminal prosecution. See *Minnesota v. Murphy*,

4    465 U.S. 420, 435 (1984).

5        In the context of Petitioner's appearance in family court, the coercive nature of the

6    proceeding creates what is known as a "penalty situation," which implicates the protections of the

7    Fifth Amendment under the U.S. Constitution.

8        Petitioner was summoned to the family court to answer questions. See Attachment 2.

9    Petitioner was a party to a court hearing and was subject to a court order to appear. The prosecution

10   erroneously alleged that Petitioner was not even subpoenaed to attend the hearing. Dkt. 3 at 278.

11   However, the use of a subpoena is generally required only for third-party witnesses, not for parties

12   to the case. A notice of hearing issued to a party functions as a court order and compels the party's

13   appearance. The prosecution's claim that Petitioner was not "subpoenaed" to attend the hearing

14   ignores the distinction between subpoenas for third parties and court orders directed to parties

15   involved in the case. Since Petitioner was a direct party in the matter, her presence was mandated by

16   the court's notice of hearing, making the prosecution's argument factually and legally incorrect.

17       At the family court hearing, Petitioner was faced with a choice between remaining silent and

18   having an adverse judgment against her. Her silence was deemed as a waiver of argument in support

19   of an adverse judgment. Under the U.S. Supreme Court's rulings in *Lefkowitz v. Cunningham*,

20   *Garrity v. New Jersey*, and *New Jersey v. Portash*, Petitioner's testimony in family court was

21   compelled through the implied threat of an adverse judgment and her failure to assert the privilege

22   would be excused.

23       In *Solano-Godines*, the court rejected the argument that absence of warnings required

24   suppression because "[t]he immigration judge could not be expected to anticipate that two years

25   later [the defendant] would illegally reenter the United States and that his responses to questions at

26   his civil deportation hearing might incriminate him in a prosecution for this future crime." *United*

27   *States v. Solano-Godines*, 120 F.3d 957, 962 (9th Cir. 1997).

28       Unlike *Solano-Godines*, the judicial officer in the family court was fully aware of the

- 34 -

1    foreseeable criminal prosecution against Petitioner because she was addressing matters intertwined
2    with criminal liability. See *Jackson v. Conway*, 763 F.3d 115, 139-40 (2d Cir. 2014) (*Miranda*
3    violation because child protection services caseworker failed to give warning before questioning
4    that was reasonably likely to elicit incriminating response.) The family court hearing was in fact
5    equivalent to a criminal trial if Petitioner's testimony in that hearing was introduced in a criminal
6    trial. Petitioner's testimony in the family court was compelled and thus should be inadmissible in
7    her criminal case under the Fifth Amendment.

8    **Referring to Petitioner's family-court testimony during closing argument (Dkt. 73 at**
9    **56)**

10    In *Berger v. United States*, 295 U.S. 78, 88 (1935), the Court emphasized that improper
11    suggestions, insinuations and, especially, assertions of personal knowledge by prosecuting attorney
12    are apt to carry much weight against the accused when they should properly carry none. The
13    prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to
14    trust the Government's judgment rather than its own view of the evidence. *Id*. at 88-89. A
15    prosecutor's "vigorous" presentation of facts favorable to his or her side "does not excuse either
16    deliberate or mistaken misstatements of fact." *People v. Purvis* (1963) 60 Cal.2d 323, 343 [ 33
17    Cal.Rptr. 104, 384 P.2d 424].

18    The transcript of the family-court testimony reflects that Petitioner explained that she did not
19    need his permission to post a video because "that's about me, about my story." When being asked if
20    there was a picture of Czodor on the video, Petitioner testified no. (Dkt. 6 at 169.) Relying on
21    Petitioner's admission of posting a video, the prosecutor concealed Petitioner's denial of a picture
22    on the video and stated:

23    [Petitioner] said she didn't need his permission. It was her story. Did you post the
24    videos? "Well, maybe some of them." Under oath, spoke to the judge in that
25    hearing and admitted that. The evidence is abundantly and absolutely clear she's
26    guilty of Count III."

27    (Dkt. 4 at 175-76.)

28    While there was no picture on the video, Petitioner's admission of posting a video cannot be

1    used as evidence to convict her of unlawful dissemination of private photographs. By concealing the

2    fact that there was no picture on the video such misrepresentation was egregious. By

3    misrepresenting the content of Petitioner's testimony and using an incomplete and distorted version

4    to suggest her guilt for Count III (unlawful dissemination of private photographs), the prosecutor

5    violated Petitioner's due process rights under the Fifth and Fourteenth Amendments.

6         The prosecutor's manipulation of Petitioner's family court testimony by concealing the

7    crucial fact that no photograph of Czodor appeared in the video constitutes prosecutorial

8    misconduct. Such a misrepresentation is egregious, misled the jury, and violated Petitioner's

9    constitutional rights to due process under the Fifth and Fourteenth Amendments. The

10   misrepresentation deprived Petitioner of a fair trial.

11        The prosecution's selective use of Petitioner's response, "It's been taken down," to suggest

12   she authored the posts, while omitting her further explanation that she searched for the posts after

13   receiving the restraining order and found they were no longer there, constitutes prosecutorial

14   misconduct. Dkt. 6 at 168. This tactic misrepresented the evidence and misled the jury by providing

15   an incomplete and distorted view of Petitioner's statements. Such conduct violates Petitioner's

16   constitutional rights under both California and federal law.

17        Misrepresenting facts to the jury, especially through selective omission of exculpatory

18   information, constitutes prosecutorial misconduct. Here, by omitting Petitioner's complete

19   explanation of why she stated "It's been taken down," the prosecution gave the false impression that

20   Petitioner admitted authorship of the posts. This manipulation of evidence is precisely the type of

21   misconduct the Supreme Court sought to prevent in Berger.

22        In *Napue v. Illinois*, 360 U.S. 264, 269 (1959), the Court held that due process is violated

23   when a prosecutor knowingly uses false evidence or allows false impressions to stand uncorrected.

24   In this case, by omitting the full context of Petitioner's statement, the prosecutor effectively created

25   a false impression that her response indicated guilt. The jury was left with an incomplete picture,

26   leading to a violation of Petitioner's due process rights.

27        Here, the prosecutor's omission of Petitioner's full response was highly material and

28   prejudicial because the suggestion that she authored the posts went directly to the heart of the case.

1  By concealing the explanation that she simply discovered the posts were gone after searching, the

2  prosecutor distorted the evidence, influencing the jury's view of her culpability.

3      California law similarly recognizes prosecutorial misconduct when the prosecution distorts

4  evidence or misleads the jury. In *People v. Hill*, 17 Cal. 4th 800, 845 (1998), the California

5  Supreme Court held that prosecutorial misrepresentation or omission of crucial facts can lead to

6  reversible error if it prejudices the defendant's case. The prosecutor's failure to provide the full

7  context of Petitioner's statement amounts to such a misrepresentation, as it directly affected the

8  jury's understanding of her involvement in the posts.

9      Even each prosecutorial misconduct or other error is harmless standing alone, the combined

10  prejudicial effect on the overall fairness of the trial cannot be ignored. As such the magistrate's

11  finding trial counsel did not perform unreasonably in failing to object to either of the prosecutor's

12  comments is flawed. Dkt. 73 at 57.

13      **Fundamental Miscarriage of Justice (Dkt. 73 at 58)**

14      The magistrate's conclusion made no mention of the evidence that destroyed Czodor's

15  credibility, and it did not consider the relative strength of all evidence.

16      "Fundamental miscarriage of justice" is narrowly defined as consisting of four categories:

17  (1) [T]hat error of constitutional magnitude led to a trial that was so fundamentally unfair that

18  absent the error no reasonable judge or jury would have convicted the petitioner; [fn.] (2) that the

19  petitioner is actually innocent of the crime or crimes of which the petitioner was convicted; [fn.] (3)

20  that the death penalty was imposed by a sentencing authority which had such a grossly misleading

21  profile of the petitioner before it that absent the trial error or omission no reasonable judge or jury

22  would have imposed a sentence of death; [fn.] (4) that the petitioner was convicted or sentenced

23  under an invalid statute. (*In re Clark* (1993) 5 Cal.4th 750, 797-798.)

24      Claims of "lack of fundamental jurisdiction" (i.e., subject matter jurisdiction) or judicial acts

25  "in excess of jurisdiction" may be raised at any time, and the petitioner is not required to justify any

26  delay in asserting the claim. (*In re Harris* (1993) 5 Cal.4th 813, 836-842.)

27  **GROUNDS ONE AND THREE: FIRST AMENDMENT CHALLENGES** (Dkt. 73 at 59)

28      In concluding that Petitioner's conviction for unlawfully disseminating the victim's nude

1    photographs did not violate the First Amendment, the magistrate referenced the texts provided by

2    Czodor – with no metadata – stating that Petitioner wanted to make him "suffer" for "cheat[ing]" on

3    her and told him that she was going to make him "famous" by "put[ting]' all [his] stuff on social

4    media." (Dkt. 73 at 63) She further threatened to post additional "surprise[s]" and told him, "I will

5    not stop." However, the police filed activity report on September 10, 2018 tells a notably different

6    story. After allegedly being threatened by Petitioner to post additional surprises, Czodor called the

7    police, not to report the threatening texts sent by Petitioner, but to allege that unknown subjects had

8    threatened to come to his residence, not mentioning any reference to the threatening text messages

9    he later presented as evidence. This inconsistency suggests that the threatening texts were most

10   likely fabricated or manufactured by Czodor. The absence of metadata for the text messages further

11   weakens their credibility. Metadata, which includes details like timestamps and source information,

12   is essential to verify the origin, authenticity, and timing of digital communications.

13       In addition, Petitioner was not prosecuted for intending her speech as a threat. It is equally

14   significant that while Czodor was able to provide texts containing alleged threats, he failed to

15   present any messages indicating that Petitioner requested his nude photos, that he asked her to keep

16   them private, or that she agreed to maintain their confidentiality before receiving Czodor's nude

17   photos. The absence of these crucial communications strongly indicates that such exchanges never

18   occurred.

19       The magistrate failed to consider the unique circumstances in this case. Czodor, as a

20   practicing nudist, complicates the prosecution's argument that he had an objective expectation of

21   privacy in his nude photos. Courts have ruled that the context in which a person shares private

22   images matters. For instance, if someone knowingly sends intimate photos to a person they barely

23   know, it weakens the argument that they held a reasonable expectation of privacy in those images.

24   See *State v. Vanburen*, 214 A.3d 791, 2018 Vt. 95 (Vt. 2019).

25       In *United States v. Jacobsen*, 466 U.S. 109 (1984), the Supreme Court clarified that the

26   expectation of privacy is contextual and depends on whether the person's actions demonstrate they

27   intended to keep the material private. Czodor's sending of nude photos to Petitioner, whom he

28   barely knew, after a single meeting, significantly undermines his claim of a reasonable expectation

of privacy.

Furthermore, Czodor's nudist lifestyle plays a central role in this analysis. By engaging in a lifestyle where nudity is normalized and openly displayed, Czodor arguably waived any reasonable expectation of privacy in images of himself in that state. The magistrate's failure to consider this fact is critical, as the public nature of his nudity as a nudist contradicts the claim that he held a strong expectation of privacy in his nude photos.

The magistrate's ruling implies that Czodor can selectively assert privacy in his nude images while maintaining a lifestyle of public nudity. However, courts have held that privacy claims must be consistent with a person's overall behavior and lifestyle. In *Smith v. Maryland*, 442 U.S. 735 (1979), the Supreme Court held that an individual's behavior can diminish their claim to privacy protections if their actions suggest they have exposed themselves to public view.

As a nudist, Czodor's consistent practice of publicly displaying his nude body suggests that his subjective expectation of privacy in nude images shared with Petitioner is diminished. Moreover, there is no authority cited by the magistrate to support the proposition that a nudist can selectively claim privacy rights in certain circumstances, despite their broader lifestyle of public nudity.

Czodor testified that his nude photo was taken at a nudist beach – a public space. He also testified that taking a nude photo by someone else at a public beach was normal.

Q Okay. And do you recall when that photo of
   yourself was taken, or where it is?

A Oh, it was on the -- on the naturalist beach.

Q On the naturalist beach.

A Naturalist beach.

See Dkt. 4 at 45.

Q Okay. And can you describe, I think it was
   Exhibit Number 1, can you -- can you describe one of the
   pictures that -- the nude photos?

A Just normal beach -- beach photo -- the photo

1        on the beach.

2        Q Okay. Did you take that photo?

3        A No, I couldn't do it, but somebody else was

4          there --

5        Q Okay.

6        A -- to do it, another person.

7        Q So another person took that photo.

8        A Yes.

9        Q And you were posing, correct?

10       A I wasn't --

11       Q In that photo.

12       A -- posing, just normal.

13       See Dkt. 4 at 101-102.

14       Czodor, being a practicing nudist, had no reasonable expectation of privacy in his nude

15   photographs. For a nudist, not wearing clothes is a normal and intentional act, part of the lifestyle

16   associated with nudism. Since Czodor voluntarily posed for a nude photograph in public while

17   adhering to a lifestyle that openly embraces public nudity, his expectation of privacy regarding

18   these photos is not one that society would recognize as reasonable.

19       See *Katz v. United States*, 389 U.S. 347, 351 (1967) (holding that there is no reasonable

20   expectation of privacy in what a person "knowingly exposes to the public"). In Czodor's case, the

21   public nature of nudist beaches, combined with his status as a nudist, challenges the legitimacy of

22   any objective expectation of privacy in his nude photos.

23       The magistrate mischaracterized Ground One as a disguised sufficiency-of-the-evidence

24   claim. Dkt. 73 at 63. However, Ground One relies on facts that were not made available to the jury

25   during trial, coupled with facts presented to the jury. Specifically, the fact that Czodor is a nudist

26   was not presented to the jury, and this information is critical to the claim. Habeas claims based on

27   facts not presented at trial are distinct from sufficiency-of-the-evidence claims.

28       The magistrate found Ground One is procedurally barred. Dkt. 73 at 63. This is contradicted

1  to her conclusion that only grounds two, eight, nine, nineteen, twenty, twenty-one, twenty-two,

2  twenty-five, twenty-nine, and thirty are procedurally defaulted. Dkt. 73 at 19.

3      The magistrate vaguely concluded ample evidence showed that both Czodor and Petitioner

4  understood that the nude photographs he sent her were meant to remain private but failed to specify

5  any evidence. Dkt. 73 at 63. To the contrary, ample evidence supports that Czodor lacked a

6  reasonable expectation of privacy in the nude photographs he sent to Petitioner, and they were not

7  intended to remain private.

8      As a practicing nudist, he regularly engages in behavior where being unclothed is

9  normalized, making any claim of privacy in his nude photographs inconsistent with his lifestyle

10  choices. Furthermore, he sent the nude photographs to Petitioner after meeting her only once, while

11  not even knowing her name, and outside the context of any established relationship or dating

12  connection. This conduct significantly undermines any legitimate expectation of privacy in his

13  images.

14      Moreover, Czodor was a married man of over ten years, and his testimony that he never sent

15  nude photographs to anyone else except Petitioner is highly suspect, if not perjurious. Dkt. 4 at 105.

16  His inconsistent testimony, alongside this implausible assertion, casts doubt on his credibility,

17  suggesting he is manipulating the facts to serve his narrative. In light of his actions and the lack of a

18  reasonable or objective expectation of privacy, any dissemination of the photos by Petitioner would

19  not constitute a violation of privacy under the relevant legal standards.

20      Thus, based on the totality of circumstances, Czodor's claims of privacy in the nude

21  photographs are not only unreasonable but also unsupported by the facts, as shown by his

22  inconsistent testimony and lifestyle as a nudist.

23      Czodor's inconsistent allegations and perjured testimony reveal a clear and desperate

24  attempt to convict Petitioner, undermining the credibility of his statements and raising serious

25  concerns about the fairness of the trial. Multiple instances of conflicting testimony, including

26  Czodor's claims about the nature of his relationship with Petitioner, his privacy expectations

27  regarding the nude photographs, and his interactions with law enforcement, suggest that he altered

28  his narrative to fit the prosecution's case.

1   For example, Czodor claimed that he only sent his nude photographs to Petitioner, despite

2   being a married man for ten years and a practicing nudist, which contradicts both his lifestyle and

3   common behavior associated with nudism and marriage. Despite he failed to provide any texts,

4   Czodor's claim that he reached an agreement with Petitioner to keep his images private further

5   demonstrate an effort to manipulate the facts.

6   Czodor's shifting testimony, which lacks internal consistency and contradicts the evidence

7   presented, indicates a calculated effort to fabricate facts in pursuit of a conviction against Petitioner.

8   Such conduct taints the integrity of the legal process, demanding close scrutiny and a reevaluation

9   of the evidence supporting his claims.

10  Where the individual depicted did not have a reasonable expectation of privacy—a

11  prosecution of dissemination of photographs would not be a justifiable incursion upon First

12  Amendment protected speech. *State v. Vanburen*, 214 A.3d 791, 813, 820-21 (Vt. 2019). As such,

13  Petitioner is entitled to habeas relief.

14  **Petitioner' Conviction for Violating a Protective Order (Dkt. 73 at 63)**

15  The stipulation by trial counsel regarding the validity of the family court orders lacks

16  binding effect on Petitioner, as it was neither informed nor authorized by Petitioner, and moreover,

17  pertains to unconstitutional orders.

18  Under both federal and California law, individuals cannot be bound by stipulations that

19  relinquish constitutional rights without informed consent. Courts have held that counsel's power to

20  stipulate is limited, especially in criminal cases where fundamental rights are at stake. In *Boykin v.*

21  *Alabama*, 395 U.S. 238 (1969), the U.S. Supreme Court emphasized that certain rights—such as the

22  right to a jury trial, the right to confront one's accusers, and the right against self-incrimination—

23  cannot be waived without clear, informed consent by the defendant.

24  In this case, trial counsel's stipulation to the validity of family court orders on Petitioner's behalf,

25  without obtaining her explicit, informed consent, effectively relinquishes her constitutional right to

26  challenge invalid restraining orders.

27  If the family court orders are unconstitutional on their face, any stipulation of validity would

28  be void. In *United States v. Mendoza-Lopez*, 481 U.S. 828, 839-840 (1987), the Supreme Court held

- 42 -

1    that defendants have the right to challenge the constitutionality of prior orders used against them in

2    criminal proceedings.

3        Since Petitioner did not consent to stipulate the validity of these family court orders, and

4    considering that these orders may infringe upon her First Amendment rights by broadly restricting

5    all speech rather than narrowly tailored unprotected speech, any stipulation by counsel that they are

6    valid is void as against public policy. Orders that are unconstitutional cannot be validated by

7    stipulation, as doing so would contravene the due process rights of the individual involved.

8    The failure of trial counsel to inform Petitioner of the stipulation and its consequences constitutes

9    ineffective assistance of counsel. Under *Strickland v. Washington*, 466 U.S. 668 (1984), ineffective

10    assistance is established where counsel's performance falls below an objective standard of

11    reasonableness and prejudices the defendant. Petitioner's lack of knowledge and consent regarding

12    the stipulation left her unable to make an informed choice, violating her Sixth Amendment rights.

13    In addition, Petitioner's presence when the stipulation was read and the absence of her objection do

14    not equate to consent, especially when trial counsel failed to explain its implications.

15        In summary, trial counsel's stipulation to the validity of the family court orders was made

16    without Petitioner's informed consent, pertained to orders unconstitutional on their face, and

17    therefore is void under both California and federal law.

18        In concluding that Petitioner implicitly approved of trial counsel's stipulation because she

19    was present and raised no objection when counsel first proposed it and later when he entered into it,

20    the magistrate's reliance on *United States v. Edwards*, 897 F.2d 445, 446-47 (9th Cir. 1990) is

21    misplaced, in which it held that the court has no duty to advise the defendant of his right to testify,

22    nor is the court required to ensure that an on-the-record waiver has occurred.

23        The right to a jury trial is a structural constitutional guarantee, a fundamental right, essential

24    for preventing miscarriages of justice, distinct from a defendant's individual right to testify. In

25    *Edwards*, the court reasoned that because the right to testify is a personal right, it may be waived

26    implicitly by conduct. However, the right to a jury trial implicates different constitutional concerns

27    and typically requires an explicit, knowing, and voluntary waiver on the record (see *Duncan v.*

28    *Louisiana*, 391 U.S. 145, 157-58 (1968)). Consequently, while a defendant's silence may be

1  sufficient to waive the right to testify, it is not sufficient to waive the right to a jury trial or an

2  essential element related to the trial process, like a stipulation on material facts or elements.

3      The magistrate's inference that Petitioner's lack of objection constituted approval is

4  incorrect, as her lack of objection was a direct consequence of ineffective assistance of counsel.

5  Effective assistance of counsel requires that attorneys communicate key strategic decisions to their

6  clients, including the potential consequences of stipulations, in a way that enables the client to make

7  informed choices regarding their defense.

8      Here, trial counsel's failure to inform Petitioner about the stipulation with the prosecution,

9  including its strategic purpose and possible consequences, constitutes deficient performance.

10  Without this critical information, Petitioner could not have knowingly consented or objected,

11  stripping her of the ability to make an informed decision—a fundamental right in criminal

12  proceedings. Petitioner's confusion throughout the proceedings underscores that her counsel did not

13  provide her with the necessary context or information about the stipulation. Petitioner's lack of

14  objection was not a conscious waiver but rather a symptom of ineffective assistance of counsel.

15      Petitioner cannot be bound by this stipulation, as it infringes upon her due process and First

16  Amendment rights.

17      In concluding that Petitioner's conviction for violating a protective order did not infringe

18  upon her First Amendment rights, the magistrate overlooked a fundamental question: whether the

19  protective orders themselves were constitutional. This oversight is significant because a conviction

20  for violating an unconstitutional order cannot stand, as individuals cannot be penalized for failing to

21  comply with an unlawful restriction on their rights. Here, the restraining orders prohibited not only

22  unprotected speech, such as "true threats," but all forms of speech directed at or concerning Czodor.

23  This overbreadth renders the orders unconstitutional and thereby void, undermining the validity of

24  Petitioner's conviction.

25      Under both federal and California law, the First Amendment protects freedom of speech,

26  including the right to criticize, comment on, or even address others, with limited exceptions for

27  categories of unprotected speech, such as "true threats" or "fighting words" (*Virginia v. Black*, 538

28  U.S. 343, 359 (2003); *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942)). For a restraining

1   order to comply with the First Amendment, it must be narrowly tailored to prohibit only those forms

2   of speech that would qualify as unprotected; blanket restrictions on all speech are impermissibly

3   broad and restrict more speech than necessary.

4        The restraining orders in this case do not appear to meet these criteria. By prohibiting all

5   speech from Petitioner concerning Czodor, regardless of the nature or context of the speech, they

6   limit not only potentially threatening or harassing communications but also speech that could be

7   protected under the First Amendment. Courts have repeatedly invalidated similar overbroad

8   restrictions, finding that overly inclusive orders infringe upon constitutional rights. For example,

9   in *Madsen v. Women's Health Center*, 512 U.S. 753, 765 (1994), the U.S. Supreme Court

10   emphasized that injunctions restricting speech must be "narrowly tailored to burden no more speech

11   than necessary."

12        Federal precedent requires that any restriction on speech, including protective orders, be

13   narrowly tailored to specific concerns about unprotected speech. If the restraining orders here were

14   unconstitutional in their overbreadth, then Petitioner's conviction for violating them is legally

15   unsound. A person cannot be convicted for disobeying an order that itself violates constitutional

16   protections. As stated in *People v. Gonzalez*, 12 Cal.4th 804, 824-825 (1996), the interest of the

17   individual in avoiding the coercive effect of void injunctive orders is more substantial than the

18   interest of society in vindicating a court's power by maintaining deference even to void orders.

19   First Amendment rights are foundational and not easily overridden by court orders. Enforcing an

20   order that voids constitutional rights does more harm to justice than good by upholding judicial

21   power at the expense of individuals' freedoms. See Madsen v. Women's Health Center, Inc., 512

22   U.S. 753 (1994); Shuttlesworth v. Birmingham, 394 U.S. 147 (1969); Walker v. City of

23   Birmingham, 388 U.S. 307 (1967); Thornhill v. Alabama, 310 U.S. 88 (1940); and Near v.

24   Minnesota, 283 U.S. 697 (1931).

25        Further, the California Supreme Court established in In re Berry (1968) 68 Cal.2d 137, 147

26   [65 Cal.Rptr. 273, 436 P.2d 273], a case involving a misdemeanor contempt prosecution, that "the

27   violation of an order in excess of the jurisdiction of the issuing court cannot produce a valid

28   judgment of contempt [citations], and that the 'jurisdiction' in question extends beyond mere subject

matter or personal jurisdiction ...." Rather, " 'any acts which exceed the defined power of a court in any instance, whether that power be defined by constitutional provision, express statutory declaration, or rules developed by the courts and followed under the doctrine of stare decisis, are in excess of jurisdiction.' " (Ibid.) Specifically, the court held in Berry that a defendant should not be tried in the municipal court for misdemeanor contempt for violating a temporary restraining order issued by the superior court during a labor dispute, when the superior court's order was violative of defendant's First Amendment rights.

Here, since the restraining orders restrict all forms of speech—protected and unprotected alike—without a clear and specific basis, they fail the requirement of narrow tailoring necessary to limit speech-related restrictions. Therefore, they were violative of Petitioner's First Amendment rights and Petitioner should not have been prosecuted in the first place.

The magistrate's focus on what speech constituted unprotected speech misses a crucial analysis: whether the restraining orders themselves met constitutional standards. Given that these orders effectively prohibited all speech, they not only exceed permissible bounds but also lack any narrowly tailored purpose required for speech-related orders. This omission in the magistrate's review fails to account for the threshold requirement that any restriction on speech must first be constitutional. Convictions based on unconstitutional orders cannot be sustained, as established in *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150-151 (1969), where the Supreme Court held that a law subjecting the right of free expression, without narrow, objective, and definite standards is unconstitutional, and a person faced with such a law may ignore it and exercise his First Amendment rights.

The magistrate erred by not addressing the constitutional validity of the restraining orders themselves according to First Amendment. Given that these orders are overly broad and restrict more speech than permissible, they are unconstitutional and cannot support Petitioner's conviction. Thus, Petitioner's conviction should be vacated, as it rests on orders that violate the First Amendment.

**GROUNDS FOUR, FIVE, AND SIX: BRADY VIOLATIONS** (Dkt. 73 at 65)

September 10, 2018 Police Field Activity Report (Dkt. 6 at 200)

1    The Police Field Activity Report dated September 10, 2018, explicitly states that "CP HAS

2  BEEN REC'VG CALL FROM **UNK SUBJS** THREATNING TO COME TO HIS RESD AT 2521

3  N JACARANDA AND 242 HIM." This report clearly indicates that the complainant, identified as

4  Czodor, reported receiving threatening calls from "**unknown subjects**." Notably, nowhere in this

5  report is Petitioner identified, nor is there any mention of text messages or other forms of direct

6  communication from Petitioner.

7    Despite this clear language, the magistrate incorrectly interpreted the report, concluding that

8  on September 10, 2018 Czodor reported that Petitioner had threatened to come to his home and

9  commit battery. This interpretation is refuted by the evidence presented in the police field activity

10  report. If Petitioner had indeed made such threats, it stands to reason that Czodor, being the

11  complainant, would have identified Petitioner by name rather than referring to the caller as an

12  "**unknown subject**." The failure to identify Petitioner at the time of the report strongly suggests that

13  Czodor did not perceive Petitioner as the source of the threats.

14    Furthermore, had Petitioner sent threatening messages to Czodor, it is reasonable to expect

15  that Czodor would have presented this evidence to the police during the initial report on September

16  10, 2018. The absence of any mention of such messages in the report, combined with Czodor's

17  identification of the caller as unknown, casts significant doubt on the veracity of Czodor's later

18  claims. The fact that these allegations and text messages surfaced only at a later date further

19  supports the argument that they were fabricated after the fact.

20    In light of the above, the magistrate's reliance on Czodor's later allegations, which are

21  inconsistent with the original police report, constitutes a serious error. The initial report provides no

22  evidence linking Petitioner to the alleged threats. This lack of identification is a critical piece of

23  exculpatory evidence that undermines any subsequent claims that Petitioner was responsible for

24  these threats. The withholding of this initial report from Petitioner deprived her of the opportunity

25  to challenge the validity of the subsequent introduction of fabricated text messages and allegations.

26  By failing to disclose this report in a timely manner, the prosecution effectively prevented Petitioner

27  from demonstrating that the initial complaint did not implicate her and that the later evidence

28  presented was inconsistent with the original report.

1    The initial report, which failed to identify Petitioner as the source of the threats, is precisely
2    the type of exculpatory evidence that should have been disclosed. Its suppression fundamentally
3    prejudiced Petitioner's case by allowing the prosecution to introduce and rely on fabricated text
4    messages and allegations without allowing Petitioner the opportunity to challenge them based on
5    the initial, exculpatory report.

6    The withholding of this report not only deprived Petitioner of the opportunity to mount a full
7    and fair defense but also allowed the prosecution to build a case on inconsistent and unreliable
8    evidence. As such, this constitutes a clear *Brady* violation, warranting habeas corpus relief from the
9    conviction based on the tainted evidence.

10    The magistrate's conclusion that there is "no reason to believe that the report would have
11    shown the text messages Petitioner sent to the victim were doctored or that his testimony
12    concerning them was false" is critically flawed and overlooks significant inconsistencies in the
13    evidence. (Dkt. 73 at 69) The magistrate further dismisses the Petitioner's claims as "self-serving
14    speculation," ignoring the fact that the circumstances surrounding the alleged text messages and
15    Czodor's testimony strongly suggest that the evidence was fabricated.

16    If the text messages later presented by Czodor were genuine and not doctored, they should
17    have been included in the initial report made on September 10, 2018. However, the initial police
18    report, which Czodor filed that day, makes no mention of any text messages or threats from
19    Petitioner. This omission is significant because Czodor testified that he attempted to report
20    Petitioner's threats to post his nude photographs online on September 7, 2018, but was unable to do
21    so because the police station was closed. He claimed that he contacted the police "the following
22    week," which would have been around September 10, 2018, yet the report from that date fails to
23    mention any such threats or text messages.

24    This inconsistency between Czodor's testimony and the contents of the September 10 report
25    directly contradicts the magistrate's finding that nothing in the report "contradicted that testimony or
26    called it into question." On the contrary, the report's failure to document the alleged threats or text
27    messages—if they indeed existed—strongly suggests that Czodor did not report any such threats on
28    that date. This discrepancy is clear evidence that Czodor's testimony about reporting threats to post

- 48 -

his nude photographs online is false.

Furthermore, Czodor's actions are inconsistent with his testimony. If Czodor genuinely believed he was being threatened by Petitioner, particularly with something as serious as the release of nude photographs, it is implausible that he would fail to mention this when he contacted the police on September 10, 2018. The fact that these allegations only surfaced later indicates that Czodor's story evolved over time, likely as a result of fabricating evidence against Petitioner. This evolution of allegations is clear evidence that the charges were fabricated, not based on genuine threats made by Petitioner.

In sum, the magistrate's conclusions fail to account for the significant inconsistencies between Czodor's testimony and the evidence presented. The omission of any reference to the text messages or threats in the initial report, combined with the delayed and inconsistent nature of Czodor's allegations, strongly supports the argument that the text messages were doctored and that Czodor's testimony is perjury.

See *Ferrara v. U.S.*, 456 F.3d 278, 281 (1st Cir. 2006) (due process violated because prosecutor suppressed exculpatory evidence that manipulated defendant into taking plea agreement); *Fernandez v. Capra*, 916 F.3d 215, 230-31 (2d Cir. 2019) (due process violated because prosecution introduced perjured testimony at defendant's trial such that defendant was prejudiced); *Sims v. Hyatte*, 914 F.3d 1078, 1091-92 (7th Cir. 2019) (due process violated because prosecution withheld material impeachment evidence.)

**The September 18, 2018 Police Field Report and the September 24, 2018 Email Exchange (Dkt. 73 at 70)**

The magistrate's finding that the September 18, 2018, police field report "showed that Czodor did not report the damage to his door on the night Petitioner came to his house" overlooks critical details. Czodor's statement to the police at 20:09 (Dkt. 6 at 201), where he allegedly described Petitioner "knocking at his front door," makes no mention of any scratching sound, despite later claims of 20 minutes scratching and significant damage to the door. Given the extent of the alleged scratching damage (showing multiple X's and dots scratched into the door), it is implausible that Czodor would not have heard the noise and reported it immediately if it had, in

1    fact, occurred. This omission constitutes exculpatory evidence, as it casts doubt on Czodor's later

2    account of the event. The withholding of this field report violated Petitioner's constitutional right to

3    a fair trial by depriving her of material evidence that could have impacted the jury's assessment of

4    Czodor's credibility.

5        The absence of any mention of a scratching sound in the field report strongly suggests that

6    Czodor may have fabricated his later claims of damage to his door. This contradiction would likely

7    have influenced the jury's assessment of Czodor's credibility, making the field report's omission

8    material to Petitioner's defense. The Ninth Circuit has held that even seemingly minor

9    inconsistencies can be material when they form part of the foundation of the prosecution's case, as

10   seen in *Paradis v. Arave*, 240 F.3d 1169, 1179-81 (9th Cir. 2001) (finding Brady violation where

11   prosecutor's notes revealed inconsistency in medical examiner's opinions that would have been

12   useful to impeach examiner's testimony).

13       Petitioner's trial counsel was deprived of critical evidence to question Czodor about

14   inconsistencies between his initial report to the police and his subsequent testimony about the

15   alleged scratching. The absence of this cross-examination opportunity prevented Petitioner from

16   fully challenging Czodor's credibility and constructing an effective defense, thereby infringing

17   upon her confrontation rights. This is particularly true when prosecution's case is weak. The only

18   hard evidence the prosecution presented, a photo of Czodor's damaged door taken seven days after

19   Petitioner left his house, is far from overwhelming.

20       The magistrate's conclusion that Petitioner's purported text messages, coupled with the

21   photograph of her pressing a metal key to Czodor's door, establish her intent to harm him and

22   damage his property materially misrepresents the evidence and misleads on critical points.

23       The photograph allegedly depicting Petitioner pressing a key to Czodor's door does not

24   show any damage to the door. If Czodor had video evidence of Petitioner scratching his door for an

25   extended period, it stands to reason that he would have captured this with visible evidence of the

26   alleged damage. The absence of any photographs showing both Petitioner and visible damage to the

27   door in a single frame raises serious questions about the credibility of Czodor's narrative and the

28   thoroughness of the evidence presented.

1        The magistrate's conclusion that Petitioner's text messages demonstrate a specific intent to

2  damage Czodor's property lacks sufficient basis in the actual content of these messages. Even if

3  Petitioner expressed animosity or an intent to make Czodor "suffer," such statements are not, on

4  their face, indicative of a plan to damage property. The magistrate's interpretation of the photograph

5  and text messages overstates the evidence against Petitioner by implying a causal link between her

6  animosity toward Czodor and physical damage to his property.

7        The magistrate's conclusion dismissing the significance of the September 24, 2018 email

8  exchange between Czodor and the website removal company fails to address crucial contextual

9  details that, collectively, cast serious doubt on Czodor's credibility and the veracity of his

10  vandalism claims. This conclusion omits key considerations about the timing of events and related

11  evidence, which, when examined together, strongly suggests that the alleged vandalism might have

12  been fabricated by Czodor.

13        The email exchange on September 24, 2018, occurred only one day before Czodor took a

14  photograph of the damaged door. If, as Czodor alleges, the damage had already occurred due to

15  Petitioner's actions on September 18, he had ample time to document the damage prior to

16  September 24. His decision to wait until the day following his email exchange with the website

17  removal company raises legitimate concerns regarding the authenticity of the damage and his

18  motives. Evidence of timing or delay in presenting evidence can support an inference of fabrication

19  or manipulation. Unexplained delays in providing evidence is highly relevant to assessing

20  credibility.

21        Czodor's failure to provide corroborative evidence—such as video or images that include

22  both Petitioner and the damage to the door in a single frame—further undermines his claim. He

23  alleged that Petitioner scratched his door for approximately 20 minutes, yet provided no audio or

24  visual evidence to substantiate this. Additionally, in his initial call to the police and interactions

25  afterward, Czodor did not mention hearing any scratching sounds, a critical omission given the

26  purported extent of the damage. The absence of expected evidence or details can weaken a party's

27  credibility, particularly when the omitted details would naturally support their claim.

28

1   The September 18 police field report includes no reference to scratching sounds. This omission is

2   notable because there is no doubt that substantial damage from a metal key would produce audible

3   noise. Here, the omission of contemporaneous observations – despite Czosor alleged Petitioner

4   scratched his door for 20 minutes – raises significant questions about the truthfulness of Czodor's

5   later claims.

6       In addition to the issues of timing, the possibility that Czodor fabricated the damage to

7   deflect attention from his own misconduct or preemptively create a narrative that would protect him

8   if his wife or other individuals questioned his infidelity merits consideration. Evidence of Czodor's

9   efforts to shift blame could reasonably have influenced the jury's perception of his testimony and

10  overall credibility, especially where his testimony is uncorroborated by other physical evidence.

11  Courts allow inferences related to witness motivation under California Evidence Code § 780, which

12  authorizes the jury to consider the existence of any motive that could affect the witness's credibility.

13  The magistrate's conclusion that the email exchange, in combination with other evidence, lacked

14  relevance fails to account for critical details and timing that cast doubt on Czodor's credibility. The

15  unexplained timing of the photo, combined with the absence of corroborating evidence and failure

16  to report scratching sounds, collectively point to a scenario in which Czodor may have fabricated

17  the alleged vandalism. Properly considered, these factors could have had a material impact on the

18  jury's verdict. Omissions and unexplained delays in presenting evidence can be highly probative, as

19  they can support an inference of manipulation. Therefore, the magistrate's conclusion regarding the

20  insignificance of this evidence overlooks vital context that could have meaningfully impacted the

21  jury's assessment of Czodor's credibility and Petitioner's defense.

22          **Czodor's Prior Misdemeanor Convictions (Dkt. 73 at 71)**

23      In *Kyles v. Whitley*, 514 U.S. 419, 441-42 (1995), the Supreme Court held that the

24  suppression of impeachment evidence that could undermine the credibility of the prosecution's key

25  witness constitutes a violation of the defendant's due process rights. Similarly, the exclusion of

26  Czodor's prior convictions based on dishonesty deprived the jury of evidence that could have

27  undermined its trust in his testimony, thereby prejudicing Petitioner's defense.

28

The withholding of Czodor's two misdemeanor convictions for contracting without a license and advertising as a contractor without a license violated Petitioner's constitutional right to a fair trial by impairing her ability to impeach Czodor's credibility before the jury. These convictions are directly relevant to Czodor's moral character, which is particularly significant in a case where the Petitioner's conviction hinges heavily on his credibility due to the lack of substantial corroborative evidence.

Misdemeanor convictions are relevant for impeachment to the same extent as felony convictions and may therefore be admitted for that purpose if they reflect "moral turpitude" or a "readiness to do evil." *People v. Wheeler*, 4 Cal.4th 284, 289 (Cal. 1992). Contracting without a license and advertising as a contractor without a license reflect dishonesty and are crimes involving moral turpitude. Czodor's state convictions fall within this realm, as they inherently involve deceit and dishonesty, implicating his character for truthfulness. One way of discrediting the witness is to introduce evidence of a prior criminal conviction of that witness. By so doing, the cross-examiner intends to afford the jury a basis to infer that the witness' character is such that he would be less likely than the average trustworthy citizen to be truthful in his testimony. The introduction of evidence of a prior crime is thus a general attack on the credibility of the witness. *Davis v. Alaska*, 415 U.S. 308, 316 (1974).

Czodor's convictions, which reveal his willingness to operate outside the law, would likely have influenced the jury's assessment of his credibility, especially given that the prosecution relied heavily on his testimony rather than direct evidence. Preventing a defendant from effectively challenging a witness's credibility violates the Sixth Amendment right to confront witnesses and the Due Process Clause of the Fourteenth Amendment. Had the jury been aware of Czodor's criminal history, they might have been less inclined to believe his unsupported allegations against Petitioner, and more inclined to question the validity of his testimony overall.

The magistrate's conclusions that Petitioner repeatedly admitted to posting Czodor's information online and that there was little doubt she posted his photographs lack evidentiary support and mischaracterize the record:

- **No Concrete Admission**: The magistrate erred in interpreting Petitioner's ambiguous

1  statement, "I don't recall," in a family court hearing as an admission of posting the
2  photographs. This statement does not equate to an acknowledgment of guilt.

3  • **Inconsistencies in Czodor's Statements**: Czodor's testimony contains multiple
4  inconsistencies, including his claim that he had not sent nude photographs to anyone else.
5  Given that he is a married man of ten years engaging infidelity, this assertion strains
6  credibility, further supporting the argument that he may have committed perjury.
7  Uncorroborated testimony, especially from a witness with questionable credibility, cannot
8  alone sustain a conviction.

9  Trial counsel's failure to investigate undermines Petitioner's defense, amounting to
10  ineffective assistance of counsel. The U.S. Supreme Court in *Strickland v. Washington*, 466 U.S.
11  668, 686 (1984), established that failure to introduce crucial impeachment evidence can constitute
12  ineffective counsel if it deprives a defendant of a fair trial. Had the jury known about Czodor's
13  criminal history, they might have assessed his statements with greater skepticism.

14  The withholding of Czodor's prior misdemeanor convictions deprived Petitioner of her right
15  to a fair trial. Czodor's convictions, coupled with his infidelity, reflect a pattern of dishonesty,
16  should have been available to impeach Czodor, whose credibility was central to the prosecution's
17  case. The magistrate erred in failing to properly address these factors and misrepresenting the
18  factual evidence.

19  **GROUND 7: FALSE EVIDENCE (Dkt. 73 at 73)**

20  Ground 8 is also based on false evidence but the magistrate incorrectly characterized it as
21  prosecutorial misconduct.

22  Czodor testified that the week following September 7, 2018 (Friday) he reported to the
23  police about Petitioner's threats from her text messages to post his nude photos. Dkt. 4 at 51-52.
24  However, the September 10, 2018 police field report shows a completely different allegation –
25  Czodor reported at 14:34 that he received phone calls from unknown subjects threatening to come
26  to his residence. Dkt. 6 at 200. Such a stark contradiction cannot be dismissed as a "minor
27  discrepancy."

28

1    The magistrate's conclusion that the brief notations in the September 10, 2018 police field

2    report do not accurately reflect Czodor's allegations is not supported by the record, and the

3    discrepancies strongly suggest perjury by Czodor regarding his interactions with law enforcement.

4    The September 10, 2018 police field activity report, documents that Czodor claimed he

5    received calls from unknown individuals threatening to come to his residence. Nowhere does the

6    report indicate that Czodor mentioned Petitioner or threats made by her via text messages to post his

7    nude photos. This is not merely a difference in wording; rather, it is a fundamental deviation in the

8    identity of the alleged threat and its source. Given the importance of accurate information in law

9    enforcement reports, significant inconsistencies in police records, particularly when contradicting a

10   witness's later statements under oath, can be strong evidence of fabrication or perjury.

11   This discrepancy suggests that Czodor's testimony regarding Petitioner's threats and his

12   report to law enforcement were likely false. If Petitioner had threatened Czodor on September 7,

13   2018, it is implausible that Czodor would report an entirely unrelated threat from "unknown

14   subjects." Given the importance of this alleged threat to establishing motive or intent in the

15   underlying case, Czodor's failure to consistently report the source of the threat significantly

16   undermines his credibility.

17   Significant inconsistencies between a witness's account and documented evidence can

18   substantially undermine that witness's credibility. Presenting false testimony violates due process,

19   especially if the false testimony concerns material facts. Here, the magistrate's dismissal of the

20   police field report's notations fails to account for the impact of Czodor's inconsistent statements on

21   his credibility.

22   Discrepancies in official reports, when weighed against witness testimony, suggest

23   deliberate falsehood or reckless disregard for the truth. Here, the magistrate's conclusion that the

24   police notations may be inaccurate fails to consider that these discrepancies actually support an

25   inference of Czodor's intent to deceive, as the field report does not align with his later testimony.

26   The magistrate found Petitioner has not shown that the prosecutor knew it was false. Dkt. 73

27   at 75. However, the prosecutor had access to the September 10, 2018, police field activity report

28   which makes it unlikely the prosecutor did not know Czodor's testimony was false because a simple

1  comparison of Czodor's testimony (reported to police about Petitioner's threats from text messages

2  the week after September 7, 2018) and the September 10, 2018 police filed activity report (phone

3  calls from unknown subjects threatening to come to his home) is self-explanatory.

4       Here, the police report's absence of any mention of Petitioner as the source of threats should

5  have been treated as exculpatory evidence in Petitioner's favor, especially since it directly conflicts

6  with Czodor's statements about alleged threats made by Petitioner.

7       In light of these inconsistencies, it was incumbent upon trial counsel to challenge Czodor's

8  conflicting accounts as part of an effective defense. The magistrate's conclusion that the September

9  10, 2018 police filed activity report may inaccurately reflect Czodor's report is unsupported by the

10  evidence. The glaring discrepancy between Czodor's testimony of Petitioner's threats and his actual

11  report of calls from "unknown subjects" undermines Czodor's credibility and suggests that his

12  allegations against Petitioner may have been fabricated. The omission of Petitioner's name and any

13  threats from her text messages in the report, the inconsistency in Czodor's testimony, and the lack

14  of scrutiny applied by the magistrate collectively warrant habeas relief.

15  **IAC - (grounds 10 through 18) (Dkt. 73 at 76)**

16       Ineffective assistance of counsel claims are not subject to the strictest procedural forfeiture

17  rules. See *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011) (citing *Strickland v. Washington*, 466

18  U.S. 668, 689-90 (1984)). In *Harrington*, the Court explained that:

19       An ineffective-assistance claim can function as a way to escape rules of waiver
     and forfeiture and raise issues not presented at trial, and so the Strickland standard
20       must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the
     integrity of the very adversary process the right to counsel is meant to serve.
21  Id.

22

23       The inquiry usually proceeds in three stages.

24       First, is there merit to the underlying claim? Second, is it likely that the outcome of the trial

25  or sentencing would have been different had counsel presented the claim? Third, is there a good

26  reason why counsel did not pursue the claim during trial or sentencing? When a court can answer

27  yes to the first two questions and no to the third, it is very likely to entertain the habeas petition.

28  *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994).

1      The magistrate found that it is unclear if Petitioner exhausted two claims of IAC because no

2   state court issued a reasoned decision concerning those claims (grounds eleven and fifteen). Dkt. 73

3   at 77. However, record shows that Petitioner gave the state courts a "fair opportunity to act" on each

4   of his claims. Dkt. 19-1 at 52, 39-40.

5      **Failure to Present Facts (email and nudist) to the Jury (Ground 11) (Dkt. 73 at 78)**

6      The Court recognized in *Martinez* that determining whether there has been IAC often

7   requires factual development in a collateral proceeding. The Court emphasized that IAC claims can

8   require "investigative work" and development of an "evidentiary basis" that "often turns on

9   evidence outside the trial record." *Martinez v. Ryan,* 132 S. Ct. 1309, 1317 (2012); *cf. id.* at 1318

10  (explaining that some states require delaying trial-counsel IAC claims until post-conviction

11  proceedings because "[d]irect appeals, without evidentiary hearings, may not be as effective as

12  other proceedings for developing the factual basis for the claim.").

13      For example, to determine whether an attorney's performance was deficient, it is often

14  necessary to ask the attorney to state the strategic or tactical reasons for his or her actions. To

15  determine prejudice, it is often necessary to authorize discovery and conduct an evidentiary hearing

16  to assess the effect of the attorney's deficient performance. *Detrich v. Ryan*, 740 F.3d 1237, 1246-47

17  (9th Cir. 2013).

18      The magistrate's denial of Petitioner's request for discovery and an evidentiary hearing,

19  followed by the speculative conclusion that trial counsel's strategy was sound, is contrary to legal

20  standards, which require the court to have a factual basis for assessing counsel's performance.

21      The State provided no hard evidence that Petitioner scratched Czodor's front door. The

22  State's case rests entirely on circumstantial evidence and the testimony of Czodor, which is riddled

23  with inconsistencies, contradictions, and clear evidence of a motive to fabricate his claims. The

24  limited evidence presented, including a photo of Petitioner standing in front of Czodor's undamaged

25  door, a video showing Petitioner tapping the door, and a photo of scratches on the door taken seven

26  days later, is insufficient to prove Petitioner caused the damage.

27      A photograph showing Petitioner standing in front of Czodor's undamaged door holding a

28  metal key simply places Petitioner near the door but does not establish any connection to the

1 scratches discovered later. There is no indication from this image that Petitioner used the key to

2 scratch the door or cause any damage. The photograph fails to show any act of vandalism or any

3 damages to Czodor's door. A video showing Petitioner tapping Czodor's front door is in no way

4 equivalent to causing significant scratches or damage. The video does not show any scratching, nor

5 does it indicate any malicious intent. Had there been any, as he later alleged that Petitioner

6 scratched his door for 20 minutes, Czodor would have reported the scratching to the police upon

7 their arrival. He would not have needed to fabricate the claim that darkness prevented him from

8 noticing the scratches, especially since his front door was well-lit. A photograph of scratches on

9 Czodor's front door was taken seven days - a significant lapse of time - after Petitioner had left the

10 premises. Dkt. 6 at 175. The State provided no evidence to suggest that these scratches were caused

11 by Petitioner or that they even existed. Given the time gap, it is entirely possible that the scratches

12 occurred after Petitioner left or were fabricated. In the absence of contemporaneous evidence

13 capturing Petitioner in the act of causing the scratches—despite Czodor's ability to take photos and

14 videos throughout the night while Petitioner was in front of his door—this photograph is inadequate

15 to establish guilt.

16      Evidence regarding Czodor's dishonesty and the timing of his discovery of the scratches

17 calls into question his credibility and motives. The photo of the scratches was taken after Czodor

18 learned that it would cost him money to remove online comments about his dishonesty. This

19 financial motivation undermines the credibility of his claim that Petitioner caused the damage. The

20 email showing Czodor's knowledge of the cost involved in removing the comments suggests a

21 highly possible motive for fabricating the alleged damage to his door in order to retaliate against

22 Petitioner or shift blame. Trail counsel's failure to present Czodor's email and cross-examine his

23 motive constitutes deficient performance. See *Reynoso v. Giurbino*, 462 F.3d 1099, 1115 (9th Cir.

24 2006) (explaining that the "failure to cross-examine [a] witness about their motivation for testifying

25 as they did . . . [is] unreasonable").

26      Czodor's testimony contains several inconsistencies, further calling his credibility into

27 question. Czodor claimed that it was too dark to notice the scratches on the night they allegedly

28 occurred, yet the lighting conditions were impossible to prevent him from seeing the scratches if

they had truly been caused by Petitioner. Additionally, the fact that Czodor only "discovered" the scratches days later raises serious doubts about whether the damage was genuinely caused by Petitioner, or whether it was fabricated after Czodor learned of the financial implications of the online comments.

Czodor claimed that Petitioner scratched his door for 20 minutes. However, the scratches shown in the photograph are inconsistent with such a lengthy and sustained effort. Had Petitioner scratched the door for that amount of time, the damage would likely have been far more severe and Czodor would have reported to the police upon their arrival. This inconsistency between the alleged duration of the scratching and the actual damage casts further doubt on Czodor's narrative.

The inconsistencies in his narrative, combined with his financial motivations and the evidence of his history of dishonesty, suggest that Czodor is a chronic liar and manipulator who cannot be relied upon to provide truthful testimony.

The magistrate erroneously concluded that the evidence corroborating the victim's testimony – including the video of the victim trying to convince Petitioner to leave his house the night the door was vandalized, the still photograph of Petitioner pressing a metal key to his door, and Petitioner's various text messages – was overwhelming. Dkt. 73 at 79. The evidence cited by the magistrate does not establish that Petitioner vandalized Czodor's door; it merely confirms that Petitioner was present in front of Czodor's door. This is far from the "overwhelming" evidence needed to support the conclusion of guilt, as the magistrate suggests. The mere fact that Petitioner was present at the scene does not prove that she caused the scratches on the door, and thus this evidence cannot be considered overwhelming.

The State provided no credible evidence that Petitioner disseminated Czodor's nude photos or Czodor suffered emotional distress from their dissemination. See *Fiore v. White*, 531 U.S. 225, 228-29 (2001) (per curiam) (habeas relief possible because due process violated by conviction of defendant without proving each element of crime beyond reasonable doubt.)

**Failure to Request a Dating-Relationship Instruction and Stipulating to Validity of the Family Court's Protective Order (Grounds 12 and 13) (Dkt. 73 at 81)**

1       Although a judge may direct a verdict for the defendant if the evidence is legally insufficient

2   to establish guilt, he may not direct a verdict for the State, no matter how overwhelming the

3   evidence. *Sullivan v. Louisiana*, 508 U.S. 275, 277 (1993). See also *United States v. Martin Linen

4   Supply Co*., 430 U.S. 564, 572-573 (1977); *Carpenters v. United States*, 330 U.S. 395, 410 (1947).

5       What the factfinder must determine to return a verdict of guilty is prescribed by the Due

6   Process Clause. It is self-evident that the Fifth Amendment requirement of proof beyond a

7   reasonable doubt and the Sixth Amendment requirement of a jury verdict are interrelated. *Sullivan

8   v. Louisiana*, 508 U.S. 275, 278 (1993).

9       The prosecution bears the burden of proving all elements of the offense charged, see,  e.g.,

10  *Patterson v. New York*, 432 U.S. 197, 210 (1977); *Leland v. Oregon*, 343 U.S. 790, 795 (1952), and

11  must persuade the factfinder "beyond a reasonable doubt" of the **facts necessary to establish each**

12  **of those elements**, see, e.g., *In re Winship*, 397 U.S. 358, 364 (1970); *Cool v. United States*, 409

13  U.S. 100, 104 (1972) (per curiam). This beyond-a-reasonable-doubt requirement, which was

14  adhered to by virtually all common law jurisdictions, applies in state, as well as federal,

15  proceedings. *Winship*, supra.

16      The proposed dating-relationship instruction was obviously pertinent to determining whether

17  Czodor was involved in a relationship that created a reasonable expectation of privacy in his nude

18  photos sent to Petitioner and to assessing the validity of the family court orders, elements of

19  violation of a protective order (Pen. Code,§ 273.6(a)) and disorderly conduct (unlawful

20  dissemination of private photographs and recordings) (Pen. Code, § 647(j)(4))(A). Dkt. 33 at 31-32,

21  57-58.

22      The magistrate's conclusion that Petitioner's IAC claims fail because they involved strategic

23  decisions by trial counsel is erroneous and unsupported by the record. While decisions regarding

24  trial strategy are generally given deference under *Strickland v. Washington*, 466 U.S. 668 (1984),

25  counsel's decisions in this case were objectively unreasonable. The magistrate's reasoning, which

26  suggests that trial counsel's failure to request a dating-relationship instruction and his decision to

27  stipulate to the validity of the family court's protective order were strategic, is contradicted by the

28  record and established legal authority.

1       As explained in *Reynoso v. Giurbino*, 462 F.3d 1099, 1115 (9th Cir. 2006), habeas courts are

2  not required to defer to strategic decisions when no reasonable justification for such decisions is

3  provided.

4       In this case, despite being asked, trial counsel failed to provide any explanation for

5  stipulating to the validity of the orders. Dkt. 6 at 207. This absence of explanation undermines the

6  magistrate's assumption that the decision was strategic. The California Supreme Court in *People v.*

7  *Pope*, 23 Cal.3d 412 (1979), clarified that when counsel is asked to explain a tactical decision and

8  fails to provide a justification, this lack of explanation can be interpreted as a sign that counsel had

9  no reasonable basis for the decision. See also *Moore v. Johnson*, 194 F.3d 586, 610 (5th Cir. 1999)

10  (holding that a particular decision could not be labeled "strategic" where, inter alia, the attorney had

11  "no idea" why the decision had been taken); *Bean v. Calderon*, 163 F.3d 1073, 1079 (9th Cir. 1998)

12  (noting that a decision cannot be characterized as "strategic" where it was a result only of

13  "confusion"); and *Loyd v. Whitley*, 977 F.2d 149, 158 n. 22 (5th Cir. 1992) (distinguishing between

14  "strategic judgment calls" and "plain omissions") (collecting cases); and compare *United States v.*

15  *Gray*, 878 F.2d 702, 712 (3d Cir. 1989) ("counsel's behavior was not colorably based on tactical

16  considerations but merely upon a lack of diligence"); *Moore*, 194 F.3d at 615 (describing a

17  "strategic" decision as, inter alia, a decision "that . . . is expected . . . to yield some benefit or avoid

18  some harm to the defense.") A straightforward application of these principles reveals the extent of

19  the magistrate's error.

20       Stipulating to the validity of the protective orders without challenging their lawfulness was

21  objectively unreasonable, especially considering the lack of a dating relationship that would have

22  provided grounds to argue that the family court orders were void.

23       The magistrate erroneously concluded that there was no need to request a dating-relationship

24  instruction, reasoning that the existence of a dating relationship is not an element of the crime of

25  violating a protective order. However, this conclusion overlooks a critical element of the offense

26  under California Penal Code § 273.6(a), which requires that a lawful court order be in place. The

27  validity of the Temporary Restraining Order (TRO) and Domestic Violence Restraining Order

28  (DVRO) against Petitioner is contingent upon the family court's jurisdiction to issue those orders,

1  which, in this case, was dependent on the existence of a dating relationship between Czodor and

2  Petitioner. (See Dkt. 3 at 159 (CALCRIM 2701, setting forth the requisite elements to prove that

3  Petitioner violated a "protective or stay away order")); Cal. Penal Code § 273.6(a).

4     Trial courts have a sua sponte duty to instruct on "the general principles of law relevant to

5  and governing the case." *People v. Cummings* (1993) 4 Cal.4th 1233, 1311. "That obligation

6  includes instructions on all of the elements of a charged offense" (ibid.), and on recognized

7  "defenses . . . and on the relationship of these defenses to the elements of the charged offense."

8  *People v. Sedeno* (1974) 10 Cal.3d 703, 716, overruled on other grounds by *People v. Breverman*

9  (1998) 19 Cal.4th 142, 178, fn. 26. In this case, whether there was a qualifying dating relationship

10  between Czodor and Petitioner for the family court to issue valid TRO and DVRO and for Czodor

11  to expect privacy in his nude photos sent to Petitioner is an element of the offense and a defense.

12     In *People v. Flood*, 18 Cal.4th 470, 481 (1998), the California Supreme Court held that

13  questions of fact related to the elements of a crime must be resolved by the jury, not the judge. The

14  existence of a dating relationship is a factual element that should have been considered by the jury

15  in determining whether the family court had jurisdiction to issue its protective orders. By stipulating

16  to the validity of the protective orders, trial counsel deprived the jury of its role as fact-finder on this

17  critical issue. This denial of the jury's duty to decide the facts of the case violates Petitioner's right

18  to a jury trial under both the U.S. Constitution's Sixth Amendment and the California Constitution,

19  Article I, § 16.

20     Similarly, in *People v. Modesto* (1963) 59 Cal.2d 722 [ 31 Cal.Rptr. 225, 382 P.2d 33],

21  speaking of the effect of the lack of instruction on the included offense of manslaughter, the court

22  said (at p. 730): "Reversal is not required because of a reasonable probability that in the absence of

23  the error the jury would have reached a different verdict (see *People v. Watson*, 46 Cal.2d 818, 836

24  [299 P.2d 243]), but because the defendant has a constitutional right to have the jury determine

25  every material issue presented by the evidence. Regardless of how overwhelming the evidence of

26  guilt may be, the denial of such a fundamental right cannot be cured by article VI, section 4 1/2, of

27  the California Constitution, for the denial of such a right itself is a miscarriage of justice within the

28  meaning of that provision." In petitioner's case, there has been no jury verdict within the meaning of

1    the Sixth Amendment, the premise for harmless error analysis is absent. *Sullivan v. Louisiana*, 508

2    U.S. 275, (1993).

3         The inquiry is not whether, in a trial that occurred without the error, a guilty verdict would

4    surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely

5    unattributable to the error. That must be so, because to hypothesize a guilty verdict that was never in

6    fact rendered — no matter how inescapable the findings to support that verdict might be — would

7    violate the jury-trial guarantee. See *Rose v. Clark*, 478 U.S. 570, 578 (1986); id., at 593

8    (BLACKMUN, J., dissenting); *Pope v. Illinois*, 481 U.S. 497, 509-510 (1987) (STEVENS, J.,

9    dissenting).

10        Here, the jury was left with no instruction on the critical issue of whether the family court's

11   protective orders were lawfully issued, and they were not given the opportunity to assess whether a

12   dating relationship existed. Furthermore, the stipulation to the validity of the protective orders

13   prevented Petitioner from challenging the orders' lawfulness and whether there was a relationship

14   engendering a reasonable expectation of privacy in Czodor's nude photos sent to Petitioner, which

15   were central to Petitioner's defense.

16        Had trial counsel requested the dating-relationship instruction and contested the validity of

17   the protective orders, there is a reasonable probability that the outcome of the trial would have been

18   different. The jury could have found that there was no qualifying dating relationship between

19   Czodor and Petitioner engendering a reasonable expectation of privacy, the family court orders

20   were issued without jurisdiction, which would have resulted in Petitioner's acquittal of disorderly

21   conduct (unlawful dissemination of private photographs and recordings) (Pen. Code, § 647(j)(4))(A)

22   and violating those orders under California Penal Code § 273.6(a).

23        **Failure to Move to Exclude Petitioner's Family-Court Testimony (Ground 14) (Dkt. 73**

24   **at 83)**

25        The magistrate found that trial counsel objected to the testimony and initially convinced the

26   trial court to exclude it. Dkt. 73 at 83. This is factually misleading and incomplete. Trial counsel

27   objected to the transcript of the restraining order being admitted based on proffered Evidence Code

28   352 instead of Fifth Amendment. Dkt. 3 at 241. When being asked by the trial court if he would be

1  objecting to statements that Petitioner made in the family court transcript being introduced, trial

2  counsel answered he would but just based on hearsay instead of Fifth Amendment. Dkt. 3 at 242.

3  When the prosecution specified the statements made by Petitioner he intended to introduce at trial,

4  trial counsel still made no objection based on Fifth Amendment. Dkt. 3 at 243-244. The trial court

5  clearly stated that there was no indication that Petitioner fully understood the consequences of

6  making incriminating statements during the course of the family court hearing. In addition,

7  Petitioner did not have legal counsel at that hearing. Dkt. 3 at 246.

8      The magistrate found the trial court ruled that the prosecutor could question the victim about

9  Petitioner's testimony. Dkt. 73 at 83. In support his argument, the prosecution cited *People v.*

10 *Battaglia*, 156 Cal.App.3d 1058, 1065 (Cal. Ct. App. 1984) in which William Ruiz, a licensed

11 clinical social worker and full time employee at the emergency walkin psychiatric unit, was not

12 acting as a state agent. A scenario completely distinct from this case. Then the prosecution asserted

13 that coercive police activity is a necessary predicate to the finding that a confession is not

14 "voluntary" within the meaning of the Due Process Clause of the Fourteenth Amendment, citing

15 *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). Dkt. 3 at 278. However, this argument overlooks

16 the broader protections provided under the Fifth Amendment. The Fifth Amendment not only

17 guards against involuntary self-incrimination in criminal prosecutions but also extends its privilege

18 to any official questioning in other proceedings—civil or criminal, formal or informal—where

19 responses may potentially incriminate the individual in future criminal proceedings. This principle

20 was established in *McCarthy v. Arndstein*, 266 U.S. 34, 40 (1924), where the Court recognized that

21 the Fifth Amendment privilege against self-incrimination applies beyond criminal trials.

22     In this case, the prosecution's reliance on the assertion that Petitioner's statements were

23 voluntary due to the absence of coercive police activity is misplaced. Although Petitioner was

24 summoned to appear in family court, the prosecution inaccurately claimed that Petitioner was not

25 required to be present, voluntarily chose to attend, and voluntarily spoke at the hearing. These

26 assertions are both factually and legally incorrect. Petitioner's appearance at the hearing and her

27 statements, regardless of the proceeding's nature, still invoke the protections of the Fifth

28 Amendment because the family court setting and the content of her testimony could have subjected

1  her to future criminal liability.

2  Furthermore, the prosecution's argument fails to account for the reality that the Fifth

3  Amendment privilege is not limited to custodial situations. As the Supreme Court emphasized in

4  McCarthy, the privilege applies in any scenario where answering questions could lead to self-

5  incrimination, whether or not the individual is in custody. Thus, the prosecution's contention is

6  fundamentally flawed, and Petitioner's Fifth Amendment rights should have been considered,

7  irrespective of whether coercive police activity was involved.

8  By introducing Petitioner's prior testimony from the family court hearing into evidence in

9  the criminal trial, the State effectively transformed the family court proceeding into the equivalent

10  of a criminal trial. Trial counsel's failure to object to the use of that testimony, based on Petitioner's

11  Fifth Amendment privilege against self-incrimination, constituted unreasonable and constitutionally

12  ineffective assistance of counsel.

13  In *Kastigar v. United States*, 406 U.S. 441, 444-45 (1972), the U.S. Supreme Court

14  emphasized that compelled testimony cannot be used, either directly or indirectly, in any criminal

15  case against the individual. The failure of Petitioner's trial counsel to invoke this established

16  protection by excluding her prior testimony at the family court hearing demonstrates

17  constitutionally ineffective representation.

18  Trial counsel's failure to object to the use of Petitioner's family court testimony is

19  particularly unreasonable in light of the high likelihood that the testimony could be incriminating in

20  the subsequent criminal case. The legal standards governing ineffective assistance of counsel

21  claims, as articulated in *Strickland v. Washington*, 466 U.S. 668 (1984), require that counsel's

22  performance meet an objective standard of reasonableness under prevailing professional norms. In

23  this case, trial counsel's failure to raise a clear and valid Fifth Amendment objection was

24  objectively unreasonable and fell below the standard of competent legal representation.

25  Additionally, Petitioner was prejudiced by counsel's failure to act. The use of her prior

26  testimony influenced the jury's assessment of the evidence and the ultimate verdict. Under the

27  *Strickland* standard, the ineffective assistance of counsel is prejudicial when there is a reasonable

28  probability that, but for counsel's errors, the result of the proceeding would have been different.

1    Given the incriminating nature of the testimony and its impact on the case, Petitioner has met the

2    prejudice prong of the *Strickland* test.

3        In conclusion, trial counsel's failure to exclude Petitioner's prior family court testimony,

4    based on her Fifth Amendment privilege, was both unreasonable and constitutionally ineffective.

5    This failure violated Petitioner's right against self-incrimination and prejudiced her defense,

6    warranting habeas relief.

7    **Failure to Expose the Victim's False Testimony and Inconsistent Statements and Call**

8    **Defense Witnesses (Grounds 15 and 16) ) (Dkt. 73 at 83)**

9        The photo taken in front of Czodor's door was well-lit, to the extent that the light showered

10   Petitioner from head to toe. Dkt. 6 at 159. The magistrate clearly erred in concluding no evidence

11   established that Czodor lied about it being too dark to see the damage to the door. Dkt. 73 at 84.

12       The magistrate found although Petitioner also alludes to the September 10, 2018 police field

13   report at issue in her first *Brady* claim, she presents no argument showing how trial counsel's

14   performance was deficient in relation to that report. Dkt. 73 at 84. However, it's self-explanatory

15   that trial counsel failed to investigate.

16       The magistrate erred in concluding that the introduction of the September 18, 2018 report

17   into evidence would not have had any impact on the jury's verdict. In *People v. Hall*, 62 Cal.2d 104,

18   41 Cal. Rptr. 284, 396 P.2d 700 (Cal. 1964), the California Supreme Court held that the absence of

19   expected evidence can support an inference of innocence if such evidence would naturally be

20   present. In *Hall*, the court emphasized that the "failure to find" certain evidence or for expected

21   circumstances to appear in the evidence presented can bolster an argument against the validity of

22   the accusations, especially when the alleged events would logically generate particular evidence or

23   reactions if they occurred as claimed. This reasoning can be analogously applied to Petitioner's

24   case, where the lack of a contemporaneous police report regarding alleged noises strengthens

25   Petitioner's argument that the allegations were fabricated.

26       Czodor alleged that Petitioner scratched his front door with a metal key for a prolonged

27   period, presumably generating a loud and continuous sound. Under the reasoning in *Hall*, one

28   would expect Czodor to have immediately reported such disturbing conduct to the police,

1  particularly given his immediate access to law enforcement. Yet, the September 18, 2018 police

2  field activity report contains no mention of any noise complaint or suspicion of property damage

3  caused by Petitioner, despite this being a situation that would likely prompt a report. This absence

4  of a report under circumstances where it would be anticipated supports the inference that the event

5  may not have occurred as claimed and raises questions about the credibility of Czodor's later

6  statements.

7       Further, the timing of Czodor's allegations raises substantial questions regarding their

8  credibility. Czodor received an email on September 24, 2018, detailing the cost to remove online

9  comments regarding his dishonesty. His claims regarding the scratched door only surfaced after this

10  email was exchanged. This context suggests a strong motivation for Czodor to fabricate claims

11  against Petitioner as a retaliatory measure rather than a factual recounting of actual events.

12       Relying on *Dows v. Wood*, 211 F.3d 480, 486 (9th Cir. 2000), in which there is no

13  evidence in the record that the potential witness actually exists, the magistrate concluded

14  Petitioner provided no declaration from any of potential witness demonstrating a

15  willingness to testify and setting forth the facts to which they would have testified.

16  However, notably distinguished from *Dows*, the potential witnesses here are police

17  officers, making it impossible that they don't actually exist. In addition, they should have

18  been subpoenaed to testify at trial regardless of their willingness. They were present at

19  the scene. It's self-explanatory that they would have testified what they seen on the night

20  on September 18, 2018. Therefore, the magistrate's reliance on *Dows* is misplaced.

21       **Failure to Object (Ground 17) (Dkt. 73 at 85)**

22       The Sixth Amendment and article I, section 15 require counsel's "diligence and active

23  participation in the full and effective preparation of his client's case." *People v. Vest* (1974) 43

24  Cal.App.3d 728, 736 [118 Cal.Rptr. 84]. Criminal defense attorneys have a "duty to investigate

25  carefully all defenses of fact and of law that may be available to the defendant. . . ." *In re Williams*

26  (1969) 1 Cal.3d 168, 175 [81 Cal.Rptr. 784, 460 P.2d 984]. This obligation includes conferring with

27  the client "without undue delay and as often as necessary . . . to elicit matters of defense. . . ." *Coles*

28  *v. Peyton* (4th Cir. 1968) 389 F.2d 224, 226. "Counsel should promptly advise his client of his

1    rights and **take all actions** necessary to preserve them. . . . Counsel should also be concerned with

2    the accused's right to be released from custody pending trial, and be prepared, where appropriate, to

3    make motions for a pretrial psychiatric examination or for the suppression of evidence. [Fns.

4    omitted.]" *United States v. DeCoster* (D.C. Cir. 1973) 487 F.2d 1197, 1203; *People v. Whittington*

5    (1977) 74 Cal.App.3d 806, 818-819, fn. 6 [141 Cal.Rptr. 742]. If counsel's failure to perform these

6    obligations results in the withdrawal of a crucial or potentially meritorious defense, "`the defendant

7    has not had the assistance to which he is entitled.'" *In re Saunders* (1970) 2 Cal.3d 1033, 1042 [88

8    Cal.Rptr. 633, 472 P.2d 921].

9        Ineffective assistance can be established by an attorney's forfeit of legal claims. See, e.g.,

10   *Miller v. Webb*, 385 F.3d 666, 674-75 (6th Cir. 2004) (holding that trial counsel's failure to

11   challenge a juror for cause after the juror made a statement that she thought she could be fair, but

12   immediately qualified the statement with a statement of partiality, was "objectively unreasonable").

13       A defendant must show that trial counsel failed to act in a manner to be expected of

14   reasonably competent attorneys acting as diligent advocates and establish that counsel's acts or

15   omissions resulted in the withdrawal of a potentially meritorious defense.

16       Once these burdens have been met, the reviewing court must look to see if the record

17   contains any explanation for the challenged aspect of representation. If it does, the court must

18   inquire whether the explanation demonstrates that counsel was reasonably competent and acting as

19   a conscientious, diligent advocate. For example, where the record shows that counsel's omissions

20   resulted from an informed tactical choice within the range of reasonable competence, the conviction

21   must be affirmed. (E.g., *People v. Fain* (1969) 70 Cal.2d 588, 600 [ 95 Cal.Rptr. 562].) In contrast,

22   where the record shows that counsel has failed to research the law or investigate the facts in the

23   manner of a diligent and conscientious advocate, the conviction should be reversed since the

24   defendant has been deprived of adequate assistance of counsel.

25       Although the magistrate faults Petitioner for her failure to lodge the voir dire transcript, the

26   currently available record has already shown that counsel's omission was not a result from an

27   informed tactical choice. Dkt. 4 at 4-6. Juror No. 4 clearly indicated that he's not paid for jury duty,

28   he had a financial hardship and he didn't want to be on jury duty anymore. He had anxiety so he's

1    not used to talking in front of other people so he didn't speak up. His dad was basically out of work

2    and his mom worked part time and so he could not miss work because he's supporting his parents.

3          Impartiality is not only determined by a juror's lack of bias toward the parties or issues in

4    the case, but also by the juror's capacity to fairly evaluate the evidence without undue personal or

5    emotional stress. Juror No. 4's anxiety, financial hardship, and fear to speak up created

6    circumstances that rendered it unreasonable to expect that he could serve as an impartial juror.

7    Anxiety, especially in conjunction with financial pressure, can impair a juror's ability to carefully

8    deliberate on the evidence, particularly when the juror is eager to conclude the proceedings due to

9    personal circumstances. The court's failure to excuse Juror No. 4 in light of these factors violated

10    Petitioner's Sixth Amendment right to an impartial jury. The trial judge, having been made aware of

11    these issues, should have engaged in a more thorough inquiry into whether Juror No. 4 could serve

12    without his impartiality being compromised. The trial judge made no effort to ensure Juror No. 4

13    could remain impartial, merely expressing sympathy for his financial hardship. The decision to

14    compel Juror No. 4 to remain on the jury was not based on his ability to be impartial despite his

15    financial hardship and anxiety; rather, the judge required him to stay solely because he had already

16    been sworn in as a juror.

17          Here, the record directly refutes the contention that trial counsel made a strategic decision.

18    Trial counsel's failure to adequately advocate for Juror No. 4's excusal fell below the standard of

19    reasonably competent attorneys. Counsel's decision to submit the issue to the court without fully

20    inquiring Juror No. 4's anxiety and financial concerns—factors that could affect his ability to

21    deliberate fairly—was a clear failure to act diligently. Reasonable counsel would have advocated

22    for the juror's removal due to his hardship, anxiety and fear to speak up, rather than passively

23    deferring to the court's discretion.

24          Juror No. 4's inability to speak freely due to anxiety and his financial situation increased the

25    likelihood that his vote was motivated by a desire to quickly end the trial rather than by a genuine

26    belief in the defendant's guilt. The magistrate's conclusion that Juror No. 4 did not explicitly

27    express that he voted guilty due to pressure is insufficient, given his fear to speak up. Juror No. 4's

28

1   anxiety, hardship, and fear to speak up alone make it unreasonable to assume he could deliberate

2   impartially.

3       The magistrate determined that Juror No. 4 only missed one day of work, noting that the

4   jury delivered its verdict on July 29, 2021, at 3:29 p.m., less than twenty-six hours after Juror No. 4

5   requested to be excused. However, the record shows that the jury was out at 3:35 p.m. Dkt. 4 at 210.

6   There was no evidence to suggest that Juror No. 4 could immediately return to work at 3:45 p.m.

7   which was close to the end of the business day.

8       Crucially, there were two alternate jurors available who could have replaced Juror No. 4.

9   This fact strengthens the argument that, had trial counsel objected to the court's decision not to

10  excuse Juror No. 4, the court would have been reasonably inclined to reconsider its ruling and allow

11  one of the alternate jurors to take his place.

12      In *People v. Pope*, 23 Cal.3d 412 (1979), the California Supreme Court established that

13  when counsel is asked for an explanation for their actions and fails to provide one, this strongly

14  suggests there was no reasonable tactical basis for the decision. In this case, despite being asked,

15  trial counsel provided no explanation for failing to support Juror No. 4's excusal. Dkt. 6 at 209.

16  Trial counsel's performance was objectively unreasonable in light of his knowledge of Juror No. 4's

17  anxiety, financial hardship and fear to speak up, coupled with the absence of any explanation for

18  counsel's action and inaction after being asked. *Reynoso v. Giurbino*, 462 F.3d 1099, 1115 (9th Cir.

19  2006). The magistrate's speculative conclusion that trial counsel may have strategically believed

20  Juror No. 4 to be advantageous is unsupported by the record and contrary to the reasoning in *Pope*

21  and *Reynoso*.

22      **Failure to Ensure Petitioner's Right to a Speedy Trial (Ground 18) (Dkt. 73 at 88)**

23      In concluding that Petitioner was not denied her right to a speedy trial, the magistrate failed

24  to apply the tests set forth in *Barker v. Wingo* (1972) 407 U.S. 514 and *Mathews v. Eldridge* (1976)

25  424 U.S. 319. Dkt. 73 at 88-89.

26      The magistrate's conclusion that there was no evidence supporting Petitioner's claim that she

27  did not personally and voluntarily waive time is factually incorrect. Petitioner provided a

28  declaration under penalty of perjury, which is an acceptable form of evidence under both California

1    and federal law. Dkt. 33 at 109-110. A declaration under penalty of perjury is treated as substantive

2    evidence and can serve as the basis for establishing facts in a legal proceeding. (See 28 U.S.C. §

3    1746; Cal. Code Civ. Proc. § 2015.5).

4         The magistrate essentially placed the credibility of Petitioner and her trial counsel under

5    scrutiny. However, in assessing the credibility of the public defender, the magistrate made a critical

6    omission—when the public defender was asked to explain the investigation conducted for each

7    period during which time waivers were entered, they provided no explanation whatsoever,

8    suggesting no legitimate reasons for continuing the trial date. Dkt. 6 at 209.

9         Moreover, it did not appear from the record that the continuances, two years in total, were

10   sought for actual trial preparation. Trial counsel's minimal performance during trial further

11   corroborates Petitioner's claim that public defender conducted minimal trial preparation during the

12   two years of the case's pendency prior to jury selection. This deficiency in preparation suggests that

13   Petitioner did not voluntarily waive her right to a speedy trial but was instead left uninformed and

14   inadequately represented. Under California law, a waiver of time must be made knowingly,

15   voluntarily, and intelligently (*People v. Johnson*, 26 Cal.3d 557, 566 (1980)), and the absence of

16   any meaningful explanation or investigation undermines the claim that Petitioner personally waived

17   time on multiple occasions and the validity of any purported waivers.

18        The magistrate's failure to fully evaluate the public defender's lack of trial preparation and

19   failure to provide explanations for the time waivers raises substantial doubt about the voluntariness

20   of Petitioner's waiver of time, rendering the conclusion legally and factually unsound.

21        The magistrate acknowledged that Petitioner's first trial date was set for March 24, 2020,

22   and justified the continuance of the trial due to the COVID-19 pandemic. However, this conclusion

23   lacks both a factual and legal basis. The record clearly demonstrates that the COVID-19-related jury

24   trial suspension lasted only two months, yet Petitioner's trial was delayed for two years. Dkt. 6 at

25   218. This extended delay cannot be attributed solely to the pandemic, as the continuance far

26   exceeded the reasonable time caused by the public health emergency.

27        The magistrate concluded that Petitioner failed to demonstrate resulting prejudice. However,

28   delay that is "uncommonly long" triggers a presumption of prejudice. *Doggett v. United States*

1    (1992) 505 U.S. 647, 651- 657. The magistrate further faulted Petitioner for not explaining how her

2    public defender's failures—such as not calling any witnesses, inadequately cross-examining the

3    victim, and failing to present evidence from any investigation—were connected to the denial of her

4    right to a speedy trial. However, this argument is flawed. It is self-evident that the public defender's

5    lack of investigation during the two-year pendency of the case prior to jury selection highlights the

6    unjustified nature of the trial's continuance. These failures underscore that the continuance was

7    unjustified, as no meaningful preparation was undertaken during this extended period.

8        Furthermore, under established precedent, a defendant need not identify specific prejudice

9    from an unreasonable delay in bringing the case to trial once the speedy trial right has attached. See

10   *Moore v. Arizona*, 414 U.S. 25, 94 S.Ct. 188, 38 L.Ed.2d 183 (1973) (per curiam) (finding

11   "fundamental error" in a ruling by the Arizona Supreme Court that a showing of prejudice to the

12   defense at trial was essential to establish a federal speedy trial claim.) The mere passage of time in

13   combination with the absence of a legitimate justification for the delay can be sufficient to

14   demonstrate a violation.

15       **Failure to Investigate and Adequately Cross-Examine the Victim (Ground 10) (Dkt. 73**

16   **at 89)**

17       The magistrate concluded that Czodor's prior convictions were irrelevant without addressing

18   the critical fact that this case was built solely on Czodor's credibility as the only witness. Where a

19   case hinges on witness credibility, prior convictions - based on dishonesty - become particularly

20   relevant. In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court noted that prejudice

21   can be shown when counsel's deficient performance prevents the jury from hearing evidence that

22   could impact its credibility determination. In this case, by omitting Czodor's prior convictions, the

23   jury was deprived of important information that could have cast doubt on his reliability.

24       Moreover, credibility is paramount when a case relies on the testimony of a single witness.

25   The magistrate's anecdotal of Czodor's prior convictions is therefore not only factually flawed but

26   also inconsistent with controlling legal authority. The jury, had it known of Czodor's past

27   dishonesty, would have been in a better position to assess whether his testimony could be trusted.

28

1    The magistrate also erroneously concluded that, even if admitted, Czodor's prior convictions

2    would not have affected the jury's assessment of his credibility. This conclusion is unsupported by

3    the facts of the case. Czodor's testimony was the linchpin of the prosecution's case, and his

4    credibility was the sole determining factor for the jury's verdict. Given the absence of any

5    independent evidence linking Petitioner to the crimes, the jury's verdict necessarily turned on

6    whether it believed Czodor's version of events.

7    Courts have recognized that evidence affecting the credibility of a key witness can have a

8    profound impact on the outcome of a trial. The duty to investigate is especially pressing where, as

9    here, the complaining witness and his credibility are crucial to the State's case. See *Huffington v.*

10    *Nuth*, 140 F.3d 572, 580 (4th Cir.1998) (collecting cases).

11    One way of discrediting the witness is to introduce evidence of a prior criminal conviction

12    of that witness. By so doing, the cross-examiner intends to afford the jury a basis to infer that the

13    witness' character is such that he would be less likely than the average trustworthy citizen to be

14    truthful in his testimony. The introduction of evidence of a prior crime is thus a general attack on

15    the credibility of the witness. *Davis v. Alaska*, 415 U.S. 308, 316 (1974). This is particularly true

16    when the prosecution's case depends on the witness's credibility, as it does here with Czodor. The

17    jury must have the opportunity to make a full assessment of the witness's "credibility, reliability,

18    and motivation" because prior convictions inform a witness's general credibility and reliability.

19    *Davis* established that general credibility, as influenced by past misconduct, is relevant and essential

20    for assessing the overall truthfulness of a witness's testimony.

21    Under *People v. Castro*, 38 Cal. 3d 301, 315 (1985), evidence of past convictions can be

22    introduced for the purpose of impeaching a witness's credibility, particularly when these

23    convictions reflect on a witness's honesty or integrity. Especially in cases hinging on testimonial

24    evidence, a witness's credibility must be fully evaluated to ensure a fair trial. See also *People v.*

25    *Burns* (1987) 189 Cal.App.3d 734 (20-year conviction not necessarily remote because of

26    subsequent lawlessness); *People v. DeCosse* (1986) 183 Cal.App.3d 404 (no abuse of discretion to

27    admit a burglary conviction from twelve years earlier).

28    Although trial counsel is typically afforded leeway in making tactical decisions regarding

1    trial strategy, counsel cannot be said to have made a tactical decision without first procuring the

2    information necessary to make such a decision. *Reynoso v. Giurbino*, 462 F.3d 1099, 1112 (9th Cir.

3    2006). See *Williams v. Washington*, 59 F.3d 673, 681 (7th Cir.1995) ("Because investigation [of the

4    witnesses] might have revealed evidence bearing upon credibility (which counsel believed was the

5    sole issue in the case), the failure to investigate was not objectively reasonable."); *cf. Sanders v.*

6    *Ratelle*, 21 F.3d 1446, 1457 (9th Cir.1994) ("Ineffectiveness is generally clear in the context of

7    complete failure to investigate because counsel can hardly be said to have made a strategic choice

8    when s/he [sic] has not yet obtained the facts on which such a decision could be made." (citations,

9    emphasis, and internal quotation marks omitted))

10        The magistrate found trial counsel's failure to address the reason why Czodor could not

11    provide digital evidence with metadata justified and no evidence suggests that any of the evidence

12    presented at trial was manipulated or incomplete. Dkt. 73 at 90.

13        Given social media's pervasiveness in our culture, and the frequency with which people use

14    it compared to other forms of communication, social media evidence is a broader and deeper trove

15    of courtroom evidence than has ever been available before. At the same time, however, social media

16    evidence is uniquely vulnerable to alteration or forgery, particularly as advances in technology

17    allow so-called "bot" accounts to create social media content autonomously. *See, e.g.,* Onur Varol et

18    al.,*Online Human-Bot Interactions: Detection, Estimation, and Characterization*,

19    ARXIV:1703.03107v2 [cs.SI] (Mar. 27, 2017). Offering text messages, instant messages, tweets,

20    and social media posts of all types at trial is now commonplace. In *United States v. Vayner*, 769

21    F.3d 125, 131 (2d Cir. 2014) the U.S. Second Circuit Court of Appeals reversed a district court's

22    decision to admit screenshots from a social media profile that contained the defendant's name,

23    photo, and work history. *Vayner* holds that merely presenting evidence proving that a post came

24    from a particular user's account is insufficient to authenticate the post as actually coming from that

25    user. In June 2020, the American Bar Association reported on a British family law proceeding in

26    which a party doctored a recording of her spouse to make it sound like he was threatening her. Matt

27    Reynolds, *Courts and lawyers struggle with growing prevalence of deepfakes*, ABA J. (June 9,

28    2020). See also *U.S. v. Jackson*, 208 F.3d 633,636 (7th Cir. 2000); *Griffin v. State*, 19 A.3d 415,423

1    (Md. 2011); *Com. v. Purdy*, 945 N.E.2d 372, 381 (Mass. 2011).

2    Metadata is a primary factor in confirming a file's origin, date, and content. If Czodor's

3    print-out was intended to be used against Petitioner, the absence of digital evidence undermines the

4    authentication process. Given the simplicity of providing metadata, withholding it here raises

5    serious concerns regarding his intent and the credibility of the evidence. The deliberate decision to

6    withhold digital evidence containing metadata suggests a strong intent to obstruct Petitioner's

7    access to crucial information needed to ensure a fair trial.

8    Czodor's motivation for his failure to provide digital evidence could have exposed

9    inconsistencies in Czodor's testimony, supporting Petitioner's right to a fair trial. Counsel's failure

10   to cross-examine the witness about his motivation for testifying as he did was, accordingly, equally

11   unreasonable and cannot be considered "sound trial strategy." *Reynoso v. Giurbino*, 462 F.3d 1099,

12   1115 (9th Cir. 2006). The magistrate's recommendation disregards how easy it is to present digital

13   evidence with metadata, overlooking the significant implications of Czodor's failure to include it.

14   Similar to the absence of digital evidence, the absence of texts messages regarding the

15   agreement to keep his nude photos private permits a negative inference regarding the authenticity

16   and completeness of the evidence presented and entitles Petitioner to an adverse inference regarding

17   Czodor's credibility and motive, and any resulting prejudice should be weighed in favor of

18   Petitioner's right to a fair trial. The magistrate's reliance on counsel's closing argument to mitigate

19   the failure to question Czodor effectively does not address the impact of failing to elicit a definitive

20   answer from Czodor on cross-examination. Closing arguments are insufficient to remedy critical

21   errors made during trial, particularly where effective cross-examination could have changed the

22   jury's perception of the evidence. A belated attempt to raise this issue in closing fails to adequately

23   counter the prejudicial effect of an unchallenged assumption of privacy.

24   The magistrate concluded that had counsel elicited testimony about the victim's marriage, it

25   would not have benefited Petitioner defense or made her any less culpable. Dkt. 73 at 91. However,

26   Czodor's willingness to go on dates with Petitioner while married could reflect on his character for

27   honesty, casting doubt on his integrity and, potentially, his entire narrative. Since Czodor's

28   credibility is pivotal to the prosecution's case, details that challenge his integrity—such as his

1   dishonesty toward his spouse and his pattern of behavior in interacting with multiple women—are

2   highly relevant and admissible for impeachment purposes. Questions about Czodor's extramarital

3   conduct would not only have been permissible but also relevant to establishing a pattern that may

4   call his integrity and truthfulness into question. In *United States v. Abel*, 469 U.S. 45, 52 (1984), the

5   Supreme Court noted that credibility attacks on a witness are permissible when they help the fact-

6   finder evaluate the witness's motivations or propensity for honesty. Bias may be induced by a

7   witness' like, dislike, or fear of a party, or by the witness' self-interest. Proof of bias is almost

8   always relevant because the jury, as finder of fact and weigher of credibility, has historically been

9   entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony.

10  The "common law of evidence" allowed the showing of bias by extrinsic evidence, while requiring

11  the cross-examiner to "take the answer of the witness" with respect to less favored forms of

12  impeachment. *See generally* E. Cleary, McCormick on Evidence § 40, p. 89 (3d ed.1984); Hale,

13  Bias as Affecting Credibility, 1 Hastings L.J. 1 (1949).

14          Czodor's marital strain, if it existed, is entirely his responsibility, due to his own infidelity.

15  Infidelity and deceit are relevant factors in assessing a witness's character and credibility,

16  particularly when these actions involve dishonesty, concealment, or self-serving motives. Under

17  California Evidence Code § 780, jurors may consider a witness's motive, interest, and relationship

18  to the case in weighing their testimony. Czodor's decision to date Petitioner while married suggests

19  a willingness to deceive his spouse, which bears directly on his credibility as a witness. Courts have

20  also recognized that personal misconduct, such as infidelity, may indicate a character for

21  dishonesty, as in *People v. Wheeler*, 4 Cal. 4th 284, 296 (1992), where the court permitted the

22  impeachment of a witness with prior dishonest acts. Misconduct involving moral turpitude may

23  suggest a willingness to lie (see *People v. Castro* (1985) 38 Cal.3d 301, 314-315 [211 Cal.Rptr.

24  719, 696 P.2d 111]; *People v. White* (1904) 142 Cal. 292, 294 [75 P. 828]; *People v. Carolan*

25  (1886) 71 Cal. 195, 196 [12 P. 52]; *Gertz v. Fitchburg Railroad* (1884) 137 Mass. 77, 78).

26          Jurors may consider a witness's personal motives and misconduct if they may lead the

27  witness to fabricate or exaggerate claims. Czodor's infidelity, and the potential marital strain it

28  created, are thus self-inflicted and irrelevant to Petitioner's actions. In fact, Petitioner is another

1  victim of Czodor's infidelity. The possibility that Czodor fabricated allegations to appease his

2  spouse or minimize the consequences of his infidelity is highly relevant and should have been

3  explored. If Czodor faced the discovery of his infidelity by his spouse, he might have had a

4  compelling motive to shift blame to Petitioner in order to minimize the personal repercussions.

5  Jurors may consider motives that a witness may have to fabricate testimony, especially when they

6  stand to benefit from such deception.

7  The exploration of potential motives to fabricate is permissible, particularly where there is a

8  personal incentive to deflect blame or mitigate personal wrongdoing. In *Napue v. Illinois*, 360 U.S.

9  264, 269 (1959), the U.S. Supreme Court emphasized that jurors must be fully informed of any

10  potential bias or motives of a witness to testify untruthfully. Czodor's potential interest in deflecting

11  blame onto Petitioner is thus relevant to the jury's full understanding of his credibility and should

12  not have been dismissed by concerns about discussing his marital strain.

13  The magistrate's reliance on the idea that questioning Czodor's marriage would result in

14  damaging testimony is legally flawed. Czodor's marital strain, if it existed, was a product of his

15  own actions, not Petitioner's. The possibility that Czodor fabricated allegations to deflect blame

16  from his infidelity is both factually plausible and legally relevant.

17  Given the inadequacy of counsel's investigation into Czodor's motives for testifying against

18  Petitioner, his failure at trial to cross-examine Czodor about his marriage and the absence of Lilly

19  on his Yelp page further rendered his performance deficient. *Reynoso v. Giurbino*, 462 F.3d 1099,

20  1114 (9th Cir. 2006)   (counsel's conduct was deficient under *Strickland*.)

21  Prejudice was found even when the prosecution's case has been stronger than in the instant

22  case. See *Rios v. Rocha*, 299 F.3d 796, 810–13 (9th Cir.2002) (holding that counsel's failure to

23  investigate and present witnesses was prejudicial when no physical evidence tied the defendant to

24  the shooting and the state's case rested on the testimony of **three eyewitnesses**); *Lord v. Wood*, 184

25  F.3d 1083, 1094-96 (9th Cir.1999) (holding that counsel's failure to interview witnesses who had

26  claimed to see the victim alive after the murder was prejudicial even though physical evidence tied

27  the defendant to the murder and two inmates testified that the defendant had confessed to them);

28  *Brown v. Myers*, 137 F.3d 1154, 1155–57 (9th Cir.1998) (holding that counsel's failure to

1   investigate and to locate and produce witnesses was prejudicial when **three witnesses** identified the

2   defendant as the shooter).

3       The magistrate found that Yelp pages do not include a given company's roster of customers.

4   Instead, at most, they identify only those who leave a review. And there is no reason to believe that

5   each and every one of the victim's customers posted a review about his company or that any

6   customer posted information on Yelp concerning the things that Petitioner had posted there. Dkt. 73

7   at 91. However, Czodor testified that Lilly was the person who reviewed his company on Yelp. Dkt.

8   4 at 61. He further testified that his customers on Yelp had notified him they had received links to

9   YouTube video. Dkt. 4 at 92.

10       First, trial counsel knew that Czodor's testimony would be at the very heart of the

11   prosecution's case. In other words, with no hard evidence on hand, the prosecutor clearly planned to

12   use Czodor's testimony based on his credibility as powerful evidence. A reasonable defense lawyer

13   would have attached a high importance to obtaining any evidence showing Czodor's dishonesty and

14   inconsistent allegations, in order to anticipate and find ways of deflecting the prosecutor's

15   arguments.

16       Second, the weak circumstantial evidence and inconsistency of his statements, raised a

17   strong likelihood that the jury would reject Czodor's credibility had trial counsel effectively cross-

18   examined Czodor regarding Lilly.

19       Third, trial counsel's actions and inactions were not the result of an informed tactical

20   decision about how the lawyers' time would best be spent. Although trial counsel had ample time to

21   realize that Czodor's credibility would be critical to the case, his failure to investigate would not

22   necessarily have been deficient if it had resulted from the lawyers' careful exercise of judgment

23   about how best to marshal his time and serve his client. But trial counsel did not ignore Lilly in

24   order to spend his time on other crucial leads. Trial counsel did not determine not to investigate

25   because it would necessarily divert him from other trial-preparation tasks he thought more

26   promising. Rather, trial counsel's complete failure "was the result of inattention, not reasoned

27   strategic judgment." *Wiggins v. Smith*, 539 U.S. 510, 534 (2003). As a result, his conduct fell below

28   constitutionally required standards. See id., at 533 ("'[S]trategic choices made after less than

1  complete investigation are reasonable' only to the extent that 'reasonable professional judgments

2  support the limitations on investigation'" (quoting *Strickland*, 466 U.S., at 690-691)).

3         In light of Czodor's testimony (Lilly reviewed his company on Yelp), trial counsel's failure

4  to pursue Lilly's existence as an impeachment strategy weakened Petitioner's defense and was thus

5  constitutionally inadequate. Lilly's absence from Czodor's Yelp page raises serious questions about

6  the credibility of his testimony. Without examining Czodor's veracity about Lilly, trial counsel

7  missed an opportunity to cast doubt on Czodor's entire testimony. The non-existence of Lilly

8  suggests Czodor may have fabricated Lilly to corroborate his claims; thus, cross-examining him

9  could have exposed inconsistencies and highlighted his motives to distort facts.

10        In the particular circumstances of this case, the attorneys' failure did not meet standards of

11  "reasonable professional judgmen[t]." Id., at 691.

12        **GROUND 24: DEFICIENT POLICE INVESTIGATION (Dkt. 73 at 92)**

13        The magistrate concluded that Petitioner cites no evidence establishing or indicating that any

14  of the evidence presented at trial was manipulated or that Czodor withheld exonerating video or

15  photographic evidence. Dkt. 73 at 95. Petitioner's inability to cite evidence is the direct result of the

16  police's failure to provide digital evidence, including all photos, screenshots and videos taken by

17  Czodor.

18        The police's failure to preserve and provide complete digital evidence, including metadata,

19  hinders Petitioner's ability to challenge the evidence and determine whether it has been

20  manipulated. Print-outs without metadata offer no way to verify authenticity, especially in a case

21  involving screenshots and other digital materials. The lack of digital evidence prevents Petitioner

22  from determining the context, date, and authenticity of materials that Czodor provided, depriving

23  her of this essential right.

24        While police have discretion in their investigatory methods, they are not relieved of their

25  duty to gather potentially exculpatory evidence or to ensure a fair and impartial investigation. The

26  U.S. Supreme Court has established that when police or prosecutors fail to preserve potentially

27  exculpatory evidence, it may result in a due process violation if the evidence "might be expected to

28  play a significant role in the suspect's defense." (*California v. Trombetta*, 467 U.S. 479, 480

1    (1984)). By failing to provide digital evidence and relying solely on Czodor's submissions, the

2    police failed to fulfill their duty to evaluate and verify the credibility of his claims impartially. Here,

3    the police's lack of independent investigation into Czodor's materials, coupled with their failure to

4    provide digital evidence to Petitioner, signifies an investigative lapse that denied Petitioner a fair

5    opportunity to challenge the evidence.

6         The magistrate found Petitioner provides no evidence to substantiate her claims concerning

7    the police investigation of the crimes underlying her conviction. Dkt. 73 at 95. Again, Petitioner's

8    inability to provide evidence is the direct result of the lack of police investigation. When there was

9    no police investigation, of course there was no evidence of police investigation.

10        Trial counsel's closing argument relied on pointing out investigative shortcomings,

11   highlighting the lack of a search warrant and digital analysis of Petitioner's electronic devices.

12   However, trial counsel's argument was not supported by the actual metadata and digital records,

13   leaving the jury with no concrete evidence to assess the police's investigative deficiencies.

14        The failure to collect digital evidence effectively forced trial counsel to make arguments

15   unsupported by tangible data, undermining Petitioner's defense. The magistrate's assertion that trial

16   counsel's closing argument was sufficient ignores the fact that counsel was deprived of essential

17   digital evidence. Law enforcement's failure to collect and disclose digital evidence with metadata

18   deprived Petitioner of the opportunity to challenge the credibility and integrity of the evidence

19   against her. This failure directly impacted trial counsel's ability to construct a robust closing

20   argument, thus infringing upon Petitioner's due process rights.

21        **Ground 26 IMPROPER AMENDMENT OF THE COMPLAINT (Dkt. 73 at 96)**

22        One day before the jury trial began on July 27, 2021 (Dkt. 3 at 29 and 230), the original

23   complaint (filed 8/6/19) was amended (filed 7 /26/21) concerning Count 2 (Pen. Code, § 273.6). In

24   the original complaint, the People alleged that petitioner violated a protective order by coming

25   within 100 yards of the protected person. In the amended complaint, the People alleged that

26   petitioner violated a protective order by failing "to deactivate website and created new websites."

27        Here, it's self-evident that the amendment shifts from a physical violation of proximity to an

28   alleged online activity, which changes the nature of the defense entirely. The amendment here

1    requires different evidentiary proof, such as website creation records and online activity, which

2    would not have been relevant to the original allegation.

3        This last-minute amendment, filed just one day before trial, essentially blindsided Petitioner,

4    altering the defense strategy by requiring her to defend against online activity allegations rather than

5    physical proximity violations.

6        The magistrate erred in finding that the amendment did not violate Petitioner's rights,

7    particularly by improperly shifting the burden onto Petitioner to show prejudice, rather than

8    requiring the prosecution to show good cause for the untimely amendment. Further, the magistrate's

9    reliance on *Morrison v. Estelle*, 981 F.2d 425 (9th Cir. 1992) and *Calderon v. Prunty*, 59 F.3d 1005

10   (9th Cir. 1995) is misplaced, as the facts of this case are notably distinguishable.

11       In *Morrison*, the defendant was charged with murder and his counsel had two days to

12   prepare for the felony-murder instructions given at trial. The Ninth Circuit found no due process

13   violation because the felony-murder instruction was given in response to evidence presented at trial,

14   and Morrison's counsel had sufficient time to prepare his closing argument on that theory. Unlike in

15   *Morrison*, Petitioner had no advance notice of the theory change in her charge; instead, the change

16   was made one day before trial, with no opportunity for her counsel to respond effectively.

17       Similarly, *Calderon* is distinguishable. In that case, the defendant was on notice of a lying-

18   in-wait theory early in the proceedings, and the specific method of murder did not need to be

19   alleged in the information for the defendant to be adequately informed of the charge. Unlike in

20   *Calderon*, where the defendant had ample opportunity to address all aspects of the charge, here the

21   amendment changed the entire nature of the alleged violation—from physical presence to online

22   actions—without any advance notice or evidence suggesting Petitioner could reasonably anticipate

23   such a shift. This substantive change required new types of evidence and entirely different defenses,

24   fundamentally altering Petitioner's trial preparation.

25       The amendment, which altered the factual basis for the violation of a protective order from

26   physical proximity to online conduct, is a substantive change that would require different

27   evidentiary support. Courts have found that such last-minute amendments violate due process when

28   they substantially prejudice the defendant's ability to prepare a defense. The amendment introduced

1   new elements that demanded distinct evidentiary preparation—specifically, records of website

2   creation and online activities—rather than evidence of physical proximity. This shift deprived

3   Petitioner of her ability to meaningfully defend against the charge in a timely and prepared manner,

4   contravening due process standards as outlined in *People v. Pitts*, 223 Cal. App. 3d 606, 906-907

5   (1990) (the opportunity to prepare a meaningful defense would obviously be adversely affected,

6   since the change in alleged acts would affect medical testimony, cross-examination of the alleged

7   victim(s), etc).

8        The magistrate's finding that Petitioner should have requested a continuance to counter the

9   effects of the last-minute amendment is legally unsound. Under both state and federal law, a

10   defendant has a right to a speedy trial, and requiring Petitioner to waive this right by requesting a

11   continuance to accommodate the prosecution's delay violates this principle. In *Barker v. Wingo*,

12   407 U.S. 514, 530 (1972), the U.S. Supreme Court held that the right to a speedy trial is

13   fundamental and cannot be waived lightly or without careful consideration.

14        This principle was echoed in *People v. Martinez*, 22 Cal. 4th 750, 768 (2000), where the

15   court ruled that the right to a speedy trial is essential to prevent unfair surprise or prejudice. By

16   amending the complaint at such a late stage, the prosecution effectively forced Petitioner to choose

17   between her right to a speedy trial and her right to adequate preparation. Such a choice violates her

18   constitutional rights by shifting the burden of prosecutorial delay onto the defendant.

19        The magistrate's finding that trial counsel's withdrawal of the motion to preclude

20   amendment demonstrated his "anticipation" of the amendment is factually incorrect and

21   misrepresents the impact of the prosecution's actions on Petitioner's constitutional rights. In reality,

22   trial counsel withdrew the motion only after the prosecution had already amended the complaint

23   over his objection, thus leaving no procedural recourse to prevent the amendment.

24        The magistrate found Petitioner identifies no evidence that she might have presented or

25   defense she might have pursued if the complaint had been amended earlier. Dkt. 73 at 99. However,

26   Petitioner has a well-founded basis for asserting prejudice, as the timing of the amendment

27   prevented her from gathering and presenting essential testimony that could have supported her

28   defense.

1      Given that the amended charge related to online conduct, Petitioner's defense required a

2 different approach than what would be relevant to a physical proximity violation. To challenge the

3 allegations, it is self-evident Petitioner would likely have pursued testimony from witnesses who

4 could speak to the veracity of Czodor's allegation. Preparation time is especially critical when

5 defendants need to secure witness testimony and adapt their defense strategy. The last-minute

6 amendment deprived Petitioner of this opportunity and impeded her ability to mount a viable

7 defense. Altering the grounds of a charge close to trial could prevent a defendant from presenting a

8 fair defense if it denies them access to crucial witnesses or evidence.

9      **Ground 27 RIGHT TO A SPEEDY TRIAL (Dkt. 73 at 100)**

10      The major evils protected against by the speedy trial guarantee exist quite apart from actual

11 or possible prejudice to an accused's defense. *United States v. Marion*, 404 U.S. 307, 320 (1971).

12 Arrest is a public act that may seriously interfere with the defendant's liberty, whether he is free on

13 bail or not, and that may disrupt his employment, drain his financial resources, curtail his

14 associations, subject him to public obloquy, and create anxiety in him, his family and his friends. *Id*.

15      The Supreme Court has held that a one-year post accusation delay will generally require a

16 full review. *Doggett v. United States*, 505 U.S. 647, 652 n. 1, 112 S. Ct. 2686 (1992).

17      The magistrate found none of the delay was attributable to the prosecution. Dkt. 73 at 102. A

18 delay of two years in a misdemeanor case is presumptively prejudicial and requires a strong

19 justification from the prosecution, which was lacking here. See *Doggett*, 505 U.S. at 657, 112 S.Ct.

20 2686 (holding that "negligence [is not] automatically tolerable simply because the accused cannot

21 demonstrate exactly how it prejudiced him").

22      In *Barker*, the Supreme Court noted, "The government, and for that matter, the trial court are

23 not without responsibility for the expeditious trial of criminal cases. The burden for trial promptness

24 is not solely upon the defense." *Barker v. Wingo* (1972) 407 U.S. 514, 527 n. 27, 92 S.Ct. 2182, 33

25 L.Ed.2d 101 (quoting *Hodges v. United States*, 408 F.2d 543, 551 (8th Cir. 1969)). In *Brillon*, the

26 Supreme Court stated that "institutional problems" and other "[d]elay resulting from a systemic

27 breakdown . . . could be charged to the State." *Vermont v. Brillon*, 556 U.S. 81, 92-94, 129 S. Ct.

28 1283, 173 L. Ed. 2d 231 (2009).

1    In addition to failing to actively push for trial by the prosecution, there is no record of any

2    valid explanation for the two-year delay in Petitioner's case. Nothing in the record supports any

3    good cause for the two-year delay. There was no discovery dispute or any pending motions over the

4    course of two-year delay. The prosecution, the trial court and public defender failed to meet their

5    duty to actively bring the case to trial, a systemic breakdown not attributable to Petitioner.

6    The magistrate found Petitioner waited until less than two weeks before trial to assert her

7    right to a speedy trial. Dkt. 73 at 102. This delay in asserting her right was not due to any intentional

8    waiver or neglect on Petitioner's part, but rather the direct result of inadequate representation by her

9    public defender. Petitioner was "kept in the dark" regarding her right to a speedy trial and the true

10   meaning of time waiver. Accordingly, she could not assert her right to a speedy trial without

11   knowing the full legal ramifications of doing so.

12   The two-year delay in a misdemeanor case far exceed any reasonable timeframe which is a

13   direct result of the trial court and the prosecution's negligence and the public defender's inadequate

14   representation.

15   The magistrate's finding that *Mathews v. Eldridge*, 424 U.S. 319 (1976), does not apply to

16   delays between arraignment and trial in criminal cases is legally unfounded. Dkt. 73 at 105.

17   *Mathews*' three-part balancing test for determining whether due process rights have been violated

18   has been cited and applied in a wide variety of contexts. See *Martinez v. McAleenan*, 385 F. Supp.

19   3d 349 (S.D.N.Y. 2019). Though *Barker* is the appropriate test for delay-related claims, the

20   *Mathews* test provides a useful framework for analyzing delays and their due process implications.

21   The *Mathews* balancing test, applied alongside or as a complement to the *Barker* test, helps

22   highlight the procedural deficiencies that can arise from excessive delays between arraignment and

23   trial.

24   **GROUND TWENTY-EIGHT: DENIAL OF MOTION TO DISMISS (Dkt. 73 at 105)**

25   The magistrate's finding that Petitioner's claim is not cognizable because it concerns state

26   law is a misinterpretation of both federal and state legal standards, particularly when the claim

27   involves a fundamental right, such as the right to a speedy trial under the Sixth Amendment.

28   The magistrate incorrectly frames Petitioner's claim as a state law procedural issue, ignoring

1  the constitutional implications. A court's refusal to consider a pretrial motion to dismiss based on a

2  violation of the right to a speedy trial is inherently linked to constitutional concerns. The U.S.

3  Supreme Court has held that the Sixth Amendment's speedy trial right is "fundamental" and thus

4  subject to federal habeas review. The case of *Barker v. Wingo*, 407 U.S. 514, 92 S. Ct. 2182 (1972)

5  underscores that the failure of the state court to provide relief for a speedy trial violation is

6  cognizable on federal habeas review, as it raises constitutional due process questions.

7      Moreover, while the trial court may have claimed that Petitioner's motion was untimely or

8  improperly noticed, the denial of a motion addressing a constitutional right—such as a motion to

9  dismiss for violation of the right to a speedy trial—cannot be excused based solely on procedural

10  technicalities. In *Zedner v. United States*, 547 U.S. 489, 509 (2006), the U.S. Supreme Court noted

11  that the government, and by extension the courts, cannot ignore speedy trial claims on procedural

12  grounds where there has been a clear constitutional violation. Therefore, even if Petitioner's motion

13  was improperly noticed, the court had an obligation to substantively address the constitutional claim

14  raised.

15      The magistrate appears to imply that because the trial court allowed Petitioner the

16  opportunity to refile her motion, her right to raise the issue was not denied. However, this overlooks

17  the essential point that a court's failure to timely address a properly raised constitutional concern,

18  especially in cases involving the right to a speedy trial, itself constitutes a violation.

19      Even if the magistrate asserts that Petitioner cannot show that the trial court would have

20  granted the motion, this reasoning is flawed because it shifts the burden away from the government

21  to ensure a fair and speedy trial. Under *Barker v. Wingo*, the length of the delay itself can create a

22  presumption of prejudice. When a defendant has been forced to endure an unreasonable delay, the

23  presumption of prejudice weighs in favor of the defendant, and it is the prosecution's burden to

24  justify the delay.

25      The magistrate concluded that the trial court found that Petitioner personally and repeatedly

26  waived time. However, the trial court made no specific findings on the record to support any

27  continuance, despite there was no discovery dispute. See *Zedner v. United States*, 126 S. Ct. 1976

28

1  (2006) (Alito, J.) (holding that the parties lack power to waive the public's interest in a speedy

2  criminal trial).

3      The record also fails to establish that Petitioner voluntarily and knowingly waived her right

4  to a speedy trial. Under both federal and California law, waivers of fundamental constitutional

5  rights, including the right to a speedy trial, must be made voluntarily, knowingly, and intelligently.

6  This requirement is underscored by the Supreme Court's decision in *Johnson v. Zerbst*, 304 U.S.

7  458, 464 (1938), which held that any waiver of a constitutional right must be done "with sufficient

8  awareness of the relevant circumstances and likely consequences."

9      Repeated continuances initiated by counsel do not inherently equate to a defendant's

10  knowing and voluntary waiver. See Dkt. 33 at 109-110. With six different public defenders cycling

11  through without conducting any substantive investigation, underscores significant issues with the

12  adequacy of her legal representation. The record indicates that Petitioner's counsel failed to

13  communicate basic court dates, leading to a bench warrant. Dkt. 3 at 21-22. The totality of

14  circumstances, missed court date, lack of investigation, and attorney turnover without explanation

15  suggest a breakdown in her legal representation and indicate professional neglect and disinterest.

16  No evidence supports that Petitioner knowingly, voluntarily, and intelligently waived her right to a

17  speedy trial because she received no benefit from the trial continuance.

18      **GROUND 31: CUMULATIVE ERROR (Dkt. 73 at 106)**

19      Contrary to the magistrate's conclusion, each of Petitioner's grounds for relief is meritorious

20  as explained herein.

21      **GROUND 32: INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL (Dkt. 73**

22  **at 109)**

23      As an initial matter, the magistrate erred in characterizing trial counsel's failure to provide

24  explanation after being asked as Petitioner's unsuccessful attempt to obtain a declaration from trial

25  counsel concerning his purported shortcomings. Dkt. 73 at 109.

26      Relying on *Dunn v. Reeves*, 594 U.S. 731 (2021), the magistrate reached the result that

27  Petitioner's appellate counsel IAC claim fails for lack of evidence because it is not supported by a

28  declaration from appellate counsel concerning his actions. However, *Reeves* is notably

1    distinguishable. Reeves' records suggested that his intelligence was below average, they also
2    indicated that he was not intellectually disabled. Despite that, Reeves sought habeas relief due to his
3    counsel's failure to hire an expert to develop additional evidence of intellectual disability. The court
4    concluded that his determination not to offer testimony or other evidence from his lawyers is
5    particularly signifcant given the "range of possible reasons [Reeves'] counsel may have had for
6    proceeding as they did." The court explained that Reeves is not a case in which a lawyer "failed to
7    uncover and present any evidence of [Reeves'] mental health or mental impairment, [or] his family
8    background." The court found counsel's initial enthusiasm to collect Reeves' records and obtain
9    funding hardly indicates professional neglect and disinterest. *Id*. at 740.

10    First, *Reeves* concerned trial counsel's strategic decision-making, where the Court noted that
11    Reeves' attorneys had gathered extensive records and funding and had presented mitigating
12    evidence. In that context, the failure to present additional expert testimony on intellectual disability
13    was seen as a reasonable strategy given the range of mitigating evidence already available.

14    In contrast, appellate counsel in this case did not exercise a similarly strategic choice among
15    potential claims. Petitioner is not asserting a complex trial strategy where multiple plausible choices
16    exist, but rather is raising an appeal where failure to address potentially meritorious issues suggests
17    a lack of diligence, rather than a strategic decision.

18    Additionally, unlike *Reeves*, the appellate counsel here did not attempt to investigate,
19    present, or argue any potentially exculpatory issues. *Reeves* does not control here because the nature
20    of the decision-making in the appellate context differs significantly. When an attorney fails to raise
21    claims that have a reasonable probability of success, the presumption of competence is weaker.

22    The magistrate's conclusion that Petitioner "does not identify any nonfrivolous claim that
23    counsel failed to raise on appeal" is factually incorrect. Petitioner's claims – that do not require
24    evidence outside records on appeal – in this habeas petition are self-evident that they could have
25    been raised on direct appeal and do not require additional identification.

26    Further, any claims here that were subject to dismissal due to procedural bar on grounds that
27    they should have been raised on appeal imply that these claims are based on the record available
28    during appellate proceedings, refuting the magistrate's assertion that no identifiable claims exist.

1    The magistrate found appellate Counsel could not have raised the ineffective-assistance-of-

2  trial counsel (IATC) claims on direct appeal because in California such claims must generally be

3  raised on habeas review, not on appeal. Dkt. 73 at 110. The general rule articulated in *People v.*

4  *Mendoza Tello*, 15 Cal. 4th 264, 266-67 (1997), is not an absolute bar; rather, it emphasizes the

5  necessity of additional fact-finding in many, but not all, IATC cases.

6    **GROUND 35: INSTRUCTIONAL ERROR (Dkt. 73 at 114)**

7    The magistrate erred in concluding that the trial court's failure to provide the correct

8  instruction to the jury on the amended charge was harmless, relying on her version of

9  "overwhelming evidence" presented in arguments that did not conform to the jury instructions. Dkt.

10  73 at 117.

11    While the magistrate points to the prosecutor's and defense counsel's arguments focusing on

12  the amended charge, arguments by counsel cannot cure instructional errors. It is well established

13  that jury instructions, not attorney statements, define the law for the jury to follow. In *Boyde v.*

14  *California*, 494 U.S. 370 (1990), the Supreme Court held that instructions, rather than arguments,

15  guide the jury's understanding of the applicable law. Additionally, the trial court's instructions

16  specifically directed the jury to disregard any conflicts between counsel's statements and the court's

17  instructions. The trial court explicitly instructed the jury "If you believe that the attorneys'

18  comments on the law conflict with my instructions, you must follow my instructions." Dkt. 4 at

19  146. The presumption here is that the jury followed the court's directive, focusing solely on the

20  instruction related to contact and messages rather than any discussions of online conduct. The

21  closing arguments is insufficient to cure instructional defects.

22    The magistrate concluded that Czodor testified that after the family court issued the

23  protective order, Petitioner posted his private photographs, created fake social media accounts in his

24  name, and posted defamatory and private things about him – including his home address and phone

25  number – on other "cheater" websites. First, the magistrate's analysis was legally flawed because

26  she improperly focused on the issuance of the protective order rather than on the date when

27  Petitioner was served with the order and became aware of its terms. Under both California law and

28  federal due process requirements, Petitioner could not have violated the protective order unless she

1    had actual notice of it at the time of the alleged conduct. No evidence showed any timestamp of any

2    alleged postings. Consequently, if Petitioner's alleged posts regarding Czodor were made even an

3    hour before she received the family court order, she cannot be held liable for actions taken before

4    being formally notified, even if both events occurred on the same day.

5        Second, Czodor's testimony confirmed that the printed representation of all "digital

6    evidence" presented at trial—including social media accounts, defamatory posts, and private

7    photographs—was entirely self-produced and provided by Czodor, without any independent third-

8    party verification or forensic analysis. Even the police officer never saw any alleged postings. Dkt.

9    6 at 178.

10       The reliance on unverified, self-serving print-outs, combined with the State's intentional

11   failure to collect forensic evidence and withholding of Czodor's inconsistent statements and

12   dishonesty history, suggests that the State may have engaged in a strategic tactic designed to

13   obscure the truth and deny Petitioner a fair trial.

14       In criminal trials, prejudicial instructional errors can violate due process when they create a

15   reasonable likelihood that the jury applied the instructions incorrectly, leading to an unfair trial

16   outcome. Incorrect instructions or omissions that mislead the jury on key elements of the offense

17   can deprive a defendant of a fair trial. Here, the trial court's instruction described the written order

18   that the defendant no contact, send any messages to, follow, or disturb the peace of the protected

19   person, rather than the amended charge of failing to remove online posts and websites. This

20   significant deviation misled the jury, especially given the confusing and contradictory nature of

21   evidence presented. The risk of prejudice was high, as jurors may have convicted Petitioner based

22   on conduct unrelated to the actual amended charge, raising substantial due process concerns.

23       The magistrate's reliance on the purportedly "overwhelming" evidence to assert that

24   Petitioner suffered no prejudice is misplaced. A jury is presumed to follow its instructions.

25   *Richardson v. Marsh*, 481 U. S. 200, 211 (1987). Here, the jurors were instructed to assess different

26   conduct than what was alleged in the amended charge, creating a risk of confusion. The fact that

27   both the prosecutor and defense counsel referenced the amended charge in closing arguments does

28

1  not override the explicit jury instruction from the court, as it is presumed that jurors follow judicial

2  instructions over attorney arguments (see *Weeks v. Angelone*, 528 U.S. 225, 234 (2000)).

3  **PETITIONER'S REQUEST FOR AN EVIDENTIARY HEARING (Dkt. 73 at 119)**

4  In *Schlup v. Delo*, 513 U.S. 298, 327-332 (1995), the Supreme Court held that to

5  satisfy Carrier's "actual innocence" standard, a petitioner must show that, in light of the new

6  evidence, it is more likely than not that no reasonable juror would have found him guilty beyond a

7  reasonable doubt. The focus on actual innocence means that a district court is not bound by the

8  admissibility rules that would govern at trial, but may consider the probative force of relevant

9  evidence that was either wrongly excluded or unavailable at trial. The district court must make a

10  probabilistic determination about what reasonable, properly instructed jurors would do, and it is

11  presumed that a reasonable juror would consider fairly all of the evidence presented and would

12  conscientiously obey the trial court's instructions requiring proof beyond a reasonable doubt. The

13  *Carrier* standard, although requiring a substantial showing, is by no means equivalent to the

14  standard governing review of insufficient evidence claims. *Jackson v. Virginia*, 443 U. S. 307,

15  distinguished. In applying the *Carrier* standard to a petitioner's request for an evidentiary hearing,

16  the District Court must assess the probative force of the newly presented evidence in connection

17  with the evidence of guilt adduced at trial. The court is not required to test the new evidence by a

18  standard appropriate for deciding a motion for summary judgment, but may consider how the

19  submission's timing and the affiants' likely credibility bear on the probable reliability of that

20  evidence.

21  The subsequent acquittal on identical evidence in Petitioner's second trial undermines

22  confidence in the outcome of the initial trial and serves as compelling evidence of innocence,

23  supporting her claim that constitutional error led to her prior conviction. Petitioner has met her

24  burden to demonstrate no reasonable juror would find her guilty beyond a reasonable doubt. See

25  *House v. Bell*, 547 U.S. 518, 536-540 (2006) (rather than requiring absolute certainty about guilt or

26  innocence, a petitioner's burden at the gateway stage is to demonstrate that more likely than not, in

27  light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt.)

28  The second jury's determination of her acquittal, despite awareness of her prior convictions,

1   highlights flaws in the first trial's process that could have been influenced by constitutional errors,

2   meriting review of the additional trial records. Therefore, Petitioner's request to expand the record

3   should have been granted to prevent a miscarriage of justice. See *Coleman v. Hardy*, 628 F.3d 314,

4   322-23 (7th Cir. 2010) (evidentiary hearing warranted to develop evidence that, "but for

5   constitutional error, no reasonable factfinder would have found [petitioner] guilty"); *Dugas v.*

6   *Coplan*, 506 F.3d 1, 7 n.4 (1st Cir. 2007) (evidentiary hearing not barred because lack of factual

7   development on petitioner's prejudice issue due to state court's decision not to reach issue, not

8   petitioner's lack of diligence); *Garner v. Lee*, 908 F.3d 845, 860 (2d Cir. 2018) (federal evidentiary

9   hearing warranted when state court did not address merits of claim); *Lambert v. Warden Greene*

10  *SCI*, 861 F.3d 459, 472-73 (3d Cir. 2017) (same); *Lee v. Kink*, 922 F.3d 772, 774-75 (7th Cir. 2019)

11  (federal evidentiary hearing warranted when state made unreasonable factual determination).

12      In addition, in denying Petitioner's request for discovery and an evidentiary hearing, the

13  magistrate erred by depriving her of essential procedural rights necessary to substantiate her claim

14  of ineffective assistance of counsel. As outlined by the Ninth Circuit in *Detrich v. Ryan*, 740 F.3d

15  1237, 1246-47 (9th Cir. 2013), when assessing ineffective assistance claims, courts must often

16  inquire directly into an attorney's reasoning for particular strategic or tactical choices.

17      Without allowing Petitioner to present evidence in a hearing, the court has effectively

18  precluded a thorough examination of whether her trial counsel's conduct impacted the trial's

19  outcome, a direct violation of her right to counsel. By refusing Petitioner's requests, the magistrate

20  has denied Petitioner the opportunity to establish her claims fully, infringing upon her fundamental

21  due process rights.

22                          **CONCLUSION**

23      Based on the foregoing, Petitioner respectfully requests that the Court not adopt the Report

24  and Recommendations. In the alternative, Petitioner has made a showing that reasonable jurists

25  would find the district court's assessment of the constitutional claims debatable or wrong. *Slack v.*

26  *McDaniel*, 529 U.S. 473, 484 (2000). Accordingly, a certificate of appealability should be granted.

27

28  DATED: 10/31/2024

1

2          _/s/ Xingfei Luo_
           In Pro Per

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I declare that I electronically filed the forgoing with the United States District Court, Central District of California. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

In addition, I electronically served the forgoing to the following email address:

michael.butera@doj.ca.gov

I declare under penalty of perjury under the laws of the State of California and United States of America that the foregoing is true and correct.

Executed on October 31, 2024

*/s/ XINGFEI LUO*

XINGFEI LUO, In Pro Per